## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SKYPORT GLOBAL | § | CASE NO. 08-36737-H4-11 |
| COMMUNICATIONS, INC., | § | (Chapter 11) |
| Debtor | § | |

| | | |
|---|---|---|
| Joanne Schermerhorn, John K. Waymire, Chet Gutowsky, John Llewellyn, Joseph A. Lopez, Robert Foote, BLF Partners, Ltd., ECAL Partners, Ltd, Whiz Kid Ventures, LLC, Bella Krieger, Martin Pollak, Gloster Holdings, LLC, Melvyn Reiser, Barry Klein, Yecheskel Kahan, John A. Rees, Brian W. Harle, MD, Michael Stein, Lawrence Solomon, Tracy Elstein & David Togut, Jason Charles Togut, BMT Grantor Trust, Lynn Joyce Elstein Trust, Charles Stack, Joseph Baker, Movada, Ltd., Puddy, Ltd., Draco Capital, Inc., Edward Pascal, Robert Mendel, Stanley Beraznik, Don Dui, Ben Ariano, 3790168 Canada, Inc., Peter Taylor, John E. Panneton, Wayne C. Fox, David Currie, Byron Messier, Darshan Khurana, Mateo Novelli, Diya Al-Sarraj, Sequoia Aggressive Growth Fund, Ltd., Sequoia Diversified Growth Fund, Ltd., Rig III Fund, Ltd., Aran Asset Management SA, Semper Gestion SA, and Eosphoros Asset Management, Inc., Plaintiffs | § § § § § § § § § § § § § § § § § § § § § § | |
| vs. | § § | ADVERSARY NO. 10-3150 |
| CenturyTel, Inc. (a/k/a CenturyLink), Clarence Marshall, R. Stewart Ewing, Jr., Michael E. Maslowski, Harvey P. Perry, Robert Kubbernus, Balaton Group, Inc., Bankton Financial Corporation, Bankton Financial Corporation, LLC, ClearSky Management, Inc., Wilson Vukelich, LLP, and ClearSky Investments, LP, Defendants | § § § § § § § § | |

## MOTION TO DISMISS, OR, ALTERNATIVELY,
## FOR SUMMARY JUDGMENT, AND FOR SANCTIONS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND

THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.
REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above-captioned Defendants,[1] being insiders and released professionals of the reorganized Debtor, SkyPort Global Communications, Inc. ("Debtor" or "SkyPort"), hereby move this Court, pursuant to 11 U.S.C. §§ 105, 524, and 1141(d) and Bankruptcy Rules 7012 and 7056, for an order dismissing the present proceeding (or granting summary judgment) and an award of damages against Plaintiffs for violating the Confirmation Order. The grounds for this motion are as follows:

---

[1]  Except Wilson Vukelich, LLP, which is a Canadian law firm doing business in Canada. Movants of this Motion are CenturyTel, Inc. (a/k/a CenturyLink), Clarence Marshall, R. Stewart Ewing, Jr., Michael E. Maslowski, Harvey P. Perry, Robert Kubbernus, Balaton Group, Inc., Bankton Financial Corporation, Bankton Financial Corporation, LLC, ClearSky Management, Inc. and ClearSky Investments, LP.

# Table of Contents

SUMMARY OF DISPUTE ......................................................................... 4

    *Confirmation Order is Being Collaterally Attacked by Parties Who Had Notice.* ............... 4
    *Plaintiffs are Violating the Confirmation Order Injunction.* ....................................... 5
    *ClearSky Should Be Dismissed.* ............................................................... 7

JURISDICTION AND VENUE ....................................................................... 8

FACTUAL BACKGROUND ........................................................................... 9

CHAPTER 11 BANKRUPTCY ....................................................................... 13

NOTICE WAS GIVEN TO THE EQUITY INTEREST HOLDERS OF SKYCOMM ..................................... 14

    *Listed from Inception as Debtor's "Equity Interest Holders" [docket #43].* ..................... 14
    *Disclosure Statement—"Interests (after Merger with SkyComm) receive nothing."* .......... 14
    *Disclosure Statement Explained Merger and Approved Under § 1125.* ............................ 15

DRACO CAPITAL OBJECTS TO MERGER AND DISCHARGE OF CLAIMS ..................................... 16

    *Draco Loses at Trial.* ......................................................................... 17
    *Draco Consents to Merger and Release with an Exception for the ClearSky Claim.* ......... 17

CONFIRMATION ORDER EFFECTS MERGER AND DISCHARGE ............................................. 17

PLAN OF REORGANIZATION BECOMES FINAL ....................................................... 19

PLAINTIFFS' PETITION ATTACKS CONFIRMATION OF THE PLAN AND MERGER ............................ 21

PLAINTIFFS' PETITION SEEKS TO CONTROL THE DEBTOR ON ACCOUNT OF CANCELED SHARES .... 23

PLAINTIFFS' PETITION IS A DISCHARGED DERIVATIVE ACTION ..................................... 24

    *Injury to SkyPort Alleged.* .................................................................... 24
    *"Disclaimers" Show Bad Faith.* ............................................................... 25
    *Plaintiffs Use "SkyComm" to Describe Discharged SkyPort Claims.* .............................. 26
    *Plaintiffs Assert a Laundry List of Derivative Claims.* ......................................... 27

LEGAL AUTHORITY ............................................................................. 29

    *Discharge of These Claims in a Bankruptcy Plan is Effective.* .................................. 29
    *Plaintiffs Lack Standing to Pursue Derivative Claims.* .......................................... 30
    *The Derivative Claims are Vested in SkyPort, the Reorganized Debtor.* ........................... 32
    *Plaintiffs' Lack Standing to Bring this Derivative Action.* ..................................... 34

RULE 12(B)(6) STANDARD IS MET FOR ALL CLAIMS EXCEPT DRACO/CLEARSKY ........................ 35

The *Dexterity Surgical* Decision is Factually Similar ................................................ 36

SUMMARY JUDGMENT IS APPROPRIATE AND THE STANDARD IS MET ...................................... 38

REQUEST FOR JUDICIAL NOTICE OF DOCKET AND PROCEEDINGS ........................................ 39

DISMISSAL COMPORTS WITH PUBLIC POLICY ....................................................... 40

SANCTIONS SHOULD BE AWARDED AGAINST PLAINTIFFS ............................................... 41

M̲OTION TO D̲ISMISS THE D̲RACO/C̲LEAR S̲KY C̲LAIMS ..................................................... 43

    *FRCP 12(b)(3)—Dismissal for Improper Venue.* ............................................... 43

C̲ONCLUSION.......................................................................................................... 44

## S̲UMMARY OF D̲ISPUTE

*Confirmation Order is Being Collaterally Attacked by Parties Who Had Notice.*

1.    This Court entered a Confirmation Order [docket #340, main case[2]] in the above-named Bankruptcy Case, after notice to all affected parties (including Plaintiffs),[3] that (a) merged SkyComm Technologies Corporation ("S̲kyComm") into the Debtor (its wholly owned subsidiary) and cancelled the Debtor's shares,[4] and (b) released all insiders from liability and derivative claims.[5]

2.    One year later, Plaintiffs (former shareholders who had notice of the Bankruptcy Case) sued SkyPort's insiders in a 111-page derivative petition (the "P̲etition").[6] Draco Capital, one of the named Plaintiffs ("D̲raco"), had even objected to confirmation because its claims would be released and it disagreed with the merger. The Court held a trial. Draco lost. The Court eventually confirmed the Plan with the carve-out of Draco's non-derivative claim against

---

[2]    All references in this Motion to "docket #" are to docket numbers in the main bankruptcy case (No. 08-36737).

[3]    Some Plaintiffs claim they received no notice, but docket #43 (filed in November 2008) is the Debtor's notice of equity interest holders listing most, if not all, of the Plaintiffs. Thus, the Clerk and Debtor repeatedly served these parties during the case. Plaintiffs had notice. The Petition ¶ 262 admits notice of the bankruptcy by most Plaintiffs: "The existence and identity of [recent stockholders] did not become known to SkyComm's Original Shareholders until late 2008 when Balaton [sic] listed them as shareholders in a second SkyPort Bankruptcy filing . . . ."

[4]    Plan at 6.3; Final Disclosure Statement [docket #264] at 21: "Because the Holders of Interests (after Merger with SkyComm) receive nothing on account of its interests, they are deemed to reject the plan and not entitled to vote."; Confirmation Order at 10: "Specifically, the merger of SkyComm into Skyport is approved such that Skyport will be the surviving entity."

[5]    Plan at 13.7 and 13.8.

[6]    Cause No. 2010-09675, *Joanne Schermerhorn, et al. v. CenturyTel, Inc., et al.*, In the 113th Judicial District Court, Harris County, Texas, which case has recently been removed to this Court.

ClearSky from the releases.[7]  All other derivative claims were released, the merger occurred, and the shares of the Debtor were cancelled.

3.      The Petition, on its face, seeks to place SkyPort under the control of its former shareholders and reverse the Confirmation Order.  Plaintiffs claim that this Court's order was "based on false testimony" and "fraudulently using the plan."[8]  The Confirmation Order effected the SkyComm/SkyPort merger, cancelled the equity interests, and stated that equity interests "shall receive the distributions provided for in this Plan, if any, in full settlement and satisfaction of all . . . such Interests."[9]  Plaintiffs, however, repeatedly seek "*an order appointing a provisional director, trustee, managing agent, fiscal agent or other court appointed fiduciary for SkyComm and SkyPort*."[10]  That relief directly violates the Confirmation Order's cancellation of the Equity Interests.  The direct challenge to this Court's Confirmation Order puts this dispute squarely within this Court's jurisdiction.

