# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SKYPORT GLOBAL | § | CASE NO. 08-36737-H4-11 |
| COMMUNICATIONS, INC., | § | (Chapter 11) |
| Debtor | § | |
| | § | |

| | | |
|---|---|---|
| JOANNE SCHERMERHORN, JOHN K. WAYMIRE, CHET GUTOWSKY, JOHN LLEWELLYN, JOSEPH A. LOPEZ, ROBERT FOOTE, BLF PARTNERS, LTD., ECAL PARTNERS, LTD., WHIZKID  VENTURE, LLC, BELLA KRIEGER, MARTIN POLLAK, GLOSTER HOLDINGS, LLC, MELVYN REISER, BARRY KLEIN, CHESKEL KAHAN, JOHN A. REES, BRIAN W. HARLE, MICHAEL STEIN, LAWRENCE SOLOMON, TRACY ELSTEIN & DAVID TOGUT, JASON CHARLES TOGUT TRUST, BMT GRANTOR TRUST, LYNN JOYCE ELSTEIN TRUST, CHARLES STACK, JOSEPH BAKER, MOVADA, LTD., PUDDY, LTD., DRACO CAPITAL, INC., EDWARD PASCAL, ROBERT MENDEL, STANLEY BERAZNIK, DON DUI, BEN ARIANO, 3791068 CANADA, INC., PETER TAYLOR, JOHN E. PANNETON, WAYNE C. FOX, DAVID CURRIE, BYRON MESSIER, DARSHAN KHURANA, MATEO NOVELLI, DIYA AL-SARRAJ, SEQUOIA AGGREESSIVE GROWTH FUND, LTD., SEQUOIA DIVERSIFIED GROWTH FUND, LTD., RIG III FUND, LTD., ARAN ASSET MANAGEMENT SA, SEMPER GESTION SA, and EOSPHOROS ASSET MANAGEMENT, INC. Plaintiffs | § § § § § § § § § § § § § § § § § § § § § § § | |
| vs. | § | ADVERSARY NO. 10-3150 |
| CENTURYTEL, INC. (a/k/a CENTURYLINK), CLARENCE MARSHALL, R. STEWART EWING, JR., MICHAEL E. MASLOWSKI, HARVEY P. PERRY, ROBERT KUBBERNUS, BALATON GROUP, INC., BANKTON FINANCIAL CORPORATION, BANKTON FINANCIAL CORPORATION, LLC, CLEARSKY MANAGEMENT, INC., WILSON VUKELICH, LLP and CLEARSKY INVESTMENTS, LP Defendants | § § § § § § § § § § | JURY TRIAL DEMANDED (Hearing scheduled: May 27 2010, 9:00 a.m.) |

## OBJECTIONS TO REMOVING DEFENDANTS' MOTION TO DISMISS, OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT, AND FOR SANCTIONS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

i

The above-captioned Plaintiffs[1] hereby file their Objection to Removing Defendants'[2] Motion to Dismiss, or, Alternatively, for Summary Judgment, and for Sanctions.   Plaintiffs respectfully submit that this Court does not have jurisdiction over the matters in controversy in the State Court Action, and to the extent the Court does have jurisdiction, it should not exercise jurisdiction over the matters in controversy.  The grounds for this Objection are as follows:[3]

---

[1] This Objection is being submitted on behalf of Plaintiffs Joanne Schermerhorn, John K. Waymire, Chet Gutowsky, John Llewellyn, Joseph A. Lopez, Robert Foote, BLF Partners Ltd., ECAL Partners, Ltd., Whizkid Venture, LLC, Bella Krieger, Martin Pollack, George Metcalf, Gloster Holdings, LLC, Melvyn Reiser, Barry Klein, Cheskel Kahan, John A. Rees, Brian W. Harle, Michael Stein, Lawrence Solomon, Tracy Elstein & David Togut, Jason Charles Togut Trust, BMT Grantor Trust, Lynn Joyce Elstein Trust, Charles Stack, Joseph Baker, Movada, Ltd, Puddy, Ltd, Draco Capital, Inc., Edward Pascal, Robert Mendel, Stanley Beraznik, Don Bui, Ben Ariano, 3791068 Canada, Inc., Peter Taylor, John E. Panneton, Wayne C. Fox, David Currie, Byron Messier, Darshan Khurana, Mateo Novelli, Diya Al-Sarraj, Sequoia Aggressive Growth Fund, Ltd., Sequoia Diversified Growth Fund, Rig III Fund, Ltd., Aran Asset Management SA, Semper Gestion SA and Eosphoros Asset Management, Inc.

[2] Removing Defendants are CenturyTel, Inc. (a/k/a CenturyLink) ("CenturyTel"), Clarence Marshall, R. Stewart Ewing, Jr., Michael E. Maslowski, Harvey P. Perry, Robert Kubbernus, Balaton Group, Inc., Bankton Financial Corporation, Bankton Financial Corporation, LLC and ClearSky Management, Inc.

[3] Contemporaneously with the filing hereof,  the Plaintiffs have filed their Request for Setting, requesting that this Court set the Motion to Remand or alternatively to Abstain, and for Sanctions for hearing contemporaneously with the Removing Defendants' Motion to Dismiss, currently set for May 27, 2010 at 9:00 a.m.

# TABLE OF CONTENTS

I.  PRELMINARY JURISDICTIONAL ISSUE ................................................................ 1

   A.  Removal of this Case is Jurisdictionally Defective................................................ 1

II.  SUMMARY ............................................................................................................ 2

   A.  Removal of The State Court Direct Claims was improper.................................... 2

      i.  *Removing Defendants Misstate Governing Law* ........................................ 2

      ii.  *Removing Defendants Grossly Mischaracterize the State Court Petition Claims* .......... 5

      iii.  *Removing Defendants Ignore the Bankruptcy Court's Statements that Confirmation would have no Impact on Third-Party Claims* ................................. 8

   B.  Securities Fraud and Oppression Claims are Direct and Not Released by the Bankruptcy Order or Plan ...................................................................... 8

   C.  Removal of the State Court Petition was in Bad Faith........................................ 12

   D.  Plaintiffs do not Challenge the Plan or Confirmation Order.............................. 14

   E.  Bankruptcy Court does not have Subject Matter Jurisdiction over these Direct Claims ............. 15

   F.  Even if this Court Finds that Claims are related and it has Jurisdiction over the State Court Action, it should Abstain from Hearing the Case ........................... 15

III.  BACKGROUND FACTS ...................................................................................... 16

   A.  The early History of SkyPort and SkyComm ................................................... 16

   B.  CenturyTel Oppresses Plaintiffs and Breaches its Fiduciary Duties to Plaintiffs...................... 17

   C.  CenturyTel Transfers control to Balaton and kubbernus Without FCC and Team Telecom Approval and He Raises Funds in ClearSky, SkyComm and Lavell ........................... 18

   D.  Kubbernus Oppresses the Shareholders in SkyComm ...................................... 24

   E.  The FCC issues an Order of Forfeiture Against SkyPort ................................... 26

   F.  The SkyPort Chapter 11 Case ........................................................................... 26

   F.  The Confirmation Order and Plan of Reorganization ........................................ 28

   G.  The State Court Petition ................................................................................... 29

   H.  Parties to the State Court Action ...................................................................... 31

IV.  LEGAL ARGUMENT ........................................................................................... 32

   A.  Plaintiffs' Claims are Direct Under Applicable Legal Authority ......................... 32

   B.  The State Court Fraud Claims are Exclusively Direct ....................................... 33

      i.  *The Fraud Claims are Direct under Texas Law* ...................................... 33

      ii.  *The Fraud Claims are Direct under Delaware Law* ................................. 35

   C.  The State Court Petition Oppression Claims are Direct..................................... 40

i.      *Claims Against the CenturyTel Defendants for Oppressive Conduct, while it was in Control of SkyComm* ................................................................................ 41

ii.     *Claims Relating to CenturyTel's transfer of Control to Kubbernus* ............................. 42

iii.    *Claims relating to the Wrongful Dilution of Shareholders' Equity and Voting Rights* . 43

iv.     *Claims against Kubbernus for Oppressive Conduct while in Control of SkyComm* ...... 43

B.   Shareholder Oppression-type Claims are Direct Claims under Delaware Law .......................... 44

i.      *Delaware Recognizes a Direct Right of Action for Breach of Duties of Loyalty, Care and Good Faith* ................................................................................... 44

ii.     *Under Delaware Law, Minority Shareholders May Bring a Direct Claim for a Pattern of Abusive and Oppressive Acts by the Majority* ................................................ 45

iii.    *Under Delaware law, Minority Shareholders May bring Claims as Direct, even when they also may be brought Derivatively* ................................................................. 48

iv.     *Minority Shareholders May Bring a Direct Claim for Breach of Fiduciary Duty when a Controlling Shareholder Issues Shares to Itself or Usurps Voting Power* ................... 48

v.      *Breach of Fiduciary Duty-Oppression Counts Allege Direct Claims under Delaware Law* ................................................................................................... 50

C.   Texas Clearly Recognizes a Direct Claim for Shareholder Oppression ................................... 51

i.      *State Court Oppression Counts Allege Direct Claims under Texas Law* ..................... 53

D.   The State Court Petition is not a Collateral Attack on the Confirmation Order or Plan ............. 54

E.   This Court Has No Jurisdiction Over These Direct Claims ......................................................... 58

i.      *The State Court Action is Not a Core Proceeding* ......................................................... 58

ii.      *State Court Action is Not Even Non-Core -- Not "Related To" Cases under Title 11* . 59

F.   In the Alternative, the Court Must or Should Abstain ................................................................. 60

i.      *In the Alternative, the Court Should Exercise Permissive Abstention and Equitable Remand* ..................................................................................................... 62

G.   Sanctions Should be Imposed, if at all, Against Removing Defendants ...................................... 65

V.  CONCLUSION ...................................................................................................................... 66

# TABLE OF AUTHORITIES

## Cases

*Albert v. Alex Brown Mgmt. Serv., Inc.*, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005).................................. 33

*Browning v. Navarro*, 743 F.2d 1069 (5th Cir. 1984)...................................................................... 58

*Browning v. Prostok, 165 S.W. 3d 336 (Tex. 2005)* ...................................................... 13, 50, 51

*Brownsberger v. Delchamps*, In., 48 Fed. Appx. 480, 2002 WL 31049433 (5th Cir. Aug. 27, 2002).......... 55

*Centrust Savings Bank v. Love*, 131 B.R. 64 (S.D. Tex. 1991)...................................................... 1, 2, 34

*Cotton v. Weatherford Bankschares, Inc.*, 187 S.W.3d 687, 699 (Tex. App.—Fort Worth 2006, no pet. h.)48

*Davis v. Sheerin*, 754 S.W.2d 375 (Tex. App.—Houston 1988, writ denied) ............................... 48

*Dieterich v. Harrer*, 857 A.2d 1017 (De1.Ch. 2004) ................................................................ 34

Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938) ........................................................................ 50

*Feld v. Zale Corp.*, 62 F. 3d 746 (5th Cir. 1995) ..................................................................... 32

*First Bank v. Arafate*, 2006 WL 2612746 (S.D. Tex. 2006)........................................................ 59

*FS Parallel Fund L.P. v. Ergen*, 2004 WL 3048751 (Del. Ch. 2004), *aff'd*, 879 A.2d 602 (Del. 2005)... 33

*Gatz v. Ponsoldt*, 925 A.2d 1265, 1274 (Del. 2007).................................................. 4, 11, 37, 42, 43, 45, 47

*Gentile v. Rossette*, 906 A.2d 91 (Del. 2006)........................................................... 4, 11, 37, 42, 45, 46

*Gonzales v. Greyhound Lines, Inc.*, 181 S.W.3d 386, 392 n. 5 (Tex. App.—El Paso 2005, no pet.)........... 48

*Harris v. Carter*, 582 A.2d 222 (Del. Ch. 1990)..................................................... 35, 36, 37, 42

*Hoggett v. Brown*, 971 S.W.2d 472 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) ........................ 48

*In re Dexterity Surgical, Inc.*, 365 B.R. 690 (Bankr. S.D. Tex. 2007)........................................................ 3

*In re Educators Group Heath Trust*, 25 F. 3d 1281 (5th Cir. 1994) ............................................... 32

*In re Gober*, 100 F.3d 1195 (5th Cir. 1996)....................................................................... 54, 58

*In re Seven Seas Petroleum*, 522 F.3d 575 (5th Cir. 2008)..................................................... 3, 11, 31, 32, 33

*In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319 (Del. Supr. 1993) ........................................... 42, 43, 44, 47

*Kaplan v. First Hartford Corp.*, 484 F. Supp. 2d 131 (D.Me. 2007)............................................ 49

*Lee v. Miller*, 263 B.R. 727 (Bankr. S.D. Miss. 2001).................................................................. 58

*Odyssey Partners v. Fleming Co.,* 1998 Del. Ch. LEXIS 40 (1998) .................................. 43, 44, 47

*Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339 (1928)......................................................... 36

*Pinnacle Data Services, Inc. v. Gillen*, 104 S.W.3d 188, 192 (Tex. App.—Texarkana 2003, no pet.)......... 48

*Redmon v. Griffith*, 202 S.W.3d 225 (Tex App.—Tyler [12th Dist.] 2006, pet. denied)....................... 48, 49

*Regal Row Fina, Inc. v. Washington Mutual Bank*, 2004 WL 2826817 (N.D. Tex. 2004) ...................... 57

*Rhodes v. Silkroad Equity LLC,* 2007 Del. Ch. LEXIS 96 (2007)................................. 4, 43, 44, 47

*Smith v. Waste Mgmt, Inc.*, 407 F. 3d 381 (5th Cir. 2005)............................................................... 3

*Southmark Corp. v. Coopers & Lybrand*, 163 F.3d 925 (5th Cir. 1999) ................................. 55, 57

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031 (Del. 2004) ........................ 2, 43, 46

*Willis v. Bydalek*, 997 S.W.2d 798, 801 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) .................... 48

*Willis v. Donnelly*, 118 S.W.3d 10, 32 n. 12 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ................. 48

### Statutes

11 U.S.C. § 101 .................................................................................................................... 28

11 U.S.C. § 1123 .................................................................................................................. 28

28 U.S.C. § 1334 ............................................................................... 14, 53, 55, 56, 57, 58, 60

28 U.S.C. § 1452 ...................................................................................... 1, 14, 55, 56, 57, 60

28 U.S.C. § 157 .............................................................................................................. 54, 57

28 U.S.C. 1441 ..................................................................................................................... 56

Tex. Rev. Civ. Stat. Ann. Art. 581-33........................................................................................ 37

### Other Authorities

Restatement of Torts Second § 281........................................................................................... 35

### Rules

Fed. R. Bankr. P. 9027 ........................................................................................................................ 1

**Treatises**

Prosser & Keeton on Torts (5th Ed. 1984) .......................................................................................... 35

# I.     PRELMINARY JURISDICTIONAL ISSUE

1.     Before responding substantively to the removal of the State Court Petition to Bankruptcy Court and the Motion to Dismiss, Plaintiffs must raise an important jurisdiction issue:

*A.     REMOVAL OF THIS CASE IS JURISDICTIONALLY DEFECTIVE*

2.     Removing Defendants' removal of this case directly to the Bankruptcy Court, as opposed to the District Court, is improper and must be immediately remanded or otherwise dismissed for lack of subject matter jurisdiction.  *Centrust Savings Bank v. Love*, 131 B.R. 64 (S.D. Tex. 1991).  Both 28 U.S.C. § 1452(a) and Fed. R. Bankr. P. 9027 are clear:

> A party may remove any claim or cause of action [related to a bankruptcy] in a civil action . . . to the **district court** for the district where such civil action is pending.

