## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SKYPORT GLOBAL | § | CASE NO. 08-36737-H4-11 |
| COMMUNICATIONS, INC., | § | (Chapter 11) |
| Debtor | § | |
| | § | |

| | | |
|---|---|---|
| JOANNE SCHERMERHORN, JOHN K. WAYMIRE, CHET GUTOWSKY, JOHN LLEWELLYN, JOSEPH A. LOPEZ, ROBERT FOOTE, BLF PARTNERS, LTD., ECAL PARTNERS, LTD., WHIZKID VENTURE, LLC, BELLA KRIEGER, MARTIN POLLAK, GLOSTER HOLDINGS, LLC, MELVYN REISER, BARRY KLEIN, CHESKEL KAHAN, JOHN A. REES, BRIAN W. HARLE, MICHAEL STEIN, LAWRENCE SOLOMON, TRACY ELSTEIN & DAVID TOGUT, JASON CHARLES TOGUT TRUST, BMT GRANTOR TRUST, LYNN JOYCE ELSTEIN TRUST, CHARLES STACK, JOSEPH BAKER, MOVADA, LTD., PUDDY, LTD., DRACO CAPITAL, INC., EDWARD PASCAL, ROBERT MENDEL, STANLEY BERAZNIK, DON DUI, BEN ARIANO, 3791068 CANADA, INC., PETER TAYLOR, JOHN E. PANNETON, WAYNE C. FOX, DAVID CURRIE, BYRON MESSIER, DARSHAN KHURANA, MATEO NOVELLI, DIYA AL-SARRAJ, SEQUOIA AGGREESSIVE GROWTH FUND, LTD., SEQUOIA DIVERSIFIED GROWTH FUND, LTD., RIG III FUND, LTD., ARAN ASSET MANAGEMENT SA, SEMPER GESTION SA, and EOSPHOROS ASSET MANAGEMENT, INC. Plaintiffs | § § § § § § § § § § § § § § § § § § § § § § | |
| vs. | § | ADVERSARY NO. 10-3150 |
| CENTURYTEL, INC. (a/k/a CENTURYLINK), CLARENCE MARSHALL, R. STEWART EWING, JR., MICHAEL E. MASLOWSKI, HARVEY P. PERRY, ROBERT KUBBERNUS, BALATON GROUP, INC., BANKTON FINANCIAL CORPORATION, BANKTON FINANCIAL CORPORATION, LLC, CLEARSKY MANAGEMENT, INC., WILSON VUKELICH, LLP and CLEARSKY INVESTMENTS, LP Defendants | § § § § § § § § § § § | JURY TRIAL DEMANDED |

## DECLARATION OF BROGAN TAYLOR IN OPPOSITION
## TO WILSON VUKELICH LLP'S MOTION TO DISMISS

Brogan Taylor declares, pursuant to 28 U.S.C. § 1746, as follows:

1.      My name is Brogan Taylor.  The facts stated in this declaration are based upon my personal knowledge and under penalty of perjury are true and correct.  I am over 18 years of age and have never been convicted of a felony.

2.      I was employed by Balaton Group Inc. ("Balaton") from September 2005 through March 2009, in various professional capacities.  At the time of my departure, my title was Vice President & Asset Manager.  From December 2005 through November 2008, I had substantial responsibility for Balaton's SkyComm, SkyPort and ClearSky projects.  I reported directly to Robert Kubbernus ("Kubbernus"), Balaton's President, and carried out his instructions regarding SkyComm, SkyPort and ClearSky.

3.      When I joined Balaton, the company promoted itself as a financial advisory firm, with capabilities to raise funds for and advise companies in turnaround situations, but not as a principal.

4.      To the best of my knowledge, Balaton was not licensed as a securities broker in Canada or in the United States.

5.      I know from personal knowledge that Wilson Vukelich ("WV") and Jeff Goldenthal ("Goldenthal"), in particular, were general counsel to Kubbernus and all of the entities that he controlled during the period of my employment at Balaton.  These entities included SkyComm, SkyPort, Balaton, Bankton, ClearSky, ClearSky Management and Lavell. As general counsel, WV had overall responsibility for the legal needs of all of the Kubbernus entities.  To the extent that other counsel was required to perform various tasks, they worked under the direction and supervision of WV.  I spoke to Goldenthal on a frequent and regular basis regarding the legal matters relating to these entities and only on a handful of occasions did I speak with other counsel in the United States.

2

6.     My only communications with Michael Black, whom Goldenthal suggests in his declaration was U.S. counsel on the SkyComm transaction, related to the payment of his invoices.

7.     WV was the primary counsel for Balaton in negotiating the SkyComm transaction with CenturyTel's and SkyComm's respective counsels in early 2006, including preparing and negotiating all of the documents for these transactions.  Among these documents are the following, all dated February 15, 2006:

        a.   Equity Placement Agreement between SkyComm and Balaton;

        b.   Debenture Purchase Agreement between CenturyTel and Watershed Funds;

        c.   Subscription Agreement (a//k/a Securities Purchase Agreement) between SkyComm, and Balaton and Other Investors;

        d.   DIP Loan Agreement between SkyComm and Balaton; and

        e.   Exit Loan Agreement between SkyComm and Balaton.

I did not retain copies of any of these documents when I left Balaton's employment, but I believe that the document annexed hereto as Exhibit A is a true copy of the Subscription Agreement dated as of February 15, 2006 between SkyComm and Balaton and Other Investors.

8.     Although WV may have been assisted by U.S. counsel on various aspects of these transactions, the only counsel for Balaton mentioned in these documents is WV.  I do not recall discussing the substance of any of these documents with any attorney other than Goldenthal and WV.  To the best of my recollection, Goldenthal and WV are the only attorneys listed as counsel to the Kubbernus entities in any of these documents, the only attorneys who negotiated these transactional documents with counsel for SkyComm, Bracewell & Guiliani LLP of Houston, Texas, and the only attorneys who represented Balaton at the closing at Bracewell & Giuliani's offices in Houston.

3

9.     Since a number of closing conditions needed to be fulfilled before the investment in SkyComm could close, including obtaining FCC and other governmental approvals of the change in ownership of SkyPort, the investor funds needed to be raised not in SkyComm, but in another entity that would not acquire its interest in SkyComm until all closing conditions had been satisfied.

10.    In February 2006, Kubbernus and Balaton began to raise the funds needed for the SkyComm transaction in an entity called ClearSky. ClearSky was specifically set up to acquire the controlling interest in SkyComm at the closing – as much as 82% of the equity.

11.    WV acted as general counsel to ClearSky and ClearSky Management for all matters involving ClearSky. WV's attorneys were the only ones whom I consulted when I had questions regarding the ClearSky offering or the ClearSky partnership.

12.    In its capacity as primary counsel to Balaton, ClearSky and ClearSky Management, WV prepared, negotiated and provided legal advice on the following documents:

   a.   ClearSky Limited Partnership Agreement ("ClearSky LPA"), which was drafted as the governing document for the entity that was intended to own the controlling interest in SkyComm and SkyPort;

   b.   ClearSky Information Memorandum, sent to prospective investors promising them an interest in ClearSky, and that ClearSky would own 82% of SkyComm; and

   c.   ClearSky Subscripting Agreement, which was executed by the investors in ClearSky.

ClearSky 's sole purpose was to acquire control of SkyComm and SkyPort, and the Information Memorandum and LPA confirm this. The LPA states that this was the purpose of ClearSky, and the Information Memorandum talks only about SkyComm and SkyPort (see Exhibit B, annexed

4

hereto). This was the only rationale provided by Kubbernus to investors in seeking to have them invest in ClearSky.

13.     WV is explicitly mentioned in the ClearSky LPA as counsel to ClearSky and ClearSky Management. WV is the party to whom investors in ClearSky were instructed to send and did send their subscription agreements. Investors funds were deposited in a WV Trust Account.

14.     The ClearSky investment was not limited to non-U.S. investors. The Subscription Agreement (a copy of which is annexed as Exhibit C hereto) contained specific provisions applicable to U.S. investors and Kubbernus solicited investors in the United States for ClearSky. In point of fact, two United States residents invested in ClearSky – Stanley Beraznik, who lives in San Francisco and ECAL Partners, a Texas business entity with its principle business office in Spring, Texas.

15.     In March 2006, soon after these documents were signed, CenturyTel and Kubbernus decided to present Balaton to the FCC and Team Telecom Agencies, as the party acquiring the controlling interest in SkyComm, rather than Watershed Funds or ClearSky. WV, as counsel to Kubbernus and Balaton, acted for them in the formulation and implementation of this decision.

16.     Although the actual filings were prepared by CenturyTel's counsel, Latham & Watkins LLP, WV was every bit a part of the joint effort to present these applications to the FCC on behalf of SkyPort.

17.     WV was counsel to Kubbernus, Balaton, and ClearSky, in connection with the decision by these parties to not respond accurately to the Department of Homeland Security request for information on each and every equity owner in SkyComm, which were filed from Houston.

5

18.     Wilson Vukelich played an integral role in preparing for the closing of the acquisition of the CenturyTel Debentures to Balaton and Securities Purchase Agreement in the Fall of 2006.  To my knowledge, it was the only firm representing Balaton for this closing.  As shown in the draft Closing Agenda for a projected September 15, 2006 closing (a copy of which is annexed hereto as Exhibit D), Wilson Vukelich was responsible for a variety of items (some already delivered an others remaining opening) including:

    a.  Drafting B7 – Agreement with other debenture holders (i.e., the Non-CenturyTel Debenture Holders);

    b.  Drafting C1 – create simple letter agreement amending Debt Purchase Agreement and Security Purchase Agreement;

    c.  Reviewing C2 – Conversion agreement with all non-CTel Debenture holders[1];

    d.  Reviewing C3 – Current Board resignation of SkyPort and SkyComm;

    e.  Reviewing C6 – Draft Stock Option Plan approval in Trust to be obtained from Balaton.

19.     In anticipation of and at the November 2, 2006 closing in Houston, WV directly participated in the negotiation and execution of closing documents transferring a controlling interest in SkyComm to Balaton, and not ClearSky.  Among the documents that were executed and delivered at the November 2, 2006 closing in Houston were:

    a.  Amendment to Debenture Purchase Agreement, substituting Balaton for Watershed Funds as the purchaser of the CenturyTel Debentures;

    b.  Amendment to the Securities Purchase Agreement, making Balaton the sole purchaser of the SkyComm shares and eliminating references to the "investors";

---

[1]  The Commentary here is noteworthy: "Conversion of these debentures can either be simultaneous or just prior to the conversion of the CTel Debentures."

   c. Shares were issued to Balaton, and not ClearSky; and

   d. The note from Balaton to CenturyTel for $3 million, representing the sum Balaton was to pay for the CenturyTel Debentures, but did not deliver at the closing.

All of these documents were integral to the fraudulent diversion of the controlling interest in SkyComm from ClearSky to Balaton.

  20. Goldenthal's statement that WV did almost no substantive work for ClearSky mystifies me and cannot possibly be true. Between March 2006 and October 2007, WV billed and collected from ClearSky almost $200,000 for legal services, as shown on the WV Trust Account f/b/o ClearSky account register, annexed hereto as Exhibit E:

| Date of Payment to WV | Amount |
| --- | --- |
| 4/13/2006 Check # 21 | $30,000.00 |
| 5/31/2006 Check # 40 | 69,188.76 |
| 8/11/2006 Check # 60 | 15,149.74 |
| 8/11/2006 Check # 61 | 7,241.45 |
| 8/18/2006 Check # 69 | 6,061.96 |
| 10/3/2006 Check # 72 | 21,854.56 |
| 10/3/2006 Check # 73 | 12,411.01 |
| 12/18/2006 Check # 98 | 3,405.79 |
| 12/18/2006 Check #99 | 19,894.44 |
| 2/20/2007 Check # 161 | 8,526.06 |
| 6/19/2007 Debit | 1,185.20 |
| 10/24/2007 Check # 158 | 1,325.32 |
| **Total** | **$196,488.52** |

7

This does not include other transfers to Wilson Vukelich totaling $64,000 that are insufficiently explained. I do not know how much WV charged other Kubbernus entities for legal services.

21.     WV acted as Balaton's counsel for the closing of the SkyComm transaction on November 2, 2006, at the offices of Bracewell & Guiliani in Houston, Texas. Goldenthal and WV appeared as Balaton's counsel on the Closing Agenda, a draft of which is annexed hereto as Exhibit F, and Goldenthal provided me with a bound volume of the closing documents afterwards.

22.     After the closing at which title to the SkyComm shares and CenturyTel Debentures was taken in Balaton, there was never any question raised by anyone, including Kubbernus and WV, that Balaton held the controlling interest in SkyComm for the benefit of ClearSky. All parties, including Kubbernus and WV, treated this as a fundamental truth.

23.     On several occasions after the Houston closing, I raised the issue of documenting ClearSky's controlling interest in SkyComm with Kubbernus and Wilson Vukelich. Kubbernus informed Taylor not to worry about it. To the best of my knowledge, Wilson Vukelich never took any steps to document ClearSky's interest.

24.     Subsequent to the November 2, 2006 closing, WV acted as counsel to SkyComm in connection with various securities offerings by SkyComm. Whenever I had questions about these offerings, I consulted Goldenthal and WV, and they advised me on these.

25.     For example, the closing of a $7 million offering by SkyPort is to take place at Wilson Vukelich's offices in Markham, Ontario. See Exhibit G, annexed hereto).

26.     WV represented SkyComm and acted as escrow agent under the 2008 SkyComm Debenture Offering, in which its job was to hold investors' funds in trust "until the minimum Offering has been met." (See Exhibit H, annexed hereto). This transaction never closed.

8

27.     Also after the November 2, 2006 closing, WV acted as counsel to Balaton and SkyComm in connection with the conversion of the $3 million note from Balaton to CenturyTel into a debt from SkyComm to CenturyTel.

28.     WV represented Lavell, SkyComm and Balaton in connection with the transaction in which all of the shareholders of SkyComm were asked to convert their shares into shares of Lavell. The Lavell transaction was designed to take SkyComm public indirectly in Canada. SkyComm shareholders sent their shares to WV for conversion into Lavell shares. WV was one of two firms that drafted the Lavell prospectus.

29.     On November 15, 2007, SkyComm sent a letter (a copy of which is annexed hereto as Exhibit I) to all of its shareholders, enclosing a draft of the Lavell Prospectus prepared by WV and asking them to convert their SkyComm shares into Lavell shares. Almost all of them did.

30.     To the best of my knowledge, these shareholders never received the Lavell shares they were promised, nor the return of their SkyComm shares.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 15, 2010.

Brogan Taylor

# EXHIBIT "A"

**Execution Copy**

# SECURITIES PURCHASE AGREEMENT

## BY AND AMONG

## SKYCOMM TECHNOLOGIES CORPORATION

## BALATON GROUP INC.

## AND THE PURCHASERS NAMED HEREIN

**[Insert Date]**

# TABLE OF CONTENTS

Page

ARTICLE I      AUTHORIZATION AND SALE ........................................................................... 1

 Section 1.1       Authorization ............................................................................. 1

 Section 1.2       Sale of Units............................................................................. 1

ARTICLE II      CLOSING AND DELIVERY ........................................................................ 1

 Section 2.1       Multiple Closing Dates .......................................................... 1

 Section 2.2       Closing ..................................................................................... 2

 Section 2.3       Delivery of Certificates ......................................................... 2

 Section 2.4       Payment of Purchase Price..................................................... 2

 Section 2.5       Notice of Final Closing Date .................................................. 2

ARTICLE III      REPRESENTATIONS AND WARRANTIES OF THE COMPANY ............ 3

 Section 3.1       Organization............................................................................ 3

 Section 3.2       Corporate Power ..................................................................... 3

 Section 3.3       Subsidiaries............................................................................. 3

 Section 3.4       Capitalization .......................................................................... 3

 Section 3.5       Authorization .......................................................................... 4

 Section 3.6       Consents and Approvals; No Violations................................. 5

 Section 3.7       Registration Rights.................................................................. 5

 Section 3.8       Governmental Consent, etc..................................................... 5

 Section 3.9       Offering................................................................................... 6

 Section 3.10      Brokers or Finders; Other Offers ........................................... 6

 Section 3.11      Absence of Undisclosed Liabilities........................................ 6

 Section 3.12      Employment Arrangements .................................................... 6

ARTICLE IV      REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ........ 6

 Section 4.1       Existence.................................................................................. 6

 Section 4.2       Authorization .......................................................................... 6

 Section 4.3       Pending Matters ...................................................................... 7

 Section 4.4       Consents and Approvals; No Violations................................. 7

 Section 4.5       Experience/Means................................................................... 7

 Section 4.6       Investment................................................................................ 7

## TABLE OF CONTENTS
### (continued)

Page

Section 4.7 Representations and Warranties ............................................................... 8

Section 4.8 Restrictive Legend/Rule 144 ................................................................. 8

Section 4.9 No Public Market .................................................................................. 9

Section 4.10 Access to Information ............................................................................. 9

Section 4.11 Bankruptcy Proceeding ......................................................................... 9

Section 4.12 No Broker .............................................................................................. 9

Section 4.13 Accredited Purchaser ............................................................................ 9

ARTICLE V PURCHASER'S CONDITIONS TO CLOSING AND CERTAIN COVENANTS OF THE COMPANY ............................................................... 9

Section 5.1 Conditions to First Closing Date ........................................................... 9

Section 5.2 Conditions to Final Closing Date ........................................................ 11

ARTICLE VI COMPANY'S CONDITIONS TO CLOSING ............................................. 12

ARTICLE VII POST-CLOSING COVENANTS ............................................................... 12

Section 7.1 Use of Proceeds ................................................................................... 13

Section 7.2 Fees ..................................................................................................... 13

Section 7.3 Exchanges; Lost, Stolen or Mutilated Certificates .............................. 14

Section 7.4 Board Resignations; Board Representation ......................................... 14

Section 7.5 Non-Dilution ........................................................................................ 14

ARTICLE VIII TERMINATION ....................................................................................... 14

Section 8.1 Termination on or Before the First Closing Date ................................. 14

Section 8.2 Obligations Upon Termination ............................................................ 15

ARTICLE IX SURVIVAL, INDEMNIFICATION; OTHER MATTERS ............................ 15

Section 9.1 Survival of Representations, Warranties and Covenants .................... 15

Section 9.2 Indemnification .................................................................................... 15

Section 9.3 Limitation on Indemnification for Breaches of Representations/Warranties ............................................................... 16

Section 9.4 Dispute Resolution .............................................................................. 16

Section 9.5 Successors and Assigns; Parties in Interest ........................................ 17

Section 9.6 Entire Agreement ................................................................................. 17

Section 9.7 Notices ................................................................................................ 17

**TABLE OF CONTENTS**
(continued)

| | | |
|---|---|---|
| Section 9.8 | Changes | 18 |
| Section 9.9 | Counterparts | 18 |
| Section 9.10 | Headings | 19 |
| Section 9.11 | Governing Law | 19 |
| Section 9.12 | Severability | 19 |
| Section 9.13 | Construction | 19 |
| Section 9.14 | Further Assurances | 19 |

## SCHEDULES AND EXHIBITS

Schedule A            Purchasers
Schedule B            Wiring Instructions
Schedule C            Debenture Holders
Schedule D            Agreements
Schedule E            Employment Agreements

Schedule 3.12         Current Employees With Written Agreements
Schedule 5.1(h)       FCC Licenses and Authorizations
Schedule 7.4          Directors


Exhibit A             Form of Amendment to Certificate of Incorporation of the Company
Exhibit B             Form of Warrant Certificate

# SKYCOMM TECHNOLOGIES CORPORATION
# SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement ("Agreement") is made and entered into as of the 15th day of February, 2006, by and among SkyComm Technologies Corporation, a Delaware corporation ("Company"), having its principal office at 2 Northpoint Drive, Suite 230, Houston, Texas 77060, Balaton Group Inc., an Ontario corporation, having an office at 152 King Street East Toronto, Ontario, M5A 1J3 ("Balaton"), and any other purchasers who may be joined to this Agreement from time to time and identified as a purchaser in Schedule A hereto, as such schedule may be amended from time to time prior to the First Closing Date (as defined herein) (each such party and Balaton being a "Purchaser" and collectively, being the "Purchasers").

