No. _____

| | | |
|---|---|---|
| JOANNE SCHERMERHORN, JOHN K. | § | |
| WAYMIRE, CHET GUTOWSKY, JOHN | § | |
| LLEWELLYN, JOSEPH A. LOPEZ, ROBERT | § | |
| FOOTE, BLF PARTNERS, LTD., ECAL | § | |
| PARTNERS, LTD., WHIZKID VENTURE, | § | |
| LLC, BELLA KRIEGER, MARTIN POLLAK, | § | |
| GLOSTER HOLDINGS, LLC, MELVYN | § | |
| REISER, BARRY KLEIN, CHESKEL | § | IN THE DISTRICT COURT OF |
| KAHAN, JOHN A. REES, BRIAN W. | § | |
| HARLE, MICHAEL STEIN, LAWRENCE | § | HARRIS COUNTY, TEXAS |
| SOLOMON, TRACY ELSTEIN & DAVID | § | |
| TOGUT, JASON CHARLES TOGUT TRUST, | § | _____ JUDICIAL DISTRICT |
| BMT GRANTOR TRUST, LYNN JOYCE | § | |
| ELSTEIN TRUST, CHARLES STACK, | § | |
| JOSEPH BAKER, MOVADA, LTD., PUDDY, | § | |
| LTD., DRACO CAPITAL, INC., EDWARD | § | |
| PASCAL, ROBERT MENDEL, STANLEY | § | |
| BERAZNIK, DON DUI, BEN ARIANO, | § | |
| 3791068 CANADA, INC., PETER TAYLOR, | § | |
| JOHN E. PANNETON, WAYNE C. FOX, | § | |
| DAVID CURRIE, BYRON MESSIER, | § | |
| DARSHAN KHURANA, MATEO NOVELLI, | § | |
| DIYA AL-SARRAJ, SEQUOIA | § | |
| AGGREESSIVE GROWTH FUND, LTD., | § | |
| SEQUOIA DIVERSIFIED GROWTH FUND, | § | |
| LTD., RIG III FUND, LTD., ARAN ASSET | § | |
| MANAGEMENT SA, SEMPER GESTION | § | |
| SA, and EOSPHOROS ASSET | § | |
| MANAGEMENT, INC. | § | |
|    Plaintiffs | § | |
| | § | |
| vs. | § | |
| CENTURYTEL, INC. | § | |
| (a/k/a CENTURYLINK), CLARENCE | § | |
| MARSHALL, R. STEWART | § | |
| EWING, JR., MICHAEL E. MASLOWSKI, | § | |
| HARVEY P. PERRY, ROBERT | § | |
| KUBBERNUS, BALATON GROUP, INC., | § | |
| BANKTON FINANCIAL CORPORATION, | § | |
| BANKTON FINANCIAL CORPORATION, | § | |
| LLC, CLEARSKY MANAGEMENT, INC., | § | |
| WILSON VUKELICH, LLP and CLEARSKY | § | |
| INVESTMENTS, LP | § | |
|    Defendants | § | |

Draft - June 21, 2010

## PLAINTIFFS' FIRST AMENDED AND RESTATED PETITION, REQUEST FOR DISCLOSURE, AND REQUEST FOR PRODUCTION OF DOCUMENTS

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Joanne Schermerhorn, John K. Waymire, Chet Gutowsky, John Llewellyn, Joseph A. Lopez, Robert Foote, BLF Partners Ltd., ECAL Partners, Ltd., Whizkid Venture, LLC, Bella Krieger, Martin Pollack, George Metcalf, Gloster Holdings, LLC, Melvyn Reiser, Barry Klein, Cheskel Kahan, John A. Rees, Brian W. Harle, Michael Stein, Lawrence Solomon, Tracy Elstein & David Togut, Jason Charles Togut Trust, BMT Grantor Trust, Lynn Joyce Elstein Trust, Charles Stack, Joseph Baker, Movada, Ltd, Puddy, Ltd, Draco Capital, Inc., Edward Pascal, Robert Mendel, Stanley Beraznik, Don Bui, Ben Ariano, 3791068 Canada, Inc., Peter Taylor, John E. Panneton, Wayne C. Fox, David Currie, Byron Messier, Darshan Khurana, Mateo Novelli, Diya Al-Sarraj, Sequoia Aggressive Growth Fund, Ltd., Sequoia Diversified Growth Fund, Rig III Fund, Ltd., Aran Asset Management SA, Semper Gestion SA and Eosphoros Asset Management, Inc., file this Original Petition complaining of defendants CenturyTel, Inc. (a/k/a CenturyLink), Clarence Marshall, R. Stewart Ewing, Jr., Michael E. Maslowski, Harvey P. Perry, Robert Kubbernus, Balaton Group, Inc., Bankton Financial Corporation, Bankton Financial Corporation, LLC, ClearSky Management, Inc., Wilson Vukelich, LLP, and ClearSky Investments LP and for cause of action would show to the Court the following:

### DISCOVERY PLAN CONTROL

1.      Plaintiffs request entry of a Scheduling Order under Level 3 as provided by Rule 190.4 of the Texas Rules of Civil Procedure.

2

Draft - June 22, 2010

## INTRODUCTION AND SUMMARY OF THE CASE

2.      This is a case in which Plaintiffs seek redress for the massive fraud, oppression, breach of fiduciary duties, and other violations of their legal rights that were perpetrated by Defendants and resulted in financial injury to them equal to the value of their investments in SkyComm Technologies, Inc. ("SkyComm"), a company which through a subsidiary, SkyPort Global Communications, Inc. ("SkyPort"), operated a state-of-the-art, ultra-secure satellite communications and network operations facility at Ellington Field in Houston, Texas.

3.      CenturyTel, Inc. ("CenturyTel"), one of the nation's 10 largest telecommunications companies, gained control over SkyComm and in violation of its fiduciary duties to the shareholders, operated SkyComm exclusively for its own benefit and to the detriment of SkyComm's shareholders.  CenturyTel exercised control over SkyComm, as holder of SkyComm's convertible debt and through four of its senior managers that it appointed to SkyComm's Board.

4.      When CenturyTel was through with SkyComm, it delivered the "keys" to the company on a silver platter to Robert Kubbernus ("Kubbernus"), despite the many red flags that indicated that he was a stock fraudster and corporate looter.  CenturyTel helped Kubbernus obtain the necessary licenses to assume control of the SkyComm corporate vehicle and SkyPort teleport by submitting false and misleading applications and other submissions to the Federal Communications Commission ("FCC"), United States Department of Homeland Security ("DHS"), Federal Bureau of Investigation ("FBI"), and Department of Justice ("DOJ").

5.      Kubbernus and various entities he controls, including Balaton Group Inc. ("Balaton"), Bankton Financial Corporation ("Bankton"), ClearSky Investments, L.P.

3

Draft - June 22, 2010

("ClearSky"), ClearSky Management, Inc. ("ClearSky Management") and Bankton Financial Corporation, LLC ("Bankton-Texas"), Lavell Systems Inc., a Canadian corporation ("Lavell"), and Lavell Systems, Inc., its Delaware subsidiary ("Lavell-Delaware"), defrauded numerous investors by inducing them to invest in SkyComm through false and misleading statements. Kubbernus diverted investors' funds to various entities controlled by him.

6.      Throughout this time period, Kubbernus' long-time law firm, Wilson Vukelich, LLP ("Wilson Vukelich"), worked with him hand in glove, defrauding investors through the use of false and misleading offering materials and other documents, co-mingling and misappropriating investors' escrow funds, failing to protect the interests of its client, ClearSky, charging excessive legal fees and collecting legal fees from ClearSky for services not rendered to those entities.

7.      All in all, Defendants violated and conspired to breach the fiduciary duties they owed to Plaintiffs, oppressed Plaintiffs, defrauded and conspired to defraud Plaintiffs, violated the Texas Securities Act, and made numerous false and misleading statements to the FCC, DHS, FBI,  and DOJ in a scheme that resulted in financial injury to Plaintiffs equal to the value of their interests in SkyComm.

8.      Given the pervasive violations, the catastrophic damages suffered by Plaintiffs, Defendants' utter contempt for United States laws designed to protect the United States' homeland, national defense and telecommunications infrastructure, and the actual and potential harm to the safety and security of the citizens of the United States, Plaintiffs should be awarded not just their compensatory and consequential, but also punitive damages to serve as a deterrent to Defendants and others from engaging in similar unlawful schemes.

4

Draft - June 22, 2010

9.     The allegations in this Petition are based upon documentary evidence and except as noted as to a particular Plaintiff, made upon information and belief.

## PARTIES

10.     Plaintiff Joanne Schermerhorn is a resident of the State of Texas and is the successor to the interest of the Milan Trust, which has been, at all relevant times until August 12, 2009, the owner of 1,000,010 shares of common stock of SkyComm, a Delaware corporation with its principal office at 1140 Aerospace Avenue, Houston, Texas.  SkyComm, through its wholly owned subsidiary, SkyPort, f/k/a SkyComm International, Inc., has at all relevant times owned and operated a satellite telecommunications facility and network operations center at Ellington Air Force Base in Houston, Texas.  SkyPort is a Texas corporation with its principal office also at 1140 Aerospace Avenue, Houston, Texas. On August 12, 2009, SkyComm was merged into SkyPort as part of a SkyPort Chapter 11 Plan, and all of the sharehodlers in SkyComm lost their equity interests in SkyComm.

11.     Plaintiff John K. Waymire is a resident of the State of Texas, and is the successor to the interest of NLMC, Inc., which has been, at all relevant times until August 12, 2009, the owner of 40,000 shares of common stock of SkyComm.

12.     Plaintiff Chet Gutowsky is a resident of the State of Texas and has been, at all relevant times until August 12, 2009, the owner of 1,000,000 shares of common stock of SkyComm.

13.     Plaintiff John Llewellyn is a resident of the State of Texas and has been, at all relevant times until August 12, 2009, the owner of 500,000 shares of common stock of SkyComm.

5

Draft - June 22, 2010

14.     Plaintiff Joseph A. Lopez is a resident of the State of New Jersey and has been, at all relevant times until August 12, 2009, the owner of 150,000 shares of common stock of SkyComm.

15.     Plaintiff Robert Foote is a resident of the State of Florida and has been, at all relevant times until August 12, 2009, the owner of 50,000 shares of common stock of SkyComm.

16.     Plaintiff BLF Partners, Ltd., is a corporation organized in the State of Texas and has been, at all relevant times until August 12, 2009, the owner of 115,500 shares of common stock of SkyComm.

17.     Plaintiff ECAL Partners, Ltd., is a corporation organized in the State of Texas and has been, at all relevant times until August 12, 2009, the owner of 375,851 shares of common stock of SkyComm and is and has been, at all relevant times, the owner of 0.70% of ClearSky, which was purchased for $50,000 in 2006.

18.     Plaintiff Whizkid Venture, LLC, is a limited liability company organized in the State of Nevada and has been, at all relevant times until August 12, 2009, the owner of 1,000,000 shares of common stock of SkyComm.

19.     Plaintiff Bella Krieger is a resident of the State of Florida and has been, at all relevant times until August 12, 2009, the owner of 25,000 shares of common stock of SkyComm.

20.     Plaintiff Martin Pollak is a resident of the State of New York and has been, at all relevant times until August 12, 2009, the owner of 1,364,412 shares of common stock of SkyComm.

Draft - June 22, 2010

21.     Plaintiff Gloster Holdings, LLC, is a limited liability company, organized in the State of Delaware and has been, at all relevant times until August 12, 2009, the owner of 1,163,91 shares of common stock of SkyComm.

22.     Plaintiff Melvyn Reiser is a resident of the State of New York and has been, at all relevant times until August 12, 2009, the owner of 105,000 shares of common stock of SkyComm.

23.     Plaintiff Barry Klein is a resident of the State of New York and has been, at all relevant times until August 12, 2009, the owner of 20,000 shares of common stock of SkyComm.

24.     Plaintiff Cheskel Kahan is a resident of the State of New York and has been, at all relevant times until August 12, 2009,  the owner of 5,000 shares of common stock of SkyComm.

25.     Plaintiff John A. Rees is a resident of the State of Arkansas and has been, at all relevant times until August 12, 2009, the owner of 125,000 shares of common stock of SkyComm.

26.     Plaintiff Brian W. Harle is a resident of the State of Texas and has been, at all relevant times until August 12, 2009, the owner of 77,000 shares of common stock of SkyComm.

27.     Plaintiff Michael Stein is a resident of the State of New York and has been, at all relevant times until August 12, 2009, the owner of 20,000 shares of common stock of SkyComm.

28.     Plaintiff Lawrence Solomon is a resident of the State of Florida and has been, at all relevant times until August 12, 2009, the owner of 50,000 shares of common stock of SkyComm.

Draft - June 22, 2010

29.     Plaintiffs Tracy Elstein and David Togut are residents of the State of New York and have been, at all relevant times until August 12, 2009, the owners of 50,000 shares of common stock of SkyComm.

30.     Plaintiff Jason Charles Togut Trust is a trust formed in the State of New York and has been, at all relevant times until August 12, 2009, the owner of 25,000 shares of common stock of SkyComm.

31.     Plaintiff BMT Grantor Trust is a trust formed in the State of New York and has been, at all relevant times until August 12, 2009, the owner of 25,000 shares of common stock of SkyComm.

32.     Plaintiff Lynn Joyce Elstein Trust is a trust formed in the State of Florida and has been, at all relevant times until August 12, 2009, the owner of 200,000 shares of common stock of SkyComm.

33.     Plaintiff Charles Stack is a resident of the State of Texas has been, at various relevant times until August 12, 2009, the owner of 8,000,000 shares of common stock of SkyComm.

34.     Plaintiff Joseph Baker is a resident of the State of Texas has been, at all relevant times until August 12, 2009, the owner of 4,000,015 shares of common stock of SkyComm.

35.     Plaintiff Movada, Ltd., is a limited company organized in the State of Texas and has been, at all relevant times until August 12, 2009, the owner of 6,584,972 shares of common stock of SkyComm.

8

Draft - June 22, 2010

36.     Plaintiff Puddy, Ltd., is a limited company organized in the State of Texas and has been, at all relevant times until August 12, 2009, the owner of 8,229,500 shares of common stock of SkyComm.

37.     Plaintiff Draco Capital, Inc. is a corporation organized in Canada and is, and has been, at all relevant times, the owner of 53.79% of ClearSky, which was purchased for $3,816,523 in 2006.

38.     Plaintiff Edward Pascal is a resident of Montreal, Quebec, Canada and is, and has been, at all relevant times, the owner of 0.70% of ClearSky, which was purchased for $50,000 in March 2006.

39.     Plaintiff Robert Mendel is a resident of Montreal, Quebec, Canada and is, and has been, at all relevant times, the owner of 0.70% of ClearSky, which was purchased for $50,000 in March 2006.

40.     Plaintiff Stanley Beraznik is a resident of the State of California and is, and has been, at all relevant times, the owner of 0.70 % of ClearSky, which was purchased for $50,000 in 2006.

41.     Plaintiff Don Bui is a resident of Montreal, Quebec, Canada and is and has been, at all relevant times, the owner of 0.15% of ClearSky, which was purchased for $10,682 in May 2006.

42.     Plaintiff Ben Ariano is a resident of Montreal, Quebec, Canada and is and has been, at all relevant times, the owner of 0.15% of ClearSky, which was purchased for $10,733 in June 2006.

9

Draft - June 22, 2010

43.     Plaintiff 3791068 Canada, Inc. is a corporation organized in the Province of Quebec, Canada and is and has been, at all relevant times, the owner 0.70% of ClearSky, which was purchased for $50,000 in 2006.

44.     Plaintiff Peter Taylor is a resident of Sutton West, Ontario, Canada and is, and has been, at all relevant times, the owner of 14.09 % of ClearSky, which were purchased for $1,000,000 in 2006.

45.     Plaintiff John E. Panneton is a resident of Toronto, Ontario, Canada and has been, at all relevant times until August 12, 2009, the owner of 4,337,500 shares of common stock in SkyComm.

46.     Plaintiff Wayne C. Fox is a resident of Toronto, Ontario, Canada and has been, at all relevant times until August 12, 2009, been the owner of 8,000,000 shares of common stock in SkyComm.

47.     Plaintiff David Currie is a resident of Toronto, Ontario, Canada and has been, at all relevant times until August 12, 2009, the owner of 4,337,500 shares of common stock in SkyComm.

48.     Plaintiff Byron Messier is a resident of Toronto, Ontario, Canada and has been, at all relevant times until August 12, 2009, the owner of 5,000,000 shares of common stock in SkyComm.

49.     Plaintiff Darshan Khurana is a resident of Montreal, Quebec, Canada and has been, at all relevant times until August 12, 2009, the owner of 801,430 shares of common stock of SkyComm.

10

Draft - June 22, 2010

50.     Plaintiff Mateo Novelli is a resident of France and has been, at all relevant times until August 12, 2009, the owner of 1,763,145 shares of common stock of SkyComm.

51.     Plaintiff Diya Al-Sarraj is a resident of the United Arab Emirates and has been, at all relevant times until August 12, 2009, the owner of 240,429 shares of common stock of SkyComm.

52.     Plaintiff Sequoia Aggressive Growth Fund, Ltd., is a limited company organized in the British Virgin Islands and managed by Nemo Asset Management in Abu Dhabi, UAE and has been, at all relevant times until August 12, 2009, the owner of 27,530,530,11 shares of common stock of SkyComm.

53.     Plaintiff Sequoia Diversified Growth Fund is an offshore fund managed by Nemo Asset Management in Abu Dhabi, UAE and has been, at all relevant times until August 12, 2009, the owner of 12,815,180 shares of common stock of SkyComm, and is and has been the owner of 4.93% of ClearSky, which was purchased for $350,000 in 2006.

54.     Plaintiff Rig III, Ltd., is a limited company organized in the British Virgin Islands Fund and managed by Nemo Asset Management in Abu Dhabi, UAE and has been, at all relevant times until August 12, 2009, the owner of 12,822,874 shares of common stock of SkyComm.

55.     Plaintiff Aran Asset Management SA is a corporation formed in Switzerland and has been, at all relevant times until August 12, 2009, the owner of 7,926,280 shares of common stock of SkyComm.

Draft - June 22, 2010

56.     Plaintiff Semper Gestion SA is a corporation formed in Switzerland and is, and has at all relevant times, been the owner of 2.24% of ClearSky, which was purchased for $159,257 in 2006.

57.     Plaintiff Eosphoros Asset Management, Inc., is a corporation organized in Ontario, Canada and is, and has at all relevant times been, the owner of 2.82% of ClearSky, which was purchased for $200,000 in February 2006.

58.     Plaintiffs Joanne Schermerhorn, John K. Waymire, Chet Gutowsky, John Llewellyn, Joseph A. Lopez, Robert Foote, BLF Partners Ltd., ECAL Partners, Ltd., Whizkid Venture, LLC, Bella Krieger, Martin Pollack, Melvyn Reiser, Barry Klein, Cheskel Kahan, John A. Rees, Brian W. Harle, Michael Stein, Lawrence Solomon, Tracy Elstein & David Togut, Jason Charles Togut Trust, BMT Grantor Trust, Lynn Joyce Elstein Trust, Charles Stack, Joseph Baker, Movada, Ltd, Puddy, Ltd, are the "Original Shareholders" of SkyComm.  The Original Shareholders held shares in SkyComm prior to CenturyTel acquiring any interest in SkyComm.

59.     Plaintiffs Gloster Holdings, LLC, and ECAL Partners, Ltd., are the "Non-CenturyTel Debenture Holders."  The Non-CenturyTel Debenture Holders purchased debentures from SkyComm prior to May 2005 and had their debentures converted into SkyComm shares on November 2, 2006.

60.     Plaintiffs Draco Capital, Inc., Edward Pascal, Robert Mendel, Stanley Beraznik, Don Bui, Ben Ariano, Sequoia Diversified Growth Fund, 3791068 Canada, Inc., Peter Taylor, Semper Gestion SA, Sequoia Diversified Growth Fund, ECAL Partners, Ltd. and Eosphoros Asset Management, Inc. are the "ClearSky Investors", having purchased membership interests in ClearSky.

