## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SKYPORT GLOBAL | § | CASE NO. 08-36737-H4-11 |
| COMMUNICATIONS, INC., | § | (Chapter 11) |
| Debtor | § | |
| | § | |

| | |
|---|---|
| JOANNE SCHERMERHORN, JOHN K. WAYMIRE, CHET GUTOWSKY, JOHN LLEWELLYN, JOSEPH A. LOPEZ, ROBERT FOOTE, BLF PARTNERS, LTD., ECAL PARTNERS, LTD., WHIZKID VENTURE, LLC, BELLA KRIEGER, MARTIN POLLAK, GLOSTER HOLDINGS, LLC, MELVYN REISER, BARRY KLEIN, CHESKEL KAHAN, JOHN A. REES, BRIAN W. HARLE, MICHAEL STEIN, LAWRENCE SOLOMON, TRACY ELSTEIN & DAVID TOGUT, JASON CHARLES TOGUT TRUST, BMT GRANTOR TRUST, LYNN JOYCE ELSTEIN TRUST, CHARLES STACK, JOSEPH BAKER, MOVADA, LTD., PUDDY, LTD., DRACO CAPITAL, INC., EDWARD PASCAL, ROBERT MENDEL, STANLEY BERAZNIK, DON DUI, BEN ARIANO, 3791068 CANADA, INC., PETER TAYLOR, JOHN E. PANNETON, WAYNE C. FOX, DAVID CURRIE, BYRON MESSIER, DARSHAN KHURANA, MATEO NOVELLI, DIYA AL-SARRAJ, SEQUOIA AGGREESSIVE GROWTH FUND, LTD., SEQUOIA DIVERSIFIED GROWTH FUND, LTD., RIG III FUND, LTD., ARAN ASSET MANAGEMENT SA, SEMPER GESTION SA, and EOSPHOROS ASSET MANAGEMENT, INC. Plaintiffs | §§§§§§§§§§§§§§§§§§§§§§§§§ |
| vs. | § ADVERSARY NO. 10-3150 |
| CENTURYTEL, INC. (a/k/a CENTURYLINK), CLARENCE MARSHALL, R. STEWART EWING, JR., MICHAEL E. MASLOWSKI, HARVEY P. PERRY, ROBERT KUBBERNUS, BALATON GROUP, INC., BANKTON FINANCIAL CORPORATION, BANKTON FINANCIAL CORPORATION, LLC, CLEARSKY MANAGEMENT, INC., WILSON VUKELICH, LLP and CLEARSKY INVESTMENTS, LP Defendants | § JURY TRIAL DEMANDED §§§§§§§§ |

## PLAINTIFFS' OBJECTION TO REMOVING DEFENDANTS' REQUEST FOR ADDITIONAL SANCTIONS AND MEMORANDUM ON THE <u>UNREASONABLENESS OF THEIR FEE REQUEST</u>

TO THE HONORABLE UNITED STATES BANKRTUPCY JUDGE:

The above-captioned Plaintiffs hereby submit this objection to the Motion for Additional Sanctions submitted by defendants CenturyTel, Inc., Clarence Marshall, R. Stewart Ewing, Jr., Michael E. Maslowski, Harvey P. Perry ("CenturyTel Defendants") and Robert Kubbernus, Balaton, Group, Inc., Bankton Financial Corporation, Bankton Financial Corporation, LLC, ClearSky Management, Inc., ("Kubbernus Defendants") (collectively, "Removing Defendants") and memorandum on the reasonableness of their request for attorneys' fees and costs.[1]

---

[1]   This Objection addresses only the issue of the appropriate amount of sanctions and does not address or waive any arguments that sanctions should not have been awarded in this case.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

POINT I: EQUITABLE PRINCIPLES STRONGLY SUGGEST THAT THE SANCTIONS
AWARD SHOULD BE MUCH LESS THAN WHAT REMOVING DEFENDANTS SEEK ..... 1

    THE PARTIES ................................................................................................... 2

        *The Parties Being Sanctioned* ................................................................... 2

        *The Parties Seeking Sanctions* .................................................................. 2

    THE NATURE OF THE CASE ............................................................................ 4

    THE VIOLATIONS .......................................................................................... 5

    ANALYSIS – FOSTERING THE APPROPRIATE PURPOSE OF THE SANCTIONING AUTHORITY ........... 5

POINT II: THE EQUITABLE DOCTRINE OF UNCLEAN HANDS MILITATES THAT
NOMINAL SANCTIONS ONLY BE AWARDED .................................................... 10

POINT III: UNDER THE THOMAS/TOPALIAN GUIDELINES, OTHER FACTORS
SUGGEST REDUCED SANCTIONS ........................................................................ 13

    MITIGATING FACTORS RELATED TO THE VIOLATIONS ............................... 13

        *Violation: Plaintiffs' Claim to still own Shares in SkyComm* ................. 14

        *Violation: Plaintiffs Sought Appointment of a State Court Receiver* ................... 15

        *Violation: Knowing before Confirmation that Fraud had been Committed on the
        Bankruptcy Court, but Holding Back from Bringing this to the Attention of the Court* ........ 16

        *Violation: Plaintiffs Asserted Derivative Claims in the State Court Action* ........................... 19

        *Violation: Collateral Attack on the Confirmation Order* ...................................... 20

    OTHER MITIGATING FACTORS RE PLAINTIFFS ........................................... 21

POINT IV: REMOVING DEFENDANTS FAILED TO MITIGATE THEIR
FEES AND COSTS ................................................................................................ 21

POINT V: COUNSEL FEES SOUGHT MUST BE RELATED TO THE VIOLATION .......... 24

POINT VI: SANTIONS MUST BE IN THE LEAST SEVERE TO ACHIEVE THE
PURPOSE OF THE RULE UNDER WHICH IT WAS IMPOSED ............................................. 26

POINT VII: REMOVING DEFENDANTS' FEES ARE NOT REASONABLE ....................... 27

Billing Rates Must be Reasonable in the Houston Market ........................................... 29

Hours Cannot be Unreasonable, Excessive, Duplicative or Unnecessary ................. 30

Inadequate Documentation of Fees Warrants Lowering of Fees ............................... 32

POINT VIII: NO LEGAL BASIS EXISTS TO PROSPECTIVELY
SANCTION AN APPEAL ......................................................................................... 34

POINT IX: A COERCIVE PER DIEM FINE IS NOT WARRANTED IN THIS CASE .......... 35

CONCLUSION ...................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Alerts Synteks, Inc. v. Spencer,* 151 SW 3d 246 (Texas Ct. App. 2004) ...................................... 15

*Arredondo v. Flores*, 2008 U.S. Dist. LEXIS 77675 (S.D. Tex., Sept. 30, 2008) ......................... 5

*Brantley v. Surles*, 804 F.2d 321 (5th Cir. 1986) ............................................................... 28

*Brown v. Federation of State Medical Boards of US*, 830 F.2d 1429 (7th Cir. 1987) ................. 6

*Browning v. Prostok*, 165 S.W. 3d 336 (Tex. 2005) ............................................................ 20

*Carroll v. Jacques*, 110 F.3d 290 (1997) ....................................................................... 13

*Chambers v. NASCO*, 501 U.S. 32 (1991) ............................................................... 6, 7, 9

*Chapman & Cole v. Itel Container International B.V.,* 865 F.2d 676 (5th Cir.1989) ................. 22

*Fortenberry v.Cavanaugh.* No. 03-04-00816-CV, 2005 Tex. App. LEXIS 4665 (Tex. App.-
     Austin 2005, no pet.) .......................................................................................... 16

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ................................................................... 33

*In re Bertuccio*, 414 B.R. 604 (Bankr N.D. Cal. 2008) ...................................................... 25

*In re Cherry,* 247 B.R. 176 (Bankr. E.D. Virginia 2000) .............................................. 21, 26

*In re Cochener*, 360 BR 542 (Bankr. S.D. Tex., Bohm, J. 2007) ........................................... 21

*In re Dawson*, 390 F.3d 1139 (9th Cir. 2004) ................................................................. 25

*In re De La Fuente v. Wells Fargo*, 2010, WL 1993520 (Bankr. S.D. Tex. May 18, 2010) ........ 35

*In re Donald G. Depugh*, 409 B.R. 125 (2009) ............................................................... 29

*In re Klein*, 226 B.R. 542 (Bankr. D.N.J. 1998) ............................................................. 30

*In re Mooney,* 340 B.R. 351 (Bankr. E.D. Tex. 2006) ....................................................... 21

*In re Osborne*, 375 B.R. 216 (Bankr. M.D. La. 2007) ....................................................... 31

*In re Parsley,* 384 BR 138 (Bankr. S.D. Texas, Bohm, J. 2008) ........................................... 26

*In re Solomat*, 231 B.R. 149 (2nd Cir. BAP (Conn.) 1999) ............................................... 19

*In re Watkins*, 240 B.R. 668 (Bankr. E.D.N.Y. 1999) ....................................................... 31

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) .............................. 29

*Louisiana Power & Light Company v. Kellstrom*, 50 F.3d 319 (5th Cir. 1995)............................ 28

*Malesovas*, 2005 WL 1155073 (S.D. Tex. 2005) ....................................................................... 19

*Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007) ......................................................... 10

*Missouri v. Jenkins*, 491 US 274 (1989)..................................................................................... 29

*Norwest Bank Worthington* v. *Ahlers,* 485 U. S. 197 (1988) ....................................................... 10

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806 (1945) ........................ 10

*Ramirez v. Rodriguez*, 2010 WL 190420 (Bankr. S.D. Tex. May 11, 2010)................................ 35

*SEC* v. *United States Realty & Improvement Co.,* 310 U. S. 434 (1940) ..................................... 10

*Shadduck v. Rodolakis*, 221 B.R. 573 (D. Mass. 1998)................................................................ 22

*South Shore Ranches, LLC v. Lakelands Co., LLC,* 2010 WL 2546112 (E.D. Cal. 2005)........... 11

***Spiller v. Ella Smithers*** *Geriatric Center*, 919 F.2d 339 (5th Cir. 1990) ..................................... 22

*Thomas v. Capital Sec. Capital Services, Inc.,* 836 F.2d 866 (5th Cir. 1988) ................... 1, 21, 26

*Topalian v. Ehrman*, 3 F.3d 931 (5th Cir.1993) ....................................................... 1, 22, 24, 26, 34

*U.S. ex rel. Miller v. Bill Harbert Intern. Const. Inc.*, 601 F. Supp. 2d 45 (D.D.C. 2009) .......... 33

*U.S. ex rel. Thompson v. Walgreen Co.*, 621 F. Supp. 2d 710 (D. Miss. 2009) ........................... 33

## LIST OF EXHIBITS

Exhibit A:       Email from Roger Klotz to Samuel Goldman, dated June 19, 2010.