*Plaintiffs are Violating the Confirmation Order Injunction.*

4.      The bulk of the 111-page Petition[11] alleges injuries to SkyPort, bad management of SkyPort, and decreased value of SkyPort shares.[12]  The standard for determining whether a cause of action is a direct claim or derivative claim focuses on the following: who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive

---

[7]   With Draco's written agreement, the Plan was modified to exclude Draco's direct claim against a non-debtor, ClearSky, for return of monies invested with that entity.  That claim is not a subject of this Motion.  That claim was a direct claim buried in more than 100+ pages of derivative claims.

[8]   Petition at 60-63.

[9]   Plan at 13.2.

[10]   Petition at 72 and 81.

[11]   Again, all claims are derivative and/or released except the direct claim by Draco against ClearSky for return of money invested with ClearSky, which was expressly not released.

[12]   As SkyComm was merged into SkyPort with the resulting entity being SkyPort, there is no "SkyComm" to seek relief against, only the reorganized Debtor, SkyPort.

the benefit of the recovery or other remedy (*i.e.*, the "*Tooley Standard*" as enunciated in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc., et al.*, 845 A.2d 1031, 1035 (Del. 2004) and applied by the Southern District of Texas in *In re Dexterity Surgical, Inc.*, 365 B.R. 690, 695–702 (Bankr. S.D. Tex. 2007)).

5.     Plaintiffs allege injuries based on harm to the merged Debtor.[13]  The gravamen appears to be an alleged misuse of corporate money and director's power.  Per the Plaintiffs' own colorful language in the petition, it was the company (and derivative share values) that was injured.   The company was "looted,"[14] and "mismanaged,"[15] and the shareholders suffered derivative injury by "loss by Plaintiffs of the entire value of their interests,"[16] or they were "diluted."[17]  *Accord In re Dexterity Surgical, Inc.*, 365 B.R. at 697–98 ("The Court notes that there is a recurring theme in Plaintiffs' allegations . . . Dexterity suffered injury.").

6.     Under the Confirmation Order, derivative claims were explicitly released by the merged Debtor and SkyComm's equity interests were cancelled.  To the extent the claims were not released, they re-vested in the reorganized SkyPort.  Plaintiffs (or most of them) were aware of the bankruptcy, had the opportunity to file an objection to the merger or release of claims, and failed to object.  The one Plaintiff who did object, Draco, eventually consented to the merger and releases (as modified to exclude the ClearSky claims).

---

[13]   Plaintiffs apparently use "SkyComm" and "SkyPort" nearly interchangeably in an effort to confound the two. After confirmation of the Plan, there was no "SkyComm," as that entity had been merged with SkyPort and SkyPort's shares were cancelled.   Thus, all discussion of "SkyComm" involves SkyPort.   Likewise, SkyComm's only duty was to hold SkyPort's stock, so the allegations of mismanagement are necessarily complaints about management of SkyPort.

[14]   Petition ¶¶ 5, 347(k).

[15]   Petition ¶ 129.

[16]   Petition ¶ 7.

[17]   Petition ¶¶ 232, 237, 278.

7.     Plaintiffs' Petition violates the letter of the Plan, which cancelled all interests in SkyComm, merged the entities and discharged claims:

> 6.3     Merger.  The Debtor is a wholly owned subsidiary of SkyComm. The only asset of SkyComm is the Debtor and the only liability of SkyComm is to CenturyTel.  SkyComm is a Delaware corporation. Pursuant to Delaware law, SkyComm (the parent company) will merge into the Debtor (the wholly owned subsidiary).  The merger will be accomplished by the vote of Balaton as shareholder of SkyComm.  **Once merged, the Debtor's equity interests (formerly SkyComm's equity holders) will be cancelled and shares of the Reorganized Debtor re-issued in exchange for the Claims of Balaton.**

Plan at 6.3 (emphasis added).

> **All Holders of Claims shall be prohibited from asserting against the Debtor, Reorganized Debtor, Balaton or Insider Released Parties (defined infra) or any of their assets or properties, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not such Holder filed a proof of Claim. . . .**

Plan at 13.5 (emphasis in original).

8.     Now, the holders of cancelled equity interests holding (at best) discharged claims (i.e., Plaintiffs) seek to obtain control of the Debtor.  Under the Confirmation Order, holders of these claims are enjoined.  Moreover, Plaintiffs were aware of the discharge and failed to object. *Republic Supply Co. v. Shoaf,* 815 F.2d 1046, 1051 (5th Cir. 1987) (failure of a party to object to a release in a plan, even if an illegal release, constitutes *res judicata*).

*ClearSky Should Be Dismissed.*

9.     The dispute between Draco and the ClearSky Entities[18] is a direct dispute between Canadians suing Delaware entities derivatively over money paid in Canada.  The parties' Delaware Partnership Agreement says Delaware law controls.  The ClearSky Entities took no

---

[18]   ClearSky Management, Inc. and ClearSky Investments, LP.

action in Texas.  There is no nexus with Texas.  In point of fact, Plaintiffs state about ClearSky, "Defendant ClearSky is named as a nominal defendant in this action because of the derivative claims asserted in its behalf by the ClearSky Investors."[19]  Obviously that part of Plaintiffs' case belongs in either Canada or Delaware Chancery Court.  The alleged claims are in an inconvenient forum and this Court (or, for that matter, any Texas court) lacks *in personam* and subject matter jurisdiction over the ClearSky/Draco dispute.

10.     For the grounds shown herein, Defendants seek to dismiss Plaintiffs' Petition, seek a hearing on sanctions, and seek to enforce the Court's Confirmation Order.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This Court retains post-confirmation jurisdiction to enforce the bankruptcy discharge. The Confirmation Order [docket #340] retained the jurisdiction of this Court for disputes exactly like the present one:

> This Court retains jurisdiction (i) to enforce and implement the terms and provisions of the Plan and this Order, all amendments thereto, any waivers and consents herein provided, and any agreements executed in connection herewith, (ii) to resolve any disputes arising under or related to this Order or the Plan, and (iii) to interpret, implement and enforce the provisions of this Order.

Confirmation Order at 11.

12.     Likewise, the Plan confirmed that this Court retains jurisdiction to enforce the releases contained therein:

> 12.1    Notwithstanding entry of the Confirmation Order or the Effective Date having occurred, the Bankruptcy Court shall retain exclusive jurisdiction of this case after the Confirmation Date with respect to the following matters:

---

[19]    Petition ¶ 75.

* * *

12.1.3  To resolve controversies and disputes regarding the interpretation  and implementation of the Plan, including entering orders to aid, interpret or enforce the Plan and to protect the Debtor and any other entity having rights under the Plan as may be necessary to implement the Plan;

* * *

12.1.11  To enforce and to determine actions and disputes concerning the releases contemplated by the Plan and to require persons holding Claims being released to release Claims in compliance with the Plan;

Plan at 19–20.

13.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B), (C), (L) or (O). Venue of the Debtor's Chapter 11 case is proper in this District pursuant to 28 U.S.C. §§ 1408(1) and (2).  This adversary proceeding arises under a case under Title XI.  Alternatively, it is related to a case under Title XI.

## FACTUAL BACKGROUND[20]

14.    SkyPort Global Communications, Inc. ("Debtor") operates a world-wide satellite communications facility from the Ellington Joint Reserve Base in Houston, Texas.  The Debtor's hardened, windowless facility was built in 2002 to 2003 and consists of a network operations center and with various satellite communications antennas, fiber-optic internet connections, and a staff trained in the highly specialized business of mission critical satellite communications equipment and managed services.  The building is designed to provide communications that are entirely secure and that work when others will not.  The satellite communication system can

---

[20]    The Factual Background can also be found in the Final Disclosure Statement and was approved by the Court under 11 U.S.C. § 1125.

provide secure voice and data in extremely remote areas and in areas damaged by natural disaster.

15.     The Debtor's business consists of buying satellite and terrestrial bandwidth directly from major satellite companies and terrestrial providers and then integrating this capacity with appropriate equipment, software and services to provide voice, data and internet services processed through the network operations center.  For instance, the Debtor may purchase a certain amount of transponder capacity operated by satellite company <u>A</u> that services North America and another amount of transponder capacity of a satellite owned by satellite company <u>B</u>, a satellite that services Africa.  The Debtor owns equipment to connect the satellite signals to the internet and to terrestrial land-lines.

16.     The Debtor does not usually provide "retail" service to an end-user, unless the end-user is a large corporation or government entity with the need for an always-on satellite communications system connecting multiple facilities.  Smaller communications companies often re-sell access the Debtor's bandwidth to end-users.  The Debtor holds several key licenses issued by the U.S. Federal Communications Commission ("FCC").  The FCC licenses are vital to the Debtor's business, but have no cognizable value.

17.     The Debtor is capable of providing, and has historically provided, communications for private entities, governmental agencies, and the National Guard Bureau and numerous State National Guard units.

18.     Establishing a satellite network operations center is cost-intensive.  Originally, CenturyTel (a publicly-traded communications company) offered several tranches of convertible debentures secured by the Debtor's assets.  Those offerings were made at various times between 2001 and 2005.  These debenture offerings provided nearly $24 Million in senior, convertible

secured financing to the Debtor.  Yet, the Debtor was not able to reach positive cash flow.  In 2007, the majority of CenturyTel's debentures were converted to equity, leaving approximately $2.2 Million unconverted.

19.     Balaton Group Inc. ("Balaton," an insider Canadian entity) also invested millions in the Debtor, mostly as equity and a significant amount as unsecured debt.

20.     Aegis Texas Venture Fund, L.P. is a hedge fund that invests for, among other things, the State of Texas.  Aegis provided $2.25 Million in financing to the debtor, also secured by a lien on the Debtor's personalty.  Balaton subordinated all of its debt to Aegis.

21.     In 2005, CenturyTel made the decision to end its investment in SkyPort and forced management to either sell or close the business.  It was at this time that management sought out Balaton for additional investment capital.  In 2005, SkyPort's board of directors placed the company into Chapter 11 due to the lack of continued financial support from CenturyTel.  Balaton—along with SkyPort's management—designed a plan to acquire the company from CenturyTel in a structured transaction which would allow the company to emerge from Chapter 11 and deal with its legacy accounts appropriately.  There was no confirmed "plan of reorganization."  Instead, the bankruptcy was dismissed by mutual agreement in March of 2006.