28 U.S.C. § 1452(a) (emphasis added).

> (a) an application for removal shall be filed with the **clerk for the district** and division within which is located the state . . . court where the civil action is pending.

******

Fed. R. Bankr. P. 9027 (emphasis added).  These rules clearly demonstrate that the bankruptcy courts receive cases by referral, never by **removal**.

3.     As Judge Hughes noted:

> The general removal statute and the bankruptcy removal statute allow a defendant to remove a case from state to federal district court when the federal district court has original jurisdiction, ***but no statute allows removal directly from a state court to bankruptcy court.*** The statutes specifically mention removal from state to federal district court, but make no mention of removal to the bankruptcy court. *Helena Chemical Co. v. Manley,* 47 B.R. 72, 74 (Bankr.N.D.Miss.1985). A party must remove the case from state court to the district court. The district court may then refer the case to the bankruptcy court.

1

28 U.S.C. § 157(a). ***Even when a standing order automatically referring the case to the bankruptcy court is employed by the district court, the case still touches the United States District Court.***

*Centrust Savings Bank,* 131 B.R. at 66 (emphasis added).  Thus notwithstanding that there is a Standing Order of reference (See General Order 2002-2 in the District Court Rules for the SD Texas), removal directly to this Court was defective, and the Adversary Proceeding must be dismissed or remanded.[4]

## II.    SUMMARY

*A.    REMOVAL OF THE STATE COURT DIRECT CLAIMS WAS IMPROPER*

4.    Removing Defendants appear to acknowledge that if Plaintiffs' claims are direct, they do not violate the Chapter 11 Plan and belong in the State Court (they state: "Under the confirmation Order, derivative claims were explicitly released")[5]  Since the State Court Petition alleges only claims for **securities fraud and shareholder oppression-type claims (**claims which by definition are direct and cannot be brought by the Debtor), Removing Defendants' assertions that plaintiffs' claims are entirely derivative and that the Petition is a "111 page derivative Petition"[6] are completely disingenuous.

*i.    Removing Defendants Misstate Governing Law*

5.    First, Removing Defendants misrepresent applicable law.  Removing Defendants contend that claims that are both direct and derivative can only be brought as derivative.  In support, they cite *Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031 (Del. 2004) and *In*

---

[4]  Removing Defendants have insisted that all applicable rules be scrupulously followed; asserting that Plaintiffs were late in filing their Corporate Ownership Statement under Rule 7007.  Plaintiffs have now filed their 7007 statement by the Court ordered deadline of April 19, 2010.

[5]  Motion to Dismiss, or Alternatively for Summary Judgment, and For Sanctions ("MTD") ¶¶ 2, 6.  The MTD is almost identical to the Notice of Removal filed by Removing Defendants.  References herein will be to the MTD, but they apply equally to the Notice of Removal.

[6]  *Id.*

*re Dexterity Surgical, Inc.*, 365 B.R. 690 (Bankr. S.D. Tex. 2007), which relied on *Tooley*, and argue that, under *Tooley*, Delaware law dictates that a claim is direct only if "the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation[.]"[7]

6. But they neglect to mention that controlling law in the Fifth Circuit is the opposite. In *In re Seven Seas Petroleum*, 522 F.3d 575 (5th Cir. 2008), the Fifth Circuit reversed Bankruptcy and District Court decisions, and held that the fact that a Debtor had derivative claims against a third-party did not preclude State court direct claims **against the same third-party arising out of the same facts**.[8] *In re Seven Seas*, 522 F.3d at 585-87. In fact, the Fifth Circuit held that the bankruptcy court did not have jurisdiction to hear claims for conspiracy to defraud and aiding and abetting fraud, even where the bankruptcy trustee had litigated and settled derivative claims against the same party on the same facts and had granted a court-approved release to the defendant. *Id*. at 589. This case was decided under Texas law and SkyPort is a Texas corporation.

7. Thus under *Seven Seas*, even if the Debtor (then represented by Removing Defendants' counsel), had sued Kubbernus, Balaton, CenturyTel and the CenturyTel Directors (whom he now represents), and had settled with them and given them court-approved releases, this would not prevent the shareholders from suing these same parties in the State court, on the same facts for breach of direct obligations to the shareholders.

8. Similarly, the interpretation of *Tooley* which Removing Defendants vigorously advocate, misstates governing Delaware precedent. Two post-*Tooley* Delaware Supreme Court

---

[7]  MTD ¶ 112 (citing *In re Dexterity*, 365 B.R. at 699).
[8]  In *Seven Seas Petroleum,* the Fifth Circuit implicitly overruled *Smith v. Waste Mgmt, Inc.*, 407 F. 3d 381 (5th Cir. 2005), another case relied upon by Removing Defendants for the proposition that a shareholder can bring a direct claim only when "he or she can prevail without showing an injury to the corporation." *Id. At 384. See* MTD Par. 85.

decisions, *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006) and *Gatz v. Ponsoldt,* 925 A.2d 1265, 1274 (Del. 2007) have held that where controlling parties act to deprive the minority of the economic value of their shares or their voting rights, as in our case, the minority shareholders could bring direct claims because it was the shareholders who were **also** harmed.  SkyComm, the SkyPort parent-entity in which all of the shareholders had shares, is a Delaware corporation.[9]

9.     In *Gentile v. Rossette*, the Delaware Supreme Court held that minority shareholders could maintain direct breach of fiduciary duty claims against those in control of a corporation where they suffered a "separate harm" from that suffered by the corporation.  The *Gentile* Court held that claims alleging an adverse impact on the economic value or voting rights associated with plaintiffs' shares sufficiently alleged "separate harm" and were thus direct claims, even if the corporation also suffered harm as a result of the defendants' acts.  *Gentile*, 906 A.2d at 91-100.  The Delaware Supreme Court reaffirmed this doctrine in *Gatz v. Ponsoldt*.

10.    In a subsequent case in the Chancery Court, *Rhodes v. Silkroad Equity LLC,* 2007 Del. Ch. LEXIS 96 (2007), the Court, relying on *Gentile v. Rossette* and *Gatz v. Ponsoldt*, held that claims which might otherwise be derivative, can be asserted as direct claims where, although, the majority's course of conduct caused harm to the corporation, the defendant "would not have suffered harm to the same extent and proportion as the Plaintiffs."  *Rhodes*, 2007 Del. Ch. 96 at * 20.  Clearly in our case, the Kubbernus Defendants and the CenturyTel Defendants did not suffer harm to the same extent as Plaintiffs as a result of the fraudulent and oppressive acts alleged in the Petition.

*ii.  Removing Defendants Grossly Mischaracterize the State Court Petition Claims*

11.    Next, Removing Defendants completely misstate the claims put forth in the State

---

[9] Removing Defendants suggest otherwise.

4

Court Petition.  They present Plaintiffs' claims as alleging "bad management of SkyPort and decreased value of SkyPort's shares,"[10] and assert that the gravamen of the Petition is a "misuse of corporate money and directors' power."[11]  But this is not what the Petition's allegations are about.  Defrauding investors *before* they became shareholders in SkyComm, misapplying escrow funds that never made it to SkyComm, massively diluting shareholders through various fraudulent and self-dealing transactions, and depriving them of the economic value of their shares and of their rights to participate in corporate governance as shareholders is not "bad management" and "decreased value" of their shares -- it is fraud and oppression.  Transferring control of SkyPort to Kubbernus, an accused stock fraudster and looter, in violation of Federal Communications Commission ("FCC"), United States Department of Homeland Security ("DHS"), Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI") (collectively, "Team Telecom") Regulations, as the Petition alleges CenturyTel did, then filing numerous false and misleading statements with these agencies, and then misrepresenting to investors and shareholders that all applicable licenses have been duly obtained, is not simply "misuse of corporate money and directors' power" -- it is fraud and oppression.

12.     The State Court Petition alleges a pattern of pervasive fraud and oppression, which began in late 2002[12] and resulted ultimately in the complete elimination of the economic value and voting rights associated with Plaintiffs' shares by those in control of the corporation. Under *In re Seven Seas Petroleum*, *Gentile v. Rossette*, *Gatz v. Ponsoldt, Rhoades v. Silkroad Equity* and other controlling authority, these are direct claims, notwithstanding that some of these wrongful acts might also give rise to derivative claims.

---

[10] MTD ¶ 5.
[11] MTD ¶ 6.
[12] Petition ¶ 91

13.     The State Court Petition clearly articulates "separate harm" as a result of defendants' fraudulent and oppressive acts.  The Petition does not name SkyPort, or SkyComm, as parties, and it asserts no claims against them or on their behalves.  Indeed, to avoid any possible suggestion that derivative claims are being asserted, the Petition states explicitly that no such claims are being alleged.[13]   Cynically, Removing Defendants describe this "failsafe" pleading as being in "bad faith."[14]

14.     Removing Defendants go to great lengths to portray Plaintiffs claims as belonging to the Debtor, SkyPort,[15] when in fact the Plaintiffs were all shareholders in SkyComm, and their claims are as a result of being offerees of SkyComm shares or minority shareholders of SkyComm.  Perhaps this is because the Removing Defendants realize that the Debtor could not have asserted even derivative claims on behalf of SkyComm, a non-Debtor, since these claims were not "property of the debtor at the outset of the case."[16]

15.     Removing Defendants also claim that the Plan releases extend to CenturyTel and its directors and officers, through whom it asserted control over SkyPort, Clarence Marshall, R. Stewart Ewing, Jr., Michael E. Maslowski, Harvey P. Perry, by claiming they were "Insider Released Parties" or "Insiders and professionals."  This is plainly not true.[17]  If the Debtor, which is controlled by Kubbernus truly believed that the State Court Petition alleged derivative claims against the CenturyTel Defendants, it should be bringing them.[18]

---

[13] Petition ¶¶ 79-80.
[14] MTD ¶ 70.
[15] *See* MTD ¶ 67, 72.
[16] *See* MTD ¶ 90.
[17] Plan ¶  13.7.1.
[18] It is unclear how an attorney can represent creditors and a controlling shareholder in an adversary proceeding, alleging that claims against his clients were released by the Debtor, whom he was then representing in the same case.  It would appear axiomatic that an attorney cannot represent opposing parties in the same action and that an attorney cannot resign from representing one party and then take on the representation of an adverse or potentially

### iii. Removing Defendants Ignore the Bankruptcy Court's Statements that Confirmation would have no Impact on Third-Party Claims

16.     Finally, Removing Defendants ignore this Court's prior admonitions that nothing in this proceeding was intended to limit direct claims against the company's insiders and other non-debtor third parties and that parties should respect that the Court was not making any factual findings which could be used to defeat third-party claims.[19]

17.     Shorn of their many mischaracterizations, it is apparent that this Notice of Removal, coupled with the Motion to Dismiss, are a disingenuous effort by the Removing Defendants to use the Bankruptcy Court to shield themselves from fraud and oppression liability and thus, they must be rejected.  These claims were not released in the bankruptcy proceeding and the State Court should be remanded to the State court where it belongs.

**B.     SECURITIES FRAUD AND OPPRESSION CLAIMS ARE DIRECT AND NOT RELEASED BY THE BANKRUPTCY ORDER OR PLAN**

18.     The Fifteen Counts asserted in the State Court Petition can be divided between securities fraud and shareholders' oppression-type claims.

19.     **Counts Seven through Eleven** allege claims based upon common law and statutory securities fraud and misrepresentation theories.  **Count Thirteen** alleges that the CenturyTel Defendants aided and abetted the Kubbernus Defendants' fraud.  These Counts seek damages in excess of $17 million for those who invested in SkyComm based upon false and misleading statements.  These claims are based upon, among other things, allegations that (a)

---

adverse party.  Especially where counsel represented a debtor and generally has trustee-like obligations to creditors, equity holders and the Court, it would appear to be a conflict of the first order for debtor's counsel to switch sides in the middle of a proceeding and take on the representation of creditors and insiders.  The integrity of the bankruptcy process rests on having those who represented the debtor's estate being scrupulously independent and free of conflicts, even post confirmation, so long as the case remains open.  Plaintiffs reserve the right to move to have Removing Defendants' counsel disqualified for having an irreconcilable conflict.

[19] Transcript of 8/7/2008 confirmation hearing [docket #351] at 172-6.

CenturyTel and Kubbernus failed to disclose to investors that the FCC, DHS, FBI and DOJ approvals of the transfer of control of SkyComm from CenturyTel to Balaton had been obtained through false and misleading statements to these agencies, (b) Kubbernus mislead investors by not informing them that if he did not raise $10 million in ClearSky, they would receive nothing, and by later telling them that ClearSky had received a controlling interest in SkyComm, (c) Kubbernus' misappropriated the $7 million he did raise from ClearSky Investors to buy Balaton's interest in SkyComm and pay himself undisclosed and unwarranted fees, (d) Kubbernus misrepresented his background and failed to disclose that he had been a defendant in several lawsuits alleging that he was a stock fraudster and corporate looter, and (e) numerous other misrepresentations about SkyComm's business and financial situation.   These are all **exclusively direct** claims, which could not have been brought by the Debtor.

20.    **Counts Fourteen and Fifteen** allege fraud-related claims in relation to ClearSky under other legal theories.  **Count Fourteen** states a breach of contract and rescission claim on behalf of the ClearSky Investors, stating that if, as Kubbernus testified in this Bankruptcy proceeding, he was not obligated to have the SkyComm shares issued to the ClearSky Investors because he failed to raise the full $10 million, then he was obligated to return the investors their money; he couldn't just take the money, use it to acquire a controlling interest for Balaton and give the ClearSky Investors nothing.

21.    **Count Fifteen** is a derivative claim on behalf of ClearSky against Kubbernus and Wilson Vukelich for breach of fiduciary duties and malpractice for not protecting the interests of ClearSky in connection with the SkyComm transaction in 2006.

22.    **Counts Three and Four** assert breach of fiduciary duty claims exclusively on behalf of the ClearSky Investors.

23.     Removing Defendants acknowledge that **Counts Three**, **Four, Fourteen** and **Fifteen** are direct[20] and do not belong in the Bankruptcy Court.  But, yet they removed these counts anyway so they could ask this Court to dismiss them and determine that they do not belong in Texas State Court either because allegedly they relate to a syndication of a Delaware LLC by an Ontario individual.[21]  Clearly, this issue is not for the Bankruptcy Court to decide, but it is worth noting that the Petition alleges that (a) the ClearSky offering was for the purpose of raising money for SkyComm, a Houston-based corporation, (b) the ClearSky offering was pursuant to an agreement reached in Houston, Texas, under which the CenturyTel Defendants caused SkyComm to appoint Balaton its equity placement agent, and (c) many of the acts complained of, including the wrongful taking of the ClearSky Investors' funds, took place in Houston, Texas.[22]  Clearly, these Counts should be heard in Texas, before a Texas judge and jury. In any event, a Texas State Court should determine whether it has jurisdiction over these parties.