WITNESSETH:

**WHEREAS**, the Company, through its wholly-owned subsidiary, SkyPort International, Inc., a Texas corporation ("SkyPort"), is primarily engaged in the business of operating a satellite services company;

**WHEREAS**, the Company intends to issue up to 133,333,335 units ("Units"), each Unit to consist of one share of common stock of the Company, par value $0.001 per share ("Common Stock"), and one warrant to purchase one share of Common Stock of the Company ("Warrant"), and Balaton desires to purchase Units, and if no other Purchasers are joined to this Agreement, all 133,333,335 Units, subject to the terms and conditions contained herein;

**NOW, THEREFORE,** in consideration of the premises contained herein and other good and valuable consideration, receipt of which is mutually acknowledged, the parties hereto agree as follows:

## ARTICLE I
## AUTHORIZATION AND SALE

Section 1.1    Authorization.  Subject to the terms and conditions hereof, the Company has authorized: (a) the sale and issuance of up to 133,333,335 Units; and (b) the reservation for issuance of up to 133,333,335 shares of the Company's Common Stock upon exercise of the Warrants issued as part of the Units ("Warrant Shares").

Section 1.2    Sale of Units.  Subject to the terms and conditions contained in this Agreement, the Company hereby agrees to issue and sell and Purchasers hereby agree to purchase from the Company from time to time, an aggregate of 133,333,335 Units at a price of $0.03 per Unit (the "Purchase Price").

## ARTICLE II
## CLOSING AND DELIVERY

Section 2.1    Multiple Closing Dates.  The offer and sale of Units shall be completed by the Company and Purchasers in up to three installments, as follows:

(i)     On the terms and subject to the conditions of this Agreement, on the later to occur of (A) the second business day following the Company's receipt of all consents and approvals required to be received from the Federal Communication Commission ("FCC") to consummate the transactions contemplated by this Agreement; and (B) the second business day following the date that the court issues an order approving the dismissal of the Chapter 11 Case No. 05-95172-H2-11 ("SkyPort Proceeding") involving SkyPort (such date being the "First Closing Date"), the Purchasers shall purchase such number of Units as may be purchased at the Purchase Price, equal to the greater of (1) the outstanding indebtedness of SkyPort to the Purchasers under that certain Credit Agreement by and between the Company and Balaton dated February 15, 2006 ("STC Credit Agreement") and (2) $2,500,000.00; and

(ii)    Provided all of the Units contemplated by this Agreement have not been sold to the Purchasers on the First Closing Date, on the terms and subject to the conditions of this Agreement, on August 31, 2006, or at any earlier other date and time mutually acceptable to the Company and the Purchasers ("Final Closing Date"), the Purchasers shall purchase at the Purchase Price, 16,666,667 Units from the Company, or all remaining Units if fewer than 16,666,667 Units remain available for purchase following the First Closing Date.

Each of the First Closing Date and the Final Closing Date are referred to generally from time to time as a "Closing Date" and the exchange of documents on each Closing Date, being a "Closing".

Section 2.2     Closing.  Each Closing of the purchase and sale of the Units contemplated by Section 2.1 above, shall be held at the offices of Bracewell & Giuliani LLP. at 10:00 a.m. local time on the Closing Date, or at such other time and place upon which the Company and the Purchaser mutually agree upon, orally or in writing.  Purchaser may, in its sole discretion, accelerate any Closing Date and waive compliance with any condition to closing, other than the condition described in Section 5.1(h).

Section 2.3     Delivery of Certificates.  At each Closing, the Company will deliver to the Purchasers certificates, registered in each respective Purchaser's name, representing the number of shares of Common Stock and the number of Warrants comprising the Units to be purchased by each Purchaser at the applicable Closing.

Section 2.4     Payment of Purchase Price.  At each Closing, delivery of the certificates representing the Common Stock and Warrants comprising the Units will be made against payment of the applicable purchase price therefor (whether in cash or other agreed upon form of consideration, including the forgiveness of indebtedness owing to any Purchaser), by wire transfer of immediately available funds to the account of the Company per the Company's instructions attached hereto as Schedule B.

Section 2.5     Notice of Final Closing Date.  The Company shall give Purchasers no less than five (5) calendar days written notice that the Company has satisfied the conditions set forth in Article 5 applicable to the Purchasers' Closing at the Final Closing Date.  The Company's notice shall identify the date for the Final Closing Date.  If the parties cannot agree on a date for

the applicable Closing, the Closing shall occur on the tenth $(10^{th})$ day following the date of the Company's notice, provided, if such tenth day is not a business day in Houston, Texas, the Closing shall occur on the next business day following such tenth $(10^{th})$ day.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Section 3.1    Organization.  The Company is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware.  SkyPort is a corporation duly organized and existing under and by virtue of the laws of the State of Texas.  Each of the Company and SkyPort has requisite corporate power and authority to own and operate its properties and assets, and to carry on its business as presently conducted and as proposed to be conducted.  Each of the Company and SkyPort is duly qualified as a foreign corporation and in good standing to do business in all such jurisdictions in which the conduct of its business or its ownership, leasing or operation of property requires such qualification, except for those jurisdictions in which failure to so qualify would not have a material adverse effect on the Company's business as now conducted or proposed to be conducted.

Section 3.2    Corporate Power.  Each of the Company and SkyPort has all requisite legal and corporate power and authority to execute and deliver this Agreement, to sell and issue the securities comprising the Units hereunder, to issue the Warrant Shares upon exercise of the Warrants and to carry out and perform its obligations under the terms of this Agreement.

Section 3.3    Subsidiaries.  Except for SkyPort, the Company does not have any subsidiaries or affiliated companies and does not otherwise own or control, directly or indirectly, any equity interest in any corporation, association or business entity.

Section 3.4    Capitalization.  (a) Upon due authorization of the certificate of amendment to the Certificate of Incorporation of the Company, as amended, the form of which is attached as Exhibit A to this Agreement ("Charter Amendment"), and the filing of such Charter Amendment with the Secretary of State of the State of Delaware, the Company will have an authorized capitalization consisting of the number of shares of Common Stock set forth in the Charter Amendment.

(b)    As of the date hereof, (i) the Company has 44,957,623 shares of Common Stock issued and outstanding, (ii) 3,000,000 shares of the Company's Common Stock have been validly reserved for issuance upon the exercise of outstanding options reserved for issuance to directors, officers, key employees and consultants of the Company and its subsidiaries ("Initial Employee Shares") in accordance with the Company's Stock Option Plan, and (iii) 157,000,000 shares of Common Stock have been validly reserved for issuance pursuant to (A) the Option to Purchase Common Stock dated as of December 31, 2002 by and between the Company and CenturyTel, Inc. ("Option"); (B) the Company's 8.5% Secured Convertible Debentures—Series A; (C) the Company's 8.5% Secured Convertible Debentures—Series B; (D) the Company's 8.5% Secured Convertible Debentures—Series C; and (E) the Company's 8.5% Secured Convertible

Debentures—Series D-2 (the debentures described in subparagraphs (B)–(E) being the "Debentures").

(c)     The outstanding shares of Common Stock of the Company are or have been, (i) duly and validly authorized and issued, fully paid, nonassessable, and not subject to any preemptive or similar rights granted by the Company, or, to the Company's knowledge, by any stockholder, other than rights granted under the Investors' Rights Agreement dated as of December 31, 2002, as amended to date by and among the Company, CenturyTel, Inc., and the principal stockholders named therein ("Investors' Rights Agreement") and the Right of First Refusal and Co-Sale Agreement dated as of December 31, 2002, by and among the Company, CenturyTel, Inc. and the principal stockholders named therein ("Co-Sale Agreement"), (ii) issued in accordance with the registration provisions of the Securities Act, and any relevant state securities laws, or pursuant to valid exemptions therefrom, and (iii) free of restrictions on transfer, other than restrictions on transfer under any applicable state and federal securities laws and restrictions on transfer under the Investors' Rights Agreement and the and the Co-Sale Agreement.  Except for (i) the conversion privileges of the Debentures, (ii) the preemptive rights provided in the Investors' Rights Agreement, (iii) the Option, (iv) the Initial Employee Shares and (v) the "put right" contained in the Co-Sale Agreement, there are no outstanding securities convertible into, exchangeable for or conferring the right to acquire equity or other securities of the Company or its subsidiaries, nor are there any subscriptions, warrants, options, rights, contracts, commitments or other arrangements of any character calling for the issuance, sale, delivery or transfer of, or that could obligate the Company or SkyPort to issue, sell, deliver or transfer, any shares of Common Stock or any other equity or other securities of the Company or its subsidiaries.

(d)     The Company is not a party or subject to any agreement or understanding, and, to the best of the Company's knowledge, there is no agreement or understanding between any persons or entities, which governs or relates to (i) the voting of (or giving of written consents with respect to) any security of the Company, the voting (or giving of written consents) by any director of the Company, (ii) the repurchase by the Company of any Common Stock or other securities of the Company, or (iii) any other corporate governance or similar procedures of the Company.

(e)     SkyPort has an authorized capitalization consisting of 100,000,000 shares of common stock, no par value per share, of which 41,818,333 shares are issued and outstanding (the "SkyPort Shares").  All of the SkyPort Shares are registered in the name of, and are beneficially owned by, the Company.

Section 3.5     Authorization.  The Company has full corporate power and authority to issue the Units and to execute and deliver this Agreement, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement by the Company and the consummation of the transactions contemplated hereby have been duly authorized and approved by the Board of Directors of the Company and no other corporate governance action on the part of the Company is necessary to authorize the execution, delivery and performance of this Agreement or the

consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by an authorized officer of the Company and is a valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except to the extent that its respective enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights generally or by general equitable principles.

Section 3.6    Consents and Approvals; No Violations.    Except for (a) the Charter Amendment to be filed with the Secretary of State of the State of Delaware, (b) any necessary filings with the FCC, (c) the Company's Outstanding Debentures and existing indebtedness owed to CenturyTel, Inc., a Louisiana corporation or any Affiliate of the Company and (d) any obligation or instrument identified in the SkyPort Proceeding, and subject to any consents or approvals required to be received from the FCC, the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby will not, with or without the giving of notice or the lapse of time or both: (i) violate, conflict with, or result in a breach or default under any provision of the Certificate of Incorporation of the Company or the Bylaws of the Company, in each case as amended to date; (ii) violate any statute, ordinance, rule, regulation, order, judgment or decree of any court or of any governmental or regulatory body, agency or authority applicable to the Company or by which any of its properties or assets may be bound; (iii) require any filing by the Company with, or require the Company to obtain any permit of, or require the Company to give any notice to, any governmental or regulatory body, agency or authority other than in connection with applicable federal and state securities laws; or (iv) result in a violation or breach by the Company of, conflict with, constitute (with or without due notice or lapse of time or both) a default by the Company (or give rise to any right of termination, cancellation, payment or acceleration) under or result in the creation of any encumbrance upon any of the assets or properties of the Company under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, permit, contract, lease or other instrument, agreement or obligation to which the Company is a party, or by which it or any of its assets or properties may be bound.

Section 3.7    Registration Rights.    Except as set forth in the Investors' Rights Agreement, the Company is not under any contractual obligation to register any of its presently outstanding securities or any of its securities which may hereafter be issued.

Section 3.8    Governmental Consent, etc.    Except for any necessary filings with, or any consents or approvals required to be received from, the FCC, no consent, approval or authorization of (or designation, declaration or filing with) any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Units offered hereby and the Warrant Shares issuable upon exercise of the Warrants, or the consummation of any other transaction contemplated hereby, except qualification (or taking such action as may be necessary to secure an exemption from qualification, if available) of the offer and sale of the Units and the Warrant Shares under applicable state securities laws, which filings and qualifications, if required, will be accomplished in a timely manner.

Section 3.9     Offering.   Subject to the accuracy of the Purchaser's representations in Article IV hereof, the offer, sale and issuance of the Units to be issued in conformity with the terms of this Agreement and the issuance of the Warrant Shares upon exercise of the Warrants constitute transactions exempt from the registration requirements of Section 5 of the Securities Act of 1933, as amended ("Securities Act").

Section 3.10    Brokers or Finders; Other Offers.   The Company has not incurred and will not incur, directly or indirectly, as a result of any action taken by the Company, any liability for brokerage or finders' fees or agents' commissions or similar charges in connection with this Agreement.

Section 3.11    Absence of Undisclosed Liabilities.   Except for (a) those liabilities and obligations otherwise required to be set out in the financial statements of the Company and SkyPort which have been delivered to the Purchasers and (b) professional fees and disbursements incurred in connection with the transactions contemplated by this Agreement, neither the Company nor SkyPort have any material liabilities or obligations of any nature, whether accrued, absolute, contingent or otherwise (including liabilities as guarantor or otherwise with respect to obligations of others) and whether due or to become due.

Section 3.12    Employment Arrangements.   The Company and SkyPort have written contracts relating to employment or other contractual services (collectively, the "Employment Agreements") with the employees set forth on Schedule 3.12.   Other than the Employment Agreements, there are no oral or written contracts of employment entered into with any current employee or independent contractor of the Company.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Each Purchaser hereby severally represents and warrants to the Company with respect to the purchase of Units as follows:

Section 4.1     Existence.   Purchaser has been duly formed, is validly existing, and has full power and authority to purchase the Units offered by the Company, to execute and deliver this Agreement, and to perform its obligations hereunder. Purchaser has previously provided to the Company a true and complete copy of the articles or certificate of incorporation of Purchaser. Purchaser has taken all action necessary to authorize the execution and delivery of the Agreement and the performance of its obligations thereunder.   The information regarding Purchaser contained on Schedule A is true, complete and correct in all respects.

Section 4.2     Authorization.   The execution, delivery and performance by it of this Agreement has been duly authorized by all requisite action by such Purchaser and, upon acceptance by the Company in accordance with its terms, this Agreement will constitute a valid and binding obligation, enforceable in accordance with its terms, except: (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general

application affecting the enforcement of creditor's rights; and (b) general principles of equity that restrict the availability of equitable remedies.

Section 4.3    Pending Matters.  There are no pending or contemplated proceedings for the merger, consolidation, liquidation, sale of all or substantially all of the assets, or dissolution of Purchaser.  There are no pending or contemplated proceedings against Purchaser which would prevent Purchaser's performance of its obligations under this Agreement.

Section 4.4    Consents and Approvals; No Violations.  Except for any filing necessary with, or any consents or approvals required to be received from, the FCC, the execution, delivery and performance of this Agreement by the Purchaser and the consummation by the Purchaser of the transactions contemplated hereby will not, with or without the giving of notice or the lapse of time or both: (a) violate, conflict with, or result in a breach or default under any provision of the organizational documents of the Purchaser or the Bylaws of the Purchaser, in each case as amended to date; (b) violate any statute, ordinance, rule, regulation, order, judgment or decree of any court or of any governmental or regulatory body, agency or authority applicable to the Purchaser or by which any of its properties or assets may be bound; (c) require any filing by the Purchaser with, or require the Purchaser to obtain any permit of, or require the Purchaser to give any notice to, any governmental or regulatory body, agency or authority other than in connection with applicable federal and state securities laws; or (d) result in a violation or breach by the Purchaser of, conflict with, constitute (with or without due notice or lapse of time or both) a default by the Purchaser (or give rise to any right of termination, cancellation, payment or acceleration) under or result in the creation of any encumbrance upon any of the assets or properties of the Purchaser under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, permit, contract, lease or other instrument, agreement or obligation to which the Purchaser is a party, or by which it or any of its assets or properties may be bound.

Section 4.5    Experience/Means.  Purchaser has business or financial experience (or has retained the services of a professional advisor who is not affiliated with or compensated by the Company who has the requisite business or financial experience) such that such Purchaser is capable of protecting its own interests in connection with the proposed purchase of the Units and the Warrant Shares.  Further, such Purchaser has adequate means of providing for its current needs and possible contingencies, and such Purchaser has no need for liquidity of an investment made hereunder in the Units, including without limitation the Common Stock and Warrants comprising the Units or the Warrant Shares issuable upon exercise of the Warrants.

Section 4.6    Investment.  Purchaser is: (a) acquiring the Units and the Warrant Shares for investment for its own account, not as a nominee or agent and not with the view to or for resale in connection with any distribution thereof; (b) does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Units, the underlying Common Stock or the Warrant Shares; (c) understands that the Units, the underlying Common Stock, Warrants and the Warrant Shares have not been, and will not be registered under the Securities Act by reason of specific exemption from the registration provisions of the Securities Act and applicable state securities laws, the availability of which depends upon, among other things, the bona fide nature

of the investment intent and the accuracy of the Purchaser's representations as expressed herein; and (d) understands that neither the Units nor the Warrant Shares have been approved or disapproved by the Commission or any other federal or state agency. If an entity, Purchaser has not been formed for the specific purpose of acquiring the Units.

Section 4.7    Representations and Warranties. Purchaser understands and agrees that no representations or warranties have been or are being made by the Company or any of its officers, employees, stockholders, agents or other representatives with respect to the Company or the issuance and sale of the Units other than those contained herein, and in the agreements, documents and instruments listed in Schedule C hereto, and each Purchaser is entering into this Agreement solely on the basis of information contained or disclosed herein (including the Schedules, the agreements, documents and instruments listed therein and Exhibits attached hereto). Purchaser understands that the Company will be relying upon the representations and warranties of Purchaser as set forth herein.