12

61.    Plaintiffs John E. Panneton, Wayne C. Fox, David Currie, Byron Messier, Darshan Khurana, Mateo Novelli, Diya Al-Sarraj, Sequoia Aggressive Growth Fund, Ltd., Sequoia Diversified Growth Fund, Rig III Fund, Ltd., and Aran Asset Management SA, are "Additional Investors" in SkyComm, having purchased shares in SkyComm after November 2, 2006.

62.    Defendant CenturyTel, a/k/a CenturyLink, is a Delaware corporation with its headquarters located at 100 CenturyTel Drive Monroe, Louisiana 71203.   CenturyTel does business in the State of Texas systematically and regularly through agents and subsidiaries, some of which are wholly-owned Texas corporations, and CenturyTel has committed torts in the State of Texas as alleged herein.   From December 2002 through approximately February 2006, CenturyTel, as lender to SkyComm and holder of SkyComm's convertible debentures, exercised complete control over the management and operations of SkyComm and SkyPort for the benefit of CenturyTel.   On or about February 15, 2006, CenturyTel transferred operational control of SkyComm to Balaton and Kubbernus, while continuing to hold nominal control over SkyComm. On November 2, 2006, CenturyTel transferred formal control to Kubbernus and Balaton. CenturyTel has not appointed a registered agent for service of process as required by State law and may be served by service upon the Texas Secretary of State with notice forwarded to CenturyTel's home office: 100 CenturyTel Drive, Monroe, Louisiana 71203.

63.    Defendant Clarence Marshall ("Marshall") was Vice President -- Corporate Technology Assessment and Strategic Planning of CenturyTel and from December 2002 until sometime in 2006, Chairman of the Board of Directors of SkyComm and SkyPort.   Marshall resigned at some point in 2006 over concerns about conflict of interest issues, but continued to

13

direct SkyComm's activities on behalf of CenturyTel.  Marshall is a resident of the State of Oklahoma.  Marshall committed torts in the State of Texas as alleged herein and is subject to personal jurisdiction in this state.  Marshall may be served under the Texas Long Arm Statute by service upon the Secretary of State with notice forwarded to Marshall's home: 12701 S Harvard Ave, Jenks OK 74037.

64.      Defendant R. Stewart Ewing, Jr. was an Executive Vice President and Chief Financial Officer of CenturyTel and at from December 2002 until sometime in 2006, a Director of SkyComm and SkyPort.  Ewing is a resident of the State of Louisiana.  Ewing committed torts in the State of Texas as alleged herein and is subject to personal jurisdiction in this state.  Ewing may be served under the Texas Long Arm Statute by service upon the Secretary of State with notice forwarded to Ewing's home: 1511 Frenchmans Bend Rd., Monroe, LA 71203.

65.      Defendant Michael E. Maslowski was a Vice President of CenturyTel and from December 2002 until sometime in 2006, a Director of SkyComm and SkyPort.  Maslowski is a resident of the State of Louisiana.  Maslowski committed torts in the State of Texas as alleged herein and is subject to personal jurisdiction in this state.  Maslowski may be served under the Texas Long Arm Statute by service upon the Secretary of State with notice forwarded to Maslowski's home: 3431 Westminister Ave., Monroe, LA 71201.

66.      Defendant Harvey P. Perry was Executive Vice President, General Counsel and Chief Administrative Officer of CenturyTel and from December 2002 until sometime in 2006, a Director of SkyComm and SkyPort.  Perry is a resident of the State of Louisiana.  Perry committed torts in the State of Texas as alleged herein and is subject to personal jurisdiction in

14

this state.  Perry may be served under the Texas Long Arm Statute by service upon the Secretary of State with notice forwarded to Perry's home: 2778 Point Dr., Monroe, LA 71201.

67.     Defendants referenced in the preceding four paragraphs are collectively referred to as the "CenturyTel Directors."  CenturyTel and the CenturyTel Directors are collectively referred to as the "CenturyTel Defendants."  From approximately December 2002 through approximately February 15, 2006 the CenturyTel Directors, acting for the benefit of CenturyTel, exercised complete control over the management and operations of SkyComm and SkyPort. From approximately February 15, 2006 through November 2, 2006, the CenturyTel Directors transferred operational control of SkyComm to Balaton and Kubbernus, while continuing on as nominal Directors of SkyComm until November 2, 2006, when they all resigned.

68.     Defendant Kubbernus is presently a resident of Galveston County, Texas and was at all relevant times a resident of Galveston County, Texas, and Ontario, Canada, and President and party in control of the defendants Balaton, Bankton, Bankton-Texas, and ClearSky Management, as well as Lavell and Lavell-Delaware and the nominal defendant, ClearSky. Kubbernus may be served at his place of employment: 11140 Aerospace Avenue, Houston, Texas 77034.

69.     Defendant Balaton is an Ontario corporation with its headquarters located at 152 King Street East, Suite 400 Toronto, Ontario, M5A 1J3 Canada.  Balaton does business in the State of Texas systematically and regularly through agents and subsidiaries, some of which are Texas corporations, and Balaton has committed torts in the State of Texas as alleged herein. Balaton has not appointed a registered agent for service of process as required by State law and

15

may be served by service upon the Texas Secretary of State with notice forwarded to Balaton's home office: 152 King Street East, Suite 400 Toronto, Ontario, M5A 1J3 Canada.

70. Defendant Bankton is a Canadian Corporation with its headquarters located at 152 King Street East, Suite 400 Toronto, Ontario, M5A 1J3 Canada. Bankton does business in the State of Texas systematically and regularly through agents and subsidiaries, some of which are Texas corporations, and Bankton has committed torts in the State of Texas as alleged herein. Bankton has not appointed a registered agent for service of process as required by State law and may be served by service upon the Texas Secretary of State with notice forwarded to Bankton's home office: 152 King Street East, Suite 400 Toronto, Ontario, M5A 1J3 Canada.

71. Defendant Bankton-Texas is a Texas limited liability company, with offices in Harris County, Texas and 152 King Street East, Suite 400, Toronto, Ontario, M5A 1J3 Canada. Bankton-Texas may be served through its registered agent: Robert Kubbernus, 319 Northcliff Ridge Lane, Friendswood, Texas 77546.

72. Defendant ClearSky Management is a Delaware corporation with its headquarters located at 152 King Street East, Suite 400 Toronto, Ontario M5A 1J3, Canada. ClearSky Management does business in the State of Texas systematically and regularly through agents and subsidiaries, some of which are Texas corporations, and ClearSky Management has committed torts in the State of Texas as alleged herein. ClearSky Management has not appointed a registered agent for service of process as required by State law and may be served by service upon the Texas Secretary of State with notice forwarded to ClearSky Management's home office: 152 King Street East, Suite 400 Toronto, Ontario, M5A 1J3 Canada.

16

Draft - June 22, 2010

73.     Defendants Kubbernus, Balaton, Bankton, Bankton-Texas, and ClearSky Management are together referred to as the "Kubbernus Defendants."

74.     Defendant Wilson Vukelich is a Canadian law firm with offices in Markham, Ontario. The Kubbernus Defendants, CenturyTel Defendants and Wilson Vukelich are together referred to as the "Defendants."  Wilson Vukelich has committed torts in the State of Texas as alleged herein.  Wilson Vukelich has no office or registered agent in the State and may be served by service upon the Texas Secretary of State with notice forwarded to Wilson Vukelich's home office: Valleywood Corporate Centre, 60 Columbia Way, Suite 710, Markham, Ontario, Canada L3R 0C9.

75.     Defendant ClearSky is named as a nominal defendant in this action because of the derivative claims being asserted in its behalf by the ClearSky Investors.

## JURISDICTION AND VENUE

76.     The Court has jurisdiction to hear this case in that the damages are in excess of the minimum jurisdictional limits of the Court.

77.     All or a substantial part of the events and transactions giving rise to the causes of action stated herein occurred in Houston, Harris County, Texas, making venue proper in Harris County pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(a)(1).  Additionally, one or more Defendants reside or maintain its principal office in Harris County.

78.     Venue is proper as to all the Defendants in Harris County, pursuant to Tex. Civ. Prac. & Rem. Code § 15.005.  Each Defendant participated in the transactions which form the basis of this action and such transactions occurred in Harris County, Texas.

17

Draft - June 22, 2010

79.     All claims and causes of action are based solely on state law.  While the factual allegations herein discuss many violations of federal statutes, these allegations are factual only and will serve only as supporting evidence of conduct which violated state law.  To the extent that any private cause of action may exist relating to any of the federal laws mentioned herein, Plaintiff's expressly limited their claims and causes of action to state law.

80.     This Petition does not allege a derivative action on behalf of SkyComm or SkyPort.  Plaintiffs are asserting only direct claims for violations of duties owed directly to Plaintiffs.  All pleading of conduct that violates duties to corporations is made solely to evidence conduct that also violates duties owed directly to Plaintiffs.

## FACTUAL BACKGROUND

### A.     SkyPort's Founding

81.     SkyPort, then known as SkyComm International, Inc., was founded in the late 1990's by a group of Houston-based telecom executives and NASA telecommunications experts for the purpose of developing, owning and operating a satellite communications facility and network operations center at Ellington Air Force Base, adjacent to NASA headquarters in the Houston, Texas.

82.     This facility was to be the most advanced and secure satellite communications facility in the United States, and perhaps the world, and it was intended to provide highly secure telecommunications services to Federal and State agencies and service providers, as well as to various commercial customers.  The facility was also to include a Special Compartmented Intelligence Facility (known as a "SCIF") to support the needs of national security agencies for advanced physical and network communications security.

18

83.     In March 1999, SkyPort entered into a long-term lease at Ellington Air Force Base for approximately 7.5 acres, with an option for 11 acres more.

84.     From 1999 and 2002, SkyPort obtained the various licenses it would need from the FCC to operate the teleport, and it developed its plans for the design and development of the teleport.  SkyPort also obtained the backing of the local business community in Houston and of various potential users of the facility.

85.      During this period, SkyPort raised several million dollars from investors to finance its activities.  SkyPort estimated that it would need approximately $14 million to develop, construct and equip the teleport.

**B.     Regulatory, National Security and Homeland Security Requirements**

86.     Section 214 of the Communications Act of 1934, as amended (the "Communications Act") required SkyComm, as a prospective operator of an international telecommunications facility and satellite earth station, to obtain a certificate of public convenience and necessity from the FCC prior to construction of the teleport.

87.     Authorizations for operation of satellite earth stations require an application and approval process pursuant to 47 C.F.R. Part 25, similar to that in 47 C.F.R. Part 63 described above for international section 214 authorizations.

88.     Transfers of control of international telecommunications facilities and satellite earth stations, or of interests within controlling entities, require approvals from the FCC and transfers of control involving foreign ownership require additional approvals from the FCC and other United States governmental agencies.

19

89.     In accordance with Sections 63.12 and 63.18 and 63.24 and 25.119 of the FCC's Rules, any transfer of control of a United States based international telecommunications carrier and satellite earth station, or any change in a controlling interest in the ownership of a licensee, including changes in legal or equitable ownership, required application to and the prior approval of the FCC under 47 C.F.R. 63.24; 47 C.F.R. 63.12; 47 C.F.R. 63.18; 47 C.F.R. 25.119.

90.     Any transfer of control to a non-United States owned entity of 10% or more of a certain telecommunications facilities requires disclosure pursuant to 47 CFR § 1.2112 and 47 USC § 310 of the potential owner, and this information is to be used to evaluate whether the transfer should be approved (see FCC, International Bureau, Foreign Ownership Guidelines).

91.     In addition, the national and homeland security agencies that SkyComm was seeking to provide services to, required that their telecommunications vendors not be under foreign ownership, control or influence as a condition to being awarded a contract.  See DoD 5220.22-R, Section C2.2 - "Industrial Security Regulation"; DoD 5220.22-M, Section 3 - National Industrial Security Program Operating Manuel; Directive-Type Memorandum (DTM) 09-019 - "Policy Guidance for Foreign Ownership, Control, or Influence (FOCI)."

92.     In 1999, SkyPort obtained an international section 214 license.  In 2000 and 2002, SkyPort obtained fixed earth station licenses and in 2005, it obtained a VSAT license.

## C.     CenturyTel's Initial Involvement

93.     In 2002, CenturyTel was the eighth largest telecommunications company in the United States with operations in 22 States and around $2 billion in annual revenues.

94.     SkyPort was introduced to CenturyTel in 2002 by one of CenturyTel's directors, Ernie Butler, Jr.

Draft - June 22, 2010

95.     CenturyTel, which provided primarily land-based communications to customers in smaller metropolitan and rural areas, wanted to have access to satellite telecommunications capabilities to enhance its business.

96.     Among the applications that interested CenturyTel were the delivery of consumer television services via satellite, satellite distribution of video to its regional offices and delivery of billing and other data from its regional offices to its headquarters.

97.     In late 2002, CenturyTel agreed to provide SkyPort with the funds it needed to build the teleport in the form of debentures, convertible into shares of the company.

98.     As part of this transaction, SkyComm was created as a holding company for SkyPort, and it issued to CenturyTel its 8.5% cumulative preferred convertible debentures, carrying an 8% per annum interest rate.   The first debentures were issued by SkyComm to CenturyTel on December 31, 2003 in the principal amount of $5.5 million.

99.     The proceeds of these debentures were to be used to construct the teleport.

100.    The debentures were convertible into common shares, but even prior to conversion, the debentures granted CenturyTel the effective status of controlling shareholder. Under the terms of the debentures, CenturyTel had the right to elect four of the eight members of the Board of Directors of SkyComm and in the event of a deadlock, the Chairman appointed by CenturyTel, had the right to cast the deciding vote.

101.    CenturyTel exercised its rights by appointing the CenturyTel Directors, each of whom was a senior officer and/or director of CenturyTel, to the Boards of Directors of SkyComm and SkyPort.  CenturyTel also appointed Marshall as Chairman of both Boards.

21

Draft - June 22, 2010

102.    The teleport was completed in the second half of 2003 and began providing services to customers in January 2004.

**D.      CenturyTel Manages SkyComm as if it were a Wholly-Owned Subsidiary**

103.    Although CenturyTel was never a shareholder in SkyComm or SkyPort, it exercised complete control over the management and operations of SkyComm and SkyPort -- directly and through the CenturyTel Directors.

104.    In their capacity as directors of SkyComm and SkyPort, the CenturyTel Directors exercised complete control over the management and operations of SkyComm and SkyPort on behalf of CenturyTel.

105.    CenturyTel caused SkyComm and SkyPort to hire a new CEO.  The new CEO, Roger Klotz ("Klotz"), was informed by CenturyTel that he should report directly to CenturyTel and defendant Marshall, rather than the Boards of Directors of these companies.

106.    Klotz, as President and CEO of SkyComm and SkyPort, reported directly to and took his instructions from CenturyTel and Marshall, who was acting on behalf of CenturyTel.

107.    CenturyTel and the CenturyTel Directors excluded the other directors of SkyComm and SkyPort (the "Non-CenturyTel Directors") from the decision making process of the two companies.

108.    The Non-CenturyTel Directors were given only intermittent and incomplete reports on what SkyComm and SkyPort were doing or were going to be doing, and were often kept unapprised of major decisions regarding SkyComm and SkyPort.

Draft - June 22, 2010

109.    The Non-CenturyTel Directors were often asked to vote on and approve courses of action that had already been determined and directed by CenturyTel, and without being given all of the particulars or final documentation relevant thereto.

110.    CenturyTel and the CenturyTel Directors managed and operated SkyComm and SkyPort for CenturyTel's benefit, as if SkyComm and SkyPort were its wholly owned subsidiaries, and they completely disregarded the interests of SkyComm's shareholders.

111.    CenturyTel and the CenturyTel Directors caused SkyPort to do significant work on a variety of projects for CenturyTel, including developing a consumer satellite television broadcast system and setting up a video distribution system.  SkyPort engineers worked with CenturyTel personnel on these projects, developing systems meeting CenturyTel's requirements.

112.    SkyPort built and successfully tested prototype systems for CenturyTel, but in each instance, CenturyTel refused to proceed with the project with SkyPort, and selected another vendor instead.

113.    CenturyTel refused to pay SkyPort for its work or the other expenses incurred by SkyPort in setting up the systems for CenturyTel, asserting, through the CenturyTel Directors, that since it was providing all of SkyPort's funding anyway, it should not have to pay for its services.

114.    For example, CenturyTel promised SkyPort a $25 million contract to develop a satellite based communications system to backhaul its billing information from its regional offices to its headquarters.  CenturyTel caused SkyPort to do significant work on setting up this system.  SkyPort engineers worked with CenturyTel personnel teaching them the intricacies and operations of such a system and worked with them to develop a system to CenturyTel's

23

requirements.   SkyPort built and successfully tested this system.   However, CenturyTel then informed SkyPort that it had decided not to proceed with this contract.

115.    Marshall and the other CenturyTel Directors informed the Non-CenturyTel Directors that since the contract was not in writing, CenturyTel did not have to honor it.

116.    CenturyTel and the CenturyTel Directors promised SkyComm on numerous occasions that CenturyTel would provide for all of the Company's financial needs.   CenturyTel and the CenturyTel Directors informed SkyComm and the Non-CenturyTel Directors, that SkyComm did not need any outside financing, that CenturyTel would be SkyComm's banker and that CenturyTel had all of the money SkyComm would ever need.

117.    SkyComm, as an early stage company needed funds to be able to develop its business -- security deposits had to be made, obligations incurred and invoices paid.

118.    To be competitive with its rivals in the satellite telecommunications industry, SkyComm had a critical need to be able to provide its customers with equipment lease financing.

119.    CenturyTel and the CenturyTel Directors refused to permit SkyComm to obtain bank or other debt or equity financing from any source, other than through the issuance of more convertible debentures to CenturyTel.

120.    CenturyTel and the CenturyTel Directors set the price, terms and timing of these debentures and their funding all to the benefit of CenturyTel.

121.    CenturyTel and the CenturyTel Directors never permitted SkyComm to seek financing from third parties or to obtain price quotes for financing from third parties so that it could determine that the financing being offered to it by CenturyTel was at fair market rates.

24

Draft - June 22, 2010

122.    Between 2002 and 2005, SkyComm issued approximately 8 rounds of debentures to CenturyTel, with the principle and accumulating interest of each round constantly increasing the percentage ownership of SkyComm that CenturyTel would receive upon conversion of the debentures and diluting the fully diluted percentage owned by each of the shareholders.

123.    CenturyTel repeatedly failed to provide timely financing to SkyComm so as to enable SkyComm to execute its business plan.  It took CenturyTel as much as six months to provide financing to SkyComm after the funds were needed and had been requested.

124.    CenturyTel's scheme of financing SkyComm exclusively through the issuance of convertible debentures resulted in SkyComm becoming a company overburdened by debt, with an unsupportable debt to equity ratio and to repeated compounded dilution of SkyComm's shareholders, who were not given the option of seeking debt financing without a conversion feature.

125.    The Non-CenturyTel Directors and SkyComm's shareholders were deprived of their voice in management and company affairs.

126.    On a number of occasions, when the Non-CenturyTel Directors raised issues or concerns with the CenturyTel Directors, Marshall would state "Remember who you are working for -- CenturyTel."

127.    SkyComm's shareholders were unaware that SkyComm was being run as a wholly-owned subsidiary of CenturyTel and with their interests completely ignored.

**E.    CenturyTel Decides to Sell its Controlling Interest in SkyComm**

128.   In May 2005, CenturyTel purchased additional debentures from SkyComm, which brought the total principal balance of its debentures to over $20 million ("CenturyTel Debentures").

129.   Shortly thereafter, after a change in the composition of CenturyTel's Board precipitated a change in business direction, CenturyTel abruptly decided to divest itself of its non-core business activities, including its interest in SkyComm.

130.   CenturyTel wrote off its investment in SkyComm and sought to end its involvement with SkyComm as quickly as possible.

131.   At about that time, CenturyTel caused the preparation and distribution of a prospectus, offering the sale of its convertible debentures and controlling interest in the Company.

132.   CenturyTel and the CenturyTel Directors failed to inform the Non-CenturyTel Directors or the SkyComm shareholders of this decision.

133.   The Non-CenturyTel Directors did not become aware of this prospectus until after they learned of its existence from prospective customers for SkyComm's services.