Exhibit B:       Letter from Samuel Goldman to Hugh Ray, III, dated April 2, 2010.

Exhibit C:       Declaration of Brogan Taylor, dated July 22, 2010.

Exhibit D:       Exhibit E to SkyPort's FCC Filing of September 2009.

Exhibit E:       Declaration of Bill McCrary, dated June 18, 2010, with two page memo attached.

**INTRODUCTION**

1.      Removing Defendants seek $571,111.67 in legal fees and costs, additional sanctions if Plaintiffs appeal – a sum that could equal $400,000 – and coercive sanctions. Plaintiffs respectfully submit that this Court should take into consideration a number of legal and equitable principles in assessing these sanction requests against Plaintiffs, and that such consideration should result in a nominal sanctions award, or at the least, one dramatically lower than what has been requested.

**POINT I**

**EQUITABLE PRINCIPLES STRONGLY SUGGEST THAT
THE SANCTIONS AWARD SHOULD BE MUCH LESS
THAN WHAT REMOVING DEFENDANTS SEEK**

2.      The Fifth Circuit provides guidance for imposing sanctions: "[T]he district court should carefully choose sanctions that foster the appropriate purpose of the rule, depending on the parties, the violation, and the nature of the case." *Thomas v. Capital Sec. Capital Services, Inc.,* 836 F.2d 866, 877 (5th Cir. 1988).

3.      In *Topalian v. Ehrman,* 3 F.3d 931, 936 n. 5 (5th Cir.1993), the Fifth Circuit refined the *Thomas* principles and determined that "the underlying principles elucidated in *Thomas* in the context of Rule 11 apply across-the-board to all of the district court's sanction powers."

4.      Application of the *Thomas/Topalian* principles to the typical post-confirmation sanctions case, in which a creditor is sanctioned for taking steps after confirmation against the debtor to collect discharged debts, is fairly straightforward.  In our case, it is a lot more complex.

THE PARTIES

*The Parties Being Sanctioned*

5.      Plaintiffs are all former shareholders of SkyComm,[2] who allege that they were collectively defrauded out of $32 million by the Removing Defendants and Wilson Vukelich. Most – at least 43 of the 47 plaintiffs – are individuals (or investment vehicles owned by individuals) who purchased their shares in SkyComm or earned them through sweat equity. Eleven of them are ClearSky investors, who Removing Defendants admit were not prohibited from bringing the State Court action.  A number are retired and had poured their life savings into their SkyComm investment.  At least one is a widow of an investor.

*The Parties Seeking Sanctions*

6.      CenturyTel controlled SkyComm from December 2003 through November 2006. It is currently the fifth largest telecommunications company in the United States and if its pending merger with EMBARQ is approved, it will be the third largest after AT&T and Verizon.[3]  During it 2009 fiscal year, it had $4.9 billion in operating revenues and $1.2 billion in operating income.[4]

7.      Clarence Marshall ("Marshall"), R. Stewart Ewing ("Ewing"), Jr., Michael E. Maslowski ("Maslowski") and Harvey P. Perry ("Perry") are all directors and/or officers of CenturyTel, who between December 2003 and November 2006 also served as directors of SkyComm and controlled SkyComm during that period.  According to the CenturyTel's 2009 DEF 14A, Ewing was paid $2,877,465 by CenturyTel as Executive Vice President and CFO and Maslowski $3,441,000 as a former executive officer.  Perry received $318,276 as a director and Marshall was not listed.[5]

---

[2]   The Petition unambiguously states this at ¶ 342.
[3]   http://www.marketwatch.com/story/centurylink-buying-qwest-in-all-stock-22-bln-deal-2010-04-22.
[4]   See CenturyTel 2009 10-K.
[5]   See CenturyTel 2009 DEF 14A.

8.      CenturyTel, Marshall, Ewing, Maslowski and Perry are not insiders or professionals of the Debtor.  They were sued for fraud, oppression primarily during the period December 2003 through November 2006 and for aiding and abetting securities fraud between February 2006 and June 2008.[6]

9.      Balaton Group, Inc. ("Balaton"), by its own proclamation, is a Canadian merchant banking and turnaround advisory firm.  Its current finances are unknown but were at least robust enough to have acquired 431,963,880 shares of SkyComm in just two years (November 2006 through October 2008).[7]  According to its bankruptcy filings, it also had the means to lend SkyPort $2 million during that two year period and to have put an additional $200,000 into a confirmation plan.  Balaton is an Insider, but not the Debtor.

10.     According to the Bankruptcy Plan which the Court confirmed in August 2009, Balaton was to receive 100 percent of the equity in SkyPort.[8]  However according to SkyPort's September 2009 FCC filing, it does not hold any post-reorganization interest in SkyPort.[9]

11.     Robert Kubbernus is the sole owner of Balaton and must have a net worth at least equal to that of Balaton's.  Kubbernus is an Insider, but not the Debtor.

12.     Bankton Financial Corporation, Bankton Financial Corporation, LLC and ClearSky Management, Inc. are all affiliates of Balaton and Kubbernus, and not Insiders.  According to 2009 FCC filings, Bankton and Bankton Texas acquired post-confirmation controlling ownership interests in the Debtor.[10]  It does not appear that ClearSky Management has any assets.

---

[6]   Petition ¶¶ 344-347; 379.
[7]   List of Equity Security Holders, attached as Exhibit A to the Notice of Removal [docket #1].
[8]   Plan of Reorganization ¶ 4.3.2.
[9]   According to Exhibit E to SkyPort's FCC filing, Balaton transferred ownership of SkyPort 66.5% to Bankton Financial Corporation, LLC, 14.25% to an investment vehicle owed by Douglas Whitworth and 14.25% to an investment vehicle owned by Bruce Dunlop.  This Exhibit is attached for the Court's convenience as Exhibit D hereto.
[10]  *Id*.

13.     Balaton, Kubbernus, Bankton, Bankton-Texas and ClearSky Management were sued for acts of fraud, securities fraud and oppression, occurring primarily during the period February 2006 and June 2008.[11]   According to the Petition, a large portion of Plaintiffs' funds were not used for their intended purpose, but rather were unlawfully diverted by Balaton and Kubbernus either to fund their acquisition of control of SkyComm or into their pockets.

14.     Notably, none of the Removing Defendants was the Debtor.

THE NATURE OF THE CASE

15.     The Petition seeks $32 million in damages for fraud, securities fraud and oppression against the Removing Defendants and Wilson Vukelich, but not against the Debtor. The Petition seeks to assert only direct claims for acts they committed prior to the filing by SkyPort in October 2008,[12] and also alleges fraudulent acts in the SkyPort Chapter 11 case.

16.     Removing Defendants removed this case from the State court, claiming that all of the claims were derivative, and sought their dismissal and sanctions against Plaintiffs.

17.     The allegations in the Petition are based primarily on documentary evidence which was assembled by Plaintiffs after confirmation of the SkyPort Plan.[13]   The Petition describes these documents and what they reveal.   No evidence has been introduced that would suggest that this lawsuit is without merit, and there has been significant testimony in this case, including that of Brogan Taylor and Bill McCrary on May 27 and July 14, 2010, and Adrien Pouliot and Jeffrey Goldenthal on July 14, 2010 strongly indicating that there is merit to Plaintiffs' allegations.

---

[11]   Petition ¶¶ 275-93 (Section AA. Balaton and Kubbernus Violate their Fiduciary Duties to SkyComm's Shareholders), in which claims are made with regard to wrongful dilutions and other wrongful conduct during the time period of February 2006 through June 2008.

[12]   Although the Court ruled on May 27, 2010, that some of Plaintiffs' claims were direct and some derivative, there is no evidence to suggest that Plaintiffs had any intention or reason to bring derivative claims.

[13]   Petition ¶¶ 262, 337.

THE VIOLATIONS

18.     The violations found by the Court in its May 27, 2010 oral ruling are:

(a)     The Petition contained language which suggested that Plaintiffs were still shareholders of SkyComm;[14]

(b)     The Petition sought appointment of a state court receiver for SkyPort;[15]

(c)     The improprieties in the bankruptcy case alleged in the Petition should have been raised by Plaintiffs in this Court, and not to a state court judge.[16]

The Court ruled that the Petition was a collateral attack on the Plan[17] and also found that the Petition contained some claims that were derivative and some that were direct.

19.     The Court determined that Plaintiffs did not bring their allegations of fraud by Balaton, Kubbernus and CenturyTel in the bankruptcy proceeding to this Court's attention, even though they knew or had suspicions of these frauds prior to confirmation.[18]

ANALYSIS – FOSTERING THE APPROPRIATE PURPOSE OF THE SANCTIONING AUTHORITY

20.     In applying the *Thomas/Topalian* factors described above to our case, the Court should assure that the sanctions award is tailored to the particular wrong and to ultimate purposes of the rule authorizing the sanction.  *See also Arredondo v. Flores*, 2008 U.S. Dist. LEXIS 77675 (S.D. Tex., Sept. 30, 2008).

21.     In our case, sanctions are being sought by parties who are not innocent, but rather stand accused of serial fraudulent conduct, including very serious frauds upon this Court. The parties against whom those sanctions are being sought are those who were the victims of the frauds.