22.     In August 2006, the FCC granted final approval for the restructuring transaction placing Balaton as the chief shareholder of SkyPort (or SkyComm, the 100% shareholder of Skyport).  Due to the technical complexity of the SkyPort business, Balaton kept the current management and technical staff in place.  This continued until May 2007 at which time a decision was made by the SkyPort board to replace the existing executive lineup with a seasoned

satellite communications team located in Reston, Virginia.  The board and Balaton expected the new management to focus on increasing sales and profit margins.

23.     During this period, SkyPort garnered such prestigious awards as the National Guard's "Minuteman Award" for delivering unprecedented services during Hurricanes Katrina and Rita, World Teleport Association's 2004 Teleport of the Year and WTA's 2006 Fastest Growing Teleport.

24.     With new management in place and a very frothy financial market, the Debtor planned to acquire multiple smaller service providers in the same field.  The theory was simple for a boom economy.   The infrastructure of SkyPort required a certain level of revenue to support its cost structure, and through acquisition, the company could fill this capability quickly.  Once "critical mass" was obtained, additional revenue would flow to the bottom line and profitability could increase to the goal of EBITDA at 30% of Revenue.  The theory was solid—assuming the creditors and capital markets would continue to tolerate negative cash flow.  They did not.

25.     By mid 2007 the capital markets began to slip.  SkyPort had entered into an acquisition agreement with an organization preparing for a major Initial Public Offering ("IPO") in first half of 2007.  SkyPort's management team had spent millions of dollars in corporate costs to participate in an industry-wide consolidation along with its acquirer.  Financial sponsors for the IPO's strategy withdrew.  The IPO was shelved.

26.     During the fall of 2008, management fell behind on trade accounts—putting the company in default with its suppliers and at risk of losing service.  Specifically, the Debtor's chief satellite provider was Intelsat—a supplier who sold service at a high price and required capacity that the Debtor could not re-sell.  Prior to bankruptcy, Intelsat threatened to terminate

service for non-payment.  Such a termination would have put not only the Debtor at risk, but also its customers, who, in many instances relied completely on SkyPort for communication services. Thus, the board placed SkyPort into Chapter 11 in order to prevent the termination of the Intelsat service while transitioning over to a new contract with significant savings (in price-per megabyte and in total capacity) and to develop a plan to make the company cash flow positive.

27.     In late October 2008, a major satellite provider (Intelsat) threatened to terminate service of the Debtor immediately.  Skyport filed bankruptcy on October 24, 2008.

### CHAPTER 11 BANKRUPTCY

28.     On the bankruptcy date, SkyPort had two principal secured creditors: (a) Aegis Texas Venture Fund ("Aegis"), which was owed $2.5 Million, and (b) CenturyTel, which was owed $2.7 Million.  Initially, there was a dispute between Aegis and CenturyTel over the validity and priority of their respective liens.

29.     In November 2008, SkyPort's management team was released and the largest shareholder—Balaton[21]—took over management of SkyPort.  Robert Kubbernus, Balaton's CEO, took the position of CEO for SkyPort and immediately put in place a number of key strategies and individuals to turn the company around.  Operations were consolidated and the company began concentrating on positive cash flow.  Mr. Kubbernus, formerly a resident of Toronto, moved to Texas to be closer to the SkyPort facilities and operations.

30.     Likewise, the Debtor lacked money to operate.  No other lender was available and so Balaton became the Debtor-in-Possession Lender (DIP Lender).  The DIP loan was approved by this Court's order [docket #32, amended by docket #99].  Balaton was, according to the Court's final order, acting in good faith.

---

[21]     Balaton was a 58% shareholder of SkyComm, which owned 100% of SkyPort.

31.     On May 22, 2009, the Debtor proposed its Chapter 11 Plan of Reorganization [docket #223] (the "Plan").

32.     On July 9, 2009, the First Amended Disclosure Statement was approved.

33.     On July 10, 2009, the Disclosure Statement, Plan, and Ballots were mailed to all creditors and stockholders in SkyComm,[22] who had until August 4, 2009, to vote to accept or reject the Plan.

### NOTICE WAS GIVEN TO THE EQUITY INTEREST HOLDERS OF SKYCOMM

*Listed from Inception as Debtor's "Equity Interest Holders" [docket #43].*

34.     On November 20, 2008, the Debtor filed its list of equity security holders [docket #43], placing all known shareholders of SkyComm (the 100% owner of SkyPort) on the list and notifying those shareholders of the Bankruptcy Case from its inception.  A copy of docket #43 is attached as **Exhibit A**.  Plaintiffs (virtually all of them) are on that list.

35.     As mentioned above, the Clerk sent notice of the Plan and Disclosure Statement to the equity interest holders in SkyComm.[23]  The Certificate of Notice was filed at docket #270. Likewise, the Debtor also served the SkyComm interest holders before the Plan was confirmed [docket #268].

*Disclosure Statements—"Interests (after Merger with SkyComm) receive nothing."*

36.     On May 22, 2009, the Debtor filed its Initial Disclosure Statement [docket #222] and in that Statement explicitly explained the Merger with SkyComm and that equity interests

---

[22]   Docket #270.

[23]   Three equity interest holders did not have addresses.  None of them are Plaintiffs.

would receive nothing, "Because the Holders of Interests (after Merger with SkyComm) receive nothing on account of its interests, they are deemed to reject the plan and not entitled to vote."[24]

37.     Further, the Disclosure Statements explained that the equity interest holders' rights were terminated.

> Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

Initial Disclosure Statement at 18; Final Disclosure Statement at 19.

38.     The Disclosure Statements also explained that Balaton would receive releases and the old equity would be cancelled:

> [I]n exchange for the voluntary subordination of its DIP Claim and release of all other Claims, and in exchange for any other funds provided, Balaton group receives releases and indemnifications, the right to 100% of the New Common Stock in the Reorganized Debtor, and old equity interests of the Debtor are cancelled.

Initial Disclosure Statement at 18; Final Disclosure Statement at 20.

### *Disclosure Statements Explained Merger and Approved Under § 1125.*

39.     The Disclosure Statements explained in detail how the merger with SkyComm would be accomplished and that SkyComm's equity interests would have no appraisal rights:

> While shareholders would normally have the right to dissent and seek a fair appraisal for their shares of a merger, a merger of a parent into the subsidiary and a subsidiary into the parent is exempt from this appraisal rights, so long as (as here) 100% of the shares of SkyPort are owned by SkyComm. By vote of the majority shareholder, SkyPort and SkyComm will have identical bylaws and Articles of Incorporation prior to the merger.

---

[24]   Docket #222 at p. 19.  Also, the final version of the Disclosure Statement [docket #264] contained this language on page 21.

Initial Disclosure Statement at 19; Final Disclosure Statement at 20.

40.     The vast majority of Plaintiffs received the Initial Disclosure Statement from the Debtor [docket #230].  The Initial Disclosure Statement was amended to address objections and approved by this Court, as amended, by docket #265.  The approved Final Disclosure Statement was also sent to virtually all Plaintiffs, either by the Clerk [docket #270] or the Debtor [docket #268].

41.     The Clerk's office served the final Plan and Confirmation Order on Plaintiffs [docket #342].  The Order was never appealed or challenged.

## DRACO OBJECTS TO MERGER AND DISCHARGE OF CLAIMS

42.     On the eve of confirmation, Draco sought to shorten the exclusivity period and objected to the Debtor's Plan.[25]  Among the various reasons for seeking to deny confirmation of the Plan was that the Plan was "attempting a de facto substantive consolidation of a debtor entity with a non-debtor entity, and instantaneously wipes out the equity interests of the non-debtor shareholders."[26]

43.     Draco specifically explained that SkyComm shareholders would lose their investment:

> As described in Draco's filings, the most recent plan seeks to strip the equity holders of Clear Sky, a non-party to this Bankruptcy Case, of their investment through the use of the Bankruptcy Code while conducting a merger that fails to meet the legal requirements of Delaware law.

Motion to Terminate Exclusivity [docket #305] at 5.

---

[25]   Docket ##293 and 299 (objections to confirmation) and Docket #305 (terminate exclusivity).

[26]   Docket #293 at 1.

*Draco Loses at Trial*.

44.     Thereafter, the Court conducted a trial on the motions, and the Debtor objected to Draco's standing.  Draco was represented by counsel and its principal, Adrien Pouliot, testified at the trial.  Counsel for Draco noted that the collapse of SkyComm into SkyPort and release of SkyPort claims would release all SkyComm claims:

> I believe that the plan, as currently drafted with the exculpation provisions the effect of the releases in light of the collapse it proposed, actually will have the impact of basically being a third-party release.

(Confirmation Hr'g Tr. [docket #351] at 173, Aug. 7, 2009).

*Draco Consents to Merger and Release with an Exception for the ClearSky Claim*.

45.     At the hearing, the Debtor stated that the direct claim related to ClearSky between Draco on one hand and Balaton, Mr. Kubbernus and ClearSky on the other, would not be released.  The Confirmation Order was amended to explicitly restrict the release of the ClearSky-related claim as to Draco.   Draco then consented to the Plan with the merger and release language contained therein.

### CONFIRMATION ORDER EFFECTS MERGER AND DISCHARGE

46.     With Draco's consent, the Court entered the Confirmation Order, effectuating the merger of SkyComm and SkyPort and entering broad releases and injunctions to suit.   The Confirmation Order stated, in relevant part:

> **Except as provided in the Plan or this Order, as of the Confirmation Date, all entities which have held, currently hold or may hold a claim or other debt or liability against the Debtor that is discharged are permanently enjoined from taking any of the following actions on account of such discharged claims, debts or liabilities or terminated interests or rights: (i) commencing or continuing in any manner, any action or other proceeding against the Debtor or its properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or other award against the Debtor or its**

> **properties; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtor or its properties; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or its properties; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan.**

Confirmation Order at 8 (emphasis in original).