24.     **Counts One**, **Two**, **Five** and **Six**, allege shareholder oppression claims.  These claims are based upon a broad and continuous pattern of illegal oppressive conduct commencing when CenturyTel first took control of SkyComm as a debenture holder, through the transaction transferring control to Kubbernus, and through the period when he was in control of the company while Plaintiffs were still shareholders.  The Petition describes in copious detail how the shareholders were deprived of their voice in corporate affairs and continually had their economic interests in the company wrongfully diluted until nothing was left.

25.     **Count Twelve** alleges a civil conspiracy to defraud and oppress plaintiffs.

26.     The Petition explains how CenturyTel took control of SkyComm, managed it as a

---

[20] As noted, **Count Fifteen** is actually a derivative claims on behalf of ClearSky.
[21] MTD ¶¶ 129-135.
[22] Petition ¶¶ 175-83; 234-55.

wholly owned subsidiary, deprived the shareholders of their voting rights and the Board of its statutory role in corporate governance, and continually diluted the shareholders by permitting SkyComm no option for financing other than the issuance of more dilutive debentures and warrants to CenturyTel.[23]

27.     It then explains how through a series of fraudulent acts, CenturyTel transferred control to Kubbernus, an accused stock fraudster, without the necessary FCC, DHS, DOJ and FBI approvals, and how CenturyTel and Kubbernus collaborated to defraud the FCC, DHS, DOJ and FBI to later obtain these approvals.  It explains how the shareholders were diluted in the transaction by Balaton and Kubbernus issuing themselves large quantities of shares for inadequate or no consideration.  It also describes how the Non-CenturyTel Directors and shareholders were deceived regarding the ultimate terms under which the deal closed on November 2, 2006.[24]

28.     The Petition then describes how Kubbernus used the SkyComm vehicle that was turned over to him by CenturyTel to defraud dozens more investors out of at least $17 million more, and how he and CenturyTel agreed to transform a $3 million Balaton obligation to CenturyTel into a SkyComm obligation to CenturyTel, how Kubbernus issued huge quantities of additional shares to Balaton in self-dealing and fraudulent transactions, and how Kubbernus and CenturyTel issued 60 million more shares to themselves via a "cashless exercise" of a warrant which did not have a cashless exercise provision in it.[25]

29.     The Petition then describes how Kubbernus repeatedly violated his fiduciary obligations to the shareholders throughout his tenure in control, culminating with his elimination

---

[23] Petition ¶¶ 123-5.
[24] Petition ¶¶ 136, 139, 152.
[25] Petition ¶¶ 225-33, 256-69, 275-93, 312.

of their interests altogether in the bankruptcy.[26]

30.     Finally, it describes how Wilson Vukelich failed to meet its professional obligations to ClearSky and the ClearSky Investors and Additional Investors as attorneys and escrow agents.[27]

31.     The fact that this recitation of a multi-year pattern of oppression includes some facts that might also be grounds for derivative claims, under authority of *In re Seven Seas, Gentile v. Rosette*, *Gatz. v. Ponsoldt* and other cases, does not change the fact that Plaintiffs are alleging direct claims that should be tried in the State Court.

C.     REMOVAL OF THE STATE COURT PETITION WAS IN BAD FAITH

32.     Removal of the State Court Petition was not just improper, it was in bad faith. Removing Defendants removed securities fraud claims against third parties, which could not possibly be derivative, and were thus, not removable.  Removing Defendants acknowledged that the claims relating to ClearSky were not derivative; yet, they removed them anyway and ask this Court to dismiss these claims even though this Court admittedly has no jurisdiction over them. They grossly misrepresented the State Court Petition claims and applicable law and ignored specific warnings from this Court that third party direct claims were not being in any manner impacted by confirmation of the Plan.

33.     If, in fact, Removing Defendants were genuinely fearful that Plaintiffs were seeking to take over control of the Debtor, as they allege,[28] they had other more appropriate remedies than improperly removing this entire case to the Bankruptcy Court. They could have written to Plaintiffs' counsel and pointed out their concern; no doubt Plaintiffs would have

---

[26] Petition ¶¶ 275-293, 310-334.
[27] Petition ¶¶ 294-300.
[28] MTD ¶ 3.

11

removed this boilerplate prayer for relief in an oppression case, from the Petition.  And, if that approach failed, they could have moved in the Bankruptcy Court to enjoin the appointment of a State Court trustee.

34.     Indeed, Plaintiffs have conferred with Removing Defendants' counsel and offered to remove the language in the State Court Petition referring to the appointment of a "provisional trustee," etc., and indicated a willingness to discuss removal of any other statements in the State Court Petition the Removing Defendants reasonably deemed objectionable so the case could be returned to State Court.  Plaintiffs did not receive a positive response to this offer.

35.     Plaintiffs do not seek to gain control of SkyComm, as Removing Defendants no doubt understand.  Plaintiffs included the remedy of appointment of a "provisional director, trustee, managing agent, fiscal agent or other court appointed fiduciary", as part of the standard form of prayer for relief in a shareholders' oppression claim.[29]  This is a statutory remedy for this direct claim, and it does not seek control for plaintiffs. It is just one of the equitable remedies provided by statute that a Court can impose if it finds that minority shareholders were oppressed. A reading of the Petition in its entirety and in context demonstrates that Plaintiffs do not seek control of the Debtor or of any type of court-appointed fiduciary; all they seek are money damages.  Accordingly, so as to eliminate any conceivable ambiguity regarding their intentions, Plaintiffs will amend their Petition to remove this prayer.

D.     PLAINTIFFS DO NOT CHALLENGE THE PLAN OR CONFIRMATION ORDER

36.     Contrary to the Removing Defendants assertions, the Petition does not attack or violate any aspect of the Plan or the Order.  However, it does make allegations from which it can be deduced that Kubbernus and CenturyTel, Inc., in addition to being untruthful to investors and

---

[29]Petition ¶387, 399.

shareholders, were also not being truthful to this Court. But, this does not convert Plaintiffs fraud and oppression claims into derivative claims, nor does it confer jurisdiction on this Court to determine these claims.

37. Plaintiffs should not be barred from asserting in direct claims facts that suggest or even state that parties may have been untruthful in this Proceeding. No evidentiary findings of the facts underlying Plaintiffs' claims were made by this Court and Plaintiffs, other than Draco, did not become aware of Kubbernus' testimony or that untruthful statements were made until after confirmation. Plaintiffs did not come into this Court seeking any relief as a result of these untrue statements; they seek no change in any aspect of the Plan, and are content to pursue their direct remedies for fraud and oppression in the State Court.

38. Further, the allegations Removing Defendants complain of are, in fact, all supported by extrinsic evidence of fraud discovered after the confirmation of the Plan, and thus, they can rightfully be raised before another court. *Browning v. Prostok*, 165 S.W. 3d 336, 346 (Tex. 2005). And, this Court made no findings of fact and admonished counsel not to state afterwards in another forum that it did.[30]

39. However, if this Court determines that the allegations that state that parties were untruthful before this Court or any other allegations in the Petition should not be pursued in the State Court proceeding, remand would still be the appropriate and just remedy, with these allegations excised from the Petition. These allegations can undoubtedly be removed from the Petition without in any way undermining Plaintiffs claims of fraud and oppression.

---

[30] Transcript of 8/7/2008 confirmation hearing [docket #351] at 172-6.

E.     BANKRUPTCY COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER THESE DIRECT
CLAIMS

40.     Removing Defendants misstate the claims and facts of Plaintiffs' Petition in order

to create the illusion of Jurisdiction. Under 28 U.S.C. § 157, none of the claims in the Complaint

qualify as core proceedings.[31]

41.     Because the claims that Plaintiffs assert are direct claims held individually by

Plaintiffs and have no impact on the SkyPort estate (indeed, there no longer is an estate, as the

Plan has gone "effective"), this Court does not have subject matter jurisdiction over them, and

should remand the action back to State Court.

F.     EVEN IF THIS COURT FINDS THAT CLAIMS ARE RELATED AND IT HAS JURISDICTION OVER THE
STATE COURT ACTION, IT SHOULD ABSTAIN FROM HEARING THE CASE

42.     Even if this Court finds that it has jurisdiction over the Plaintiffs' lawsuit because

it is related to the Bankruptcy case, pursuant to 28 U.S.C. § 1334(c)(2), it must abstain because

the action has been commenced in a the appropriate State Court and "can be timely adjudicated"

there, and it "could not have been commenced in a court of the United States absent jurisdiction

under this section."

43.     In the alternative, pursuant to 28 U.S.C. § 1334(1), the Court may abstain from

hearing the case "in the interest of justice, of in the interest of comity for State courts or respect

for State law."  For the equitable reasons set forth below, if this Court does not find that it must

---

[31] The United States Supreme Court ruling in *Caterpillar Inc. v. Williams*, 482 U.S. 386, 107 S.Ct. 2425(1987) is
equally applicable here:

> Only state-court actions that originally could have been filed in federal court may be removed to
> federal court by the defendant.  Absent diversity of citizenship, federal-question jurisdiction is
> required.  The presence or absence of federal-question jurisdiction is governed by the "well-
> pleaded complaint rule," which provides that federal jurisdiction exists only when a federal
> question is presented on the face of the plaintiff's properly pleaded complaint. See *Gully v. First
> National Bank*, 299 U.S. 109, 112-113, 57 S.Ct. 96, 97-98, 81 L.Ed. 70 (1936). The rule makes the
> plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on
> state law.

abstain, it should then choose to abstain from hearing the case.

### III.    BACKGROUND FACTS

A.    THE EARLY HISTORY OF SKYPORT AND SKYCOMM[32][33]

44.    SkyPort Global Communications, Inc. ("SkyPort"), the debtor in the Bankruptcy case (Case No. 08-36737), is a Texas corporation, which was founded in the late 1990's, by a group of Houston-based telecom executives and NASA telecommunications experts for the purpose of developing, owning and operating a satellite communications facility and network operations center at Ellington Joint Reserve Base, adjacent to NASA headquarters in Houston, Texas.

45.    As of late 2002, SkyPort had obtained the necessary licenses from the Federal Communications Commission ("FCC") to operate the teleport and had approximately 40 shareholders consisting of founders, employees and investors in the early stages of the company's development.

46.    This is when CenturyTel, Inc. a Delaware corporation, listed on the New York Stock Exchange and one of the 10 largest United States telecommunications companies in the United States, agreed to provide SkyPort with the funds it need to build the teleport in the form of loans convertible into equity.

47.    SkyComm Technologies Corp. ("SkyComm"), a Delaware corporation, was

---

[32]The complete Factual Background can be found in Plaintiffs' Petition, which was submitted to this Court by Defendants with their Motion to Dismiss and Notice of Removal.  This abbreviated version addresses the major points relevant to the direct nature of the claims.
[33] Petition ¶¶ 81-102.

founded in 2002, in connection with the CenturyTel transaction, as a holding company for SkyPort. All of the SkyPort shareholders converted their shares into shares of SkyComm, and CenturyTel provided financing in the form of its "8.5% cumulative preferred convertible debentures" (the "CenturyTel Debentures"). The CenturyTel Debentures each came with warrants attached.

48.     Under the terms of the debentures, CenturyTel had the right to elect four of the eight members of the Board of Directors of SkyComm and in the event of a deadlock, the Chairman, who was appointed by CenturyTel, was designated to cast the deciding vote. CenturyTel appointed four of its senior officers, Clarence Marshall, R. Stewart Ewing, Jr., Michael E. Maslowski and Harvey P. Perry, to the SkyComm Board of Directors, with Mr. Marshall acting as Chairman. In this manner, CenturyTel controlled the management of SkyComm. CenturyTel selected a CEO for SkyComm and instructed him to report directly to Mr. Marshall and to CenturyTel.

49.     CenturyTel provided the funding for the teleport and SkyPort, the operating subsidiary of SkyComm, completed the teleport in the second half of 2003 and began providing services to customers in January 2004.

B.     CENTURYTEL OPPRESSES PLAINTIFFS AND BREACHES ITS FIDUCIARY DUTIES TO PLAINTIFFS[34]

50.     Commencing in late 2002, CenturyTel and the CenturyTel Directors operated SkyComm and SkyPort as if they were wholly-owned subsidiaries of CenturyTel. They usurped the power of the Board of Directors, by having SkyComm's CEO report directly to it and to Marshall. The CenturyTel Defendants deprived the Shareholders of their voting rights in

---

[34] Petition ¶¶ 103-131.

SkyComm.

51.     CenturyTel, as a lender, ran the companies exclusively for the benefit of CenturyTel and to the detriment of SkyComm's shareholders.  CenturyTel caused SkyPort to do work for it without compensation and permitted SkyComm to receive financing only from CenturyTel in the form of additional debentures.  The Original Shareholders' stock interests were increasingly diluted with each round of debentures.

52.     All told, between the end of 2002 and mid-2005, CenturyTel caused SkyComm to issue to it over $20 million in convertible debentures.[35]

53.     In addition, several other investors (the "Non-CenturyTel Debenture Holders") participated in the Debenture rounds and purchased over $2 million in Convertible Debentures.

C.     CENTURYTEL TRANSFERS CONTROL TO BALATON AND KUBBERNUS WITHOUT FCC AND TEAM TELECOM APPROVAL AND HE RAISES FUNDS IN CLEARSKY, SKYCOMM AND LAVELL[36]

54.     In the second half of 2005, CenturyTel abruptly decided that SkyComm, as a non-core business, should be divested as quickly as possible and put its convertible debentures and controlling interest in SkyComm up for sale.

55.     On November 21, 2005, CenturyTel caused SkyComm to file a petition for relief under Chapter 11.

56.     In late 2005, Robert Kubbernus, a Canadian citizen, approached CenturyTel with a proposal to take over CenturyTel's position in SkyComm utilizing not his own funds, but rather funds he would obtain from third party investors.

57.     In early 2006, Kubbernus presented a recapitalization plan to CenturyTel, the

---

[35] With accumulated interest, the balance due CenturyTel was over $23 million, convertible into about 108,000,000 shares.

[36] Petition ¶¶ 132-274.

Original Shareholders and the Non-CenturyTel Debenture Holders, to make SkyComm long-term debt free, and thus able to raise additional financing, which it had been unable to do previously other than from CenturyTel.  Among other things, this recapitalization plan provided that:

(a)     an offshore investment fund he had organized, Watershed Funds ("Watershed Funds") would acquire the CenturyTel Debentures for $3 million and convert them into 108,000,000 shares of SkyComm;

(b)     another entity he had organized, "ClearSky LP," would then acquire these 108,000,000 shares from Watershed Funds for $3 million in investors' funds ; and

(c)     ClearSky would acquire an additional 133,333,333 shares from SkyComm for $4 million in additional investors' funds; and

(d)     The Non-CenturyTel Debenture Holders would convert their Debentures into 30,134,798 SkyComm shares.