Section 4.8    Restrictive Legend/Rule 144. Each certificate for the Common Stock issued pursuant to this Agreement, each Warrant certificate, each Warrant Share and any shares of capital stock received in respect thereof, whether by reason of a stock split or share reclassification thereof, a stock dividend thereon or otherwise and each certificate for any such securities issued to subsequent transferees of any such certificate shall be stamped or otherwise imprinted with one or more of the following legends in substantially the following form:

(a)    THE SHARES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE LAWS (THE "ACTS"). THE SHARES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE SOLD OR OFFERED FOR SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACTS OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

(b)    THE TRANSFER OF THE SHARES EVIDENCED BY THIS CERTIFICATE IS PROHIBITED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S, PURSUANT TO REGISTRATION UNDER THE ACTS, OR PURSUANT TO AN AVAILABLE EXEMPTION FROM REGISTRATION. ANY HEDGING TRANSACTIONS INVOLVING SUCH SECURITIES MAY NOT BE CONDUCTED UNLESS CONDUCTED IN COMPLIANCE WITH THE ACTS.

The Purchaser understands that the exemption from registration afforded by Rule 144 (the provisions of which are known to the Purchaser) promulgated under the Securities Act depends on the satisfaction of various conditions and is not currently available to the

Purchaser, and that, if and when applicable, Rule 144 may afford the basis for sales by a Purchaser only in limited amounts.

Section 4.9    <u>No Public Market</u>.  Purchaser understands that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

Section 4.10    <u>Access to Information</u>.  Purchaser has had an opportunity to discuss the Company's business, management and financial affairs with directors, officers and management of the Company, to review the Company's operations and facilities and has received all information that such Purchaser has deemed necessary or appropriate as a prudent and knowledgeable Purchaser in evaluating its purchase of the Units and the Warrant Shares being purchased by the Purchaser.

Section 4.11    <u>Bankruptcy Proceeding</u>.    Purchaser hereby voluntarily evidences its knowledge of the existence and contents of all of the pleadings and motions involving the SkyPort Proceeding.    Purchaser is familiar with the financial information, operations and business affairs of both the Company and SkyPort.

Section 4.12    <u>No Broker</u>.  The Purchaser has not employed any broker or finder in connection with the transactions contemplated by this Agreement.

Section 4.13    <u>Accredited Purchaser</u>.    The Purchaser is an "Accredited Investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

**ARTICLE V**
**PURCHASER'S CONDITIONS TO CLOSING AND CERTAIN**
**COVENANTS OF THE COMPANY**

Section 5.1    <u>Conditions to First Closing Date</u>.  The Purchasers' obligations to purchase the Units on the First Closing Date are subject to the fulfillment or written waiver of the following conditions at or prior to the applicable Closing Date:

(a)    *Representations and Warranties*.  The representations and warranties made by the Company in Article III hereof shall be true, correct and complete in all material respects as of the date hereof;

(b)    *Covenants*.  All terms, covenants, agreements and conditions contained in this Agreement to be complied with or performed by the Company on or prior to a Closing Date shall have been duly complied with or performed in all material respects;

(c)    *Corporate Proceedings; Consents, etc.*    All corporate and other proceedings to be taken and all waivers, permits and consents to be obtained in connection with the transactions and all documents incident thereto shall be satisfactory in form and substance to

the Purchasers and their counsel, and the Purchasers shall have received all such originals or certified or other copies of such documents either may reasonably request;

(d) *Stockholder Approval of Charter Amendment.* The Company shall have received the approval of the stockholders of the Company necessary to approve the Charter Amendment and file the Charter Amendment with the Secretary of State of the State of Delaware;

(e) *Charter Amendment.* The Charter Amendment attached hereto as Exhibit A shall have been filed with the Secretary of State of the State of Delaware and evidence of the filing of the foregoing with the Secretary of State of Delaware in form satisfactory to the Purchasers shall have been delivered to the Purchasers;

(f) *Blue Sky Matters.* All consents, approvals, qualifications and registrations required to be obtained, if any, or effected under any applicable state securities or "blue sky" laws in connection with the designation, issuance, sale and delivery of the Units, including without limitation the underlying Common Stock and Warrants, and the issuance, sale and delivery of the Warrant Shares shall have been obtained or effected (except for the filing of any notice subsequent to the Closing which may be required under applicable state securities laws which, if required, shall be filed on a timely basis as may be so required) and copies of the same delivered to the Purchasers;

(g) *Certificate of Secretary.* The Purchasers shall have received a certificate of the Secretary of the Company, dated the Closing Date, to the effect that: (a) attached thereto is a true and complete copy of the Certificate of Incorporation and the Bylaws of the Company as in effect on the date thereof; (b) attached thereto is a true and complete copy of resolutions adopted by the Board of Directors of the Company authorizing the execution, delivery and performance of this Agreement, the issuance of the Units and reserving the Warrant Shares for issuance upon exercise of the Warrants; (c) the Company is in good standing in reliance upon a good standing certificate from the Office of the Secretary of State of the State of Delaware, as of a recent date; and (d) such other matters as may be reasonably requested by the Purchaser;

(h) *Receipt of FCC Approval.* The Company and SkyPort shall have received all consents and approvals required to be received from the FCC with respect to the licenses and authorizations set forth on Schedule 5.1(h) hereto, to consummate the transactions contemplated by this Agreement;

(i) *Motion of Dismissal of Bankruptcy Proceedings Involving SkyPort.* At or prior to the Closing, the Company shall have provided evidence to the Purchasers of the entry of an order of dismissal in the case of the SkyPort Proceeding;

(j) *Business Plan.* At or prior to the First Closing Date, Balaton, on behalf of the Purchasers, shall have approved the business plan applicable to the Company SkyPort for the fiscal years 2006 and 2007;

(k) *Agreement with CenturyTel, Inc.* Balaton or its affiliate shall have entered into a written agreement with CenturyTel, Inc., a Louisiana corporation, regarding the purchase of the Debentures held by CenturyTel, Inc;

(l) *Agreement with Certain Holders of Debentures.* Balaton or its affiliate shall have entered into a written agreement with the parties identified on Schedule D regarding the purchase of the Debentures held by such persons;

(m) *Credit Agreements.* No Event of Default shall have occurred and be continuing under the STC Credit Agreement; and

(n) *Employment Agreements.* The Company shall have entered into new or amended employment agreements with the officers and employees identified on Schedule E on terms acceptable to Balaton.

Section 5.2 Conditions to Final Closing Date. The Purchasers' obligations to purchase the Units on the Final Closing Date are subject to the fulfillment or written waiver at or prior to the Final Closing Date of the following conditions:

(a) *Representations and Warranties.* The representations and warranties made by the Company in Article III hereof shall be true, correct and complete in all material respects as of the Closing Date;

(b) *Covenants.* All terms, covenants, agreements and conditions contained in this Agreement to be complied with or performed by the Company on or prior to the Closing Date shall have been duly complied with or performed in all material respects;

(c) *Corporate Proceedings; Consents, etc.* All corporate and other proceedings to be taken and all waivers, permits and consents to be obtained in connection with the transactions and all documents incident thereto shall be satisfactory in form and substance to the Purchasers and their counsel and Purchaser shall have received all such originals or certified or other copies of such documents either may reasonably request;

(d) *Blue Sky Matters.* All consents, approvals, qualifications and registrations required to be obtained, if any, or effected under any applicable state securities or "blue sky" laws in connection with the designation, issuance, sale and delivery of the Units, including without limitation the underlying Common Stock and Warrants, and the issuance, sale and delivery of the Warrant Shares shall have been obtained or effected (except for the filing of any notice subsequent to the Closing which may be required under applicable state securities laws which, if required, shall be filed on a timely basis as may be so required) and copies of the same delivered to the Purchasers; and

(e) *Certificate of Secretary.* The Purchasers shall have received a certificate of the Secretary of the Company, dated the Closing Date, to the effect that: (a) attached thereto is a true and complete copy of the Certificate of Incorporation and the Bylaws of the Company as in effect on the date thereof; (b) attached thereto is a true and complete copy of resolutions adopted

by the Board of Directors of the Company authorizing the execution, delivery and performance of this Agreement, the issuance of the Units and reserving the Warrant Shares for issuance upon exercise of the Warrants; (c) the Company is in good standing in reliance upon a good standing certificate from the Office of the Secretary of State of the State of Delaware, as of a recent date; and (d) such other matters as may be reasonably requested by the Purchaser.

## ARTICLE VI
## COMPANY'S CONDITIONS TO CLOSING

The Company's obligation to sell and issue the Units as of a Closing Date is, at the sole option and discretion of the Company, subject to the fulfillment of the following conditions at or prior to the applicable Closing Date:

(a)     *Representations and Warranties.*   The representations and warranties made by the Purchasers in Article IV hereof shall be true, correct and complete in all material respects as of the applicable Closing Date;

(b)     *Compliance with State Securities Laws.*  The Company shall have obtained all permits and qualifications required by any state for the offer and sale of the Units and the Warrant Shares on the Closing Date, or shall have the availability of exemption therefrom;

(c)     *Stockholder Approval of Charter Amendment.*  The Company shall have received the approval of the stockholders of the Company necessary to approve the Charter Amendment and file the Charter Amendment with the Secretary of State of the State of Delaware;

(d)     *Charter Amendment.*   The Charter Amendment attached hereto as Exhibit A shall have been filed with the Secretary of State of the State of Delaware;

(e)     *Blue Sky Matters.*  All consents, approvals, qualifications and registrations required to be obtained, if any, or effected under any applicable state securities or "blue sky" laws in connection with the designation, issuance, sale and delivery of the Units, including without limitation the underlying Common Stock and Warrants, and the issuance, sale and delivery of the Warrant Shares shall have been obtained or effected (except for the filing of any notice subsequent to the Closing which may be required under applicable state securities laws which, if required, shall be filed on a timely basis as may be so required); and

(f)     *Receipt of FCC Approval.*  The Company and SkyPort shall have received all consents and approvals required to be received from the FCC with respect to the licenses and authorizations set forth on Schedule 5.1(h) hereto to consummate the transactions contemplated by this Agreement.

## ARTICLE VII
## POST-CLOSING COVENANTS

Section 7.1     Use of Proceeds.  (i) The Company shall use the proceeds from the First Closing Date as follows:

(1)     first, the Company shall advance to SkyPort such proceeds from the First Closing Date as are sufficient to repay in full all outstanding indebtedness owing to the Purchaser under the STC Credit Agreement;

(2)     second, to the extent that such amounts were not previously paid by SkyPort out of the proceeds from the DIP Agreement dated February 15, 2006 (the "DIP Agreement") or the STC Credit Agreement, the Company shall advance to SkyPort and shall cause SkyPort to pay, any amounts currently owing to IntelSat Communications pursuant to the letter dated February 10, 2006 ("IntelSat Agreement"); and

(3)     third, to the extent that such amounts were not previously paid by SkyPort out of the proceeds from the DIP Agreement or the STC Credit Agreement, the Company shall advance to SkyPort and shall cause SkyPort to pay any indebtedness owed to any trade creditor; and

(4)     last, any remaining proceeds from the issuance of the Units on the First Closing Date shall be used for general working capital purposes, provided, such uses are consistent with the business plan approved by Balaton pursuant to Section 5.1(j).

(ii)     The Company shall use the proceeds received on the Final Closing Date as follows:

(1)     first, to the extent that such amounts were not already paid to IntelSat from the proceeds of advances from the DIP Agreement, the STC Credit Agreement, or this Agreement, the Company shall advance to SkyPort and shall cause SkyPort to discharge any amounts owing to IntelSat Communications under the IntelSat Agreement;

(2)     second, any remaining proceeds shall be used for general working capital purposes, provided, such uses are consistent with the business plan approved by Balaton pursuant to Section 5.1(j); and

(3)     last, to the extent that such amounts were not already pledged to a Bank from the proceeds of advances under the DIP Agreement or the STC Credit Agreement to obtain a letter of credit or certificate of deposit from a Schedule A/Tier 1 Banking Institution, any remaining proceeds shall be used to securitize a revolving credit facility for the benefit of the operations of the Company and SkyPort, but only on terms that are acceptable to Balaton.

Section 7.2     Fees.  The Company will: (a) pay, and save the Purchasers harmless against all liability for the payment of, all reasonable costs and other expenses incurred in connection with the Company's performance of and compliance with all agreements and conditions contained herein on its part to be performed or complied with; and (b) pay the reasonable fees and disbursements of two (2) counsel selected by the Purchasers, for its services

in connection with the transactions contemplated by this Agreement, which fees and disbursements will be paid by the Company at the Closing.

Section 7.3    Exchanges; Lost, Stolen or Mutilated Certificates.  Upon surrender by any Purchaser to the Company of any certificate representing the Common Stock, the Warrants or Warrant Shares purchased or acquired hereunder, the Company will issue in exchange therefor and deliver to such Purchaser, a new certificate or certificates representing such shares in such denominations as may be requested by such Purchaser.  Upon receipt of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of any certificate representing any Common Stock, Warrants or Warrant Shares purchased or acquired by the Purchaser hereunder, and in case of any such loss, theft or destruction, upon delivery of any indemnity agreement satisfactory to the Company, or in case of any such mutilation, upon surrender and cancellation of such certificate, the Company at its expense will issue and deliver to such Purchaser a new certificate for such securities of like tenor, in lieu of such lost, stolen, destroyed or mutilated certificate.

Section 7.4    Board Resignations; Board Representation.  Immediately following the First Closing Date, the directors identified on Schedule 7.4 shall resign from the Board of Directors of the Company.

Section 7.5    Non-Dilution.  From and after the date hereof until the First Closing Date and except for shares of Common Stock of the Company issuable upon conversion from time to time of the Company's outstanding Debentures and employee options, shares of Common Stock or securities issuable in connection with the transactions contemplated by this Agreement, the Company shall not issue any equity, subordinated debt, convertible debt or any other instrument which will result in an increase in the issued capital stock of the Company or SkyPort without the prior written consent of the Purchasers.

## ARTICLE VIII
## TERMINATION

Section 8.1    Termination on or Before the First Closing Date.  This Agreement may be terminated and the transactions contemplated by this Agreement abandoned at any time prior to the First Closing Date:

(a)    by mutual written consent of the Purchaser and the Company; or

(b)    by either Balaton or the Company, if the First Closing Date does not occur on or prior to August 31, 2006, provided, however, that the right to terminate this Agreement under this clause (b) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c)    by Balaton, if an Event of Default has occurred and is continuing under the STC Credit Agreement;

(d)     by the Company, if Balaton shall fail to fund any Borrowing Request, as such term is used in Section 2(c) of the DIP Agreement, which Balaton is required to fund under the DIP Agreement; or

(e)     by the Company, if Balaton shall fail to fund any Borrowing Request, as such term is used in Section 2(c) of the STC Credit Agreement, which Balaton is required to fund and such failure continues for 10 business days from the borrowing date outlined in the Borrowing Request.

Section 8.2     <u>Obligations Upon Termination</u>.  If this Agreement shall be terminated pursuant to Section 8.1:

(i)     Purchasers shall immediately return to the Company all documents and other material received from the Company and its representatives (including any copies thereof in whatever medium) relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof;

(ii)     each Nondisclosure/Confidentiality Agreement shall remain in full force and effect for the period set forth therein, notwithstanding the termination of this Agreement; and

(iii)     this Agreement shall become null and void and of no further force and effect, except that the provisions of Section 9.11 shall still govern this Agreement.

## ARTICLE IX
## SURVIVAL, INDEMNIFICATION; OTHER MATTERS

Section 9.1     <u>Survival of Representations, Warranties and Covenants</u>.     All representations, warranties and covenants made hereunder shall survive for a period of one (1) year from the Final Closing Date, provided that any representation or warranty which was fraudulently made shall survive indefinitely. The covenants set forth in Section 7.1 shall survive until the Final Closing Date; <u>provided</u>, that if all Units are sold at the First Closing Date, the covenants set forth in Section 7.1 shall not survive the First Closing Date.  The covenants set forth in Section 7.2 shall survive until the thirtieth (30th) day following the Final Closing Date, <u>provided</u>, that if all Units are sold at the First Closing Date, the covenants set forth in Section 7.2 shall survive until the thirtieth (30th) day following the First Closing Date.  The covenants set forth in Section 7.3 shall survive until the expiration of the Warrants.

Section 9.2     <u>Indemnification</u>.  The Company shall, with respect to the representations, warranties, covenants and agreements made by the Company herein, indemnify, defend and hold the Purchasers harmless against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses), arising from the untruth, inaccuracy or breach of any such representations, warranties, covenants or agreements of the Company.  Without limiting the generality of the foregoing, the Purchaser shall be deemed to have suffered liability, loss or damage as a result of the untruth, inaccuracy or

breach of any such representations, warranties, covenants or agreements if such liability, loss or damage shall be suffered by the Company as a result of, or in connection with, such untruth, inaccuracy or breach or any facts or circumstances constituting such untruth, inaccuracy or breach.

The Purchaser shall with respect to the representations, warranties, covenants and agreements made by such Purchaser herein, severally and not jointly, indemnify, defend and hold the Company harmless against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including legal and accounting fees and expenses), arising from the untruth, inaccuracy or breach of any such representations, warranties, covenants or agreements of such Purchaser.

Section 9.3    Limitation on Indemnification for Breaches of Representations/Warranties. No Claim shall be made for breaches of representations or warranties (a) to the extent that the party making such claim, or its affiliates, employees, officers, directors or representatives of any of them had knowledge of such breach as of the date of this Agreement or (b) to the extent that such breach was indicated in the SkyPort Proceeding. In no event shall any claim for indemnity be made or amount recovered by Purchaser or its affiliates unless such claim is asserted by such Purchaser prior to the close of business Houston, Texas time on the date that is eighteen months following the Final Closing Date; provided, that if all Units are sold at the First Closing Date, any claim asserted pursuant to this Section 9.3 shall be asserted on or before the date that is eighteen (18) months following the First Closing Date.

Section 9.4    Dispute Resolution. (a) All disputes between the Company and any Purchaser arising out of, relating to, or in connection with this Agreement, including any claim or question relating to this Agreement's negotiation, performance, non-performance, interpretation, termination or the relationship between the Company and any Purchaser established by this Agreement, shall be referred to and finally resolved under the Rules of Arbitration of the American Arbitration Association ("AAA"), as such rules may be in force on the date of this Agreement, and subject to whatever modifications the parties may adopt in writing (the "Rules"), which Rules are deemed to be incorporated by reference into this Section 9.4.

(b)    The number of arbitrators shall be three (3), each of whom shall be impartial and independent. Each party shall select one arbitrator. The two arbitrators and the parties shall select the third neutral arbitrator. The decision of the arbitrators shall be final and binding and shall be enforceable by the national courts against the losing Party. The place of arbitration shall be Houston, Texas. The language to be used in the arbitral proceeding shall be English. Either Party may initiate arbitration by providing to the other a written notice of arbitration specifying the claims to be arbitrated. If a party refuses to honor its obligations under the Agreement to arbitrate, the other Party may compel arbitration in either federal or state court or the court system of the country in which the claim arose. In deciding the substance of the party's claims, the arbitrators shall apply the substantive laws of the State of Texas (excluding choice-of-law principles that might call for the application of another jurisdiction's law).