F.     **Kubbernus and Balaton Enter the Picture**

134.   In or about November 2005, Kubbernus became aware that CenturyTel was seeking to divest its controlling interest in and obtain another source of funding for SkyComm.

135.   According to Kubbernus, he was informed that CenturyTel needed to divest itself of its interest in SkyComm in order to be able to proceed with a $10 billion merger with Alltel, another telecommunications company.

26

Draft - June 22, 2010

136.   Kubbernus acting through Balaton, an investment banking firm he had recently organized, put out offering materials on SkyComm seeking to find a buyer or investors for SkyComm, describing it as a "superb telecom opportunity."

137.   At the time, Kubbernus and Balaton had recently formed The Watershed Funds, Ltd., a Cayman Islands corporation (the "Watershed Funds"), which he planned to set up as an offshore "blind pool" investment fund.

138.   Kubbernus made an offer to CenturyTel on behalf of the Watershed Funds to acquire the CenturyTel Debentures and controlling interest in SkyComm, and began telling prospective investors that SkyComm would be the Watershed Funds' first investment.

139.   Prior to the time that CenturyTel began negotiating with Kubbernus, Kubbernus had been involved in several shareholder disputes and had been accused of defrauding investors, abusing shareholders' rights and misappropriating and misusing company assets for his own benefit.   These lawsuits included:

(a)   *Chamberlain and Rhea v. Optima International Trust, Robert Kubbernus et. al,* Civ. No. A-05-CA-394-LY (W. D. Tex 2005), in which Kubbernus was accused of, among other things, theft, breach of fiduciary duty, fraud/negligent misrepresentation, conspiracy, securities fraud and breach of contract;

(b)   *TrueStar Petroleum Corporation et al v. Optima Services International Ltd., Balaton Group, Inc., Robert J. Kubbernus, M. Carole Coale, John S. Burns, and Frederick Bryson Farrill vs. J.W. Rhea, IV and Robert Chamberlain vs. Thomas F. Cooke,* Cause No. 2005-54028, 157th Judicial District Court of Harris County, Texas, alleging breach of contract, business disparagement, breach of fiduciary duty and statutory fraud; and

27

(c) *Bristol Asset Management v. JAWZ, Inc and Robert Kubbernus* (2000), alleging fraud, breach of fiduciary duty and unfair business practices in connection with his failure to deliver shares to an investor.

All of these facts were available through an ordinary internet search regarding Mr. Kubbernus.

140.    Although Kubbernus fashioned himself as a "turnaround expert," the two companies in which his involvement could be verified on the internet had gone out of business after he became involved and resulted in shareholders' litigation.

141.    Kubbernus did not have any experience in satellite communications and his expertise was not in business operations or management.

142.    Rather, Kubbernus' experience was in "financial engineering," and stock manipulation.

143.    Kubbernus proposed to take control of SkyComm utilizing not his own funds, but rather funds he would obtain from third party investors.

144.    Yet, CenturyTel and the CenturyTel Directors decided to enter into negotiations with him on an exclusive basis.

145.    In these negotiations, CenturyTel and the CenturyTel Directors pursued the interests of CenturyTel at the expense of the SkyComm shareholders and prospective investors in Kubbernus' entities.

146.    SkyComm's Non-CenturyTel Directors were not involved in or kept apprised of these negotiations.

Draft - June 22, 2010

147.    Kubbernus proposed to CenturyTel a multi-phased fundraising plan that he and Balaton would execute for SkyComm, which would result in massive dilution for the SkyComm shareholders.

148.    At the time, various other parties were interested in negotiating with CenturyTel to acquire its debentures and controlling interest in SkyComm under terms that would have been much better for SkyComm's shareholders, but CenturyTel refused to entertain such offers and insisted on negotiating exclusively with Kubbernus, or on having such parties go through Kubbernus.

**G.    CenturyTel Causes SkyPort to File for Chapter 11 Protection**

149.    On November 21, 2005, CenturyTel and the CenturyTel Directors caused SkyPort to file a voluntary petition under Chapter 11 of the Bankruptcy Act.

150.    In connection to the Bankruptcy filing, CenturyTel and the CenturyTel Directors caused SkyComm's officers to file with the FCC applications for authority to transfer SkyPort's FCC 312 authorizations and 214 licenses to SkyPort, as Debtor-in-Possession ("SkyPort DIP"). These applications were *pro forma* in that they did not involve an actual change in the ownership interests in SkyComm.

**H.    CenturyTel Signs an Agreement to Sell to the Watershed Funds and Causes SkyComm to sign Agreements for Balaton to Syndicate Interests in SkyComm**

151.    On or about February 15, 2006, CenturyTel entered into a Debenture Purchase Agreement with the Watershed Funds for the CenturyTel Debentures.  Under this agreement, the Watershed Funds was to acquire all of the CenturyTel Debentures for a purchase price of $3 million, plus an amount needed to reimburse CenturyTel for certain payments it made on behalf

29

of SkyComm.  The Watershed Funds was also given the right to purchase for $500,000, a restructured revolving $750,000 note from SkyPort to CenturyTel (the "Revolver Note").  The closing was scheduled for June 30, 2006.  Balaton guaranteed the Watershed Funds obligations under the Debenture Purchase Agreement.

152.    Under the Debenture Purchase Agreement, CenturyTel and the Watershed Funds agreed to promptly make and prosecute all filings and submissions required by the FCC and obtaining FCC approval of the transfer of control **to the Watershed Funds**.  Obtaining the FCC approvals was made a condition of closing.

153.    Also on February 15, 2006, Balaton agreed to provide SkyComm with a $1.5 million DIP Financing Facility.  Balaton obtained these funds as a loan convertible into equity in SkyComm, from Draco Capital, Inc. ("Draco"), a Canadian corporation controlled by Adrien Pouliot ("Pouliot"), a Canadian investor.

154.    Also on February 15, 2006, CenturyTel and the CenturyTel Directors caused SkyComm to enter into a $4 million Equity Placement Agreement with Balaton, under which Balaton was to be paid commissions for raising equity financing for SkyComm from third-party investors.

155.    Also on February 15, 2006, the CenturyTel Defendants caused SkyComm to enter into:

(a)    a $4 million Exit Credit Facility Agreement with Balaton (which was inclusive of the 1.5 million DIP Financing);

(b)    a Recapitalization Agreement;

30

Draft - June 22, 2010

(c)      a $4 million Securities Purchase Agreement with **Balaton and other purchasers** to be brought in by Balaton (the "SPA Purchasers"), under which SkyComm agreed to issue 133,333,333 at $0.03 per share to the SPA Purchasers, in exchange for a $4 million equity investment in SkyComm.  The amounts advanced under the DIP Financing facility and Equity Credit Financing facility were to be converted into equity as part of the $4 million Securities Purchase Agreement; and

(d)      Warrants giving **Balaton** the right to purchase 133,333,335 shares of SkyComm stock at $0.10 per share.

156.    The obligations of the SPA Purchasers to proceed with these transactions were conditioned upon receipt of **all required** FCC consents and approvals.

157.    The Non-CenturyTel Directors were not provided with information on the proposed transaction or the proposed purchaser.

158.    When asked to vote in favor of the resolutions approving this transaction, the Non-CenturyTel Directors requested information about Kubbernus' background and financial capabilities, as well as the terms of the transaction, but the CenturyTel Directors ignored their requests.

159.    The Non-CenturyTel Directors caused an internet search on Kubbernus to be performed and informed the CenturyTel Directors that they had uncovered litigation, including litigation in Harris County, Texas in which Kubbernus was being accused of abusing shareholders' rights and looting.

Draft - June 22, 2010

160.    The Non-CenturyTel Directors raised with the CenturyTel Directors on several occasions the concern that Kubbernus did not have the financial resources to consummate the proposed transaction.

161.    The Non-CenturyTel Directors informed the CenturyTel Directors that SkyComm's counsel had repeatedly taken the position that a transfer of even a 20% interest in SkyPort to foreign ownership would not be permitted by the FCC.   The Non-CenturyTel Directors expressed concerns as to whether FCC approval of foreign ownership of a satellite telecommunications operator important to national security could be obtained.

162.    The Non-CenturyTel Directors expressed concerns to the CenturyTel Directors that a transfer of SkyPort to foreign ownership would adversely impact SkyPort's ability to obtain national security related contracts and its ability to obtain common carrier licenses. Although SkyPort did not have a common carrier license at the time, it was contemplated that SkyPort would seek such a license in order to extend its services.  47 U.S.C. 310 placed a 20% limit on foreign ownership of U.S. common carriers.

163.    The CenturyTel Directors did not respond to these concerns and stated that they would be proceeding with the transaction anyway.

164.    The Non-CenturyTel Directors had no input regarding who the placement agent or SPA Purchasers would be, nor did they have any input on the terms of the transactions or the pricing for the new shares SkyComm was agreeing to issue.

165.    The CenturyTel Defendants made no effort to assure that this price reflected fair market value for those shares.

32

Draft - June 22, 2010

166.    The transaction was negotiated by the CenturyTel Defendants with only CenturyTel's interests in mind, and ignored the interests of SkyComm's shareholders.

167.    On or about February 15, 2006, SkyPort filed a motion in the Chapter 11 case seeking permission to accept up to $1.5 million in DIP financing from Balaton.

168.    On March 15, 2006, CenturyTel and the CenturyTel Directors caused SkyComm to file a motion to dismiss the bankruptcy proceeding on the grounds that based upon the Balaton and/or Watershed Funds' financing commitment; it no longer needed the protection of the Bankruptcy Act.  This motion was granted on March 30, 2006 and the case dismissed.

**I.    Balaton and Kubbernus Form ClearSky and Begin to Syndicate Interests in SkyComm**

169.    Balaton and Kubbernus were unable to complete the steps necessary to be able to begin to legally solicit investments in the Watershed Funds.

170.    On or about February 15, 2006, Balaton and Kubbernus launched a separate effort to raise the funds needed for the SkyComm transaction.  They formed an entity called ClearSky Investments, LP, a Delaware limited partnership, and began offering $10 million in limited partnership interests in ClearSky.  ClearSky Management, a Delaware corporation and wholly-owned subsidiary of Balaton of which Kubbernus was a Director, was designated as the general partner of ClearSky.

171.    Wilson Vukelich represented ClearSky, ClearSky Management, Balaton and Kubbernus in this offering and also acted as escrow agent for investors' funds.

172.    According to the ClearSky Confidential Investment Memorandum dated February 2006 prepared in connection with the offering of interests in ClearSky (the "ClearSky IM") and

Draft - June 22, 2010

the ClearSky Partnership Agreement ("ClearSky LPA") dated as of February 10, (a) ClearSky would provide $1.5 million in DIP financing to SkyComm, and an Exit Credit Facility of $4 million (inclusive of the $1.5 million DIP loan), (b) ClearSky would purchase from SkyComm 133,000,000 shares SkyComm for $4 million, and receive from SkyComm warrants to purchase an additional 133,000,000 SkyComm shares, (c) the $4 million would be used in part to repay the Exit Credit Facility, and the balance for SkyPort operations, (d) ClearSky would acquire all of the CenturyTel Debentures, then in the face amount of $20,596,000, and convertible into 108,000,000 shares of SkyComm, and (e) the equity investment and purchase of the CenturyTel Debentures would be deferred until receipt of FCC approval of the acquisition of control of SkyComm and SkyPort **by ClearSky**.

173.    The ClearSky IM and ClearSky LPA also provided that if the maximum proceeds of $10 million were raised, ClearSky would acquire a 76% interest in SkyComm, which would increase to 82% if the common stock purchase warrants were exercised.  The offering document provided that if less than the maximum proceeds were raised, ClearSky's participation would be **proportionately reduced** and Balaton could retain any participation rights not assigned to ClearSky.

174.    On or about February 15, 2006, Balaton and Kubbernus circulated to CenturyTel and the Non-CenturyTel Debenture Holders, a share restructuring plan for SkyComm, in which they showed that Watershed Funds would acquire the CenturyTel Debentures and convert them into 108,000,000 shares of SkyComm, and thereafter, ClearSky would acquire Watershed Funds position in these shares and an additional 133,000,000 shares directly from SkyComm.

34

Draft - June 22, 2010

175.    This restructuring plan also showed that ClearSky would acquire 15,567,080 shares from two of the original shareholders in SkyComm, Puddy, Ltd. and Charles K. Stack, Jr. Prior to receiving this plan, Puddy, Ltd. and Charles K. Stack, Jr. had not even been asked if they were interested in selling their shares.

176.    At about this time, CenturyTel began to refer potential suitors and investors in SkyComm to Kubbernus and Balaton.

177.    Kubbernus informed at least one such potential suitor that he was asking $30 million for the controlling interest in the company.

**J.      CenturyTel Unlawfully Transfers Control to Balaton without FCC Approval**

178.    Even before dismissal of the Bankruptcy case, Balaton and Kubbernus assumed *de facto* control over SkyComm's management and operations.  The management of SkyPort began to report to Balaton and Kubbernus on a regular basis.  Kubbernus took control over personnel, terminating some employees and hiring others for key managerial positions.  He put in place new business, accounting and sales systems and took control of SkyComm's sales efforts.

179.    This transfer of control to Balaton and Kubbernus by CenturyTel and the CenturyTel Directors was without prior FCC approval and as such violated Section 214 of the Communications Act and FCC Rules 63.24 and 25.119.  See 47 C.F.R. 63.24; 47 C.F.R. 25.119.

180.    The Defendants knew that such a transfer was not permitted without prior FCC approval, knew or should have known that this illegal transfer was violative of their obligations to the shareholders in SkyComm, who were indirectly the equity owners in SkyPort and knew that the shareholders and investors in SkyComm would rely on such approvals.

35

**K.**   **Defendants Cause the Submission of Fraudulent "Pro Forma" Filings to the FCC**

181.   Commencing in February 2006, the CenturyTel Defendants, in coordination with the Kubbernus Defendants, caused SkyPort to file a series of *pro forma* applications, pursuant to 47 C.F.R. 25.119, seeking permission to assign back to SkyPort the earth station licenses that had been assigned to SkyPort DIP.

182.   On March 31, 2006, the CenturyTel Defendants, in coordination with the Kubbernus Defendants, caused SkyPort to file a notification pursuant to 47 C.F.R. 63.24, which they deemed *pro forma,* of SkyPort DIP assigning back to SkyPort its international 214 license (this notification and the applications described in the previous paragraph are collectively referred to as the"2006 Pro Forma Applications").

183.   The 2006 Pro Forma Applications were in fact not "pro forma" as defined in 47 C.F.R. 25.119 and they were materially false and misleading by not disclosing that CenturyTel had already transferred *de facto* control to Balaton and Kubbernus, and had entered into a contract to transfer actual control to the Watershed Funds and that Balaton had stated in various documents that control would transferred to ClearSky.  The 2006 Pro Forma Applications did not disclose that the DIP financing was being provided by Canadian investors and that it was convertible into equity in SkyComm.

**L.**   **Defendants Cause the Submission of Fraudulent Transfer Applications to the FCC the United States Department of Justice, Department of Homeland Security and Federal Bureau of Investigation**

184.   On April 4, 2006, CenturyTel and the CenturyTel Directors, in conjunction with Balaton and Kubbernus, caused SkyPort's officers to file a series of applications on behalf of

36

SkyPort pursuant to 47 C.F.R. 63.24  and under 47 C.F.R. 25.119 seeking permission to transfer control of SkyPort from CenturyTel **to Balaton** (the "2006 Transfer Applications").

185.    Because the 2006 Transfer Applications involved a transfer of control of more than a 10% equity interest to foreign ownership, they required the approval of an inter-governmental agency group, consisting of the United States Department of Justice, Department of Homeland Security and Federal Bureau of Investigation.  This group is known as "Team Telecom."

186.    The 2006 Transfer Applications listed Balaton as the transferee and disclosed that the equity in Balaton was owned by five Canadian citizens, one of whom was Kubbernus, who owned a 30% equity interest in Balaton.  The  2006 Transfer Applications represented that:

> The parties have entered into an agreement pursuant to which Balaton, through a series of transactions, will acquire approximately 84% of SkyComm's issued and outstanding stock.

and that

> Balaton has a proven track record of enabling companies in which it invests to maximize their potential through utilization of Balaton's business development and strategy, business operations, and financing experience

187.    The 2006 Transfer Applications were materially false and misleading in that they did not disclose that (a) the Watershed Funds was the contract vendee of the controlling CenturyTel Debenture interests, (b) ClearSky was, according to documents prepared by Kubbernus, the entity that was to acquire the controlling interest in SkyComm, (c) Balaton was actually the equity placement agent for SkyComm, (d) Balaton and Kubbernus had already assumed *de facto* control over SkyComm, (e) the ownership of SkyComm was at the time being widely syndicated to foreign investors, (f) interim financing that was convertible into equity in

37

SkyComm had been and was continuing to be provided by Canadian investors, (g) Balaton did not have the track record or experience represented, and (h) Balaton and Kubbernus had been named defendants in several lawsuits within the prior year.

188.    As would be revealed later, the 2006 Transfer Applications were also materially false and misleading in that they did not disclose that (a) Kubbernus was in the process of buying out his partners in Balaton, (b) Kubbernus' interest in Balaton was not even owned by him, but rather by Bankton, a company he controlled, and (c) Kubbernus' interest in Bankton was not even owned by him, but rather "ultimately" by a family trust.

189.    Wilson Vukelich, as counsel to Watershed Funds, ClearSky, Balaton and Kubbernus, had negotiated all of the relevant documents for the SkyComm transactions and was responsible for delivering the FCC approvals at the closing.  Wilson Vukelich at the very least, had an obligation to assure that the FCC licenses reflected ClearSky's controlling interest in SkyComm.

190.    In the 2006 Transfer Application pursuant to 47 C.F.R. 63.24 (for international 214 license), the CenturyTel Defendants, in coordination with the Kubbernus Defendants, caused SkyPort to falsely make the certification that any transfer of control would not occur prior to the consent of the FCC.

191.    The CenturyTel Defendants caused SkyPort to file the 2006 Transfer Applications, knowing that they were materially false and misleading and over the objections of the Non-CenturyTel Directors.

Draft - June 22, 2010

192.    The CenturyTel Defendants attempted to force one of the Non-CenturyTel Directors to sign the 2006 Transfer Applications, but despite the intense pressure they placed on him, he refused to sign them.  Finally, they caused Klotz to sign them.

193.    The Defendants were aware that had the FCC been informed the Watershed Funds was the contract vendee of the controlling CenturyTel Debenture interests or that the real party in interest acquiring the CenturyTel Debentures and additional shares in SkyComm was to be ClearSky, the FCC would deny approval of the 2006 Transfer Applications, or at the least delay them until all of the investors in the Watershed Funds and ClearSky had been identified and granted clearance status by the FCC and Team Telecom.  This would have resulted in the failure or substantial delay of the closing, and CenturyTel needed or desired to divest itself of SkyComm as quickly as possible.

194.    The Defendants knowingly and willfully caused the filing of false and fraudulent applications with the FCC and Team Telecom agencies, with utter disregard for the rights of Plaintiffs, the laws of the United States and safety of its citizens.

195.    The Defendants knew that such applications were illegal and knew or should have known that such illegal applications were violative of their obligations to the shareholders in SkyComm, who were indirectly the equity owners in SkyPort.

196.    The Defendants knew or should have known that shareholders and investors in SkyComm would rely on their assurances that the SkyPort licenses were duly and lawfully obtained.

**M.    The ClearSky Investors' Interests are Not Disclosed to the FCC and Team Telecom**

39

197.    As the 2006 Transfer Applications were being filed and approvals being pursued by CenturyTel, Kubbernus and Balaton continued to sell interests in ClearSky to foreign investors being promised indirect ownership interests in SkyComm.

198.    In or about April 2006, Balaton and Kubbernus reached an agreement with Pouliot for Draco to invest over $3.0 million in ClearSky.  Draco wound up investing over $3.5 million in ClearSky in a closing that took place on September 15, 2006, and in return was promised by Balaton and Kubbernus, an approximately 50% equity interest in ClearSky and 35% indirect interest in SkyComm.  Pouliot, who had participated in meetings with CenturyTel in Houston, Texas, was also promised a seat on SkyComm's Board of Directors.