---

[14]   May 27, 2010 Transcript p.290, lines 18-21.
[15]   May 27, 2010 Transcript p.284, lines 4-11.
[16]   May 27, 2010 Transcript p.277, line 2 to p.278, line 4.
[17]   May 27, 2010 Transcript p.288
[18]   May 27, 2010 Transcript p. 279, line 15 to p.280, line 10.

5

22.     In our case, sanctions are being sought not by a debtor in financial distress and need of rehabilitation, but rather by a multibillion dollar New York Stock Exchange company, its very highly compensated executives and a merchant banking firm.  The sanctions are being sought against primarily individuals of relatively modest means and the amount of the sanctions being sought, if imposed, would have catastrophic consequences for them.

23.     The relative wealth of the parties should be considered in awarding sanctions. *Brown v. Federation of State Medical Boards of US*, 830 F.2d 1429, 1440 (7th Cir. 1987), but the issues go far deeper than that.

24.     The uniqueness of our case is apparent from the fact that in their various sanctions briefs, Removing Defendants have not cited a single case that is like ours; not one case in which parties accused of fraud have secured sanctions against defrauded parties for suing them in the wrong court or otherwise violating a confirmation order; indeed, not a single case in which parties accused of fraud – generally or on the Bankruptcy Court – have obtained sanctions, **nor**  a single case in which defrauded parties have been sanctioned.  Not surprisingly, Plaintiffs have been unable to find any such case either.

25.     In support of the Court's authority to assess sanctions, Removing Defendants rely on and put forward the same quote from *Chambers v. NASCO,* in both their motion for sanctions and motion for additional sanctions:

> In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's, fees against the responsible party, as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order," The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy."

*Chambers v. NASCO*, 501 U.S. 32, 46 (1991) (internal citations omitted).[19]

26.     *Chambers v. NASCO* is not a case in which a party was sanctioned for any of the wrongs committed in our case; rather it is case in which there was "an attempt to perpetrate a fraud on the court." *Chambers* at 50.   Remarkably, *Chambers* and the quote from it that Removing Defendants find so relevant, fits the conduct of the parties seeking sanctions far more than the conduct of the party to be sanctioned.   It is Removing Defendants who have been accused of practicing a fraud on the Court.   Plaintiffs are not accused of any fraud upon this Court, or of delaying or disrupting the litigation, or hampering the enforcement of a court order.

27.     Without in any way minimizing the violations that this Court found Plaintiffs have committed, this Court should at the least consider that it is the parties that stand accused of defrauding this Court that are seeking and will be the beneficiaries of the sanctions award against parties who have not been so accused.

28.     The evidence to date supporting Plaintiffs fraud charges and indicating that a fraud on this Court was committed by Kubbernus and CenturyTel is considerable.   At the May 27, 2010 hearing, Kubbernus admitted that ClearSky funds had gone into SkyComm.[20]   This contradicts Kubbernus' testimony at the confirmation hearing that ClearSky received no interest in SkyComm because ClearSky had to raise $10 million to receive shares in SkyComm and **it** only raised $7 million.[21]   If ClearSky had received no interest in SkyComm, then its funds should have been returned to the ClearSky investors and not have gone into SkyComm.

29.     Further, Kubbernus acknowledged that he and Balaton were responsible for raising the funds that were invested in ClearSky.[22]   Had this fact been made known to the Court

---

[19]   A fraud on the court occurs "when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process" in an attempt to "hinder the fact finder's fair adjudication of the case and his adversary's defense of the action." *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002).
[20]   May 27, 2010, Transcript, p.166, line 17-24.
[21]   Transcript of 8/7/2008 confirmation hearing [docket #351] at p.63, lines 1-14.
[22]   May 27, 2010, Transcript p.152, line 8 to p.154, line 11.

by Kubbernus, it is inconceivable that the Court would have ruled that ClearSky had no interest because **it** did not raise $10 million.

30.     Brogan Taylor, a former Balaton employee who worked directly for Kubbernus, testified that ClearSky was the party that always had beneficial ownership of the controlling interest in SkyComm, not Balaton, and that this was a fact repeated by Kubbernus to investors and others repeatedly.[23]  According to Taylor, it was Kubbernus' decision not to raise more than $7 million in ClearSky.  In point of fact, it was Kubbernus who decided to cut off the ClearSky raise at $7 million, but he continued to raise funds for SkyComm after he acquired control of SkyComm but at an increased price.[24]

31.     According to the testimony of Jeffrey Goldenthal, Kubbernus' and Balaton's counsel, there can be no doubt that Kubbernus defrauded the ClearSky Investors and this Court by claiming that ClearSky had no interest in SkyComm.

32.     Had Kubbernus not defrauded the court in this manner, then ClearSky would have been acknowledged as the party in control of SkyComm, a different plan might have been adopted and Kubbernus might not have been able to seek this Court's intervention in a suit against him for investor fraud.  The fact that his fraud may actually have led to Plaintiffs sanctions should be considered as a mitigating factor by this Court.

33.     Recently, Dawn Cole has filed a letter with this Court accusing Kubbernus of perjury and witness tampering.  According to Ms. Cole, Kubbernus attempted to bribe her, and

---

[23]   May 27, 2010, Transcript p.229, lines 11-16:
```
11 Q Did he tell you at any time in your employment at Balaton,
12 that Clearsky was not a shareholder in SkyComm?
13 A Never once.
14 Q Did he ever tell you that Clearsky was a shareholder in
15 SkyComm?
16 A Yes.
```
   *See also* May 27, 2010, Transcript, p.234, line 15 to p.235, line 4:
```
15 Q Did Mr. Kubbernus make a statement to you personally that
16 Clearsky controlled a majority interest in SkyComm?
17 A Yes.
…
2 Q Did he make that statement in your presence to any
3 investors?
4 A Yes.
```
[24]   May 27, 2010 Transcript p.248, lines 14-25.

8

when this failed, sued her on behalf of SkyPort and attempted to ruin her business.[25]  Notably, Kubbernus did this after the Court had enjoined Plaintiffs from speaking Ms. Cole on Kubbernus' testimony at the May 27 hearing that she was a prospective customer of SkyPort.[26]

34.     As for the CenturyTel Defendants, they too stand accused of multiple acts of fraud – both in and out of the bankruptcy case.  According to Taylor's testimony, the $2.7 million obligation of SkyComm that CenturyTel claimed to hold was actually an obligation of Balaton that CenturyTel and Kubbernus had conspired to transfer to the books of SkyPort.[27] This too represents a fraud on the Court and as reflected in the *Chambers v. NASCO,* a defilement of the temples of justice.

35.      Without minimizing the Court's interest in deterring the conduct it found Plaintiffs to have committed, Plaintiffs' conduct pales in comparison to that of Removing Defendants.  This Court, no doubt, would agree that giving false testimony to or filing false schedules with this Court are far worse offenses than those the Court found were committed by Plaintiffs.   This Court certainly has remedies available to it to address perjured testimony and false filings and it is of course in its discretion to determine whether it wishes to pursue these remedies.  However, the relative offensiveness of Removing Defendants' conduct should at least be considered in determining sanctions against Plaintiffs.

36.     The Court should also consider that CenturyTel and its four executives have no claim to protection under the releases contained in the Plan, and that Kubbernus and Balaton have no claim to protection under the Plan release provisions for events taking place outside the Bankruptcy proceeding.[28]  The Court should consider that the sanctions Removing Defendants

---

[25]   See docket #122.
[26]   May 27, 2010 Transcript p107, line 21 to p.108, line 3
[27]   May 27, 2010 Transcript p. 242, lines 3-11.
[28]   Confirmation Order ¶ 31; Plan ¶¶ 13.7, 13.8.

seek would have catastrophic financial consequences on Plaintiffs and severely cripple their ability to pursue their individual claims against Removing Defendants.

37.     The Court should consider that Plaintiffs had a good faith basis to believe that they could pursue direct claims in the State court against those who defrauded them without first bringing the frauds they had uncovered to this Court's attention.  Even if they were wrong in not exposing the frauds in the bankruptcy court, the fact that Plaintiffs uncovered these very serious frauds through months of painstaking analysis should be taken into consideration and balanced against the wrongs they stand accused of by the very parties that defrauded this Court.

38.     Without minimizing the public policy goal of deterring violations such as Plaintiffs, broader societal interests must be considered in not allowing sanctions to be used to inhibit parties from pursuing their individual claims against non-debtors or to encourage parties so accused from enlisting the court's good offices as a shield against such claims.

## POINT II

## THE EQUITABLE DOCTRINE OF UNCLEAN HANDS
## MILITATES THAT NOMINAL SANCTIONS ONLY BE AWARDED

39.     It is undisputed that a bankruptcy court is a court of equity and must be guided by equitable principles in awarding sanctions.  *Norwest Bank Worthington* v. *Ahlers,* 485 U. S. 197, 206 (1988); *accord*, *SEC* v. *United States Realty & Improvement Co.,* 310 U. S. 434, 455 (1940). *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007).

40.     The doctrine of "unclean hands" is applicable to parties seeking sanctions:

> The equitable maxim of "he who comes into equity must come with clean hands" is a "self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the [other party]." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). The maxim "necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant." *Id.* at 815. However, while the misconduct at issue need not be criminal or tortious, almost any willful conduct "concerning the cause of

10

> action which rightfully can be said to transgress equitable standards of
> conduct is sufficient cause for the invocation of the maxim by the [court]." *Id.*
> "What is material is not that the plaintiff's hands are dirty, but that he dirtied
> them in acquiring the right he now asserts, or that the manner of dirtying
> renders inequitable the assertion of such rights against the [other party]."
> *Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347, 349 (9th
> Cir.1963).

*South Shore Ranches, LLC v. Lakelands Co., LLC,* 2010 WL 2546112, *4, fn.2 (E.D. Cal. 2005).