47.     The Confirmation Order further provided for (a) the release of all derivative claims against directors, and (b) the elimination of rights of the holders of equity interests:

> 32.   Except as expressly set forth in the Modification, pursuant to Section 13.7 of the Plan, **all officers, directors and professionals of the Debtor are hereby released from any and all causes of action held by the Debtor**.  Notwithstanding anything else contained herein, or in the Plan, the releases contained in Section 13.7 of the Plan and approved hereby shall not act to release any claims or causes of action held by Draco Capital, Inc., Clear Sky Management, Inc., Clear Sky Investments, L.P, their investors, partners or affiliates against any person or entity other than the Debtor and the Reorganized Debtor.

> 33.   All rights of the holders of claims or interests of all classes under the Plan, including, without limitation, the right to receive distributions on account of such Claims or interests, shall hereinafter be limited solely to the right to receive such distributions exclusively as provided in the Plan, and, to the extent applicable, the provisions of this Order.  After the date hereof, the holders of such claims or interests shall have no other or further rights against the Debtor except as provided for in the Plan and this Order.

Confirmation Order at 9 (emphasis added).

48.     The Confirmation Order also effectuates the merger between SkyPort and SkyComm, leaving only the Debtor as the successor, "Specifically, the merger of Skycomm into Skyport is approved such that Skyport will be the surviving entity."[27]

49.     The Confirmation Order further stated that it was incorporating the Plan:

> 36.   The failure specifically to include any particular provisions of the Plan in this Order shall not diminish or impair the efficiency of such

---

[27]   Confirmation Order [docket #340] at 10.

provision, it being the intent of the Court that the Plan be authorized and approved in its entirety.

Confirmation Order at 10.

## P<small>LAN OF</small> R<small>EORGANIZATION</small> B<small>ECOMES</small> F<small>INAL</small>

50.     The Plan, as mentioned above, merged SkyComm into SkyPort and cancelled all equity interests and discharged all claims.  The equity interests were cancelled in the Plan, a fact repeated in several different places:

> 4.5.2   Holders of Equity Interests shall receive no distribution or any property under the Plan on account of said Equity Interests, said Equity Interests shall be cancelled, and new common stock in the Reorganized Debtor shall be issued to Balaton, as otherwise provided for in the Plan.

Plan at 4.5.2.

> 6.3     Merger.  The Debtor is a wholly owned subsidiary of SkyComm. The only asset of SkyComm is the Debtor and the only liability of SkyComm is to CenturyTel.   SkyComm is a Delaware corporation. Pursuant to Delaware law, SkyComm (the parent company) will merge into the Debtor (the wholly owned subsidiary).   The merger will be accomplished by the vote of Balaton as shareholder of SkyComm.  Once merged, the Debtor's equity interests (formerly SkyComm's equity holders) will be cancelled and shares of the Reorganized Debtor re-issued in exchange for the Claims of Balaton.

Plan at 6.3.

51.     The Plan, of course, contained extensive releases, exculpations, and injunctions against bringing the type of suit as Plaintiffs have brought with their Petition.  First, the Plan contained a broad, general release of derivative claims:

> **13.5     Injunction.     The Confirmation Order shall include a permanent injunction prohibiting the collection of Claims in any manner other than as provided for in the Plan.  All Holders of Claims shall be prohibited from asserting against the Debtor, Reorganized Debtor, Balaton or Insider Released Parties (defined infra) or any of their assets or properties, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not such**

> **Holder filed a proof of Claim. Such prohibition shall apply whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code; or (c) the Holder of a Claim based upon such debt has accepted the Plan. This injunction also permits the Reorganized Debtor to enforce 11 U.S.C. §525(a) upon improper revocation or restriction of licenses.**

Plan at 13.5 (emphasis in original).

52.     Next, the Plan contained a specific release for Mr. Kubbernus and Balaton that reached back to the beginning of time and released all claims through confirmation:

> 13.7     Releases. On the Effective Date and pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code, the Debtor, and to the maximum extent provided by law, its agents, release and forever discharge all claims, including acts taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into or any other act taken or entitled to be taken in connection with the Plan or this case against the following, whether known or unknown:
>
> 13.7.1   Robert Kubbernus and Balaton Group, Inc. ("Insider Released Parties"), in connection with any and all claims and causes of action arising on or before the Confirmation Date that may be asserted by or on behalf of the Debtor or the Bankruptcy Estate and/or on account of the Debtor's Case.
>
> 13.7.2 The release of these Insider Released Parties shall be conditioned upon the occurrence of the Effective Date.

Plan at 13.7 (emphasis added).

53.     Further, the Plan contained additional release language releasing the Debtor and insiders from all liability arising out of the Plan and the merger associated therewith:

> 13.8     Exculpation. Neither the Debtor, the Insider Released Parties, nor any of their respective present members, officers, directors, or employees shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission (specifically including negligence and gross negligence) in connection with, relating to, or arising out of the Chapter 11 Case, the formulation, negotiation, or implementation of the

> Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions not otherwise released and which are the result of fraud or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Plan at 13.8 (underline added, original was entirely in boldface).

54.     The Confirmation Order was not appealed, and the Plan was consummated. Money was disbursed and the reorganized Debtor has been operating under the Plan for nearly a year.   The Court has not yet been asked to vacate the Confirmation Order.   Indeed, nothing challenging the releases or confirmation has been raised to this Court.

### PLAINTIFFS' PETITION ATTACKS CONFIRMATION OF THE PLAN AND MERGER

55.     On or about February 12, 2010, Plaintiffs filed suit against Balaton, Kubbernus, CenturyTel and related parties.[28]   No advance notice was given of the Petition and no demand letter was sent.

56.     In the instant Bankruptcy Case, in August of last year, the Court heard arguments that ClearSky was not entitled to SkyComm shares if there were less than $10 Million raised. The Court found that investors in ClearSky, specifically Draco, were not shareholders of SkyComm:

> **[By the Court]** Exhibit 1 of Draco says the maximum proceeds of this offering, if completed, will support the acquisition and restructuring of SkyCom and SkyPort by the partnership, **and to the extent words are supposed to mean something, and I think they are, the word says, the phrase says "if completed"** which suggests to me, just like going back to the language in the partnership agreement, it says, If you produce $10 million in cash, you're going to get stock, which impliedly says to me, if you don't, then you're not going to get stock, unless there's some other provision in this thing that says you are going to get stock.

---

[28]   Plaintiffs also sued an unrelated Canadian law firm for reasons that are unclear at best and frivolous at worst.

(Trial Tr. [docket #351] at 165, Aug. 7, 2009 (ruling) (emphasis added)).

57.     Yet, in their Petition, Plaintiffs seek to re-try that issue and claim that the testimony was false and this Court's decision was wrong:

> Kubbernus deceitfully and falsely testified [in the Bankruptcy Court] that under the ClearSky IM, if ClearSky did not raise $10 million, Balaton had no Obligation to turn over **any** interest in SkyComm to ClearSky.

Petition at 60 (emphasis in original).

58.     Also in their Petition, Plaintiffs attack the legitimacy of the Plan, this Court's ordered merger in the Confirmation Order, and the cancellation of the shares as improper, fraudulent and a breach of duty:

> As a result of their blatantly false representations and unconscionable breach of their fiduciary duties to the shareholders of SkyComm and ClearSky, Balaton and Kubbernus were able to eliminate all other shareholders in SkyComm and secure 100% of the equity in SkyComm and SkyPort for themselves in the Bankruptcy proceeding and CenturyTel was able to secure the survival of the debt Balaton owed it.
>
> CenturyTel acquiesced and cooperated with Balaton's and Kubbernus' plan, even though it knew that Kubbernus and Balaton were wrongfully and fraudulently using the plan to deprive the SkyComm shareholders of their interests in SkyComm.

Petition at 62–63.

59.     These allegations of "blatantly false" testimony and "fraudulently using the plan" were never raised to <u>this</u> Court.  If the claims had any merit, one would assume that they would be addressed to the Bankruptcy Court.

60.     Plaintiffs also allege in their Petition that the Disclosure Statement was false and that the testimony given to this Court was perjurious:

> **[of the disclosure statement]** Balaton and Kubbernus falsely represented that under Delaware law, Balaton as purportedly the majority owner of the equity in SkyComm, had the legal right to approve a merger of SkyComm

into its subsidiary, SkyCom. Without a shareholders' vote and without granting appraisal rights to the non-assenting shareholders;

Balaton and Kubbernus falsely represented that by consummating this merger, they could effectively wipe out the share interests of the other SkyComm shareholders, even thought SkyComm was not a debtor in the bankruptcy case.

* * *

[of CenturyTel] CenturyTel made numerous false representations in the Chapter 11 case, CenturyTel asserting that it held a secured claim of approximately $2,700,000 against SkyPort, alleging that $2,500,000 of the SkyComm debentures it had held had never been cancelled and that accumulated interest had brought this debt to $2,700,000.

SkyPort did not have a debt outstanding to CenturyTel, rather Balaton did.

SkyPort did not have any debts outstanding to Balaton; rather Balaton and Kubbernus had misappropriated millions of dollars of SkyComm and investor funds.

Petition at 60.

61.     These allegations are alarming and ought to be addressed to this Court, not the State Court.  The State Court is powerless to grant any remedy to Plaintiffs for these alleged wrongs.  Indeed, those causes of action were released by Paragraph 13.8 of the Plan and barred by the Confirmation Order.