58.     In this manner, all of the debentures would be converted and SkyComm's new capital structure would allow it to raise additional financing.

59.     Balaton Group, Inc. ("Balaton"), a Canadian financial advisory firm controlled by Kubbernus, acted as his umbrella entity and was to raise the funds needed for this transaction.

60.     CenturyTel agreed to negotiate exclusively with Kubbernus to the exclusion of other potential investors and then agreed to transfer control of the company to him, notwithstanding that it was on notice that he was being accused of being a stock fraudster and corporate looter in several contemporaneous lawsuits.

61.     On February 15, 2006, Watershed Funds signed an agreement with CenturyTel to acquire the CenturyTel Debentures for $3 million and convert them to equity.  Watershed Funds,

it was later learned, never even completed the formalities necessary to begin fundraising.

62.    Also on February 15, 2006, CenturyTel caused SkyComm to sign an Equity Placement Agreement with Balaton, appointing it as SkyComm's placement agent to raise $4 million for the company in return for 133,333,333 SkyComm shares.

63.    The price of $.03 per share was fixed by CenturyTel and Kubbernus, and did not represent fair market value. Every share issued at below market consideration harmed the shareholders by adding to their dilution.

64.    On or about February 15, 2005, Kubbernus set up ClearSky Investments, LP, a Delaware limited partnership, to raise funds to be invested in SkyComm pursuant to the Equity Placement Agreement.

65.    Balaton agreed, as an interim measure, to provide $1.5 million in debtor-in-possession financing to SkyComm, as part of an overall $4 million loan facility.  This $4 million was to be converted into the ClearSky $4 million equity contribution into SkyComm.

66.    Balaton borrowed the initial funds for the DIP financing facility from Draco Capital Corp, a Canadian corporation owned by Adrien Pouliot. CenturyTel was aware that Pouliot was the source of these funds, and not Balaton or Kubbernus.

67.    After the February 15, 2006 agreements were signed, CenturyTel and Kubbernus were apprised that the FCC and Team Telecom Agencies would not approve a transfer to control to Watershed Funds and/or ClearSky, if at all, until all of the foreign owners were identified and cleared by these agencies.  This would mean a substantial delay and possible prohibition altogether of the transfer.  So, CenturyTel and Kubbernus agreed that CenturyTel would transfer **de facto** **control only** to Balaton at that time, and that they would represent Balaton as the party to whom control was being transferred, rather than ClearSky; in this manner, Balaton would act

as nominee for ClearSky and ClearSky's ownership of the controlling interest in SkyComm would not be revealed to the FCC and Team Telecom.

68.    Shortly after February 15, 2006, CenturyTel turned over day-to-day operational control of the company to Kubbernus.  This was a direct violation of FCC rules, which prohibited a change of control of SkyPort without prior FCC approval.  It was also a violation of rules requiring DHS, DOJ and FBI prior approval of any transfer of control to foreign ownership.

69.    With these the February 15, 2006 agreements in hand, SkyComm withdrew its bankruptcy petition on March 31, 2006.

70.    Beginning in April 2006, CenturyTel and Kubbernus caused SkyComm to file applications for approval of the transfer of control with the FCC and Team Telecom Agencies. These applications were materially false and misleading, in that they did not disclose the true facts regarding the transactions between CenturyTel and the Kubbernus entities; they did not disclose that *de facto* control had already been transferred and they did not disclose that Kubbernus was widely syndicating SkyComm's ownership primarily to non-U.S. citizens.

71.    Based upon the false information provided to the FCC and Team Telecom Agencies, the FCC approved the transfer of control on August 4, 2006.

72.    From approximately March through November 2006, Kubbernus raised approximately $7 million in ClearSky from approximately 45 investors -- all or almost all of them, non-United States citizens.  Kubbernus made numerous false and misleading statements in this offering.  For example, he represented to each of them that their funds would be used to acquire a majority interest in SkyComm for ClearSky. Kubbernus did not disclose to these investors that if **he** did not raise the full $10 million maximum offering amount he said he

wanted to raise for ClearSky, ClearSky would not receive any interest at all in SkyComm.[37] Kubbernus did not disclose that he would use a portion of the investors' money ($4.8 million) to fund the acquisition of control of SkyComm not for ClearSky, but for Balaton, and he did not disclose that he would use the rest of the investors' funds ($2.2 million) for personal and other purposes.  He failed to disclose to these investors, among other things, that the FCC and Team Telecom approvals had been obtained through false and fraudulent filings.  Kubbernus also misrepresented his personal background and failed to disclose that he had been sued on several occasions for claims including shareholder fraud, looting and failure to deliver share certificates.

73.     In or about November 2006, Kubbernus informed investors that he was closing off the ClearSky investment round at $7 million.[38]

74.     On November 2, 2006, Kubbernus closed the acquisition of 108,000,000 shares of SkyComm by Balaton, using ClearSky's funds for this acquisition.  Apparently, Kubbernus informed CenturyTel that he did not have the funds to pay for the CenturyTel Debentures, and CenturyTel agreed to take a $3 million note in return for the Debentures, which were not converted and instead pledged to secure the note.  None of this was disclosed to the Original Shareholders, the Non-CenturyTel Debenture Holders, or even the non-CenturyTel SkyComm Board members.  The CenturyTel Directors formally resigned and Kubbernus took over formal control of the company.

75.     Kubbernus and CenturyTel had induced the Non-CenturyTel Debenture Holders to agree to convert their Debentures to shares on the promise that CenturyTel would do the same. They were informed that on November 2, both their Debentures and those owned by CenturyTel

---

[37] This is what he testified his agreement with the investors was.
[38] The documentation supporting this fact did not become available to Plaintiffs until after the Petition was filed.

were converted.

76.     Kubbernus and CenturyTel also agreed on November 2, 2006, that SkyComm would issue to CenturyTel 43,000,000 shares in SkyComm in exchange for "forgiveness of debt."

77.     All of these share issuances to Balaton and CenturyTel were transactions between the corporation and those who controlled it, for inadequate or no consideration.  No corporate formalities were observed to assure that the price was fair; and the shareholders suffered additional dilution as a result of the massive numbers of discounted shares which CenturyTel and Balaton caused SkyComm to issue to themselves.

78.     Immediately after the closing on November 2, 2006, Kubbernus ceased selling equity interests in ClearSky and began selling interests in SkyComm directly at approximately $.14 per share.

79.     From November 2006 through June 2008, Kubbernus raised approximately $8 million by selling shares in SkyComm to approximately 45 investors, all or almost all of them non-United States citizens. Kubbernus made numerous false and misleading statements in this offering. For example, he failed to disclose to these investors, among other things, that the FCC and Team Telecom approvals had been obtained through false and fraudulent filings, or that additional filings would be required with Team Telecom before any of these investors could be issued shares by SkyComm.  Kubbernus also represented that the ClearSky had received a majority interest in the company, and that only 30% of ClearSky's interest belonged to Balaton through its general partner, ClearSky Management, Inc., when in actuality Kubbernus had taken the entire interest for Balaton and given none to ClearSky.

80.     Beginning in the summer of 2007, Kubbernus began to raise funds for a new

entity he created, Lavell Systems, Inc. ("Lavell-Canada"), a Canadian corporation that he planned to roll SkyComm and other companies into and take public on the Toronto Stock Exchange. Kubbernus raised at least $1.9 million by selling convertible notes in Lavell-Canada to several investors, all of whom were non-United States citizens. Kubbernus made numerous false and misleading statements to these investors, including failing to disclose that the FCC and Team Telecom approvals had been obtained through false and fraudulent filings, or that additional filings would be required with Team Telecom before any of these investors could be issued shares by SkyComm.

81.     Kubbernus made repeated false and misleading statements to the FCC and Team Telecom Agencies never disclosing that many non-U.S. citizens from Canada, Europe and the Middle East owned shares in SkyComm; nor did he ever disclose that throughout his period that he was in control of the company, he was constantly syndicating ownership interests in SkyComm, primarily to non-U.S. citizens.

D.     KUBBERNUS OPPRESSES THE SHAREHOLDERS IN SKYCOMM[39]

82.     After he took control of SkyComm, he completely deprived the shareholders of any voice in the company. Kubbernus ignored all corporate formalities and disclosed no financial or other information to shareholders, except as was necessary to continue to seek money from them as part of his constant fundraising activities.

83.     In September 2007, Balaton caused SkyComm to issue to Balaton 130,926,766 shares "as payment for restructuring fees and other costs incurred in relation to the anticipated acquisition of the company by Lavell," another Kubbernus entity.[40] No explanation was given as

---

[39] Petition ¶¶ 275-309.
[40] Petition ¶ 278.

to why SkyComm was being charged for Lavell expenses.

84. At the same time, Balaton acquired 53,073,849 additional shares in SkyComm and CenturyTel acquired approximately 6,000,000 additional shares of SkyComm via a purported "cashless exercise" of warrants.[41] These additional share issuances were improper since the warrant instruments did not provide for cashless exercise.

85. It is not known what other shares Kubbernus caused SkyComm to issue to Balaton, but within less than two years after he took over, Balaton purported to own over 500,000,000 shares of SkyComm stock, and there is no evidence that Balaton used any of its own funds to acquire these shares.

86. As a result of all of these activities, the equity participation of the Original Shareholders in SkyComm was reduced from approximately 50% to 5%.

87. Kubbernus continued to try to raise funds by selling shares in SkyComm through false and misleading representations up until the day he filed the SkyPort Chapter 11 Petition in October 2008.

88. After the filing, he attempted to raise funds from select investors so that they could form a group to propose a plan to take over SkyComm from its shareholders.

89. Wilson Vukelich represented Kubbernus in the preparation of the false and misleading documents presented to investors, served as escrow agent for the investors' funds and represented both Balaton and ClearSky in connection with the SkyComm closing.

E.    THE FCC ISSUES AN ORDER OF FORFEITURE AGAINST SKYPORT[42]

90. In March 2009, the FCC issued a Forfeiture Order against SkyPort because

---

[41] Petition ¶ 246, 312.
[42] Petition ¶¶ 335-7.

Kubbernus had failed to disclose that in 2006-2007, he had bought out the interests of the other four partners in Balaton. Some of the shareholders became aware of this through public sources in July 2009, and began to look into SkyComm's FCC filings.

F.    THE SKYPORT CHAPTER 11 CASE

91.    On October 24, 2008, Kubbernus caused SkyPort to file a Petition under Chapter 11.

92.    The Chapter 11 Plan of Reorganization [docket #223] was submitted to this Court on May 22, 2009.  As provided by the Plan, SkyComm, the holding company, which never filed for bankruptcy, was to be merged into the Debtor, SkyPort, which was the operating company.

93.    On August 7, 2009, this Court held a confirmation hearing for the Plan.  At the hearing, Edward Rothberg and Hugh M. Ray III, who were then both with Weycer, Kaplan, Pulaski & Zuber, P.C., were attorneys for SkyPort.

94.    Draco, represented by John E. Mitchell of Vinson & Elkins, also appeared at the hearing and sought to object to the confirmation of the Plan.  Draco contended that it had an indirect interest in SkyComm through ClearSky and it sought to protect its interest.  At the hearing, however, Kubbernus testified that he had never assigned any SkyComm shares to ClearSky, and that therefore ClearSky and Draco had no interest in SkyComm.

95.    The Court found that Draco did not have standing because ClearSky was unable to prove ClearSky's share ownership in SkyComm.  This Court explicitly narrowed its ruling to only this determination.[43]

96.    After the Court's decision, Mr. Mitchell stated:

---

[43] Transcript of 8/7/2008 confirmation hearing [docket #351] at pp. 156 -72.

Early on in his presentation, Mr. Rothberg suggested that this may be related to third-party disputes, and nothing is being impacted with respect to if there's lawsuits outside the Chapter 11. [44]

97.     The Court was very clear that it did not want the ruling to impact third party disputes that might be brought outside the Bankruptcy Court and did not want the hearing to be used to prejudice such third-party claims:

> **The Court:** "… if you're in some other court in some other state at some other time, what I don't want to have happen is for some other attorney – obviously, Mr. Rothberg, it wouldn't be you, but it might be some attorney in New York or Delaware or Canada saying, Here's a transcript from Bohm's hearing and this witness said X, and Bohm confirmed the plan.  I want to make sure we've got a clear a record as we can so that no other court, no other jury, is going down that path.
>
> **Mr. Rothberg**:  Understood, You Honor.
>
> **The Court**:  Okay.
>
> **Mr. Mitchell**: Thank you, Your Honor.[45]

98.     Mr. Mitchell, who was representing Draco, wanted specific written assurances in the confirmation order and plan that Draco's third party claims would not be affected.[46]  He received these when the following language was added to the Confirmation Order:

> Notwithstanding anything else contained herein, or in the Plan, the exculpation provisions contained in Section 138 of the Plan and approved hereby shall not act to exculpate Balaton Group, Inc., Robert Kubbernus, or ClearSky Management, Inc. with respect to any claims of, transactions, dealings, or relationships with Draco Capital, Inc., or ClearSky Investments, L.P., their investors affiliates.
>
> Notwithstanding anything else contained herein, or in the Plan, the releases contained in Section 13.7 of the Plan and approved hereby shall not act to release any claims or causes of action held by Draco Capital, Inc., ClearSky Management, Inc., ClearSky Investments, L.P., their investors, partners or

---

[44] Transcript of 8/7/2008 confirmation hearing [docket #351] at 173.
[45] Transcript of 8/7/2008 confirmation hearing [docket #351] at 175-6.
[46] Transcript of 8/7/2008 confirmation hearing [docket #351] at 173.

affiliates against any person or entity other than the Debtor and the Reorganized Debtor.

Confirmation Order ¶¶31-2

99.     At the close of the hearing, the Court noted:

Okay. Mr. Mitchell, although that I have ruled that your client does not have standing, let me make sure that I square the circle.  Based upon the testimony, I don't believe that we've got anything in the record that puts your client in harm's way with respect to the release issue, but I want to make sure that you agree with me.[47]

F.    THE CONFIRMATION ORDER AND PLAN OF REORGANIZATION

100.    The Order explicitly states that releases of the affiliates, officers, directors, shareholder, etc., of the Debtor are limited to actions taken from the Petition Date to the Effective Date in connection with the operation of the Debtor, or reorganized Debtor, the proposal or implementation of any of the transactions provided for, or contemplated in, the Plan or the Plan documents or the administration of the Plan or the assets and property to be distributed pursuant to the Plan.[48]  In addition, the Order notes that the exculpation provisions contained in Section 13.8 of the Plan do not act to exculpate Balaton, Kubbernus, or ClearSky Management with regard to any claims of, transaction, dealings or relationships with Draco or ClearSky.[49]

101.    The Order only releases all officers and directors for any and all causes of action **held by the debtor, SkyPort**.[50]

102.    The Injunction in Section 13.5 of the Plan that Defendants cite in their moving papers refers to the collection of Claims, which are given the meaning they are given under the

---

[47] Transcript of 8/7/2008 confirmation hearing [docket #351] at 205
[48] Order ¶ 31.
[49] *Id.*
[50] Order ¶ 32.