(c)     Only damages allowed pursuant to this Agreement may be awarded and the arbitrators shall have no authority to award treble, exemplary or punitive damages of any type or under any circumstances regardless of whether such damages may be available under applicable law.   The arbitrators shall not have the power to revise this Agreement to reflect changed circumstances or otherwise fill any gap that may exist in this Agreement by adding a new term.   Any and all of the arbitrators' orders and decisions may be enforceable in, and judgment upon any award rendered in the arbitration proceeding may be confirmed and entered by, any court having jurisdiction.

(d)     Except as required by law, each party shall maintain the confidentiality of (i) the existence of any arbitral proceeding; (ii) any documents produced or exchanged by the Parties during any arbitration proceeding; (iii) any documents prepared during any arbitration proceeding for use therein; and (iv) any arbitral award.

(e)     The costs of arbitration under this Section 9.4, including the cost of the arbitrators, the expenses relating thereto, administrative fees, fees of experts appointed by the arbitrators and reasonable legal fees of a party shall be allocated by the arbitrators to reflect the party's relative success and failure in the award of the arbitrators.   Any award of the arbitrators shall be made in United States Dollars.

Section 9.5     Successors and Assigns; Parties in Interest.   This Agreement shall bind and inure to the benefit of the Company, the Purchasers and each other person who shall become a registered holder of any certificate representing: (a) the Common Stock or Warrants comprising the Units purchased hereby or the Warrant Shares; and (b) the respective successors and assigns of the Company.

Section 9.6     Entire Agreement.   This Agreement and the other writings referred to herein or delivered pursuant hereto contain the entire agreement among the parties with respect to the subject matter hereof and supersede all prior and contemporaneous arrangements or understandings with respect to the purchase of the Units and the Warrant Shares, whether written or oral, including the letter of intent between the Company and Balaton Group Inc. dated December 21, 2005.   Each of the parties expressly warrants and represents that no promise or agreement which is not herein expressed has been made in connection with the execution of this Agreement, and that it is not relying on any statement or representation of any agent of any other party to this Agreement.   Any term that is defined in this Agreement and used in any Exhibit hereto without again being defined therein shall have the meaning ascribed to such term in this Agreement.

Section 9.7     Notices.   All notices, requests, consents and other communications made to any party shall be deemed to be sufficient if contained in a written instrument delivered by courier, sent by facsimile transmission to the telephone number set forth below or such other number as may hereinafter be designated in writing by the recipient to the sender listing all parties, or duly sent by first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or such other address as may hereafter be designated in writing by the addressee to the addressor listing all parties:

(a)     *If to the Company, to:*

      Skycomm Technologies Corporation
      2 Northpoint Drive, Suite 230
      Houston, Texas 77060
      Attention: Roger L. Klotz
      Facsimile No: (281) 999-4455

*with a copy to:*

      Bracewell & Giuliani LLP
      711 Louisiana Street
      South Tower Pennzoil Place, Suite 2300
      Houston, Texas  77002
      Attention: Margaret B. Symonds
      Facsimile No.: 713-221-2174

(b)     *If to the Purchaser:*

      Balaton Group Inc.
      152 King Street East
      Toronto, Ontario, M5A 1J3

*with a copy to:*

      Wilson Vukelich
      60 Columbia Way, Suite 710
      Markham ON L3R 0C9
      Attention: Jeff Goldenthal
      Facsimile No.: 905-940-8785

All such notices, requests, consents and other communications shall be deemed to have been received: (a) in the case of personal delivery, on the date of such delivery; (b) in the case of facsimile transmission, on the date of transmission if sent during normal business hours of the recipient, if not, then on the next business day; or (c) in the case of mailing, on the third day after the posting thereof.

Section 9.8     Changes.   The terms and provisions of this Agreement may not be modified or amended or any of the provisions hereof waived, temporarily or permanently, except pursuant to the written consent of the Company and the holders of at least a majority of the total number of shares of Common Stock issued in connection with the sale of the Units.

Section 9.9     Counterparts.   This Agreement may be executed simultaneously in two or more original or facsimile counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same

instrument. Each counterpart may consist of a number of copies hereof each signed by less than all parties, but together signed by all parties.

Section 9.10    Headings.    The headings of the sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

Section 9.11    Governing Law.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED EXCLUSIVELY IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF TEXAS, AND WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS, EXCEPT TO THE EXTENT FEDERAL LAW APPLIES.

Section 9.12    Severability.    Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 9.13    Construction.    Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine, and neuter; (b) references to Articles and Sections refer to articles and sections of this Agreement; (c) references to Exhibits and Schedules are to the Exhibits and Schedules attached to this Agreement, each of which is made a part of this Agreement for all purposes; (d) references to particular provisions of a law include any corresponding provisions of any succeeding law; and (e) references to money or cash refer to legal currency of the United States of America.

Section 9.14    Further Assurances.    The Company and the Purchasers agree to cooperate with each other, and at the request of the other party, to execute and deliver any further instruments or documents, to provide any further information regarding a party hereto and to take all such further actions as the other party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder, including such actions as may be necessary to receive any consents or approvals from the FCC required in connection with the transactions contemplated by this Agreement.

**[SIGNATURES APPEAR ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on their behalf.

**"COMPANY"**

**SKYCOMM TECHNOLOGIES CORPORATION**

By: _____

Name: ROGER KLOTZ

Title: PRESIDENT & CEO

**"PURCHASER"**

BALATON GROUP INC.

By: _____

Name: _____

Title: _____

1917965.9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on their behalf.

**"COMPANY"**

**SKYCOMM TECHNOLOGIES CORPORATION**

By: _____

Name: _____

Title: _____

**"PURCHASER"**

BALATON GROUP INC.

By: _____

Name: Robert Kwabernus

Title: President

1917965.9

## SCHEDULE A

### PURCHASERS

| Name | Address |
|------|---------|
|      |         |
|      |         |
|      |         |

## SCHEDULE B

## WIRING INSTRUCTIONS

Wire the appropriate investment amount on or prior to the Closing Date to:

**Bank Name**:  Amegy Bank of Texas
**ABA Routing Number**: 113011258
**Name on Account**:  SkyPort International, Inc.
**Account Number**:  3146685

## Schedule C
## DEBENTURE HOLDERS

1. Dr. Daniel Elstein
2. Mr. John Robert Graves
3. Mrs. Sue Ann Graves
4. Mr. Sam Goldman
5. Evest Sky, L.P.

**Schedule D**
**AGREEMENTS**

1.     DIP Credit Agreement dated February 15, 2006, including all Schedules and Exhibits thereto.

2.     Credit Agreement dated February 15, 2006, including all Schedules and Exhibits thereto.

**Schedule E**
**EMPLOYMENT AGREEMENTS**

Roger L. Klotz
Charles K. Stack, Jr.
Thomas S. Orem
Guy Fielder
Rick Davis

## Schedule 3.12
## CURRENT EMPLOYEES WITH WRITTEN AGREEMENTS

Employment Agreement dated December 31, 2002 by and between Guy Fielder and SkyComm Technologies Corporation.

Employment Agreement dated December 31, 2002 by and between Thomas S. Orem and SkyComm Technologies Corporation.

Employment Agreement dated December 31, 2002 by and between Charles K. Stack, Jr. and SkyComm Technologies Corporation.

Employment Agreement dated August 6, 2003 by and between Richard Davis and SkyPort International, Inc.

Employment Agreement dated May 26, 2003 by and between Roger L. Klotz  and SkyPort International, Inc.

Consulting Agreement, dated to be effective as of May 14, 2004, by and between SkyComm Technologies Corporation, a Delaware corporation, and Bonaire Associates, LLC, (Clarence G. Marshall, Principal).

## Schedule 5.1(h)
## FCC LICENSES AND AUTHORIZATIONS

1. International Section 214 Authorization (File Number: ITC-214-19990211-00083)

2. 12/14 GHz VSAT Network (Call Sign: E050044)

3. Fixed Earth Station (Call Sign: E010295)

4. Fixed Earth Station (Call Sign: E000361)

## Schedule 7.4
## DIRECTORS

Clarence G. Marshall
Joseph K. Baker
Roger S. Clary
R. Stewart Ewing Jr.
Michael Maslowski
Bill B. McCrary
Harvey P. Perry
Charles K. Stack. Jr.

**EXHIBIT A**

## FORM OF AMENDMENT TO
## CERTIFICATE OF INCORPORATION
## OF SKYCOMM TECHNOLOGIES CORPORATION

**THE SECURITY REPRESENTED BY THIS CERTIFICATE WAS ORIGINALLY ISSUED ON [_____, 2006], AND HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THE TRANSFER OF SUCH SECURITY IS SUBJECT TO THE CONDITIONS SPECIFIED HEREIN AND THE ISSUER HEREOF (THE "COMPANY") RESERVES THE RIGHT TO REFUSE THE TRANSFER OF SUCH SECURITY UNTIL SUCH CONDITIONS HAVE BEEN FULFILLED WITH RESPECT TO SUCH TRANSFER.**

## SKYCOMM TECHNOLOGIES CORPORATION

FORM OF WARRANT CERTIFICATE
FOR PURCHASE OF
SHARES OF COMMON STOCK

**This Warrant Certificate is void
after 5:00 p.m., Houston, Texas time on January ___, 2009.**

Number of Warrants:_____                    Warrant Certificate No.: W-_____

This Warrant Certificate certifies that, for value received,

### [INSERT NAME OF HOLDER]

is the registered holder of the number of Warrants (the "Warrants") set forth above. Each Warrant entitles the holder thereof to purchase from SkyComm Technologies Corporation, a Delaware corporation ("Company"), at any time or from time to time after January ___, 2006 and on or before 5:00 p.m., Houston, Texas time, on January ___, 2009 (the "Expiration Date"), one (1) share of fully paid and nonassessable common stock, $0.001 par value ("Common Stock"), of the Company at an exercise price of $0.10 per share of Common Stock, subject to adjustment as provided herein ("Exercise Price"), on the terms set forth herein. As used herein, the term "Warrant Issuance Date" shall mean January ___, 2006. "). This Warrant is one of the Warrants issued pursuant to the terms of the Securities Purchase Agreemen dated as of January ___, 2006.

     1.      **Exercise of Warrants**. (a) At any time after January ___, 2006 and prior to the Expiration Date, the Warrants evidenced by this Warrant Certificate may be exercised in whole or in part by presentation and surrender of this Warrant Certificate at the office of the Company with the within contained Subscription Form duly completed and executed and accompanied by payment of the Exercise Price as then in effect by bank draft or cashier's check for the number of Warrants being exercised. If the holder of this Warrant Certificate at any time exercises less than all the Warrants evidenced by this Warrant Certificate, the Company shall issue to such holder a warrant certificate identical in form to this Warrant Certificate, but evidencing a number of Warrants equal to the number of Warrants originally represented by this Warrant Certificate less the number of Warrants previously exercised. Likewise, upon the presentation and surrender of this Warrant Certificate at the office of the Company and at the request of the holder, the Company will, at the option of the holder, issue to the holder in substitution for this Warrant Certificate one or more warrant certificates in identical form and for an aggregate number of Warrants equal to the number of Warrants evidenced by this Warrant Certificate.

(b)     To the extent that the Warrants evidenced by this Warrant Certificate have not been exercised on or before 5:00 p.m., Houston, Texas time, on January ___, 2009, such Warrants shall expire and the rights of the holder shall become void and of no effect.

**2.**     **Restrictions on Transfer**.  This Warrant Certificate, the Warrants evidenced hereby and the shares of Common Stock or other securities purchasable upon the exercise of the Warrants have not been registered under the Securities Act of 1933, as amended, or under any state securities law (collectively, the "Acts"), in reliance on exemptions from the registration provisions thereof.  The holder hereof acknowledges that this Warrant Certificate, the Warrants evidenced hereby and the Common Stock or other securities purchasable on the exercise of the Warrants may not be directly or indirectly sold, transferred or otherwise disposed of in violation of the provisions of the Acts.  Any purported sale, transfer or other disposition of this Warrant Certificate, the Warrants evidenced hereby or the shares of Common Stock or other securities purchasable on exercise of the Warrants in violation of this provision shall be void and the Company shall not be required to recognize the same.  Compliance with this provision is the responsibility of the holder.  The Company shall deem and treat the registered holder of this Warrant Certificate as the true and lawful owner of the Warrants evidenced hereby for all purposes, any claims of another person to the contrary notwithstanding.

**3.**     **Antidilutive Adjustment**. The shares of Common Stock purchasable on exercise of the Warrants evidenced by this Warrant Certificate are shares of Common Stock of the Company as constituted as of the Warrant Issuance Date.  The number and kind of securities purchasable on the exercise of the Warrants evidenced by this Warrant Certificate, and the Exercise Price, shall be subject to adjustment from time to time upon the happening of certain events, as follows:

(a)     **Mergers, Consolidations and Reclassifications**.  In case of any reclassification or change of outstanding securities issuable upon exercise of the Warrants evidence by this Warrant Certificate at any time after the Warrant Issuance Date (other than a change in par value, or from par value to no par value, or from no par value to par value or as a result of a subdivision or combination to which subsection 3(b) applies), or in case of any consolidation or merger of the Company with or into another corporation (other than a merger with another corporation in which the Company is the surviving corporation and which does not result in any reclassification or change other than a change in par value, or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination to which subsection 3(b) applies of outstanding securities issuable upon exercise of this Warrant), the holder of the Warrants evidenced by this Warrant Certificate shall have, and the Company, or such successor corporation or other entity, shall covenant in the constituent documents affecting any of the foregoing transactions that such holder does have, the right to obtain upon the exercise of the Warrants evidenced by this Warrant Certificate, in lieu of each share of Common Stock, other securities, money or other property theretofore issuable upon exercise of a Warrant, the kind and amount of shares of stock, other securities, money or other property receivable upon such reclassification, change, consolidation or merger by a holder of Common Stock, other securities, money or other property issuable upon exercise of a Warrant as if the Warrants evidenced by this Warrant Certificate had been exercised immediately prior to such reclassification, change, consolidation or merger.  The constituent documents effecting any such reclassification, change, consolidation or merger shall provide for any adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided in this subsection 3(a).  The provisions of this subsection 3(a) shall similarly apply to successive reclassifications, changes, consolidations or mergers.

(b)     **Subdivisions and Combinations**.  If the Company, at any time after the Warrant Issuance Date, shall subdivide its shares of Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced, and the number of shares of Common Stock purchasable upon exercise of the Warrants evidenced by this Warrant Certificate shall be proportionately increased, as at the effective date of such subdivision, or if the Company shall take a record of

holders of its Common Stock for the purpose of so subdividing, as at such record date, whichever is earlier. If the Company, at any time after the Warrant Issuance Date, shall combine its shares of Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such combination shall be proportionately increased, and the number of shares of Common Stock purchasable upon exercise of the Warrants evidenced by this Warrant Certificate shall be proportionately reduced, as at the effective date of such combination, or if the Company shall take a record of holders of its Common Stock for purposes of such combination, as at such record date, whichever is earlier.

(c)     **Dividends and Distributions**. If the Company at any time after the Warrant Issuance Date shall declare a dividend on its Common Stock payable in stock or other securities of the Company or of any other corporation or other entity, or in property or otherwise than in cash, to the holders of its Common Stock, the holder of a Warrant evidenced by this Warrant Certificate shall, without additional cost, be entitled to received upon any exercise of a Warrant evidenced by this Warrant Certificate, in addition to the Common Stock to which such holder would otherwise be entitled upon such exercise, the number of shares of stock or other securities or property which such holder would have been entitled to receive if he had been a holder immediately prior to the record date for such dividend (or, if no record date shall have been established, the payment date for such dividend) of the number of shares of Common Stock purchasable on exercise of such Warrant immediately prior to such record date or payment date, as the case may be.

4.     **Covenants of the Company**. The Company covenants and agrees that:

(a)     During the period within which the Warrants evidenced by this Warrant Certificate may be exercised, the Company shall at all times reserve and keep available, free from preemptive rights, out of the aggregate of its authorized but unissued Common Stock, for the purpose of enabling it to satisfy any obligation to issue shares of Common Stock upon the exercise of the Warrants evidenced by this Warrant Certificate, the number of shares of Common Stock issuable upon the exercise of such Warrants.

(b)     The Company shall pay all expenses, taxes (other than stock transfer taxes or charges) and other charges payable in connection with the preparation, issuance and delivery of new warrant certificates on transfer of the Warrants evidenced by this Warrant Certificate.

(c)     All Common Stock which may be issued upon exercise of the Warrants evidenced by this Warrant Certificate shall upon issuance be validly issued, fully paid, non-assessable and free from all taxes, liens and charges with respect to the issuance thereof.

(d)     All original issue taxes payable in respect of the issuance of shares of Common Stock to the registered holder hereof upon the exercise of the Warrants evidenced by this Warrant Certificate shall be borne by the Company; provided, that the Company shall not be required to pay any tax or charge imposed in connection with any transfer involved in the issuance of any certificate representing shares of Common Stock in any name other than that of the registered holder hereof, and in such case the Company shall not be required to issue or deliver any certificate representing shares of Common Stock until such tax or other charge has been paid or it has been established to the Company's satisfaction that no such tax or charge is due.

5.     **No Rights as Stockholder**. The holder of the Warrants evidenced by this Warrant Certficate shall not, by virtue of holding such Warrants, be entitled to any rights of a stockholder of the Company either

at law or in equity, and the rights of the holder of the Warrants evidenced by this Warrant Certificate are limited to those expressed herein.

6. **Entire Agreement**.  This Warrant Certfiicate contains the entire agreement among the parties with respect to the subject matter hereof and supersede all prior and contemporaneous arrangements or understandings with respect to this Warrant, whether written or oral.

7. **Notices**.  All notices, requests, consents and other communications made to any party shall be made and delivered as set forth in the Securities Purchase Agreement dated as of January __, 2006.

8. **Changes**.  The terms and provisions of this Agreement may not be modified or amended or any of the provisions hereof waived, temporarily or permanently, except pursuant to the written consent of the Company and the registered holder of this Warrant Certificate.

9. **Counterparts**.  This Agreement may be executed simultaneously in two or more original or facsimile counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Each counterpart may consist of a number of copies hereof each signed by less than all parties, but together signed by all parties.

10. **Headings**.  The headings of the sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

11. **Governing Law**.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED EXCLUSIVELY IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF TEXAS, AND WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS, EXCEPT TO THE EXTENT FEDERAL LAW APPLIES.

12. **Severability**.  Any provision of this Warrant that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13. **Construction**.  Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Warrant Certificate includes the masculine, feminine, and neuter; (b) references to sections and subsections refer to sections and subsections of this Warrant; (c) references to particular provisions of a law include any corresponding provisions of any succeeding law; and (d) references to money or cash refer to legal currency of the United States of America.