199.    Even though the 2006 Transfer Applications were then pending before the FCC and Team Telecom, none of the facts alleged above were disclosed to these agencies.

**N.    Defendants Cause the Submission of a False Response to the Department of Homeland Security Inquiry**

200.    In May 2006, the United States Department of Homeland Security sent SkyPort a document entitled Initial Questions for International 214 Applicants ("Initial Questions").  Among other things, the questionnaire required the disclosure of:

> every non-U.S. individual, government or other entity that
> (a) exercises or may exercise voting or other ownership rights of the Applicant,
> (b) makes or may make overall corporate policy decisions for Applicant, or
> (c) otherwise manages the Applicant.
>
> For each such individual or entity, explain clearly the nature and extent of that involvement AND, provide the name, citizenship (for individuals), county for any entity, type of entity for any entity, and, if applicable, date of birth, place of birth, social security number, U.S. alien number, all passport identifying information including the passport number and the issuing country, all residence address(es), all business address(es) and all phone numbers.

40

201.    The CenturyTel Defendants, in coordination with the Kubbernus Defendants, knowingly and willfully caused SkyPort not to respond truthfully to this request and not to reveal the nature, extent and particulars of the foreign ownership of SkyPort.

202.    The Defendants knew that such responses were illegal and knew or should have known that such illegal responses were violative of their obligations to the shareholders in SkyComm, who were indirectly the equity owners in SkyPort.

203.    The Defendants knew or should have known that shareholders and investors in SkyComm would rely on their assurances that the SkyPort licenses were duly and lawfully obtained.

**O.    Kubbernus' Acquisition of 100% Ownership in Balaton is Not Disclosed to the FCC**

204.    On June 30, 2006, the four other shareholders in Balaton departed the firm, leaving Kubbernus 100% in control of Balaton.

205.    This transaction, which also would have required prior FCC and Team Telecom approval, was not disclosed to the FCC or to Team Telecom.

206.    The 2006 Transfer Applications were never amended to reflect that Kubbernus had acquired 100% control of Balaton, thus making them additionally materially and knowingly fraudulent and misleading.

**P.    The July 31, 2006 Assurances Letter to the United States Department of Justice, Department of Homeland Security and Federal Bureau of Investigation**

207.    The United States Department of Justice, Department of Homeland Security and FBI responded to the Transfer Applications by requiring specific written assurances from

Draft - June 22, 2010

Balaton, SkyComm and SkyPort with respect to the proposed owners of SkyComm and SkyPort before they would agree to a transfer of control to Balaton.

208.     Balaton, SkyComm and SkyPort. executed and delivered a letter dated July 31, 2006, addressed to the United States Department of Justice, Department of Homeland Security and Federal Bureau of Investigation (the "2006 Assurances Letter") agreeing to abide by the various conditions mandated by the Team Telecom agencies.  In this letter, they represented the proposed transaction to which they were seeking consent, to be as follows:

> On February 15, 2006, Balaton and the current owners of SkyComm entered into several transaction agreements pursuant to which Balaton will obtain an approximately 83% equity interest in SkyComm (the "Proposed Transaction"). Upon completion of the Proposed Transaction, the remaining 17% of SkyComm will be owned by certain of SkyComm's existing shareholders, whose individual ownership will be substantially diluted and range from approximately 0.002% to 2.738%.  All of these remaining shareholders are U.S. citizens, with the exception of one individual, a French citizen that the Signatories have been unable to locate, who will own less than 0.5% of SkyComm.  CenturyTel no longer will hold any interest in SkyComm.

Balaton, SkyComm and SkyPort agreed to notify the United States Department of Justice, Department of Homeland Security and FBI "promptly if there are material changes in any of the facts as represented in this letter."

209.     This 2006 Assurances Letter was materially false and misleading in that it failed to disclose that (a) Balaton had already assumed control of SkyPort, (b) an offshore fund, Watershed Funds, and not Balaton, was the contract vendee of the controlling interest in SkyComm under the February 15, 2006 Debenture Purchase Agreement, (c) Balaton was acting as placement agent for SkyComm, (d) Balaton was selling interests in ClearSky to foreign investors, (e) Balaton had agreed to assign its interest in SkyComm to ClearSky and had

42

represented to the ClearSky investors that ClearSky would be acquiring 76-82% ownership of SkyComm, (f) Pouliot had already provided substantial funds to ClearSky and had been promised a 35% ownership interest a director's seat in SkyComm, (g) Kubbernus had bought out his partners in Balaton, (h) Bankton owned 100% of Balaton, (i) the entities that owned the equity in Bankton had not been disclosed, and (j) Kubbernus owned indirectly less than 100% of Bankton.  The facts regarding Balaton's true ownership structure are still not fully known to Plaintiffs.

210.   CenturyTel and the CenturyTel Directors, with the cooperation and assistance of the Kubbernus Defendants and Wilson Vukelich, caused the 2006 Assurances Letter, which was materially and knowingly fraudulent and misleading, to be executed and delivered by SkyComm and SkyPort.

**Q.    The Transfer Approvals**

211.   CenturyTel and the CenturyTel Directors, with the cooperation and assistance of the Kubbernus Defendants and Wilson Vukelich, vigorously pursued obtaining the consent of the FCC and Team Telecom to the transfer to Balaton and used all means at its disposal, including mail, emails and telephonic communications in this pursuit.  Throughout this process, the Defendants concealed the true facts from the FCC and Team Telecom.

212.   Based upon the fraudulent applications and fraudulent letter of assurances to the United States Department of Justice, Department of Homeland Security and Federal Bureau of Investigation, the FCC and Team Telecom approved SkyPort's Section 214 and 312 applications on August 4, 2006.

43

Draft - June 22, 2010

213.    Shortly thereafter, The CenturyTel Defendants and Kubbernus Defendants caused SkyComm to inform all shareholders that the transfer of control had been approved by the FCC and Team Telecom, and that the deal with Balaton could now proceed.  Defendants did not disclose their illegal filings to the shareholders and investors in SkyComm, and knew that they would rely on SkyPort licenses being duly obtained.

## R.    Defendants Cause the Non-CenturyTel Debenture Holders to Convert their Debentures

214.    From time to time, CenturyTel had given SkyComm shareholders and others the right to purchase their pro-rata share of new debentures being offered to CenturyTel.  Two non-shareholders (John and Sue Graves) were also given the right to purchase such debentures.

215.    As a result, at the time of the Watershed Funds transaction, three shareholders and these two non-shareholders (together, the "Non-CenturyTel Debenture Holders") had acquired debentures in the aggregate sum of $2,237,000 (the "Non-CenturyTel Debentures").

216.    In early 2006, the CenturyTel Defendants and the Kubbernus Defendants represented to the shareholders of SkyComm, including the Non-CenturyTel Debenture Holders, that the buyer of the CenturyTel Debentures had agreed to convert them all to shares, and that the Non-CenturyTel Debenture Holders would be required to do so as well.  This was presented as part of the SkyComm restructuring plan and as a major benefit to SkyComm, in that it would deleverage the company and make it free of long-term debt.

217.    The Non-CenturyTel Debenture Holders were asked to convert their debentures at their initial conversion price of around $0.20 per share, but after negotiation, the conversion price was improved to approximately $0.07 per share.

44

218.    The Non-CenturyTel Debenture Holders agreed in writing to convert their debentures at $0.07 per share, subject to obtaining FCC consent to the transfer of control. The conversion was also subject to conversion of the CenturyTel Debentures.

219.    Together with the other shareholders, the Non-CenturyTel Debenture Holders were informed in August 2006 that the FCC and Team Telecom had approved the transfer of control to Balaton.

**S.    CenturyTel Agrees to Become a Shareholder in SkyComm**

220.    On September 15, 2006, the Non-CenturyTel Directors were informed that CenturyTel had agreed to convert the Revolver Note and certain other SkyComm debts which were to be paid off under the Debenture Purchase Agreement, into shares at $0.03 per share.

221.    CenturyTel's decision to become a shareholder in SkyComm was presented by both Kubbernus and CenturyTel as a major benefit to SkyComm because it allowed SkyComm to replace debt with equity, helping it even more so to become debt free, and because having CenturyTel as a shareholder would assist Balaton in its capital raising activities for SkyComm.

**T.    Balaton Becomes the Purchaser of the CenturyTel Debentures and CenturyTel receives Shares in SkyComm**

222.    With the closing imminent, on or about October 27, 2006, various draft closing documents were presented to the SkyComm Board for approval.

223.    Among these drafts was an Amended and Restated Debenture Purchase Agreement in which Balaton was substituted for Watershed Funds, as the purchaser.

224.    This Agreement provided that CenturyTel was owed $1,290,935 by SkyComm, which was convertible into SkyComm shares at the rate of $0.03 per share.  Within the sum of

45

$1,290,935 was (a) $117,390 in legal fees allegedly incurred by CenturyTel in securing approval of the transfer of control to Balaton from the FCC and Team Telecom, (b) approximately $300,000 that was to be paid by the Watershed Funds, as part of the purchase price, and (c) $873,025 in principal and interest under the $750,000 Revolver Loan.

225.    The $117,390 in legal fees was properly an expense of CenturyTel or Watershed Funds/ClearSky/Balaton, but the CenturyTel Directors caused SkyComm to agree to issue shares to reimburse CenturyTel for such amount.

226.    The $300,000 portion of the purchase price, referenced above was properly an obligation of Watershed Funds/ClearSky/Balaton, but the CenturyTel Directors caused SkyComm to issue shares to reimburse CenturyTel for such amount.  In this manner, the consideration to be paid by Watershed Funds/ClearSky/Balaton for the CenturyTel Debentures was reduced by $300,000, and SkyComm agreed to issue $300,000 more in shares to CenturyTel at $0.03 per share.

227.    Under the Debenture Purchase Agreement, the $873,025 in principal and interest owed to CenturyTel under the Revolver Loan would be acquired by Watershed Funds/ClearSky/Balaton for $500,000, but the CenturyTel Directors caused SkyComm to agree to issue $873,025 in SkyComm shares to CenturyTel at $.03 per share to pay this amount.

228.    Thereby, the Defendants caused SkyComm to issue a total of 43,031,166 shares to CenturyTel.

229.    Both CenturyTel and Balaton agreed to issue to themselves shares in SkyComm at $0.03 per share, when they had required $0.07 per share from the Non-CenturyTel Debenture Holders on conversion of their debentures.

46

Draft - June 22, 2010

230.    None of these transactions were negotiated with the interests of SkyComm's shareholders in mind, neither the process nor the price were fair and the SkyComm shareholders were additionally and improperly diluted by these transactions.

**U.    Balaton and Kubbernus Acquire *De Jure* Control of SkyComm**

231.    The Non-CenturyTel Directors, SkyComm shareholders, Non-CenturyTel Debenture Holders, and even Klotz, the company president, were informed by CenturyTel and Kubbernus that that transactions contemplated by the February 15, 2006 agreements, as amended by the agreements approved by the SkyComm Board, had closed on November 2, 2006.

232.    According to the information disclosed to the SkyComm shareholders, Non-CenturyTel Debenture Holders, Non-CenturyTel Directors and company officers, at the November 2, 2006 closing (a) Balaton acquired the  CenturyTel Debentures from CenturyTel for $3 million, and simultaneously converted them into 108,000,000 shares of SkyComm; (b) Balaton acquired 133,000,000 shares of SkyComm stock and 133,000,000 warrants for $4 million; (c) CenturyTel acquired 43,031,166 SkyComm shares in exchange for debts outstanding to it; (d) the Non-CenturyTel Debenture Holders acquired 30,134,798 SkyComm shares upon conversion of  their debentures; and (e) all Directors of SkyComm and SkyPort resigned and were replaced by Kubbernus and his nominees.

233.    The FCC was informed by letter dated November 2, 2006, from Latham & Watkins, counsel to CenturyTel, that the transfer of control contemplated by the 2006 Transfer Applications was consummated on November 2, 2006.  On November 14, 2006, SkyPort sent a letter on behalf of itself and Balaton to the Team Telecom agencies confirming that the transfer to Balaton had occurred on November 2, 2006.

234.     The FCC and Team Telecom Agencies were not informed that Kubbernus had been running SkyComm since on or about February 15, 2006 or that numerous foreign investors had been sold and were continuing to be sold equity interests in SkyComm.

235.     The FCC and Team Telecom Agencies were not informed of any change in the terms of the transaction that had been represented to them in the 2006 Transfer Applications or that CenturyTel itself had acquired shares in SkyComm.  The 2006 Transfer Applications had stated that CenturyTel would have no interest in SkyPort after the closing, and the parties had agreed to provide notification of any changes in the 2006 Assurances Letter.

236.     Only after confirmation of the SkyPort Bankruptcy Plan in August 2009 and a detailed review of documentation provided to various investors by Kubbernus, did the Original Shareholders and Non-CenturyTel Debenture Holders learn that the closing had not occurred as had been presented to them.  Apparently, Balaton had not paid the $3 million in cash it was obligated to pay for the CenturyTel Debentures, but had instead given CenturyTel a $3 million note for the CenturyTel Debentures.  The CenturyTel Debentures had apparently not been converted and SkyComm had not become long-term debt free.  The Original Shareholders and Non-CenturyTel Debenture Holders had never been informed of these facts.

237.     This investigation also revealed that Balaton and Kubbernus had deliberately cut off fundraising for ClearSky at $7 million prior to the closing, so that they could raise the per share price for subsequent investors.  Balaton and Kubbernus had apparently informed CenturyTel on November 2, 2006 that they did not have the funds to pay for the CenturyTel Debentures at that time, but would pay for them out of the next round of financing which was imminent.  CenturyTel agreed to accept a $3 million promissory note **of Balaton** in lieu of cash

48

for the CenturyTel Debentures.  Immediately after the closing, Balaton and Kubbernus began raising funds in SkyComm at a much higher per share price, with $3 million of the proceeds purportedly earmarked for SkyComm to pay off the debt to CenturyTel.

238.    Unbeknownst to anyone at the time other than Defendants, the CenturyTel Debentures were not converted into shares in SkyComm.

## V.    Balaton and Kubbernus Defraud the ClearSky Investors

239.    Balaton and Kubbernus raised approximately $7 million in ClearSky from 45 investors -- all or most of whom were non-U.S. citizens.  These investors purchased interests in ClearSky on the false representation that ClearSky would acquire a controlling share ownership interest in SkyComm.

240.    The information provided to the ClearSky Investors, including in the ClearSky IM and ClearSky LPA, was false and misleading in numerous respects.  The ClearSky Investors were not informed that (a) Balaton, and not ClearSky, was being represented to the FCC and Team Telecom as the acquirer of control to SkyPort, (b) the FCC had approved Balaton, and not ClearSky, as the party acquiring control of SkyComm, (c) the Kubbernus Defendants did not intend to acquire the SkyComm interests in ClearSky, and (d) there was a material risk that the FCC would cancel SkyPort's licenses if it discovered that SkyComm's ownership had been falsely represented to it.

241.    The ClearSky IM and ClearSky LPA were false and misleading in that they did not disclose (a) Kubbernus' background, including that JAWZ, a corporation he was most recently president of, went bankrupt and resulted in shareholder lawsuits, and that Kubbernus

49

was in protracted litigation with TrueStar Petroleum alleging fraud and other misdeeds or (b) Kubbernus' true intent regarding the use of the investors' funds.

242.    Balaton and Kubbernus used the funds raised in ClearSky to acquire shares in SkyComm, but in direct violation of their representations to the ClearSky Investors, acquired such shares in the name of Balaton, and not ClearSky.

243.    Wilson Vukelich represented its long-time clients, Kubbernus and Balaton, at the closing on November 2, 2006 and closed the transaction in the name of Balaton, and not its client, ClearSky, which had supplied all of the funds for the transaction and which was entitled to that interest under the ClearSky IM and ClearSky LPA.

244.    At no point did Wilson Vukelich inform the ClearSky Investors that it was also acting for Balaton and Kubbernus, or that Wilson Vukelich would be representing Balaton at the closing of the acquisition of the CenturyTel Debentures and SkyComm shares promised to ClearSky.  At no point did Wilson Vukelich inform the ClearSky Investors that it would be acting or did act contrary to the interests of ClearSky and contrary to the provisions of the ClearSky IM and ClearSky LPA.

245.    Although Wilson Vukelich had attempted to absolve itself in the ClearSky LPA, of liability with respect to its conflict of interest in representing both ClearSky and ClearSky Management, it did not reveal its conflict in also representing Kubbernus and Balaton or attempt to obtain such absolution with respect to a conflict of interest in representing both ClearSky, on the one hand, and Balaton and Kubbernus, on the other.

246.    In violation of its professional obligations to ClearSky, Wilson Vukelich failed to document the controlling interest of its client, ClearSky, in SkyComm.

Draft - June 22, 2010

247. Over the next two years, Balaton and Kubbernus sent ClearSky's limited partners financial statements and other materials confirming ClearSky's interest in SkyPort. Balaton and Kubbernus made numerous and repeated representations to the ClearSky Investors and others that ClearSky owned the controlling interest in SkyComm.

## W.      Balaton and Kubbernus Defraud the Additional Investors

248. In the fall of 2006, Balaton and Kubbernus ceased offering shares in ClearSky and began offering shares in SkyComm directly. They put out various offering documents seeking to raise between $7 million and $30 million for SkyComm and representing that $3 million of the proceeds would be used to pay off the CenturyTel note, even though this was an obligation of Balaton or ClearSky, and not SkyComm.

249. In February 2007, Balaton and Kubbernus prepared and distributed a private placement memorandum for an offering of $30 million in shares in SkyComm (the "February 2007 Offering Memorandum"), in which Balaton and Kubbernus represented that SkyComm had no long-term debt.

250. The February 2007 Offering Memorandum did not show that SkyComm had any debt outstanding to CenturyTel or to Balaton.

251. The February 2007 Offering Memorandum represented that the "Majority Shareholder" owned 70.37% of SkyComm's shares, but failed to identify who that was. It also stated that the FCC had approved a transfer of ownership to the "new majority owner' without identifying who that was.

252. The February 2007 Offering Memorandum contained materially false and misleading statements, in that it failed to disclose among other things that (a) the FCC approvals

51

had been obtained, with CenturyTel's assistance, through fraudulent applications and statements to the FCC and the Team Telecom agencies, (b) there was a material risk that the FCC licenses could be revoked at any time by the FCC or Team Telecom agencies, as a result of such licenses having been procured by fraud, and (c) that the "Majority Shareholder" and "new majority owner" was Balaton, and not ClearSky, as was being represented to the ClearSky Investors.

253.   The February 2007 Offering Memorandum was false and misleading in that it did not disclose (a) Kubbernus' background, including that JAWZ, a corporation he was most recently president of, went bankrupt and resulted in shareholder lawsuits, and that Kubbernus was in protracted litigation with TrueStar Petroleum alleging fraud and other misdeeds or (b) Kubbernus' true intent regarding the use of the investors' funds.

254.   Over the next six months, Balaton raised not less than an additional $8,198,843 from foreign investors (the "Additional Investors") in these offerings of shares in SkyComm.  As described below, the existence and identity of these investors did not become known to SkyComm's Original Shareholders until late 2008 when Balaton listed them as shareholders in a second SkyPort bankruptcy filing described below.

## X.   Balaton and Kubbernus Defraud the Lavell Investors

255.   In or about July, 2007, Balaton and Kubbernus formed Lavell, a company into which they stated they would merge SkyComm and certain other companies in the satellite communications business, and then take it public and list it on the Toronto Stock Exchange. Balaton and Kubbernus stated at various times that they planned to raise approximately $65-120 million Canadian for Lavell in an initial public offering.

52

Draft - June 22, 2010

256.   Balaton and Kubbernus prepared and distributed to prospective investors a Lavell Preliminary Prospectus (Draft: September 24, 2007) (the "Lavell Prospectus"), which was accompanied by "audited" consolidated financial statements for SkyComm as at December 31, 2007, prepared by Deloitte Touche Tohmatsu (the "Deloitte 2007 Financials").