41.     The evidence of Removing Defendants' unclean hands relating to the matters as to which they now seek sanctions is manifest, and under the United States Supreme Court decision in *Precision Instrument,* can alone be the basis for barring sanctions "however improper may have been the behavior of the [other party]." *Id.*

42.     Evidence is abundant that that Removing Defendants transgressed equitable standards of conduct before, during and after the SkyPort Chapter 11 proceeding;[29]

*Before the Proceeding*:

(a)     Kubbernus and Balaton misappropriated the controlling interest in SkyComm and SkyPort from ClearSky.[30]

(b)     Kubbernus, Balaton and CenturyTel lied to the FCC, Department of Homeland Security, Federal Bureau of Investigation and Department of Justice by not disclosing the interests of any of the foreign owners of shares in SkyComm other than Balaton.[31]

(c)     CenturyTel claimed to be owed $2.7 million by SkyPort, when this debt was actually an obligation of Balaton.[32]

(d)     Balaton and CenturyTel each caused SkyComm to issue many millions of SkyComm shares to each other for no or insufficient consideration, thereby diluting Plaintiffs to

---

[29]    Plaintiffs submit that all of these points may be taken into consideration by the Court in an equitable "unclean hands" analysis, even if some of the claims relating to these events may turn out to be legally barred.
[30]    May 27, 2010 Transcript (Taylor-Direct) p.234, line 15 to p.235, line 4.
[31]    May 27, 2010 Transcript (Kubbernus-Cross) p.147, line 5 to p.150, line 1.
[32]    May 27, 2010 Transcript (Taylor-Direct) p.242, lines 3-11.

the point where each of them believed that the value of his or her interest in SkyComm was so miniscule that it was not worthwhile to even follow the bankruptcy proceeding;[33]

*During the Proceeding*:

(e)     Kubbernus and Balaton asserted that they held the controlling interest in SkyPort and were empowered to direct its actions, when in fact, the controlling interest was held by ClearSky.[34]  This fraud tainted the entire SkyPort Chapter 11 proceeding;

(f)     When ClearSky came into this Court to assert its rights, Kubbernus lied under oath stating that ClearSky had no interest in SkyPort because it had not raised the full $10 million it was supposed to raise.[35]  He also testified that ClearSky had lost its interest by not making payments it was obligated to, but this too was untrue;[36]

(g)     CenturyTel claimed to be owed $2.7 million by SkyPort, when this debt was actually an obligation of Balaton;[37]

(h)     On May 27, 2010, Kubbernus testified falsely that Dawn Cole, Roger Klotz and the FCC were customers of SkyPort's and contact with them by Plaintiffs would harm SkyPort's business.[38]  In point of fact, all of these were parties defrauded by Kubbernus and/or with interests adverse to Kubbernus, and Kubbernus through his false statements, induced this Court to enjoin Plaintiffs from contacting them and adducing additional evidence of Kubbernus' wrongful conduct relevant to whether Removing Defendants should be awarded sanctions against Plaintiffs;[39]

---

[33]     Declaration of Bill McCrary, annexed hereto as Exhibit E.
[34]     May 27, 2010, Transcript p.229, lines 11-16.
[35]     Transcript of 8/7/2008 confirmation hearing [docket #351] at p.63, lines 1-14
[36]     Transcript of 8/7/2008 confirmation hearing [docket #351] at p.76, lines 16 to p.77, line 18.
[37]     May 27, 2010 Transcript (Taylor-Direct) p.242, lines 3-11.
[38]     May 27, 2010 Transcript p.107, line 13 to p.108, line 23.
[39]     *See* ¶ 61, *infra*.

*After the Proceeding*:

(i)     Immediately after he testified on May 27, 2010, Kubbernus reached out to Brogan Taylor and threatened him for testifying;[40]

(j)     Immediately after he obtained an injunction against Plaintiffs contacting Dawn Cole, he sought to buy her silence against him and when that failed, he sued her to intimidate her against testifying in this case.  He also sent copies of the complaint to Cole's customers implying that if they talked to her they would be subject to suit for complicity in her violation of her Non-Disclosure Agreement;[41]

(k)     As soon as Kubbernus received the Court's June 10, 2010 order granting him an injunction against the Schermerhorn parties contacting Klotz, he sent an email to Klotz seeking to create a record that Klotz somehow had an ongoing business relationship with SkyPort.  Klotz immediately called the Schermerhorn Parties' counsel and sent him an email confirming that he was not a customer of SkyPort and had no business relationship with it (copies of these emails are annexed hereto as Exhibit A).

43.     As demonstrated above, all of the Removing Defendants come before this court with unclean hands, and as such, sanctions should not be awarded to them.

## POINT III

## UNDER THE THOMAS/TOPALIAN GUIDELINES, OTHER FACTORS SUGGEST REDUCED SANCTIONS

MITIGATING FACTORS RELATED TO THE VIOLATIONS

44.     The Fifth Circuit has held that it is proper to apply mitigating factors in imposing sanctions.  *Carroll v. Jacques*, 110 F.3d 290 (1997) (citing *Thomas*).  The specific violations the Court found should be viewed in a broader context and mitigating factors should be taken into consideration.

---

[40]    See ¶ 72, infra.
[41]    See docket # 122.

13

*Violation: Plaintiffs' Claim to Still own Shares in SkyComm*

45.     The Court should consider that the Petition contains explicit language stating that Plaintiffs' interests in SkyComm were terminated:

> On October 13, 2009, Kubbernus and Balaton caused SkyPort to be merged with SkyComm, with SkyPort – a Texas corporation – as the survivor.  All of the former shareholders in SkyComm, except Balaton, were eliminated.[42]

46.     The Court focused on the language in some of the paragraphs in the Petition introducing Plaintiffs, which stated that each such Plaintiff "is, and has been, the owner of [     ] shares of common stock in SkyComm,"[43] as suggesting that Plaintiffs were claiming to still own shares in SkyComm and that this violated the Confirmation Order.  But, this language can be read as consistent with the explicit statement in Petition ¶ 342 that "all of the former shareholders of SkyComm, except Balaton, were eliminated," and to the extent that it was ambiguous, all ambiguity was eliminated by the explicit language of ¶ 342.

47.     Removing Defendants understood that Plaintiffs were making no claim that their shares were still alive.  In their motion papers, they alleged "Plaintiffs' Petition seeks control over the Debtor on account of cancelled shares" (emphasis supplied),[44] not that Plaintiffs were claiming that their shares had not been cancelled.  The contention that the language in Petition ¶¶ 11-57 indicated that Plaintiffs were claiming that the shares were not cancelled was first suggested at the May 27, 2010 hearing by David Jones, Esq., who was making a special appearance on behalf of Wilson Vukelich and had not filed any papers relevant to the motion before the Court.[45]  This suggestion was first made by Jones during his cross-examination of Kubbernus, and even Kubbernus, when first questioned about this language in the Petition, did

---

[42]   Petition ¶ 342.
[43]   Petition ¶¶ 11-57 contain this description.  At the same time, ¶ 10 describing the first Plaintiff, Joanne Schermerhorn states only that she "**is** the successor to the interest of Milam Trust, which **has been** the owner of 1,100,010 shares of the common stock of SkyComm." (emphasis supplied).  It is entirely likely that the descriptions in ¶¶ 11 through 57 were not deceitful or disingenuous, but rather inartfully drafted.
[44]   See Removing Defendants' Motion to Dismiss at 23.
[45]   May 27, 2010 Transcript p. 2, lines 16-19.

not pick up Mr. Jones' inference that it suggested Plaintiffs were still shareholders in SkyComm.[46]

48.     Accordingly, to the extent that the phrase in ¶¶ 11-57 could be interpreted as asserting that Plaintiffs shares were not cancelled, the Court should take these facts – especially, Plaintiffs' explicit statement that the shares were cancelled – into account as a mitigating factor.

*Violation: Plaintiffs Sought Appointment of a State Court Receiver*

49.     Mr. McCrary, whose testimony the Court found credible, stated unequivocally that there was never any effort or intent to take control of SkyPort; it was not even discussed.[47] The Court should take into consideration that consistent with his testimony, Plaintiffs made no claims against the Debtor that could be a basis for the appointment of a State Court receiver, had no motive to seek such a receiver, failed to cite a requisite statutory basis for appointment of a receiver and could not legally have obtained such a receiver.  The only provisions in the Petition referencing appointment of a receiver appear in the prayer for relief on Plaintiffs' shareholder oppression claims.   This is a statutory remedy in Texas if the Court finds shareholder oppression[48] and it is a claim in aid of a judgment of oppression against Kubbernus and Balaton.

50.     Plaintiffs made no claim against SkyPort, had no claim against SkyPort, never mentioned any statutory authority requisite for such an appointment, and did not plead the requisite statutory grounds for such a receiver, i.e., that there is no other adequate remedy available at law or in equity.  *See Alerts Synteks, Inc. v. Spencer,* 151 SW 3d 246 (Texas Ct. App. 2004).

> The remedy of receivership is an extraordinary remedy that must be cautiously applied. It has been described as a drastic, far-reaching, and harsh remedy. *See*, *e.g.*, *Rowe v. Rowe*, 887 S.W.2d 191, 200 (Tex. App.—Fort Worth 1994, writ denied); *Balias v. Balias*, *Inc.*, 748 S.W.2d 253, 257 (Tex. App.—Houston [14th Dist.] 1988, writ denied). Accordingly, a receiver will not be appointed if another

---

[46]   May 27, 2010 Transcript p.114, line 1 to p.155, line 10.
[47]   Transcript, May 27, 2010 Hearing at 179.
[48]   See Tex. Bus. Corp. Act Ann art. 7.05.

remedy exists at law or in equity that is adequate and complete, even if
receivership is authorized under a specific statutory provision, as in this case.

*Fortenberry v.Cavanaugh.* No. 03-04-00816-CV, 2005 Tex. App. LEXIS 4665, *10 (Tex. App.-

Austin 2005, no pet.).