62.     Of course, Plaintiffs' allegations are less than accurate and this Court is aware of their absurdity.  Hence, the suit was brought in State Court before a judge unaware of the rigorous examination and trial on the confirmation issues.   Plaintiffs have engaged in gamesmanship to obtain a second attempt to challenge the bankruptcy reorganization.

## PLAINTIFFS' PETITION SEEKS TO CONTROL THE DEBTOR ON ACCOUNT OF CANCELED SHARES

63.     The Confirmation Order vested the reorganized (and merged) Debtor with all estate property and the ability to govern itself without concern to former shareholders, whose shares were cancelled by the Court's Order.

64.     Yet, Plaintiffs seek "*an order appointing a provisional director, trustee, managing agent, fiscal agent or other court appointed fiduciary for SkyComm and SkyPort.*"[29] That relief directly violates the Confirmation Order's cancellation of the equity interests of Plaintiffs, who knew of the Bankruptcy Case and, in at least one instance (Draco), objected.

65.     That relief would reverse the Court's Confirmation Order, undo the merger, and remove the Debtor's officers, whose actions were discharged.   The Court should consider Plaintiff's Petition a direct assault on the Chapter 11 proceeding.

### PLAINTIFFS' PETITION IS A DISCHARGED DERIVATIVE ACTION

66.     Plaintiffs have sued insiders of SkyPort (who also held board positions on the merged parent, SkyComm) for actions related to SkyPort's operations.   For instance, SkyPort, not SkyComm, has FCC licenses.   SkyPort, not SkyComm, had operations.   The non-CenturyTel Directors of SkyPort (not SkyComm) complained of the transfer of FCC license.

*Injury to SkyPort Alleged.*

67.     Plaintiffs' Petition alleges misuse of SkyPort by its directors, which caused an injury to SkyPort.   For instance:

> CenturyTel and the CenturyTel Directors caused SkyPort to do significant work on a variety of projects for CenturyTel, including developing a consumer satellite television broadcast system and setting up a video distribution system.   SkyPort engineers worked with CenturyTel personnel on these projects, developing systems meeting CenturyTel's requirements.
>
> SkyPort built and successfully tested prototype systems for CenturyTel, but in each instance, CenturyTel refused to proceed with the project with Skyport, and selected another vendor instead.
>
> CenturyTel refused to pay SkyPort for its work or the other expenses incurred by SkyPort in setting up the systems for CenturyTel, asserting,

---

[29]   Petition at 72 and 81.

through the CenturyTel Directors, that since it was providing all of SkyPort's funding anyway, it should not have to pay for its services.

Petition ¶¶ 111–13.

68.     Plaintiffs also allege that <u>SkyPort</u> operated without necessary FCC approval and that the CenturyTel directors injured minority shareholders by doing so.[30]  The directors involved were necessarily SkyPort directors exercising their duties for SkyPort, "The CenturyTel Defendants caused SkyPort to file the 2006 Transfer Applications . . . over the objections of the Non-CenturyTel Defendants."  Petition ¶ 197.

69.     Plaintiffs fail to mention that the FCC has approved Balaton and Mr. Kubbernus and consented to the current structure of SkyPort.  Plaintiffs further fail to mention that the sum total paid to the FCC by SkyPort or Balaton for a regulatory fine is $3,000.  In any case, any injury for SkyPort's operating in violation of regulations was an injury to SkyPort and is a derivative claim.

### *"Disclaimers" Show Bad Faith*.

70.     Plaintiffs are aware that they are pursuing discharged claims in violation of the discharge injunction and in violation of Rule 11.  Accordingly, Plaintiffs put two feckless disclaimers in the middle of their Petition:

> The allegations in this petition, are except as noted as to a particular plaintiff, made upon information and belief.  Plaintiffs do not have access to many of the documents relevant to this case.

Petition ¶ 9.

> This Petition does not allege a derivative action on behalf of SkyComm or SkyPort.  Plaintiffs are asserting only direct claims for violations of duties owed directly to Plaintiffs.  Any pleading of conduct that violates duties to

---

[30]   Petition ¶ 167, *et seq.*

> corporations is made solely to evidence conduct that also violates duties owed directly to Plaintiffs.

Petition ¶ 80.

71.     These "disclaimers" contradict Fed. R. Civ. P. 8 and 11 and the general rule of notice pleading.  Taking the disclaimers at their word, the Court may dismiss the suit for failing to state anything other than conjecture.  One may not plead an entire complaint "upon information and belief."  One may not, commensurate with the Rules, state a factual claim for a derivative cause of action, seek derivative relief (including control over the corporation), and then claim "this is not a derivative cause of action."  These disclaimers (and others) evidence bad faith and an attempt at artful drafting, which falls short of the ethical obligations of a counsel under Rule 11.

*Plaintiffs Use "SkyComm" to Describe Discharged SkyPort Claims.*

72.     More importantly, Plaintiffs attempt to argue that alleged injuries to SkyPort (which are clearly discharged) were somehow not discharged because they use the word "SkyComm."  For instance, "CenturyTel repeatedly failed to provide timely financing to SkyComm so as to enable SkyComm to execute its business plan."[31]  Clearly, SkyComm had no operations or personnel or business plan—that claim is against SkyPort.

73.     Likewise, SkyComm had no sales or employees—it was a holding company.  Yet, Plaintiffs artfully seek to avoid the SkyPort discharge by re-naming the SkyPort sales staff as SkyComm employees: "CenturyTel and the CenturyTel Directors hired a sales staff for SkyComm that did not have experience in satellite telecommunications sales and this negatively impacted SkyComm's sales efforts."  Petition ¶ 130.  Again, SkyComm had no employees or

---

[31]   Petition ¶ 126.

"sales staff"—Plaintiffs' alleged injuries were alleged injuries to SkyPort—which would have (allegedly) been the one deprived of sales.

74.     SkyComm had no operations, but Plaintiffs hope to skirt that issue while simultaneously claiming that CenturyTel directors were negligent in <u>operating</u> a communications company:

> CenturyTel and the CenturyTel Directors grossly mismanaged SkyComm and failed to exercise reasonable care in the performance of their duties. Their experience was in land-based telecommunications and they did not have the experience or know-how to operate a satellite based communications company or sell satellite communications services.

Petition ¶ 129.

75.     Since SkyPort was the only entity selling services and operating a communications company, one must surmise that Plaintiffs mean "SkyPort" when the Petition says "SkyComm."  Alleged injuries to a "communications company" from bad directors would have to be a derivative claim.  The Petition implicitly acknowledges that Plaintiffs lack standing to bring such claims.

*Plaintiffs Assert a Laundry List of Derivative Claims.*

76.     Undaunted, the Petition marches on for 111 pages alleging wrongs that ignore the effect of the Confirmation Order and are clearly discharged/derivative claims.  Such as:

(a)     "CenturyTel and the CenturyTel Directors set the price, terms and timing of these debentures and their funding all *to the benefit of CenturyTel*."  ¶ 123 (SkyPort derivative claim).

(b)      "CenturyTel repeatedly failed to provide timely financing to SkyComm so as to enable SkyComm to execute its business plan. . . . "  ¶ 126 (Skyport derivative claim).

(c)     "SkyComm lost customers" ¶ 138 (only SkyPort had customers).

(d)     "Kubbernus proposed to take control of SkyComm" ¶ 149 (Skyport).

(e)     "CenturyTel Directors pursued the interests of CenturyTel at the expense of the SkyComm shareholders" ¶ 151 (derivative claim).

(f)     "the management of Skyport began to report to Balaton . . . .  Kubbernus took control over personnel" ¶ 184 (SkyPort derivative claim).

(g)     "transfer of control could jeopardize SkyComm's licenses" ¶ 186 (SkyPort derivative claim—only SkyPort had licenses).

(h)     "CenturyTel's decision to become a shareholder in SkyComm was presented by both Kubbernus and CenturyTel as a major benefit" ¶ 224 (derivative).

(i)     "Defendants [as directors] caused SkyComm to issue a total of 43,031,166 shares" ¶ 231 (derivative).

(j)     "CenturyTel defendants [directors] gave Balaton and Kubbernus control of SkyComm" ¶ 237 (derivative).

(k)     "CenturyTel's acquisition of SkyComm shares was never disclosed to the FCC" ¶ 239 (derivative).

(l)     "Kubbernus acted as Chairman of the Board of Directors of both SkyComm and SkyPort.  Kubbernus and Balaton ran the company [sic] for their own benefit" ¶ 276 (Skyport derivative claim).

(m)     Balaton and Kubbernus [as directors] caused SkyComm to issue to Balaton 130,926,766 shares" ¶ 278 (derivative claim).

(n)     "Balaton and Kubbernus [as directors] paid themselves massive fees from SkyComm" ¶ 279 (derivative claim).

(o)     "Balaton and Kubbernus caused SkyPort to pay Balaton approximately $1 Million" ¶ 280 (SkyPort derivative claim).

(p)     "Balaton and Kubbernus caused SkyPort to pay Balaton approximately $2.4 Million" ¶ 281 (SkyPort derivative claim).

(q)     "Balaton and Kubbernus failed to hold required annual shareholders meetings" ¶ 289 (SkyPort derivative claim).

(r)     "Balaton and Kubbernus grossly mismanaged SkyComm and SkyPort" ¶ 291 (the essence of a derivative claim).

77.     The Court looks at the totality of a pleading to determine what it says.  There is one part of the Petition that was not discharged—the claim by Draco involving ClearSky.  That claim survives, albeit perhaps in a Delaware or Canadian forum.  Excluding the claim by Draco against ClearSky, the Petition is a manifesto of petty grievances brought by disaffected minority shareholders who were aware of the bankruptcy (and its merger and releases).  The Petition was brought as if the Confirmation Order was never entered.  As a result, the released parties have been injured in an amount to be shown at trial.