27

Bankruptcy Code, Section 101.[51]

103.    In addition, Section 13.7 of the Plan only releases Kubbernus and Balaton -- the **only** "Insider Parties" – only for any action taken in connection with the Plan. That Section is authorized under 11 U.S.C. § 1123(b)(3)(A) which only speaks to the settlement of claims or interests **belonging to the debtor or to the estate**.

104.    CenturyTel is not mentioned in any of the releases in the Order or Plan. Nothing in the Plan suggests that it limits third-party direct claims.

G.    THE STATE COURT PETITION

105.    The claims in the State Court Petition are based almost entirely on documentary evidence that was obtained from various parties after the Plan was confirmed. Documents and financial information received from various sources were analyzed and compared over a period of months in order to develop the factual allegations supporting the claims in the Petition.

106.    One aspect of the fraud perpetrated on Plaintiffs is that they were each given minimal information regarding SkyComm; each was deliberately given only what was necessary to convince them to invest or reinvest in SkyComm.[52]  None of the investors and shareholders had sufficient information at the time of the confirmation process to be able to come forward and expose the fraud.

107.    Plaintiffs considered the various options available to them to obtain redress against the Defendants, including seeking to reopen the bankruptcy case on grounds of fraud, bringing a lawsuit in federal court alleging federal claims and bringing an action on their direct claims in State Court.

---

[51] *See* Plan at ¶ 2.1.12.
[52] Or, in the case of the Non-CenturyTel Debenture Holders, to convince them to convert their shares as part of a restructuring plan where CenturyTel's Debentures would also be converted.

108.    They elected the latter. They did not seek relief in the Bankruptcy case because they understood that the Bankruptcy Court did not have jurisdiction to fully adjudicate their securities fraud and oppression claims. They also determined to forego other federal claims that they could have brought, and to limit themselves to seeking relief for their direct state law claims in the State Court.  Under *Caterpillar Inc. v. Williams*, 482 U.S. 386, 107 S.Ct. 2425(1987), Plaintiffs' decision to plead only state law claims must be respected.

109.    On February 12, 2010, Plaintiffs -- 47 individuals, companies and investment funds -- commenced an action in Texas State Court against Kubbernus, CenturyTel, and Wilson Vukelich, and various individuals and entities affiliated with Kubbernus and CenturyTel alleging state and common law securities fraud and shareholder oppression claims and seeking damages for these violations.

110.    Plaintiffs were very careful to allege only direct claims against these defendants and in no way intended to challenge or upset the SkyPort Chapter 11 Plan. To make Plaintiffs' intentions crystal clear, they included a statement that:

> This Petition does not allege a derivative action on behalf of SkyComm or SkyPort.  Plaintiffs are asserting only direct claims for violations of duties owed directly to Plaintiffs.  All pleading of conduct that violates duties to corporations is made solely to evidence conduct that also violates duties owed directly to Plaintiffs.[53]

H.    PARTIES TO THE STATE COURT ACTION

111.    The State Court Petition asserts related claims on behalf of four groups of plaintiffs:

(i)    The "**Original Shareholders**" -- those who held shares in SkyComm when CenturyTel took control of the company at the end of 2002.

---

[53] Petition ¶ 80.

(ii)     The "**Non-CenturyTel Debenture Holders**" -- the investors who had purchased debentures from SkyComm and were induced by Kubbernus and CenturyTel to convert them to shares of SkyComm in November 2006.

(iii)    The "**ClearSky Investors**" -- those who invested in ClearSky between February and November 2006.

(iv)    The "**Additional Investors**" -- those investors who invested in SkyComm directly from and after November 2006.

Plaintiffs still do not know all of the investors that Kubbernus took money from in connection with SkyComm, but they do intend to amend their complaint to assert claims in connection with at least $1.9 million in "Lavell Notes" that Kubbernus sold to non-U.S. investors based upon false and misleading information.

112.    The Defendants are, for convenience, broken down into three groups:

(i)     The "**CenturyTel Defendants**" -- (a) CenturyTel, Inc., which controlled SkyComm beginning in December 2002; in March 2006, CenturyTel turned over *de facto* control of the company to Kubbernus and in November of that year, it transferred *de jure* control; and (b) four of CenturyTel's senior officers and directors, Clarence Marshall, R. Stewart Ewing, Jr., Michael Maslowski and Harvey P. Perry, who served as directors of SkyComm from approximately December 2003 through November 2006.

(ii)    The "**Kubbernus Defendants**" -- Kubbernus and various entities through which he carried out the various acts of securities fraud and shareholder oppression outlined in the Petition, Balaton, Bankton Financial Corporation and Bankton Financial Corporation, LLC

30

(iii)     **Wilson Vukelich**, the law firm that represented the Kubbernus Defendants, as well as ClearSky and SkyComm in the offering of securities to the ClearSky Investors and the Additional Investors, and as fiduciary in the escrowing of the investor funds.

## IV.     LEGAL ARGUMENT

A.     PLAINTIFFS' CLAIMS ARE DIRECT UNDER APPLICABLE LEGAL AUTHORITY

113.     "Whether a particular cause of action belongs to the bankruptcy estate is . . . a matter decided by reference to the facial allegations of the complaint." *In re Seven Seas Petroleum*, 522 F.3d at 583 (citations omitted). "Whether a particular state-law claim belongs to the bankruptcy estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case." *In re Seven Seas Petroleum*, 522 F.3d at 584 (relying in both instances on *In re Educators Group Heath Trust,* 25 F. 3d 1281 (5th Cir. 1994)).

114.     The filing of a bankruptcy petition creates an estate that is comprised of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. 541(a)(1).  Direct claims are not property of the bankruptcy estate and must be remanded to the state court.  *In re Seven Seas Petroleum*, 522 F. 3d at 578, 584.[54]

B.     THE STATE COURT FRAUD CLAIMS ARE EXCLUSIVELY DIRECT

*i.     The Fraud Claims are Direct under Texas Law*

115.     The State Court Petition alleges that Defendants committed fraudulent acts in the State of Texas; therefore, Texas law should govern.   Under Texas law, derivative claims belonging to the estate and direct claims belonging to third parties can arise out of the same facts.

---

[54] Similarly, any derivative claims of SkyComm would not have become part of the Debtor's estate, since SkyComm was not a debtor "as of the commencement of the case."  This why Removing Defendants mischaracterize plaintiffs' claims as pertaining to SkyPort, even though they were shareholders and investors only in SkyComm. *See* MTD ¶¶ 72-75, 90.

*See In re Educators Group Heath Trust,* 25 F. 3d 1281 (5th Cir. 1994), in which the Court held that fraud and misrepresentation claims alleging misrepresentations to plaintiffs belonged to the plaintiffs and not the estate. Shared facts alone are insufficient to make a third-party action "related to" the bankruptcy. *Feld v. Zale Corp.*, 62 F. 3d 746, 753 (5th Cir. 1995). *See In re Seven Seas*, 522 F.3d at 584-6.

116.    The Court's reasoning in *In re Seven Seas Petroleum*, is precisely applicable to our case:

> For example, the conspiracy to defraud claim alleges that Chesapeake "knew that the misrepresentations and/or omissions contained in Ryder Scott's reserve estimates were false or had been made with reckless disregard as to their truth," and that Chesapeake, Hefner, and Seven Seas "employ[ed] the material misrepresentations and/or omissions ... in order to induce potential investors and existing investors in [the unsecured notes] ... to either acquire interests in ... or to refrain from selling interests in [the unsecured notes]." If Chesapeake knew that the reserve estimates were false and used them to induce the bondholders to purchase or refrain from selling the unsecured notes, then there was a direct injury to the bondholders that was independent of any injury to Seven Seas. Indeed, we fail to see what direct injury Seven Seas might have suffered on account of the specific wrongdoing that the bondholders complain of here. Although Seven Seas is not named as a defendant, the bondholders' theory is that Seven Seas itself was a wrongdoer, in conjunction with Chesapeake and Hefner. It is thus not surprising that the injury that this claim alleges is not derivative of an injury to Seven Seas.

*In re Seven Seas*, 522 F.3d at 585-6.  Similarly, in our case, SkyComm, although not named as a defendant, was itself a wrongdoer in connection with the false statements put out to investors. The CenturyTel Defendants and Kubbernus Defendants have liability as promoters, and aiders and abettors of this fraud.

117.    In *In re Seven Seas Petroleum,* the Court explicitly rejected an argument that inclusion of wrongs causing direct injury to the debtor, made plaintiffs' injuries derivative.  The same would be true with regard to allegations in the Petition that SkyComm itself may have

suffered injury; these do not negate the fact that the shareholders suffered separate harm from the wrongs alleged. As in *Seven Seas,* the debtor could not have brought these claims at the outset of the bankruptcy and this was a jurisdictional defect requiring remand. *Id.* at 589.

118.    The *Seven Seas* Court also rejected a claim that the State Court action was an attempt to subvert the Bankruptcy Plan. "[I]t does not follow that a discharge in bankruptcy alters the right of a creditor to collect from third parties." *Id.* at 589-90. The Court also notes that 11 U.S.C. 524(e) "prohibits the discharge of debts of nondebtors." *Id.* (citing *In re Zales Corp.*, 62 F. 3d at 760). The same would be equally true for claims of investors and shareholders against third parties, as in our case.

119.    Finally, the *Seven Seas* Court rejected the argument that because the bondholders appeared in the bankruptcy proceeding, it would be inequitable for them to raise their separate claims. *Id.* at 590. Even more so for the shareholders in SkyComm, who weren't present.

*ii.  The Fraud Claims are Direct under Delaware Law*

120.    Plaintiffs' fraud claims would also be held to be direct under Delaware law, which Removing Defendants seek to apply to all of Plaintiffs' claims.

121.    Under Delaware law, fraud claims are inherently direct. In *FS Parallel Fund L.P. v. Ergen,* 2004 WL 3048751 (Del. Ch. 2004), *aff'd,* 879 A.2d 602 (Del. 2005), the Delaware Chancery Court noted that "a fraud claim is inherently direct under the pre- or post *Tooley* analysis." 2004 WL 3048751 at *3.

122.    In *Albert v. Alex Brown Mgmt. Serv., Inc.*, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005), the Court held that fraud by non-disclosure claims were direct, not derivative under *Tooley,* since it was the shareholders who were harmed and who would benefit from any recovery. The Court noted that "[g]enerally, non-disclosure claims are direct claims." 2005 WL

2130607 at *12.

123.    And, in *Dieterich v. Harrer,* 857 A.2d 1017, 1029 (Del.Ch. 2004), the Court also determined that under *Tooley*, non-disclosure claims were direct.

124.    **Count Seven** alleges common law fraud claims against all Defendants on behalf of all Plaintiffs. The misrepresentations alleged include that: (a) SkyPort was in compliance with all FCC and other governmental requirements for the transfer of control to Balaton and Kubbernus, (b) the FCC and Team Telecom approvals of such transfer of control to Balaton were obtained lawfully and in compliance with FCC and Team Telecom rules and regulations.[55]

125.    It alleges misrepresentations to the ClearSky Investors, including that (c) ClearSky would acquire 133,000,000 shares in SkyComm, at a purchase price of $0.03 per share plus warrants and an additional 133,000,000 shares in SkyComm for a total investment of $4 million; (d) ClearSky would acquire the CenturyTel Debentures, then in the face amount of $20,596,000, for a purchase price of $3 million, and then convert them into 108,000,000 shares of SkyComm; (e) all told, ClearSky would, upon completion of these transactions, own 76% of SkyComm; (f) the parties would obtain approval from the FCC of ClearSky as the party in control of SkyPort; and (g) the proceeds of the offering would be used only for ClearSky's purposes and benefit.[56]

126.    It alleges a failure to disclose the material fact that if Kubbernus failed to raise $10 million in ClearSky, then the ClearSky investors would receive nothing.[57]  This is how Kubbernus described the terms of the ClearSky offering during his testimony in the Bankruptcy

---

[55] Petition ¶ 403
[56] Petition ¶ 413.
[57] Petition ¶ 321(l).

Court, but he told investors otherwise.[58]

127.    It alleges misrepresentations to the Additional Investors, including that (a) ClearSky was the rightful owner of the majority of SkyComm shares (this would have had to have been a misrepresentation -- since Kubbernus testified before this Court that they had no interest in SkyComm), and (b) SkyComm owed CenturyTel $3 million in payment for the CenturyTel Debentures, when this was actually a Balaton obligation.[59]

128.    It alleges a failure to disclose material information, including that (a) the applications to the FCC and Team Telecom had been made in the name of Balaton, and not ClearSky; (b) Kubbernus was then involved in litigation with Truestar Petroleum alleging that he was guilty of fraud; and (c) Kubbernus had recently been CEO of JAWS, a company that went out of business and resulted in shareholder litigation.[60]

129.    All of these are direct fraud claims.

130.    **Count Eight** is a breach of duty of care/negligence claim against the CenturyTel Defendants on behalf of the ClearSky Investors and Additional Investors in connection with CenturyTel's sale of control of SkyComm, to Kubbernus.  It alleges that CenturyTel was under a heightened duty of care based upon Kubbernus being sued for securities fraud and looting, and based upon his willingness to defraud the FCC and Team Telecom agencies.[61]

131.    These claims are direct under Delaware law.  In *Harris v. Carter*, 582 A.2d 222, 234 (Del. Ch. 1990), the Delaware Chancery Court stated that majority shareholders and directors had a fiduciary duty to minority shareholders and others who might be harmed not to

---

[58] Transcript of 8/7/2008 confirmation hearing [docket #351] at 61-3.
[59] Petition ¶ 420.
[60] Petition ¶ 415.
[61] Petition ¶ 431-2.

negligently sell control of a corporation to a buyer who they had reason to believe might loot the corporation.[62]  The Harris court's reasoning is especially pertinent:

> [I]t does not follow from the proposition that ordinarily a shareholder has a right to sell her stock to whom and on such terms as she deems expedient, that no duty may arise from the particular circumstances to take care in the exercise of that rights.  It is established American legal doctrine that, unless privileged, each person owes a duty to those who may foreseeable be harmed by her action to take such steps as a reasonably prudent person would take in similar circumstances to avoid such harm to others.  While these principles arises from the law of torts and not the law of corporations or of fiduciary duties, that distinction is not, I think, significant unless the law of corporations or of fiduciary duties somehow privileges a selling shareholder by exempted her from the reach of this principle.  The principle itself is one of the great generality and, if not negated by privilege, would apply to a controlling shareholder who negligently places others foreseeably in the path of injury.

Harris, 582 A.2d at 234-5 (citing Restatement of Torts Second § 281; Prosser & Keeton on Torts, pp. 284-290 (5th Ed. 1984); Palsgraf v. Long Island Railroad Co., 248 N.Y. 339 (1928)).