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be executed this _____ day of _____, 2006 by its President and Chief Executive Officer, thereunto duly authorized.

**SKYCOMM TECHNOLOGIES CORPORATION**

By: _____

Roger L. Klotz
President and Chief Executive Officer

ATTEST:

_____

Thomas S. Orem
Secretary

## SUBSCRIPTION FORM

[To be executed on exercise of the Warrants evidenced by this Warrant Certificate]

TO:     SkyComm Technologies Corporation

The undersigned, the holder of the Warrants evidenced by the attached Warrant Certificate, hereby irrevocably elects to exercise the purchase right evidenced by such Warrant Certificate for, and to purchase thereunder, _____ shares of Common Stock of SkyComm Technologies Corporation and herewith makes payment of _____ ($_____) for those shares, and requests that the certificate representing those shares be issued in the name of _____ and delivered to _____, whose address is _____.

Dated: _____          _____

_____
Signature(s) of Registered Holder(s)
*Note:  The above signature(s) must correspond with the*
*name as written on the face of this Warrant Certificate in*
*every particular, without alteration or enlargement or any*
*change whatsoever.*

------------------------------------------------------------------------------------------------------------------

## TRANSFER FORM

[To be executed only upon transfer of the Warrants evidenced by this Warrant Certificate]

FOR   VALUE   RECEIVED,   the   undersigned   hereby   sells,   assigns   and   transfers   unto _____ the Warrants represented by the within Warrant Certificate, together with all right, title and interest therein, and does hereby irrevocably constitute and appoint _____ Attorney-in-Fact, to transfer same on the books of the Company with full power of substitution in the premises.

Dated:_____          _____

_____
Signature(s) of Registered Holder(s)
*Note:  The above signature(s) must correspond with the*
*name as written on the face of this Warrant Certificate in*
*every particular, without alteration or enlargement or any*
*change whatsoever.*

WITNESS:

_____

**EXHIBIT B**

## FORM OF WARRANT CERTIFICATE

**CERTIFICATE OF AMENDMENT**
**OF**
**CERTIFICATE OF INCORPORATION, AS AMENDED,**
**OF**
**SKYCOMM TECHNOLOGIES CORPORATION**

SkyComm Technologies Corporation, a corporation duly organized and existing under and by virtue of the General Corporation Law of the State of Delaware, as amended (the "Corporation"), hereby certifies that:

FIRST:  That at a meeting of the Board of Directors of the Corporation resolutions were duly adopted setting forth a proposed amendment of the Certificate of Incorporation of the Corporation, as previously amended, declaring said amendment to be advisable and authorizing management to submit such proposed amendment to the stockholders of the Corporation and all other securityholders of the Corporation entitled to vote on such amendment, for consideration thereof.  The resolution setting forth the proposed amendment is as follows:

RESOLVED, that Article IV(a) of the Certificate of Incorporation, as amended, shall be deleted in its entirety and replaced with the following:

"(a)    Authorized Shares.  The total number of shares of stock, which the Corporation shall have authority to issue, is _____ shares of common stock, par value $.001 per share ("Common Stock")."

SECOND:  That thereafter, pursuant to Section 228 of the General Corporation Law of the State of Delaware a consent of the stockholders of the Corporation was duly circulated amongst the holders of Common Stock of the Corporation, pursuant to which the necessary number of shares were voted in favor of said amendment.

THIRD:    That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

FOURTH:  That the capital of the Corporation shall not be reduced under or by reason of said amendment.

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by an Authorized Officer of the Corporation, this _____ day of _____, 2006.

By: _____
Name:  Thomas S. Orem
Title:   Secretary

# EXHIBIT "B"

## CONFIDENTIAL INVESTMENT MEMORANDUM

This memorandum is confidential and for the use of investment dealers only. The contents are not to be reproduced or distributed to the public or press. Securities legislation in all states and provinces prohibits such distribution. The information contained herein, while obtained from sources, we believe to be reliable, is not guaranteed as to its accuracy or completeness. This memorandum is for information purposes only and does not constitute an offer to sell or a solicitation to buy the securities referred to herein

**February, 2006**



**US$10,000 per Unit**                              **Maximum:1,000 Units  (US$10,000,000)**

### INVESTMENT HIGHLIGHTS

ClearSky Limited Partnership (the "Partnership") has been formed for the purpose of acquiring control of SkyPort International Inc. ("SkyPort") through its parent corporation, SkyComm Technologies Corporation (SkyComm"), and assisting SkyComm and SkyPort in realizing significant capital appreciation through organic and structured growth. The General Partner of the Partnership is ClearSky Management, Inc., a wholly-owned subsidiary of Balaton Group Inc. ("Balaton"), a merchant banking and corporate re-structuring firm headquartered in Toronto, Ontario and with offices in London, New York and Vancouver.

The maximum proceeds of this offering, if completed, will support the acquisition and re-structuring of SkyComm and SkyPort by the Partnership. As the Partnership is funded with the proceeds of this offering, Balaton will assign to the Partnership rights to participate under certain agreements it has entered into with SkyComm, SkyPort and their secured creditors. By applying the proceeds of this offering in exercise of the rights offered by such agreements, the Partnership will acquire ownership of SkyComm common stock and securities of SkyComm convertible into SkyComm common stock. If the maximum proceeds are raised, Balaton will assign all of its participation rights to the Partnership and the Partnership will acquire stock representing approximately 76% percent of the issued and outstanding shares of SkyComm, together with common stock purchase warrants which, if exercised by the Partnership, would increase its fully-diluted ownership position to 82%, excluding any dilution resulting from further recapitalization of SkyComm. If less than the maximum proceeds are raised, the Partnership's participation in the acquisition and re-structuring of SkyComm will be proportionately reduced and Balaton may retain any participation rights which have not been assigned to the Partnership. The General Partner plans to take SkyComm public within 12 months following the completion of the offering. The General Partner, supported by its Balaton, will remain active in the affairs of SkyComm and SkyPort to maximize the capital appreciation of the Partnership's investment.

A tremendous telecom opportunity:

- *Uniquely Positioned*
- *Built for Growth* – Global Expansion
- *Capital Assets in Place to Produce Significant Revenue* – \$60 Million Top Line
- *Mandatory for Government* – DOD, Military, FEMA etc...
- *Proof of Concept* – Completed.
- *Opportunity for Healthy Return on Investment*

The General Partner will assist management in accomplishing the following value enhancement initiatives:

- *Deleverage balance sheet*
- *Reduce burn rate*
- *Expand business nationally and internationally*
- *Drive current capacity levels*
- *Optimize internal processes*
- *Maximize external capital market valuation optics*
- *Build/acquire additional teleport facilities in other locations*
- *Identify and exploit other attractive merger and acquisition opportunities*



## SKYPORT INTERNATIONAL, INC.

SkyPort is a global telecommunications firm providing managed, secure, broadband satellite and terrestrial communication services for a discriminating client base whose telecommunication and data needs exceed traditional solutions. Industries such as the Department of Defense, Home Land Security, Oil and Gas, Maritime and many others, who must achieve 99.99% reliability while maintaining the highest levels of security and data throughput, rely on SkyPort to provide the end-to-end communications solutions they require. With its global network and infrastructure located at the Ellington Air Force Base in Houston Texas, SkyPort continues to meet and exceed the security and reliability standards of its growing list of clients.

SkyPort serves private clients such as: ESSO – Imperial Oil (AMEX: IMO); HESS – Amerada HESS CP (NYSE: AHC); Encana Corp. (NYSE: ECA); Anadarko (NYSE: APC); Exxon Mobile (NYSE: XOM); Kerr-McGee (NYSE: KMG); and SYSCO (NYSE: SYY). Equally notable are the government, public and quasi-public entities such as FEMA; the National Guard, Army National Guard and the American Red Cross that continue to trust and rely on SkyPort to provide systems support to their organizations.

Founded in 1999 and headquartered in Houston, Texas, SkyPort has an experienced management and technical team, including engineers and communications experts who pioneered space communications at NASA during the Mercury, Apollo and Space Shuttle programs.

SkyPort's goal is to deliver the most secure, advanced, end-to-end communications network offering global video, voice, data, and IP networking to enterprises and governments across the world.

SkyPort successfully competes against companies offering a wide range of products, coverage areas, connection speeds, and prices:

> **Tier 1 Competitors:** Stratos, Schlumberger, CapRock, PetroCom, SolaComm, InfoSat, Harris
>
> - Global coverage
> - Broad product offerings (e.g., high speed satellite, SCADA)
> - Competitive prices (typical 128 Kbps uplink and downlink approximately $2,000/month)
> - Heavy focus on oil and gas
>
> **Tier 2 Competitors:** Spacelink, Mystro, DirecWay, Connextar, Starband
>
> - Regional coverage (North America)
> - Limited product offering (primarily only high speed data with limited VoIP capabilities)
> - Very competitive prices (128 Kbps uplink and downlink priced from $200 / month)
> - Small business focus (most offerings are enhanced versions of consumer applications)
>
> **Tier 3 Competitors:** Iridium, Inmarsat, GlobalStar
>
> - Global coverage
> - Limited product offering (primarily voice connectivity with slow data transmission)
> - Relatively expensive (services can cost up to several thousand dollars per month)

SkyPort is uniquely positioned to continue to build a differentiated platform with its unparalleled security, Houston-based teleport, and state of the art technology.

## SUMMARY OF THE OFFERING

| | |
|---|---|
| **Issuer** | Clear Sky Investments LP, formed under the laws of the State of Delaware |
| **Issue** | Class A Limited Partnership interests structured as units (the "Class A Units") |
| **Issue Amount/ Size** | A maximum of US$10,000,000 (1,000 Class A Units) |
| **Price** | US$10,000 per Class A Unit |
| **Minimum Subscription** | 5 Class A Units or US $50,000 |
| **General Partner** | Clear Sky Management, Inc. formed under the laws of the State of Delaware |

**Use of Proceeds**

The net proceeds of the offering, after payment of agency fees and costs of issue shall be applied as follows:

(i)    The Partnership will provide up to $1,500,000 of interim debtor-in-possession ("DIP") financing to SkyPort to meet its working capital requirements pending the termination of the Chapter 11 bankruptcy court proceedings. The credit facility will be secured with a first charge security interest in the accounts receivable of SkyPort.

(ii)    The Partnership will provide a credit facility of up to $4,000,000. net of the DIP proceeds, to be made available in stages, commencing with the termination of the Chapter 11 proceedings, (the "Exit Credit Facility") expected in late February, 2006. The Exit Credit Facility will be secured with a first charge general security interest in all of the assets of SkyComm, to be shared on a pari-pasu basis with the holders of approximately $24,000,000 face amount convertible debentures of SkyComm.

(iii)    The Partnership will purchase an aggregate of 133,000,000 shares of common stock and 133,000,000 warrants of SkyComm for an aggregate purchase price of $4,000,000. The equity subscription will be used in part to repay the principal amount of the Exit Credit Facility, with the balance to be made available to SkyPort for general working capital purposes. Completion of the equity investment will be deferred until receipt of FCC approval to the acquisition of control of SkyComm and SkyPort by the Partnership;

(iv)    The Partnership will purchase $20,596.000 face amount of convertible debentures of SkyComm from the incumbent holder. The debentures convert into an aggregate of 108,000,000 shares of common stock of SkyComm. Completion of the purchase will be deferred until receipt of FCC approval to the acquisition of control of SkyComm and SkyPort by the Partnership.

(v)    The Partnership will pay professional expenses and other organizational expenses.

(vi)    The Partnership will pay management fees to the General Partner.

**Investment Objectives**

The objective of the Partnership is to provide to the holders of Class A Units with significant capital appreciation generated by (a) the revitalization and growth of SkyPort; and (b) an enhanced valuation. achieved by seeing the company through the "going public" process and thereby creating liquidity and a greater multiple on earnings.

| | |
|---|---|
| **Interim Distributions** | The General Partner will attempt to make distributions from cash generated from liquidation of the Partnership's holdings in SkyComm, with the actual timing and quantum to be determined at the discretion of the General Partner. Seventy percent (70%) of all cash distributions shall be allocated and paid to the holders of the Class A Limited Partnership Units as a class issued pursuant to this offering and twenty-nine percent (29%) shall be allocated and paid to an affiliate of the General Partner in its capacity as the sole holder of Class B Limited Partnership interests, while one percent (1%) of all cash distributions shall be allocated and paid to the General Partner. |
| **Dissolution Distribution** | Upon Dissolution, the assets of the Partnership will be distributed in the following priority: <br><br> a. all debts of the Partnership to third parties shall be satisfied in full; <br><br> b. all debts of the Partnership to the General Partner in respect of legitimate and reasonable expenses incurred by the General Partner for and on behalf of the Partnership shall be satisfied in full; <br><br> c. any unpaid management fees owing to the General Partner shall be satisfied in full; and <br><br> d. the remaining assets of the Partnership shall be allocated as follows: seventy percent (70%) shall be allocated and paid to the holders of the Class A Limited Partnership Units as a class issued pursuant to this offering; twenty nine percent (29%) shall be allocated and paid to an affiliate of the General Partner in its capacity as the sole holder of Class B Limited Partnership interests; while one percent (1%) shall be allocated and paid to the General Partner. |
| **Management Fees to General Partner** | The General Partner shall receive a yearly management fee equal to 3.0% of the Net Asset Value of the Partnership, payable monthly and reimbursement for its reasonable operating expenses. The management fee shall be in addition to any other distributions payable to the General Partner as set forth in "Distributions". |
| **Eligible Purchasers and Jurisdictions of Offering** | Class A Units are offered in the United States, Europe, Asia, the Caribbean and in Canada where the Units can be offered on a private placement basis, exempt from any prospectus, filing and other similar registration requirements and otherwise in compliance with applicable law. |
| **Closing** | First Closing of Minimum Offering on or before March 15, 2006, with subsequent closings until Maximum Offering completed |

## USE OF PROCEEDS

|  | $1,000,000 (1) | Maximum |
|---|---|---|
| Gross proceeds of Issue | $1,000,000 | $10,000,000 |
| Agents Fees | 80,000 | 800,000 |
| Issue cost/Professional Fees | 120,000 | 550,000 |
| Net Proceeds to the Partnership | $800,000* | $8,650,000 |
| DIP Financing | $800,000 | $1,500,000 |
| Exit Financing/Equity Subscription (Net of DIP Repayment ) | NA | 2,500,000 |
| Acquisition of Debentures | NA | 3,250,000 |
| Cash Reserves | NA | 1,400,000 |
| Total Use of Proceeds | $1,000,000 | $10,000,000 |

(1) The $1,000,000 is for illustrative reference only; there is no minimum offering size.

## PRO-FORMA SHARE CAPITALIZATION OF SKYCOMM

Existing Shareholders    44,957,623    (As at Dec 31, 2005)

| | | |
|---|---|---|
| Converted Debt "A" | 108,000,000 | (Conversion by Partnership of debentures purchased with maximum proceeds of offering) |
| Converted Debt "B" | 30,134,798 | (Conversion by incumbent debenture holders) |
| Equity Subscription | 133,000,000 | (Acquired by Partnership with maximum proceeds of offering; $4,000,000 @ $0.03 per Unit) |
| TOTAL | 316,092,421 | (with 241,000,000 owned by the Partnership (76.2%) |

**FULLY DILUTED:**

| | | |
|---|---|---|
| Employee Options | 1,800,000 | |
| Warrants | 133,000,000 | (Acquired by Partnership with maximum proceeds of offering; exercise price $0.10/share). |

TOTAL    450,092,421 (with 374,000,000 owned by the Partnership (83.1%) assuming Partnership
finances warrant exercise at a cost to the Partnership of $13,300,000)

## SKYPORT SUMMARY FINANCIAL INFORMATION & FORECAST

|  | Actual | Proforma | | | | |
|---|---|---|---|---|---|---|
|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
| Revenue | 1,742,000 | 9,000,000 | 18,500,000 | 30,000,000 | 49,000,000 | 73,000,000 |
| EBITDA | (5,911,043) | (4,000,000) | 6,500,000 | 14,000,000 | 23,000,000 | 40,000,000 |
| Capex | 1,627,201 | 447,000 | 425,000 | 1,400,000 | 4,500,000 | 3,350,000 |

While the information in the table is based upon current expectations, and the General Partner believes such expectations are reasonable, such expectations are subject to a number of factors, risks and uncertainties that could cause the actual the timing of payment and the quantum of the cash flows to differ materially from those described in the table.

## PARTNERSHIP MANAGEMENT AND DIRECTORS

Senior Management and the Directors of the General Partner / Partnership are:

### Bryson Farrill

Bryson has worked globally in the capital markets and has held several notable positions including Chairman of Scotia Macleod International, as well as numerous board positions on companies traded on the major North American exchanges. This has given Bryson an extraordinarily broad perspective. Bryson's relationships and talents run deep and long across many continents.

As Balaton's Chairman, Bryson's expertise cannot be replicated and offers distinct advantages to the group, and to our portfolio holdings.

### Robert Kubbernus

With over 18 years of expertise in work-outs and troubled issuer experience, Robert leads the Balaton team in execution, opportunity identification and strategy. With a proven track record in Europe, United States and Canada, Robert has developed the key business, political and capital market relationships needed to build global organizations. Robert has delivered over $850 million in debt and equity to special situation companies.

As a noted speaker in areas of capital formation, technology and turn-around situations, he has delivered over 80 keynote and conference speeches. Noted achievements include nomination as Ernst and Young Entrepreneur of the Year, and named by them as one of the Top 50 Most Influential People. Robert has appeared in over 100 published articles and was an adjunct professor at Florida State University.

### Martin Doane

Martin Doane, B.A., LL.B., is a graduate of the University of Western Ontario and Osgoode Hall Law School. He is the Managing Director of Balaton and brings with him 16 years' experience as a litigation lawyer and many years of work in the corporate finance and venture capital spheres. Since his admission to the Ontario Bar in 1991, Martin has engaged in a diverse litigation practice, including significant work in the areas of business, employment, constitutional, securities and class action litigation. He has appeared as counsel at all levels of court in Canada, including the Supreme Court of Canada.

Martin has helped start and served in advisory capacities with a variety of private and public businesses in the technology, resource and financial services areas.

### Paul E. Heney

Paul obtained his Bachelor of Social Sciences in Economics in 1981 and his Bachelor of Laws in 1984 from the University of Ottawa. He then received his Master of Business Administration from the Schulich School of Business, York University, in 1985.

Paul is a member of the Law Society of Upper Canada, the Ontario Bar Association and the Canadian Bar Association. He has been a featured speaker at many conferences on the subject of structuring, creating and marketing alternative investment products requirements in Canada.

### Bill Calsbeck

Bill Calsbeck brings over 25 years of capital market and micro-cap experience to Balaton. As the firm's Pacific Rim Vice President, Bill is responsible for working directly with each issuer that Balaton supports primarily from the Pacific Rim region.