257.   The Lavell Prospectus stated that (a) as part of the 2005 SkyPort bankruptcy reorganization, Balaton acquired 166,666,665 units of SkyComm, with each unit consisting of one share of SkyComm stock at $.03 and one warrant for an additional share at $.10 per share, (b) Balaton acquired 500,000 common shares from a founding shareholder of SkyComm, (c) Balaton purchased the CenturyTel convertible debentures for $3mm, which was satisfied by the issuance by Balaton of a promissory note, secured by a pledge by Balaton to CenturyTel of certain of the SkyComm Shares and warrants held by Balaton and (d) as part of the 2005 reorganization, CenturyTel also acquired SkyComm shares and warrants from Balaton.

258.   The Lavell Prospectus also stated that as of June 30, 2007, there were 252,149,572 SkyComm Shares outstanding, and that on September 26, 2007, $23,024,789 of convertible debenture debt, inclusive of accrued interest, was converted by its holder (Balaton) into 112,093,328 common shares of SkyComm, and that as a result of the conversion of debenture debt, SkyComm has only $2,500,000 of 8.5% convertible debenture debt outstanding inclusive of accrued interest which is held by Balaton and pledged to CenturyTel.

259.   This was the first time that Balaton and Kubbernus revealed that Balaton's $3 million note to CenturyTel had been secured by a pledge of certain of the debentures it purchased from CenturyTel.

53

260.    Balaton and Kubbernus stated in the Lavell Prospectus that the $2.5 million in debentures would be retired out of the proceeds of the Lavell offering.  These were the same debentures that they had raised money from the ClearSky Investors and Additional Investors to pay off.  Balaton and Kubbernus gave no explanation as to why Lavell would be paying off Balaton's obligation.

261.    Balaton and Kubbernus hired a management team for Lavell, including Patrick Brant, a former President and CEO of Loral Skynet Corp.  This Lavell management team, brought on in anticipation of the Lavell IPO, was very highly compensated and Kubbernus and Balaton caused their salaries and other expenses of Lavell to be paid by SkyComm. This was not disclosed to SkyComm's shareholders or investors.

262.    The Deloitte 2007 Financials showed that $22,945,135 of debentures was still outstanding as of June 30, 2007.

263.    Elsewhere, the Deloitte 2007 Financials stated that as of August 31, 2007, SkyComm had $25,490,416.47 in these debentures outstanding, including interest and that on September 26, 2007, $23,024,789 of such debt was converted into 112,093,328 shares of SkyComm, leaving $2.5 million in debentures outstanding.

264.    This was the first indication that none of the CenturyTel Debentures had been converted on November 2, 2006 or that some of the CenturyTel were still outstanding as of September 27, 2007.

265.    The April 18, 2008 transmittal letter to the Deloitte 2007 Financials stated that:

> The consolidated financial statements as at and for the year ended December 31, 2006 were audited by another auditor who expressed an unqualified opinion dated August 30, 2007 in accordance with the auditing standards

generally accepted in the United States of America. The auditors' report contained an emphasis of matter with respect to the company's ability to continue as a going concern.

None of the SkyComm shareholders had ever been provided with a copy of the 2006 audited financial statements referenced in this report.

266.   In December 2007, Balaton and Kubbernus prepared and distributed additional materials relating to the proposed Lavell public offering, in an effort to sell Lavell convertible debentures.

267.   In or about June 2008, Balaton and Kubbernus began to circulate a document entitled "SkyComm Technologies Corporation & SkyPort Global Communications, Inc. Shareholder Update by Robert Kubbernus June 2, 2008," in an effort to sell convertible debentures in Lavell.

268.   Upon information and belief, the Balaton Defendants sold approximately $2 to $3 million in Lavell convertible debentures.

269.   The offering and sale of the Lavell convertible debentures was based upon false and misleading information provided by Kubbernus, Balaton and Wilson Vukelich, including that : (a) FCC approval of the transfer of ownership to Balaton had been duly obtained; (b) Lavell had a valid and binding agreement to acquire another company, Artel, and roll it into Lavell along with SkyComm; and (c) SkyPort could obtain and operate under a common carrier international license at any point it chose.

270.   The Balaton Defendants and Wilson Vukelich failed to disclose to the Lavell Investors material information including that: (a) Kubbernus had been sued for fraud upon shareholders and looting, and for failing to deliver shares to shareholders; (b) the company

55

Draft - June 22, 2010

Kubbernus had most recently been CEO of had quickly gone out of business and resulted in shareholder litigation, and (c) the $2.5 million obligation to CenturyTel was actually an obligation of Balaton and not of SkyComm.

271.    In around 2008, with the IPO difficult to consummate, Balaton and Kubbernus proposed to take Lavell public via a merger with a public shell company, Software Growth, and also proposed to raise equity for Lavell through a private offering.

272.    None of these efforts were successful and the investors in the Lavell debentures lost all of their money.

## Y.    Balaton and Kubbernus Cause the SkyComm Shareholders to Convert their Shares to Lavell Shares

273.    At the end of 2007, Balaton and Kubbernus requested that the shareholders of SkyComm sell their shares in SkyComm to Lavell in return for shares of Lavell.  In connection with this solicitation, Balaton and Kubbernus gave them copies of the Lavell Prospectus, whichw as metrially false and misleading, as aforesaid.

274.    Most, if not all, of the SkyComm shareholders agreed to sell their shares to Lavell shares and sent their SkyComm shares to Balaton and Kubbernus.

275.    The submitting SkyComm shareholders never received shares in Lavell and never received their SkyComm shares back. The SkyComm shareholders were induced by Kubbernus and Balaton to believe that they were shareholders of Lavell and not of SkyComm.

## Z.    Balaton and Kubbernus Violate their Fiduciary Duties to SkyComm's Shareholders

276.    Beginning in February 2006, Balaton and Kubbernus exercised control over the management and operations of SkyComm.  Even before they closed that acquisition of the

Draft - June 22, 2010

CenturyTel Debentures in November 2006, they ran the company and excluded the Non-CenturyTel Directors from the decision making process.

277.     From November 2, 2006, Kubbernus acted as Chairman of the Board of Directors of both SkyComm and SkyPort.  Kubbernus and Balaton ran the company for their own benefit, and with complete disregard for the rights and interests of the other shareholders.

278.     Balaton and Kubbernus failed to provide SkyComm shareholders with financial reports or other information, except in the context of asking them for additional funds or asking them to sell their shares to Lavell-Canada.

279.     On September 25, 2007, Balaton and Kubbernus caused SkyComm to issue to Balaton, 130,926,766 shares of its common stock purportedly "as payment for restructuring fees and other costs incurred relating to the anticipated acquisition of the company by Lavell."  This issuance of shares was unjustified and further diluted the shareholders of SkyComm.

280.     Only $4.8 million of the $7 million raised from the ClearSky Investors ever made it into SkyComm's accounts.  The rest went to Balaton or Bankton, or to pay Balaton's expenses.

281.     Balaton and Kubbernus caused ClearSky to pay $146,776.07 to Bankton, when ClearSky had no relationship with Bankton.

282.     Balaton and Kubbernus failed to disclose to investors and shareholders that on multiple occasions they had failed to comply with FCC rules and requirements and failed to disclose the true ownership of SkyComm to the FCC, thereby jeopardizing SkyComm's license and the interests of SkyComm's shareholders.

283.     Balaton and Kubbernus massively diluted the shareholders of SkyComm without proper consideration and without providing them any information on what was happening to their shareholdings.

284.     Balaton and Kubbernus offered for sale additional interests in SkyComm through numerous false, misleading and inconsistent statements.

285.     Balaton and Kubbernus failed to hold required annual shareholders meetings or provide shareholders with financial and other reports and information that they requested.

286.     Balaton and Kubbernus maintained at least two sets of books for SkyComm -- one showing ClearSky as owning a substantial interest in SkyComm and the other showing Balaton owning substantially the same interest.

287.     Balaton and Kubbernus' acts were illegal and and constituted gross violations of Balaton's and Kubbernus' fiduciary duties to the SkyComm shareholders.

**Z.     Wilson Vukelich Commits Malpractice and Breaches its Fiduciary Duties to ClearSky and the ClearSky Investors**

288.     Wilson Vukelich represented Kubbernus, Balaton, ClearSky Management and ClearSky in connection with (a) the ClearSky offering, including the preparation of the ClearSky LPA, and acting as trustee for investors' funds in the offering, (b) the acquisition of the CenturyTel Debentures, and shares in SkyComm, (c) the SkyComm offerings, including the preparation of the 2007 Offering Memorandum.

289.     Wilson Vukelich did not exercise due care in the preparation of these offering documents and in the supervision of investors' funds entrusted to it and permitted Kubbernus to

divert investors' funds contributed to one entity to pay expenses of other Kubbernus controlled entities and to divert such funds for his own and Wilson Vukelich's purposes.

290.    The ClearSky IM and the 2007 Offering Memorandum were false and misleading in that they did not disclose (a) Kubbernus' background, including that JAWS Technologies, a corporation he was most recently President of, went bankrupt and resulted in shareholder lawsuits, (b) Kubbernus was in protracted litigation with TrueStar Petroleum, (c) SkyComm was not in compliance with FCC, and Team Telecom Agency requirements, (d) there was a substantial risk that the FCC would terminate SkyPort's licenses if it determined that it had been gotten through false representations, (e) the April 2006 Transfer of Control Applications named Balaton as transferee rather than ClearSky, (f) ClearSky had not received its interest in SkyComm as the ClearSky Investors had been promised and as represented in the ClearSky LPA, and (g) Balaton's debt to CenturyTel had been shifted to SkyComm.

291.    Wilson Vukelich violated its professional obligations to ClearSky and the ClearSky Investors by (a) not causing their interests to be disclosed to the FCC in a transaction in which it represented them, (b) closing the acquisition of the interests in SkyComm in the name of Balaton, and not in the name of ClearSky, (c) failing to properly document the interests of the ClearSky Investors in SkyComm and (d) permitted the misapplication and comingling of investors' funds.

292.    Wilson Vukelich had a clear conflict of interest which it did not disclose to the ClearSky Investors.

59

Draft - June 22, 2010

293.   Between April 2006 and June 2007, Wilson Vukelich billed and collected almost $200,000, perhaps more, in legal fees from ClearSky.  These fees were excessive and largely not attributable to work not performed for ClearSky.

294.   These fees included charges for work performed for Balaton and Kubbernus on other projects and fees for work performed that was diametrically opposed to the interests of ClearSky.

## AA.   The 2007 FCC Applications

295.    As alleged above, in June 2006, Kubbernus bought out the other four partners in Balaton.  This transfer required prior FCC approval, but Balaton and Kubbernus did not disclose this change in ownership to the FCC, nor did they file an application seeking approval of such change.

296.   In September 2007, Balaton and Kubbernus caused SkyPort to make additional applications to the FCC in connection with the proposed transfer of control of SkyComm to Lavell-Canada (the "Lavell-Canada Applications").

297.   Only as part of the Lavell application process did Balaton inform the FCC of Kubbernus' acquisition of the interests of his four former partners in Balaton.  On September 27, 2007, Balaton filed a notification with the FCC seeking retroactive approval of what it deemed was the *"pro forma"* transfer of 100% ownership in Balaton to Kubbernus **in April 2007** (the "Balaton Notification").

298.   This transfer was not *pro forma* under FCC rules in that there was an actual transfer of ownership and Kubbernus misrepresented the transfer as taking place in April 2007,

60

rather than June 2006 -- prior to when the transfer to Balaton had been approved on the representation that Balaton had five partners.

299.    The Lavell-Canada Applications, as well as the Balaton Notification, were false and misleading in a much more serious manner in that they did not disclose the interests of the ClearSky Investors or the Additional Investors, the fact that all or most of the equity owners in SkyComm were non-U.S. citizens or, as was revealed later, the true equity ownership in Balaton.

**AB.    The 2008 FCC Applications and Assurances Letter to the United States Department of Justice, Department of Homeland Security and Federal Bureau of Investigation**

300.    Commencing in July 2008, Balaton and Kubbernus, caused SkyPort to file a series of applications pursuant to 47 C.F.R. 63.24  and under 47 C.F.R. 25.119 seeking permission to transfer control of SkyPort from Balaton to Lavell Systems, Inc. a Delaware corporation ("Lavell-US") and subsidiary of Lavell-Canada ("Lavell") (the "2008 Transfer Applications").   These applications were characterized by applicants as necessitated by the abandonment of plans to consummate a public offering of Lavell-Canada on the Toronto Stock Exchange.

301.    On or about July 30, 2008, in connection with the proposed transfer of control of SkyComm to Lavell-US, Balaton, Lavell-US, Lavell-Canada, SkyComm and SkyPort executed and delivered another letter (the "2008 Assurances Letter") to the United States Department of Justice, Department of Homeland Security and FBI confirming their agreement to abide by the terms of the July 31, 2006 Assurances Letter.

302.    The 2008 Transfer Applications and the 2008 Assurances Letter were false and misleading in that, among other thing, they did not disclose the existence of dozens of investors

in SkyComm -- most or all of them non-U.S. citizens -- or that these investors would continue to have interests in Lavell-US as part of the acquisition of SkyComm by Lavell-US.

303.    During the second half of 2008, Kubbernus made several efforts to raise additional funds by offering interests in SkyComm, and he raised additional undetermined sums at that time.

## AC.    Kubbernus distributes false and Misleading Financial Statements to the ClearSky Investors

304.    Sometime in 2008, Balaton and Kubbernus delivered to Pouliot draft financial statements for ClearSky, which had a draft accountants' review letter attached, but without the accounting firm identified.  Pouliot refused to sign them because the ClearSky LPA required a full audit, and the financials were not audited nor did they appear to have been prepared by an accounting firm.

305.    On August 27, 2008, Kubbernus distributed to the ClearSky Investors, unaudited "Consolidated Financial Statements" for ClearSky for the year ended December 31, 2006 **signed by Kubbernus** (the "2006 ClearSky Financials"). These were not prepared by an accounting firm and purported to present consolidated financial statements of ClearSky and its "partially owned subsidiaries, SkyComm Technologies Corporation and SkyPort International Inc. (collectively referred to as the "Partnership")."

306.    The 2006 ClearSky Financials stated that on November 2, 2006, (a) ClearSky had, for $4 million, acquired 133,333,337 shares of SkyComm, plus warrants to purchase an identical number of shares at $.10 per share, (b) the 133,333,337 shares represented a 53.08% equity ownership interest in SkyComm, (c) ClearSky had acquired debentures in the face amount of

62

$20,596,000 for $3 million, (d) these debentures were convertible into 115,319,245 shares of SkyComm or approximately 31% of the non-diluted equity in SkyComm.

307.    The 2006 ClearSky Financials show contributions by limited partners of $6,845,195 and by the general partner (owned 100% by Kubbernus) of zero.

308.    The 2006 ClearSky Financials (Note 5) were contradictory and incomprehensible regarding what happened to the CenturyTel Debentures. They referenced a note payable to CenturyTel "secured by the Partnership's investment in its SkyComm Technologies Corporation subsidiary which has been eliminated on consolidation." The 2006 ClearSky Financials further stated:

> In September 2007, this note was renegotiated to $2.5 million repayable December 31, 2007 after a principal payout by the Partnership of $500,000. This note was not repaid as at February 29, 2008 as is in default (sic).

309.    The 2006 ClearSky Financials showed long term debt of approximately $1.9 million in 8.5% convertible debentures as of December 31, 2006 (their description matched CenturyTel Debentures) (Note 6).   The 2006 ClearSky Financials also showed that all of such debentures were retired in 2007 (Note 6).

310.   The 2006 ClearSky Financials stated (Note 13):

**June 2007 Activity**

In June 2007 ClearSky increased its equity stake in SkyComm, as permitted in the LP and debenture agreements. The increase provided additional shares of 29,499,667 with a conversion price of $0.03 per share.

Also in June, ClearSky received 31,224,223 shares in settlement of various fees and expenses owed.

**September 2007 Activity**

63

In September 2007 ClearSky converted part of the outstanding debenture for 112,093,328 in shares and also received an additional 53,073,849 in shares for the non-cash exercise of the 133,333,333 common share warrants which were exercisable at $0.10. The unconverted portion of the convertible debenture was replaced with a note for $2.5 million. The outstanding note is accruing interest at 8.25%.

311.     The 2006 ClearSky Financials, sent to the ClearSky investors in August 2008, were materially false and misleading in numerous respects including that they did not disclose that Balaton, and not ClearSky, held title to the controlling interest in SkyComm.

## AD.     SkyPort is Reorganized in Chapter 11

312.     On October 24, 2008, Balaton and Kubbernus caused SkyPort to file another petition for relief under Chapter 11 of the Bankruptcy Act.

313.     SkyComm did not file a Chapter 11 petition, but Balaton listed the shareholders of SkyComm in the schedule of equity security holders it filed with the Bankruptcy Court.  This list of shareholders included investors from England, France, Switzerland, Canada, Kuwait, Abu Dhabi-United Arab Emirates.  It included several investors whose addresses were listed as "n/a" (not available).  None of these Additional Investors had been disclosed to the FCC or the Team Telecom agencies -- or to any of the Original Investors.

314.     ClearSky did not appear on the schedules as having any interest in SkyComm.

315.     On May 22, 2009, Balaton and Kubbernus filed a proposed plan of reorganization pursuant to which SkyComm would be merged into SkyPort, Balaton would exchange its alleged secured and unsecured debts for 100% of the equity in the merged entity and all of the other shareholders in SkyComm would have their shares expunged.  Balaton proposed to contribute approximately $200,000 in new funds as part of the Plan.

64

316.     This plan was amended on July 8, 2009 to reflect settlements reached with secured creditors to obtain their support for the plan. One of these purported secured creditors was CenturyTel.

317.     Pouliot and Draco sought to challenge this plan.  In response, Kubbernus and Balaton argued that they did not have standing to do so since neither they, nor ClearSky, had an interest in SkyPort.

318.     After a hearing, the Court ruled that Pouliot and Draco did not have standing since they did not establish ClearSky's interest in SkyComm, but the Court ruled that they, ClearSky and the ClearSky Investors would be free to pursue their claims against Kubbernus and Balaton elsewhere.

319.     None of the shareholders of SkyComm appeared to oppose the Balaton Plan.

320.     The Bankruptcy Court issued its order confirming Balaton's plan on August 12, 2009 (the "Confirmation Order").  A copy of the Confirmation Order and Plan is annexed hereto as Exhibit A.

321.     Under the Plan, SkyComm was merged into SkyPort and all of the equity interests of the Original Shareholders, Non-CenturyTel Debenture Holders and Additional Investors were eliminated.

322.     The Confirmation Order provided that (a) claims or causes of action against Balaton and Kubbernus relating to their actions during the Bankruptcy case were released and (b) claims or causes of action on behalf of the Debtor against Kubbernus and Balaton were released and could not be brought derivatively on behalf of the Debtor.

Draft - June 22, 2010

323.    However, claims or causes of action held by Draco, ClearSky Management, ClearSky, their investors, partners and affiliates (the "ClearSky Parties") against parties other than the Debtor or Reorganized <u>Debtor were not released and may still be brought, including claims relating to wrongs committed by Kubbernus and Balaton in the Bankruptcy case.</u>

**AF.    The FCC Sanctions SkyPort**

324.    In July 2009, certain of the Plaintiffs learned that the FCC had issued an Order of Forfeiture against SkyPort in March 2009, after finding that it and its affiliates had "willfully and repeatedly violated the Commission's rules by engaging in unauthorized transfers of control."

325.    The Forfeiture Order related to SkyComm's failure to disclose the transfer of ownership interests within Balaton from Kubbernus' four partners to Kubbernus.  This violation had been characterized by Balaton and Kubbernus in the applications as a minor violation of *pro forma* filing requirements.

**AG.    The 2009 *Pro Forma* FCC Filings**

326.    On September 8, 2009, Balaton submitted a *pro forma* application to the FCC for approval of the transfer of control in connection with the restructuring of SkyPort in the Chapter 11 case.

327.    In this application, Kubbernus and Balaton represented that Kubbernus owned 100% of the shares in Balaton.

328.    Kubbernus also represented that under the new ownership structure for SkyPort, (a) Bankton-Texas, a newly created entity, would own 66.5% of SkyPort, (b) Bankton would own 100% of Bankton-Texas and (c) "Robert Kubbernus, via Irrevocable Trust (Canada)" would own 100% of Bankton.