51.    As the Court noted in its ruling from the bench, the actual seeking of a receiver

would have required the joinder of the Debtor as a necessary, indeed an indispensable party.[49]

Not only did Plaintiffs not name SkyPort as a defendant, they have no claim against SkyPort that

they could have asserted and they had no conceivable motive for seeking a state court

receivership over SkyPort.  The aggregate interests of all 47 Plaintiffs in SkyPort was worth at

most $250,000, less than one percent of the total losses of $32 million attributable to Defendants'

frauds. Plaintiffs had no rationale for pursuing the possible collection of this $250,000 via a

convoluted and flawed on its face effort to obtain appointment of a State court receiver, when

they could collect the full $32 million they had lost by pursuing their individual claims.

52.    These mitigating factors should be considered by the Court in its sanctions

determination.

*Violation: Knowing before Confirmation that Fraud had been Committed on the Bankruptcy*
*Court, but Holding Back from Bringing this to the Attention of the Court*

53.    The Court should consider that the only evidence cited by Removing Defendants

and by the Court for the proposition that Plaintiffs knew of the fraud prior to confirmation and

held back from exposing it was McCrary's two page memo[50] and that neither Mr. McCrary's

testimony nor the two page memo supports this inference.

54.    Mr. McCrary's testimony, on cross-examination by Mr. Ray, was that he wrote a

two page memo about concerns he had relating to the period 2005-6, discussed these with Mr.

---

[49]    May 27, 2010 Transcript p.284, lines 12-19. The Court stated that this was deceitfully or disingenuously
        drafted, but Plaintiffs respectfully submit "for what purpose?" Had Plaintiffs indeed sought a state court
        receiver, filing a pleading defective on its face would not have accomplished this goal.
[50]    May 27, 2010 transcript p.253, line 16 to p.254, line 6; May 27, 2010 Transcript p.373, lines 7-10; May 27,
        2010 Transcript p.279, line 17 to p.280, line 10.

Goldman before 2009 and gave Mr. Goldman a copy of his two-page memo (he did not mention the date he did so).[51]   There is nothing in his testimony or anywhere else in the evidentiary record that would support a finding that Plaintiffs knew of or even suspected that frauds had been committed by Kubbernus, Balaton and CenturyTel prior to confirmation, but held back from making these allegations.   There is nothing in the record to suggest Plaintiffs had sufficient suspicions of these frauds prior to confirmation to come into the bankruptcy case to seek discovery.[52]

55.     The Court should also consider that Plaintiffs had very legitimate reasons that were not devious or nefarious for not coming back into the bankruptcy court, and instead pursuing their individual claims in state court.

56.     First, there is also nothing in the record to support the contention that Plaintiffs had sufficient evidence to meet the very high evidentiary burden of overturning the plan for fraud prior to the expiration of the six-month period.   The fact that Plaintiffs filed their state court action on February 12, 2010 does not establish that Plaintiffs could have met this burden on that date.   As of February 12, 2010 Plaintiffs had only some of the documents they needed to establish fraud, and they still do not have these documents today.

57.     Plaintiffs' analysis of the evidence did not even begin to come together until late January and early February, 2010.   Plaintiffs were scrambling to finish off their State Court Petition and file it before the four-year anniversary of the February 15, 2006 agreements that are material to their claims against CenturyTel so they could avoid a costly battle over statute of limitations issues.   Indeed, Plaintiffs were still analyzing documents and gathering evidence

---

[51]   May 27, 2010 Transcript p.184-198. Plaintiffs have requested permission to supplement the record with a copy of the two page record and a Declaration by Mr. McCrary affirming that he did not give this memo to Mr. Goldman in late January 2010.  There is nothing in the record to support any conclusion that Mr. Goldman knew or had any suspicions of fraud prior to confirmation.

[52]   In its ruling the Court noted that Rule 2004 would have given Plaintiffs broad powers to examine Kubbernus, but there is no basis in the record to conclude that Plaintiffs had such suspicions before the confirmation.

when they filed their Petition and significant facts have come to light relevant to these frauds since the filing of the Petition.

58.     Second, many of the Plaintiffs were ClearSky Investors who the Court had found did not have standing and were free to pursue their claims in State Court. Plaintiffs did not perceive based on the transcript of the confirmation hearing that the ClearSky Investors could bring their individual claims, but somehow the other Plaintiffs were constrained from doing so.

59.     Third, there is nothing to suggest that Plaintiffs had any financial incentive to come into the bankruptcy court. Even if the ClearSky Investors were able to obtain reversal of the Court's denying them standing and Plaintiffs were successful in setting aside the plan, there is nothing to indicate that Plaintiffs would have received any monetary benefit from this, let alone enough benefit to justify the expenses of pursuing this course. Aside from Plaintiffs obtaining some vindication against Kubbernus and the cancellation of the CenturyTel debt, they would likely not have even preserved the $250,000 of value they perhaps had in the company.

60.     Plaintiffs' decision to accept the consequences of the Plan and seek their legal recourse by asserting their remaining claims in the State court was not only rational, it was the only course then support by the evidence and standing, and the only course that made any financial sense. Their true legal recourse was to pursue their individual claims against **all** of the parties that had defrauded them – including CenturyTel and Wilson Vukelich – for the full $32 million they had lost, and they could not achieve this purpose in the bankruptcy court.

61.     The Court should consider that Plaintiffs had no intent of offending this Court or seeking to skirt its jurisdiction by bringing their allegations of fraud in the bankruptcy case to another court.

*Violation: Plaintiffs Asserted Derivative Claims in the State Court Action*

62.     The Court should consider that Plaintiffs did not intend to bring derivative claims and that bringing derivative claims is not sanctionable. *See In re Solomat*, 231 B.R. 149, 156 (2nd Cir. BAP (Conn.) 1999)[53]; *See also Malesovas*, 2005 WL 1155073 (S.D. Tex. 2005).

63.     There is no evidence that Plaintiffs sought to bring derivative claims and if they inadvertently did so, these are claims belonging to the Debtor and not claims against the debtor. They should not be sanctioned for this.

64.     The Court should consider that the confirmation order contained releases only for Released Insiders and Professionals for acts committed in the bankruptcy proceeding.[54] The Petition asserts claims against non-released parties and insider released parties for actions which the confirmation order did not release them from liability.

65.     The claims in the Petition are all based upon their acts prior to the bankruptcy case and are thus not released. The fraudulent securities offerings, the diversion of ClearSky's equity to Balaton, the fraudulent issuance of additional shares to Balaton, the lies to the FCC and

---

[53]   In *In re Solomat*, 231 B.R. 149,156 (2nd Cir. BAP (Conn.) 1999).the Court noted that even when the Bankruptcy Court issued a separate explicit order barring the bringing of derivative claims, the dismissal of some of plaintiffs' pleaded "direct" claims as derivative did not constitute a violation of this order or of the confirmation order:

> Reorganized Debtors have not and cannot point to any language in either the Confirmation Order or the March 3, 1995 Order which Ibar or the other Appellees violated by commencing the New York Action. The March 3, 1995 Order did prohibit Ibar from commencing "derivative claims." But a derivative claim is a claim filed by a shareholder *on behalf of* his corporation. As the Bankruptcy Court correctly stated on August 3, Ibar did not assert any derivative claim *on behalf of* the Reorganized Debtors. To the contrary, he expressly disclaimed any intent to sue derivatively. The fact that portions of Ibar's personal claims against Field were pleaded defectively and were dismissed by Judge Chin because they sought personal redress for harms to the corporate entities (*i.e.,* claims that were, colloquially, derivative in nature) does not mean that Ibar violated a court order prohibiting the filing of derivative claims. …

> Ibar's defective pleading of personal claims in the New York action did not constitute contempt of an Order of the Bankruptcy Court or any provision of the Bankruptcy Code.

[54]   See Confirmation Order ¶ 31 ( released "with respect to any action, forbearance from action, decision, or exercise of discretion taken from the Petition Date to the Effective Dates in connection with (i) the operation of the Debtor or the Reorganized Debtor; (ii) the proposal or implementation of any of the transaction provided for, or contemplated in, the Plan or the Plan Documents; or (iii) the administration of the Plan or the assets and property to be distributed pursuant to the Plan and the Plan Documents.").

Team Telecom Agencies all occurred before the Chapter 11 filing. Furthermore, CenturyTel and the CenturyTel Directors do not even have a colorable argument that claims against them were released.

*Violation: Collateral Attack on the Confirmation Order*

66.    The Court should consider that Plaintiffs did not perceive that their law suit could be interpreted as a collateral attack on the confirmation order, and that they certainly had no intent of making such an attack. Plaintiffs believed that they could bring a lawsuit asserting individual claims against Defendants and intended to bring only individual claims. Plaintiffs believed that their individual claims were not barred by the confirmation order for this reason, because the confirmation order did not bar claims against Kubbernus and Balaton for acts prior to the bankruptcy and because their claims of improprieties in the bankruptcy case were based upon evidence uncovered after confirmation. Plaintiffs believed that the frauds they had uncovered would be classified as extrinsic, and could be brought outside the Bankruptcy Court. *Browning v. Prostok*, 165 S.W. 3d 336, 346 (Tex. 2005).

67.    Plaintiffs also had a good faith basis to believe, based upon the confirmation hearing transcript, that this Court had explicitly stated that it was not making any findings of fact on the issues that could have been litigated by the ClearSky Investors and that there was thus, no bar on bringing these claims outside the bankruptcy court by the ClearSky Investors or others. See, e.g., (Transcript of 8/7/2008 confirmation hearing [docket #351] at p.175, line21 to p.176, line 4:

> [I]f you're in some other court in some other state at some other time, what I don't want to have happen is for some other attorney – obviously, Mr. Rothberg, it wouldn't be you, but it might be some attorney in New York or Delaware of Canada saying, Here's a transcript from Bohm's hearing and this witness said X, and Bohm confirmed the plan. I want to make sure we've got a clear a record as we can so that no other court, another jury, is going down that path.

68.     Plaintiffs did not seek to alter any provision of the Plan; they only sought money judgments against Defendants for individual claims based on duties directly owed to them.