## LEGAL AUTHORITY

### *Discharge of These Claims in a Bankruptcy Plan is Effective.*

78.     The Bankruptcy Code permits debtors to discharge claims and cancel interests. 11 U.S.C. §§ 524, 1141(d).  Indeed, so strong is the Bankruptcy Code's policy of waiver and *res judicata*, that even if a release were *illegal*, the release is enforced.  *See, e.g.*, *Republic Supply*, 815 F.2d at 1051; *see also, United Student Aid Funds, Inc. v. Espinosa*, No. 08-1134, 559 U.S. ____ (March 23, 2010) (improper discharge of student loan debt in a Chapter 13 plan is effective if creditor fails to object after notice).  To do otherwise would be to put the entire bankruptcy system at jeopardy and permit collateral attacks on a debtor's fresh start.  Here, most (if not all) of the Plaintiffs were listed by the Debtor as shareholders in November 2008 [docket #43]. These are the same shareholders who could have appeared in the Bankruptcy Case.  The claims are the same claims they could have raised in the bankruptcy.  The remedy is one they could have sought in the Bankruptcy Court.  However, Plaintiffs to take action in the Bankruptcy Court and did not object to or appeal the Plan Confirmation.

79.     The Fifth Circuit recently reminded us that even when a bankruptcy court discharges debt on non-estate property, the confirmation order is *res judicata* and cannot be challenged by one with notice of the case.  *Brown v. Chesnut* (*In re Chesnut*), No. 09-10145, 2009 U.S. App. LEXIS 27686, at *6–21 (5th Cir. Dec. 17, 2009).

80.     Here, the releases were supported by consideration, namely, the forgiveness of the position of a DIP Lender and a secured lender.  Balaton (as DIP Lender) and CenturyTel's position as prepetition senior secured lender gave them both the opportunity to foreclose and terminate the shareholders' rights.  Instead, they waived defaults and (in the case of Balaton) waived claims to obtain their position with the reorganized Debtor.  The Court found that the Confirmation of the Plan was in good faith.

81.     Moreover, as the Fifth Circuit has noted in *Shoaf* and *Chesnut*, for a creditor who knows of a plan that discharges debts on non-estate property, yet does not appeal, is bound by the terms of the plan.  *See e.g.*, *Chesnut*, 2009 U.S. App. LEXIS 27686, at *6–21.  Here, the Clerk sent notice of the Plan to over 200 persons, including most, if not all, Plaintiffs.  Plaintiffs acknowledge they were aware of the Bankruptcy Case.  Plaintiffs then complain that the merger was improper and deprived them of their rights as shareholders.  As damages, Plaintiffs seek control over the Debtor—from the Harris County District Court.

82.     It is hornbook law that the Bankruptcy Court may properly cancel equity interests of shareholders.  The rights of Plaintiffs as shareholders ended when this Court entered the Confirmation Order on August 12, 2009, which merged SkyComm into SkyPort and issued blanket releases.

*Plaintiffs Lack Standing to Pursue Derivative Claims.*

83.     Plaintiffs are not the real party in interest to assert the claims alleged in the Petition.  The suit is a thinly-veiled derivative suit.  "To determine whether a complaint states a derivative or an individual cause of action, <u>we must look to the nature of the wrongs alleged in the body of the complaint, not to the plaintiff's designation or stated intention</u>."  *Lipton v. News Int'l, PLC*, 514 A.2d 1075, 1078 (Del. 1986) (citing *Elster v. American Airlines, Inc.*, 34 Del. Ch. 94, 100 A.2d 219, 223 (Del. Ch. 1953); *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1069–70 (Del. Ch. 1985)) (emphasis added).

84.     Texas and Delaware law[32] define a shareholder's derivative action as an action or proceeding brought by a stockholder on behalf of the corporation for harm done to the

---

[32]    SkyComm was a Delaware corporation and formerly the 100% shareholder of SkyPort, a Texas corporation. The merger of the two left only a single corporation—Skyport—a Texas corporation.

corporation.  *See 2055 Inc. v. McTague*, No. 05-08-01057-CV, 2009 Tex. App. LEXIS 6399, at

\*25-26 (Tex. App.—Dallas Aug. 18, 2009, pet. denied); *Tooley v. Donaldson, Lufkin, &*

*Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004); *Smith v. Waste Mgmt. Inc.*, 407 F.3d 381, 384

(5th Cir. Tex. 2005) (looking to the Delaware Supreme Court's opinion in *Tooley*).

85.     In *Smith v. Waste Mgmt. Inc.*, the Fifth Circuit looked to *Tooley* to decide whether

a claim was direct or derivative, quoting: "The analysis must be based solely on the following

questions: Who suffered the alleged harm—the corporation or the suing stockholder

individually—and who would receive the benefit of the recovery or other remedy?"  *Smith*, 407

F.3d at 384 (quoting *Tooley*, 845 A.2d at 1035) (internal quotations omitted).  "The stockholder

must demonstrate that the duty breached was owed to the stockholder and that <u>he or she can

prevail</u> <u>without showing an injury to the corporation</u>."  *Id.* at 384 (emphasis added, citation

omitted).

86.     Moreover, claims of mismanagement are the very essence of a derivative suit.

"Delaware courts have long recognized that actions charging 'mismanagement which depress the

value of the stock allege a wrong to the corporation; i.e., the shareholders collectively, to be

enforced by a derivative action.'"  *Lewis v. Spencer*, 577 A.2d 753, 1990 Del. LEXIS 154, at \*5

(Del. 1990) (quoting *Kramer v. Western Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988)). "A

claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the

corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared

collectively by all the shareholders, rather than independently by the plaintiff or any other

individual shareholder."  *Kramer*, 546 A.2d at 353. "[A] plaintiff alleges a special injury and

may maintain an individual action [only] if he complains of an injury distinct from that suffered

by other shareholders or a wrong involving one of his contractual rights as a shareholder." *Lipton*, 514 A.2d at 1078.

87.     Similarly, analysis in this case leads to only one conclusion—Plaintiffs' claims[33] are shareholder derivative claims that can only be presented by Plaintiffs through a shareholder derivative lawsuit.

88.     Plaintiffs allege that "SkyPort raised several million dollars from investors (the 'Original Shareholders') to finance its activities."  Petition ¶ 85.  Plaintiffs also allege a loss of their investment and/or harm from diminished corporate value which stemmed from the alleged issuance of shares below fair market value.  *See also supra* Summary of Dispute ¶¶ 1–8.  If there is any injury, it is only indirect as to Plaintiffs as a result of their ownership of shares.  *See Smith*, 407 F.3d at 385; *Geruschat v. Ernst & Young, LLP* (*In re Earned Capital Corp.*), 331 B.R. 208, 222 (Bankr. W.D. Pa. 2005) ("The Plaintiffs allege to have suffered indirect harm through asserted losses on their stock investment which stems from the alleged diminution in value of their corporation. This type of injury is a corporate injury.").

89.     Further confirming that Plaintiffs' interests are derivative, Plaintiffs cannot prove their injury without also simultaneously proving corporate injury.  *Smith*, 407 F.3d at 385.

*The Derivative Claims are Vested in SkyPort, the Reorganized Debtor.*

90.     Filing a bankruptcy petition creates a legal estate comprising "'all legal or equitable interests of the debtor in property as of the commencement of the case.'"  *In re E.F. Hutton Southwest Properties II, Ltd.*, 103 B.R. 808, 811 (Bankr. N.D. Tex. 1989) (citing 11 U.S.C. § 541).  A shareholder's derivative suit passes to the bankruptcy estate.  *Id.* at 811 n.4

---

[33]   In this case, Plaintiffs have an "Interest" as defined by the Plan.  *See* Plan at 2.1.32 ("an Interest (a) in respect to which a proof of interest has been filed with the Bankruptcy Court within the applicable period of limitation fixed by Bankruptcy Rule 3001 or (b) scheduled in the list of Equity Security Holders prepared and filed with the Bankruptcy Court pursuant to Bankruptcy Rule 1007(b).").

(collecting cases; specifically parenthetically notating that "shareholder's derivative suit for breach of officers' and directors' fiduciary duties passes to the bankruptcy estate" (citing *Mitchell Excavators, Inc. v. Mitchell*, 734 F.2d 129, 131 (2d Cir. 1984))).

91.     In the event of bankruptcy, a stockholder's derivative action and similar actions for imposing liability on insiders belongs to the bankruptcy estate and is enforceable by the debtor-in-possession. *See, e.g.*, *In Re Dexterity Surgical*, 365 B.R. at 694 (Isgur, J.); *see also S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc.* (*In re S. I. Acquisition*), 817 F.2d 1142, 1150–52 (5th Cir. 1987); *Am. Nat'l Bank v. MortgageAmerica Corp.* (*In re Mortgageamerica*), 714 F.2d 1266, 1276–77 (5th Cir. 1983); *Mitchell*, 734 F.2d at 131 (citing *Pepper v. Litton*, 308 U.S. 295, 306–07 (1939)).

92.     In *In re WorldCom, Inc.*, the court affirmed the dismissal of the plaintiff's derivative action because "If Seinfeld disagreed with the Reorganized Debtors' retention of the right to assert the claims, he should have objected before confirmation of the Plan." 351 B.R. 130, 133–34 (Bankr. S.D.N.Y. 2006) (emphasis added, citing *First Union Commercial Corp. v. Nelson, Mullins, Riley, and Scarborough* (*In re Varat Enters., Inc.*), 81 F.3d 1310, 1315 (4th Cir. 1996) ("[P]arties may be precluded from raising claims or issues that they could have or should have raised before confirmation of a bankruptcy plan, but failed to do so.")).

93.     In this case, the Plan is clear that the reorganized Debtor, SkyPort, not the individual stockholders, is vested with the property of the estate.[34]

94.     There was no abandonment before confirmation of the Plan. There was no appeal.

---

[34]     *See Mitchell*, 734 F.2d at 134; Confirmation Order [docket #340] ¶ 29 ("Except as otherwise provided in the Plan, and subject only to the occurrence of the Effective Date of the Plan, all property of the Debtor's estate and all other property dealt with by the Plan owned by the Debtor be and hereby is vested in the Reorganized Debtor free and clear of all claims and interest of creditors of the Debtor.").