132.    The Harris Court went on to note that:

> [I]n some circumstances, the seller of a control block of stock may or should reasonably foresee danger to other shareholders; with her sale of stock will also go control over the corporation and with it the opportunity to misuse that power to injury of such other shareholders [,and T]hus the reason that a duty of care is recognized in any situation is fully present in this situation . . . .
>
> "while a person who transfers corporate control to another is surely not a surety for his buyer, when the circumstances would alert a reasonably prudent person to a risk that his buyer is dishonest or in some material respect not truthful, a duty devolves upon the seller to make such inquiry as a reasonably prudent person would make, and generally to exercise care so that others who will be affected by his actions should not be injured by wrongful conduct."

---

[62] In Harris v. Carter, the Court held that the "sale of a controlling interest in a corporation, at least where . . . that sale is coupled with an agreement for the sellers to resign from the board of directors in such a way as to assure that the buyer's designees assume that corporate office, does . . . involve or implicate the corporate mechanisms so as to call this principle [that the controlling shareholder assumes a fiduciary duty of the same kinds as that owed by a director] into operation."  Harris, 582 A.2d at 235.

*Id*. 582 A.2d at 235.   Although, in *Harris*, plaintiffs brought derivative claims, the Court's decision makes it clear that the duties owed can run directly to the shareholders. *Id*. 582 A.2d at 224 (standing for the proposition that negligent sale breach runs to those harmed).

133.   Further, a claim for negligent sale to a stock fraudster resulting in fraudulent deprivation of the shareholders of their voting rights and economic value of their shares would be direct under *Gentile v. Rossette* and *Gatz v. Ponsoldt*.   In our case, plaintiffs allege not just negligent transfer of control, but intentional transfer to a stock fraudster, resulting in the loss of their entire share interests in SkyComm.

134.   **Count Nine** alleges a claim for negligent misrepresentation against the CenturyTel Defendants. This claim is personal to the Plaintiffs and thus direct.

135.   **Count Ten** alleges violations of the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-33A(2) and Tex. Rev. Civ. Stat. Ann. Art. 581-33F(2) for the same reasons as asserted in **Count Seven**, and **Count Eleven** alleges violations of Texas Business and Commerce Code 27.01.

136.   **Count Twelve** alleges Civil Conspiracy and **Count Thirteen** alleges aiding and abetting claims in relation to the fraud claims, as well as the oppression claims.

137.   These are all direct fraud and misrepresentation claims; they are State law claims which should be resolved in the State Courts.

C.   THE STATE COURT PETITION OPPRESSION CLAIMS ARE DIRECT

138.   The Petition alleges a pervasive and continuing pattern of abuse and oppression of shareholders in SkyComm from the day that CenturyTel gained control, through the period when it transferred control to Kubbernus, and though the period of Kubbernus' control until Plaintiffs' interests were terminated in this Bankruptcy case.

139.    **Counts One and Five** allege oppression claims against the CenturyTel Defendants; **Count One** alleges shareholder oppression-type claims under Delaware law and **Count Five** under Texas law. **Counts Two and Six** allege oppression claims against the Kubbernus Defendants.   **Count Two** alleges oppression-type claims under Delaware law and **Count Six** relating to SkyPort under Texas law.[63]

140.    Under Delaware law, shareholder oppression-like claims are pleaded as breaches of fiduciary duties to the shareholders, as distinct from breaches of fiduciary duties to the corporation.   **Counts One and Two** state clearly that they are asserting claims on behalf of the shareholders for breaches of the duties of loyalty and due care owed to them by controlling parties, as distinct from duties the same parties may have owed to the corporation.[64]

141.    **Counts Three** alleges separate breach of fiduciary duty claims against the Kubbernus Defendants and Wilson Vukelich with respect to ClearSky and **Count Four** alleges such claims against Wilson Vukelich only.   The Removing Defendants do not challenge these claims as being improperly asserted in State Court.[65]

142.    The breaches alleged are summarized as follows:

i.    *Claims Against the CenturyTel Defendants for Oppressive Conduct, while it was in Control of SkyComm*

143.    Even though CenturyTel never owned shares in SkyComm prior to November 2006, the CenturyTel Defendants used their position as the holder of the CenturyTel Debentures to assert complete control and domination over SkyComm and SkyPort between 2003 and 2006. During this period, they excluded the shareholders and non-CenturyTel Directors from the

---

[63]Technically, in Texas, claims for breach of fiduciary duties, are distinct from claims of oppression, so **Counts One and Two** may also state separate breach of fiduciary duty claims under Texas law.
[64]Petition ¶ 347.
[65] MTD ¶¶ 129-31.

decision-making process; they bypassed the board of directors by having the company's CEO report directly to its proxy, Clarence Marshall, rather than to the Board,[66] and they did not give requisite information to the Board or the shareholders, who were both generally kept unapprised of the management decisions affecting SkyComm.[67]

144.    The CenturyTel Defendants unlawfully diluted the shareholders' interests by insisting that the only financing SkyComm would be permitted to obtain would be in the form of more convertible debentures.   CenturyTel used its control position to cause SkyComm to repeatedly do work for CenturyTel that CenturyTel did not pay for, and which forced SkyComm to issue more debentures to CenturyTel, thereby further diluting the shareholders.[68]

145.    The CenturyTel Defendants permitted no financing from other sources and it set the price of the debentures by itself.   CenturyTel refused to allow SkyPort to obtain financing from third parties at more favorable terms, and forced the company to issue more debentures to CenturyTel.[69]   These debentures kept accruing interest which could not be repaid by SkyComm, still an early stage company, and added to the daily dilution of the Original Shareholders' shares.

*ii.   Claims Relating to CenturyTel's transfer of Control to Kubbernus*

146.    The Petition also outlines wrongful and oppressive acts of the CenturyTel Defendants and the Kubbernus Defendants and breaches of fiduciary duties to Plaintiffs in relation to the sale of its control block of debentures to Kubbernus.

147.    It alleges that the CenturyTel Defendants were on notice regarding Kubbernus being an alleged stock fraudster and looter, and should have known from its own dealings with

---

[66] Petition ¶¶103-09.
[67] Petition ¶ 347(a) and (b).
[68] Petition ¶¶111-17; 347(s).
[69] Petition ¶¶118-28.

him that he was not an honest individual, when he evidenced no compunctions about defrauding the FCC, DHS, FBI and DOJ.[70]  The CenturyTel Defendants owed a direct duty to the shareholders not to transfer control to him, but did so, with full knowledge that the shareholders and future investors in SkyComm would be harmed; and they conspired with him to obtain the FCC and Team Telecom approvals for the transfer by making false and misleading statements to these agencies.

148.    It alleges that CenturyTel and Kubbernus conspired to engage in other deceitful and wrongful acts that violated duties to shareholders.

149.    It alleges that Kubbernus and CenturyTel deprived the shareholders of their right to disclosure of the facts necessary to make informed decisions regarding the transaction, including failing to disclose the true terms of the transaction that closed on November 2, 2006. It alleges a failure to disclose that the CenturyTel Debentures had not been converted on November 2, 2006, and that this failure would result in more shares being issuable by SkyComm than had been disclosed and further dilution of the shareholders.

150.    It alleges that Kubbernus and CenturyTel caused the Non-CenturyTel Debenture Holders to convert their Debentures through false and misleading statements.[71]

*iii. Claims relating to the Wrongful Dilution of Shareholders' Equity and Voting Rights*

151.    The Petition alleges that CenturyTel caused SkyComm to issue shares at $.03 per shares, while at the same time, Kubbernus was selling the same shares to investors at $.14 cents per share.[72]

152.    It alleges conspiracy and self-dealing between Kubbernus and CenturyTel to issue

---

[70] Petition ¶¶157-61; 347(i), (u) and (w); ¶¶165-69, 184-6; 347(j)(k).
[71] Petition ¶¶ 216-33.
[72] *Id.*

shares to themselves to further dilute plaintiffs' shares.[73] It alleges that Kubbernus and CenturyTel caused SkyComm to grant Balaton and CenturyTel large quantities of additional shares, including via a purported "cashless exercise" of warrants that did not permit a cashless exercise. It alleges that Kubbernus caused SkyComm to issue Balaton over 100,000,000 shares to Balaton, allegedly in reimbursement for expenses incurred by it for another corporation.

153.    It alleges CenturyTel's collusion with Kubbernus to recharacterize debt of Balaton to it as debt of SkyComm, thus shifting an obligation from SkyComm's controlling shareholder at the time, Balaton, to SkyComm.[74]

*iv. Claims against Kubbernus for Oppressive Conduct while in Control of SkyComm*

154.    The State Court Petition alleges that Kubbernus deprived the shareholders completely of their voting rights while he was in control of SkyComm.

155.    It alleges collusion with CenturyTel to convert a debt from Balaton to CenturyTel into a debt from SkyComm to CenturyTel. This had the direct effect of shifting the purchase price for the CenturyTel Debentures from Balaton, which received them, to SkyComm.  It shifted debt from a company the minority shareholders had no share in to a company that they did. Balaton benefited at the expense of the minority.

156.    It alleges that Kubbernus wrongfully used the ClearSky Investors' funds to acquire Balaton's interest in SkyComm.

157.    It alleges that Kubbernus maintained two sets of books, one showing that the ClearSky Investors owned a majority of SkyComm and the other showing Balaton did.

158.    It alleges that Kubbernus breached his fiduciary duties to the Plaintiffs by not

---

[73] Petition ¶¶ 222-39; 347(o); 216-21.
[74] Petition ¶¶ 256, 266, 269, 313.

looking out for their interests in the SkyPort Chapter 11 proceeding and it alleges that he made various statements in the Chapter 11 proceeding that were inconsistent with what he had represented to investors and in financial statements created prior to the filing of the Chapter 11 Petition.[75]

B.  SHAREHOLDER OPPRESSION-TYPE CLAIMS ARE DIRECT CLAIMS UNDER DELAWARE LAW

159.    Under Delaware case law, as shown below, all of the wrongs outlined above give rise to direct claims by the shareholders.  Even though some of the wrongs alleged may also be used to support claims by the corporation, under *Gentile v. Rossette* and *Gatz v. Ponsoldt*, these claims may be brought directly by plaintiffs.

   i.  *Delaware Recognizes a Direct Right of Action for Breach of Duties of Loyalty, Care and Good Faith*

160.    In discharging duties to manage the business and affairs of a corporation, directors owe fiduciary duties of care and loyalty to the corporation **and to its shareholders**.  *Revlon, Inc., v. MacAndrews Forbes Holdings, Inc.*, 506 A.2d 173, 179 (1986).

161.    It is equally well established that "when a shareholder presumes to exercise control over a corporation, to direct its actions, that shareholder assumes a fiduciary duty of the same kinds as that owed by a director.  *Harris,* 582, A.2d at 234 (citations omitted).

   ii.  *Under Delaware Law, Minority Shareholders May Bring a Direct Claim for a Pattern of Abusive and Oppressive Acts by the Majority*

162.    In *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319 (Del. Supr. 1993), the Delaware Supreme Court held that **former** minority shareholders could maintain a direct action to challenge a combination between TriStar and Coca Cola Company.  The Court stated:

---

[75] The Petition seeks redress for these misrepresentations to investors and shareholders and not for anything Kubbernus did in the bankruptcy case; Plaintiffs make no effort to disturb the Plan or Confirmation Order based upon anything Kubbernus did in the Bankruptcy case.

"[t]he Combination, with its related transactions and surrounding facts, is complicated and convoluted — sufficient to daunt any but the most determined analyst or challenger. Shorn of its bristles and fuzz, however, it was the way Coca-Cola, at no significant cost to itself, obtained 80% ownership of Tri-Star…

We find that the plaintiffs alleged sufficient individual injury resulting from the defendants' asserted manipulation of the Combination so as to dilute the cash value and impinge upon the voting rights of the minority's shares. Plaintiffs' claims clearly survive a motion to dismiss under Chancery Court Rule 12(b)(6). Such conduct, taken as true for present purposes, is a breach of the duty of loyalty requiring that the defendants' actions be judged by principles of entire fairness. Since this shifts the burden to the defendants to prove the "most scrupulous inherent fairness of the bargain", *Weinberger,* 457 A.2d at 710, there is no requirement that plaintiffs prove damages to survive a motion to dismiss.

*In re Tri-Star,* 634 A.2d 330. *In re Tri-Star* was cited approvingly in *Gatz v. Ponsoldt,* 925 A.2d at 1277-81. Thus, in our case, under Texas law, the transactions relating to the various CenturyTel and Kubbernus share issuances must be judged under the "entire fairness" doctrine; defendants must prove "most scrupulous inherent fairness" in these circumstances.

163.    In *Odyssey Partners v. Fleming Co.,* 1998 Del. Ch. LEXIS 40 (1998), the Court, citing to In re *Tri-Star,* held that a direct action was permitted where a controlling shareholder allegedly engaged in a course of dealing that culminated with its purchase of all the corporation's assets at a foreclosure sale for inadequate value.  The Court held that the shareholders had alleged "special injury" in the form of the usurpation of 100% of the value of their shares. Odyssey Partners, 1998 Del. Ch. LEXIS 40 at *6-10.

164.    In *Rhodes v. Silkroad Equity LLC,* 2007 Del. Ch. LEXIS 96 (2007), the Court held that minority shareholders could maintain a direct suit against those in control where **former** shareholders alleged that the controlling shareholders ran down the corporation in order to force them out at a reduced price. *Id.* at *11  Applying *Tooley,* the Court held that the claim was

derivative, **but also** direct, because the conduct in effect permitted the majority to increase its interest in the company while diluting the interest of the minority stockholders.   Thus, the minority interest suffered harm different from that suffered by the majority.

> [Those in control of the corporation] caused a direct harm to the Plaintiffs by the "extraction" of economic value and residual voting power and a "redistribution" of the economic value and voting power to themselves as controlling shareholders (citing *Gentile*, 906 at 100). In addition, the Court's inquiry is not restricted to the abstract structuring of the transaction or course of conduct under scrutiny. Instead, the Court must focus on the "true substantive effect" of the challenged transaction (citing *Gatz v. Ponsoldt*, 925 A.2d at 1279).

> If the alleged facts supporting the claims are taken as true, they allow the Court to infer that the Defendants' actions had the "true substantive effect" of harming the Plaintiffs, as minority shareholders in SilkRoad Holding, in substantially different fashion from SilkRoad Equity (*i.e.,* Filipowski and Roszak), as controlling shareholder. With the allegations made in Count One and Count Four--*e.g.,* loading InterAct with SilkRoad Equity employees, using InterAct (citing *Gentile*, 906 A.2d at 100) funds for SilkRoad Equity's other companies, causing SilkRoad Holding to acquire a SilkRoad Equity entity--it cannot be said, in the words of *Gatz,* that the Court should view these transactions as "confined to an equal dilution of the economic value . . . of each of the corporation's outstanding shares." Those alleged to have benefited directly from the Defendants' misdeeds are Filipowski and Roszak or entities controlled by them. Thus, SilkRoad Equity, as controlling shareholder, would not have suffered harm to the same extent and proportion as the Plaintiffs. Moreover, the Defendants' alleged breaches of fiduciary duty may readily be viewed as facilitating their efforts to drive out the Plaintiffs at a bargain price. Accordingly, the Court concludes that the fiduciary duty claims alleged in the Complaint can be brought as direct claims and that the Defendants' motion to dismiss Counts One and Four should be denied.