Having been involved in a wide variety of industries such as Oil and Gas, High Tech, Biotech, and Communications, and in raising hundreds of millions of dollars for client firms, both in equity and in capital market buying, Bill brings a great deal of diversification to Balaton.



## CONTACT INFORMATION

BALATON GROUP

| **Toronto** | **London** | **Vancouver** |
| Canada | United Kingdom | Canada |
| Global Head Office | Europa Head Quarters | Pacific Rim Office |
| | | |
| 152 King Street East Suite 400 | 33 Cork Street 5th Floor | 915 - 925 West Georgia Street |
| Toronto, ON. M5A 1J3 | London W1S 3NQ | Vancouver, BC V6C 3L2 |
| | | |
| PH: 416.366.5702 | PH +44 (0) 20.7478.3300 | PH: 604.484.5761 |
| FX: 416 366.8273 | FX: +44 (0) 20.7734.6618 | FX 604.484.5760 |
| www.balatongroupinc.com | www.balatongroupinc.com | www.balatongroupinc.com |
| info@balatongroupinc.com | bryson@balatongroupinc.com | bill@balatongroupinc.com |

### SAFE HARBOR STATEMENT

This Confidential Investment Memorandum may contain "forward-looking statements" Statements included herein which are not purely historical, are forward-looking statements and include any statements regarding beliefs, plans, expectations or intentions regarding the future.

Except for the historical information presented herein, matters discussed in this Confidential Investment Memorandum contain forward-looking statements that are subject to certain risks and uncertainties that could cause actual results to differ materially from any future results, performance or achievements expressed or implied by such statements. Statements that are not historical facts, including statements that are preceded by, followed by or that include such words as "estimate", "anticipate", "believe", "plan", "pro-forma" or "expect" or similar statement's are 'orward-looking statements. Risks and uncertainties for Clear Sky and SkyPort include, but are not limited to, the risks associated with corporate growth and development and funding. Other risks include risks associated with the regulatory approval process, competitive companies, and future capital requirements. There can be no assurance that Clear Sky and SkyPort's efforts will succeed and that Clear Sky and SkyPort will ultimately achieve commercial success These forward-looking statements are made as of the date of this Confidential Investment Memorandum, and Clear Sky and SkyPort assume no obligation to update the forward-looking statements, or to update the reasons why actual results could differ from those projected in the forward-looking statements. Although Clear Sky and SkyPort believe that the beliefs, plans, expectations and intentions contained in this Confidential Investment Memorandum are reasonable, there can be no assurance those beliefs, plans, expectations or intentions will prove to be accurate. Investors should consider all of the information set forth herein.

## PARTNERSHIP AGREEMENT

### FOR

### CLEAR SKY INVESTMENTS L.P.

#### A Delaware Limited Partnership

**THIS PARTNERSHIP AGREEMENT**, dated as of February 10, 2006, is among the Persons signing it below.

**WHEREAS,** the Persons signing this Agreement have formed a limited partnership known as Clear Sky Investments, L.P., a limited partnership pursuant to the Delaware Revised Uniform Limited Partnership Act (the "Act") and desire to set out herein their respective rights and obligations pursuant to the Act in connection with such limited partnership.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

### ARTICLE I
### DEFINITIONS

**1.1.** **Definitions.** In this Agreement, the following terms shall have the meanings set forth below:

(a) *"Affiliate"* shall mean, with respect to a specified person (a) any person who directly or indirectly owns, controls, or holds with power to vote, 10% or more of any class of equity securities of such specified person; (b) any person 10% or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such specified person; (c) any person who, directly or indirectly, controls, is controlled by, or is under common control with such specified person; or (d) any officer, director or partner of, or any person who serves in a similar capacity with respect to, such specified person, or of which such specified person is an executive officer, director or general partner, or with respect to which such specified person serves in a similar capacity

(b) *"Agreement"* shall mean this partnership agreement, as it may from time to time be amended.

(c) *"Capital Account"* shall mean the account to be maintained by the Partnership for each Economic Interest Holder in accordance with the following provisions:

(i) an Economic Interest Holder's Capital Account shall be increased by the Economic Interest Holder's Capital Contributions, the amount of any Partnership liabilities assumed by the Economic Interest Holder (or which are secured by Partnership property distributed to the Economic Interest Holder), the Economic Interest Holder's share of Profit and any item in the nature of income or gain specially allocated to the Economic Interest Holder pursuant to the provisions of Article VI; and

- 2 -

(ii) an Economic Interest Holder's Capital Account shall be decreased by the amount of money and the fair market value of any Partnership property distributed to the Economic Interest Holder, the amount of any liabilities of the Economic Interest Holder assumed by the Partnership (or which are secured by property contributed by the Economic Interest Holder to the Partnership), the Economic Interest Holder's share of Loss and any item in the nature of expenses or losses specially allocated to the Economic Interest Holder pursuant to the provisions of Article VI.

If the book value of Partnership property is adjusted pursuant to Section 6.1(d)(i), the Capital Account of each Economic Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Partnership had recognized gain or loss equal to the amount of such aggregate adjustment.

(d) *"Capital Contribution"* shall mean the fair market value of any contribution by a Partner to the capital of the Partnership in cash or property.

(e) *"Capital Proceeds"* shall mean the excess of (x) all proceeds received by the Partnership from (i) the financing or refinancing of any mortgage on or security interest in any assets of the Partnership, (ii) the sale or exchange of any Partnership assets either within or outside of the ordinary course of business, including without limitation a sale of some or all of the Partnership's Securities, (iii) any casualty resulting in insurance proceeds, and (iv) any reserves previously set aside from Capital Proceeds which are deemed available for distribution by the General Partner, over (y) the sum of (i) all expenditures attributable to any transaction giving rise to such proceeds and (ii) all reserves retained in the reasonable discretion of the General Partner for use by the Partnership.

(f) *"Capital Transaction"* shall mean a transaction which results in Capital Proceeds being earned by the Partnership.

(g) *"Class A Limited Partners"* shall mean those individuals or entities listed as such on the attached Exhibit A or admitted to the Partnership as Partners after the date of this Agreement in accordance with Section 3.2 of this Agreement.

(h) *"Class B Limited Partners"* shall mean those individuals or entities listed as such on the attached Exhibit A or admitted to the Partnership as Partners after the date of this Agreement in accordance with Section 3.2 of this Agreement.

(i) *"Certificate of Limited Partnership"* shall mean the Certificate of Limited Partnership of the Partnership filed originally with the Delaware Secretary of State on February 10, 2006 as it may from time to time be amended.

(j) *"Code"* shall mean the Internal Revenue Code of 1986, as amended, or any superseding federal revenue statute.

- 3 -

(k)     *"Economic Interest"* shall mean a Person's right to share in the Profits and Losses of, and the right to receive distributions from, the Partnership.

(l)     *"Economic Interest Holder"* shall mean any Person who holds an Economic Interest, whether as a Partner or an unadmitted assignee of a Partner.

(m)     *"Fiscal Year"* shall mean the fiscal year of the Partnership, which shall be the year ending December 31.

(n)     *"General Partner"* shall mean Clear Sky Management, Inc., a Delaware corporation.

(o)     *"Involuntary Withdrawal"* shall mean, with respect to any Partner, the occurrence of any of the following events:

(i)     the Partner makes an assignment for the benefit of creditors; (ii) the Partner files a voluntary petition of bankruptcy;

(ii)     the Partner is adjudged bankrupt or insolvent or there is entered against the Partner an order for relief in any bankruptcy or insolvency proceeding;

(iii)     the Partner files a petition seeking for the Partner any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(iv)     the Partner seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Partner or of all or any substantial part of the Partner's properties;

(v)     the Partner files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Partner in any proceeding described in Subsections (i) through (iv);

(vi)     any proceeding against the Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Partner or all or any substantial part of the Partner's properties without the Partner's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(vii)     if the Partner is an individual, the Partner's death, incapacity, or adjudication by a court of competent jurisdiction as incompetent to manage the Partner's person or property;

- 4 -

(viii)  if the Partner is an individual, entry of a final order, judgment or decree of a domestic or foreign court of competent jurisdiction, not subject to appeal, in connection with or arising out of any action for the annulment of, the dissolution of, the declaration of the nullity of or separation or divorce with respect to, the marriage of such Partner directing the transfer of all or part of such Partner's Partnership Interest to such Partner's spouse;

(ix)  if the Partner is acting as a Partner by virtue of being a trustee of a trust, the termination of the trust;

(x)  if the Partner is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(xi)  if the Partner is a corporation, the dissolution of the corporation or the revocation of its charter; or

(xii)  if the Partner is an estate, the distribution by the fiduciary of the estate's entire interest in the Partnership.

(p)  *"Limited Partner"* shall mean the Persons executing this Agreement as Class A Limited Partners or Class B Limited Partners listed in Exhibit A.

(q)  *"Majority in Capital Accounts of the Class A Limited Partners"* shall mean the Class A Limited Partners owning a majority of the Capital Accounts owned by all Class A Limited Partners.

(r)  *"Net Cash Flow"* shall mean the excess, if any, for a fiscal period of (a) cash received by the Partnership during such period from operations, plus releases from reserves over (b) the sum of (i) all cash expenditures by the Partnership with respect to the Partnership's assets or business, and (ii) such reasonable additions to reserves for anticipated expenses, contingent or otherwise, in such amounts as the General Partner, in its sole discretion, deems necessary.

(s)  *"Partner"* shall mean each Person who or which executes a counterpart of this Agreement as a Partner and each Person who or which may hereafter become a Partner of the Partnership.

(t)  *"Partnership"* shall mean Clear Sky Investments, L.P.

(u)  *"Partnership Interest"* shall mean a Partner's aggregate rights in the Partnership, including, without limitation, the Partner's (i) Economic Interest and (ii) right to vote in matters coming before the Partnership.

- 5 -

(v) *"Percentage"* or *"Percentage Interest"* shall mean, as to a Partner, the percentage interest in residual profits and losses set forth after the Partner's name on Exhibit A, as amended from time to time.

(w) *"Person"* shall mean any person, corporation, governmental authority, limited liability company, partnership, trust, unincorporated association or other entity.

(x) *"Profits and Losses"* shall mean, for each Fiscal Year (or other period for which Profit or Loss must be computed), the Partnership's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i) all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703 (a)( 1) shall be included in computing taxable income or loss;

(ii) any tax-exempt income of the Partnership, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(iii) any expenditures of the Partnership described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)), not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(iv) gain or loss resulting from any taxable disposition of Partnership property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

(v) in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset.

(y) *"Transfer"* shall mean when used as a noun, any gift, sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means to gift, sell, hypothecate, pledge, assign, or otherwise transfer.

(z) *"Security or Securities"* shall mean any domestic or foreign note, stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, interest in any limited partnership or limited liability company, collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, financial futures contract, commodity futures contract, put or call option, voting-trust certificate, certificate of deposit for a security, mortgage-backed security (including collateralized mortgage obligations of any type), or,

- 6 -

in general, any interest or instrument commonly known as a "security" or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase or any derivative of any of the foregoing.

(aa) *"Treasury Regulations"* shall mean all proposed, temporary and final regulations promulgated under the Code as from time to time in effect.

(bb) *"Valuation Date"* shall mean any date on which the value of the Partnership's Securities or other assets are valued.

(cc) *"Voluntary Withdrawal"* shall mean a Partner's disassociation with the Partnership by means other than a Transfer or an Involuntary Withdrawal.

## ARTICLE II
## ORGANIZATION

**2.1. Formation.** This Partnership was formed as a limited partnership pursuant to the Act by the filing of a Certificate of Limited Partnership on February 10, 2006.

**2.2. Name.** The name of the Partnership shall be "Clear Sky Investments, L.P.".

**2.3. Principal Place of Business.** The principal place of business of the Partnership shall be 152 King Street East, Suite 400, Toronto, Ontario, Canada M5A 1J3. The Partnership may establish any other places of business as the Partners may from time to time deem advisable.

**2.4. Registered Agent and Office.** The registered office of the Partnership shall be located at 108 West 13th Street, Wilmington, Delaware. Business Filings Incorporated shall be the registered agent of the Partnership for service of process. The General Partner may, at any time and from time to time, change the location of the Partnership's registered office or registered agent as it may from time to time determine upon notice of such change to all Partners. The principal place of business of the Partnership and the office of General Partner shall be 152 King Street East, Suite 400, Toronto, Ontario, Canada M5A 1J3 , or at such other location as may be selected from time to time by the General Partner. The Partnership may maintain such other offices or agents as the General Partner deems advisable.

**2.5. Term.** The term of the Partnership shall begin upon the execution and filing of the Certificate of Limited Partnership with the Delaware Secretary of State and shall continue until terminated pursuant to Article IX of this Agreement.

**2.6. Purpose.** The purpose of the Partnership is to use the maximum aggregate initial Class A Limited Partners' maximum Capital Contributions of US$10,000,000 to acquire debt and equity securities of SkyComm Technologies Corporation ("SkyComm") and its wholly owned subsidiary SkyPort International Inc. ("SkyPort") pursuant to and in accordance

- 7 -

with the agreements to be assigned to the Partnership by Balaton Group Inc. ("Balaton") and The Watershed Funds Ltd. ("Watershed") described in Exhibit B to this Agreement and to assist management of SkyComm and SkyPort in revitalizing the operating business of SkyPort and seeing SkyComm through a going public transaction and thereby enhancing the fair market value of the Securities held by the Partnership for the benefit of the Partners. The maximum aggregate initial Class A Limited Partners' Capital Contributions of US$10,000,000 if completed, will support the acquisition and re-structuring of SkyComm and SkyPort by the Partnership. As the Partnership is capitalized with subscriptions for Class A Limited Partners' interests, Balaton and Watershed will assign to the Partnership rights to participate under the agreements described in Exhibit B. By applying the Class A Limited Partners Capital Contributions in exercise of the rights offered by such agreements, the Partnership will acquire ownership of SkyComm common stock and securities of SkyComm convertible into SkyComm common stock. If the maximum aggregate initial Class A Limited Partners' Capital Contributions of US$10,000,000 are completed, Balaton and Watershed will assign all of their participation rights in the Exhibit B agreements to the Partnership and the Partnership will acquire stock representing approximately 76% percent of the issued and outstanding shares of SkyComm, together with common stock purchase warrants which, if exercised by the Partnership, would increase its fully-diluted ownership position to 82%, excluding any dilution resulting from further recapitalization of SkyComm. If less than the maximum aggregate initial Class A Limited Partners' Capital Contributions of US$10,000,000 are completed, the Partnership's participation in the acquisition and re-structuring of SkyComm will be proportionately reduced and Balaton and Watershed may retain any participation rights which have not been assigned to the Partnership.

     **2.7. Conflict Waiver.** Each Partner hereby acknowledges that he, she or it is aware that Hodgson Russ LLP ("HR") and Wilson Vukelich LLP ("WV") has represented the Partnership, the General Partner and the Class B Limited Partners and that such representation may result in conflicts of interest for such counsel. Each Partner acknowledges that as a Partner of the Partnership, he, she or it may not receive the same protections that such Partner would otherwise receive if he, she or it, individually or as a group, had counsel separate from the Partnership, the General Partner or the Class B Limited Partners, and by executing this Agreement, each Partner hereby (a) consents to the representation by HR and WV of the Partnership, the General Partner and the Class B Limited Partners (b) specifically disclaims and waives any duty of care that HR and WV may owe to him, her or it, with respect to any matter arising as a result of HR's or WV's representation of the Partnership, the General Partner or the Class B Limited Partners and (c) specifically disclaims and waives any duty imposed as a result of any direct or indirect attorney-client relationship which has been established between HR or WV and such Partner.

## ARTICLE III
## PARTNERS

     **3.1. Names and Addresses.** The names and addresses of the Partners are as set forth on the attached Exhibit A to this Agreement.

- 8 -

**3.2. Additional Partners/Investments.**

(a) The General Partner may admit additional Class A Limited Partners and Class B Limited Partners or accept, on behalf of the Partnership, additional capital contributions from existing Class A Limited Partners, provided, however, that the admittance of any additional Limited Partners within a class or the acceptance of any additional capital contributions shall be conditioned upon the satisfaction of the requirements of Section 3.2(b) of this Agreement. Upon the acceptance of additional contributions from existing Class A Limited Partners or the admission of a new Class A Limited Partner or Class B Limited Partner, the Partnership interests of each of the Limited Partners within the affected class shall be adjusted so that each Limited Partner within the affected class receives a Percentage Interest determined by multiplying the total Limited Partner percentage interest within the class by a fraction, the numerator of which is each the Capital Contribution of each Limited Partner within the affected class and the denominator of which is the sum of the aggregate Capital Contributions of the Limited Partners within the affected class.

(b) Any admittance of additional Class A Limited Partners or acceptance of additional capital contributions from existing Class A Limited Partners beyond the aggregate initial Class A Limited Partners' maximum Capital Contributions of $10,000,000 shall be subject to the conditions precedent that (i) each Class A Limited Partner be given written notice of such additional investment, (ii) each Class A Limited Partner be given the reasonable opportunity to make an additional Capital Contribution in an amount equal to the amount necessary for such Limited Partner to maintain the same Percentage Interest immediately after the additional investments as such Limited Partner held immediately prior to the additional investments, and (iii) in the event of the admission of a new Limited Partner, such new Limited Partner shall execute and deliver an agreement whereby said partner agrees to become a party to this Agreement and to be bound by each of the terms and conditions of this Agreement.

**3.3. Books and Records.** The Partnership shall keep books and records of accounts and minutes of all meetings of the Partners. Such books and records of accounts shall be maintained on the accrual basis in accordance with this Agreement.

**3.4. Information.** Each Partner may inspect during ordinary business hours and at the principal place of business of the Partnership, the Certificate of Limited Partnership, this Agreement, the minutes of any meeting of the Partners and any tax returns of the Partnership for the immediately preceding three Fiscal Years.

**3.5. Limitation of Liability.** Each Partner's liability shall be limited as set forth in this Agreement, the Act and other applicable law. A Limited Partner shall not be personally liable for any indebtedness, liability or obligation of the Partnership, except as set forth in this Agreement, the Act and any other applicable law.

- 9 -

## ARTICLE IV
## MANAGEMENT

**4.1.** **Rights and Duties of Limited Partners.** Except as may hereafter be required or permitted by the Delaware Revised Uniform Limited Partnership Act, the Limited Partners shall take no part whatever in the control, management, direction or operation of the affairs of the Partnership and shall have no power to act for or bind the Partnership.

**4.2.** **Management.** The powers of the Partnership shall be exercised by or under the authority of, and the business and affairs of the Partnership shall be managed under the direction of the General Partner. Any Person dealing with the Partnership, other than a Partner, may rely on the authority of the General Partner and officers in taking any action in the name of the Partnership without inquiry into the provisions of, or compliance with, this Agreement, regardless of whether that action is actually taken in accordance with the provisions of this Agreement.