66

Draft - June 22, 2010

329.    On October 6, 2009 the FCC granted approval of the transfer described in this application.

330.    On October 13, 2009, Kubbernus and Balaton caused SkyPort to be merged with SkyComm, with SkyPort -- a Texas corporation -- as the survivor.   All of the former shareholders in SkyComm, except Balaton, were eliminated.

**AH.    Plaintiffs Seek Redress of their Remaining Claims against Defendants**

331.    In accordance with the Bankruptcy Court's Confirmation Order, (a) the Original Shareholders, Non-CenturyTel Debenture Holders and Additional Investors assert only direct claims against Defendants, and (b) the ClearSky Investors assert only (i) direct claims and (ii) derivative claims on behalf of ClearSky against Defendants. The ClearSky Investors assert claims against Kubbernus or Balaton relating to acts by them in the Bankruptcy since these claims are not barred.  All Plaintiffs do not assert any derivative claims on behalf of SkyComm or SkyPort.  The Plaintiffs other than the ClearSky Investors do not assert any claims against Kubbernus or Balaton relating to acts by them in the Bankruptcy proceeding.

**COUNT ONE**

**(Breach of Fiduciary Duties -- Against the CenturyTel Defendants on behalf of the Original Shareholders and Non-CenturyTel Debenture Holders)**

332.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

333.    Each of the CenturyTel Directors, as directors of SkyComm and SkyPort through November 2006, owed fiduciary duties to the shareholders of these companies; these included a duty of due care and a duty of loyalty.

67

Draft - June 22, 2010

334.   CenturyTel, as a party in control of SkyComm and SkyPort, owed fiduciary duties to the shareholders of these companies, including a duty of due care and a duty of loyalty.

335.   CenturyTel and the CenturyTel Directors breached their duties of loyalty and due care and failed to act in good faith with respect to the shareholders of SkyComm and improperly extracted economic value and voting power from the shareholders and redistributed to themselves by:

(a) causing the CEO of SkyComm to report directly to CenturyTel, thereby usurping the authority of the SkyComm and SkyPort's Board of Directors and rendering meaningless the shareholders rights to elect directors;

(b) usurping and rendering meaningless the participation of the shareholders' representatives on the SkyComm Board of Directors;

(c) not conducting proper due diligence on Kubbernus in the sale of their controlling interest in SkyComm to him;

(d) not making reasonable efforts to assure that shareholders and investors in SkyComm would not be harmed as a result of CenturyTel's disposition of its controlling interest in SkyComm;

(e) selling control of SkyComm to Kubbernus despite clear warnings of the danger that Kubbernus posed to its shareholders and investors;

(f) keeping the Non-CenturyTel Directors and shareholders in the dark regarding the sale of the CenturyTel Debentures and issuance of additional shares by SkyComm, and the negotiations leading up to it;

68

(g) failing to inform the Non-CenturyTel Directors, SkyComm shareholders and Non-CenturyTel Debenture Holders of the complete and the final terms of the transaction with Balaton;

(h) causing the Non-CenturyTel Debentures to be improperly converted;

(i) causing SkyComm to issue shares to CenturyTel and to Balaton for inadequate consideration and at below fair market value thereby diluting the economic value of plaintiffs' shares;

 (k) causing SkyComm to file illegal, false and misleading applications and statements with the FCC and the Team Telecom agencies of the United States government, as part of their effort to transfer control of SkyComm to Kubbernus;

(l) turning over control of SkyComm and SkyPort to Balaton and Kubbernus before obtaining the approval of the FCC and the Team Telecom agencies,  and without any vote by the SkyComm Board;

(m) selling control of SkyComm and SkyPort to a looter and securities fraudster in violation of the rights of SkyComm's shareholders.

336.    CenturyTel and the CenturyTel Directors knew that the shareholders of SkyComm would be harmed as a result of the transfer of control to Balaton and Kubbernus.

337.    CenturyTel and the CenturyTel Directors acted recklessly and with utter disregard for the welfare of the SkyComm shareholders by causing SkyComm to make false and misleading statements to the FCC and Team Telecom.

338.    CenturyTel and the CenturyTel Directors breached their duties of loyalty and due care and failed to act in good faith with respect to the Non-CenturyTel Debenture Holders by

Draft - June 22, 2010

permitting their debentures to be converted without fulfillment of the conditions to their conversion, by causing them to pay a much higher price for SkyComm shares than CenturyTel paid for such shares and by not disclosing to the Non-CenturyTel Debenture Holders the price which CenturyTel paid for such shares.

339.    CenturyTel and the CenturyTel Directors acted willfully, wantonly and outrageously in breaching their fiduciary duties to the shareholders of SkyComm.

340.    As a direct and proximate result of the CenturyTel Defendants' breach of the fiduciary duties owed to the Original Shareholders and the Non-CenturyTel Debenture Holders, they were personally injured and suffered the loss of the value of their investments in SkyComm believed to be in excess of $17 million.

341.    As a result of their willful, wanton and outrageous conduct, the CenturyTel Defendants should be held liable for punitive damages.

**WHEREFORE**, the Original Shareholders and the Non-CenturyTel Debenture Holders pray that the Court enter an order, judgment and decree granting the following relief against the CenturyTel Defendants:

A.    Awarding the Original Shareholders and the Non-CenturyTel Debenture Holders compensatory and consequential damages against all Defendants, jointly and severally, in a sum of not less than $17 million, together with interest thereon;

B.    Awarding the Original Shareholders and the Non-CenturyTel Debenture Holders punitive damages against Defendants, jointly and severally;

70

Draft - June 22, 2010

C.      Directing the CenturyTel Defendants, jointly and severally, to pay the Original Shareholders' and the Non-CenturyTel Debenture Holders' costs of the action, including reasonable counsel fees; and

D.      Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT TWO

### (Breach of Fiduciary Duties -- Against the Kubbernus Defendants on behalf of all Plaintiffs)

342.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

343.    Kubbernus, as a director of SkyComm and SkyPort from November 2006 on, owed fiduciary duties to the shareholders of these companies, including Plaintiffs; these included a duty of due care and a duty of loyalty.

344.    The Kubbernus Defendants, as parties in control of SkyComm and SkyPort, owed fiduciary duties to the shareholders of these companies, including Plaintiffs, including a duty of due care and a duty of loyalty.

345.    As outlined in this Petition, the Kubbernus Defendants breached their duties of loyalty and due care to the shareholders.

346.    The Kubbernus Defendants breached their duties of loyalty and due care and did not act in good faith with respect to the shareholders of SkyComm by:

(a)      depriving the shareholders of their voting rights and rights to participate in the management of SkyComm;

71

(b)      wrongfully extracting the economic value and residual voting power of Plaintiffs' shaes and redistributing such economic value and voting power to themselves as controlling shareholders;

(c)      misrepresenting to the shareholders of SkyComm that the FCC and Team Telecom approvals had been duly and properly obtained;

(d)      failing to disclose to the Non-CenturyTel Debenture Holders or the shareholders the actual terms of the transactions which closed on or about November 2, 2006;

(e)      causing the Non-CenturyTel Debentures to be improperly converted;

(f)      fraudulently diverting ClearSky's interest in SkyComm to Balaton in 2006;

(g)      failing to issue share certificates to the Additional Investors despite repeated requests that they do so;

(h)      failing to properly record all of the shareholders of SkyComm on the books and records of the corporation;

(i)      diluting the SkyComm shareholders for inadequate and/or no consideration; and

(j)      causing SkyComm to issue shares to Balaton and CenturyTel without adequate and/or no consideration.

347.    The Kubbernus Defendants acted willfully, wantonly and outrageously in breaching their fiduciary duties to the individual shareholders of SkyComm.

348.    As a direct and proximate result of the Kubbernus Defendants' breaches of the fiduciary duties owed to all Plaintiffs, they were personally injured and suffered the loss of the value of their investments in SkyComm believed to be in excess of $32 million.

349.     As a result of their willful, wanton and outrageous conduct, Defendants should be held liable for punitive damages.

**WHEREFORE**, all the Plaintiffs pray that the Court enter an order, judgment and decree granting the following relief against the Kubbernus Defendants:

A.     Awarding all Plaintiffs compensatory and consequential damages against the Kubbernus Defendants, jointly and severally, in a sum of not less than $32 million, together with interest thereon;

B.     Awarding all Plaintiffs punitive damages against the Kubbernus Defendants, jointly and severally;

C.     Directing the Kubbernus Defendants, jointly and severally, to pay all Plaintiffs' costs of the action, including reasonable counsel fees; and

D.     Granting such other, further or different relief as to the Court shall seem fair and just.

### COUNT THREE

**(Breach of Fiduciary Duties -- Against the Kubbernus Defendants and Wilson Vukelich on behalf of the ClearSky Investors)**

350.     Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

351.     The Kubbernus Defendants as parties in control of ClearSky, owed fiduciary duties to the members of ClearSky, including a duty of due care and a duty of loyalty.

352.     Wilson Vukelich invited reliance on the part of the ClearSky Investors and therefore owed a duty of due care to the ClearSky Investors.

Draft - June 22, 2010

353.   As outlined in this Petition, the Kubbernus Defendants breached their duties of loyalty and due care by not acting in the best interests of ClearSky and its members, but rather acting in bad faith and for their own personal interests.

354.   The Kubbernus Defendants breached their duties of loyalty and due care and did not act in good faith with respect to the members of ClearSky by:

(a)     failing to obtain FCC and Team Telecom approvals of ClearSky's controlling interest in SkyComm;

(b)     closing the acquisition of control of SkyComm in Balaton and not ClearSky;

(c)     fraudulently diverting ClearSky's interest in SkyComm to Balaton;

(d)     making numerous false and misleading statements to the ClearSky Investors about the status of their investments and confirming their ownership of the controlling interest in SkyComm;

(e)     diverting funds from ClearSky;

(f)     collecting unjustified and excessive fees from ClearSky;

(g)     acting to deprive the ClearSky Investors of their interests in SkyComm in 2006; and

(h)     acting exclusively in their own best interests, and not in the interests of ClearSky or its members.

355.   As outlined in this Petition, Wilson Vukelich breached their duties of due care by not acting in the best interests of ClearSky and its members, but rather acting in bad faith and for their own personal interests. Wilson Vukelich knowingly participated in the breaches of fiduciary duties committed by the Kubbernus Defendants.

74

Draft - June 22, 2010

356.     The Kubbernus Defendants and Wilson Vukelich acted willfully, wantonly and outrageously in breaching their fiduciary duties to the individual ClearSky Investors.

357.     As a direct and proximate result of the Kubbernus Defendants' and Wilson Vukelich's breaches of the fiduciary duties owed to Plaintiffs, Plaintiffs were personally injured and suffered the loss of the value of their investments in ClearSky believed to be in excess of $7 million.

358.     As a result of their willful, wanton and outrageous conduct, the Kubbernus Defendants and Wilson Vukelich should be held liable for punitive damages.

**WHEREFORE**, the ClearSky Investors pray that the Court enter an order, judgment and decree granting the following relief against the Kubbernus Defendants and Wilson Vukelich:

A.     An Order for an accounting;

B.     Awarding the ClearSky Investors compensatory and consequential damages against the Kubbernus Defendants and Wilson Vukelich, jointly and severally, in a sum of not less than $7 million, together with interest thereon;

C.     Awarding the ClearSky Investors equitable relief, including disgorgement of compensation, fees and benefits, restitution, forced buy-out of interest, or other relief as determined by the Court as necessary to do justice.

D.     Awarding the ClearSky Investors punitive damages against the Kubbernus Defendants and Wilson Vukelich, jointly and severally;

E.     Directing Kubbernus Defendants and Wilson Vukelich, jointly and severally, to pay the ClearSky Investors' costs of the action, including reasonable counsel fees; and

75

Draft - June 22, 2010

F.      Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT FOUR

### (Breach of Fiduciary Duty -- Against Wilson Vukelich
### on behalf of the ClearSky Investors)

359.    Wilson Vukelich acted as a trustee of the funds invested by the ClearSky Investors in ClearSky, and as such was in a fiduciary relationship with the ClearSky Investors and the Additional Investors.

360.    Wilson Vukelich breached the fiduciary duties it owed to the ClearSky Investors by:

(a)     failing to assure that the ClearSky Investors funds were expended in accordance with the terns of the ClearSky LPA and ClearSky IM;

(b)     failing to assure that the ClearSky Investors' funds were used to acquire good title to the interests ClearSky was entitled to in SkyComm under the ClearSky IM and the ClearSky LPA;

(c)     failing to ensure that the ClearSky Investors' funds, which it held in escrow, were properly disbursed;

(d)     allowing Kubbernus to comingle and use ClearSky Investors' funds to pay expenses that were not obligations of ClearSky;

(e)     billing ClearSky excessive legal fees and billing ClearSky for work that was not properly attributable to ClearSky and collecting the same out of the ClearSky Investor's funds; and

76

(f)     allowing Kubbernus to use its name in his various offering to give investors a false sense of assurance that their funds would be properly taken care of and invested in accordance with the undertakings and representations to investors.

361.    Wilson Vukelich acted willfully, wantonly and outrageously in breaching their fiduciary duties to the individual ClearSky Investors.

362.    As a direct and proximate result of Wilson Vukelich's breaches of the fiduciary duties owed to the ClearSky Investors, these Plaintiffs were personally injured and suffered the loss of the value of their investments in ClearSky and SkyComm believed to be in excess of $7 million.

363.    As a result of their willful, wanton and outrageous conduct, Defendants should be held liable for punitive damages.

**WHEREFORE**, the ClearSky Investors pray that the Court enter an order, judgment and decree granting the following relief against the Wilson Vukelich:

A.     An Order for an accounting with respect to the Wilson Vukelich trust account for ClearSky and all affiliated entities;

B.     Awarding the ClearSky Investors compensatory and consequential damages against Wilson Vukelich in a sum of not less than $7 million, together with interest thereon;

C.     Awarding the ClearSky Investors punitive damages against Wilson Vukelich;

D.     Directing Wilson Vukelich to pay the ClearSky Investors' costs of the action, including reasonable counsel fees; and

E.     Granting such other, further or different relief as to the Court shall seem fair and just.

Draft - June 22, 2010

## COUNT FIVE

**(Oppression -- Against the CenturyTel Defendants on behalf of the
Original Shareholders and the Non-CenturyTel Debenture Holders)**

364.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

365.    Each of the Original Shareholders is and has been a shareholder indirectly in SkyPort, a closely-held Texas corporation.

366.    Each of the Non-CenturyTel Debenture Holders had the right to convert their debentures into indirect share ownership in SkyPort.

367.    Each of the CenturyTel Defendants exercised control over SkyPort from approximately the end of 2002 through November 2, 2006.

368.    The CenturyTel Defendants had a duty not to act illegally, oppressively or fraudulently with respect to the Original Shareholders and the Non-CenturyTel Debenture Holders.

369.    Each of the CenturyTel Defendants, as a party in control of SkyPort, was prohibited from acting illegally, oppressively or fraudulently towards the shareholders, substantially defeating their reasonable expectations, acting in a burdensome, harsh or wrongful manner acting with a lack of probity and fair dealing in the company's affairs to the prejudice of the other shareholders, or visibly departing from the standards of fair dealing on which every shareholder is entitled to rely.

370.    As set forth in this Petition, each of the CenturyTel Defendants acted in an illegal, oppressive and fraudulent manner towards the Original Shareholders.

Draft - June 22, 2010

371.    Each of the CenturyTel Defendants acted to frustrate the reasonable expectations of the Original Shareholders.

372.    Each of the CenturyTel Defendants acted in a burdensome, harsh, and wrongful manner, characterized by a lack of probity and fair dealing in company's affairs to the prejudice of the Original Shareholders.

373.    Each of the CenturyTel Defendants acted in a manner that was a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

374.    The CenturyTel Defendants acted to deprive the Original Shareholders and Non-CenturyTel Debenture Holders of the benefits and rights associated with their stock ownership and entitlements in SkyPort and their participation in SkyPort's affairs, took benefits for CenturyTel to the exclusion of the other shareholders, wasted corporate assets and converted for their own benefit to the detriment of the other shareholders.

375.    As a direct result of CenturyTel Defendants' oppressive conduct, the Original Shareholders and Non-CenturyTel Debenture Holders have lost the full value of their interests in SkyPort.

376.    Plaintiffs have no adequate remedy at law.

**WHEREFORE**, the Original Shareholders and the Non-CenturyTel Debenture Holders pray that the Court enter an order, judgment and decree granting the following relief against the CenturyTel Defendants:

Draft - June 22, 2010

A.     Awarding Original Shareholders and the Non-CenturyTel Debenture Holders compensatory and consequential damages against the CenturyTel Defendants, jointly and severally, in a sum of not less than $17 million, together with interest thereon;

B.     Awarding the Original Shareholders and the Non-CenturyTel Debenture Holders punitive damages against the CenturyTel Defendants, jointly and severally;

C.     Directing the CenturyTel Defendants, jointly and severally, to pay the Original Shareholders' and Non-CenturyTel Debenture Holders' costs of the action, including reasonable counsel fees; and

D.     Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT SIX

### (Oppression -- Against the Kubbernus Defendants on behalf of All Plaintiffs)

377.     Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

378.     Each of the Plaintiffs was a holder of an indirect holder of an equity interest in SkyPort, a closely-held Texas corporation.

379.     Each of the Kubbernus Defendants exercised control over SkyPort from approximately February 2006 through the date of this Petition.

380.     The Kubbernus Defendants had a direct duty not to act illegally, oppressively or fraudulently with respect to the Plaintiffs.

381.     Each of the Kubbernus Defendants, as a party in control of SkyPort, was prohibited from acting illegally, oppressively or fraudulently towards the indirect shareholders in SkyPort, including Plaintiffs, substantially defeating their reasonable expectations, acting in a

Draft - June 22, 2010

burdensome, harsh or wrongful manner acting with a lack of probity and fair dealing in the company's affairs to the prejudice of the other shareholders, including Plaintiffs, or visibly departing from the standards of fair dealing on which every shareholders is entitled to rely.

382.    Each of the Kubbernus Defendants acted in an illegal, oppressive and fraudulent manner towards Plaintiffs.

383.    Each of the Kubbernus Defendants acted to frustrate the reasonable expectations of Plaintiffs.

384.    Each of the Kubbernus Defendants acted in a burdensome, harsh, and wrongful manner, characterized by a lack of probity and fair dealing in company's affairs to the prejudice of Plaintiffs.

385.    Each of the Kubbernus Defendants acted in a manner that was a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

386.    The Kubbernus Defendants acted to deprive Plaintiffs of the benefits and rights associated with their indirect stock ownership in SkyPort and their participation in SkyPort's affairs, took benefits for Balaton and Kubbernus to the exclusion of the other shareholders, including Plaintiffs, wasted corporate assets, and converted for their own benefit to the detriment of the other shareholders, including Plaintiffs.

387.    As a direct result of the Kubbernus Defendants' oppressive conduct, Plaintiffs were harmed in an amount equal to the full value of their interests in SkyPort.

388.    Plaintiffs have no adequate remedy at law.

81

**WHEREFORE**, all Plaintiffs pray that the Court enter an order, judgment and decree granting the following relief against the Kubbernus Defendants:

A.      Awarding all Plaintiffs compensatory and consequential damages against the Kubbernus Defendants, jointly and severally, in a sum of not less than $32 million, together with interest thereon;

B.      Awarding all Plaintiffs punitive damages against the Kubbernus Defendants, jointly and severally;

C.      Directing the Kubbernus Defendants, jointly and severally, to pay all Plaintiffs' costs of the action, including reasonable counsel fees; and

D.      Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT SEVEN

### (Common Law Fraud -- Against all Defendants on behalf of All Plaintiffs)

389.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

390.    As described herein, Defendants made and caused to be made numerous material misrepresentations which at the time they were made, they knew were false and/or were made recklessly without knowledge of the truth.  Such statements were made with the intent that they be relied upon, which were in fact relied upon and which caused injury to Plaintiffs.

391.    Defendants, as persons in control of SkyComm and SkyPort had fiduciary duties to Plaintiffs, as shareholders of these companies.