OTHER MITIGATING FACTORS RE PLAINTIFFS

69.     Other mitigating factors that merit consideration by the Court include the following:

(a)     Plaintiffs' sanctioned conduct consisted of a single act, as opposed to a repetitive series of acts.  *See In re Mooney,* 340 B.R. 351 (Bankr. E.D. Tex. 2006), *In re Cochener,* 360 BR 542 (Bankr. S.D. Tex., Bohm, J. 2007).

(b)     Plaintiffs received no warning or request that they withdraw the sanctioned conduct.

(c)     Plaintiffs offered to remedy the sanctioned conduct as soon as they became aware of it.

(d)     Plaintiffs' sanctionable acts were committed inadvertently; Plaintiffs' did not target the Debtor, but sought monetary damages from third parties.

(e)     Plaintiffs are not institutional lenders and they will not likely have opportunity to repeat the conduct in question. *See In re Cherry,* 247 B.R. 176 (Bankr. E.D. Virginia 2000).

(f)     Plaintiffs' counsels were not certified in bankruptcy.  *In re Cochener*, 360 BR 542.

## POINT IV

## REMOVING DEFENDANTS FAILED TO MITIGATE THEIR FEES AND COSTS

70.     The Fifth Circuit teaches that a party seeking counsel fees and expenses has a duty to mitigate those expenses.  "A party seeking [costs and fees for defending against frivolous claims] has a duty to mitigate those expenses, by correlating his response, in hours and funds expended, to the merit of the claims," *Thomas,* 836 F.2d at 879, as well as by giving notice to the

court and the offending party promptly upon discovering the sanctionable conduct. *See Chapman & Cole v. Itel Container International B.V.,* 865 F.2d 676, 684 (5th Cir.1989), *Topalian v. Ehrman*, 3 F. 3d 931 (5th Cir. 1993).

71.     In *Spiller v. Ella Smithers Geriatric Center*, 919 F.2d 339, 347-8 (5th Cir. 1990), the Fifth Circuit, citing *Thomas*, notes that:

> Finding an expense to be reasonable requires a court to examine "the extent to which the nonviolating party's expenses and fees could have been avoided or were self-imposed." *Thomas,* 836 F.2d at 879. Thus, the Fifth Circuit imposes a so-called "duty to mitigate" on the nonviolating party. *Id.; Napier v. Thirty or More Unidentified Federal* 348*348 *Agents,* 855 F.2d 1080, 1092 (3d Cir.1988); *Dubisky v. Owens,* 849 F.2d 1034, 1037 (7th Cir.1988).

It is noteworthy that the Fifth Circuit used the phrase "non-violating," which perhaps states the obvious that violating parties do not merit fees altogether.  In any event, the duty to mitigate encompasses both a duty to seek to avoid litigation and a duty to keep the expenses of remediation or removal of the sanctionable conduct as low as possible.[55]

72.     In our case, Removing Defendants made no effort to address the conduct they deemed sanctionable before simultaneously removing the case, seeking dismissal and sanctions. These facts alone should bar them from collecting anything more than perhaps nominal sanctions.

73.     But beyond this, Removing Defendants rejected every effort by Plaintiffs to resolve these issues along the way.  When Plaintiffs first appeared before this Court on April 14, 2010, they offered to remove any offending language from their Petition.  Removing Defendants, however, refused to even discuss this with them or even pause in their quest for sanctions.

74.     At the hearing on April 14, 2010, they asked for emergency permission to take the depositions of all 47 plaintiffs on the issue of what each one knew and when, and graciously

---

[55] Where the only damages that debtor can establish as result of creditor's willful violation of automatic stay are the attorney fees that debtor incurred in bringing contempt motion, debtor will be entitled to award of such fees as damages only if debtor makes some attempt to resolve his dispute with creditor prior to filing motion for contempt and sanctions.  *Shadduck v. Rodolakis*, 221 B.R. 573 (D. Mass. 1998).

agreed to limit such discovery to several hundred hours. The only rationale offered was that the depositions were necessary to determine the award of sanctions.

75. Shortly after the April 14, 2010 hearing, Plaintiffs' counsel contacted Removing Defendants' counsel to discuss the removal of offending language from the Petition. Removing Defendants' counsel refused again to discuss this with him, telling him to put it in writing.

76. On April 26, 2010, Plaintiffs' counsel wrote to Removing Defendants' counsel in an effort to open a dialogue on resolving the issues raised by Removing Defendants' papers. Plaintiffs offered to remove the references to appointment of a provisional director, etc. without condition, and offered "to amend [the] Petition to remove [derivative claims] from the State Court action." (Attached hereto as Exhibit B). Removing Defendants did not bother to respond to this letter.

77. Apparently beginning April 12, 2010, Removing Defendants' counsel, McKool Smith began to prepare papers for Hoover Slovacek to file in this case, ostensibly for SkyPort and Kubbernus. These papers were filed on May 18, 2010.[56] It is unclear why Kubbernus needed another law firm to represent him or what a second law firm attacking Plaintiffs added to the case, aside from significant additional fees to be added to the sanctions award Removing Defendants sought.[57]

---

[56] See McKool Smith time entries on April 12, April 13, April 26, May 5, May 11, May 17, May 18, and May 23 and Hoover Slovacek time entry on May 14, 15 and 16, 2010.

[57] *See Religious Tech. Ctr. v. Liebreich*, 98 Fed. Appx. 979, 984-5 (5th Cir. 2004):

In determining the appropriate quantum of sanctions against the Dandars, the district court made the important observation that RTC itself was not blameless in this respect. The court also concluded that the three law firms representing RTC billed hours that were excessive:

There was no need to have three law firms duplicating work on a simple case wherein the court found the liability issue on summary judgment for [RTC] before trial. Numerous, overly zealous arguments were advanced by [RTC] in needless voluminous fashion . . . . Also it appears there was much billing for conferences between attorneys at different firms, rereading of pleadings by three different sets of lawyers, and some needless duplication.

78.     It is also indicative of Removing Defendants true intent that when Plaintiffs requested permission to submit an amended petition removing the allegations that may have violated the Confirmation Order, Removing Defendants' argued that it should be ignored.

79.     Any possible doubt that Removing Defendants' intent was to run up their fees as high as possible was removed by Kubbernus immediately after the May 27, 2010 hearing when he confronted Brogan Taylor, who had just finished testifying against him.  Kubbernus called Taylor aside and threatened him, noting that his lawyers were very expensive, had run up $750,000 in fees already and that he was going to come after Plaintiffs for these fees with everything he had.  *See* Declaration of Brogan Taylor dated July 22, 2010, submitted hereto as Exhibit C.

80.     From their course of conduct, one can deduce that Removing Defendants' primary interest was not to eliminate the offensive claims or language from Plaintiffs' Petition, but rather to continue the litigation and run up their fees so as to impose maximum penalties on Plaintiffs.  Had Removing Defendants been interested in obtaining removal of these offending provisions, they would have at least made an effort to do so before pursuing massive and unnecessary litigation.  Under *Thomas* and *Spiller*, Removing Defendants should not receive any reimbursement of their legal fees.

## POINT V

## COUNSEL FEES SOUGHT MUST BE RELATED TO THE VIOLATION

81.     In awarding counsel fees as sanctions, the Court must determine:

> *What expenses or costs were caused by the violation of the rule?* The district court must demonstrate some connection between the amount of monetary sanctions it imposes and the sanctionable conduct by the violating party. *See Thomas,* 836 F.2d at 879; *Willy v. Coastal Corp.,* 855 F.2d 1160, 1173 (5th Cir.1988), *appeal after remand,* 915 F.2d 965 (1990); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974).

*Topalian*, 3 F.3d at 937.

24

82.    There are many cases which illustrate this principle. In the context of a willful violation of the automatic stay, the court should look to see what fees or costs are resulted from the violation, and only award those fees.  *In re Bertuccio*, 414 B.R. 604 (Bankr N.D. Cal. 2008), *subsequent determination*, 2009 WL 3380605 (Bankr. N.D. Cal. 2009).  *In re Dawson*, 390 F.3d 1139 (9th Cir. 2004) (when debtor in stay litigation prevailed on only one of 20 issues that they raised, and failed to present any documentary evidence corroborating their estimate of how much time its attorney spent in litigating this one successful issue, bankruptcy court did not abuse its discretion in dividing by 20 the total time spent by debtor's attorney on stay litigation and using this quotient as number of hours reasonably expended for purpose of calculating Lodestar fees).

83.    As can be seen from their papers and time sheets, only a small percentage of the time billed by McKool Smith is connected to the sanctionable conduct.

84.    The vast majority of removing Defendants' legal work related to seeking dismissal of the State Court Petition on the grounds that it contained only derivative claims. Removing Defendants' time entries show that vast majority of their efforts were expended on seeking to have Plaintiffs' claims dismissed as "all derivative."  Of Plaintiffs' 38 page Motion to Dismiss, only two pages related to the argument that the petition attacked the confirmation of the plan and one page argued that plaintiffs were seeking control of the Debtor.  In contrast, 14 pages dealt with the argument that Plaintiffs' claims were all derivative.  Plaintiffs "sanctions" argument was generic and unrelated to the violations claimed.

85.    In any event, the Court found that the Petition contained both direct and derivative claims, and gave no indication that the bringing of some derivative claims was a basis for its decision to award sanctions.[58]

---

[58]    See May 27, Transcript p. 293, lines 22-25.

86.     In addition, a great deal of time was spent on a motion seeking a Rule 42 separate Trial and on a motion seeking pre-suit depositions from all 47 plaintiffs and other matters unrelated to the sanctioned conduct.[59]  These were denied by the Court.

**POINT VI**

**SANTIONS MUST BE IN THE LEAST SEVERE TO ACHIEVE THE PURPOSE OF THE RULE UNDER WHICH IT WAS IMPOSED**

*87.*     It is well accepted that the Court must impose "the least severe sanction adequate to achieve the purpose of the rule under which it was imposed." *See Thomas,* 836 F. 2d 866; *Topalian*, 3 F.3d 931; *In re Parsley,* 384 BR 138 (Bankr. S.D. Texas, Bohm, J. 2008).