95.     Failure to object to confirmation of a plan affects a discharge, even if the discharge was improper.  *See Espinosa*, 559 U.S. ____ (March 23, 2010) (legal defects not a basis to void judgment when creditor received actual notice of plan but failed to object).

*Plaintiffs' Lack Standing to Bring this Derivative Action.*

96.     The Court should enforce its Confirmation Order.  First, the Plan is substantially consummated.  *See Ins. Subrogation Claimants v. U.S. Brass Corp.* (*In re U.S. Brass Corp.*), 169 F.3d 957, 960 (5th Cir. Tex. 1999) (listing elements of substantial consummation).

97.     Second, a derivative action that collaterally attacks the Plan impairs the binding nature of plans of reorganization in general.  "Pursuant to 11 U.S.C. § 1141(a), all parties are bound by the terms of a confirmed plan of reorganization."  *In re WorldCom*, 351 B.R. at 134 (citation and internal quotations omitted).

98.     Finally, as a matter of law, Plaintiffs lack standing to prosecute a shareholder's derivative action because Plaintiffs' shares were indisputably cancelled under ¶ 6.3 of the Plan.

99.     *In re WorldCom* is substantially similar to this case.  In that case, the debtors' corporate entity merged into the reorganized debtors' corporation.  *Id.* at 135.  The debtors' shares were cancelled and equity holders of the debtors received no distribution.  The *In re WorldCom* court stated that, "[t]he fact that the causes of action were shareholder derivative actions in the hands of the Debtors does not mean that that derivative nature survived vesting in the Reorganized Debtors."  *Id.*  The court found that whatever interest plaintiff held did not flow from its former interest stating that, "even if a shareholder of a merged entity can maintain continuous derivative standing under certain circumstances . . . the independent nature of Seinfeld's past and present interests provides no basis to confer such standing."  *Id.* (citing 2 DELAWARE CORPORATION LAW AND PRACTICE § 42.03 [1]).

100.    Here, Plaintiffs have ham-handedly attempted to pursue a shareholder action that they were enjoined from pursuing by the Court's Confirmation Order.  Because Plaintiffs know that they lack standing to sue derivatively through SkyComm and SkyPort, they placed a disclaimer in their Petition to the effect that "this is not a derivative suit."  Petition ¶ 80 ("This Petition does not allege a derivative action[.]").

101.    Yet, this Court is neither blind nor given leave of logic.  As noted by *In re Dexterity Surgical* and *Lipton*, *supra*, a court considers the whole complaint and determines its true gravamen.  Plaintiffs allege no special injury from mismanagement and self-dealing not suffered by every other shareholder.  Their claims are, therefore, derivative.

102.    Moreover, under Delaware law, the shareholders failed to challenge the merger when they had the chance and lack standing to challenge it afterwards—"in order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price."  *Parnes v. Bally Entertainment Corp.*, 722 A.2d 1243, 1245 (Del. 1999).

### RULE 12(B)(6) STANDARD IS MET FOR ALL CLAIMS EXCEPT DRACO/CLEARSKY

103.    The Supreme Court has said that the difference between a live complaint and one that fails to state a claim is whether the complaint is merely "conceivable" or rather "plausible":

> [Rule 12 requires] enough facts to state a claim to relief that is plausible on its face.  Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

104.    Further, in *Ashcroft v. Iqbal*, the Supreme Court confirmed the rule that, "[*t*]o survive a motion to dismiss, a complaint must contain sufficient factual matter, *accepted as true*, to state a claim to relief that is plausible on its face."  129 U.S. 1937, 1949 (2009) (citation

omitted) (emphasis added).  The Supreme Court explained that, "when considering a motion to dismiss," courts should take care to "identify[] pleadings that, because they are no more than conclusions, are not entitled to the  assumption of truth."  *Id.* at 1950.

105.    Here, the Petition, taken as a whole, is not plausibly a non-derivative complaint seeking direct redress for a specific injury.[35]   Plaintiffs' thinly-veiled derivative action allegations are purely conclusory.  In fact, Plaintiffs admit that all "[t]he allegations in this Petition . . . [are] made upon information and belief."  Petition ¶ 9.  "[F]ormulaic recitation of the elements" of a derivative action is nothing more than "naked assertions devoid of further factual enhancement[,]." *Iqbal*, 129 S. Ct. at 1949 (internal quotations omitted), which "disentitles them to the presumption of truth."  *Id.* at 1951; s*ee supra* pp.27–28 and accompanying text.

106.    As the Court examines the gravamen of the Petition, the Court sees that (with the exception of the Draco/ClearSky claim) all of Plaintiffs' claims are based on injuries sustained by shareholders generally—by alleged breaches of director's duties and alleged self-dealing.  In the absence of sufficient factual allegations to make plausible their derivative action claim, Plaintiffs' Petition cannot survive this motion to dismiss. *Id.* at 1949–51.

### The *In re Dexterity Surgical* Decision is Factually Similar

107.    In *In re Dexterity Surgical*, plaintiffs, minority shareholders of Chapter 11 debtor, filed a state court action against Dexterity's majority shareholder and several board members and officers alleging fraud, civil conspiracy, breaches of fiduciary duty, and breach of and tortious interference with contract.  365 B.R. at 694. They alleged the action was non-derivative and "direct."

---

[35]   Even the ClearSky claim is derivative of ClearSky.  "Defendant ClearSky is named as a nominal defendant in this action because of the derivative claims asserted in its behalf by the ClearSky Investors." Petition at ¶ 75.

108.     Yet, the facts showed a derivative claim was plead.  For instance, the *Dexterity* plaintiffs alleged that Dexterity's majority shareholder seized control and directed distribution of assets to their affiliate.  *Id*.  Judge Isgur first noted that "It is a well accepted principle that a direct and derivative action may be maintained out of the same set of facts."  *Id*. at 697.  However, when the court looked to the operative complaint to evaluate whether the plaintiffs pled facts to establish a direct claim, he found a recurring theme: "Dexterity suffered injury."  *Id.* at 697–98.

109.     The *Dexterity* minority shareholder plaintiffs were clever, seeking a recovery for "breach of contract" as an alleged non-derivative claim.  Yet, the court noted that their breach of contract action was barred under the confirmed plan pursuant to 11 U.S.C. § 1141.  *In re Dexterity Surgical*, 365 B.R. at 702.  Plaintiffs lacked standing to assert a 'breach of contract' claim that sought a remedy for the corporate harm, or which was not peculiar to that single shareholder.

110.     Despite the fact that the *Dexterity* defendants "may have gained a benefit from their alleged self-dealings, as shareholders of Dexterity Surgical, [majority shareholders] suffered the same type of injury as [minority shareholders]."  *Id*. at 698.  "Plaintiffs have failed to show how their alleged injury is distinct or separate from the injury of all the other shareholders of Dexterity Surgical. . . . [It was] Dexterity Surgical, itself, [that] suffered a loss." *Id*.

111.     In this case, Plaintiffs are essentially disaffected former minority shareholders cleverly re-titling derivative claims in an effort to circumvent the discharge injunction.  In *In re Dexterity Surgical*, the Court noted that "clever" re-titling of claims does not work:

> The allegations in the Second Amended Complaint do not demonstrate any basis
> on which the Court can conclude that there are bona fide claims for tortious

interference. At best, the allegations are merely a clever restatement of a claim for breach of fiduciary duty.

*Id.* at 702.

112.    When looking at the Plaintiffs' Petition, which is flush with references to the losses suffered by SkyComm/SkyPort, and considering the nature of the wrongs alleged, and the relief requested, Plaintiffs cannot show direct injury "without showing an injury to the corporation."  *Id.* at 699 (citing *Tooley*, 845 A.2d. at 1033).   Plaintiffs' claims, thus, are derivative and barred as a matter of law.

### SUMMARY JUDGMENT IS APPROPRIATE AND THE STANDARD IS MET

113.    The Court may grant summary judgment under Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56 when there is no genuine issue of material fact and the Defendants are entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Perry v. One Sugar Lakes Prof'l Ctr. Partners, L.P.* (*In re Perry*), 411 B.R. 368, 373 (Bankr. S.D. Tex. 2009).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

114.    If the moving party carries its initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine issue of a material fact.   This showing requires more than "some metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649–50 (4th Cir. 2002) (explaining that "[c]onclusory or speculative allegations do not suffice" to demonstrate a genuine issue of material fact).  Instead,

the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

115.     Whether an action is derivative is a question of law for the Court to decide.  *See Williams v. McGreevey* (*Touch Am. Holdings, Inc.*), 401 B.R. 107, 122 n.26 (Bankr. D. Del. 2009).   Finding that Plaintiffs lack standing to now bring derivative claims is properly determined in summary judgment.

116.     Additionally, a court may grant a no-evidence summary judgment where (a) the movant identifies elements essential to the non-movant's affirmative defenses as to which there is an absence of a genuine issue of material fact; (b) the movant identifies portions of the record which it believes demonstrate the absence of a material fact; and (c) the non-movant fails to direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *Celotex*, 477 U.S. at 323.

117.     Defendants are entitled to summary judgment.   The material facts of the Confirmation Order and discharge of derivative claims are not in dispute.  Likewise, the claims of the Petition may be reviewed as a matter of law to determine whether they assert direct or derivative harm.   Tellingly, Plaintiffs ask for control over the post-confirmation Debtor as a remedy for alleged injuries based on their pre-bankruptcy equity interests cancelled by the Plan.

## REQUEST FOR JUDICIAL NOTICE OF DOCKET AND PROCEEDINGS

118.     Pursuant to Rule 201 of the Federal Rules of Evidence, Defendants ask the Court to take judicial notice of the proceedings before it, specifically:

(a)     The docket of the main case.