*Rhodes v. Silkroad Equity LLC,* 2007 Del. Ch. LEXIS 96 at *16-20.

165.   The State Court Petition alleges a series of related transactions and surrounding facts that resulted in the complete loss by Plaintiffs of their voting rights and economic interests in SkyComm.   Under *In re Tri-Star, Odyssey* and *Rhodes v. Silkroad Equity*, these are direct claims.

166.    These cases should be sufficient to establish that Plaintiffs' claims are direct under Delaware law, as discussed below, the same result would obtain under other applicable principles of Delaware law.

### iii. Under Delaware law, Minority Shareholders May bring Claims as Direct, even when they also may be brought Derivatively

167.    Contrary to Removing Defendants' suggestion that claims which are both direct and derivative cannot be brought as direct claims, the law is the exact opposite, as exemplified by *Gentile v. Rosette* and *Gatz v. Ponso*ldt.  Indeed, in *Gatz v. Ponsoldt*, the Delaware Supreme Court explicitly reversed a lower court decision, stating:

> Although the Chancellor found that the claims at issue were derivative based on the then-existing case law, an intervening legal development occurred while this appeal was pending: this Court decided *Gentile v. Rossette*, a case that bore importantly on the issue of whether the dismissed claims were derivative, direct, or both. Having heard the parties on the impact of *Rossette*, we conclude that the claims before us are not exclusively derivative and could be brought directly. It therefore follows that the Court of Chancery's contrary conclusions were legally erroneous. Accordingly, we reverse and remand the case to the Court of Chancery for further proceedings consistent with this Opinion. *Gatz*, 925 A.2d at 1268.

### iv. Minority Shareholders May Bring a Direct Claim for Breach of Fiduciary Duty when a Controlling Shareholder Issues Shares to Itself or Usurps Voting Power

168.    The Delaware Supreme Court has recognized that a direct breach of fiduciary duty claim arises where (i) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value and (ii) the exchange causes an increase in the percentage of the outstanding interest owned by the controlling party, and a corresponding decrease in the share percentage owned by the minority shareholder.  *Gentile v. Rossette,* 906 A. 2d at 99-100. Thus, although equity dilution claims are generally derivative because the corporation has suffered an injury (inadequate payment for its shares) and, therefore, any recovery would flow to

45

the corporation, the *Gentile*-type of equity dilution claim -- one in which a corporation issues more shares to its controlling shareholder and dilutes the minority shareholders' equity -- is also direct.

169.    As *Gentile* explained:

> Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer-or expropriation-of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited.   In such circumstances, the public shareholders are entitled to recover the value represented by that overpayment-an entitlement that may be claimed by the public shareholders directly and without regard to any claim the corporation may have.

*Gentile*, 906 A.2d at 100.

170.    The *Gentile* court also stressed that diminution of a shareholders' voting rights constituted a grounds for a direct claim and held that there was no threshold degree of minority's voting power that needed to be injured in order to give rise to such a claim. *Id*. at 102.

171.    In addition, *Gentile* noted explicitly that terminated shareholders could maintain direct claims where the company in question had been merged out of existence and taken through bankruptcy.  The Court held, in fact, that the second prong of the *Tooley* test[76] was met since the corporation could not benefit from any recovery because it no longer existed, and thus the eliminated shareholders were the only parties that could benefit. *Id.* at 103.  Thus, applying the

---

[76] Who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  Tooley, 845 A.2d. at 1033.

*Tooley* standard, the Court held that claims of equity and voting rights diminution were direct claims, properly brought by minority shareholders because of their unique injury separate and apart from any harm that may have been inflicted on the corporation, and their unique ability to benefit from a recovery.

172.    *Rhodes v. Silkroad Equity LLC*, cited above, illustrates that claims which are derivative may be brought directly where the injury suffered by minority shareholders is different in degree from that suffered by the majority.

*v.   Breach of Fiduciary Duty-Oppression Counts Allege Direct Claims under Delaware Law*

173.    The State Court Petition alleges a pattern of actionable conduct on the part of the Defendants -- oppression, breaches of fiduciary duties owed them by those controlling the corporation and securities fraud and misrepresentation -- which had the effect of depriving them of 100 percent of their economic and voting interests in SkyComm. Under *In re Tri-Star, Odyssey Partners v. Fleming, Gentile v. Rosettte* and *Gatz v. Ponsoldt,* this deprivation of Plaintiffs' interests in SkyComm is a direct claim, which is properly brought as a breach of fiduciary claim.

174.    The "special harm" is the loss, due to the wrongful acts of the controlling parties of SkyComm of 100% of the economic value and voting rights associated with plaintiffs' shares. This is not harm suffered by the corporation, nor is it harm suffered by all of the shareholders equally.

175.    The State Court Petition describes the pattern of conduct that resulted in this harm in significant detail.  Under *Gentile v. Rosette, Gatz v. Ponsoldt* and *Rhodes v. Silkroad Equity* the fact that some of the wrongful conduct may also serve as the basis for derivative claims does not impact Plaintiffs' right to maintain an action seeking damages for the loss of the value of their shares.

47

C.   TEXAS CLEARLY RECOGNIZES A DIRECT CLAIM FOR SHAREHOLDER OPPRESSION

176.   The claim for shareholder oppression is well-established under Texas law.  It is a direct cause of action brought by minority shareholders against a majority or controlling party. *See Redmon v. Griffith*, 202 S.W.3d 225, 234 (Tex App.—Tyler [12th Dist.] 2006, pet. denied) ("a corporate shareholder may have an individual action for wrongs done to him where the wrongdoer violates a duty arising from a contract or otherwise owing directly by him to the shareholder.  Such a principle is not so much an exception to the general rule as it is a recognition that a shareholder may sue for violation of his individual rights regardless of whether the corporation also has a cause of action.  It is the nature of the wrong, whether directed against the corporate only or against the shareholder personally, not the existence of injury, which determines who may sue.") (citations omitted).

177.   Numerous Texas appellate courts have recognized an individual cause of action for "shareholder oppression" or "oppressive conduct." *Id.  See also, e.g.*, *Cotton v. Weatherford Bankschares, Inc.*, 187 S.W.3d 687, 699 (Tex. App.—Fort Worth 2006, no pet. h.); *Gonzales v. Greyhound Lines, Inc.*, 181 S.W.3d 386, 392 n. 5 (Tex. App.—El Paso 2005, no pet.); *Willis v. Donnelly*, 118 S.W.3d 10, 32 n. 12 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *Pinnacle Data Services, Inc. v. Gillen*, 104 S.W.3d 188, 192 (Tex. App.—Texarkana 2003, no pet.); *Willis v. Bydalek*, 997 S.W.2d 798, 801 (Tex. App.—Houston [1st Dist.] 1999, pet. denied); *Hoggett v. Brown*, 971 S.W.2d 472, 488, n. 13 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); *Davis v. Sheerin*, 754 S.W.2d 375, 383 (Tex. App.—Houston 1988, writ denied).

178.   Oppressive Conduct has been defined as follows:

(i) Majority shareholders' conduct that substantially defeats the minority's expectations that, objectively viewed, were both reasonable under the

circumstances and central to the minority shareholder's decision to join the venture; or

(ii) Burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

*Redmon,* 202 S.W.3d at 234.

179.    A claim of oppressive conduct can be independently supported by evidence of a variety of conduct, *Id.*, and such evidence is usually a pattern of activity.  *See, e.g., Redmon, 202 S.W.3d at 233-5*)(noting that oppression supported by a variety of conduct and describing a pattern of wrongful conduct); *Kaplan v. First Hartford Corp.*, 484 F. Supp. 2d 131 (D.Me. 2007) ("No one of these actions alone would meet the oppression standard for a shareholder dissolution suit -- each has its own remedy, ranging from the remedies [already pursued successfully] to other remedies such as a derivative lawsuit . . . . It is the pattern of abusive conduct that establishes oppression.").

180.    While oppressive conduct is more easily found in the context of a close corporate, no case law limits it to such a context.  *Redmon,* 202 S.W.3d at 234.

i.    *State Court Oppression Counts Allege Direct Claims under Texas Law*

181.    The State Court Petition alleges a pattern of actionable conduct on the part of the Defendants -- oppression, breaches of fiduciary duties owed them by those controlling the corporation and securities fraud and misrepresentation -- which had the effect of depriving them of 100 percent of their interests in SkyComm.

182.    All of the allegations contained in the Petition, when viewed as whole, articulate a direct claim for shareholder oppression under Texas law with regard to both the CenturyTel Defendants and the Kubbernus Defendants.  The conduct alleged reveals a pattern of wrongful

activity on the part of the majority or controlling shareholders that substantially defeated the minority's expectations, conduct that was burdensome, harsh, and wrongful, a lack of probity and fair dealing in the company's affairs to the prejudice of the minority shareholders, a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely on.

D.   THE STATE COURT PETITION IS NOT A COLLATERAL ATTACK ON THE CONFIRMATION ORDER OR PLAN

183.   A collateral attack is an attempt to avoid the binding force of a judgment in a proceeding not instituted for the purpose of correcting, modifying, or vacating the judgment, but in order to obtain some specific relief which the judgment currently stands as a bar against. *Browning v. Prostok*, 165 S.W. 3d 336, 346 (Tex. 2005).  It is axiomatic that when interpreting state law, federal courts are bound by decisions of the state's highest court.  *See, e.g.*, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

184.   Plaintiffs have not purported to challenge the Plan or Confirmation Order and, clearly accept the results of the Plan in the Petition.[77]  They do not seek any result that the judgment would bar.

185.   The Texas Supreme Court has clearly held that when a party does not seek to set aside a prior judgment, but instead brings suit based on extrinsic fraud, the action is not a collateral attack.  *Id*.  (citing *State v. Durham*, 860 S.W.2d 63, 67 (Tex. 1993) (recognizing, in a suit brought by the state for fraud in obtaining court approval for an oil and gas lease, that the State had not sought to set aside the judgment but had "alleged fraud extrinsic to the judgment, and invoke[d] the equity powers of the court to impose a constructive trust").

---

[77] See Counts in Petition, ¶¶ 343-496 , none of which attack the Order or Plan.

50

186.    Extrinsic fraud is fraud that denies a losing party the opportunity to fully litigate at trial all the rights or defenses that could have been asserted.  *Browning*, 165 S.W.3d at 347.  It generally includes wrongful conduct occurring outside of the adversarial proceedings. *Id.*  The controlling question is "whether the alleged fraud prevented the party from knowing about and presenting [their] legal rights at trial."  *Brown*, 165 S.W.3d at 349.

187.    In our case, plaintiffs' direct claims for fraud could not have been alleged or tried in the Bankruptcy Court.  As *In re Seven Seas* demonstrates, the fact that derivative claims were tried and settled by the Trustee does not prevent a plaintiff from asserting direct claims against the identical parties on the same facts.

188.    Further, a fiduciary's concealment of material facts to induce an agreed or uncontested judgment, which prevents a party from presenting his legal rights at trial, is extrinsic fraud. *Browning*, 165 S.W.3d at 347.  Each Plaintiff was unable to contest the Bankruptcy Plan on fraud grounds because he was denied the information by Defendants regarding the true nature of the fraud.  Only when the documents that many of the defrauded investors received were assembled and analyzed did the fraud become apparent.

189.    Kubbernus, who was a fiduciary to plaintiffs, concealed from each plaintiff the documents that would have enabled him to determine that:

(a)    The $2 million that Balaton claimed to be owed by SkyComm which made it a creditor in this case, was claimed to result from advances made by Balaton to SkyComm in 2006.  Yet, contemporaneous documents and financial statements covering this period, do not reflect this obligation.  If Balaton was owed this money, it was never reflected in any of the financial statements generated for SkyComm by Kubbernus.

(b)     The $2.7 million secured obligation that CenturyTel claimed to be owed by SkyComm was not known by Plaintiffs to be the same as the $2.5 million obligation that Balaton incurred to CenturyTel in November 2006, plus interest.  The fact that not all of the CenturyTel Debentures were converted on that date was hidden by CenturyTel and Kubbernus from the shareholders and not revealed to them until they were able to assemble the paper trail which showed that CenturyTel and Kubbernus had taken an obligation of Balaton and converted it into an obligation of SkyComm.

(c)     Plaintiffs did not know that Kubbernus had not transferred to ClearSky, beneficial ownership of the controlling interest in SkyComm until he testified in August 2009 that ClearSky had no interest.  This Court ruled that Draco did not have standing because it couldn't prove that ClearSky owned an interest in SkyComm.  Plaintiffs obtained proof that this was incorrect after they received a copy of a June 2008 Kubbernus document showing ClearSky's ownership interest.  This document was given to an investor who already owned an interest in ClearSky and was being induced to invest in the "Lavell Notes."  Obviously, Kubbernus had no choice but to show him his interest in SkyPort, to extract more money out of him.  This document was prepared just a few months before Kubbernus put SkyPort into the Chapter 11 proceeding.

(d)     Plaintiffs did not know until after confirmation, when they began to analyze the various transactions between Kubbernus and his various entities, on the one hand, and SkyComm, on the other, that Kubbernus had sold a valuable piece of networking equipment belonging to SkyComm and diverted the proceeds to Balaton, which used these proceeds to fund

the Plan, whereby Balaton acquired almost 100% of the equity in SkyComm and wiped out all of the shareholders.[78]

190.    As demonstrated previously, the fact that some of these facts discovered after confirmation may give rise to derivative claims on behalf of SkyPort does not mean that the shareholders cannot bring an independent and separate action against Kubbernus for the separate and direct harm they suffered.

191.    As even Removing Defendants acknowledge, "[t]hese allegations are alarming and ought to be addressed by this Court."[79]   But, it does not follow, as Removing Defendants suggest, that this Court should also hear Plaintiffs' direct claims.  It does not mean that Plaintiffs should be forced to pursue remedies in this Court for extrinsic fraudulent acts, when they explicitly elected to forgo this course and pursue their State Court remedies.

192.    The allegations Removing Defendants complain of are, in fact, not vital to plaintiffs case, and should this Court determine that the allegations that state that parties were untruthful before this Court or any other allegations in the Petition should not be pursued in the State Court proceeding, remand would still be the appropriate and just remedy, with these allegations excised from the Petition.

193.    Further, Plaintiffs do not seek to gain control of SkyComm, as Removing Defendants charge.  Plaintiffs included the remedy of appointment of a "provisional director, trustee, managing agent, fiscal agent, or other Court appointed fiduciary" in their form prayer for relief on their shareholders' oppression claims,[80]   This is a standard statutory remedy for this

---

[78] Petition Par. 320
[79] MTD ¶ 61.
[80] Petition ¶ 72.

type of direct claim,[81] but plaintiffs have no desire to seek such relief or, as Removing

Defendants suggest, take over SkyComm. Accordingly, Plaintiffs will remove this prayer for

relief so as to eliminate this as a point of contention.