**4.3.** **Powers of the General Partner.** The General Partner shall have full, complete and exclusive power to manage and control the Partnership, and shall have the authority to take any action it deems to be necessary, convenient or advisable in connection with the management of the Partnership, including, without limitation, the power and authority on behalf of the Partnership:

(a) subject to the provisions of Section 3.2(b), to expend the Partnership's Capital Contributions and revenues and to execute and deliver all checks, drafts, endorsements and other orders for the payment of Partnership funds;

(b) to employ agents, employees, accountants, lawyers, clerical help, and such other assistance and services as may seem proper, and to pay therefore such remuneration as the General Partner may deem reasonable and appropriate;

(c) to purchase, lease, rent, or otherwise acquire or obtain the use of office equipment, materials, supplies, and all other kinds and types of real or personal property, and to incur expenses for travel, telephone, and for such other things, services and facilities, as may be deemed necessary, convenient or advisable for carrying on the business of the Partnership;

(d) to carry, at the expense of the Partnership, insurance of the kinds and in the amounts that the General Partner deems advisable or make other arrangements for payment of losses or liabilities to protect the Partnership or the Partners, General Partner, agents and employees of the Partnership against loss or liability;

(e) to borrow money from any Person for any Partnership purpose on whatever terms and conditions the General Partner deems advisable, to obligate the Partnership to repay the borrowed money, and in connection therewith, to encumber or hypothecate Partnership property as security for such repayment by mortgage, deed of

trust, pledge or otherwise (without limiting the generality of the foregoing, the General Partner may, without the consent of any or all of the Limited Partners, execute promissory notes and other loan documents in order to secure financing for the Partnership);

(f) to sell, transfer, assign, dispose of, trade, exchange, quitclaim, surrender, release or abandon Partnership property, or any interests therein, to any Person, including the General Partner or its Affiliates, and in connection therewith to receive such consideration as it deems fair and in the best interests of the Partnership;

(g) to sue and be sued, complain and defend in the name and on behalf of the Partnership;

(h) to do all acts, take part in any proceedings, and exercise all rights and privileges as could an absolute owner of Partnership property, subject to the faithful performance of the General Partner's fiduciary obligations to the Partnership and the Partners;

(i) in the exercise of any of the foregoing powers, to negotiate, execute and perform, on any terms deemed desirable in the General Partner's, sole discretion, such agreements, contracts, leases, instruments and other documents as the General Partner shall from time to time approve in accordance with, and subject to, the terms of this Agreement;

(j) to appoint one or more officers of the Partnership as the General Partner deems necessary, convenient or advisable in carrying out the purposes of the Partnership;

(k) to take such other action and perform such other tasks as the General Partner deems necessary, convenient or advisable in carrying out the purposes of the Partnership.

The enumeration of powers in this Agreement shall not limit the general or implied powers of the General Partner or any additional powers provided by law.

4.4. **Restrictions.** Notwithstanding the foregoing, the consent of the General Partner, all of the Class B Limited Partners and a Majority in Capital Accounts of the Class A Limited Partners shall be required prior to any action by the General Partner with respect to the following matters:

(a) The sale or assignment of the General Partner's Interest in the Partnership (but not its rights to receive fees or other compensation as provided herein), the admission of a substitute General Partner or the retirement of a General Partner, except for as otherwise provided in this Agreement.

(b) Any act in contravention of this Agreement.

- 11 -

(c) Any act which would make it impossible to carry on the ordinary business of the Partnership, except as otherwise provided in this Agreement.

(d) The filing of a voluntary petition or otherwise initiating proceedings to have the Partnership adjudicated bankrupt or insolvent, or consenting to the institution of bankruptcy or insolvency proceedings against the Partnership, or the filing of a petition seeking or consenting to reorganization or relief of the Partnership as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Partnership; or the seeking or consenting to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Partnership or of all or any substantial part of the properties and assets of the of the Partnership, or the admitting in writing the inability of the Partnership to pay its debts generally as they become due or declare or effect a moratorium on the Partnership debt or the taking of any action in furtherance of any such action.

**4.5. Binding Authority.** Unless authorized to do so by this Agreement or the General Partner, no Person shall have any power or authority to bind the Partnership.

**4.6. Limitation on Authority of Partners.** No Partner is an agent of the Partnership solely by virtue of being a Partner, and no Partner has authority to act for the Partnership solely by virtue of being a Partner.

**4.7. Liability for Certain Acts.** Neither a General Partner nor an agent (including a person having more than one capacity) shall be liable for any debts, obligations or liabilities of the Partnership or each other, whether arising in tort, contract or otherwise, solely by reason of being a General Partner or agent or acting (or omitting to act) in such capacities or participating (as an employee, consultant, contractor or otherwise) in the conduct of the business of the Partnership. Without limiting the generality of the preceding sentence, a General Partner does not in any way guaranty the return of any Capital Contribution to a Partner or a profit for the Partners from the operations of the Partnership.

**4.8. Indemnification.** The General Partner shall not be liable, responsible or accountable in damages or otherwise to the Partnership or any of the Partners or the predecessor in interest of such Partner for any act or omission performed or omitted by it (or its directors, officers, employees or agents) in good faith on behalf of the Partnership and in a manner reasonably believed by it to be within the scope of the authority granted to it by this Agreement and in the best interest of the Partnership, except for actual fraud, gross negligence or willful misconduct with respect to such acts or omissions. Any loss or damage incurred by the General Partner by reason of any act or omission performed or omitted by it (or its directors, officers, employees or agents) in good faith on behalf of the Partnership and in a manner reasonably believed by it to be within the scope of the authority granted to it by this Agreement and in the best interest of the Partnership (but not, in any event, any loss or damage incurred by any General Partner by reason of actual fraud, gross negligence or willful misconduct with respect to such act or omission) shall be paid from Partnership assets to the extent available.

- 12 -

**4.9.** **Resignation.** The General Partner may resign at any time by giving written notice to the Partners of the Partnership. The resignation of the General Partner shall take effect upon receipt of such notice or at any later time specified in such notice. Unless otherwise specified in such notice, the acceptance of the resignation shall not be necessary to make it effective. The resignation of the General Partner shall not affect the General Partner's rights as a Partner and shall not constitute a withdrawal of a Partner.

**4.10.** **Removal.** The General Partner may not be removed except as provided herein. Upon the written consent of Class A Limited Partners owning Percentage Interests of not less than eighty five percent (85%) of the total Class A Limited Partner Percentage Interests as a Class, the General Partner may be removed for any actual fraud, willful misconduct or gross negligence in the performance of its duties and obligations as a General Partner. A General Partner shall be automatically removed upon its dissolution, bankruptcy, death, disability or legal incapacity.

**4.11.** **Management Fees** The General Partner shall receive a yearly management fee equal to 3.0% of the Net Asset Value of the Partnership, payable monthly.. The management fees shall be charged to each Class A Limited Partner's respective Capital Account. The management fee shall be in addition to (i) any other distributions payable to the General Partner in accordance with this Agreement; and (ii) any payment made in accordance with Section 4.12.

**4.12.** **Reimbursement.** The General Partner shall be reimbursed by the Partnership for its reasonable operating expenses. All of the Partnership's expenses shall be borne by the Partnership (or reimbursed to the General Partner to the extent such expenses are advanced by it). The Partnership's expenses include, but are not limited to:

(a)     expenses directly related to investment transactions and positions for the Partnership's account, including brokerage and sales commissions, fees and custody charges, costs of any outside accountants, attorneys or other experts or consultants engaged by the General Partner in connection with specific transactions (including reimbursement of the Partnership's advisers, whether or not they are Affiliates of the General Partner, for research and due diligence expenses paid by them which are directly allocable to the Partnership's activities), and any legal fees and costs (including settlement and indemnification costs) arising in connection with any litigation or regulatory investigation instituted against the Partnership or the General Partner in connection with the affairs of the Partnership;

(b)     any withholding or transfer taxes imposed on the Partnership or any of the Limited Partners as a result of its or their earnings, investments or withdrawals (which amounts will be assessed, where applicable to particular Partners, directly against the Capital Accounts of such Partners); and

- 13 -

(c)     costs of the preparation of the Partnership's annual financial statements, the preparation of its tax returns, any outside accounting or bookkeeping services, and the fees and expenses of the Partnership's legal counsel.

4.13. **Other Business Activities.** The General Partner and its Affiliates will devote such time and services to the Partnership as they deem necessary, but they shall not be required to devote their full time to the Partnership's business. The General Partner and its Affiliates including but not limited to Balaton and Watershed are free to engage in other business activities (even if they conflict, or are in competition with the Partnership's business) including, but not limited to, the formation of other investment partnerships and the providing of advisory services to other clients. In addition, Affiliates of the General Partner may from time-to-time be engaged to provide professional services directly to SkyPort and or SkyComm which are outside of the scope of its general management responsibilities as General Partner of the Partnership, provided that any such engagements shall be effected only on terms competitive with those that may be obtained by SkyPort and or SkyComm from unaffiliated Persons and shall be reported to the Partners with the delivery each year of the Partnership's financial report. The Limited Partners acknowledge that such activities on the part of the General Partner or its Affiliates does not give rise to any obligation on their part to account to the Partnership or any Limited Partner for any revenue, profits or other benefits derived therefrom.

## ARTICLE V
## CAPITAL CONTRIBUTIONS; LOANS

5.1.     **Capital Contributions.** Each Class A Limited Partner has made an initial Capital Contribution to the Partnership.

5.2.     **Additional Contributions.** Except as set forth in Section 5.1 of this Agreement, no Partner shall be required to make any additional Capital Contribution.

5.3.     **Capital Accounts.** A Capital Account shall be maintained for each Economic Interest Holder of the Partnership.

5.4.     **Transfers.** If any Economic Interest is Transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Economic Interest.

5.5.     **Deficit Capital Account.** Except as otherwise required in the Act or this Agreement, no Economic Interest Holder shall have any liability to restore all or any portion of a deficit balance in a Capital Account.

5.6.     **Withdrawal or Reduction of Capital Contributions.** An Economic Interest Holder shall not receive from the Partnership any portion of a Capital Contribution until all indebtedness and liabilities of the Partnership have been paid or there remains property of the

- 14 -

Partnership, in the sole discretion of the General Partner, sufficient to pay them, except as specifically set forth in this Agreement.

**5.7.   Interest on and Return of Capital Contributions.**  No Economic Interest Holder shall be entitled to interest on such Economic Interest Holder's Capital Contribution or to a return of such Economic Interest Holder's Capital Contribution, except as specifically set forth in this Agreement.

**5.8.   Loans.**  If the General Partner determines that additional funds are needed by the Partnership, the General Partner may request, on behalf of the Partnership, that the Partners loan such funds to the Partnership in proportion to their Percentage Interests. Any such loans shall be on terms and conditions determined by the General Partner to be then necessary to obtain funds in the amounts, for the periods and for the purposes needed. No Partner shall be obligated to make any loan to the Partnership. If, however, any Partner elects not to make such Partner's pro-rata share of any loan within ten (10) days after request by the General Partner, the remaining Partners may make such loan in such Partner's place.

## ARTICLE VI
## ALLOCATIONS AND DISTRIBUTIONS

### 6.1.   Allocations.

(a)      *Allocation of Profits.*  Except as provided in subparagraphs (b), (c) and (d) of this Section, all Profits for each Fiscal Year shall be allocated 1% to the General Partner, 29% to the Class B Limited Partners as a class, pro rata in accordance with their Percentage Interests as listed on the attached Exhibit A, and 70% to the Class A Limited Partners as a class, pro rata in accordance with their Percentage Interests as listed on the attached Exhibit A.

(b)      *Allocation of Profits from Capital Transactions.*  Except as provided in subparagraphs (d) and (e), all Profits from transactions producing Capital Proceeds for each Fiscal Year shall be allocated to Partners as follows:

(i)       First, to all Partners with a negative balance in their Capital Account in proportion to, and to the extent of, such negative balances;

(ii)      Second, to the General Partner and the Class B Limited Partners, pro rata in accordance with their Percentage Interests as listed on the attached Exhibit A, any Profits remaining after the allocation in subparagraph (i), up to the amount necessary to bring their aggregate Capital Account balances to an amount equal to 43% of the aggregate Capital Account balances of the Class A Partners; and

(iii)     Third, the balance, if any, pro rata, (i) 30% to the General Partner and the Class B Limited Partners, pro rata in accordance with their Percentage Interests

- 15 -

as listed on the attached Exhibit A and (ii) 70% to the Class A Limited Partners, pro rata in accordance with their Percentage Interests as listed on the attached Exhibit A.

(c)     *Allocation of Losses*.  All Losses for each Fiscal Year shall be allocated to the General Partner and the Class A Limited Partners, pro rata in accordance with the positive balances in the Partners' Capital Accounts.

(d)     *Special Allocations*.  All capitalized terms used in this Section not otherwise defined in this Agreement shall have the meaning set forth in the Regulations promulgated pursuant to Section 704 of the Code. The following special allocations shall be made in the following order:

(i)     *Property Contributions*.  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Partnership or revalued in accordance with Reg. 1.704-1(b)(2)(iv)(f) shall, solely for tax purposes, be allocated among the Economic Interest Holders so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial fair market value. Any elections or decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.

(ii)     *Minimum Gain Chargeback*.  Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Section 6.1, if there is a net decrease in Partnership Minimum Gain during any Adjustment Period, each Economic Interest Holder shall be specially allocated items of gross income and gain for such period (and, if necessary, subsequent periods) in an amount equal to such Economic Interest Holder's share of the net decrease in Partnership Minimum Gain, determined in accordance with Section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Economic Interest Holder pursuant thereto. The items to be so allocated shall be determined in accordance with Section 1.704-2(f\6) and 1.704-2(j)(2) of the Regulations. This Section 6.1(c)(ii) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(iii)     *Partner Minimum Gain Chargeback*.  Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Section 6.1, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any period, each Economic Interest Holder who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Partnership income and gain for such Adjustment Period (and, if necessary, subsequent Adjustment Periods) in an amount

- 16 -

equal to such Economic Interest Holder's share of the net decrease in Partner
Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt,
determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant
to the previous sentence shall be made in proportion to the respective amounts required to
be allocated to each Partner pursuant thereto. The items to be so allocated shall be
determined in accordance with Sections l.704-2(f)(4) and 1 .704-2(j)(2) of the
Regulations. This Section 6.1(c)(iii) is intended to comply with the minimum gain
chargeback requirement in Section 1.704-2(l)(4) of the Regulations and shall be
interpreted consistently therewith.

      (iv)    *Qualified Income Offset.* If any Economic Interest Holder
unexpectedly receives any adjustments, allocations, or distributions described in Section
1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6)
of the Regulations, items of Partnership income and gain shall be specially allocated to
each such Economic Interest Holder in an amount and manner sufficient to eliminate, to
the extent required by the Regulations, the Capital Account deficit (determined in
accordance with the rules set forth in Section l.704-l(b)(2)(ii)(d)) of such Economic
Interest Holder as quickly as possible, provided that an allocation pursuant to this Section
6.1(c)(iv) shall be made only if and to the extent that such Economic Interest Holder
would have an Capital Account deficit (determined in accordance with the rules set forth
in Section 1.704-1(b)(2)(ii)(d)) after all other allocations provided for in this Section 6.1
have been tentatively made as if this Section 6.1(c)(iv) were not in the Agreement.

      (v)    *Nonrecourse Deductions.* Nonrecourse Deductions for any period
shall be specially allocated among the Economic Interest Holder in proportion to their
Economic Interests.

      (vi)    *Partner Nonrecourse Deductions.* Any Partner Nonrecourse
Deductions for any period shall be specially allocated to the Economic Interest Holder
who bears the economic risk of loss with respect to the Economic Interest Holder
Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in
accordance with Regulations Section 1.704-2(i)(1).

      (vii)    *Section 754 Adjustments.* To the extent an adjustment to the
adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Code
Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or

Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining
Capital Accounts as the result of a distribution to an Economic Interest Holder in
complete liquidation of such Economic Interest Holder's Interests, the amount of such
adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment
increases the basis of the asset) or loss (if the adjustment decreases such basis) and such
gain or loss shall be specially allocated to the Economic Interest Holders in proportion to
their Percentage Interests in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(2)

- 17 -

applies, or to the Economic Interest Holder to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(viii) *Compensation Income.* If any Partner is determined to recognize compensation income upon his receipt of an Interest, such Partner shall be allocated all corresponding items of Partnership deduction.

(e) *Capital Account.* The provisions of this Agreement, as amended, relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such regulations. In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such regulations, the General Partner may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Economic Interest Holder upon the dissolution of the Partnership.

(f) *Allocation to Transferred Interests.* Profits, gains, losses, deductions and credits allocated to a Economic Interest Holder assigned or reissued during a Fiscal Year of the Partnership shall be allocated to the Person who was the holder of such Economic Interest during such Fiscal Year, in proportion to the number of days that each such Person was recognized as the owner of such Economic Interest Holder during such Fiscal year or in any other proportion permitted by the Code and selected by the General Partner, without regard to results of Partnership operations during the period in which each such Person was recognized as the owner of such Economic Interest Holder during such Fiscal Year, and without regard to the date, amount or recipient of any distributions which may have been made with respect to such Economic Interest Holder.

### 6.2. Distributions to Partners.

(a) *Net Cash Flow.* Net Cash Flow, if any, shall be distributed each year to the General Partner and the Class B Limited Partners, pro rata in accordance with their Percentage Interests as listed on the attached Exhibit A.

(b) *Capital Proceeds.* All Capital Proceeds shall be distributed in the same manner as allocations are made in Section 6.1(a); provided, however, that if Profits from Capital Transactions are not sufficient to bring the Capital Accounts so that the General Partner has 1% of all Capital Accounts, the Class B Limited Partners in the aggregate have 29% of all Capital Accounts, and the Class A Limited Partners in the aggregate have 70% of all Capital Accounts, the Partners hereby authorize a shift in Capital Accounts such that the aforementioned percentage of Capital Account ownership is achieved.

(c) *Allocation of Distributions.* Distributions to Partners shall be allocated among such Partners in accordance with their respective Percentage Interests as

- 18 -

of the date of such distribution without regard to the length of time such Partner has held such Percentage Interest.

**6.3.    Distributions in Kind.** In the event that the General Partner shall determine that a portion of the Partnership's assets should be distributed in kind to the Partners, the General Partner shall obtain an independent appraisal of the fair market value of each such asset as of a date reasonably close to the date of such distribution. Any unrealized appreciation or depreciation with respect to such asset shall be allocated among the Partners (in accordance with Section 6.1, assuming that the property were sold for the appraised value) and distribution of any such assets in kind to a Partner shall be considered a distribution of an amount equal to the assets' appraised fair market value for purposes of determining the Capital Account of the distributee.

**6.4.    Offset.** The Partnership may offset all amounts owing to the Partnership by a Partner against any distribution to be made to such Partner.