392.    As described herein, Defendants concealed or failed to disclose material facts they knew Plaintiffs were ignorant of and intended to induce them to take certain acts or refrain from

82

Draft - June 22, 2010

taking certain acts by concealing or failing to disclose such facts. Plaintiffs suffered damages as a result of acting or refraining to act as a result of such non-disclosure.

**A.**     **Non-disclosure of Material Facts re FCC and Team Telecom Approvals**

393.     Defendants failed to disclose to Plaintiffs that the approvals of the transfer of control by the FCC and Team Telecom Agencies were obtained through materially false and misleading statements to the FCC and Team Telecom Agencies, as described above. This non-disclosure was material and intended to induce Plaintiffs to invest in and/or maintain their investments in SkyComm.

394.     Plaintiffs did invest in SkyComm and/or refrain from disposing of their interests in SkyComm as a direct result of such non-disclosures and suffered damage as a result thereof.

395.     The Non-CenturyTel Debenture Holders were induced to permit the conversion of their debentures as a result thereof. The ClearSky Investors and Additional Investors were induced to invest in ClearSky and SkyComm respectively, as a result.  The Original Shareholders were induced not to sell their shares in SkyComm as a result. All relied upon such statements to their financial injury.

**B.**     **Misrepresentations to the ClearSky Investors**

396.     The Kubbernus Defendants, together with Wilson Vukelich, made numerous false and misleading representations and statements to the ClearSky Investors, with the intent that the . ClearSky Investors rely upon them. Such statements were made to induce the ClearSky Investors to invest in ClearSky. The ClearSky Investors did in fact rely upon such representations in deciding to invest in ClearSky and suffered financial injury as a result. Among these false representations were that:

Draft - June 22, 2010

(a)     ClearSky would acquire 133,000,000 shares in SkyComm, at a purchase price of $0.03 per share plus warrants and an additional 133,000,000 shares in SkyComm for a total investment of $4 million;

(b)     ClearSky would acquire the CenturyTel Debentures, then in the face amount of $20,596,000, for a purchase price of $3 million, and then convert them into 108,000,000 shares of SkyComm;

(c)     all told, ClearSky would, upon completion of these transactions, own 76% of SkyComm;

(d)     the Kubbernus Defendants would obtain approval from the FCC of ClearSky as the party in control of SkyPort; and

(e)     the proceeds of the offering would be used only for ClearSky's purposes and benefit.

397.    The Kubbernus Defendants and Wilson Vukelich failed to disclose to the ClearSky Investors numerous material facts that were necessary to be disclosed to make the disclosures to them not misleading; they did so in order to induce the ClearSky Investors to invest in ClearSky and the ClearSky Investors suffered financial injury as a result.  Among these material non-disclosures were that:

(a)     the applications to the FCC and Team Telecom had been made in the name of Balaton, and not ClearSky and/or that appropriate filings would be made to reflect ClearSky's and the ClearSky Investors interests;

(b)     the closing of title to the controlling interest in SkyComm had been made to Balaton and not to ClearSky;

Draft - June 22, 2010

(c)     Kubbernus was then involved in litigation with True Star Petroleum alleging fraud; and

(d)     Kubbernus had recently been CEO of JAWS, a company that went out of business and resulted in shareholder litigation.

## C.     Misrepresentations to the Additional Investors

398.    The Kubbernus Defendants, together with Wilson Vukelich, made numerous false and misleading representations and statements to the Additional Investors, with the intent that the Additional Investors rely upon them. Such statements were made to induce the Additional Investors to invest in SkyComm. The Additional Investors did in fact rely upon such representations in deciding to invest in SkyComm and suffered financial injury as a result. Among these false representations were that the Kubbernus Defendants and Wilson Vukelich made to the Additional Investors were that:

(a)     FCC and Team Telecom approval of the transfer of ownership to the "new majority owner" had been duly obtained; and

(b)     the proceeds of the offering would be used only for SkyComm's purposes and benefits;

399.    The Kubbernus Defendants and Wilson Vukelich failed to disclose to the ClearSky Investors numerous material facts that were necessary to be disclosed to make the disclosures to them not misleading; they did so in order to induce the ClearSky Investors to invest in ClearSky, and the ClearSky Investors suffered financial injury as a result. Among these material non-disclosures were that:

(a)     ClearSky was the rightful owner of the majority of SkyComm's shares;

85

Draft - June 22, 2010

(b)      Balaton and not SkyComm, owed CenturyTel $3 million in payment for the CenturyTel Debentures;

(c)      Kubbernus had been sued for failing to deliver shares, fraud upon shareholders and looting;

(d)      the company Kubbernus had most recently been CEO of JAWS, had gone out of business and was the subject of shareholder litigation;  and

(e)      Pouliot, who was listed as a director, actually owned more than 35% of the equity in SkyComm through his company, Draco.

400.    The Additional Investors justifiably relied on such statements to their detriment. Had the Additional Investors known the truth regarding such representation, they would never have invested in SkyComm.

**D.      The CenturyTel Defendants' Participation**

401.    The CenturyTel Defendants, with intent to deceive or defraud and with reckless disregard for the truth or the law worked jointly with, conspired with and assisted Kubbernus and Balaton in perpetrating their fraudulent scheme.

402.    The CenturyTel Defendants worked jointly with, conspired with and assisted Kubbernus and Balaton in their fraudulent schemes and misrepresentations, by not disclosing and assisting the Kubbernus Defendants in not disclosing:

(a) the filing  of fraudulent statements with the FCC and Team Telecom agencies;

(b) the obtaining of FCC and Team Telecom approvals of the transfer of control to Balaton based upon such false statements;

(c) that the FCC and Team Telecom approvals had not been duly and properly obtained;

86

Draft - June 22, 2010

(d) that SkyPort was operating with licenses that were improperly obtained and which were at a material risk of being terminated upon the FCC's and Team Telecom's learning of the falsity of the information supplied to them;

(e) that the controlling interest in SkyPort had been transferred to Balaton and not to ClearSky;

(f) that CenturyTel had accepted shares in SkyComm in return for debt that was not properly SkyComm's; and

(g) that the CenturyTel Debentures had not been converted.

403.    The CenturyTel Defendants worked jointly with, conspired with and assisted Kubbernus and Balaton in their fraudulent schemes and misrepresentations by permitting its participation as a shareholder in SkyComm to be used as an endorsement of Balaton and Kubbernus

## E.    Reliance and Injury

404.    Plaintiffs reasonably relied upon these representations to their detriment.

405.    As a result of such reliance, Plaintiffs suffered financial injury equal to the value of their entire investments in SkyComm and/or ClearSky.

406.    The Defendants acted willfully, wantonly and outrageously in breaching their fiduciary duties to the individual shareholders of SkyComm.

407.    Defendants' actions were taken jointly, severally, and in conspiracy with each other.

87

Draft - June 22, 2010

408. As a direct and proximate result of the aforesaid fraudulent, malicious and oppressive conducts of the defendants, Plaintiffs lost the value of their investments in SkyComm believed to be in excess of $32 million.

409. As a result of their willful, wanton and outrageous conduct, Defendants should be held liable for punitive damages.

**WHEREFORE**, all Plaintiffs pray that the Court enter an order, judgment and decree granting the following relief against all Defendants:

A. Awarding all Plaintiffs compensatory and consequential damages against all Defendants, jointly and severally, in a sum of not less than $32 million, together with interest thereon;

B. Awarding all Plaintiffs punitive damages against all Defendants, jointly and severally;

C. Directing all Defendants, jointly and severally, to pay all Plaintiffs' costs of the action, including reasonable counsel fees; and

D. Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT EIGHT

**(Breach of Duty of Care; Negligence -- Against the CenturyTel Defendants on behalf of the ClearSky Investors and the Additional Investors)**

410. The CenturyTel Defendants owed a duty to those that might foreseeably be harmed by their actions to take such steps as a reasonably prudent person would take in similar circumstances to avoid such harm to others.

88

Draft - June 22, 2010

411.    As previously stated, the CenturyTel Defendants were under a heightened duty of care because of the many danger signs concerning Kubbernus, including that:

(a) Kubbernus had been accused on more than one occasion of being a stock fraudster and corporate looter;

(b) Kubbernus was not using his own funds to close the acquisition of control of SkyPort; but rather was relying exclusively on funds raised from investors;

(c) Kubbernus was not being truthful with the FCC and Team Telecom;

(d) Kubbernus was not being truthful with his own investors;

(e) Kubbernus was willing to issue SkyComm shares to pay obligations that were not SkyComm's, but rather CenturyTel's or Balaton's; and

(f) Kubbernus was willing to fraudulently convert Balaton debt into SkyComm debt.

412.    The CenturyTel Defendants were obligated to take reasonably prudent steps to assure that control of SkyComm would not be delivered to a stock fraudster and looter.

413.    The CenturyTel Defendants knew that Kubbernus and Balaton were actively selling direct and indirect ownership interests in SkyComm to the ClearSky Investors and the Additional Investors, and it was foreseeable that ClearSky Investors and the Additional Investors would be hurt by the sale of control of SkyComm to a stock fraudster and looter.

414.    The CenturyTel Defendants failed to take any reasonably prudent steps to prevent harm to the ClearSky Investors and the Additional Investors in connection with the CenturyTel Defendants' sale of control of SkyComm to Balaton and Kubbernus.

415.    The CenturyTel Defendants were guilty of gross negligence in that they acted with wanton disregard for the interests of the ClearSky Investors and the Additional Investors.

89

416.     As a result of their willful, wanton and outrageous conduct, Defendants should be held liable for punitive damages.

417.     The ClearSky Investors and the Additional Investors were in fact hurt by CenturyTel's acts and lost their entire investments in SkyComm thought to be in excess of $15 million.

**WHEREFORE**, the ClearSky Investors and the Additional Investors pray that the Court enter an order, judgment and decree granting the following relief against the CenturyTel Defendants:

A.     Awarding the ClearSky Investors and the Additional Investors compensatory and consequential damages against all the CenturyTel Defendants, jointly and severally, in a sum of not less than $15 million, together with interest thereon;

B.     Awarding the ClearSky Investors and the Additional Investors punitive damages against the CenturyTel Defendants, jointly and severally;

C.     Directing the CenturyTel Defendants, jointly and severally, to pay the ClearSky Investors' and the Additional Investors' costs of the action, including reasonable counsel fees; and

D.     Granting such other, further or different relief as to the Court shall seem fair and just.

### COUNT NINE

**(Negligent Misrepresentation -- Against the CenturyTel Defendants
on Behalf of All Plaintiffs)**

418.     Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

90

419.     As described in this Petition, the CenturyTel Defendants made and caused to be made numerous material misrepresentations with the intent that they be relied upon.

420.     The CenturyTel Defendants did not exercise reasonable care or competence in obtaining or communicating this information to Plaintiffs.

421.     As set forth in this Petition, the CenturyTel Defendants had actual knowledge that the Original Shareholders, Non-CenturyTel Debenture Holders, ClearSky Investors and Additional Investors would rely on such false and misleading statements.

422.     As set forth in this petition, the Original Shareholders, Non-CenturyTel Debenture Holders, ClearSky Investors and Additional Investors justifiably relied on such statements to their detriment.

423.     As a result of such reliance, Plaintiffs suffered financial injury equal to the value of their entire investments in SkyComm.

424.     The Defendants acted willfully, wantonly and outrageously in breaching their fiduciary duties to the individual shareholders of SkyComm.

425.     The Defendants' actions were taken jointly, severally, and in conspiracy with each other.

426.     As a direct and proximate result of the aforesaid misrepresentations and omissions, Plaintiffs suffered the loss of the value of their investments in SkyComm believed to be in excess of $32 million.

427.     As a result of their willful, wanton and outrageous conduct, the CenturyTel Defendants should be held liable for punitive damages.

Draft - June 22, 2010

**WHEREFORE**, all Plaintiffs pray that the Court enter an order, judgment and decree granting the following relief against the CenturyTel Defendants:

A.    Awarding all Plaintiffs compensatory and consequential damages against the CenturyTel Defendants, jointly and severally, in a sum of not less than $32 million, together with interest thereon;

B.    Awarding all Plaintiffs punitive damages against the CenturyTel Defendants, jointly and severally;

C.    Directing the CenturyTel Defendants, jointly and severally, to pay all Plaintiffs' costs of the action, including reasonable counsel fees; and

D.    Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT TEN

**(Violations of the Texas Securities Act -- Against all Defendants on Behalf of the Non-CenturyTel Debenture Holders, ClearSky Investors, and Additional Investors)**

428.    Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

429.    SkyComm is an issuer of securities in the State of Texas.

430.    The Kubbernus Defendants offered for sale and sold securities from within the State of Texas.

431.    CenturyTel, the CenturyTel Directors and Wilson Vukelich aided and abetted the sale of securities of SkyComm and ClearSky from the State of Texas.

432.    As described herein, the Kubbernus Defendants violated the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-33A(2) and Tex. Rev. Civ. Stat. Ann. Art. 581-33F(2), by

Draft - June 22, 2010

offering and selling securities in SkyComm, and as controlling persons of SkyComm, by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading,

433.    As described herein, the CenturyTel Defendants and Wilson Vukelich violated the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-33F(2), by directly or indirectly, with intent to deceive or defraud and with reckless disregard for the truth or the law aided and gave substantial assistance in the issuance of securities by SkyComm and sale of such securities by Balaton and Kubbernus in the State of Texas.

434.    As set forth in this Petition, the CenturyTel Defendants and Wilson Vukelich were fully aware of the Kubbernus Defendants' improper activities and of their role in the fraudulent scheme and acts.

435.    The CenturyTel Defendants and Wilson Vukelich rendered assistance to Balaton and Kubbernus in the face of a perceived risk that its assistance would facilitate untruthfulness and illegal activity by the Kubbernus Defendants.

436.    The CenturyTel Defendants and Wilson Vukelich intended to deceive the Non-CenturyTel Debenture Holders, ClearSky Investors, and Additional Investors and/or acted with reckless disregard for the truth of the Kubbernus Defendants' misrepresentations.

437.    Defendants acted willfully, wantonly, recklessly and outrageously.

438.    Defendants' actions were taken jointly, severally, and in conspiracy with each other.

93

Draft - June 22, 2010

439.     As a direct and proximate result of the aforesaid violation of the Texas Securities Act, Plaintiffs lost the value of their investments in SkyComm believed to be in excess of $17 million.

440.     As a result of their willful, wanton and outrageous conduct, all Defendants should be held liable for punitive damages.

**WHEREFORE**, the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors pray that the Court enter an order, judgment and decree granting the following relief against all Defendants:

A.     Awarding the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors compensatory and consequential damages against all Defendants, jointly and severally, in a sum of not less than $17 million, together with interest thereon;

B.     Awarding the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors punitive damages against all Defendants, jointly and severally;

C.     Directing all Defendants, jointly and severally, to pay the Non-CenturyTel Debenture Holders', the ClearSky Investors' and the Additional Investors' costs of the action, including reasonable counsel fees; and

D.     Granting such other, further or different relief as to the Court shall seem fair and just.

**COUNT ELEVEN**

**(Violations of Texas Business and Commerce Code 27.01 -- Against
all Defendants on Behalf of the Non-CenturyTel Debenture Holders,
ClearSky Investors and Additional Investors)**

441.     Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

Draft - June 22, 2010

442.    Defendants violated Texas Business and Commerce Code 27.01(b) by making and causing to be made, numerous false representations of material facts described above to the Non-CenturyTel Debenture Holders for the purpose of inducing them to convert their debentures into shares of SkyComm.

443.    Defendants violated Texas Business and Commerce Code 27.01(c) by having actual awareness of the falsity of such statements.

444.    The Kubbernus Defendants violated Texas Business and Commerce Code 27.01(b) by making and causing to be made, numerous false representations of material facts described above to the ClearSky Investors and the Additional Investors for the purpose of inducing them to purchase shares in ClearSky and SkyComm, respectively.

445.    The Kubbernus Defendants violated Texas Business and Commerce Code 27.01(c) by having actual awareness of the falsity of such statements.

446.    The CenturyTel Defendants and Wilson Vukelich violated Texas Business and Commerce Code 27.01(d) in that they had actual awareness of the falsity of the representations made or caused to be made by the Kubbernus Defendants and failed to disclose the falsity of such representations to the shareholders and investors in SkyComm.

447.    The CenturyTel Defendants benefited from such false representations in that they were able to divest CenturyTel of its interest in SkyComm and to receive consideration therefore.

448.    Wilson Vukelich benefited from such false representations as they were able to derive substantial fees from these transactions and were able to collect other fees that the Kubbernus Defendants owed them for work unrelated to these transactions.

Draft - June 22, 2010

449.    Such misrepresentations included numerous materially false and misleading statements to the FCC and Team Telecom agencies described above, which were made in order to induce their approval of the transfer to Balaton, knowing and having reason to expect that such approvals would be relied upon by the shareholders and investors in SkyComm.

450.    Such representations included numerous false and misleading statements to the shareholders and investors in SkyComm and ClearSky described above, including without limitation that (a) SkyPort was in compliance with all FCC and other governmental requirements for the transfer of control to Balaton and Kubbernus, (b) the FCC and Team Telecom approvals of such transfer of control to Balaton were obtained lawfully and in compliance with FCC and Team Telecom rules and regulations, (c) all of the CenturyTel Debentures would be converted into shares, and (d) all of the CenturyTel Debentures were in fact converted into shares.

451.    The Non-CenturyTel Debenture Holders justifiably relied on such statements to their detriment.  Had the Non-CenturyTel Debenture Holders known that the approval of the transfer of the SkyPort FCC licenses had been obtained through fraudulent misrepresentations, they never have converted their debentures to shares in SkyComm.

452.    The ClearSky Investors and the Additional Investors justifiably relied on such statements to their detriment.  Had such investors known that the approval of the transfer of the SkyPort FCC licenses had been obtained through fraudulent misrepresentations, they would never have agreed to purchase shares in ClearSky and SkyComm, respectively.

453.    As a direct and proximate result of the aforesaid violation of Texas Business and Commerce Code 27.01, Plaintiffs suffered financial injury equal to the value of their investments in SkyComm believed to be in excess of $17 million.

454.    As a result of their willful, wanton and outrageous conduct, all Defendants should be held liable for punitive damages.

**WHEREFORE**, the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors pray that the Court enter an order, judgment and decree granting the following relief against all Defendants:

A.    Awarding the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors compensatory and consequential damages against all Defendants, jointly and severally, in a sum of not less than $17 million, together with interest thereon;

B.    Awarding the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors punitive damages against all Defendants, jointly and severally;

C.    Directing all Defendants, jointly and severally, to pay the Non-CenturyTel Debenture Holders, the ClearSky Investors and the Additional Investors costs of the action, including reasonable counsel fees; and

D.    Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT TWELVE

### (Civil Conspiracy -- Against all Defendants on Behalf of All Plaintiffs)

455.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

456.    Defendants conspired among themselves for CenturyTel, the CenturyTel Directors, Balaton and Kubbernus and Wilson Vukelich to defraud the SkyComm shareholders and investors, to breach their respective fiduciary duties to Plaintiffs and to oppress Plaintiffs and to deprive them of their ownership and participation in SkyComm.

Draft - June 22, 2010

457.     Defendants conspired among themselves to transfer control of SkyComm without prior notice to or approval of the FCC, to make false and misleading statements in applications and filings to the FCC and Team Telecom, and to operate the teleport without proper licenses and without required disclosures of transfers of ownership and control.

458.     As a direct and proximate result of such the above-mentioned conduct, Plaintiffs, as shareholders in SkyComm, suffered pecuniary loss believed to be in excess of $32 million.

**WHEREFORE**, all Plaintiffs pray that the Court enter an order, judgment and decree granting the following relief against all Defendants:

A.     Awarding all Plaintiffs compensatory and consequential damages against all Defendants, jointly and severally, in a sum of not less than $32 million, together with interest thereon;

B.     Awarding all Plaintiffs punitive damages against all Defendants, jointly and severally;

C.     Directing all Defendants, jointly and severally, to pay all Plaintiffs' costs of the action, including reasonable counsel fees; and

D.     Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT THIRTEEN

**(Aiding and Abetting -- Against the CenturyTel Defendants on Behalf of All Plaintiffs)**

459.     Plaintiffs reallege the above paragraphs as if fully set forth herein.

460.     The CenturyTel Defendants were aware of the fiduciary relationship of the Kubbernus Defendants to the ClearSky Investors and the Additional Investors and they were

98

Draft - June 22, 2010

aware of the fiduciary relationship of the Kubbernus Defendants to all of the shareholders of SkyComm after their transfer of control of SkyComm to Balaton and Kubbernus.