88.     If the purpose of the sanctions is to deter plaintiffs from violating the proscribed conduct in the future, it should be noted that it is extremely unlikely that Plaintiffs will commit this conduct in the future, even if they are not sanctioned or assessed nominal sanctions. Plaintiffs are not institutional lenders likely to face this situation again.  *See In re Cherry,* 247 B.R. 176 (Bankr. E.D. Virginia 2000).

89.     Plaintiffs have already suffered severe consequences as a result of the removal of this action and the proceedings in this Court in terms of time and money.  They have been stopped from asserting their individual claims for half a year now, and this was the Removing Defendants' entire objective.  As noted, Plaintiffs had no rational motive to pursue claims against the Debtor or derivative claims on behalf of the Debtor.  The only parties that have been benefited by these proceedings are the Removing Defendants.

**POINT VII**

---

[59]     See e.g in McKool's invoices: "Research presuit deposition procedures and elements" (3/29/10 – IW), "Research cases related to bankruptcy issues for Motion for Leave; research supporting cases for arguments" (3/31/10 – IW), "Review draft of discovery motion and modify to add motion for bifurcation" (4/01/10 – HMR), "Review legal research related to motion for leave to promulgate discovery; review draft motion for leave to promulgate discovery; conference with I. Wang regarding same" (4/10/10 – CL), "review communication from client regarding potential damages to Skyport; review case law regarding interpleader" (4/09/10 – CL), and "Conference with H. Ray III regarding motion for separate trial" (4/02/10 – RMM).

**REMOVING DEFENDANTS' FEES ARE NOT REASONABLE**

90.     On June 11, 2010, Removing Defendants submitted the redacted invoices of their joint counsel, McKool Smith, attached to their Notice of Filing Redacted Fee Statements of McKool Smith (docket # 87).   The invoices were split in half, with one half payable by CenturyTel and the other half by the "Kubbernus Defendants" (Balaton Group, Inc., Robert Kubbernus, Bankton Financial Corporation, Bankton Financial Corporation, LLC, and ClearSky Management, Inc.).   Removing Defendants submitted only one of its two sets of fee statements, those invoiced to CenturyTel and showed that the total invoiced to CenturyTel and the Kubbernus Defendants was $571,111.67.

91.     The invoices revealed that McKool Smith had spent over 1300 hours on what was essentially one motion, utilizing three partners (Robert M. Manley, L David Anderson and Hugh M. Ray, III), one senior counsel (Ruth Van Meter) three associates (Christopher Limpus, Ivan Wang, Nicholas Zugaro), and a handful of paralegals or secretaries (Jodie L. Mow, Amy A. Nichols and Nancy Jones).   The billing rates of the ten persons utilized were listed as:

| | |
|---|---|
| Robert M. Manley: | $675/hr |
| L. David Anderson: | $515/hr |
| Hugh M. Ray, III: | $515/hr |
| Christopher Limpus: | $495/hr |
| Ivan Wang: | $350/hr |
| Ruth Van Meter: | $325/hr |
| Nicholas Zugaro: | $285/hr |
| Jodie L. Mow: | $185/hr |
| Amy A. Nichols: | $155/hr |
| Nancy Jones: | $65/hr |

27

92.     On June 29, 2010, Removing Defendants then filed a motion for additional sanctions, requesting and award of $75,000 if Plaintiffs were to appeal to the District Court, $75,000 for an appeal to the Fifth Circuit, and $250,000 for an appeal to the Supreme Court of the United States.  Removing Defendants also asked for a coercive $350 per diem fine for each day that the award remained unpaid, as well as the right to seek additional coercive measures.

93.     On June 30, 2010, Plaintiffs filed a certification stating that Removing Defendants fees as reflected in their invoices were excessive, duplicative, unnecessary and unrelated to the Motion to Dismiss, and that the redactions made it difficult, if not impossible, to determine whether fees with redacted comments were related to the Motion to Dismiss.

94.     The Court has scheduled a hearing on August 3, 2010, on Removing Defendants' Motion for Additional Sanctions, as well as the reasonableness of Removing Defendants' fees.

95.     *Thomas* and other Fifth Circuit cases provide guidelines for determining reasonableness of counsel fees that are being awarded as part of a sanctions award.  *See Thomas,* 836 F. 2d 866.

96.     The Fifth Circuit applies the "lodestar" method of determining counsel fees, under which the Court must multiply the reasonable number of hours expended in defending the suit by the reasonable hourly rates for participating lawyers.  *Louisiana Power & Light Company v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995).   In the Fifth Circuit, the product of this multiplication is either accepted by the court or adjusted upward or downward, depending on the circumstances of the case.  *Brantley v. Surles*, 804 F.2d 321, 325 (5th Cir. 1986).

97.     In determining whether to adjust the resulting lodestar number up or down, bankruptcy courts should consider the following twelve factors: (a) time and labor required; (b) novelty and difficulty of questions raised; (c) skill required to properly perform legal services rendered; (d) preclusion of other employment; (e) customary fee charged for like work; (f)

whether the fee sought is fixed or contingent; (g) time limitations imposed by attorney's clients or by circumstances; (h) amount in controversy and results obtained; (i) experience, reputation and ability of attorney; (j) undesirability of case; (k) nature and length of professional relationship; and (l) attorney fee awards in similar cases. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

BILLING RATES MUST BE REASONABLE IN THE HOUSTON MARKET

98.     The billing rates of an attorney must be reasonable in the relevant market. *See Missouri v. Jenkins*, 491 US 274 (1989).  That the rates contained in the McKool Smith invoices are not reasonable can be adduced from several sources.

99.     In *In re Donald G. Depugh*, 409 B.R. 125 (2009), this Court determined that a rate of $350 per hour for an attorney with 25 years of bankruptcy experience was a reasonable rate in the Houston market.

100.     Edward Rothberg's hourly rate appears consistent with this, and he is an experienced Houston attorney specializing in bankruptcy, having practiced for over 30 years.  He is board certified in business bankruptcy by the Texas Board of Legal Specialization and his rate is $375 per hour (See Hoover Slovacek Invoice # 270748, attached as Exhibit A to SkyPort's Motion for Additional Sanctions [docket #104]).

101.     Thus, it appears that the reasonable rates for Houston bankruptcy attorneys should not exceed Mr. Rothberg's rate of $375/hr and should decline from there.  Associates should not be billed at more than $180/hr, which is the rate that associates were billed by Weycer Kaplan in the SkyPort bankruptcy case fee application.[60]

102.     In contrast, McKool Smith's rates far exceed this standard.  Hugh M. Ray, III, who has half the experience of Mr. Rothberg is billed at $515/hr.  Just one year earlier, Mr.

---

[60]     See Chapter 11 Fee Application Summary, docket # 364 in Case No. 08-36737.

29

Ray's rate at Weycer Kaplan, when he represented the Debtor, was $315 per hour.[61]   At that time, Mr. Rothberg, who was also at Weycer Kaplan, billed at a rate of $350 per hour.   Clearly, the move by Mr. Ray to McKool Smith did not increase the value of his services by $200 per hour or 65%.

103.    Robert Manley, who has 17 years of experience, is billed at $675 and David Anderson, who has 14 years of experience, is also billed at $515 per hour.   Ivan Wang, an attorney with just three years of experience, not even in bankruptcy law, is being billed at $350/hr ($25 less per hour that Mr. Rothberg).   Other rates similarly far exceed what is reasonable for the Houston market.   All should be proportionately reduced.

HOURS CANNOT BE UNREASONABLE, EXCESSIVE, DUPLICATIVE OR UNNECESSARY

104.    As noted previously, the bulk of McKool Smith's time is unconnected to the sanctioned conduct and should be disallowed for that reason.   However, there are other issues with McKool Smith's request.

105.    In determining a debtor's award of reasonable attorney fees for judgment creditor's willful stay violation, a bankruptcy court should be guided in its examination of each time entry by whether service was reasonable, necessary, and beneficial. *In re Klein*, 226 B.R. 542 (Bankr. D.N.J. 1998).

106.    The 1301.1 hours that McKool Smith spent on the Motion to Dismiss over a two and a half month period generating a $571,000 invoice, are excessive, unnecessary and duplicative in the extreme.   No law firm would have the temerity to present such an invoice to a client, unless it was on the assumption that someone else would have to pay for it.

107.    A review of the timesheets demonstrates that this project was overstaffed in the extreme, with at least six lawyers and numerous support staff billing time to the matter.   Much of the work was performed in parallel by multiple lawyers.   For example, Christopher Limpus and

---

[61]    See Chapter 11 Fee Application Summary, docket # 364 in Case No. 08-36737.

Ivan Wang, associates in the Dallas office of McKool Smith, mirrored each other in their work on the case. Their efforts were duplicative on nearly every task.[62] This is obvious as there are nearly daily entries such as "conference with I. Wang regarding same" (3/25/10 – CL) and corresponding with H. Ray III and C. Limpus regarding research; teleconference with C. Limpus regarding updates" (3/25/10 – IW). In addition, a third associate, Nicholas Zugaro spent copious time researching the same issues as Mr. Limpus and Mr. Wang, and communicating with them regarding the same.

108.    The duplicative nature of this work extended to the partners as well, as demonstrated by the time entries. March 25, 2010, is particularly exemplary in exposing the unnecessary and duplicative billing by Removing Defendants' counsel: Robert Manley invoiced for "Review and approve Motion to Dismiss...", Hugh Ray invoiced for "Finalize Motion to Dismiss; review and incorporate changes…", David Anderson invoiced for "Review of draft of Motion to Dismiss…", Christopher Limpus invoiced for "Review draft of Motion to Dismiss", Ivan Wang invoiced for "Review case; summarize case and organize facts", and Nicholas Zugaro invoiced for "Review and revise Motion for Sanctions," which was the exact same document as the Motion to Dismiss (See docket #1, #2, #3). On this day alone, McKool Smith attorneys billed over 30 hours of work finalizing the 38-page Motion to Dismiss, which was filed the next day. This is not an isolated incident, but rather is characteristic of the invoices and is the epitome of duplicative, excessive and unnecessary billing. These invoiced hours are unreasonable and should be dramatically reduced or excluded. *In re Watkins*, 240 B.R. 668 (Bankr. E.D.N.Y. 1999); *In re Osborne*, 375 B.R. 216 (Bankr. M.D. La. 2007).