(b)     Docket #340—the Confirmation Order, which explicitly released derivative claims or, to the extent not released, vested the same in the reorganized Debtor.

(c)     Docket #264—the Final Disclosure Statement, including the releases and merger outlined therein and the fact it stated, "Because the Holders of Interests (after Merger with SkyComm) receive nothing on account of its interests, they are deemed to reject the plan and not entitled to vote."

(d)     Docket #43—the Debtor's list of equity interest holders that lists most (if not all) Plaintiffs.

(e)     Docket ##270 and 341—the Clerk's notice of service of the order Approving Disclosure Statement and Order Confirming Plan.

(f)     Docket #268—the Debtor's certificate of service of the Disclosure Statement and Plan.

(g)     Docket #351 and related entries—the trial testimony of Draco, the proceedings involving Draco, and the Court's findings that Draco was not a shareholder of either SkyComm or SkyPort.

(h)     The Supreme Court's recent decision in *United Student Aid Funds, Inc. v. Espinosa*, No. 08-1134, 559 U.S. _____ (March 23, 2010).

### DISMISSAL COMPORTS WITH PUBLIC POLICY

119.    Here, no rational trier of fact could conclude that Plaintiffs have only asserted direct claims for violations of duties owed directly to them without simultaneously demonstrating corporate injury. *See* Petition ¶ 80; *Smith*, 407 F.3d at 385.

120.    Further, the Court's dismissal of the Petition will promote the Bankruptcy Code's policy of waiver and *res judicata*. Plaintiffs should be precluded from impairing the binding nature of the Confirmation Order. *See* 11 U.S.C. § 1141. The Court should also forbid Plaintiffs to collaterally attack the security and preservation of the estate's property properly confirmed and subsequently distributed. That Plaintiffs failed to object to confirmation of the Plan confirms summary judgment is appropriate.

## SANCTIONS SHOULD BE AWARDED AGAINST PLAINTIFFS

121.    Sanctions are appropriate because Plaintiffs are acting in bad faith.  The court has the inherent power to enforce its own orders.  Where a party is acting in willful disobedience of a court order, the court may sanction the offending party.  Inherent power sanctions require a finding of bad faith.  The sanction is reserved for fraud, bad faith and oppression that "defiles the temple of justice":

> In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order," The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy."

*Chambers v. NASCO*, 501 U.S. 32, 46 (1991) (internal citations omitted).

122.    This Court has the inherent power to deal with abuses of the judicial system.  A federal district court has both specific and inherent power to control its docket, and this includes the power to dismiss cases as a sanction for failure to obey court orders.  *Taylor v. Combustion Eng'g, Inc.*, 782 F.2d 525, 527–27 (5th Cir.1986); *see also Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1406–07 (5th Cir.1993) (noting that a federal district court's power to impose sanctions for bad-faith behavior during litigation is inherent and goes beyond powers granted by specific Federal Rules of Civil Procedure), *cert. denied sub nom.*, *Fox v. Natural Gas Pipeline Co.*, 114 S.Ct. 882 (1994).

123.    Bad faith and repetitive abuse of the courts warrant severe sanctions.  *See Frame v. S-H, Inc.*, 967 F.2d 194, 202 (5th Cir.1992); *Price v. McGlathery*, 792 F.2d 472, 474 (5th

Cir.1986) (no abuse of discretion found in involuntary dismissal of case when litigant had "a history of disobedience to this court's orders").

124.    These sanctions can even include refusal of access to the courts.  *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir.1990); *see also E.E.O.C. v. Gen. Dynamics*, 999 F.2d 113, 119 (5th Cir.1993) (the "death penalty" sanction of striking pleadings is appropriate "only under extreme circumstances" such as willfulness or bad faith).

125.    This Court has the inherent authority to protect the integrity of the bankruptcy process by the imposition of appropriate sanctions.  *In re Rainbow Magazine, Inc., 11* F.3d 278 (9th Cir. 1996).  As was noted by the Ninth Circuit, "[t]here can be little doubt that the bankruptcy courts have the inherent power to sanction vexatious conduct presented before the court." *Id.* at 284.

126.    Inherent power sanctions require a finding of "bad faith,"[36] but "bad faith" is simply the opposite of good faith—proceeding with an illegitimate motive or improper purpose. Bad faith is not limited to any single definition or set of circumstances.  If the Court finds— under the totality of the circumstances—that Plaintiffs (or their counsel) have acted in bad faith, it should determine the appropriate sanction.

127.    Under the Court's inherent powers, the appropriate sanction for Plaintiffs' activities before this Court is not limited to the harm caused but should be determined with a view toward deterring future conduct.  *Pearson v. First NH Mortgage Corp.,* 200 F.3d 30, 42 (1st Cir. 1999).  The sanction should be the minimum needed to preserve the integrity of the system.

---

[36]    *See Crowe v. Smith*, 151 F.3d 217, 236 (5th Cir. 1998).

128.    Defendants suggest that an appropriate sanction is a joint and several award of double the attorneys' fees actually incurred by Defendants in defense of this proceeding and a fine that increases by $5,000 each day the sanction remains unpaid.

## MOTION TO DISMISS THE DRACO/CLEARSKY CLAIMS

129.    The Draco/ClearSky claims are not related to Texas.   There is no nexus with Texas.   The claims involve an investment memorandum circulated in Canada by a Canadian law firm involving an investment in a Delaware entity.   The claims are derivative in nature and the Petition so states.   The claims belong in a Delaware Chancery Court or a Canadian Court.

130.    While the Petition contains a boilerplate assertion that ClearSky committed torts in Texas, no facts are alleged from which one could determine such torts occurred in Texas. Indeed, it appears the wronged party, Adrien Pouliot, and Balaton's control person(s), including Robert Kubbernus, were both residents of Canada at the time of the alleged wrong.

131.    Moreover, the law firm of Wilson Vukelich, LLP is based in Canada and is a necessary party.   The suit against Wilson Vukelich alleges legal malpractice of a Canadian law firm under Canadian Law.   This Court is not best suited for such a dispute.   The parties, most of whom reside in, or have connections with, Canada, may proceed there if this Court dismisses the claims here.

### FRCP 12(b)(3)—Dismissal for Improper Venue.

132.    The venue of the claims involving ClearSky is improper.   The parties' Partnership Agreement (Art. 11.9) states that Delaware law governs construction of the agreement without regard to conflicts of law principles.   The Petition acknowledges that the case is a derivative suit against ClearSky.

133.     Moreover, Balaton and Draco were both located in Canada when the ClearSky transaction occurred.  The proper venue for such a suit is either the Delaware Chancery Court or the courts of Canada.  The bare-bones allegations of the ClearSky case involving a tort in Texas are false and unsupported by the more detailed allegations.  In detail, the Petition demonstrates that the ClearSky transaction has no nexus with Texas and the claims arise under Delaware state law.

134.     Once the issue of improper venue has been raised by motion, the burden is on Plaintiffs to sustain the choice of venue.  *See Laserdynamics Inc. v. Acer Am. Corp.*, 209 F.R.D. 388, 390 (S.D. Tex. 2002) (citations omitted).  Here, the parties contracted in Canada with a Delaware entity and allege no factual nexus with Texas.  Further, the parties agreed to Delaware law as controlling.  E.g., *Laserdynamics*, 209 F.R.D. at 390 (forum selection clauses carry a presumption of validity and venue change is proper).

135.     Thus, the Court should dismiss the claims involving ClearSky.

<u>**CONCLUSION**</u>

136.     Plaintiffs were, as their Petition admits, aware of SkyPort's Bankruptcy Case, this Court's Confirmation Order, the merger, and the releases.  Nonetheless, they filed their Petition in an effort to game the system and obtain control over the post-confirmation Debtor.  Plaintiffs claim derivative injuries in the guise of "direct" causes of action.  Plaintiffs sued a Canadian law firm for Canadian torts of malpractice in Texas, and sue ClearSky derivatively, though those claims belong in Delaware.

137.     Defendants therefore ask that the Court enforce its order and dismiss those claims that allege derivative causes of action (all claims except the Draco/ClearSky claims) and further award damages to the Defendants in the amount to be shown at trial.

WHEREFORE, the Defendants pray that:

1.   The Court enter an order dismissing the present proceeding;

2.   Award damages against Plaintiffs for violating the Confirmation Order; and

3.   Grant such other and further relief as is just and proper.

DATED: March 26, 2010.

Respectfully submitted,

MCKOOL SMITH P.C.

By:   */s/ Hugh M. Ray, III*
       HUGH M. RAY, III
       State Bar No. 24004246
       ROBERT M. MANLEY
       State Bar No. 00787955
       600 Travis, Suite 7000
       Houston, Texas 77002
       Telephone: (713) 485-7300
       Facsimile: (713) 485-7344

**ATTORNEYS FOR ALL DEFENDANTS
(EXCEPT WILSON VUKELICH, LLP)**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that true and correct copies of the above and foregoing were forwarded via U.S. first class mail, postage prepaid, to Plaintiffs' counsel and by international registered mail to Defendant, Wilson Vukelich, LLP, at the addresses noted below on this 26th day of March, 2010, and to parties listed on the attached Service List.

<u>Plaintiffs' Counsel</u>:
Eric Fryar
The Fryar Law Firm
1001 Texas Ave, Ste 1400
Houston, TX 77002-3194

Samuel Goldman
Samuel Goldman & Assoc.
100 Park Ave 20th FL
New York, NY 10017

Harold B. Obstfeld
Harold B. Obstfeld, P.C.
100 Park Ave 20th FL
New York, NY 10017

<u>Wilson Vukelich, LLP</u>:
Wilson Vukelich, LLP
Valleywood Corporate Centre
60 Columbia Way, Ste 710
Markham, Ontario
L3R 0C9
CANADA

_____*/s/ Hugh M. Ray, III*_____
HUGH M. RAY, III