E.    THIS COURT HAS NO JURISDICTION OVER THESE DIRECT CLAIMS

    *i.    The State Court Action is Not a Core Proceeding*

194.    28 U.S.C. § 1334(b) provides that the "district courts shall have original but not

exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to

cases under title 11." Proceedings "arising under" title 11 involve causes of action created or

determined by a statutory provision of titles 11, and proceedings "arising in" title 11 are not

based on a right expressly created by title 11, but are based on claims that have no existence

outside bankruptcy. *See In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987).

195.    In this vein, *Wood* holds that if a "proceeding involves a right created by the

federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a

preference." *Id.*

196.    Thus, "a proceeding is core under section 157 if it invokes a substantive right

provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a

bankruptcy case." *Id*.

197.    Defendants urge this court that this is a core proceeding under 157(b)(2)(B), (C),

(L) or (O). "In determining the nature of a proceeding for purposes of determining core status,

the court must look to both the form and substance of the proceeding." *Id*.

---

[81] See TEX. BUS. CORP. ACT ANN. art. 7.05 (Vernon 2003) (court may appoint a receiver for the assets and business of a corporation when the acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent).

198.     Although 28 U.S.C. § 157(b)(2) provides a non-exclusive list of core proceedings, the Fifth Circuit has more comprehensively stated that claims that "arise under" or "arise in" a bankruptcy case are "core" matters, whereas claims that "relate to" a bankruptcy case, but do not arise in or arise under the Bankruptcy Code, are "non-core."  *In re Gober*, 100 F.3d 1195, 1206 (5th Cir. 1996).

199.     Here, the form of this action is not that of a "claim" (or "counterclaim") as that term is used in bankruptcy law, nor is the procedure like that of a bankruptcy proceeding, and thus this case could not be core under 157(b)(2)(B) or (C).  Nor would the State Court Action be core under 157(b)(2)(L) or (O).  It doesn't not challenge or concern the confirmation of plans, nor does it affect the liquidation of the assets of the estate.

200.     The substance of this action does not support a finding of core status either.  The essential issue in the State Court Action is whether the Defendants are liable under state law.

*ii.   State Court Action is Not Even Non-Core -- Not "Related To" Cases under Title 11*

201.     Bankruptcy Courts also may, in some circumstances, also exercise jurisdiction over proceedings that are "related to" cases under title 11.

202.     The Fifth Circuit has adopted the *Pacor* test for determining whether a proceeding is related to a case under title 11, which queries whether a proceeding will have any conceivable effect on the bankruptcy estate.  *In re Wood,* 825 F.2d at 93-4.

203.     The State Court Action is not even "related to" the SkyPort Chapter 11 case because it can have no effect on the estate.  Plaintiffs seek no remedy against SkyPort, nor do they seek to overturn any of the Order or Plan.  The estate is closed and merged back into the Debtor.  The State Court Action does not seek to recoup an interest distributed under the Plan, nor does it seek to recover any stock or cash withdrawals.  The State Court Action is based

simply on oppression and fraud claims under state law against non-debtors and seeks judgments

against those same non-debtors.

F.     IN THE ALTERNATIVE, THE COURT MUST OR SHOULD ABSTAIN

204.    In the Fifth Circuit, mandatory abstention under § 1334(c)(2) is a proper basis for

the Bankruptcy Court to remand to the State Court a case that was removed pursuant to § 1452.

*Brownsberger v. Delchamps*, In., 48 Fed. Appx. 480, 2002 WL 31049433, at *2 (5th Cir. Aug. 27,

2002) (not designated for publication) (citing to *Southmark Corp. v. Coopers & Lybrand*, 163

F.3d 925, 929 (5th Cir. 1999) for the proposition that "[u]under the law of this circuit, mandatory

abstention under § 1334(c)(2) is a proper basis for a federal court to remand to state court a case

that was removed pursuant to § 1452.").

205.    28 U.S.C. § 1334(c)(2) provides for mandatory abstention of certain state law

claim:

> Upon timely motion of a party in a proceeding based upon a State law
> claim of State law cause of action, related to a case under title 11 but not arising
> under title 11 or arising in a case under title 11, with respect to which an action
> could not have been commenced in a court of the United States absent
> jurisdiction under this section, the district court shall abstain from hearing such
> a proceeding if an action is commenced, and can be timely adjudicated, in a
> State forum of appropriate jurisdiction

206.    The District Court must abstain from hearing state law claims if the following

requirements are met: (1) the claims have no independent basis for federal jurisdiction other than

§ 1334(b); (2) the claims are non-core; (3) an action has been commenced in state court; and (4)

the action can be adjudicated timely in state court. *WRT Creditor's Liquidation Trust v. C.I.B.C.*

*Oppenheimer Corp.*, 75 F. Supp. 2d 596, 605 (S.C. Tex. 1999).

207.    There is no independent basis for federal jurisdiction here, if at all, other than §

1334(b).   In the State Court Action, Plaintiffs assert direct claims against Defendants for

oppression, breach of fiduciary duty, fraud, statutory fraud, state securities fraud, negligent misrepresentation, negligence, conspiracy, aiding and abetting and breach of contract, none of which causes of action raise any federal question. There is no diversity jurisdiction because plaintiffs filed this lawsuit in Harris County, Texas, and at least one defendant, Kubbernus, is a citizen of the State of Texas. 28 U.S.C. 1441(b).

208. The second test for mandatory abstention is met because the claims are non-core. As shown above, none of the causes of action asserted in the State Court Action were created by a statutory provision of title 11 and all exist outside bankruptcy. Proceedings "related to" cases under title 11 involve matter where the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy. *See In re Wood*, 825 F.2d at 93. The distinction is important because "[m]andatory abstention applies only to non-core proceedings – that is, proceedings 'related to a case under Title 11' but not 'arising under Title 11, or arising in a case under Title 11.'" *In re Gober*, 100 F.3d at 1206 (quoting 28 U.S.C. §§ 157(b)(1) & 1334(c)(2)). At best, the claims asserted in the State Court Action are non-core matters over which this Court has "related to" jurisdiction.

209. The third mandatory abstention test is patently met: that an action has been commenced in state court. *Southmark*, 163 F.3d at 929.

210. Likewise the fourth test is met: this case can be timely adjudicated in State Court.

*i. In the Alternative, the Court Should Exercise Permissive Abstention and Equitable Remand*

211. If the Court should determine that mandatory abstention is not applicable, then Plaintiffs request that the Court remand the State Court action under 28 U.S.C. § 1452(b) and exercise its discretion to abstain from all related matters under 28 U.S.C. § 1334(c)(1). Section

1452(b) in pertinent part provides:

> The Court to which such claim of cause of action is removed may remand such claim or cause of action on any equitable ground.

212.    Section 1334(c)(1) in pertinent party provides:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

213.    The court in *Regal Row Fina, Inc. v. Washington Mutual Bank*, 2004 WL 2826817, at *8, U.S.D.C. N.D. Tex. observed:

> Together, § 1452(b) and § 1334(c) evince a congressional policy that the trial of state law created issues and rights should be allowed to proceed in state court, at least where this is no basis for federal jurisdiction independent of § 1334 and the litigation can be timely completed in state court.

*Lee v. Miller*, 263 B.R. 727, 763 (S.D. Miss. 2001).

214.    Importantly, the Fifth Circuit in *In re Gober*, 100 F.3d at 1206-1207, emphasized this Congressional preference for state court proceedings, stating:

> Nothing, however, prevents a court from permissively abstaining under § 1334(c)(1) where some, but not all, of the requirements for mandatory abstention are met . . . . We find no abuse of discretion [in abstaining] because we agree that Gober's claims hinge solely on questions of state law and invoke no such substantive right created by federal bankruptcy law. Gober's claims exist wholly outside of bankruptcy . . . .

215.    There is no basis for federal jurisdiction of Plaintiffs claims other than § 1334(b), and they exist wholly outside of bankruptcy.

216.    In the Fifth Circuit, equitable consideration that are relevant to a decision to remand include:

> (a) *forum non conveniens*;
> (b) a holding that, if the civil action has been bifurcated by removal, the entire action should be tried in the same court;

(c) a holding that a state court is better able to respond to questions involving state law;
(d) expertise of the particular court;
(e) duplicative and uneconomic effort of judicial resources in two forums;
(f) prejudice to the involuntarily removed parties;
(g) comity considerations; and
(h) a lessened possibility of an inconsistent result.

*Browning v. Navarro*, 743 F.2d 1069, 1076 n. 21 (5th Cir. 1984) (citations omitted); *see also In re Fairchild Aircraft Corporation*, Bankr. No. 90-50257C, 1990 WL 119650, at *1, 4 (Bankr. W.D. Tex. June 18, 1990).

217.     Additionally, bankruptcy and district courts in the Fifth Circuit have developed the following list of 14 factors for consideration when determining whether to exercise discretionary abstention and equitable remand:

(a)  the effect or lack thereof on the efficient administration of the estate if the court decides to remand or abstain;
(b)  the extent to which state law issues predominate over bankruptcy issues;
(c)  difficult or unsettled nature of applicable law;
(d)  presence of a related proceeding commenced in state court or other nonbankruptcy proceeding;
(e)  jurisdictional basis, if any, other than § 1334;
(f)  degree of relatedness or remoteness of proceeding to main bankruptcy case;
(g)  the substance rather than the form of an asserted core proceeding;
(h)  the feasibility of severing the state law claims from core bankruptcy matter to allow judgments to be entered in state court with enforcement left to the bankruptcy court;
(i)  the burden on the bankruptcy court's docket;
(j)  the likelihood that the commencement of the proceeding in the bankruptcy court involves forum shopping by one of the parties;
(k)  the existence of a right to a jury trial;
(l)  the presence in the proceeding of non debtor parties;
(m)  comity; and
(n)  the possibility of prejudice to other parties in the action.

*First Bank v. Arafate*, 2006 WL 2612746 (S.D. Tex. 2006).

218.     On balance, the factors weigh heavily in favor of remanding the State Court Action to state court for trial and abstaining from related matters pending its outcome.  The

59

claims involve state law issues only, and the bankruptcy court is not faced with uniquely bankruptcy issues (e.g., dischargability, fraudulent transfer, preference, etc.).

219.     With no particular need to address any unique federal question, bankruptcy or otherwise, comity considerations should weigh heavily in favor of trying the state law issues before the state court judge, and there are claims involving oppression, which is an evolving area of state law.

220.     The Fifth Circuit's remand factors also compel remand.

221.     Because the disputes between Plaintiffs and Defendants raise purely state law issues, they predominate over bankruptcy issues, and there is no basis for jurisdiction other than 1334(b).

222.     There are no factors raised by Defendants' Notice of Removal that overcome the Congressional intent that state law disputes prepared for trial in state court be tried in state court. Thoughtful evaluation of these factors compels abstention and remand.  Accordingly, Plaintiffs request that under 28 U.S.C. §§ 1334(c)(2), 1334 (c)(1) and 1452(b), this Court remand the State Court Action to state court and abstain in Adversary Proceeding No. 10-3150.

G.     SANCTIONS SHOULD BE IMPOSED, IF AT ALL, AGAINST REMOVING DEFENDANTS

223.     As outlined above, removal of this action was based upon mischaracterizations of the claims in the State Court Petition and of applicable law, and it included removal of claims that they admitted this Court did not have jurisdiction over and asked this Court to dismiss such claims.  At most, Removing Defendants could have removed just the few counts that could possibly have been construed as colorably derivative (See 11 U.S.C. 1452(a) (authorizing removal of "any claim")), but instead removed the entire Petition.  And, if they feared that Plaintiffs were seeking a takeover of SkyPort, they could have resolved this issue without

invoking the Court's jurisdiction or by seeking an injunction against such a takeover.

224.    Removing Defendants lack of good faith is confirmed by the fact that the removal was an effort to hinder and delay direct claims against third-parties after this Court had stated that third-party claims were not in any manner being affected by the Plan confirmation.

225.    Notwithstanding their bad-faith removal, Removing Defendants moved for sanctions against plaintiffs on the basis that Plaintiffs had knowledge that their claims had been released in the Plan. This was directly contrary to the Court's statement that the Plan did not in any manner inhibit direct claims against third-parties.

226.    Removing Defendants' request for sanctions should be denied, and if sanctions are awarded, they should be awarded against Removing Defendants for the fees and costs related to the removal and otherwise as this Court sees fit.

## V.    CONCLUSION

227.    Removal of this case was procedurally and substantively defective.

228.    The State Court Petition alleges direct claims for fraud and shareholders oppression, which were not released in the Bankruptcy Plan.  Accordingly this Court should refrain from hearing this case, and remand back to the State Court from which it was removed.

229.    The State Court Petition is not a collateral attack on the Plan or Confirmation Order, and if necessary, appropriate amendments can be made to the State Court Petition to assure Removing Defendants that no modification of any aspect of the confirmed Plan occurs in the State Court Action.

230.    Removing Defendants Motion to Dismiss or for Summary Judgment should be denied.

231.    Sanctions should not be imposed upon Plaintiffs and if sanctions are imposed,

they should be imposed against Removing Defendants for their bad faith removal, without any legal or factual basis.

WHEREFORE, the Plaintiffs pray that:

1.      The Court enter an order remanding the present proceeding;

2.      The Court dismiss Removing Defendants' motion to dismiss and for summary judgment;

3.      This Court impose sanctions, if at all, against Removing Defendants for their bad faith removal of the State Court Petition, for the fees and costs related to the removal and otherwise as this Court sees fit.

4.      Grant such other and further relief as is just and proper.


Dated: April 19, 2010

                                        Respectfully submitted,



                                        /s/ Eric Fryar
                                        Eric Fryar
                                        SBN 07495770
                                        1001 Texas Ave. Ste 1400
                                        Houston, Texas 77002-3194
                                        Tel.        888-481-9995
                                                    281-715-6396
                                        Main Fax:  281-715-6397
                                        Direct Fax: 281-605-1888
                                        Email: efryar@fryarlawfirm.com

Samuel Goldman
Samuel Goldman & Associates
100 Park Ave; 20th Floor
New York, New York 10017
Tel.          212-725-1400
Fax.          212-725-0805
Email: sg@sgalaw.com

Harold B. Obstfeld
Harold B. Obstfeld, P.C.
100 Park Ave; 20th Floor
New York, New York 10017
Tel.          212-696-1212
Fax.          212-867-7360
Email: hobsd@erols.com

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the above and foregoing was forwarded to al counsel of record via electronic mail by the Clerk via CM/ECF.

Defendants' Counsel:
Hugh M. Ray, III
Robert M. Manley
McKool Smith P.C.
600 Travis, Suite 7000
Houston, Texas 77002

Wilson Vukelich, LLP:
Wilson Vukelich, LLP
Valleywood Corporate Centre
60 Columbia Way, Ste 710
Markham, Ontario
L3R 0C9
CANADA

/s/ Eric Fryar