**6.5.    Accounting Period.** The accounting period of the Partnership shall be the Fiscal Year.

**6.6.    Reports.** As soon as is practicable after the conclusion of each Fiscal Year, the Partnership will send (i) financial statements (including a balance sheet and statement of income) of the Partnership for the Fiscal Year then ended, prepared by an independent public accountant and (ii) tax information relating to the Partnership as is necessary for a Limited Partner to complete the Limited Partner's federal income tax return. At the end of each calendar year the General Partner will send each Limited Partner a statement reflecting the Net Asset Value (as determined in accordance with Section 6.7 below) of each Limited Partner's interest for the year then ended. The General Partner is authorized to expend Partnership funds to provide the foregoing information and to notify the Limited Partners of other information as the General Partner may deem appropriate. Limited Partners or their authorized representatives may inspect the Partnership books and records at the General Partner's offices during normal business hours upon reasonable written notice to the General Partner.

**6.7.    Net Asset Value Calculation** The Partnership's net asset value ("Net Asset Value") shall be determined according to the following principles, and where no principle is governing, then on the basis of generally accepted accounting principles, consistently applied.

(a)     Net Asset Value means the Partnership's total assets less total liabilities and shall include any unrealized profit or loss on all open positions.

(b)     Any Security that is listed on a national securities exchange will be valued at its last sale price on the most recent date on or before the Valuation Date that the requisite information is available (the Date of Determination) as recorded by the composite tape system, or, if the Security is not included in such system, at its last sale price on the Date of Determination on the principal national securities exchange on which

- 19 -

the Security is traded, as recorded by the exchange, or, if no sale occurred on the Date of Determination, at the mean between the closing "bid" and "asked" prices on the Date of Determination as recorded by the composite tape system or the exchange, as the case may be.

(c)     Any Security that is not listed on a national securities exchange but is included in the National Market System (NMS) of the National Association of Securities Dealers, Inc.'s Automated Quotation System (NASDAQ) (such a Security is referred to as a NMS Security) will be valued at its last sale price on the Date of Determination as reported by NASDAQ or, if no sale occurred on the Date of Determination, at the mean between the highest closing "bid" and lowest closing "asked" prices on the Date of Determination, as reported by NASDAQ.

(d)     Any Security that is not subject to valuation under subparagraph (a) or (b) of this section but for which "bid" and "asked" prices are reported by NASDAQ or another price quotation service will be valued at the mean between the highest closing "bid" and the lowest closing "asked" prices on the Date of Determination as reported by NASDAQ or, if not so reported, as reported in such other price quotation service for the over-the-counter market as the General Partner, in its sole discretion, determines fairly reflects the market for such Security.

(e)     All other Securities and all other assets shall be assigned a value determined in good faith by the General Partner. With respect to funds or other investment vehicles in which the Partnership may invest, the General Partner may rely on the values reported by such entities in computing the value of the Partnership's assets but will carry the investment at the cost basis unless otherwise prudent.

(h)     Appropriate reserves may be created, accrued and charged against Net Asset Value for contingent liabilities, as of the date any contingent liability becomes known to the General Partner. Any reserves shall reduce Net Asset Value for all purposes, including withdrawals.

## ARTICLE VII
## TAXES

7.1.     **Tax Returns.** The General Partner shall cause to be prepared and filed all necessary federal and state income tax returns for the Partnership. Each Partner shall furnish to the General Partner all pertinent information in its possession relating to Partnership operations that is necessary to enable the Partnership's income tax returns to be prepared and filed.

7.2.     **Tax Elections.** The Partnership shall make the following elections on the appropriate tax returns:

(a)     To adopt the calendar year as the Fiscal Year;

- 20 -

(b)     To adopt the accrual method of accounting and keep the Partnership's books and records on the income tax method;

(c)     If a distribution as described in Section 734 of the Code occurs or if a transfer of a Partnership Interest described in Section 743 of the Code occurs, upon the written request of any Partner, to elect to adjust the basis of the property of the Partnership pursuant to Section 754 of the Code;

(d)     To elect to amortize the organizational expenses of the Partnership and the start-up expenditures of the Partnership under Section 195 of the Code ratably over a period of sixty months as permitted by Section 709(b) of the Code;

(e)     To elect as a domestic eligible entity to be treated as a partnership under the federal entity classification election rules; and

(f)     Any other election that the General Partner may deem appropriate and in the best interests of the Partners.

Neither the Partnership nor any Partner may make an election for the Partnership to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law, and no provisions of this Agreement shall be interpreted to authorize any such election.

**7.3.     Tax Matters Partners.** The General Partner shall be the "tax matters partner" of the Partnership pursuant to Section 6231(a)(7) of the Code.

**7.4.     Tax Withholding.** To the extent the Partnership is required by law to withhold or to make tax payments on behalf of or with respect to any Partner ("Tax Advances"), the General Partner may cause the Partnership to withhold such amounts and make such tax payments as so required. All Tax Advances made on behalf of a Partner will, at the option of the General Partner, reduce any future distributions made to such Partner. Each Partner hereby agrees to indemnify and hold harmless the Partnership and the General Partner from and against any liability with respect to Tax Advances required on behalf of or with respect to such Partner. Each Partner hereby agrees to promptly give the General Partner or the Partnership any true certification or affidavit that the General Partner may request in connection with this Section 7.4.

## ARTICLE VIII
## TRANSFERABILITY AND WITHDRAWAL OF PARTNERS

### 8.1.     Transfers.

(a)     *General.* Except as set forth in this Agreement, no Partner shall Transfer to another Person any portion of a Partnership Interest without the consent of the General Partner, which consent may be withheld for any reason. In addition, a Transfer of a Partnership Interest may not be effected unless and until the General Partner shall have

- 21 -

received on behalf of the Partnership a document (i) signed by the Person to whom the Partnership Interest or part thereof is transferred and by the Partner effecting the transfer, (ii) containing the agreement of such Person to be bound by this Agreement in respect of the Partnership Interest or part thereof being retained and (iii) setting forth the Percentage Interest of the Partner effecting the Transfer and the Person to which the Partnership Interest or part thereof is transferred. No assignment or transfer will be permitted unless the General Partner is satisfied that (a) the assignment or transfer would not violate the *Securities Act* of 1933or the laws of any state, (b) notwithstanding such assignment or transfer, the Partnership shall continue to be classified as a partnership and not as a corporation or association under the Code and appropriate state taxing statutes, (c) such transfer shall not cause the Partnership to become a publicly traded partnership under the Code and (d) such assignment or transfer shall not require the Partnership to be registered as an Investment Company under the United States *Investment Company Act* of 1940, as amended . The General Partner may require an opinion of counsel from a transferor confirming (a), (b), (c) and (d) above. All costs related to such transfer (including attorney's fees) shall be borne by the transferor. Any attempted Transfer by a Partner of a Partnership Interest or right included therein, other than in accordance with this Section shall be, and is hereby declared, null and void ab initio.

(b) *Transferee Not a Partner.* Notwithstanding Section 8.1(a) above, any Partner may Transfer its Economic Interest to any Person. Except as specifically provided herein, no Person acquiring a Partnership Interest or an Economic Interest from a Partner or an unadmitted assign of a Partner (other than a Partner), shall become a Partner unless such Person is approved by written consent of the General Partner. If no such approval is obtained, such Person's Partnership Interest shall only entitle such Person to receive the distributions and allocations of Profits and Losses to which the Partner from whom or which such Person received such Partnership Interest would be entitled. Any such approval may be subject to any terms and conditions imposed by the Partners.

(c) *Effective Date.* Any sale of a Partnership Interest or admission of a Partner pursuant to this Article shall be deemed effective as of the last day of the calendar month in which such sale or admission occurs.

**8.2.    Involuntary Withdrawal.** Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Partner shall thereupon become an Economic Interest Holder, but shall not become a Partner.

## ARTICLE IX
## DISSOLUTION

**9.1.    Dissolution.** The term of the Partnership shall end and the Partnership shall be dissolved and its affairs shall be wound up upon the first to occur of the following: (1) December 31, 2016; (2) receipt by the General Partner of an election to dissolve the Partnership at a specified time by a Majority in Capital Accounts of the Class A Limited Partners, notice of

- 22 -

which is sent by registered mail or courier to the General Partner not less than ninety (90) days prior to the effective date of dissolution; (3) withdrawal, removal, insolvency or dissolution of the General Partner (unless the Partnership is continued pursuant to the terms of this Agreement); (4) upon the vote or written consent of the General Partner; (5) any event which shall make it unlawful for the existence of the Partnership to be continued or requiring termination of the Partnership; or (6) upon the occurrence of an Involuntary Withdrawal, unless within one hundred and eighty (180) days after such event the Partnership is continued by the vote or written consent of (a) the General Partner, all the Class B Limited Partners and by Class A Limited Partners collectively owning Percentage Interests of not less than twenty-five percent (25%) of the Class A Limited Partner Percentage Interests as a class.

**9.2.     Winding Up.** Upon the dissolution of the Partnership the General Partner may, in the name of and for an on behalf of the Partnership, prosecute and defend suits, whether civil, criminal or administrative, sell and close the Partnership's business, dispose of and covey the Partnership's property, discharge the Partnership's liabilities and distribute to the Partners any remaining assets of the Partnership, all without affecting the liability of Partners. Upon winding up of the Partnership, the assets shall be distributed as follows:

(a)     To the payment of all debts and liabilities of the Partnership;

(b)     To the Partners, pro rata in accordance with the positive balances in their respective Capital Accounts; provided, however, that if Capital Account balances are not held in the 1%, 29% and 70% proportions among the General Partner, the Class B Limited Partners in the aggregate, and the Class A Limited Partners in the aggregate, respectively, the Partners hereby authorize a shift in Capital Accounts prior to liquidation such that the aforementioned percentage of Capital Account ownership is achieved.

**9.3.     Deficit Capital Account.** Upon a liquidation of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Partner has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other adjustments for all Fiscal Years, including the Fiscal Year in which such liquidation occurs), the Partner shall have no obligation to make any Capital Contribution, and the negative balance of any Capital Account shall not be considered a debt owed by the Partner to the Partnership or to any other Person for any purpose.

**9.4.     Nonrecourse to Other Partners.** If the assets of the Partnership remaining after the payment or discharge of the debts and liabilities of the Partnership is insufficient to return any Capital Contribution of any Partner, such Partner shall have no recourse against any other Partner.

**9.5.     Cancellation of Certificate.** Upon the completion of the distribution of Partnership assets, the Partnership shall be terminated and the person acting as liquidator shall cause the cancellation of the Certificate of Limited Partnership and shall take such other actions as may be necessary or appropriate to terminate the Partnership.

- 23 -

## ARTICLE X
## AMENDMENTS

**10.1. Amendments.** The amendment procedures with regards to this Agreement are as follows:

(a)   Amendments to this Agreement may be proposed by the General Partner or by Class A Limited Partners collectively owning Percentage Interests of not fewer than twenty-five percent (25%) of the total Class A Limited Partner Percentage Interests as a class. A proposed amendment will be adopted and effective only if it receives the consent of the General Partner, all of the Class B Limited Partners and Class A Limited Partners collectively owning Percentage Interests not less than sixty-seven percent (67%) of the total Percentage Interests owned by the Class A Limited Partners as a class; provided however, that no such amendment shall be enforceable against any Partner if (i) the effect of the amendment would be to increase the capital contributions required of that Partner, or reduce the rights and interest of that Partner in the income, gains, deductions, credits or income tax allocations of the Partnership, the voting rights of that Partner or the rights of that Partner respecting liquidation of the Partnership, unless the Partner shall have consented to the adoption of such amendment, or (ii) such right of amendment would constitute the right to exercise control or any other power which would cause any Partner to incur liability for any liabilities, contracts or obligations of the Partnership in excess of such Partner's Capital Contributions.

(b)   Within fifteen (15) days of the making of any proposal to amend this Agreement, the General Partner shall give the Partners notification of such proposal (including the text of any amendment or document and a statement of its purposes). Any matter requiring the consent of the Partners may be considered at a meeting of the Partners held not less than fifteen (15) and not more than thirty (30) days after notification to the Partners of any proposal. Any consent required by this Section shall mean either the written consent of a Partner, or the affirmative vote of such Partner at a meeting duly called and held pursuant to this Agreement, as the case may be, to do the act or thing for which the consent is solicited, or the act of granting such consent as the context may require. Any consent required by this Agreement shall be deemed to have been given only when the General Partner has actually received the required written consents of Partners to the act or thing for which the consent was solicited or after the required affirmative vote of Partners to the act or thing at a meeting called to consider the same. Any consent so given will be nullified if a written nullification by a Partner of such consent is actually received by the General Partner prior to the time such proposed act or thing is actually done.

**10.2. Exceptions.** Notwithstanding the provisions of Section 10.1(a) and 10.1(b):

(a)   This Agreement shall not be amended to alter the purposes of the Partnership, or to amend Sections 10.1(a) or 10.1(b), without the consent in writing of the

- 24 -

General Partner and Class A Limited Partners collectively owning not less than seventy-five (75%) or more of the Percentage Interests in the Partnership held by Class A Limited Partners as a class and the Class B Limited Partners then outstanding ;

(b)     The General Partner may, without the consent of the Partners, amend the Certificate of Limited Partnership and this Agreement to reflect changes validly made in the membership of the Partnership and in the contributions of the Partners to the Partnership;

(c)     The General Partner may, without the consent of the Partners, amend this Agreement from time to time in each and every manner to comply with the then existing requirements of the Code, Treasury regulations and rulings of the Internal Revenue Service affecting the status of the Partnership as a partnership for federal income tax purposes provided, however, that no such amendment may affect the personal liability of any Partner in the Partnership and provided further that no such amendment shall alter in any material respect, the economic interests of any Partner;

(d)     No amendment shall be adopted which will directly or indirectly affect or jeopardize the status of the Partnership as a partnership for federal income tax purposes; and

(e)     The General Partner may, without the consent of the Partners, amend the Certificate of Limited Partnership and Exhibit A to this Agreement to reflect changes in Limited Partnership interests as the result of (i) the admission of a new Limited Partner or the receipt of an additional contribution from an existing Limited Partner pursuant to Section 3.2 and (ii) a merger or other reorganization of the Partnership pursuant to Section 4.2(1).

## ARTICLE XI
## GENERAL PROVISIONS

**11.1. Notices.** Any notice, demand or other communication required or permitted to be given pursuant to this Agreement shall have been sufficiently given for all purposes if (a) delivered personally to the party or to an executive officer of the party to whom such notice, demand or other communication is directed or (b) sent by email or facsimile or overnight courier service or (c) sent by registered or certified mail, postage prepaid, addressed to the Partner or the Partnership at such Partner's email, fax or mailing address set forth in this Agreement, whichever is applicable. Except as otherwise provided in this Agreement, any such notice shall be deemed to be given three business days after the date on which it was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as set forth in this Section or on the date it is received.

**11.2. Entire Agreement.** This Agreement contains the entire agreement among the Partners with respect to the subject matter of this Agreement, and supersedes each course of

- 25 -

conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by the Partners with respect thereto, whether or not relied or acted upon.

**11.3. Construction.** Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

**11.4. Headings.** The headings in this Agreement are for convenience only and shall not be used to interpret or construe any provision of this Agreement.

**11.5. Waiver.** No failure of the Partnership or a Partner to exercise, and no delay by the Partnership or a Partner in exercising, any right or remedy under this Agreement shall constitute a waiver of such right or remedy. No waiver by the Partnership or Partner of any such right or remedy under this Agreement shall be effective unless made in a writing duly executed by the Partnership or such Partner and specifically referring to each such right or remedy being waived.

**11.6. Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

**11.7. Binding.** This Agreement shall be binding upon and inure to the benefit of the Partnership and all Partners, and each of the successors and assignees of the Partnership and the Partners, except for any right or obligation of a Partner under this Agreement which may not be transferred by such Partner to another Person without first obtaining the written Consent of the other Partners.

**11.8. Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**11.9. Governing Act.** This Agreement shall be governed by, and interpreted and construed in accordance with, the laws of the State of Delaware, without regard to principles of conflict of laws.

[Signatures on the following page]

- 26 -

IN WITNESS WHEREOF, the individuals and entities signing this Agreement below conclusively evidence their agreement to the terms and conditions of this Agreement by so signing.

**GENERAL PARTNER**

**CLEAR SKY MANAGEMENT, INC.**

By:
Its: President

**CLASS B LIMITED PARTNER**

**CLEAR SKY MANAGEMENT, INC.**, on behalf
of a corporation to be formed.

By:
Its: President

**CLASS A LIMITED PARTNERS**

DRACO CAPITAL INC.
Signature
Den: Maur, president
Print Name

_____
Signature

_____
Print Name

- 27 -

_____
Signature

_____
Print Name

_____
Signature

_____
Print Name

_____
Signature

_____
Print Name

_____
Signature

_____
Print Name

_____
Signature

_____
Print Name

- 28 -

_____
Signature

_____
Print Name

_____
Signature

_____
Print Name

_____
Signature

_____
Print Name

_____
Signature

_____
Print Name

- 29 -

## EXHIBIT A

### 1. GENERAL PARTNER

#### CAPITAL CONTRIBUTIONS -

| NAME AND ADDRESS | AMOUNT | DATE CONTRIBUTED |
|---|---|---|
| Clear Sky Management, Inc c/o152 King Street East, Suite 400 Toronto, Ontario | NIL | N/A |
|  |  |  |
|  |  |  |

### 2. CLASS A LIMITED PARTNERS

#### CAPITAL CONTRIBUTIONS -

| NAME AND ADDRESS | AMOUNT | DATE CONTRIBUTED |
|---|---|---|
| Draco Capital Inc. 345 WOODLEA AVENUE MONT-ROYAL, QC H3P 1R4 | 3,050,000.00 | Sept. 15th, 2006 |
| Draco Capital Inc. Additional Subscription | 200,000.00 | Oct. 11th, 2006 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

- 30 -

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |

## 3. CLASS B LIMITED PARTNER

CAPITAL CONTRIBUTIONS -

| NAME AND ADDRESS | AMOUNT | DATE CONTRIBUTED |
|------------------|--------|------------------|
| Clear Sky Management, Inc. for and on behalf of a corporation to be formed c/o 152 King Street East, Suite 400 Toronto, Ontario | NIL | N/A |

- 31 -

## EXHIBIT B

1. DIP Credit agreement between Balaton and SkyPort, effective date February 15, 2006;

2. Credit Agreement between Balaton and SkyComm effective date February 15, 2006;

3. Securities Purchase Agreement between Balaton and SkyComm effective February 15, 2006 allowing Balaton to purchase 133,333,335 Units of SkyComm;

4. Debenture Purchase Agreement effective February 15, 2006 pursuant to which Watershed may acquire $20,596,000 of principal face amount of SkyComm convertible debentures from the incumbent holder convertible into an aggregate of 108,000,000 shares of common stock of SkyComm