461.    The CenturyTel Defendants knew of the Kubbernus Defendants' breaches of their fiduciary duties to Plaintiffs and knowingly participated in, aided and abetted such breaches by giving substantial assistance to the Kubbernus Defendants.

462.    Specifically, the CenturyTel Defendants participated in, aided and abetted the Kubbernus Defendants in their fraudulent activities, including (a) the making of false and misleading representations to the ClearSky Investors and the Additional Investors about the due proper obtaining of the FCC and Team telecom approvals; (b) making false and misleading statements to the Non-CenturyTel Debenture Holders and permitting the conversion of their debentures into shares even though the conditions for such a conversion had not been met.  (c) permitting Kubbernus to convert the CenturyTel Debentures, or most of them, into shares, without paying for them, thereby diluting plaintiffs, (d) failing to disclose to shareholders or the Non-CenturyTel Directors what had actually occurred and what had closed at the closing on November 2, 2006; and (e) permitting Kubbernus and Balaton to represent CenturyTel as endorsing their efforts on SkyComm.

463.    As a proximate result of the assistance and support of the CenturyTel Defendants to the Kubbernus Defendants in the Kubbernus Defendants' breach of fiduciary duties and fraud, Plaintiffs suffered pecuniary loss believed to be in excess of $32 million.

**WHEREFORE**, all Plaintiffs pray that the Court enter an order, judgment and decree granting the following relief against the CenturyTel Defendants:

99

A.      Awarding all Plaintiffs compensatory and consequential damages against the CenturyTel Defendants and Wilson Vukelich, jointly and severally, in a sum of not less than $32 million, together with interest thereon;

B.      Awarding all Plaintiffs punitive damages against the CenturyTel Defendants and Wilson Vukelich, jointly and severally;

C.      Directing the CenturyTel Defendants, jointly and severally, to pay all Plaintiffs' costs of the action, including reasonable counsel fees; and

D.      Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT FOURTEEN

**(Breach of Contract and Rescission -- Against the Kubbernus Defendants
on Behalf of the ClearSky Investors and the Additional Investors)**

464.    The Kubbernus Defendants had contractual obligations to the ClearSky Investors pursuant to the ClearSky LPA, ClearSky IM and pursuant to other representations and undertakings by the Kubbernus Defendants.

465.    The Kubbernus Defendants had a contractual obligation to cause ClearSky to acquire the controlling interest in SkyComm, with the Kubbernus Defendants receiving 30% of ClearSky's interest.

466.    ClearSky did not acquire such interest.

467.    As a result, the Kubbernus Defendants breached their contractual obligations to the ClearSky Investors and the ClearSky Investors are entitled to the return of their investments in ClearSky.

Draft - June 22, 2010

468.    Kubbernus has taken the position that contractually, the Kubbernus Defendants were not required to cause the controlling interest in SkyComm to be acquired by ClearSky unless Kubbernus raised $10 million in ClearSky.

469.    If Kubbernus is correct in this assertion, then the Kubbernus Defendants are contractually obligated to return all of the proceeds of the offering to the ClearSky Investors, and the contract between the Kubbernus Defendants and the ClearSky Investors should be rescinded.

470.    The Kubbernus Defendants failed to issue share certificates to the Additional Investors despite repeated demands therefore.

471.    Thus, the Kubbernus Defendants are obligated under implied contract and under law to return all of the proceeds of the offering to the Additional Investors, and the contract between the Kubbernus Defendants and the Additional Investors should be rescinded.

472.    Accordingly, the ClearSky Investors are entitled to the return of their capital contributions to ClearSky in the sum of approximately $7 million and the Additional Investors are entitled to the return of their capital contributions to SkyComm in the sum of approximately $8 million.

473.    As a result of their willful, wanton and outrageous conduct, the Kubbernus Defendants should be held liable for punitive damages.

**WHEREFORE**, the ClearSky Investors and the Additional Investors pray that the Court enter an order, judgment and decree granting the following relief against the Kubbernus Defendants:

Draft - June 22, 2010

A.      Awarding the ClearSky Investors and the Additional Investors compensatory and consequential damages against the Kubbernus Defendants, jointly and severally, in a sum of not less than $15 million, together with interest thereon;

B.      Awarding the ClearSky Investors and the Additional Investors punitive damages against the Kubbernus Defendants, jointly and severally;

C.      Directing the Kubbernus Defendants, jointly and severally, to pay the ClearSky Investors' and the Additional Investors' costs of the action, including reasonable counsel fees; and

D.      Granting such other, further or different relief as to the Court shall seem fair and just.

## COUNT FIFTEEN

**(Breach of Fiduciary Duty and Malpractice -- Against Wilson Vukelich and the Kubbernus Defendants Brought by the ClearSky Investors Derivatively on Behalf of ClearSky)**

474.    The ClearSky Investors owned interests in ClearSky at the time the wrongs complained of below occurred and continue to own interests in ClearSky as of the filing of this Petition.  The ClearSky Investors will fairly and adequately represent the interests of ClearSky and its members in enforcing ClearSky's rights in this action.

475.    As alleged above, Wilson Vukelich violated its fiduciary and professional duties to ClearSky by charging excessive fees to ClearSky, charging ClearSky for work not performed for ClearSky, permitting the misapplication and comingling of ClearSky funds, failing to assure that ClearSky obtained title to the interests in SkyComm and representing Balaton in taking title to such interests.

102

Draft - June 22, 2010

476.    As alleged above, the Kubbernus Defendants violated their fiduciary and contractual duties to ClearSky by taking title in Balaton to the interests in SkyComm to which ClearSky was entitled, and misapplying and misappropriating funds from ClearSky.

477.    As a direct and proximate result of the Wilson Vukelich's failure to perform its professional and fiduciary obligations and of the Kubbernus Defendants' violations of their fiduciary and contractual duties, ClearSky has sustained significant damages, for which such Defendants are liable.

478.    The ClearSky Investors have not made demand on ClearSky Management, the general partner of ClearSky, to bring this claim against the Kubbernus Defendants and Wilson Vukelich.  Such demand would be a futile because ClearSky Management is a wholly-owned subsidiary of Balaton and is managed by Kubbernus as its sole Director; Balaton and Kubbernus would not cause ClearSky to bring suit against themselves or against the law firm which allowed them to deprive ClearSky of its right to title of the shares in SkyComm it was lawfully entitled to receive.

**WHEREFORE**, the ClearSky Investors pray that the Court enter an order, judgment and decree granting the following relief against the Wilson Vukelich and the Kubbernus Defendants:

A.    Awarding ClearSky compensatory and consequential damages against Wilson Vukelich and the Kubbernus Defendants, jointly and severally, in a sum of not less than $15 million, together with interest thereon;

B.    Awarding ClearSky punitive damages against the Wilson Vukelich and the Kubbernus Defendants, jointly and severally;

103

C.      Directing Wilson Vukelich. and the Kubbernus Defendants, jointly and severally, to pay ClearSky's costs of the action, including reasonable counsel fees; and

D.      Granting such other, further or different relief as to the Court shall seem fair and just.

## JURY DEMAND

479.    As permitted by Rule 216 of the Texas Rules of Civil Procedure, Plaintiffs demand trial by jury of all issues so triable.  Plaintiffs have deposited with the District Clerk the required jury fee.

## REQUEST FOR DISCLOSURE

480.    Pursuant to Rule 194, each Defendant served with this Petition is requested to disclose, within 50 days of service, the information or material described in Rule 194.2.

## REQUEST FOR PRODUCTION OF DOCUMENTS

481.    Pursuant to Rule 196, each Defendant served with this Petition is requested to produce documents within 50 days of service, as directed below:

**Definitions**

As used in these interrogatories, the following terms have the following meanings:

1.      "Defendants" collectively means Clarence Marshall, R. Stewart Ewing, Jr., Michael E. Maslowski, Harvey P. Perry, CenturyTel, Inc. (a/k/a CenturyLink), Balaton Group, Inc., Bankton Financial Corporation, Bankton Financial Corporation, LLC, ClearSky Management, Inc., Robert Kubbernus and Wilson Vukelich, LLP.
2.      "Communication" means any oral or written communication of which the Defendant has knowledge, information, or belief.
3.      "Document" or "documents" means " means any written, typed, printed, recorded or graphic matter, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation all correspondence, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), telegrams, telexes, messages (including, but not limited to reports of telephone

conversations and conferences), studies, books, periodicals, magazines, booklets, circulars, bulletins, instructions, papers, files, minutes, other communications (including, but not limited to, inter and intra office communications), questionnaires, contracts, memoranda or agreements, assignments, licenses, ledgers, books of account, orders, invoices, statements, bills, checks, vouchers, notebooks, receipts, acknowledgments, data processing cards, computer-generated matter, photographs, photographic negatives, phonograph records, tape recordings, wire recordings, other mechanical recordings, transcripts or logs of any such recordings, all other data compilations from which information can be obtained, or translated if necessary, and any other tangible thing of a similar nature.

4.      "Refer or relate to" when used with respect to a given subject, means any document that constitutes, contains, evidences, identifies, refers to, deals with, communicates with, comments on, responds to, describes or is in any way pertinent to that subject, including, without limitation, documents concerning the presentation or existence of other documents.

5.      "Possession, custody or control" means documents within Defendant's possession, custody or control, including documents within the possession, custody and control of Defendant's agents, auditors, employees, representatives or attorneys; documents that Defendant has a legal right to obtain; and documents that Defendant has placed in the temporary possession, custody or control of any third party.

6.      Whenever a party is named in these document requests, the reference shall mean to include any and all officers, employees, agents, servants, attorneys, and representatives of such party.  For example, a request for all documents relating to "SkyComm" shall mean all documents relating to "SkyComm,  or any of its, officers, employees, agents, servants, attorneys, or representatives."

**Instructions**

A.      This Request for Production is served on you pursuant to Texas Rule of Civil Procedure 196.  You must respond to each request separately, fully and in writing and provide the responses to Plaintiffs' counsel within fifty (50) days after this Request for Production is served on you.

B.      You must state, with respect to each item or category of items in the request, any objection to the particular document or category of items, and either (1) that production, inspection, or other requested action will be permitted as requested; (2) that the requested items are being served with the response; (3) that production, inspection, or other requested action will take place at a specified time and place, if you are objecting to the time and place of production; or (4) that no items have been identified -- after a diligent search -- that are responsive to the request.

C.      You must produce the requested documents that are within your possession, custody and control for inspection and copying at the offices of Fryar Law Firm P.C., 1001 Texas Ave., Suite 1400, Houston, Texas 77002, no later than 5:00 p.m. on the first business day following the 50th day after service, unless otherwise agreed in writing.

Draft - June 22, 2010

D.     Your responses should be typed or handwritten in the space provided.  If a response requires more space, please attach an additional page and identify that response by the request number.

E.     You are required to apply due diligence in seeking out the documents and things requested.  The answer that you have no knowledge of the matter requested is only appropriate after reasonable efforts by you to obtain the requested information.

F.     Magnetically or electronically stored data must be produced in Microsoft Word or searchable PDF format.

G.     Each request to identify or produce a document or documents shall be deemed to call for the identification or production of the original document or documents to the extent that they are in or subject to, directly or indirectly, the control of the party to whom these interrogatories are addressed.  In addition, each request should be considered as including a request for separate identification or production of all copies and, to the extent applicable, preliminary drafts of documents that differ in any respect from the original or final draft or from each other (e.g., by reason of differences in form or content or by reason of handwritten notes or comments having been added to one copy of a document but not on the original or other copies thereof).

**Request for Production**

1.     Any and all documents of any of the Defendants or of SkyComm, SkyPort, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada, or Lavell-US relating to the subject matter of this action, including with respect to SkyComm, SkyPort, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US all (a) offering documents, (b) business analyses, (c) business plans, (d) financial reports, (e) projections, (f) valuation reports or appraisals, whether formal or informal, (g) documents which relate to or mention a value for SkyComm, SkyPort, Watershed Funds, ClearSky, Lavell-Canada or Lavell-US, or of any interest in any of the foregoing and (h) documents relating to or to or from equity owners, investors, lenders, placement agents, underwriters finders or other investment intermediaries, or prospective investors, lenders, placement agents, underwriters finders or other investment intermediaries, (i) payroll and other records regarding employees or consultants, (j) documents relating to transactions among SkyComm, SkyPort, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, or (k) documents relating to the purchase or sale, or offer of purchase or sale, of any equipment or other assets by SkyComm or SkyPort.

RESPONSE:


2.     Any and all documents of any of the Defendants or of SkyComm, SkyPort, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada, or Lavell-US relating to the subject matter of this action, including with respect to SkyComm or SkyPort, all documents relating to (a) licenses, approvals, authorizations from, applications to and communications with the FCC, United States Department of Homeland Security, FBI and United States Department of

Draft - June 22, 2010

Justice, (b) CenturyTel's loans to or investment in SkyComm, including the CenturyTel Debentures and shares held by CenturyTel in SkyComm, (c) transactions between or among any of the CenturyTel Defendants, on the one hand, and any of the Kubbernus Defendants, on the other,  (d) debts and obligations from any of the Defendants to any other Defendant, or to or from SkyComm, SkyPort, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, (e) efforts by CenturyTel to sell the CenturyTel Debentures, SkyComm or any interest in SkyComm.

RESPONSE:


3.      Any and all documents between any of the Defendants and their agents, servants, employees, attorneys, and representatives on the one hand, and SkyComm, SkyPort, Balaton, Bankton, Bankton-Texas, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, and their respective agents, servants, employees, attorneys, and representatives on the other hand.

RESPONSE:


4.      Any and all documents between any of the CenturyTel Defendants and their agents, servants, employees, attorneys, representatives on the one hand, and any of the Kubbernus Defendants and their agents, servants, employees, attorneys, and representatives on the other hand.

RESPONSE:


5.      Any and all documents between any of the Defendants and their agents, servants, employees, attorneys, and representatives on the one hand, and any third party relating to SkyComm, SkyPort, Balaton, Bankton, ClearSky, Bankton-Texas, Lavell-Canada or Lavell-US and any of their agents, servants, employees, attorneys, and representatives on the other hand regarding the subject matter of this lawsuit.

RESPONSE:


6.      Any and all minutes, consents, notices and other documents relating to meetings or votes of the shareholders or Board of Directors of SkyComm or SkyPort from January 1, 2002 through the present.

RESPONSE:

Draft - June 22, 2010

7.     Any and all minutes, consents, notices and other documents relating to meetings or votes of the equity holders or Board of Directors of Balaton, Bankton, ClearSky, ClearSky Management, Bankton-Texas, Lavell-Canada or Lavell-US from January 1, 2005 through the present and any agreements among or between or relating to any of the equity holders of any of the forgoing.

RESPONSE:

8.     Any and all documents, including Board minutes, briefing papers and notes, of the CenturyTel Defendants from January 1, 2002 through the present which mention or refer to (a) SkyComm or SkyPort, (b) Kubbernus, Balaton, Bankton, Bankton-Texas, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, (c) any CenturyTel non-landline business activity, (d) a possible merger with or sale to AllTel, (e) divestiture of assets by CenturyTel, (f) any investor or prospective investor in or purchaser of any of SkyComm, SkyPort, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, (g) the use of satellite services by CenturyTel for any purpose, including delivery of consumer television services, distribution of video, and backhaul of billing and other data from CenturyTel's regional offices.

RESPONSE:

9.     Any and all documents of any of the Kubbernus Defendants from January 1, 2005 through the present which refer or relate to (a) any CenturyTel Defendant, (b) any CenturyTel non-landline business activity, (c) AllTel, (f) any investor or prospective investor in SkyComm, SkyPort, Balaton, Bankton, Bankton-Texas, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US or (d) any actual or contemplated public or private offering in any of SkyComm, SkyPort, Balaton, Bankton, Bankton-Texas, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US.

REPONSE:

10.    Any and all tax returns with schedules and attachments, financial statements (certified and uncertified), balance sheets, and profit and loss statements for SkyComm, SkyPort, Balaton, Bankton, Bankton-Texas, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US from January 1, 2002 to the present time.

RESPONSE:

Draft - June 22, 2010

11.    Any and all share or equity interest registries for SkyComm, SkyPort Balaton, Bankton, Bankton-Texas, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, and any other documents reflecting equity ownership, voting rights or capital contributions with respect to SkyComm, SkyPort, Balaton, Bankton, Bankton-Texas, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US from inception through the present time.

RESPONSE:

12.    Any and all documents relating to any proposed, completed, contemplated, requested or discussed loan or advance to or investment in SkyComm or SkyPort by CenturyTel.

RESPONSE:

13.    Any and all documents relating to proposed, completed, contemplated, requested or discussed sale of SkyComm, SkyPort, Balaton, Bankton, ClearSky, ClearSky Management, Bankton-Texas, Lavell-Canada or Lavell-US, or any interest therein or indebtedness thereof.

RESPONSE:

14.    Any and all documents relating to the CenturyTel Debentures or any proposed, completed, contemplated, requested or discussed sale of the CenturyTel Debentures or of CenturyTel's controlling interest in SkyComm or SkyPort.

RESPONSE:

15.    Any and all documents relating to any transaction between CenturyTel, SkyComm or SkyPort, on the one hand, and Balaton, Kubbernus, Watershed Funds, ClearSky, ClearSky Management, Lavell-Canada or Lavell-US, on the other, including (a) the sale of the CenturyTel Debentures, (b) the payment of the purchase price therefore, and (c) any promissory notes or collateral documents from Balaton, Kubbernus, SkyComm, SkyPort, ClearSky or Lavell-Canada or Lavell-US to CenturyTel.

RESPONSE:

Draft - June 22, 2010

16.     Any and all documents relating to the issuance of shares in SkyComm, SkyPort, ClearSky, ClearSky Management, Balaton, Watershed Funds, Bankton and Bankton-Texas.
RESPONSE:

17.     Any and all documents reflecting debts or obligations between or among Balaton, Bankton, SkyComm, SkyPort, ClearSky, ClearSky Management, Bankton-Texas, Lavell-Canada or Lavell-US.
RESPONSE:

18.     Any and all documents relating to Wilson Vukelich or Hodgson Russ LLP and any work that they performed for any of  Kubbernus, Balaton, Bankton, SkyComm, SkyPort, ClearSky, ClearSky Management, Bankton-Texas, Lavell-Canada or Lavell-US.
RESPONSE:

19.     Any and all SkyComm, SkyPort, Balaton, Bankton, Bankton-Texas ClearSky, ClearSky Management, Lavell-Canada and Lavell-US books of original entry including general ledgers, disbursements, receipts, sales, purchase, payroll journals, accounts payable, accounts receivable subsidiary ledgers, bank statements, cancelled cheeks, checkbook stubs, and deposit slips.
RESPONSE:

20.     Any and all documents relating to the 2006 SkyPort Chapter 11 case.
RESPONSE:

21.     Any and all documents relating to the 2008 SkyPort Chapter 11 case.
RESPONSE:

Draft - June 22, 2010

Respectfully Submitted,

_____

Eric Fryar
SBN 07495770
1001 Texas Ave. Ste 1400
Houston, Texas 77002-3194
Tel.        888-481-9995
            281-715-6396
Main Fax:  281-715-6397
Direct Fax: 281-605-1888
Email: efryar@fryarlawfirm.com


Samuel Goldman
Samuel Goldman & Associates
100 Park Ave; 20th Floor
New York, New York 10017
Tel.           212-725-1400
Fax.           212-725-0805
Email: sg@sgalaw.com


Harold B. Obstfeld
Harold B. Obstfeld, P.C.
100 Park Ave; 20th Floor
New York, New York 10017
Tel.           212-696-1212
Fax.           212-867-7360
Email: hobsd@erols.com

ATTORNEYS FOR PLAINTIFFS

Draft - June 22, 2010

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument was forwarded to all parties by and through their counsel of record in the manner required by the Texas Rules of Civil Procedure, as noted below, on this January __, 2010.


_____
Eric Fryar

Draft - June 22, 2010