109.    In addition, on May 2, 2010 Mr. Limpus billed with comment, "draft response to plaintiffs' motion to remand." On May 3, 2010, Mr. Limpus continued to "draft response to

---

[62] See entries on 3/11/10, 3/12/10, 3/14/10, 3/15/10, 3/16/10, 3/17/10, 3/18/10, 3/19/10, 3/22/10, 3/23/10, through end of May.

plaintiffs' motion to remand." On May 4, 2010, Mr. Manley billed with comment, "prepare draft response to the motion to remand." Also on May 4, 2010, Mr. Limpus billed with comment, "draft and review response to plaintiffs' motion to remand." On May 6, 2010, Mr. Zugaro billed with comment, "draft sections for motion opposing remand." On May 7, 2010, Mr. Manley once against took it up and billed with comment, "provide redlines to response to motion to remand." Also on May 7, Mr. Ray billed with comment, "work on revisions to response to motion to remand…." Also on May 7, 2010, Mr. Limpus billed with comment, "draft and revise response to plaintiffs' motion to remand." On May 8, Mr. Limpus billed with comment, "draft and revise response to plaintiffs' motion to remand." On May 9, Mr. Limpus billed with comment, "Draft and revise response to plaintiffs' motion to remand." On May 10, Mr. Ray billed with comment, "review response to motion to remand…." Then, on May 11, Mr. Ray billed with comment, "Substantially re-write response to motion to remand…." During this eight-day period, Mr. Wang alone spent over 80 hours drafting "sections" and "arguments" and "proofreading" and "editing" and "incorporating" and "organizing" and "corresponding" and "analyzing" and "conferencing" and "reviewing."

110.    Mr. Ray's and Mr. Manley's work on tasks overlapped significantly, with both of them updating clients, drafting papers, and assigning projects to keep associates busy billing over 10 hours a day on this case (and sometimes as high as 13.7 hrs).

111.    In contrast, Mr. Rothberg, who represented the Mr. Kubbernus and the Debtor, spent no more than 10 hours preparing his 15-page Complaint.

112.    Undoubtedly, had Removing Defendants perceived that they would be paying the McKool Smith invoice, they no doubt would have insisted that their counsel complete the assigned tasks in a fraction of the time, and McKool Smith no doubt would have done so.

*INADEQUATE DOCUMENTATION OF FEES WARRANTS LOWERING OF FEES*

113. Where documentation is considered inadequate, a court may reduce the fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Thus, courts may reduce an award for vague entries such as "conference call." *U.S. ex rel. Thompson v. Walgreen Co.*, 621 F. Supp. 2d 710, 728 (D. Miss. 2009) (reduction of 8% for vague entries such as "participation in conference call); *U.S. ex rel. Miller v. Bill Harbert Intern. Const. Inc.*, 601 F. Supp. 2d 45, 52 (D.D.C. 2009) (reducing hours for vague entries).

114. The invoices of McKool Smith contain numerous redactions and vague entries, which make it impossible to determine what the work related to or if it was connected to the sanctioned conduct. These includes entries such as "review petition" (3/11/10 – CL), "review transcript" (3/25/10 – IW), "teleconference with C. Limpus regarding motion" (4/01/10 – IW), "Incorporate edits; review additional cases; organize section; proofread; correspond with team regarding motion; review changes and edit" (4/02/10 – IW), "Discuss strategy with R. Kubbernus" (4/05/10 – HMR), "Teleconferences with C. Limpus regarding research and related issues" (4/11/10 – IW), "Analyze issues relating to hearing; conference with C. Limpus regarding tasks and research; conference with C. Limpus and R. Manley regarding updates and research; strategy teleconference with Houston and C. Limpus" (4/12/10 – IW), "draft issues and correspond with C. Limpus" (4/13/10 – IW), "Review cases" (4/26/10 – IW), "teleconference with C. Limpus regarding updates and research issues" (5/01/10 – IW), "continue to research and review applicable law and support" (5/02/10 – IW), "conference with C. Limpus regarding pleading" (5/03/10 – IW), "draft issues and cite cases" and "correspond with team" (5/06/10 – IW), "research case law" (5/08/10 – IW), "Review arguments and issues" (5/10/10 – IW), "review cases and research" (5/24/10 – IW), "numerous telephone conferences with co-defense counsel and reorganized debtor counsel" (5/26/10 – RMM). These are just a

few of the vague entries in the CenturyTel invoices. Counsel fees should be adjusted accordingly.

## POINT VIII

### NO LEGAL BASIS EXISTS TO PROSPECTIVELY SANCTION AN APPEAL

115.   As outlined above, the Fifth Circuit requires sanctions to be connected to the expenses caused by the violation of the rule, to be mitigated whenever possible, to be reasonable, and to be the least severe sanctions adequate to achieve the purpose of the rule under which it was imposed.   *Topalian,* at 937 *(*again citing *Thomas).* Removing Defendants motion for additional sanctions does not meet the test of any of these requirements.

116.   It should also be noted that any court reviewing the orders entered in this proceeding has ample authority to impose sanctions for frivolous or bad-faith pleadings or other misconduct occurring in that court.   Removing Defendants seek to have this Court make an advance ruling that any effort to seek appellate review would be frivolous, regardless of what position is advanced in the reviewing court.   Such an effort to have this Court pre-penalize and deter an appeal would seem to be beyond this Court's jurisdiction and violative of due process on its face.

117.   Indeed, Removing Defendants exhibit an extreme lack of respect for the Constitution of the United States and its "due process" requirement or for Plaintiffs statutory right to appeal, which this Court recognized in its May 27, 2010 ruling.[63]   Their request for ever-escalating prospective sanctions if Plaintiffs elect to exercise their legal right to appeal illustrates the sense of invincibility they somehow perceive they have obtained in this case.   It is not surprising that Removing Defendants cite no legal authority for this request.   This motion is patently frivolous and sanctionable.

---

[63]   The Court stated, "And I'll issue a written ruling.   So that if people want to appeal me, they can."   May 27, 2010, Transcript, Various Motion Hearing, at p.293, lines 20-21.

34

## POINT IX

### A COERCIVE PER DIEM FINE IS NOT WARRANTED IN THIS CASE

118.   Coercive measures, such as Defendants' request for $350 per day fine each day that awarded fees and costs are not paid, is not appropriate in this case.  Coercive measures like per diem fines are only used on when parties continually fail to comply with a court order.  *See, e.g., Ramirez v. Rodriguez*, 2010 WL 190420 (Bankr. S.D. Tex. May 11, 2010).  *See In re De La Fuente v. Wells Fargo*, 2010, WL 1993520 (Bankr. S.D. Tex. May 18, 2010) (per diem fine only imposed after several months of failing to comply with agreed judgment).

### CONCLUSION

119.   For all of the foregoing reasons, the sanctions against Plaintiffs should be nominal and Removing Defendants' Motion for Additional Sanctions should be denied in its entirety.

Dated: July 23, 2010

Respectfully submitted,

McFALL, BREITBEIL & SHULTS, P.C.

By: */s/ W. Steve Smith*
      W. STEVE SMITH
      State Bar No. 18700000
      1331 Lamar Street, Suite 1250
      Houston, Texas 77010
      Tel.          713-590-9300
      Fax.          713-590-9399
      Email:  ssmith@mcfall-law.com

THE FRYAR LAW FIRM

By: /s/ F. Eric Fryar
    F. ERIC FRYAR
    State Bar No. 07495770
    1001 Texas Ave., Suite 1400
    Houston, Texas 77002
    Tel.       (888) 481-9995
               (281) 715-6396
    Main Fax:  (281) 715-6397
    Direct Fax: (281) 605-1888
    Email: efryar@fryarlawfirm.com

SAMUEL GOLDMAN & ASSOC.

By: /s/ Samuel Goldman
    SAMUEL GOLDMAN
    100 Park Ave., 20th Fl.
    New York, NY 10017
    (212) 725-1400
    (212) 725-0805 (fax)
    Tel.       (212) 725-1400
    Fax.      (212) 725-0805
    Email: sg@sgalaw.com

HAROLD B. OBSTFELD, P.C.

By: /s/ Harold B. Obstfeld
    HAROLD B. OBSTFELD
    100 Park Ave., 20th Floor
    New York, NY 10017
    (212) 696-1212
    (212) 867-7360 (fax)
    Tel.       (212) 696-1212
    Fax.      (212) 867-7360
    Email: hobsd@erols.com

ATTORNEYS FOR PLAINTIFFS

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document is being served on the 23rd day of July, 2010, on all of the following parties via regular first class mail, postage prepaid.  Those ECF users registered in this case will receive electronic notice on July 23, 2010.

| | | |
|---|---|---|
| Office of U.S. Trustee<br>515 Rusk Ave., Ste. 3516<br>Houston, TX 77002 | Hugh M. Ray, III<br>McKool Smith, P.C.<br>600 Travis, Suite 7000<br>Houston, TX 77002 | Robert M. Manley<br>McKool Smith, P.C.<br>300 Crescent Court, Suite 1500<br>Dallas, TX 75201 |
| Edward L. Rothberg<br>Hoover Slovacek, L.P.<br>5847 San Felipe, Ste. 2200<br>Houston, TX 77057 | David R. Jones<br>Elizabeth Freeman<br>Porter & Hedges, LLP<br>1000 Main Street, 36th Fl.<br>Houston, TX 77002 | Wilson Vukelich, LLP<br>Valleywood Corporate Centre<br>60 Columbia Way, Suite 710<br>Markham, Ontario L3R 0C9<br>CANADA |

*/s/ W. Steve Smith*
W. Steve Smith

37