**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

**ENTERED
01/13/2011**

| | | |
|---|---|---|
| In  re: | § | |
| | § | |
| **SKYPORT GLOBAL** | § | **Case No. 08-36737** |
| **COMMUNICATIONS, INC.,** | § | |
| | § | |
| Debtor. | § | **Chapter 11** |
| | § | |
| | § | |
| | § | |
| | § | |

| | | |
|---|---|---|
| **JOANNE SCHMERMERHORN, JOHN** | § | |
| **K. WAYMIRE, et al.,** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | **Adversary No. 10-03150** |
| | § | |
| **CENTURYTEL, INC. (a/k/a CENTURY** | § | |
| **LINK), CLARENCE MARSHALL, et** | § | |
| **al.,** | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| | § | |
| | § | |

**MEMORANDUM OPINION RELATING TO MOTION TO DISMISS ADVERSARY
PROCEEDING FILED BY ALL DEFENDANTS EXCEPT THE LAW FIRM OF
WILSON VUKELICH LLP**
[Adv. Docket No. 2]

**I. PRESENT POSTURE OF THE ADVERSARY PROCEEDING**

The present dispute was initiated in Texas state court, where the plaintiffs named in

Exhibit B (the Plaintiffs) filed a petition (the Petition) accusing the defendants named in Exhibit

C (the Defendants) of certain acts and omissions in connection with investments in and

1

management of two companies—SkyPort Global Communications, Inc. (SkyPort) and SkyComm Technologies, Inc. (SkyComm). SkyPort is currently operating pursuant to a Chapter 11 plan of reorganization (the Plan) which was confirmed by an order of this Court in 2009 (the Confirmation Order). After the Plaintiffs filed the Petition, the Defendants, except the law firm of Wilson Vukelich LLP, then removed the suit from state court to this Court on March 26, 2010, asserting that this Court has jurisdiction over the suit because its filing constitutes an attack on the Plan and the Confirmation Order.[1] [Adv. Docket No. 1]. Specifically, the Defendants, except the law firm of Wilson Vukelich LLP, argue that the claims in the Petition are barred derivative claims on behalf of SkyPort, and the Plaintiffs' request in the Petition that a receiver be appointed to run SkyPort is an attempt to undermine the Plan.

On March 26, 2010, the Defendants, except the law firm of Wilson Vukelich LLP, also filed a Motion to Dismiss Adversary Proceeding (the Motion to Dismiss). [Adv. Docket No. 2]. On April 19, 2010, the Plaintiffs filed their Objections to the Motion to Dismiss. [Adv. Docket No. 15].

On May 27, 2010, this Court held a hearing on these issues and concluded that some of

---

[1] Although Wilson Vukelich, LLP did not sign the Notice of Removal, the Court construes the notice to remove all of the claims asserted in the state court suit, not just the claims against the Non-Wilson Vukelich Defendants. The Non-Wilson Vukelich Defendants expressly provided that they "file this Notice of Removal pursuant to 28 U.S.C. § 1452, Federal Rule Bankruptcy Procedure 9027, and Bankruptcy Local Rule 9027(b)(1), and provide notice of removal of all claims of Plaintiffs asserted against Defendants in Cause No. 2010-09675 . . . currently pending in the 113th Judicial District Court, Harris County, Texas (the "State Court Lawsuit") to the United States Bankruptcy Court for the Southern District of Texas, Houston Division." [Adv. Docket No. 1, p. 2]. Wilson Vukelich, LLP must necessarily agree with this Court's interpretation, as it failed to object to removal of the entire suit and subsequently filed a motion to dismiss in this Court. *See Dukes v. S.C. Ins. Co.*, 770 F.2d 545, 548 (5th Cir. 1985) (holding that parties waived an objection to removal from a state court by failing to timely object in the federal forum); *Harris v. Edward Hyman Co.*, 664 F.2d 943, 944–45 (5th Cir. 1981) (holding that a party waived his right to object to a defect in the removal petition because he failed to properly assert his objection to the removal and proceeded with the action in the federal forum).

the claims and relief sought in the Petition do violate the terms of the Plan and the Confirmation Order.[2] The Court arrived at this conclusion on the grounds that many of the claims brought by the Plaintiffs are derivative claims—which therefore belong to Skyport—and are barred from being brought under the express terms of the Plan. The Court noted in its oral ruling that distinguishing between derivative claims and direct claims (most of which are not barred by the Plan) is not an easy task. Given the numerous claims brought by the Plaintiffs, the Court thought that it would be appropriate to allow the parties and their counsel approximately one month to meet and attempt to come to an agreement as to which claims are derivative with respect to Skyport (and therefore may not be brought by the Plaintiffs) and which claims are direct, or not otherwise barred by the Plan and Confirmation Order. At a hearing held on June 22, 2010, the parties conceded that they were unable to come to such an agreement on the claims in the Petition. As a result, the Court concluded that due to the complexity and breadth of the Plaintiffs' allegations, it would issue a Memorandum Opinion specifying which claims in the Petition violate the Plan or the Confirmation Order and, therefore, must be dismissed with prejudice.

The Court has now completed its analysis of all of the claims brought by the Plaintiffs in the Petition. The Court therefore issues this Memorandum Opinion setting forth which claims in the Petition are barred and therefore must be dismissed with prejudice, and which claims are not barred and therefore may be prosecuted.

At the hearing on May 27, 2010, this Court stated that it would dismiss with prejudice

---

[2] The hearing on May 27, 2010 related solely to the Motion to Dismiss filed by all Defendants except Wilson Vukelich LLP. One day before that hearing, on May 26, 2010, Wilson Vukelich LLP filed its own motion to dismiss, and this motion is based primarily on lack of personal jurisdiction. [Adv. Docket No. 69]. On June 17, 2010, the Plaintiffs filed their objections to Wilson Vukelich LLP's motion to dismiss. [Adv. Docket No. 90]. The Court held a hearing on this particular dispute on July 14–15, 2010, and then took the matter under advisement. The Court is issuing a separate ruling on this particular motion to dismiss.

those claims that are barred by the Plan and Confirmation Order, and that it would dismiss without prejudice those claims which are not barred by the Plan and Confirmation Order. Because it has taken the Court substantial time to analyze all of these claims, the Court has decided not to dismiss without prejudice those claims that are not barred; rather, the Court has decided to remand these claims to Texas state court.[3] *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351–53 (1988) ("As many lower courts have noted, a remand generally will be preferable to a dismissal when the statute of limitations on the plaintiff's state-law claims has expired before the federal court has determined that it should relinquish jurisdiction over the case. . . . Even when the applicable statute of limitations has not expired, a remand may best promote the values of economy, convenience, fairness, and comity.").

Finally, to the extent that any of this Court's oral findings of fact and conclusions of law made in open court on May 27, 2010 conflict with anything set forth in this Memorandum Opinion, the latter shall govern; and to the extent that anything set forth in this Memorandum Opinion does not encompass all of this Court's oral findings of fact and conclusions of law made in open court on May 27, 2010, the latter shall supplement what is set forth in this Memorandum Opinion.

---

[3] At the hearing on May 27, the Court orally stated that it would deny the Motion to Remand that the Plaintiffs had filed [Adv. Docket No. 14].  And, indeed, the Court signed an order to this effect on June 7, 2010. [Adv. Docket No. 79].  However, in their Objection to the Motion to Dismiss, the Plaintiffs expressly argue, in the alternative, that this Court should remand the causes of action set forth in the Petition to Texas state court. [Adv. Docket No. 15, ¶ 211–222]. As already stated above, given the amount of time that this Court has spent analyzing which causes of action in the Petition are derivative and which are direct, the Court, out of fairness to the Plaintiffs, has decided not to dismiss without prejudice those claims which survive, but rather remand them to avoid any statute of limitations taking effect.

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural History

1. On August 12, 2009, this Court entered the Order Confirming Plan of Reorganization, as Modified (the Confirmation Order) [Main Case Doc. No. 340], approving the Chapter 11 Plan of Reorganization for SkyPort Global Communications, Inc. [Main Case Doc. No. 223] and its modifications [Main Case Doc. No. 289] (collectively, the Plan).

2. The Plaintiffs had notice of the filing of SkyPort's bankruptcy petition in 2008. Moreover, the Plaintiffs had notice that SkyPort had filed a proposed plan and was seeking to confirm this proposed plan.[4] Indeed, certain Plaintiffs objected to the proposed plan in its original form, only withdrawing their objections after the proposed plan was amended to explicitly state that these parties are not barred from bringing specified claims, some of which are the subject of this dispute. The actions taken by these Plaintiffs indicate that they knew a dispute existed prior to the confirmation of the proposed plan. Moreover, at the hearing held on May 27, 2010, this Court also found that, based on testimony provided by Bill McCrary, other Plaintiffs knew that they had a dispute with some of the Defendants during the pendency of SkyPort's bankruptcy. [May 27, 2010, Tr. 174:10–181:13]. For these reasons, the Plaintiffs had adequate notice of the proposed plan and disclosure statement, and they, therefore, had adequate notice of what effect confirmation of the proposed plan would have on their interests and on the dispute that they had with the Defendants. [Main Case Doc. Nos. 228 & 230]; [May 27, 2010, Tr. 273:4–17]. Stated differently, the Plaintiffs had ample opportunity to object to the

---

[4] This Court did, in fact, confirm the proposed plan, and the confirmed plan is defined for purposes of this Opinion as "the Plan."

proposed plan during the pendency of SkyPort's Chapter 11 case. However, the Plaintiffs did not take advantage of their opportunity to object to the proposed plan or conduct discovery prior to the confirmation hearing. [May 27, 2010, Tr. 273:4-17].

3. The Plan defines a variety of terms which are frequently found in the text of the Plan and the Confirmation Order. Because this Memorandum Opinion quotes both of these documents, the following definitions from the Plan will be used for the purposes of clarity and consistency.

    i. "<u>Debtor</u> shall mean SkyPort."

    ii. "<u>Effective Date</u> shall mean the later of the date upon which the Confirmation Order becomes a Final Order."[5]

    iii. "<u>Reorganized Debtor</u> shall mean SkyPort immediately after the Effective Date." [Main Case Doc. No. 223].

4. In the Confirmation Order, and pursuant to the language of the Plan, this Court placed limitations on certain actions between various interested parties to the bankruptcy case, particularly derivative actions on behalf of the Debtor.

5. Article 6.3 of the Plan provides for a merger of SkyPort with its sole shareholder, SkyComm. [Main Case Doc. No. 289, Art. 6.3]. Pursuant to the Plan, SkyComm was to be merged into SkyPort, which would remain as the sole surviving company after the merger was consummated. [Main Case Doc. No. 289, Art. 6.3]. Once merged, all shares of stock owned by SkyComm's shareholders were to be cancelled and all shares of the Reorganized Debtor were to be re-issued to Balaton Group, Inc. [Main Case Doc. No.

---

[5] The Court recognizes that this definition is grammatically poor, but concludes that it means that the Effective Date is the date upon which the Confirmtion Order becomes a final order.

289, Art. 6.3]. The Confirmation Order mandates that this merger occur as part of the effectuation of the Plan. [Main Case Doc. No. 340, ¶ 32].

6. On October 13, 2009, the merger of SkyComm with SkyPort was enacted pursuant to the Plan and the Confirmation Order. Accordingly, all of SkyComm's shareholders lost their equity interests in SkyComm through the cancellation of their shares. All shares of the Reorganized Debtor were then issued to Balaton Group, Inc.

7. On February 12, 2010, the Plaintiffs filed the Petition against the Defendants in Texas state court. *See* [Adv. Doc. No. 1]. The Petition alleges fifteen counts of a variety of misdeeds. Each cause of action is on behalf of some or all of the Plaintiffs. Each cause of action is against some or all of the Defendants. The Petition is approximately 110 pages and this pleading asserts multiple claims against multiple Defendants.

8. On March 26, 2010, the non-Wilson Vukelich LLP Defendants responded by filing their Notice of Removal of all claims the Plaintiffs had asserted against them in Texas state court. [Adv. Doc. No. 1].

9. Additionally, on March 26, 2010, the non-Wilson Vukelich LLP Defendants filed the Motion to Dismiss. [Adv. Docket No. 2].

10. On April 19, 2010, the Plaintiffs filed their Objections to the Motion to Dismiss. [Adv. Docket No. 15].

11. Additionally, on April 19, 2010, the Plaintiffs filed their Motion to Remand or Alternatively to Abstain (the Motion to Remand). The Motion to Remand asserts that this Court "does not have jurisdiction over the matters in controversy in the state court action, and to the extent the Court does have jurisdiction, it should not exercise jurisdiction over

the matters in controversy." [Adv. Docket No. 14].

12. On May 10, 2010, the non-Wilson Vukelich LLP Defendants filed their Objection to the Motion to Remand. [Adv. Docket No. 33].

13. On May 27, 2010, the Court held a hearing on the Motion to Dismiss and the Motion to Remand. At the end of this hearing, the Court concluded that it has jurisdiction over the removed claims because: (a) there are explicit allegations in the Petition which constitute an attack on the findings of fact and conclusions of law made by this Court in the Confirmation Order; and (b) the relief sought by the Plaintiffs, among other relief, seeks appointment of a receiver to take over the Reorganized Debtor (*i.e.*, the Reorganized SkyPort)—relief which is a direct attack on the Plan and the Confirmation Order. [May 27, 2010 Tr. 288:24–289:4]. Under these circumstances, the Court concluded that the dispute between the parties pertains to "the implementation, interpretation and execution of the plan [this Court] confirmed in August of 2009." [May 27, 2010 Tr. 280:16–25]. Therefore, the Court concluded that it has subject matter jurisdiction over this dispute.[6]

14. At that same hearing, on May 27, 2010, this Court concluded, from the language contained in the Petition, that at least some of the counts alleged therein were direct actions brought on some or all of the Plaintiffs' own behalf, which did not violate the injunction in the Confirmation Order. [May 27, 2010 Tr. 288:13–16]. As such, these counts could properly be brought by the Plaintiffs. *Id*. The Court also concluded that

---

[6] Neither the Plaintiffs nor the non-Wilson Vukelich LLP Defendants argue that this Court lacks personal jurisdiction over any of them.  It is only the Wilson Vukelich LLP law firm that argues that this Court has no personal jurisdiction over it. As already noted, the Court has held a separate hearing on the motion to dismiss for lack of personal jurisdiction filed by Wilson Vukelich LLP, and the Court is issuing an order on this particular motion which is separate and distinct from the order which this Court is issuing on the Motion to Dismiss filed by the non-Wilson Vukelich LLP Defendants.

some of the counts alleged in the Petition were derivative—*i.e.*, brought on behalf of the Debtor—and are therefore barred by the Confirmation Order, and may not be prosecuted by the Plaintiffs. [May 27, 2010 Tr. 288:16–25]. Given the multiple claims brought by the Plaintiffs, the Court thought that it would be appropriate to allow the parties and their counsel some time to meet and attempt to reach an agreement as to which claims are derivative, and therefore may not be prosecuted, and which claims are direct, and therefore may be pursued. The Court stated that after the parties conferred with each other, they should report back to the Court; and the Court would then dismiss with prejudice those claims which are derivative and dismiss without prejudice those claims which are direct.[7]

15. Additionally, at the same hearing, on May 27, 2010, this Court ruled that it would deny the Motion to Remand.[8]

16. Finally, at the hearing June 22, 2010, the parties informed the Court that they had been unable to reach an agreement as to which claims in the Petition are derivative and which claims are direct. The Court therefore stated that it would issue a Memorandum Opinion addressing these issues.

---

[7] In general, those claims that are derivative are barred, and those claims that are direct are not barred. However, the Court wants to emphasize that there are some direct claims that are barred by the Confirmation Order and the Plan, and there are also some derivative claims that are not barred. This Memorandum Opinion attempts to address all of these claims.

[8] In fact, the Court signed an order denying the Motion to Remand on June 7, 2010. [Adv. Doc. No. 79]. However, as set forth in footnote 2, based upon the Plaintiffs' requested relief in their Objection to the Motion to Dismiss, the Court is going to remand (rather than dismiss without prejudice) those causes of action that are direct claims or claims not otherwise barred.

**B. Synopsis of Plaintiffs' Factual Allegations**

    1. Introduction

The Petition sets forth a long list of allegations detailing the Plaintiffs' view of the parties' relationships, the history of the parties, and the acts or omissions of the Defendants. A synopsis of these factual allegations is provided here for the purpose of giving context to the conclusions of law that follow below. These allegations are just that, **mere allegations**. This synopsis is **not** a comment on the merits of the Plaintiffs' case. Thus, although the comments which follow below are couched in declarative terms, they are simply condensed recitations of the Plaintiffs' allegations, nothing more.

    2. Outline of the Parties to this Adversary Proceeding

1. Organizational Charts illustrating the alleged relationships between some of the following parties can be found in Exhibit D, attached to this Memorandum Opinion.

2. SkyPort is a Texas corporation with its principal office at 1140 Aerospace Avenue, Houston, Texas.

3. SkyComm was a Delaware Corporation and the 100% shareholder in SkyPort prior to being merged with SkyPort.

4. CenturyTel, a/k/a CenturyLink (CenturyTel) is a Delaware corporation. From December 2002 through approximately February 2006, CenturyTel, as lender to SkyComm and holder of SkyComm's convertible debentures (the Controlling Debentures), exercised complete control over the management and operation of SkyComm and SkyPort for the benefit of CenturyTel. On or about February 15, 2006, CenturyTel transferred operational control of SkyComm to both Balaton Group, Inc. and Robert Kubbernus, while

CenturyTel continued to exercise control in working towards the transfer of formal control, which occurred on November 2, 2006, also for the benefit of CenturyTel.

5. Robert Kubbernus (Kubbernus) is presently a resident of Galveston County, Texas, and was at all relevant times a resident of Galveston County, Texas and Ontario, Canada, as well as the President and party in control of the defendants Balaton Group, Inc., Bankton Financial Corporation, Bankton Financial Corporation, LLC, ClearSky Investments, LP,and ClearSky Management, as well as Lavell-Canada and Lavell-US.

6. Balaton Group Inc. (Balaton) is an Ontario corporation.

7. Bankton Financial Corporation (Bankton) is a Canadian Corporation.

8. Bankton Financial Corporation, LLC (Bankton-Texas) is a Texas limited liability company.

9. ClearSky Investments, LP (ClearSky) is a limited partnership organized in Canada.

10. ClearSky Management, Inc. (ClearSky Management) is a Delaware corporation.

11. Wilson Vukelich, LLP (Wilson Vukelich) is a Canadian law firm.

12. The Plaintiffs bringing this suit, due to their sheer number, have been organized into groups based on alleged ownership interests in SkyComm or ClearSky, as listed in Exhibit B. However, these Plaintiffs can also be organized into groups based on when and how investments were made:

    i.    The Original Shareholders: individuals and entities which held stock in SkyPort prior to the sale of the Controlling Debentures to CenturyTel.

    ii.    The Additional Investors: individuals and entities which purchased stock after the sale of the Controlling Debentures to CenturyTel. There is some

overlap between the Additional Investors and the Original Shareholders.

iii. The Non-CenturyTel Debenture Holders: intities and individuals who also purchased debenture bonds from SkyPort or SkyComm. These debentures are not the Controlling Debentures.

iv. The ClearSky Investors: purchasers of investments in ClearSky, an investment vehicle which was allegedly intended to purchase a large segment of stock in SkyComm.

13. The Defendants are listed in Exhibit C. They can be organized into four groups:

i. The CenturyTel Defendants: This group is composed of CenturyTel and a sub-group—the CenturyTel Directors—who are those directors of SkyComm and SkyPort whom CenturyTel was entitled to appoint after it purchased the Controlling Debentures.

ii. The Kubbernus Defendants: Kubbernus and associated entities. These Defendants are implicated in relation to the sale of the Controlling Debentures to Balaton and Kubbernus' assumption of control of SkyComm.

iii. Wilson Vukelich: A Canadian law firm involved in the sale of the Controlling Debentures from CenturyTel to Balaton, the conversion of the NonCenturyTel Debentures into equity, and the sale of investments to the Additional Investors and the ClearSky Investors.

iv. The Nominal Defendant: ClearSky itself is named as a defendant for the purpose of allowing the ClearSky Investors to bring derivative claims on its behalf.

12

3. <u>Description of Events</u>

A timeline of the events described in the Petition, as described below, is provided in Exhibit E attached to this Memorandum Opinion.

       i. *The Creation of SkyPort and the Issuance of the Controlling Debentures to CenturyTel.*

SkyPort, then known as SkyComm International, Inc., was founded in the late 1990s by a group of Houston-based telecom executives and NASA telecommunications experts for the purpose of developing, owning and operating a satellite communications facility and network operations center. From 1999 to 2002, SkyPort obtained the various licenses it would need from the FCC to operate a teleport. It also developed its plans for the design and development of the teleport. During this period, SkyPort raised several million dollars from investors to finance its activities. At the time, SkyPort estimated that it would need approximately $14 million to develop, construct and equip the teleport.

CenturyTel, which provided primarily land-based communications to customers in smaller metropolitan and rural areas, wanted to have access to satellite telecommunications capabilities to enhance its business. In late 2002, CenturyTel agreed to provide SkyPort with the funds it needed to build the teleport in the form of debentures. As part of this transaction, SkyComm was created as a holding company for SkyPort, and SkyComm was the entity that issued to CenturyTel the Controlling Debentures—8.5% cumulative preferred convertible debentures, carrying an 8% per annum interest rate. The Controlling Debentures were convertible into SkyComm stock. The first debentures were issued by SkyComm to CenturyTel on December 31, 2003 in the principal amount of $5.5 million. The proceeds of the Controlling

Debentures were to be used to construct the teleport. The Controlling Debentures were convertible into common shares (of SkyComm), but even prior to conversion, the Controlling Debentures granted CenturyTel the effective status of controlling shareholder. Under the terms of the Controlling Debentures, CenturyTel had the right to elect four of the eight members of the Board of Directors of SkyComm and in the event of a deadlock, the chairman appointed by CenturyTel had the right to cast the deciding vote. CenturyTel exercised its rights by appointing the CenturyTel Directors.

Although CenturyTel was never a shareholder in SkyComm or SkyPort, it exercised control over the management and operations of SkyComm and SkyPort—directly and through the CenturyTel Directors. In exercising this control, it interfered with the proper functioning of SkyComm in several ways. For instance, CenturyTel compelled SkyComm and SkyPort to hire a new CEO who was informed by CenturyTel that he should report directly to CenturyTel, rather than the Board of Directors for either company. The directors who were elected by the shareholders (the Non-CenturyTel Directors) were frozen-out—receiving little information on the operations and major decisions of the companies and asked to vote on courses of action without knowledge of all aspects of those courses of action. CenturyTel also compelled SkyPort to do research and development on projects for which CenturyTel never compensated SkyPort.

CenturyTel also largely prevented SkyComm from obtaining debt or equity financing from other sources, forcing SkyComm to issue more and more Controlling Debentures to CenturyTel in order to finance its operation and expansion as an early-stage company. Between 2002 and 2005, SkyComm issued approximately eight rounds of debentures to CenturyTel, with the principal and accumulating interest of each round constantly increasing the percentage

14

ownership of SkyComm that CenturyTel would receive upon conversion of the the Controlling Debentures and diluting the fully diluted percentage owned by each of the shareholders. CenturyTel's scheme of financing SkyComm exclusively through the issuance of convertible debentures resulted in SkyComm becoming a company overburdened by debt, with an unsupportable debt-to-equity ratio, and to repeated compounded dilution of SkyComm's shares owned by other shareholders.

> ii. *CenturyTel decides to sell the Controlling Debentures; SkyPort files its first bankruptcy petition.*

After a change in the composition of CenturyTel's Board precipitated a change in business direction, CenturyTel abruptly decided to divest itself of its non-core business activities, including its interest in SkyComm. To this end, CenturyTel distributed a prospectus, offering the sale of the Controlling Debentures and controlling interest in SkyComm, but did not inform the Non-CenturyTel Directors or the shareholders of SkyComm. Around November of 2005, Kubbernus became aware that CenturyTel was seeking to divest its controlling interest in and obtain another source of funding for SkyComm. Kubbernus, acting through Balaton, an investment banking firm he had recently organized, distributed offering materials on SkyComm seeking to find a buyer or investors for SkyComm. Prior to the time that CenturyTel began negotiating with Kubbernus, Kubbernus had been involved in several shareholder disputes, and did not have experience in satellite communications. Moreover, the two companies in which his involvement could be verified on the internet had gone out of business after he became involved—which resulted in shareholders' litigation. CenturyTel eventually entered into negotiations exclusively with Kubbernus.

On November 21, 2005, CenturyTel compelled SkyPort to file a voluntary petition under Chapter 11 in the Southern District of Texas. In connection with the bankruptcy filing, CenturyTel and the CenturyTel Directors caused SkyComm's officers to file with the FCC applications for authority to transfer SkyPort's FCC 312 authorizations and 214 licenses to SkyPort, as Debtor-in-Possession (SkyPort DIP). These applications were *pro forma* in that they did not involve an actual change in the ownership interests.

> iii. *The first attempted sale of the Controlling Debentures; SkyComm enters into multiple investment agreements with Balaton; SkyPort has its first bankruptcy petition dismissed.*

In February of 2006, CenturyTel entered into a Debenture Purchase Agreement with the Watershed Funds for the the Controlling Debentures. The Watershed Funds was an investment fund run by Kubbernus for the purpose of soliciting investments in SkyComm. Balaton guaranteed the Watershed Funds obligations under the Debenture Purchase Agreement. Also in February of 2006, Balaton agreed to provide SkyComm with a $1.5 million DIP financing facility,[9] a $4 Million Equity Placement Agreement, a $4 Million Exit Credit Facility Agreement, a Recapitalization Agreement, and a $4 Million Securities Purchase Agreement with Balaton and

---

[9] The Petition actually alleges that a $1.5 million DIP financing facility was to be provided to SkyComm. Because SkyComm has never filed a bankruptcy petition, it is legally impossible for a DIP Financing Facility to have been provided to SkyComm. A "DIP Financing Facility" refers to a "Debtor In Possession Financing Facility"—which is a form of financing provided to a debtor in possession and which must be approved by the bankruptcy court. In the Chapter 11 case at bar, the only entity that has been in bankruptcy is SkyPort. Accordingly, the Court construes the allegation in the Petition to really mean that a $1.5 million DIP Financing Facility was to be provided to SkyPort, not SkyComm. Alternatively, the allegation in the Petition could also be construed to mean that Balaton had agreed to provide SkyComm with a $1.5 million financing facility, which loaned monies SkyComm would then in turn loan to SkyPort through the use of a DIP Financing Facility. This alternative construction is logical because the Plaintiffs allege that SkyComm controlled SkyPort.

　　Finally, there are other instances in the Petition where reference is made to SkyComm when one might reasonably interpret the allegation to really refer to SkyPort. But, as noted above, because the Plaintiffs allege that SkyComm controlled SkyPort, it may well be that the attorney for the Plaintiffs who drafted the Petition really did mean to use the word "SkyComm" rather than "SkyPort." In this Memorandum Opinion, in setting forth the allegations made in the Petition, the Court refers to SkyComm even though it may well be that, in the Court's view, the reference should be to SkyPort because it is only SkyPort who has filed a bankruptcy petition.

other purchasers to be solicited and procured by Balaton under which SkyComm would issue

133,333,333 shares of stock to Balaton and the other purchasers.

The Non-CenturyTel Directors were not kept apprised of these transactions as they

developed, and upon belatedly learning of them, had their concerns that Kubbernus did not have

the financial resources to consummate the proposed transaction. The Non-CenturyTel Directors

also expressed concern about the potential transfer of control to foreign interests, which could

interfere with their ability to obtain FCC approval to be a satellite telecommunications operator,

to enter into national security related contracts, and to possess common carrier licenses.

CenturyTel ignored these concerns and did not allow the Non-CenturyTel Directors to have input

in the transaction.

On March 15, 2006, CenturyTel and the CenturyTel Directors caused SkyComm[10] to file

a motion to dismiss its bankruptcy case on the grounds that based upon the Balaton and/or

Watershed Funds' financing commitment, it no longer needed the protection of the Bankruptcy

Code. This motion was granted on March 30, 2006, and SkyPort's first Chapter 11 case was

dismissed.

Balaton and Kubbernus were unable to complete the steps necessary to be able to begin

to legally solicit investments in the Watershed Funds.

> iv. *The second attempted sale of the Controlling Debentures; ClearSky is created; Kubbernus and Balaton obtain control of SkyComm; applications for approval of the transfer of control are filed with the various government agencies.*

In February of 2006, Balaton and Kubbernus launched a separate effort to raise the funds

needed for the SkyComm transaction. They formed ClearSky, a Delaware limited partnership,

---

[10] The Court construes this allegation to really mean that it was SkyPort, not SkyComm, which filed the motion to dismiss the Chapter 11 Case. *See supra* note 8, second paragraph.

and began offering $10 million in limited partnership interests in ClearSky. ClearSky Management, a Delaware corporation and wholly-owned subsidiary of Balaton of which Kubbernus was a Director, was designated as the general partner of ClearSky. Wilson Vukelich represented ClearSky, ClearSky Management, Balaton and Kubbernus in this offering and also acted as escrow agent for investors' funds.

According to the ClearSky Confidential Investment Memorandum dated February 2006 prepared in connection with the offering of interests in ClearSky (the ClearSky IM) and the ClearSky Partnership Agreement (the ClearSky LPA), (a) ClearSky would provide $1.5 million in DIP financing to SkyComm,[11] and an Exit Credit Facility of $4 million (inclusive of the $1.5 million DIP loan), (b) ClearSky would purchase from SkyComm 133,000,000 shares of SkyComm for $4 million, and receive from SkyComm warrants to purchase an additional 133,000,000 SkyComm shares, (c) the $4 million would be used in part to repay the Exit Credit Facility, and the balance for SkyPort operations, (d) ClearSky would acquire all of the Controlling Debentures, then in the face amount of $20,596,000, and convertible into 108,000,000 shares of SkyComm, and (e) the equity investment and purchase of the Controlling Debentures would be deferred until receipt of FCC approval of the acquisition of control of SkyComm and SkyPort by ClearSky.

The ClearSky IM and ClearSky LPA also provided that if the maximum proceeds of $10 million were raised, ClearSky would acquire a 76% interest in SkyComm, which would increase to 82% if the common stock purchase warrants were exercised. The offering document further provided that if less than the maximum proceeds were raised, ClearSky's participation would be

---

[11] Once again, the Court construes this allegation to really mean that ClearSky would provide $1.5 million in DIP financing to SkyPort, not SkyComm. *See supra* note 8, second paragraph.

proportionately reduced and Balaton could retain any participation rights not assigned to ClearSky.

On or about February 15, 2006, Balaton and Kubbernus circulated to CenturyTel and the Non-CenturyTel Debenture Holders a share restructuring plan for SkyComm, in which they showed that Watershed Funds would acquire the Controlling Debentures and convert them into 108,000,000 shares of SkyComm; and thereafter, ClearSky would acquire Watershed Funds' position in these shares and an additional 133,000,000 shares directly from SkyComm.

Even before dismissal of SkyComm's Chapter 11 case, Balaton and Kubbernus assumed *de facto* control over SkyComm's management and operations.[12] The management of SkyPort began to report to Balaton and Kubbernus on a regular basis. Kubbernus took control over personnel, terminating some employees and hiring others for key managerial positions. He put in place new business, accounting, and sales systems and took control of SkyComm's sales efforts.[13] This transfer of control to Balaton and Kubbernus by CenturyTel and the CenturyTel Directors was without prior approval of the relevant government agencies.

Commencing in February 2006, the CenturyTel Defendants, in coordination with the Kubbernus Defendants, caused SkyPort to file a series of *pro forma* applications, pursuant to 47 C.F.R. 25.119, seeking permission to assign back to SkyPort the earth station licenses that had been assigned to SkyPort DIP. On March 31, 2006, the CenturyTel Defendants, in coordination with the Kubbernus Defendants, caused SkyPort to file a notification pursuant to 47 C.F.R.

---

[12] The Court contrues the reference to "SkyComm's Chapter 11 case" to really mean SkyPort's Chapter 11 case. *See supra* note 8, second paragraph.

[13] The Court contrues the reference to "SkyComm's sales" to really mean SkyPort's sales. *See supra* note 8, second paragraph.

63.24, which they deemed *pro forma,* of SkyPort DIP assigning back to SkyPort its international 214 license (this notification and the applications described previously are collectively referred to as the"2006 Pro Forma Applications"). The 2006 Pro Forma Applications were in fact not "pro forma" and they were materially false and misleading (a) by not disclosing that CenturyTel had already transferred *de facto* control to Balaton and Kubbernus, and had entered into a contract to transfer actual control to the Watershed Funds; and (b) by Balaton's representations in various documents that control would be transferred to ClearSky. The 2006 Pro Forma Applications also did not disclose that the DIP financing was being provided by Canadian investors and that it was convertible into equity in SkyComm.

Because the 2006 Transfer Applications involved a transfer of control of more than a 10% equity interest to foreign ownership, they required the approval of an intergovernmental agency group, consisting of the United States Department of Justice, Department of Homeland Security and Federal Bureau of Investigation. This group is known as "Team Telecom."

Wilson Vukelich, as counsel to Watershed Funds, ClearSky, Balaton and Kubbernus, negotiated all of the relevant documents for the SkyComm transactions and was responsible for delivering the FCC approvals at the closing.

The 2006 Transfer Applications were materially false and misleading in a number of respects. The Defendants knowingly and willfully caused the filing of false applications with the FCC and Team Telecom agencies. The Kubbernus Defendants also filed a number of other false applications with these agencies from 2006 through the filing of SkyPort's second bankruptcy petition in 2008.

v. *The Non-CenturyTel Debenture Holders agree to convert their debentures; Balaton purchases the Controlling Debentures.*

From time to time, CenturyTel had given SkyComm shareholders and others the right to purchase their pro-rata share of new debentures being offered to CenturyTel. Two non-shareholders (John and Sue Graves) were also given the right to purchase such debentures. As a result, at the time of the Watershed Funds transaction, three shareholders and these two non-shareholders had acquired debentures in the aggregate sum of $2,237,000 (the Non-CenturyTel Debentures). In early 2006, the CenturyTel Defendants and the Kubbernus Defendants represented to the shareholders of SkyComm, including the Non-CenturyTel Debenture Holders, that the buyer of the CenturyTel Debentures had agreed to convert them all to shares, and that the Non-CenturyTel Debenture Holders would be required to do so as well. The Non-CenturyTel Debenture Holders agreed to convert their debentures at approximately $0.07 per share.

On or about October 27, 2006, various draft closing documents were presented to the SkyComm Board for approval. Among these drafts was an Amended and Restated Debenture Purchase Agreement in which Balaton was substituted for Watershed Funds, as the purchaser. This Agreement provided that CenturyTel was owed $1,290,935 by SkyComm, which was convertible into SkyComm shares at the rate of $0.03 per share. Under the Debenture Purchase Agreement, the $873,025 in principal and interest owed to CenturyTel under the Revolver Loan would be acquired by Watershed Funds/ClearSky/Balaton for $500,000, but the CenturyTel Directors caused SkyComm to agree to issue $873,025 in SkyComm shares to CenturyTel at $.03 per share to pay this amount. Overall, the Defendants caused SkyComm to issue a total of 43,031,166 shares to CenturyTel. Both CenturyTel and Balaton agreed to issue to themselves

21

shares in SkyComm at $0.03 per share, when they had required $0.07 per share from the Non-CenturyTel Debenture Holders on conversion of their debentures. According to the information disclosed to the SkyComm shareholders, Non-CenturyTel Debenture Holders, Non-CenturyTel Directors and company officers, the following occurred at the November 2, 2006 closing: (a) Balaton acquired the Controlling Debentures from CenturyTel for $3 million, and simultaneously converted them into 108,000,000 shares of SkyComm; (b) Balaton acquired 133,000,000 shares of SkyComm stock and 133,000,000 warrants for $4 million; (c) CenturyTel acquired 43,031,166 SkyComm shares in exchange for debts outstanding to it; (d) the Non-CenturyTel Debenture Holders acquired 30,134,798 SkyComm shares upon conversion of their debentures; and (e) all Directors of SkyComm and SkyPort resigned and were replaced by Kubbernus and his nominees.

Only after confirmation of SkyPort's Chapter 11 Plan in August 2009 and a detailed review of documentation provided to various investors by Kubbernus, did the Original Shareholders and Non-CenturyTel Debenture Holders learn that the closing had not occurred as had been presented to them. Apparently, Balaton had not paid the $3 million in cash it was obligated to pay for the Controlling Debentures, but had instead given CenturyTel a $3 million note for the the Controlling Debentures. The Controlling Debentures had apparently not been converted and SkyComm had not become long-term debt free. The Original Shareholders and Non-CenturyTel Debenture Holders had never been informed of these facts. Unbeknownst to anyone at the time other than the Defendants, the Controlling Debentures were not converted into shares in SkyComm.

> vi. *ClearSky receives commitments for funding but does not receive equity from SkyComm or Balaton.*

In or around April 2006, Balaton and Kubbernus reached an agreement with Adrien Pouliot (Pouliot) for Draco to invest over $3.0 million in ClearSky. Draco wound up investing over $3.5 million in ClearSky in a closing that took place on September 15, 2006, and in return was promised by Balaton and Kubbernus an approximately 50% equity interest in ClearSky and 35% indirect interest in SkyComm. Pouliot, who had participated in meetings with CenturyTel in Houston, Texas, was also promised a seat on SkyComm's Board of Directors.

Balaton and Kubbernus raised approximately $7 million in ClearSky from 45 investors -- all or most of whom were non-U.S. citizens. These investors purchased interests in ClearSky on the false representation that ClearSky would acquire a controlling share ownership interest in SkyComm. Balaton and Kubbernus used the funds raised in ClearSky to acquire shares in SkyComm, but in direct violation of their representations to the ClearSky Investors, acquired such shares in the name of Balaton, and not ClearSky. Wilson Vukelich represented its long-time clients, Kubbernus and Balaton, at the closing on November 2, 2006 and closed the transaction in the name of Balaton, and not its client, ClearSky, which had supplied all of the funds for the transaction and which was entitled to that interest under the ClearSky IM and ClearSky LPA.

Over the next two years, Balaton and Kubbernus sent ClearSky's limited partners financial statements and other materials confirming ClearSky's interest in SkyPort. Balaton and Kubbernus made numerous and repeated representations to the ClearSky Investors and others that ClearSky owned the controlling interest in SkyComm.

23

vii. *The Additional Investors purchase equity in SkyComm.*

In the fall of 2006, Balaton and Kubbernus ceased offering shares in ClearSky and began offering shares in SkyComm directly. They distributed various offering documents seeking to raise between $7 million and $30 million for SkyComm and representing that $3 million of the proceeds would be used to pay off the CenturyTel note, even though this was an obligation of Balaton or ClearSky, and not SkyComm. In February of 2007, Balaton and Kubbernus prepared and distributed a private placement memorandum for an offering of $30 million in shares in SkyComm (the February 2007 Offering Memorandum), in which Balaton and Kubbernus represented that SkyComm had no long-term debt. This placement memorandum was misleading in numerous ways.

Over the next six months, Balaton raised not less than an additional $8,198,843 from foreign investors (the Additional Investors) in these offerings of shares in SkyComm. As described below, the existence and identity of these investors did not become known to SkyComm's Original Shareholders until late 2008 when Balaton listed them as shareholders in the second SkyPort bankruptcy filing described below.

viii. *Balaton and Kubbernus control SkyComm; more stock is issued to Balaton; funds are inappropriately funneled to certain Kubbernus Defendants.*

Beginning in February 2006, Balaton and Kubbernus exercised control over the management and operations of SkyComm. From November 2, 2006 and thereafter, Kubbernus acted as Chairman of the Board of Directors of both SkyComm and SkyPort. Kubbernus and Balaton ran the company for their own benefit, and with complete disregard for the rights and interests of the other shareholders. Among other things : (a) Balaton and Kubbernus caused

SkyComm to issue to Balaton 130,926,766 shares of its common stock as payment for restructuring fees and other costs associated with the attempted sale of control of SkyComm to another entity; (b) only $4.8 million of the $7 million raised from the ClearSky Investors ever made it into SkyComm's accounts (the rest went to Balaton or Bankton); (c) Balaton and Kubbernus caused ClearSky to pay $146,776.07 to Bankton, when ClearSky had no relationship with Bankton; (d) Balaton and Kubbernus maintained at least two sets of books for SkyComm— one showing ClearSky as owning a substantial interest in SkyComm and the other showing Balaton owning substantially the same interest.

ix. *In its second bankruptcy, SkyPort is reorganized under Chapter11.*

On October 24, 2008, Balaton and Kubbernus caused SkyPort to file another petition for relief under Chapter 11 of the Bankruptcy Code. ClearSky did not appear on the schedules as having any interest in SkyComm.[14] On May 22, 2009, a proposed plan of reorganization was filed pursuant to which SkyComm would be merged into SkyPort, Balaton would exchange its alleged secured and unsecured debts for 100% of the equity in the merged entity, and all of the other shareholders in SkyComm would have their shares extinguished. Balaton proposed to contribute approximately $200,000 in new funds as part of the proposed plan. This proposed plan was amended on July 8, 2009 to reflect settlements reached with secured creditors to obtain their support for the plan. One of these purported secured creditors was CenturyTel. Pouliot and Draco sought to challenge this proposed plan. In response, Kubbernus and Balaton argued that they did not have standing to do so since neither they, nor ClearSky, had an interest in SkyPort.

---

[14] Once again, the Petition refers to SkyComm when this Court believes that the Petition really intends to refer to SkyPort. *See supra* note 8, second paragraph.

After a hearing, this Court ruled that Pouliot and Draco did not have standing since they did not establish ClearSky's interest in SkyComm, but the Court ruled that they, as well as ClearSky and the ClearSky Investors, would be free to pursue their claims against Kubbernus and Balaton in other fora. None of the shareholders of SkyComm appeared at the confirmation hearing to oppose the proposedplan.

After holding the confirmation hearing on the proposed plan (the Plan), this Court issued its order confirming the Plan on August 12, 2009 (the Confirmation Order).[15] Under the Plan, SkyComm was merged into SkyPort and all of the equity interests of the Original Shareholders, Non-CenturyTel Debenture Holders and Additional Investors were eliminated. The Confirmation Order provided that (a) claims or causes of action against Balaton and Kubbernus relating to their actions during the bankruptcy case were released; and (b) claims or causes of action on behalf of the Debtor against Kubbernus and Balaton were released and could not be brought derivatively on behalf of the Debtor.

x. *The FCC sanctions SkyPort.*

In July 2009, certain of the Plaintiffs learned that the FCC had issued an Order of Forfeiture against SkyPort in March 2009, after finding that it and its affiliates had "willfully and repeatedly violated the Commission's rules by engaging in unauthorized transfers of control." The Forfeiture Order related to SkyComm's failure to disclose the transfer of ownership interests within Balaton from Kubbernus' four partners to Kubbernus. This violation had been

---

[15] This order was defined on pages 2 and 4 of this Opinion as the Confirmation Order, but is once again defined here in the exact same way so that there is no ambiguity about which confirmation order is being referenced. Stated differently, there is only one Confirmation Order. Finally, on pages 2 and 4 of this Opinion, reference is made to SkyPort's Chapter 11 plan of reorganization, which was defined on those pages as the Plan. The Plan defined on those pages is the same Plan defined on this page.

characterized by Balaton and Kubbernus in the applications as a minor violation of *pro forma* filing requirements.

> xi. *SkyComm is merged with SkyPort; SkyPort is the surviving entity.*

On October 13, 2009, pursuant to the terms of the Plan and the Confirmation Order, Kubbernus and Balaton caused SkyPort to be merged with SkyComm, with SkyPort—a Texas corporation—as the survivor. All of the shares in SkyComm were extinguished. New shares in the surviving entity—*i.e.*, the entity that came into existence out of the merger of the Reorganized SkyPort and SkyComm—were issued solely to Balaton.

### III. CONCLUSIONS OF LAW

#### A. Jurisdiction and Venue

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1334(b) and 157(a). *See Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp.* (*In re Nat'l Gypsum Co.*), 118 F.3d 1056, 1063 (5th Cir. 1997) (noting that a proceeding in a bankruptcy court to enforce and construe a confirmation order issued by that court constitutes a proceeding arising in or related to a case under title 11). This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(L) and the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though

the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").

Although the dispute at issue concerns a Chapter 11 case in which a plan of reorganization has been confirmed, this Court has retained jurisdiction to interpret and enforce its own orders. Indeed, a bankruptcy court's original core jurisdiction continues in order for it to enforce its orders, even after the case has been closed. *In re U.S. Brass Corp.*, 301 F.3d 296, 304 (5th Cir. 2002); *New Nat'l Gypsum Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 219 F.3d 478, 483 (5th Cir. 2000) ("[T]he bankruptcy court [may] interpret and construe the Confirmation Order, Plan, and plan documents regarding matters as to which there is a substantial and immediate controversy."); *see also Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 379–80 (1994) (A federal court always has subject matter jurisdiction "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees").

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**B. Choice of Law and the *Erie* Doctrine as they relate to a determination of which claims are barred and which claims are not.**

1. Choice of Law

In determining which law governs the issues before this Court, the Court must first decide which choice of law rules control. *Tow v. Rafizadeh (In re Cyrus II P'ship)*, 413 B.R. 609, 613 (Bankr. S.D. Tex. 2008). When a federal court sits in federal question jurisdiction but a state law issue must be evaluated, the choice of law rules to be applied are not as well defined as they

are for courts sitting in diversity jurisdiction. In *Tow*, the Honorable Marvin Isgur, United States

Bankruptcy Judge for the Southern District of Texas, explained that:

> In *Klaxon,* the Supreme Court of the United States held that a federal court sitting in diversity jurisdiction must apply choice of law rules of the forum state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). However, the Court has jurisdiction over this adversary proceeding arising out of Plaintiffs' bankruptcy filing pursuant to 28 U.S.C. § 1334(b). Thus, the Court sits in federal question jurisdiction and not diversity jurisdiction. This case is not bound by *Klaxon.* The Fifth Circuit has not specifically ruled on whether bankruptcy courts should apply federal or state choice of law rules.

*Id.* (internal citations omitted). In *Tow*, the court held that selecting the appropriate choice of law

rules requires a bankruptcy court to analyze whether the pending claim involves important

federal bankruptcy policy. *Id.* at 614 (applying federal choice of law rules to fraudulent

conveyance claims under 11 U.S.C. § 544(b) because they are not pendant state claims in federal

bankruptcy cases but rather federal causes of action rooted in federal bankruptcy law and

policy).[16] Other circuits have likewise applied forum state choice of law rules in bankruptcy

cases where there was no compelling federal policy. *See, e.g.*, *In re Merritt Dredging Co.,* 839

F.2d 203, 205 (4th Cir.1988) ("It would be anomalous to have the same property interest

governed by the law of one state in federal diversity proceedings and by the laws of another state

where a federal court is sitting in bankruptcy.").

    Issues regarding the internal affairs of corporations do not implicate the same federal

bankruptcy policies addressed in *Tow. CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 91

(1987) (stating that it is "an accepted part of the business landscape in this country for States to

---

[16] Reference to a "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure. Any reference herein to "the Code" refers to the United States Bankruptcy Code. Further, reference to any section (i.e. §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Reference to a "Rule" refers to the Federal Rules of Civil Procedure.

create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares"). Accordingly, this Court applies forum state choice of law rules to determine which law governs analysis of the claims and allegations found in the Petition.

Because this Court is located in Texas, and because Texas law governs the contstruction and implementation of the Plan,[17] the Court applies Texas choice of law rules. Under Texas choice of law rules, the internal affairs of an entity incorporated in Texas will be governed by the laws of Texas. Tex. Bus. Org. Code § 1.101. By the same token, "actions involving the internal affairs of a foreign corporation are governed by the law of the state of incorporation." Tex. Bus. Org. Code § 1.102; *In re Dexterity Surgical, Inc.*, 365 B.R. 690, 695 (Bankr. S.D. Tex. 2007). The evaluation of whether a claim is direct or derivative falls into this category of actions involving the internal affairs of a corporation. *See In re Dexterity Surgical, Inc.*, 365 B.R. at 695; Tex. Bus. Org. Code § 1.105 ("For the purposes of this code, the internal affairs of an entity include: (1) the rights, powers, and duties of its . . . owners and members.").

Under the plain language of the Texas Business Organizations Code § 1.101, Texas law would appear to apply to the internal affairs of SkyPort. However, due to the merger of SkyPort and SkyComm, SkyPort is the current owner of any claims which were originally held by

---

[17] There is no question that Texas law governs the interpretation of the Plan. [Main Case Docket No. 223, ¶ 14.8]. Paragraph 14.8 of the Plan expressly states as follows:

> Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or the law of the jurisdiction of organization of any entity, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan or the Chapter 11 case, including the documents executed pursuant to the Plan.

> There is also no question that Texas law governs the interpretation of the Confirmation Order. The Plan is attached to the Confirmation Order, and the language from paragraph 14.8—*i.e.*, that Texas law governs any documents executed in connection with the Plan—clearly includes the Confirmation Order.

SkyComm, a Delaware corporation, prior to the merger of these two companies. Here, the juxtaposition of § 1.102, which states that the internal affairs of a foreign corporation will be governed by the law of the state of incorporation, with § 1.101, which states that the internal affairs of a domestic corporation will be governed by Texas law, creates an ambiguity as to which state's law is to be applied to the claims which were formerly owned by SkyComm. Stated differently, the plain language of the statute does not clarify which law governs a cause of action that arose while SkyComm was a Delaware corporation, but is presently owned by SkyPort, a Texas corporation. As far as this Court can ascertain, there is no Texas case law interpreting these statutes in the context of the facts of this dispute.

However, this Court believes that the correct approach is to apply Delaware law pursuant to § 1.102. First, because these claims all arose pre-merger, they do not concern the internal governance of the Texas corporation, SkyPort, but rather the Delaware corporation, SkyComm. Indeed, none of the Plaintiffs are, or have ever been, shareholders of SkyPort, so arguably § 1.101 may not apply to these claims because the definition of "internal governance" only involves issues pertaining to a governing authority, governing person, officer, owner, or member. Tex. Bus. Org. Code § 1.105.

Second, and most importantly, the due process clause and the commerce clause require the application of the law of the state of incorporation at the time the cause of action arose. Texas Business Organizations Code §§ 1.101 & 1.102 are a codification of what is commonly referred to as the "internal affairs doctrine." Discussing the constitutional underpinnings of the internal affairs doctrine, the Delaware Supreme Court provided this persuasive summary:

31

In *CTS Corp. v. Dynamics Corp. of Am.*, the United States Supreme Court stated that it is "an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares." In *CTS*, it was also recognized that "[a] State has an interest in promoting stable relationships among parties involved in the corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs." *Id*. The internal affairs doctrine is a long-standing choice of law principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs—the state of incorporation.

The internal affairs doctrine developed on the premise that, in order to prevent corporations from being subjected to inconsistent legal standards, the authority to regulate a corporation's internal affairs should not rest with multiple jurisdictions. It is now well established that only the law of the state of incorporation governs and determines issues relating to a corporation's internal affairs. By providing certainty and predictability, the internal affairs doctrine protects the justified expectations of the parties with interests in the corporation.

The internal affairs doctrine applies to those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders. The Restatement (Second) of Conflict of Laws § 301 provides: "application of the local law of the state of incorporation will usually be supported by those choice-of-law factors favoring the need of the interstate and international systems, certainty, predictability and uniformity of result, protection of the justified expectations of the parties and ease in the application of the law to be applied." Restatement (Second) of Conflict of Laws § 301 (1971). Accordingly, the conflicts practice of both state and federal courts has consistently been to apply the law of the state of incorporation to "the entire gamut of internal corporate affairs.". The internal affairs doctrine does not apply where the rights of third parties external to the corporation are at issue, *e.g.*, contracts and torts.

**The internal affairs doctrine is not, however, only a conflicts of law principle**. Pursuant to the Fourteenth Amendment Due Process Clause, directors and officers of corporations "have a significant right . . . to know what law will be applied to their actions" and "[s]tockholders . . . have a right to know by what standards of accountability they may hold those managing the corporation's business and affairs.". Under the Commerce Clause, a state "has no interest in regulating the internal affairs of foreign corporations." Therefore, this Court has held that an "application of the internal affairs doctrine is mandated by constitutional principles, except in the 'rarest situations,'" *e.g.*, when "the law of the state of

32

incorporation is inconsistent with a national policy on foreign or interstate commerce."

*VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1013 (Del. 2005) (emphasis added) (internal citations omitted).

This Court agrees with this analysis and believes that the facts of the current dispute constitute one of those rare situations when the rote application of the internal affairs doctrine is inappropriate. A claim relating to the internal affairs of a company should be governed by the law of the state which was the state of incorporation at the time that claim arose. The law that applies to such a claim should not change simply because the company that is the owner of the claims is incorporated in a new state. The Court reaches this conclusion based on the very principles that animate the internal affairs doctrine. The internal affairs doctrine is based on the idea that all parties to the internal affairs of a corporation should clearly understand their rights in the internal affairs of the corporation and the standards to which their conduct will be held. This certainty and predictability is achieved by applying the law of the state of incorporation, and only the law of the state of incorporation, to these internal affairs. If these rights and standards could change *post hoc* due to a merger, it would destroy this certainty and predictability and undermine the entire purpose of the internal affairs doctrine.[18] Accordingly, this Court will apply Delaware

---

[18] A Delaware chancery court has discussed this problem in dicta, stating:

> The question is a subtle one. For example, it seems to me obvious that Delaware law would apply to determine whether the defendants had committed any breach of duty against Amax Gold in connection with the financing that is challenged in the amended complaint. To find that the change in domicile of Amax Gold changed the law that applied to the merits would be a highly troubling conclusion, disruptive of the defendants' settled expectations. The proposition that the law of Kinross's or Amax Gold's home jurisdiction might govern whether a former Amax Gold stockholder could continue to press claims that belonged to Amax Gold before the merger when that stockholder continues to own Kinross stock is a less extreme one.

law to issues dealing with the internal affairs of SkyComm because SkyComm was a Delaware corporation at the time these claims arose.

In sum, whereas SkyPort is a Texas corporation whose internal affairs are governed by Texas law, SkyComm (prior to the merger) was a Delaware corporation whose internal affairs were governed by Delaware law. Thus, this Court will apply Delaware law to issues related to the internal affairs of SkyComm, and will apply Texas law to issues related to the internal affairs of SkyPort.

### 2. The *Erie* Analysis

When a federal court is determining the content of state law to be applied, the Fifth Circuit has stated that:

> "[T]he underlying substantive rule involved is based on state law and the State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State."

*Hulin v. Fibreboard Corp.*, 178 F.3d 316, 319 (5th Cir. 1999) (internal citations omitted). Thus, this Court will look first to cases from the Supreme Court of Delaware and the Supreme Court of Texas to determine whether the Plaintiffs' claims are direct or derivative. Then, only if there are no such cases on point will this Court turn to cases from the lower courts.

---

*Lewis v. Ward*, No. Civ.A. 15255, 2003 WL 22461894, at *2 n.10 (Del.Ch. Oct. 29, 2003). This Court agrees that changing the law that applies to the characterization of derivative claims to a new state of domicile offends notions of due process less than, for example, changing the standards of fiduciary duty to which officers and directors are held. However, applying different laws to different aspects of the internal affairs of a company would also serve to destroy the certainty and predictability that is the entire purpose of the internal affairs doctrine. The approach this Court embraces provides predictability by requiring all legal issues pertaining to the internal affairs of a company that arise at a given time to be governed by the laws of the then state of incorporation, for as long as such claims may be brought. *See CTS Corp.*, 481 U.S. at 89–93.

**C. Interpretation of the Confirmation Order and the Plan: The Scope of the Confirmation Order and the Plan with Respect to the Claims Asserted in the Petition**

The Confirmation Order and the Plan provide that certain claims held by or against the Debtor or Interested Parties are released, enjoined, or restricted in some other way. Therefore, the determination of which claims that have been asserted in the Petition are to be dismissed with prejudice requires a two step analysis: first, this Court must interpret its Confirmation Order and the Plan in order to determine which types of claims are barred; and second, this Court must then evaluate the claims asserted by the Plaintiffs in the Petition and determine whether any of them are the types of claims that are barred.

Under Fifth Circuit precedent, chapter 11 plans are to be interpreted like contracts. *See In re Tex. Pig Stands, Inc.*, 610 F.3d 937, 943 (5th Cir. 2010). As noted above, this Court will apply Texas law in interpreting the Confirmation Order and the Plan pursuant to the express language of the Plan itself. Thus, this Court follows the mandate that "[c]ontracts are to be read as a whole, and an interpretation that gives effect to every part of the agreement is favored so that no provision is rendered meaningless or as surplusage." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 235 (Tex. 2003).

The Court begins here with the threshold issue of what types of claims are barred by either the Confirmation Order or the Plan.

1. The Injunctions

Section 13.5 of the Plan, entitled "Injunction," provides that:

The Confirmation Order shall include a permanent injunction prohibiting the collection of Claims in any manner other than as provided for in the Plan. All Holders of Claims shall be prohibited from asserting against the Debtor, Reorganized Debtor, Balaton or Insider Released Parties (defined *infra*) or any of

their assets or properties, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not such Holder filed a proof of Claim. Such prohibition shall apply whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code; or (c) the Holder of a Claim based upon such debt has accepted the Plan. This injunction also permits the Reorganized Debtor to enforce 11 U.S.C. §[]525(a) upon improper revocation or restriction of licenses.

[Main Case Doc. No. 223, p. 21, ¶ 13.5].

Under the Plan, the definition of the term "Claim" states that it "shall have the meaning given in Section 101 of the Bankruptcy Code, to wit, any right to payment, or right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, against the Debtor in existence on or before the Filing Date, whether or not such right to payment or right to equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, [d]isputed, undisputed, legal, secured or unsecured whether or not asserted." [Main Case Doc. No. 223, p. 4–5, ¶ 2.1.12]. The relevant aspect of this injunction is that, under the definition of Claim in the Plan, it enjoins suits against the Debtor based on a right to payment in existence on or before the Filing Date. Stated differently, Section 13.5 enjoins suits, based on a right to payment from SkyPort in existence on or before the Filing Date, that are brought against SkyPort (before and after the Effective Date), Balaton, or the Insider Released Parties (*i.e.*, Kubbernus and Balaton Group, Inc.).

Section 13.9 of the Plan, entitled "Lawsuits," provides that:

On the Effective Date, all lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of Claims against the Debtor except proof of Claim and/or objections thereto pending in the Bankruptcy Court shall be dismissed as to the Debtor. Such dismissal shall be with prejudice to the assertion of such Claim in any manner other than as

36

prescribed by the Plan. All parties to any such action shall be enjoined by he Bankruptcy Court by the confirmation Order from taking any action to impede the immediate and unconditional dismissal of such actions. All lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of a claim(s) by the Debtor or any entity proceeding in the name of for the benefit of the Debtor against a person shall remain in place only with respect to the claim(s) asserted by the Debtor or such other entity, and shall become property of the Post-Confirmation Debtor to prosecute settle or dismiss as it sees fit.

[Main Case Doc. No. 223, p. 22, ¶ 13.9].

Section 13.9 of the Plan works in conjunction with Section 13.5 of the Plan in eliminating avenues for recovering Claims outside the confines of the Plan. Whereas Section 13.5 permanently enjoins attempts to assert Claims in a manner inconsistent with the Plan, Section 13.9 affirmatively dismisses, with prejudice, all suits against the Debtor. Specifically, this section reads as follows: "All lawsuits, litigations, administrative actions or other proceedings, judicial or administrative in connection with the assertion of Claims against the Debtor except proof of Claim and/or objections thereto pending in the Bankruptcy Court shall be dismissed as to the Debtor." [Main Case Doc. No. 223, p. 23, ¶ 13.9]. Thus, as of the Effective Date, any such proceedings were dismissed with prejudice as to the Debtor. The key restriction to the scope of this dismissal is that it is limited to Claims **against the Debtor** and is dismissed with prejudice **only as to the Debtor**.

Paragraph 30 of the Confirmation Order provides that:

Except as provided in this plan or this Order, as of the Confirmation Date, all entities which have held, currently hold or may hold a claim or other debt or liability against the Debtor that is discharged are permanently enjoined  from taking any of the following actions on account of such discharged claims, debts or liabilities or terminated interest or rights: (i) commencing or continuing in any manner, any action or other proceeding against the Debtor or its properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award,

37

decree or other award against the Debtor or its properties; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtor or its properties; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or its properties; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan.

[Main Case Doc. No. 340, p. 8, ¶ 30].

Paragraph 30 of the Confirmation Order works in conjunction with Sections 13.5 and 13.9 of the Plan, as well as Paragraph 33 of the Confirmation Order (discussed below), to define and restrict the rights of entities holding a claim against the Debtor. Much like Section 13.5 of the Plan, Paragraph 30 of the Confirmation Order permanently enjoins specified actions based on certain Claims, other debts, or liabilities against the Debtor in a way that is inconsistent with the Plan. It is more specific in some respects than Section 13.5 of the Plan, but it shares the key restriction of enjoining entities which hold Claims against the Debtor.

Paragraph 33 of the Confirmation Order provides that:

All rights of the holders of claims or interests of all classes under the Plan, including, without limitations, the right to receive distributions on account of such Claims or interests, shall hereinafter be limited solely to the right to receive such distributions exclusively as provided in the Plan, and, to the extent applicable, the provisions of this Order. After the date hereof, the holders of such claims or interests shall have no other or further rights against the Debtor except as provided for in the Plan and this Order.

[Main Case Doc. No. 340, p. 9, ¶ 33].

Paragraph 33 works in conjunction with Sections 13.5 and 13.9 of the Plan of Reorganization in restricting rights of the holders of Claims or interests under the Plan to only those rights exclusively provided in the Plan and the provisions of the Confirmation Order. In

other words, the rights explicitly granted to holders of Claims or interests under the Plan are the only rights held by the holders of these Claims or interests.

2. <u>The Releases</u>

Paragraph 31 of the Confirmation Order provides that:

> The respective affiliates, officers, directors, shareholders, members, representatives, attorneys, financial advisors, and agents of the Debtor, the Reorganized Debtor, have acted in good faith, and each of those parties are hereby forever released from and shall not be liable to any holder of a Claim, or other party with respect to any action, forebearance from action, decision, or exercise of discretion taken from the Petition Date to the Effective Date in connection with (i) the operation of the Debtor or the Reorganized Debtor, (ii) the proposal or implementation of any of the transactions provided for, or contemplated in, the Plan or the Plan Documents; or (iii) the administration of the Plan or the assets and property to be distributed pursuant to the Plan and the Plan Documents. Notwithstanding anything else contained herein, or in the Plan, the exculpation provisions contained in Section 13.8 of the Plan and approved hereby shall not act to exculpate Balaton Group, Inc., Robert Kubbernus, or Clear Sky Management Inc. with respect to any claims of, transactions, dealings or relationships with Draco Capital, Inc., or Clear Sky Investments, L.P., their investors and affiliates.

[Main Case Doc. No. 340, p. 8, ¶ 31].

Paragraph 31 of the Confirmation Order acts as a finding of fact that the "respective affiliates, officers, directors, shareholders, members, representatives, attorneys, financial advisors, and agents of the Debtor, [and] the Reorganized Debtor" acted in good faith in a variety of capacities pertaining to the bankruptcy of SkyPort, between the Petition Date and the Effective Date. It also acts as a release from liability for these parties for various aspects of their roles in the administration of SkyPort while in bankruptcy.

Section 13.8 of the Plan, entitled "Exculpation," provides that:

> Neither the Debtor, the Insider released Parties, nor any of their respective present members, officers, directors, or employees shall have or incur any liability to any

holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission (specifically including negligence and gross negligence) in connection with, relating to, or arising out of the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions not otherwise released and which are the result of fraud or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

[Main Case Doc. No. 223, p. 22, ¶ 13.8]

Section 13.8 of the Plan works in conjunction with Paragraph 31 of the Confirmation Order, and although the language of the two provisions is not exactly the same, the releases perform largely the same role. Section 13.8 acts to release various employees and agents from liability for any role they played relating to SkyPort's bankruptcy.

Paragraph 32 of the Confirmation Order provides that:

Except as expressly set forth in the Modification, pursuant to Section 13.7 of the Plan, all officers, directors and professionals of the Debtor are hereby released from any and all causes of action **held by the Debtor**. Notwithstanding anything else contained herein, or in the Plan, the releases contained in Section 13.7 of the Plan and approved hereby shall not act to release any claims or causes of action held by Draco Capital, Inc., Clear Sky Management, Inc., Clear Sky Investments, L.P., their investors, partners or affiliates against any person or entity other than the Debtor and the Reorganized Debtor.

[Main Case Doc. No. 340, p. 9, ¶ 32] (emphasis added).

This is the paragraph of the Confirmation Order that has been the primary battleground of the various parties to this dispute. Both sides have assumed that it enjoins any derivative suits brought by the shareholders of what was once SkyComm, and so the arguments between the

40

parties have largely turned on the single question of whether a cause of action the Plaintiffs have brought is derivative or not.

The Court disagrees with this assumption. Paragraph 32 clearly releases claims "held by the Debtor." An analysis of the language of the Confirmation Order and the Plan in the context of the Effective Date of the Plan, and the date of the merger between SkyComm and SkyPort, leads this Court to conclude that Paragraph 32 releases only claims held by SkyPort, not any claims held by SkyComm. Thus, the shareholders of SkyComm are not enjoined by the Confirmation Order from bringing claims that belonged to SkyComm prior to its merger with SkyPort pursuant to the Plan. The analysis that leads the Court to this conclusion follows below.

Paragraph 32 states that any causes of action held by the "Debtor" are released. The Confirmation Order incorporates the definitions of the Plan,[19] which defines "Debtor" as meaning "SkyPort." However, the Plan also defines "Reorganized Debtor" as meaning "SkyPort immediately after the Effective Date." Thus, the definition of "Reorganized Debtor" makes a temporal distinction which, because the canons of construction require this Court to interpret its orders in a way that would avoid making any language in the Confirmation Order mere surplusage, compels this Court to interpret the term "Debtor" as pertaining to SkyPort prior to the Effective Date.[20] If the definition of "Debtor" were not to be limited in this manner, it would render the term "Reorganized Debtor" superfluous, as the term "Debtor" would refer to SkyPort

---

[19] Though the Confirmation Order does not explicitly state that it incorporates the definitions of the Plan, it uses the defined terms from the Plan with a regularity that indicates that these terms are being incorporated. [Main Case Doc. No. 340].

[20] *Adams v. Adams*, 214 S.W.2d 856, 857 (Tex. Civ. App.—Waco 1948, writ ref'd n.r.e.) ("However, if the language used is ambiguous the judgment should be construed as a whole so as to give reasonable meaning and effect to all of its terms and provisions.").

at any time before or after the Effective Date. This interpretation, that the "Debtor" and the "Reorganized Debtor" represent SkyPort during discrete time periods, is supported by frequent reference to both terms in tandem throughout the Plan and the Confirmation Order.[21] Such use further supports this Court's conclusions that these terms are used in the Plan and the Confirmation Order to refer to different things and, moreover, that their meanings are exclusive of each other. Thus, when paragraph 32 of the Confirmation Order states that the Debtor releases a cause of action, it means that only a cause of action held by SkyPort, before or as of the Effective Date of the Plan, is released.

SkyComm is formally recognized in the Plan as being a separate entity from SkyPort by its definition, which recognizes SkyComm as the "100% shareholder of the Debtor."[22] As such, any reference in the Plan to the Debtor (defined as SkyPort prior to the Effective Date) or SkyPort does **not** include SkyComm. SkyComm, as a separate entity from SkyPort, held its own causes of action prior to the Effective Date which could have been brought as derivative claims by its shareholders. SkyComm and SkyPort were merged into a single entity under the Plan, with SkyPort as the surviving entity. This merger did not occur until October 13, 2009.[23] This date is well after the Effective Date occurred on August 23, 2009. Paragraph 32 of the Confirmation Order became effective on the Effective Date and released claims that SkyPort held **on the Effective Date**. Stated differently, SkyComm did not merge with SkyPort until well after

---

[21] *See, e.g.*, Confirmation Order paragraphs 31, 32 (second sentence), & 34; [Main Case Doc. No. 340]; Plan section 13.5 [Main Case Doc. No. 223].

[22] Plan Section 2.1.44. [Main Case Doc. No. 340].

[23] [Main Case Doc. No. 388].

SkyPort's release of claims occurred on the Effective Date—at the time of the merger, SkyPort was no longer the "Debtor." Paragraph 32 of the Confirmation Order could no longer act to cause SkyPort to release any causes of action it acquired from SkyComm. As a result, SkyComm's claims were not released, and SkyPort still retains any causes of action which were held by SkyComm at the time of the merger.[24]  Notwithstanding any other legal barriers to the former SkyComm Shareholders raising these causes of action through a derivative suit (and, as discussed below, this Court believes these barriers to be substantial), the Confirmation Order does **not** prevent these shareholders from raising claims which were held by SkyComm prior to the merger.

As a result, in determining which counts should be dismissed with prejudice as enjoined or otherwise restricted by the Confirmation Order, this Court must determine: (1) whether the cause of action is derivative or direct; and (2) if the cause of action is derivative, whether it was held by SkyComm or SkyPort prior to the merger of those two entities. Only if the Count is derivative **and** it was held by SkyPort on or before the Effective Date will the claim be dismissed with prejudice on the basis of the release required by Paragraph 32 of the Confirmation Order.

Finally, Section 13.7 of the Plan, entitled "Releases," provides that:

On the Effective Date and pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code, the Debtor, and to the maximum extent provided by the law, its agents, release and forever discharge all claims, including acts taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document

---

[24] Section 5.01 of the Plan and Agreement of Merger states that "[SkyPort] shall possess all of the rights, privileges, powers and franchises [ ] of a public as [well as] of a private nature, and shall be subject to all the restrictions, disabilites and duties of SkyComm; and all rights, privileges, powers and franchises of SkyComm, and all property, real, personal . . . as they were of SkyComm." [Main Case Doc. No. 388].

created or entered into or any other act taken or entitled to be taken in connection with the Plan or this case against the following, whether known or unknown:

13.7.1  Robert Kubbernus and Balaton Group, Inc. ("Insider Released Parties"), in connection with any and all claims and causes of action arising on or before the Confirmation Date that may be asserted by or on behalf of the Debtor or the Bankruptcy Estate and/or on account of the Debtor's Case.

13.7.2  The release of these Insider Released Parties shall be conditioned upon the occurrence of the Effective Date.

13.7.3  The Debtor's professionals will be released from any and all claims and liabilities other than willful misconduct or except the releases is [sic] otherwise restricted by the Texas Disciplinary Rules of Professional Conduct.

[Main Case Doc. No. 223, p. 22, ¶ 13.7].

The scope of these releases is limited to two groups of claims. The first group consists of claims that: (1) are held by the Debtor and, to the extent allowed by law, the agents of the Debtor; (2) are against Kubbernus and Balaton; (3) arose before the Confirmation Date; and (4) may be asserted by or on behalf of the Debtor or the Bankruptcy Estate and/or on account of the Debtor's Case. The second group consists of claims that: (1) are held by the Debtor and, to the extent allowed by law, the agents of the Debtor; and (2) are against the Debtor's professionals; but (3) does not include claims for willful misconduct or other claims restricted by the Texas Disciplinary Rules of Professional Conduct.

The same temporal distinction made in Paragraph 32 of the Confirmation Order also exists in Section 13.7 of the Plan. Because Section 13.7 releases claims held by the Debtor, Section 13.7 does **not** release any claims held by SkyComm, which had not merged with SkyPort by the Effective Date of the Plan.[25]

---

[25] As noted above, the Effective Date was August 23, 2009, whereas the merger took place several weeks later on October 13, 2009.

**D. Standards for Determining Whether a Claim is Derivative or Direct**

    1. Delaware Law: The *Tooley* Standard

    "The derivative suit has been generally described as 'one of the most interesting and ingenious of accountability mechanisms for large formal organizations.' It enables a stockholder to bring suit on behalf of the corporation for harm done to the corporation. Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation. A stockholder who is directly injured, however, does retain the right to bring an individual action for injuries affecting his or her legal rights as a stock holder. Such a claim is distinct from an injury caused to the corporation alone. In such individual suits, the recovery or other relief flows directly to the stockholders, not to the corporation." *Tooley v. Donaldson,* 845 A.2d 1031, 1036 (Del. Super. 2004). "Determining whether an action is derivative or direct is sometimes difficult and has many legal consequences." *Id.*

    In an effort to ease the burden of courts that attempt to differentiate derivative claims from direct claims, the Supreme Court of Delaware provided that such "analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?" *Id.* ("The decision whether a suit is direct or derivative may be outcome-determinative. Therefore, it is necessary that a standard to distinguish such actions be clear, simple and consistently articulated and applied by our courts."). The Supreme Court of Delaware made it clear that its expression of the law in *Tooley* is not to be considered a new standard, stating that "[t]his simple analysis is well embedded in our jurisprudence." *Id.* Rather, this two-prong test was delineated in *Tooley* "because some cases have complicated it by injection of the amorphous

45

and confusing concept of 'special injury'" or "the proposition . . . that an action cannot be direct if all stockholders are equally affected or unless the stockholder's injury is separate and distinct from that suffered by other stockholders." *Id*. at 1036, 1039. The proper analysis does not include these considerations, instead:

> [A] court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

*Id*. at 1039. Thus, "in the context of a claim for breach of fiduciary duty," the correct inquiry for the first prong of the test will be: "[l]ooking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?" *Id*. "The second prong of the analysis should logically follow." *Id*.

2. Texas Law

The standard for determining whether a claim is derivative under Texas law was articulated by the Supreme Court of Texas in *Wingate v. Hajdik*. 795 S.W. 2d 717, 719 (Tex. 1990). Stating that "a corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong," the Supreme Court of Texas expanded on the nature of a derivative claim under Texas law, quoting a previous case of its own:

> Ordinarily, the cause of action for injury to the property of a corporation, or the impairment or destruction of its business, is vested in the corporation, as distinguished from its stockholders, even though it may result indirectly in loss of earnings to the stockholders. Generally, the individual stockholders have no separate and independent right of action for injuries suffered by the corporation

46

> which merely result in the depreciation of their stock. This rule is based on the principle that where such an injury occurs each shareholder suffers relatively in proportion to the number of shares he owns, and each will be made whole if the corporation obtains restitution or compensation from the wrongdoer. Such action must be brought by the corporation, not alone to avoid a multiplicity of suits by the various stockholders and to bar a subsequent suit by the corporation, but in order that the damages so recovered may be available for the payment of the corporation's creditors, and for proportional distributions to the stock holders as dividends, or for such other purposes as the directors may lawfully determine.

*Id.* Though articulated differently from the *Tooley* standard, the Texas standard for whether a claim is derivative turns on the same facts as the *Tooley* standard. The relevant considerations are which party suffered the harm and which party would receive relief. Just as with the *Tooley* standard, if a shareholder's claim would require a demonstration of harm to the corporation in order to succeed, it is a derivative claim.

### E. The SkyComm Shareholders lack standing to bring a derivative claim asserting the causes of action that once belonged to SkyComm.

As discussed in Sections C and D *supra*, neither the Confirmation Order nor the Plan prevent the causes of action which were once held by SkyComm (and are now held by SkyPort) from being asserted, **assuming there are no other barriers to their assertion**. This Court believes, however, that the SkyComm shareholders may not assert these causes of action on behalf of SkyPort **because they lack standing to do so**. As noted in Section B, the law of the state of incorporation at the time a cause of action arises governs derivative claims as they pertain to the internal affairs of the corporation. Thus, Delaware law is applied to determine whether the SkyComm Shareholders have standing to maintain a derivative claim; and under Delaware law, they have no standing.

Under Delaware law, "a plaintiff loses standing to maintain a derivative suit where the corporation[ ] in which the plaintiff holds stock[ ] merges with another company." *Ark. Teacher Ret. Sys. v. Caiafa*, 996 A.2d 321, 322–23 (Del. 2010). The two exceptions to this rule are: "(1) where the merger itself is the subject of a claim of fraud; and (2) where the merger is in reality a reorganization which does not affect plaintiff's ownership of the business enterprise." *Lewis v. Anderson*, 477 A.2d 1040, 1046 n.10 (Del. 1984); *Ark. Teacher*, 996 A.2d at 322–23. In this Chapter 11 case, the merger took place pursuant to the Plan. [Main Case Doc. No. 340]. Paragraph 31 of the Confirmation Order and Section 13.8 of the Plan act to release the "respective affiliates, officers, directors, shareholders, members, representatives, attorneys, financial advisors, and agents of the Debtor, the Reorganized Debtor,"—*i.e.*, Kubbernus and the Balaton Group. These releases apply to activities related to the bankruptcy of SkyPort between the Petition Date and the Effective Date. Paragraph 31 of the Confirmation Order also operates as a finding that these parties acted in good faith. Thus, the first exception is not available to the SkyComm Shareholders. *See In re Chesnut*, 356 Fed. Appx. 732, 736 (5th Cir. 2009) (*citing Travelers Indem. Co. v. Bailey,* 129 S.Ct. 2195, 2205) ("[O]nce the [prior] Orders becom final on direct review . . . they became res judicata to the parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."); *Republic Supply v. Shoaf*, 815 F.2d 1046, 1051 (5th Cir. 1987).

Nor is the second exception, which requires that the merger be in reality a reorganization which does not affect the plaintiff's ownership of the business enterprise. Here, the Plaintiffs, who were once shareholders in SkyComm, had their equity interests in the company

extinguished pursuant to the merger under the Plan. [Main Case Doc. Nos. 340 & 388]. The Plaintiffs' ownership interest was therefore very certainly affected. In sum, neither exception applies to the general rule that a shareholder does not have standing to bring a derivative claim post-merger.

**F. Analysis of the Fifteen Counts Contained in the Petition**

The Petition includes fifteen Counts seeking compensation for alleged harms resulting from a variety of activities related to SkyComm and SkyPort. The purpose of this section of the Opinion is to perform a two-part analysis. First, this Court will characterize each Count, or portion of a Count when necessary, as direct actions or derivative actions against the Defendants. Second, if a Count or portion of a Count is determined to be derivative, this Court will determine which entity it is being brought on behalf of—SkyComm, SkyPort, or ClearSky.[26]

Once characterized, the Counts, or portions of the Counts where appropriate, will be treated as follows: (1) derivative claims brought on behalf of SkyPort will be dismissed with prejudice as violating the Confirmation Order and the Plan;[27] (2) derivative claims brought on behalf of SkyComm will be dismissed with prejudice due to the Plaintiffs' lack of standing to bring such a claim; (3) direct claims otherwise barred by the Confirmation Order and the Plan will be dismissed with prejudice; (4) direct claims not barred by the Confirmation Order or the

---

[26] It is worth noting that the terms "derivative claims brought on behalf of SkyPort" and "derivative claims brought on behalf of SkyComm" are simplified terms used by this Court in the interest of clarity. The former refers to claims which belonged to SkyPort prior to its merger with SkyComm, including those claims belonging to SkyPort prior to SkyPort's release of claims pursuant to the Confirmation Order. The latter refers to claims which belonged to SkyComm prior to the same merger.

[27] For ease and clarity, Exhibit A attached to this Memorandum Opinion sets forth which claims are being remanded to Texas state court, and which claims are being dismissed with prejudice.

Plan will be remanded to the Texas state court; and (4) derivative claims brought on behalf of ClearSky will be remanded to the Texas state court.[28]

The Petition itself characterizes the Counts as direct. It also makes regular reference to harms accruing to the shareholders and duties owed by the Defendants to these shareholders. However, simply including this language in the Petition does not, by itself, make the claims direct. *Gatz v. Ponsoldt*, No. Civ.A. 174-N, 2004 WL 3029868 at *7 (Del. Ch. Nov. 5, 2004) ("[E]ven after *Tooley*, a claim is not 'direct' simply because it is pleaded that way. . . . Instead, the court must look to all the facts of the complaint and determine for itself whether a direct claims exists.") (internal quotation marks omitted); *In re Dexterity Surgical, Inc.*, 365 B.R. 690, 697 (Bankr. S.D. Tex. 2007) ("It is a well accepted principle that a direct and derivative action may be maintained out of the same set of facts. [The plaintiff's] mere recognition of this principle does not excuse it from proving that it individually suffered the alleged harm and that any recovery would properly belong to [the plaintiff]."). Fifth Circuit precedent also dictates that this Court look at the substance of the Petition, and the nature of the wrongs alleged therein, rather than the Plaintiffs' characterization. *See id.* at 701–02 (citing *Armstrong v. Capshaw, Goss & Bowers*, 404 F.3d 933, 936 (5th Cir. 2005); *Litman v. Prudential-Bache Props., Inc.*, 611 A.2d 12, 15 (Del. Ch. 1992).

Thus, in order to determine whether a claim is direct or derivative, the Court will look at the substance of the Petition and the nature of the wrongs alleged therein in order to determine

---

[28] Unlike derivative claims belonging to SkyPort and SkyComm, the derivative claims of ClearSky are not barred from being brought because the Plan and the Confirmation Order do not prohibit such claims and, additionally, ClearSky (unlike SkyComm) has never merged with SkyPort. Of course, there may be other reasons under applicable law as to why ClearSky's claims could not be brought, but those arguments are left for another day to another forum.

whether the Plaintiffs must show harm to one of the involved companies in order to prevail on a

Count or a portion of a Count.

1. <u>Count One: Breach of Fiduciary Duties against the CenturyTel Defendants on behalf of the Original Shareholders and the Non-CenturyTel Debenture Holders</u>

Count One, in relevant part, alleges that:

344. Each of the CenturyTel Directors, as directors of SkyComm and SkyPort through November 2006, owed fiduciary duties to the shareholders of these companies; these included a duty of due care and a duty of loyalty.

345. CenturyTel, as a party in control of SkyComm and SkyPort, owed fiduciary duties to the shareholders of these companies, including a duty of due care and a duty of loyalty.

346. As outlined in [the] Petition, each of the CenturyTel Defendants breached their duties of loyalty and due care by not acting in the best interests of SkyComm, SkyPort and their shareholders, but rather acting in bad faith and for their own personal and corporate interests.

347. CenturyTel and the CenturyTel Directors breached their duties of loyalty and due care and failed to act in good faith with respect to the shareholders of SkyComm by:

(a) causing the CEO of SkyComm to report directly to CenturyTel, thereby usurping the authority of the SkyComm and SkyPort's Board of Directors;

(b) depriving the shareholders of their rights to participate in the management of SkyComm;

(c) depriving SkyComm of the ability to obtain arms-length financing on the best terms available to it;

(d) causing SkyPort to perform services for CenturyTel without paying for the same;

(e) causing CenturyTel to breach and SkyComm not to enforce agreements whereby SkyComm was to perform services for CenturyTel;

(f) managing SkyComm for the benefit of CenturyTel and to the detriment of its shareholders;

(g) grossly mismanaging SkyComm and SkyPort;

(h) not informing the Non-CenturyTel Directors that they were actively in the process of seeking to sell SkyComm;

(i) not conducting proper due diligence on Kubbernus in the sale of their controlling interest in SkyComm to him;

(j) not making reasonable efforts to assure that shareholders and investors in SkyComm would not be harmed as a result of CenturyTel's disposition of its controlling interest in SkyComm;

(k) selling control of SkyComm to Kubbernus despite clear warnings of the danger that he would loot SkyComm and defraud investors;

(l) making no effort to assure [sic] that SkyComm was obtaining the best price and terms for the sale of shares in SkyComm;

(m) keeping the Non-CenturyTel Directors and shareholders in the dark regarding the sale of the [Controlling Debentures] and issuance of additional shares by SkyComm, and the negotiations leading up to it;

(n) disregarding the best interest of SkyComm and its shareholders in the negotiation of the sale of shares to Balaton and SPA Purchasers;

(o) causing SkyPort to issue shares to CenturyTel and to Balaton for inadequate consideration and at below fair market value;

(p) actively colluding with Balaton and Kubbernus to file false and misleading applications and statements with the FCC and the Team Telecom agencies of the United States government, in an effort to cause the FCC to approve the transfer of control of SkyPort to Balaton.

(q) causing SkyComm to reimburse CenturyTel for its legal expenses in Securing FCC and Team Telecom approval;

(r) causing SkyComm to agree that Balaton could pay the consideration for the [Controlling] Debentures with SkyComm funds;

(s) permitting the conversion of Balaton indebtedness to CenturyTel into SkyComm indebtedness;

(t) failing to inform the Non-CenturyTel Directors, SkyComm shareholders and Non-CenturyTel Debenture Holders of the complete and the final terms of the transaction with Balaton;

(u) turning over control of SkyComm and SkyPort to Balaton and Kubbernus before obtaining the approval of the FCC and the Team Telecom agencies, and without any vote by the SkyComm Board;

(v) conspiring with Kubbernus and Balaton to revive a portion of the [Controlling] Debentures after representing to the Non-CenturyTel Directors and SkyComm Shareholders that they would be and had been fully converted; and

(w) selling control of SkyComm and SkyPort to a looter and securities fraudster.

i. *Analysis of Parts (a), (b), (f), (l), (n), and (o) of Count One*

Part (f) of Count One states that the CenturyTel Defendants ran SkyComm and SkyPort for CenturyTel's own benefit as if they were wholly-owned subsidiaries. Implicit in this assertion is the premise that running SkyComm and SkyPort for CenturyTel's benefit caused harm to SkyComm and SkyPort. Such harm could arise if SkyComm or SkyPort was compelled to follow a course of action which benefitted CenturyTel but was detrimental to SkyComm or SkyPort. For the Plaintiffs to prove harm to themselves for such an act, they would have to show harm to SkyComm or SkyPort, thus making such a claim derivative. Therefore, Part (f) of Count One is derivative. Part (a) of Count One fits easily within the allegations of Part (f), and so it too is derivative. Part (a) of Count One alleges a sabotage of internal governance for CenturyTel's benefit. The harm in this case is to SkyPort and SkyComm because it is these entities' proper functioning which is being impeded. The shareholders were only harmed to the extent that this

resulted in mismanagement of either SkyComm or SkyPort—or both. Therefore, Part (a) of Count One is derivative.

Parts (n) & (o) of Count One constitute both direct claims and derivative claims. Anytime a corporation is compelled to issue stock for inadequate compensation, that corporation suffers harm by way of a reduction in its overall economic value. *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006). When such diluting stock is issued, shareholders are usually only harmed indirectly as a result of this reduction in the corporation's economic value. *Id.* at 99-100 (noting that generally claims of corporate overpayment which result in shareholder dilution are derivative claims because "any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in value of the entire corporate entity.").

However, there is a species of stock issuance for inadequate consideration that causes direct harm to shareholders as well. *Id.* A diluting issuance of stock to the majority shareholder shifts voting power from the minority shareholders to the majority shareholder. *See Feldman v. Cutaia*, 951 A.2d 727, 732 (Del. 2008); *Gentile*, 906 A.2d at 99-100 (Del. 2006). When a majority shareholder compels a company to issue diluting stock, part of the voting power of the minority shareholder block is extracted and transferred from the minority to the majority. This extraction constitutes a direct harm to the minority shareholders. *Id.* Here, Parts (n) & (o) allege that the CenturyTel Defendants played a role in an issuance of stock to Balaton for inadequate consideration. Balaton is not alleged to have been a controlling shareholder at the time, but it is alleged to have had control of SkyComm and SkyPort in its role as holder of the Controlling Debentures. As such, this Court concludes that, logically, the harm which flows from such an action is analogous and the shareholders of SkyComm have allegedly suffered a direct harm

54

from the extraction of their voting power. Accordingly, Parts (n) and (o) are both direct and derivative.

Pursuant to these principles, Part (l) of Count One is derivative with respect to any issuance of stock for inadequate consideration that was not to a controlling entity, and both direct and derivative with respect to any issuance of stock for inadequate consideration to a controlling entity.

Part (b) of Count One is only derivative. Part (b) specifically alleges that the shareholders lost their rights to manage SkyComm and SkyPort. Looking to the body of the Petition, the basis for this allegation must be that the CenturyTel Defendants controlled SkyComm and excluded the shareholder-elected directors from the regular functions of the company. As discussed before with respect to Part (a) of Count One, interference of this sort with the internal governance of a company will result in a direct harm to the company, not the shareholders. However, the Plaintiffs couch this part in terms meant to indicate that they suffered from "their" directors being frozen-out. Fundamentally, then, Part (b) is an allegation that the SkyComm Shareholders suffered a *de facto* loss of voting rights in the corporation because the specific directors which the shareholders elected were not involved in the management of SkyComm or SkyPort. However, the facts alleged by the Plaintiffs are different and do not constitute the same extraction of voting power recognized in *Feldman* and *Gentile*.

Here, the Plaintiffs do not allege that they lost proportional voting power, or that they were not able to vote for the directors of SkyComm. Thus, the shareholders of SkyComm did not experience a reduction of the voting power of their shares as defined by *Feldman* and *Gentile.* Nor do the Plaintiffs allege that they were unable to elect their four directors as set out by the

debenture agreement with CenturyTel, so they certainly were able to exercise their voting power pursuant to the documents organizing SkyComm. The shareholder power to elect directors is not a guarantee that shareholders will always get their way in the management of the business. Moreover, the Plaintiffs have a serious problem before them if seeking to show that the Kubbernus Defendants' control of SkyComm and SkyPort disenfranchised the shareholders. This control was given to the holders of the Controlling Debentures freely by SkyComm under a board entirely elected by shareholders, some of whom are Plaintiffs in this suit. Under the terms of the Controlling Debentures, the holder of the Controlling Debentures has the authority to appoint half of the directors of SkyComm and holds the tie-breaking vote in case of a dead-lock. It was this transaction that ceded control of SkyComm and SkyPort to the holder of the Controlling Debentures. Under these circumstances, the SkyComm shareholders cannot later come to court and complain of some direct injury to their ability to participate in the management of SkyComm or SkyPort arising from the Controlling Debentures holders' exercise of this control. Thus, the Plaintiffs' claims based on Part (b) of Count 1 are derivative claims brought in the right of both SkyComm and SkyPort. Those claims brought on behalf of SkyComm are dismissed with prejudice because the Plaintiffs lack standing to bring such claims after the merger of SkyComm and SkyPort. Those claims brought on behalf of SkyPort are dismissed with prejudice because they are barred by the Confirmation Order.

In sum, for the reasons discussed above, Parts (a) and (f) of Count One are derivative claims. Part (f) is brought on behalf of SkyComm and, accordingly, will be dismissed with prejudice because the Plaintiffs lack standing after the merger of SkyComm and SkyPort. Part (a) is brought on behalf of SkyComm and SkyPort. Accordingly, Part (a) will be dismissed with

prejudice with respect to SkyPort because it violates the Confirmation Order, and with respect to SkyComm because the Plaintiffs do not have standing to bring such a claim. Part (b) of Count One is entirely derivative, brought in the right of both SkyComm and SkyPort, and will be dismissed with prejudice because respectively, the Plaintiffs lack standing and it violates the Confirmation Order. The derivative aspect of Part (l) of Count one is brought on behalf of SkyComm and will be dismissed with prejudice for lack of standing. The direct aspects of Part (l) will be remanded to the Texas state court. Parts (n) and (o) of Count One have both derivative and direct aspects. The derivative aspect is brought on behalf of SkyComm and will be dismissed with prejudice because the Plaintiffs lack standing to bring such a claim. The direct claim will be remanded to the Texas state court.

### ii. *Analysis of Parts (c)-(e), (g), (m), (p)-(s), and (u)-(w) of Count One*

Parts (c)-(e), (g), (m), (p)-(s), and (u)-(w) of Count One all allege harms only to SkyComm or SkyPort. As a result, these Parts are all derivative claims. Parts (d) and (p) are derivative claims brought solely on behalf of SkyPort. Accordingly, these Parts will be dismissed with prejudice because they violate the Confirmation Order and the Plan. Parts (e), (m), (q), (r), (s), and (v) are derivative claims brought solely on behalf of SkyComm. Accordingly, they will be dismissed with prejudice on the basis that the Plaintiffs do not have standing to bring these claims after the merger of SkyComm and SkyPort. Parts (c), (g), (u) and (w) are derivative claims brought on behalf of both SkyComm and SkyPort (*i.e.*, both SkyComm and SkyPort suffered harm based on these allegations). Accordingly, the claims brought on behalf of SkyPort are dismissed with prejudice because they violate the Confirmation Order and the Plan, and the claims brought on behalf of SkyComm and SkyPort are dismissed with prejudice on the basis

that the Plaintiffs either lack standing to bring such claims or are barred by the Confirmation Order from bringing such claims.

### iii. *Analysis of Parts (h)-(k) and (t) of Count One*

Parts (h)-(k) and (t) of Count One all concern the assignment of the Controlling Debentures to Balaton. These Parts are all claims predicated on an assumption that Balaton harmed the Plaintiffs during its ownership of the Controlling Debentures. Balaton is only alleged to have caused direct harms to the Original Shareholders in two claims: the oppression claim and claims related to a diluting issuance of stock to a controlling entity. These claims provide a basis for the Original Shareholders to prove their breach of fiduciary duty claim without demonstrating harm to either SkyComm or SkyPort. Accordingly, Parts (h)-(k) and (t) of Count One are direct claims and will be remanded to the Texas state court.

### 2. Count Two: Breach of Fiduciary Duties Against the Kubbernus Defendants

Count Two, in relevant part, alleges that:

355. Kubbernus, as a director of SkyComm and SkyPort from November 2006 on, owed fiduciary duties to the shareholders of these companies, including Plaintiffs; these included a duty of due care and a duty of loyalty.

356. The Kubbernus Defendants, as parties in control of SkyComm and SkyPort, owed fiduciary duties to the shareholders of these companies, including Plaintiffs, including a duty of due care and a duty of loyalty.

357. As outlined in this Petition, the Kubbernus Defendants breached their duties of loyalty and due care by not acting in the best interest of SkyComm, SkyPort and their shareholders, but rather acting in bad faith and for their own personal and corporate interests.

358. The Kubbernus Defendants breached their duties of loyalty and due care and did not act in good faith with respect to the shareholders of SkyComm by:

(a) taking *de facto* control of SkyPort without FCC and Team Telecom approval, but with the active collusion and support of the CenturyTel Defendants;

(b) actively colluding with CenturyTel and the CenturyTel Directors to file false and misleading applications and statements with the FCC and the Team Telecom agencies of the United States government, in an effort to cause the FCC to approve to the transfer of control of SkyPort to Kubbernus and Balaton;

(c) repeatedly filing false and misleading applications and statements with the FCC and the Team Telecom agencies in an effort to cause the FCC to approve the transfer of control of SkyPort to Kubbernus and Balaton;

(d) misrepresenting to the shareholders of SkyComm that the FCC and team Telecom approvals had been duly and properly obtained;

(e) fraudulently diverting ClearSky's interest in SkyComm to Balaton;

(f) failing to issue share certificates to the Additional Investors despite repeated requests that they do so;

(g) failing to properly record all of the shareholders of SkyComm on the books and records of the corporation;

(h) diluting the SkyComm Shareholders for inadequate and/or no consideration;

(i) causing SkyComm to issue shares to Balaton and CenturyTel without adequate and/or no consideration

(j) falsely asserting that debts of Balaton and Kubbernus were debts of SkyComm;

(k) diverting funds from SkyComm and SkyPort, and misappropriating and converting assets of those entities;

(l) failing to account for the funds invested in SkyComm and SkyPort;

(m) collecting unjustified and excessive fees from SkyComm;

(n) managing SkyComm and SkyPort for their own benefit and to the detriment of the SkyComm shareholders;

59

(o) grossly mismanaging SkyComm and SkyPort, with reckless disregard for the interests of SkyComm and SkyPort;

(p) conspiring with CenturyTel to "revive" $2.5 million of converted and cancelled debentures;

(q) not representing the interests of the shareholders to whom the [sic] owed fiduciary duties, in the 2008 Chapter 11 Case;

(r) acting to deprive the shareholders of their interest in SkyComm and taking 100% of the equity in SkyComm for Balaton; and [sic]

(s) falsely asserting that Balaton was a creditor of SkyComm;

(t) falsely asserting that CenturyTel was a creditor of SkyComm; and

(u) making numerous other false and misleading statements to the bankruptcy court in order to acquire 100% ownership of SkyComm and SkyPort and to deprive the shareholders of their interests in the corporations.

i. *Analysis of Parts (a)-(d) of Count 2*

In Parts (a)-(d) of Count 2, the Plaintiffs allege that the Kubbernus Defendants made misrepresentations to the FCC and the Plaintiffs regarding the FCC disclosures. Part (a) is derivative because the harm from Balaton allegedly taking *de facto* control of SkyComm prior to FCC approval is solely to SkyComm and SkyPort. Parts (b) and (c) are derivative because the consequences of these misrepresentations to the FCC would be some form of sanction against SkyComm or SkyPort. For reasons explained *infra* in Counts 7 and 9, Part (d) of Count 2 is derivative to the extent that the Plaintiffs allege that these representations or omissions caused them to maintain their investments in SkyComm or ClearSky, and it is direct to the extent that the Plaintiffs allege that they were induced to make an investment due to the misrepresentations. *See Smith v. Waste Mgmt., Inc.*, 407 F.3d 381, 384–85 (5th Cir. 2005); *In re Enron Corp. Sec.,*

60

*Derivative & "ERISA" Litig.*, No. MSL-1446, 2005 WL 2230169, at *3 (S.D. Tex Sept. 12, 2005).

ii. *Analysis of Part (e) of Count 2*

Only the ClearSky Investors have a claim under Part (e) of Count 2, and this claim is derivative on behalf of ClearSky. In order for the ClearSky Investors to demonstrate that they were harmed as a result of the alleged fraudulent diversion of ClearSky's interest in SkyComm to Balaton, they would necessarily need to demonstrate harm to ClearSky. As a result, Part (f) is derivative on behalf of ClearSky and will be remanded to the Texas state court.[29]

iii. *Analysis of Part (f) of Count 2*

Only the Additional Investors have a claim under Part (f) of Count 2, and it is entirely direct. The Additional Investors do not need to demonstrate harm to either SkyComm or SkyPort to demonstrate that they were harmed by not receiving share certificates. As a result, Part (g) of Count 2 is direct and will be remanded to the Texas state court.

iv. *Analysis of Part (g) of Count 2*

Part (g) of Count 2 is direct. In order to demonstrate harm, the Plaintiffs could demonstrate that the rights of the shareholders were breached by the failure to properly record all of the shareholders of SkyComm on the books and records of the corporation without demonstrating any sort of harm to the company. Therefore Part (g) of Count 2 is direct and will be remanded to the Texas state court.

---

[29] As already noted in footnote 27, unlike derivative claims belonging to SkyPort and SkyComm, the derivative claims of ClearSky are not barred from being brought because the Plan and the Confirmation Order do not prohibit such claims and, additionally, ClearSky (unlike SkyComm) has never merged with SkyPort. Of course, there may be other reasons under applicable law as to why ClearSky's claims could not be brought, but those arguments are left for another day to another forum.

v. *Analysis of Part (h) of Count 2*

Part (h) of Count 2 alleges a breach of fiduciary duty against the Kubbernus Defendants for "diluting the SkyComm Shareholders for inadequate and/or no consideration." Just as is the case with Part (l) of Count One, this Part is both direct and derivative as it applies to an issuance of stock to a controlling entity, but is solely derivative with respect to any issuance of stock to a non-controlling entity. *See Gentile*, 906 A.2d at 99–100 (Del. 2006). Accordingly, the result of this Court's analysis is the same, as well. To the extent that the Plaintiffs assert that the Kubbernus Defendants merely caused the dilution of their SkyComm stock without the extraction of economic and voting power from the Plaintiffs, the Plaintiffs assert a derivative claim on behalf of SkyComm; and this claim is dismissed with prejudice because the Plaintiffs lack standing to bring such a claim after the merger of SkyComm and SkyPort. To the extent that the Plaintiffs assert that the Kubbernus Defendants extracted economic and voting power by causing SkyComm to issue stock to Balaton (a controlling entity) for inadequate consideration, the Plaintiffs assert a direct claim; and this claim is remanded to the Texas state court.

vi. *Analysis of Parts (i)-(k), and (l)-(p) of Count 2*

Parts (i)-(k) and (l)-(p) of Count 2 all allege harms only to SkyPort or SkyComm. As a result, they are all derivative claims. Parts (i)-(k), and (l)-(p) all assert derivative claims on behalf of SkyComm and will be dismissed with prejudice because the Plaintiffs lack standing to bring such claims after the SkyComm and SkyPort merger. Parts (k), (l), (n), and (o) are also derivative claims brought on behalf of SkyPort which will be dismissed with prejudice because they violate the Confirmation Order.

vii. *Analysis of Parts (q)-(u) of Count 2*

Parts (q)-(u) of Count 2 are barred by the Confirmation Order and the Plan because they are based on acts or omissions by the Kubbernus Defendants during the pendency of SkyPort's 2008 bankruptcy case. Accordingly, Parts (q)-(u) will be dismissed with prejudice.

3. <u>Analysis of Count Three: Breach of Fiduciary Duties against the Kubbernus Defendants and Wilson Vukelich on behalf of the Clear Sky Investors</u>[30]

Count Three, in relevant part, alleges that:

363. The Kubbernus Defendants as parties in control of ClearSky, owed fiduciary duties to the members of ClearSky, including a duty of due care and a duty of loyalty.

364. Wilson Vukelich invited reliance on the part of the ClearSky Investors and therefore owed a duty of due care to the ClearSky Investors.

365. As outlined in this Petition, the Kubbernus Defendants breached their duties of loyalty and due care by not acting in the best interests of ClearSky and its members, but rather acting in bad faith and for their own personal interests.

366. The Kubbernus Defendants breached their duties of loyalty and due care and did not act in good faith with respect to the members of ClearSky by:

(a) failing to obtain FCC and Team Telecom approvals of ClearSky's controlling interest in SkyComm;

(b) closing the acquisition of control of SkyComm in Balaton and not ClearSky;

(c) fraudulently diverting ClearSky's interest in SkyComm to Balaton;

(d) making numerous false and misleading statements to the ClearSky Investors about the status of their investments and confirming their ownership of the controlling interest in SkyComm;

---

[30] As already noted previously in this Memorandum Opinion, the Wilson Vukelich LLP law firm has filed its own separate motion to dismiss based primarily upon lack of personal jurisdiction, and this Court is issuing a separate order on this particular motion. Nevertheless, because the Petition makes allegations against the Wilson Vukelich LLP law firm, and because these allegations are tied to allegations against other Defendants, the Court necessarily must analyze the claims that are brought collectively against both the law firm and the other defendants.

(e) diverting funds from ClearSky;

(f) collecting unjustified and excessive fees from ClearSky;

(g) not representing the interests of ClearSky and the ClearSky Investors in the 2008 Chapter 11 Case;

(h) falsely asserting in the 2008 Chapter 11 case that ClearSky had no interest in SkyComm;

(i) making numerous other false and misleading statements to the bankruptcy court in order to deprive the ClearSky Investors of the value of their investments;

(j) acting to deprive the ClearSky Investors of their interests in SkyComm and taking 100% of the equity in SkyComm for Balaton; and

(k) acting exclusively in their own best interests, and not in the interests of ClearSky or its members.

(l) grossly mismanaging ClearSky in reckless disregard for the interests of ClearSky Investors.

367. As outlined in this Petition, Wilson Vukelich breached their duties of due care by not acting in the best interests of ClearSky and its members, but rather acting in bad faith and for their own personal interests. Wilson Vukelich knowingly participated in the breaches of fiduciary duties committed by the Kubbernus Defendants.

Count Three of the petition is entirely direct under both Delaware and Texas law. Indeed, in the allegations contained in Count Three, the Clear Sky Investors never obtained shares in SkyComm or SkyPort. Nor does it appear from the allegations in the Petition that the ClearSky Investors had any formal relationship with SkyComm and SkyPort which would cause the ClearSky Investors to be harmed by a harm accruing to either company.  Instead, the harms complained of by the ClearSky Investors are linked to representations made in conjunction with the sale and purchase of equity in ClearSky. Thus, because the harms alleged by the Clear Sky

64

Investors could not be the result of a reduction in the value of shares in SkyComm and SkyPort, the claims seeking to redress these alleged harms cannot be derivative in nature. They are therefore direct.

However, Parts (g)-(i) of Count 3—although direct claims—are based on acts or omissions by the Kubbernus Defendants during the pendency of SkyPort's 2008 bankruptcy. Parts (g)-(i) are thus barred by the Confirmation Order and will be dismissed with prejudice. The remaining parts are not barred and will be remanded to the Texas state court.

### 4. Analysis of Count Four: Breach of Fiduciary Duties against Wilson Vukelich on behalf of all of the ClearSky Investors[31]

Count Four, in relevant part, alleges that:

371. Wilson Vukelich acted as a trustee of the funds invested by the ClearSky Investors in ClearSky, and as such was in a fiduciary relationship with the ClearSky Investors and the Additional Investors.

372. Wilson Vukelich breached the fiduciary duties it owed to the ClearSky Investors by:

> (a) failing to assure that the ClearSky Investors['] funds were expended in accordance with the terns of the ClearSky LPA and ClearSky IM;

> (b) failing to assure that the ClearSky Investors' funds were used to acquire good title to the interests ClearSky was entitled to under the ClearSky IM and the ClearSky LPA;

> (c) failing to ensure that the ClearSky Investors' funds, which it held in escrow, were properly disbursed;

> (d) allowing Kubbernus to comingle and use [the] ClearSky Investors' funds to pay expenses that were not obligations of ClearSky; and

---

[31] *See supra* note 27.

(e) billing ClearSky excessive legal fees and billing ClearSky for work that was not properly attributable to ClearSky and collecting the same out of the ClearSky Investor[s'] funds.

As with Count Three, Count Four is entirely direct. All harms alleged by the ClearSky Investors stem from the sale and purchase of equity in ClearSky. Because the ClearSky Investors allege that neither they, nor ClearSky, ever received any interest in either SkyComm or SkyPort, their alleged harms cannot flow from any harms to these companies or from the devaluation of stock held in these companies. Therefore, these claims are direct claims which will be remanded to the Texas state court.

5. <u>Analysis of Count Five: Oppression against the CenturyTel Defendants on behalf of the Original Shareholders and the Non-CenturyTel Debenture Holders</u>

Count 5, in relevant part, alleges that:

377. Each of the Original Shareholders is and has been a shareholder indirectly in SkyPort, a closely-held Texas corporation.

378. Each of the Non-CenturyTel Debenture Holders had the right to convert their debentures into indirect share ownership in SkyPort.

379. Each of the CenturyTel Defendants exercised control over SkyPort from approximately the end of 2002 through November 2, 2006.

380. Each of the CenturyTel Defendants, as a party in control of SkyPort, was prohibited from acting illegally, oppressively or fraudulently towards the shareholders, substantially defeating their reasonable expectations, acting in a burdensome, harsh or wrongful manner[,] acting with a lack of probity and fair dealing in the company's affairs to the prejudice of the other shareholders, or visibly departing from the standards of fair dealing on which every shareholder is entitled to rely.

381. As set forth in this Petition, each of the CenturyTel Defendants acted in an illegal, oppressive and fraudulent manner towards the Original Shareholders.

382. Each of the CenturyTel Defendants acted to frustrate the reasonable expectations of the Original Shareholders.

383. Each of the CenturyTel Defendants acted in a burdensome, harsh, and wrongful manner, characterized by a lack of probity and fair dealing in company's affairs to the prejudice of the Original Shareholders.

384. Each of the CenturyTel Defendants acted in a manner that was a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

385. The CenturyTel Defendants acted to deprive the Original Shareholders and Non-CenturyTel Debenture Holders of the benefits and rights associated with their stock ownership and entitlements in SkyPort and their participation in SkyPort's affairs, took benefits for CenturyTel to the exclusion of the other shareholders, wasted corporate assets and converted for their own benefit to the detriment of the other shareholders.

386. As a direct result of [the] CenturyTel Defendants' oppressive conduct, the Original Shareholders and Non-CenturyTel Debenture Holders have lost the full value of their interests in SkyPort.

No party has submitted a Delaware case evaluating whether a claim of oppression is direct or derivative. Nor has this Court's research of Delaware case law turned up any case bearing directly on the proper characterization of oppression claims. The case law on this cause of action is sparse. Delaware courts *have* recognized oppression as a cause of action, but have not expounded on the direct or derivative nature of these claims under Delaware law. *See Litle v. Waters*, Civ. A. No. 12155, 1992 WL 25758, at *7–8 (Del. Ch. Feb. 11, 1992) ("Defendants' argument that the non-Delaware cases are distinguishable because they relate to a statutory dissolution procedure is unpersuasive. The cases address what constitutes oppressive behavior to minority shareholders. Since I am not aware of a Delaware case that has found oppressive behavior, I look to decisions, such as these, that have found oppression for guidance.") (citing *Gimpel v. Bolstein*, 47 N.Y.S.2d 1014, 1017 (N.Y. Sup. Ct. 1984)). The closest a Delaware court has come to performing this evaluation is in *Orloff v. Shulman*, where, in finding that *res*

*judicata* barred certain of the plaintiffs' claims without regard to whether these claims were direct or derivative, the court observed that "*Gimpel*, where the plaintiff had brought both derivative claims and a statutory oppression action, strongly suggests that oppression is an individual claim under New York law." No. 852-N, 2005 WL 5750635, at * 8 (Del. Ch. Nov. 23, 2005). "But," the court observed, "some of the plaintiffs' claims in the prior case seem to be derivative in nature under Delaware law, alleging financial mismanagement that would harm the corporation as a whole, and for which the corporation should be compensated." *Id*. Ultimately, however, the court did not decide the issue of whether the claim of oppression was direct, derivative, or both; therefore, this Court can only take minimal guidance from *Orloff*.

Applying Delaware law, the district court in the Northern District of Illinois has provided at least one data point for this Court to look to regarding the characterization of oppression claims. In *Minor v, Albright*, the district court concluded that the plaintiffs' claims of "waste and misappropriation of corporate assets are harms against the corporation and must be brought derivatively." No. 01 C 4493, 2001 WL 1516729, at *3 (N.D. Ill. Nov. 28, 2001). However, the court continued to say that:

> The [defendants'] attempts to solicit additional investors, which could have the consequence of diluting plaintiffs' shares, would affect all shareholders similarly. But the complaint alleges that this was part of a scheme by the [defendants] to freeze [the plaintiffs] out of the corporation.

*Id.* Concluding that such allegations are adequate to raise a direct claim, the district court stated that:

> Plaintiffs may not recover under these counts for their termination from management. That is governed by their employment contracts. Nor may they recover for harms to the corporation that affect shareholders generally. That requires a derivative action. They do, however, state individual claims that the

> [defendants] attempted to freeze them out. Whether plaintiffs can prove a broad-
> reaching attempt to exclude them is a question for another day. For now, their
> allegations suffice.

*Id.* Unfortunately, *Minor* pre-dates *Tooley*, and the district court explicitly relied on the now

defunct "special injury" rule as the basis for the conclusion that the plaintiffs' oppression claim

was direct. *Id.* As a result, the persuasiveness of the district court's reasoning in *Minor* is now

questionable.

A survey of other jurisdictions yields two prevailing treatments of oppression claims.

Some jurisdictions treat these claims as inherently direct. *Masinter v. Webco Co.*, 164 W.Va.

241, 255 (W. Va. 1980) ("We recognize, as have other authorities that a suit for oppressive

conduct by an individual shareholder differs from a derivative suit. In an oppression suit, the

shareholder is ordinarily seeking some type of individual relief, whereas in a derivative suit he is

usually seeking relief on behalf of the corporation as well as other similarly situated

shareholders. In a given case, it is possible that both causes of action may be utilized.") (citing

*Watson v. Button*, 235 F.2d 235 (9th Cir. 1956); *Kirk v. First Nat'l Bank*, 439 F.Supp. 1141,

1148–49 (M.D. Ga. 1977); *Lydia E. Pinkham Med. Co. v. Gove*, 20 N.E.2d 482, 490 (Mass.

1939); *Eckelkamp v. Diamonds*, *Inc.*, 432 S.W.2d 360 (Mo. App. 1968)). Other jurisdictions

have held that such a claim may be a direct or derivative claim, but they qualify this conclusion

by stating that the nature of the allegations involved in a claim for oppression will generally

make them at least partially direct. *See Minor*, 2001 WL 1516729, at *3.

Absent Delaware case law indicating that a claim of oppression is, by its very nature, a

direct claim, this Court cannot follow the lead of states which treat oppression claims as

inherently direct. The Courts of Delaware have made it clear that plaintiffs should not be able to

compel a characterization of their claims as direct by simply pleading them as such. *Tooley*, 845 A.2d at 1036; *Gatz*, 2004 WL 3029868, at *7 ("[E]ven after *Tooley*, a claim is not 'direct' simply because it is pleaded that way . . . . Instead, the court must look to all the facts of the complaint and determine for itself whether a direct claim exists.") (internal quotation marks omitted). A conclusion that oppression claims are inherently direct would have the effect of allowing plaintiffs to plead their way into a direct claim by including a claim of oppression in their complaint. Thus, this Court will approach claims of oppression as possibly being direct or derivative based upon the teachings of *Tooley*. The relevant question in the analysis, as with the other causes of action raised by the Petition, is: Can the Plaintiffs prove a claim of oppression without showing harm to SkyComm or SkyPort? If it is possible for them to do so, their claim will be direct. Otherwise, their claim will be derivative.

Under Delaware law, a party asserting oppression must meet one of two standards to prevail, either: (1) the violation of the "'reasonable expectations' of the minority," where "[t]he reasonable expectations are the spoken and unspoken understandings on which the founders of a venture rely when commencing a venture[]"; or (2) "burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely." *Litle*, 1992 WL 25758, at * 7–8.

*Tooley* teaches that a court must look to "the body of the complaint, and consider[ ] the nature of the wrong alleged and the relief requested." *Tooley*, 845 A.2d at 1036 (quoting *Agostino v. Hicks*, No. Civ. A. 20020 NC, 2004 WL 443987, at *7 (Del. Ch. March 11, 2004)).

70

Count Five is not specific about the acts committed by the CenturyTel Defendants which constituted the oppression. Instead, Count 5 largely reiterates the standard for shareholder oppression.

These generic factual allegations indicate that Count 5 is direct. Paragraph 278 of the Petition states that the CenturyTel Defendants were involved in the issuance of stock to Balaton, a controlling entity, for inadequate consideration. This factual allegation gives rise to a direct claim and may serve as the basis for a court to conclude that oppression has occurred. Thus, in theory, the Plaintiffs can demonstrate oppression without showing harm to SkyComm or SkyPort. This is so even despite the fact that the Original Shareholders and the Non-CenturyTel Debenture Holders seek the full value of their investments in SkyComm. The harm the Plaintiffs allege in this oppression claim is not the devaluation of their stock as a result of harms to the company, but rather the extinguishing of their stock pursuant to the Plan as a culmination of the alleged oppressive acts. This harm does not require the demonstration of harm to the company. As a result, this Court concludes that Count 5 is a direct claim and will therefore be remanded to the Texas state court.

6. Analysis of Count Six: Oppression against the Kubbernus Defendants on behalf of all the Plaintiffs

Count 6, in relevant part, alleges that:

389. Each of the Plaintiffs is a holder of an equity interest indirectly in SkyPort, a closely-held Texas corporation.

390. Each of the Kubbernus Defendants exercised control over SkyPort from approximately February 2006 through the date of this Petition. The Kubbernus Defendants had a direct duty not to act illegally, oppressively or fraudulently with respect to the Plaintiffs.

391. Each of the Kubbernus Defendants, as a party in control of SkyPort, was prohibited from acting illegally, oppressively or fraudulently towards the indirect shareholders in SkyPort, including Plaintiffs, substantially defeating their reasonable expectations, acting in a burdensome, harsh or wrongful manner[,] acting with a lack of probity and fair dealing in the company's affairs to the prejudice of the other shareholders, including Plaintiffs, or visibly departing from the standards of fair dealing on which every shareholders [sic] is entitled to rely.

392. Each of the Kubbernus Defendants acted in an oppressive manner towards Plaintiffs.

393. Each of the Kubbernus Defendants acted to frustrate the reasonable expectations of Plaintiffs.

394. Each of the Kubbernus Defendants acted in a burdensome, harsh, and wrongful manner, characterized by a lack of probity and fair dealing in [the] company's affairs to the prejudice of Plaintiffs.

395. Each of the Kubbernus Defendants acted in a manner that was a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

396. The Kubbernus Defendants acted to deprive Plaintiffs of the benefits and rights associated with their stock ownership in SkyPort and their participation in SkyPort's affairs, took benefits for Balaton and Kubbernus to the exclusion of the other shareholders, including Plaintiffs, wasted corporate assets, and converted for their own benefit to the detriment of the other shareholders, including Plaintiffs.

397. The Kubbernus Defendants used SkyPort as a vehicle to oppress Plaintiffs and wrongfully deprive them of their interests in SkyComm and SkyPort in connection with the 2009 Chapter 11 Plan.

398. As a direct result of the Kubbernus Defendants' oppressive conduct, Plaintiffs were harmed in an amount equal to the full value of their interests in SkyPort.

As with Count 5 above, Count 6 is direct. The Kubbernus Defendants are also implicated in the diluting issuance of stock to Balaton, which constitutes both a direct and a derivative claim. Thus, there is a basis for the Plaintiffs to prevail on their suit without showing harm to SkyPort or SkyComm. As a result, Count 6 is entirely direct. However, Part 397 is based on acts,

omissions, or bad-faith by the Kubbernus Defendants in SkyPort's 2008 bankruptcy, which is barred by the Confirmation Order and Plan. Accordingly, the claims represented by Part 397 will be dismissed with prejudice. The remainder of Count 6 will be remanded to the Texas state court.

7. Analysis of Count Seven: Common Law Fraud against all of the Defendants on behalf of all of the Plaintiffs

Count 7, in relevant part, alleges that:

401. As described herein, Defendants made and caused to be made numerous material misrepresentations which[,] at the time they were made, they knew were false and/or were made recklessly without knowledge of the truth. Such statements were made with the intent that they be relied upon.

A. False and Misleading Statements re the FCC and Team Telecom Approvals

402. Such representations included numerous materially false and misleading statements to the FCC and Team Telecom agencies described above, made in order to induce their approval of the transfer of control of SkyComm to Balaton, knowing that such approvals would be relied upon by Plaintiffs in their decision to invest in and maintain their investments in SkyComm.

403. Such representations included numerous false and misleading statements to the shareholders and investors in SkyComm and ClearSky, including without limitations that (a) SkyPort was in compliance with all FCC and other governmental requirements for the transfer of control to Balaton and Kubbernus, and (b) the FCC and Team Telecom approvals of such transfer of control to Balaton were obtained lawfully and in compliance with the FCC and Team Telecom rules and regulations.

404. Defendants had actual knowledge that the Original Shareholders, Non-CenturyTel Debenture Holders, ClearSky Investors and Additional Investors would rely on such false and misleading statements.

405. Defendants had actual knowledge that the transfer to Balaton could not have been completed without the FCC and Team Telecom duly and properly approving such transfer.

406. Defendants had actual knowledge that the Original Shareholders and Non-CenturyTel Debenture Holders would not have permitted the transfer to Balaton

and Kubbernus without the transfer of control of the FCC licenses being duly and properly approved by the FCC and Team Telecom.

407. Defendants had actual knowledge that the Non-CenturyTel Debenture Holders would not have converted their debentures without the transfer of control of the FCC licenses being duly and properly approved by the FCC and Team Telecom and without the conversion of all of the [Controlling] Debentures.

408. Defendants had actual knowledge that the ClearSky Investors would not have invested their funds in ClearSky without the transfer of control of the FCC licenses being duly and properly approved by the FCC.

409. Defendants had actual knowledge that the Additional Investors would not have invested their funds in SkyComm without the transfer of control of the FCC licenses being duly and properly approved by the FCC.

410. The Original Shareholders justifiably relied on such statements to their detriment. Had the SkyComm shareholders known that the FCC and Team Telecom had been obtained through fraudulent misrepresentations, they would have exposed the same and thus, never have permitted such transfer to go through.

411. The Non-CenturyTel Debenture Holders justifiably relied on such statements to their detriment. Had the Non-CenturyTel Debenture Holders known that the approval of the transfer of the SkyPort FCC licenses had been obtained through fraudulent misrepresentations, they never have [sic] permitted the conversion of their debentures to be consummated.

412. The ClearSky Investors and the Additional Investors justifiably relied on such statements to their detriment. Had such investors known that the approval of the transfer of the SkyPort FCC licenses had been obtained through fraudulent misrepresentation, they would never have invested in ClearSky and SkyComm, respectively.

B. Misrepresentations to the ClearSky Investors

413. The Kubbernus Defendants, together with Wilson Vukelich, made numerous false and misleading representations and statements in the ClearSky IM and ClearSky LPA, including that

> (a) ClearSky would acquire 133,000,000 shares in SkyComm, at a purchase price of $0.03 per share plus warrants and an additional 133,000,000 shares in SkyComm for a total investment of $4 million;

74

(b) ClearSky would acquire the [Controlling] Debentures, then in the face amount of $20,596,000, for a purchase price of $3 million, and then convert them into 108,000,000 shares of SkyComm;

(c) all told, ClearSky would, upon completion of these transactions, own 76% of SkyComm;

(d) they would then obtain approval from the FCC of ClearSky as the party in control of SkyPort; and

(e) the proceeds of the offering would be used only for ClearSky's purposes and benefit.

414. All of these representations were knowingly false and misleading when made and were intended to induce the ClearSky Investors to invest in ClearSky.

415. The Kubbernus Defendants and Wilson Vukelich failed to disclose numerous facts that were necessary to be disclosed to make the ClearSky IM and ClearSky IPA not misleading; including that:

(a) the applications to the FCC and Team Telecom had been made in the name of Balaton;

(b) Kubbernus was then involved in litigation with True Star Petroleum alleging fraud; and

(c) Kubbernus had recently been CEO of JAWS, a company that went out of business and resulted in shareholder litigation.

416. This information was material to the ClearSky Investors' decisions and was required to be disclosed to make the offering documents truthful and not misleading.

417. The ClearSky Investors justifiably relied on such statements to their detriment. Had the ClearSky Investors known the truth regarding such representation, they would never have invested in ClearSky.

C. Misrepresentations to the Additional Investors

418. The Kubbernus Defendants and Wilson Vukelich represented in the 2007 Offering Memorandum that:

(a) FCC approval of the transfer of ownership to the "new majority owner" had been duly obtained; and

(b) the proceeds of the offering would be used only for SkyComm's purposes and benefit.

419. All of these representations were knowingly false when made and were intended to induce the Additional Investors to invest in SkyComm.

420. The Kubbernus Defendants and Wilson Vukelich failed to disclose numerous material facts that were necessary to be disclosed to make the 2007 Offering Memorandum not misleading, including that:

(a) ClearSky was the rightful owner of the majority of SkyComm's shares;

(b) Balaton owed CenturyTel $3 million in payment for the [Controlling] Debentures;

(c) Kubbernus had been sued for failing to deliver shares, fraud upon shareholders and looting;

(d) the company Kubbernus had most recently been CEO of[,] JAWS, had gone out of business and was the subject of shareholder litigation; and

(e) Pouliot, who was listed as a director, actually owned more than 35% of the equity in SkyComm through his company, Draco.

This information was material to the Additional Investors' decisions and was required to be disclosed to make the offering documents truthful and not misleading.

421. The Additional Investors justifiably relied on such statements to their detriment. Had the Additional Investors known the truth regarding such representation, they would never have invested in SkyComm.

D. The CenturyTel Defendants' Participation

422. The CenturyTel Defendants, with intent to deceive or defraud and with reckless disregard for the truth or the law worked jointly with, conspired with and assisted Kubbernus and Balaton in perpetrating their fraudulent scheme.

423. The CenturyTel Defendants worked jointly with, conspired with and assisted Kubbernus and Balaton in their fraudulent schemes and misrepresentations, including:

(a) the filing of fraudulent statements with the FCC and Team Telecom agencies;

(b) the obtaining of FCC and Team Telecom approvals of the transfer of control to Balaton based upon such false statements;

(c) informing Plaintiffs that the FCC and Team Telecom approvals had not been duly and properly obtained;

(d) permitting SkyComm to operate with licenses that were improperly obtained and which were at a material risk of being terminated upon the FCC's and Team Telecom's learning of the falsity of the information supplied them;

(e) accepting shares in SkyComm in return for debt that was not properly SkyComm's;

(f) reviving $2.5 Million of previously converted debentures;

(g) misrepresenting CenturyTel as being a secured creditor of SkyPort in the 2008 Chapter 11 case;

(h) not disclosing the interests of Pouliout and ClearSky in SkyComm in the 2008 Chapter 11 case; and

(i) permitting its participation as a shareholder in SkyComm to be used as an endorsement of Balaton and Kubbernus.

424. The CenturyTel Defendants failed to inform that [sic] FCC or Team Telecom of the existence of the numerous non-U.S. investors shown on SkyPort's bankruptcy schedules and failed to inform investors in SkyComm that the FCC and Team Telecom Approvals had been obtained through false and misleading statements and were in danger of being revoked.

Under Delaware law, the elements of common law fraud are: (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to

induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

Under Texas law, the elements of common law fraud are: (1) a material representation that was false made by the defendant; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and thereby suffered injury. *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

Unsurprisingly, both Delaware and Texas law require a demonstration of harm to the plaintiff. Each Plaintiff group has different relationships to the Kubbernus Defendants, SkyPort, and SkyComm. The various representations and non-disclosures complained of in the Petition affect each group in different ways. These relationships fundamentally affect whether an assertion that the Defendants committed common law fraud is direct or derivative.

The following excerpt from Count 7 provides the key to determining which claims contained in Count 7 are direct, and which claims are derivative:

> 402. Such representations included numerous materially false and misleading statements to the FCC and Team Telecom agencies described above, made in order to induce their approval of the transfer of control of SkyComm to Balaton, knowing that such approvals would be relied upon by Plaintiffs in their decision to invest in and maintain their investments in SkyComm.
>
> . . . .
>
> 410. The Original Shareholders justifiably relied on such statements to their detriment. Had the SkyComm shareholders known that the FCC and Team Telecom had been obtained through fraudulent misrepresentations, they would

have exposed the same and thus, never have permitted such transfer to go through.

411. The Non-CenturyTel Debenture Holders justifiably relied on such statements to their detriment. Had the Non-CenturyTel Debenture Holders known that the approval of the transfer of the SkyPort FCC licenses had been obtained through fraudulent misrepresentations, they never have [sic] permitted the conversion of their debentures to be consummated.

412. The ClearSky Investors and the Additional Investors justifiably relied on such statements to their detriment. Had such investors known that the approval of the transfer of the SkyPort FCC licenses had been obtained through fraudulent misrepresentation, they would never have invested in ClearSky and SkyComm, respectively.[32]

Delaware law indicates that a claim of fraud which induces a shareholder to retain ownership of stock is a derivative claim. *Waste Mgmt.,* 407 F.3d at 384–85; *In re Enron Corp.*, 2005 WL 2230169, at *3. This is because the harm that accrues to the shareholder is simply the devaluation of that shareholder's stock when the truth becomes publicly known. *Waste Mgmt.,* 407 F.3d at 384–85; *In re Enron Corp.*, 2005 WL 2230169, at *3. The shareholder can only demonstrate harm from a fraudulent misrepresentation or omission in such a scenario by demonstrating harm to the company which led to a devaluation of the company's stock. *Waste Mgmt.*, 401 F.3d at 385. *Tooley* instructs that such a harm gives rise to a derivative claim. Accordingly, any Plaintiff alleging harm from maintaining an investment in SkyComm is raising a derivative claim.

The allegations found in Paragraphs 402 and 410-412 of the Petition indicate that the ClearSky Investors and the Additional Investors allege a direct claim for fraud because they assert that they were **induced** to make an investment rather than **maintain** an investment. The

---

[32] Similar allegations to the effect that the ClearSky Investors and the Additional Investors relied on other misrepresentations of the Defendants in making their investments can be found in Paragraphs 417 and 421 of the Petition as well.

Original Shareholders hold only a derivative claim because they were allegedly induced to maintain their investment in SkyComm. Certain Delaware cases buttress this Court's conclusion that the Original Shareholders' claims in Count 7 are derivative. These cases mandate that courts not allow a direct claim to be transformed into a derivative claim by artful pleading. *Gatz*, 2004 WL 3029868, at *7 ("[E]ven after *Tooley*, a claim is not 'direct' simply because it is pleaded that way . . . . Instead, the court must look to all the facts of the complaint and determine for itself whether a direct claim exists.") (internal quotation marks omitted). If this sort of fraud claim was not characterized as derivative, it would act to transform any harm to a business that is not subsequently communicated to all shareholders into a direct claim. Such a scenario would occur so often as to render the distinction between derivative claims and direct claims meaningless. The vast majority of harms to a company would give rise to direct claims by the shareholders for fraud or negligent misrepresentation. Such a result would undermine the structure of derivative lawsuits under Delaware law. For this additional reason, this Court concludes that the Original Shareholders' claims under Count 7 are derivative.

Implicit in the allegations of the Plaintiff groups—other than the Original Shareholders— is that none of these Plaintiff groups were also fraudulently induced into maintaining these investments. If such allegations were to be made, they too would state derivative claims. In summary, all Plaintiff groups other than the Original Shareholders allege direct claims related to their purchase of investments in ClearSky or SkyComm. However, to the extent these claims rely on Paragraph 423(g) and (h), they are barred because these Parts of Count 7 are based on acts or omissions of the CenturyTel Defendants during SkyPort's 2008 bankruptcy. As such, they are dismissed with prejudice because they violate the Plan and the Confirmation Order. The Original

Shareholders, along with any other Plaintiff group that alleges harm from maintaining its investment in SkyComm, allege a derivative claim brought in the right of SkyComm. Any of these derivative claims, whether brought by the Original Shareholders or another Plaintiff group, are dismissed with prejudice because the Plaintiffs lack standing to bring such a claim after the merger of SkyComm and SkyPort.

       8. <u>Analysis of Count 8: Negligence against the CenturyTel Defendants on behalf of the ClearSky Investors and the Additional Investors</u>

Count 8, in relevant part, alleges that:

431. The CenturyTel Defendants owed a duty to those that might foreseeably be harmed by their actions to take such steps as a reasonably prudent person would take in similar circumstances to avoid such harm to others.

432. As previously stated, the CenturyTel Defendants were under a heightened duty of care because of the many danger signs concerning Kubbernus, including that:

      (a) Kubbernus had been accused on more than one occasion of being a stock fraudster and corporate looter;

      (b) Kubbernus was not using his own funds to close the acquisition of control of SkyPort; but rather was relying exclusively on funds raised from investors;

      (c) Kubbernus was not being truthful with the FCC and Team Telecom;

      (d) Kubbernus was not being truthful with his own investors;

      (e) Kubbernus was willing to issue SkyComm shares to pay obligations that were not SkyComm's, but rather CenturyTel's or Balaton's; and

      (f) Kubbernus was willing to "revive" debentures after they had been converted into shares.

433. The CenturyTel Defendants were obligated to take reasonably prudent steps to assure that control of SkyComm would not be delivered to a stock fraudster and looter.

81

434. The CenturyTel Defendants knew that Kubbernus and Balaton were actively selling direct and indirect ownership interests in SkyComm to the ClearSky Investors and the Additional Investors, and it was foreseeable that ClearSky Investors and the Additional Investors would be hurt by the sale of control of SkyComm to a stock fraudster and looter.

435. The CenturyTel Defendants failed to take any reasonably prudent steps to prevent harm to the ClearSky Investors and the Additional Investors in connection with the CenturyTel Defendants' sale of control of SkyComm to Balaton and Kubbernus

436. The CenturyTel Defendants were guilty of gross negligence in that they acted with wanton disregard for the interests of the ClearSky Investors and the Additional Investors.

Count Eight of the Petition is entirely direct under both the Delaware and Texas standards. The harm at issue in Count 8 is alleged to have occurred to the ClearSky Investors and Additional Investors through their purchase of investments in ClearSky and SkyComm. Neither Plaintiff group would need to demonstrate harm to ClearSky or SkyComm. Therefore, Count 8 is entirely direct and will be remanded to the Texas state court.

9.  Analysis of Count Nine: Negligent Misrepresentation against the CenturyTel Defendants on behalf of all the Plaintiffs

Count 9, in relevant part, alleges that:

440. As described in [the] Petition, the CenturyTel Defendants made and caused to be made numerous material misrepresentations with the intent that they be relied upon.

441. The CenturyTel Defendants did not exercise reasonable care or competence in obtaining or communicating this information to Plaintiffs.

442. As set forth in [the] Petition, the CenturyTel Defendants had actual knowledge that the Original Shareholders, Non-CenturyTel Debenture Holders, ClearSky Investors and Additional Investors would rely on such false and misleading statements.

443. As set forth in [the] [P]etition, the Original Shareholders, Non-CenturyTel Debenture Holders, ClearSky Investors and Additional Investors justifiably relied on such statements to their detriment.

444. As a result of such reliance, Plaintiffs suffered financial injury equal to the value of their entire investments in SkyComm.

Under Delaware law, the elements of negligent misrepresentation are: "(1) pecuniary duty to provide accurate info[rmation], (2) the existence of a 'material misrepresentation,' (3) failure to exercise reasonable care in obtaining or communicating the information, and (4) pecuniary loss caused by reliance. Plaintiffs must prove that there was an actual material misrepresentation, not one that 'may' have occurred." *Gallagher v. E.I. Dupont DeNemours & Co.*, No. 06C-12-188 WCC, 2010 WL 1854131, at *5 (Del. Sup. Ct. Apr. 30, 2010) (internal citations omitted) (citing *Lundeen v. Pricewaterhousecoopers, LLC*, No. 04C-03-200 RRC, 2006 WL 2559855, at *6 (Del. Sup. Ct. Aug. 31, 2006)).

Under Texas law, the elements of negligent misrepresentation are as described by the Restatement (Second) of Torts § 552. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999). The rule of the Restatement requires: (1) one who, in the course of his business, profession or employment, or in any transaction in which he has a pecuniary interest; (2) supplies false information; (3) for the guidance of others in their business transactions; (4) is subject to liability for pecuniary loss caused to them; (5) by their justifiable reliance upon the information; (6) if he fails to exercise reasonable care or competence in obtaining or communicating the information. *Id.*

Unsurprisingly, both Delaware and Texas law require a demonstration of harm to the plaintiff. Just as with Count 7, the key to the analysis of Count 9 turns on the nature of the

alleged harm that flows from the reliance of each Plaintiff group. As noted above, Delaware law indicates that a misrepresentation which induces a shareholder to retain ownership of stock is a derivative claim, as the harm that accrues to the shareholder is simply the devaluation of that shareholder's stock when the truth becomes publicly known. The shareholder can only show harm from a fraudulent misrepresentation in such a scenario by demonstrating harm to the company which led to a devaluation of the company's stock. *Tooley* instructs that such a harm gives rise to a derivative claim. Accordingly, any Plaintiff alleging harm from maintaining an investment in SkyComm is raising a derivative claim.

Whereas Paragraphs 402 and 410–412 in Count 7 spell out whether the alleged harm is due to the making of an investment or the maintenance of an investment, Paragraphs 443 and 444 in Count 9 do not. These Paragraphs state:

> 443. As set forth in [the] [P]etition, the Original Shareholders, Non-CenturyTel Debenture Holders, ClearSky Investors and Additional Investors justifiably relied on such statements to their detriment.

> 444. As a result of such reliance, Plaintiffs suffered financial injury equal to the value of their entire investments in SkyComm.

Though these allegations are less specific than those in Count 7, the same rule applies. The Original Shareholders, because they can only assert that they retained their investments in SkyComm, assert derivative claims. *Waste Mgmt.*, 407 F.3d at 384–85; *In re Enron Corp.* 2005 WL 2230169, at *3. Thus, these claims must be dismissed with prejudice.

All Plaintiffs, except for the Original Shareholders, assert a direct claim to the extent that they allege that they were induced to make an investment. To the extent that any of these Plaintiffs also attempt to allege harm from the maintenance of investments in ClearSky or

SkyComm, they assert a derivative claim. In summary, all Plaintiff groups other than the Original Shareholders allege direct claims related to their purchase of investments in ClearSky or SkyComm. The Original Shareholders, along with any other Plaintiff group that alleges harm from maintaining an investment in ClearSky or SkyComm, allege a derivative claim.

The direct claims asserted in Count 9 will be remanded to the Texas state court. The claims of the ClearSky Investors, to the extent they argue that they were harmed by maintaining their investments based on a misrepresentation, are derivative claims brought on behalf of ClearSky and will be remanded to the Texas state court.[33] All claims under Count 9 by any Plaintiff group that asserts harm from the maintenance of an investment based on a misrepresentation are derivative claims brought on behalf of SkyComm; these claims will be dismissed with prejudice, as these Plaintiffs do not have standing to bring such claims after the merger of SkyComm and SkyPort.

10. Analysis of Count Ten: Violations of the Texas Securities Act against all of the Defendants on behalf of the Non-CenturyTel Debenture Holders, the ClearSky Investors, and the Additional Investors

Count Ten, in relevant part, alleges that:

450. SkyComm is an issuer of securities in the State of Texas.

451. The Kubbernus Defendants offered for sale and sold securities from within the State of Texas.

452. CenturyTel, the CenturyTel Directors and Wilson Vukelich aided and abetted the sale of securities of SkyComm and ClearSky from the State of Texas

---

[33] Once again, unlike derivative claims belonging to SkyPort and SkyComm, the derivative claims of ClearSky are not barred from being brought because the Plan and the Confirmation Order do not prohibit such claims and, additionally, ClearSky (unlike SkyComm) has never merged with SkyPort. Of course, there may be other reasons under applicable law as to why ClearSky's claims could not be brought, but those arguments are left for another day to another forum. *See supra* note 27.

453. As described herein, the Kubbernus Defendants violated the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-33A(2) and Tex. Rev. Civ. Stat. Ann. Art. 581-33F(2), by offering and selling securities in SkyComm, and as controlling persons of SkyComm, by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

454. As described herein, the CenturyTel Defendants and Wilson Vukelich violated the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-33F(2), by directly or indirectly, with intent to deceive or defraud and with reckless disregard for the truth or the law aided and gave substantial assistance in the issuance of securities by SkyComm and sale of such securities by Balaton and Kubbernus in the State of Texas.

455. As set forth in [the] Petition, the CenturyTel Defendants and Wilson Vukelich were fully aware of the Kubbernus Defendants' improper activities and of their role in the fraudulent scheme and acts.

456. The CenturyTel Defendants and Wilson Vukelich rendered assistance to Balaton and Kubbernus in the face of a perceived risk that its assistance would facilitate untruthfulness and illegal activity by the Kubbernus Defendants

457. The CenturyTel Defendants and Wilson Vukelich intended to deceive the Non-CenturyTel Debenture Holders, ClearSky Investors, and Additional Investors and/or acted with reckless disregard for the truth of the Kubbernus Defendants' misrepresentations.

Count Ten of the petition is entirely direct under both the Delaware and Texas standards. These allegations pertain specifically to the sale of securities to the ClearSky Investors and the Non-CenturyTel Debenture Holders and the harms that flow therefrom. These claims do not require a demonstration of harm to ClearSky or SkyComm in order to demonstrate violations of the Texas Securities Act. The Plaintiffs cite Tex. Rev. Civ. Stat. Ann. Art. 581-33A(2)  & 581-33F(2). Tex. Rev. Civ. Stat. Ann. Art. 581-33A(2) reads as follows:

A(2) Untruth or Omission. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances

under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission. The issuer of the security (other than a government issuer identified in Section 5M) is not entitled to the defense in clause (b) with respect to an untruth or omission (i) in a prospectus required in connection with a registration statement under Section 7A, 7B, or 7C, or (ii) in a writing prepared and delivered by the issuer in the sale of a security.

Tex. Rev. Civ. Stat. Ann. Art. 581-33F(2) reads as follows:

F(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

Neither the language of A(2) nor that of F(2) contains a requirement that the purchased security become devalued in order for liability to accrue to a seller. Indeed, these provisions explicitly make rescission available to the person buying the security—reversing the offending transaction and returning the securities purchaser back to his pre-purchase position. In doing so, the Texas Legislature takes the position that the effectuation of a fraudulent sale of securities is harmful in and of itself. As a corollary, no devaluation of the purchased securities needs to occur for the seller to accrue liability. Accordingly, the Plaintiffs do not need to demonstrate a harm to SkyPort or SkyComm in order to prove that the issuance of securities to the Additional Investors, the Non-CenturyTel Debenture Holders, and the ClearSky Investors was in violation of the Texas Securities Act. Therefore, these Plaintiffs assert direct claims which will be remanded to the Texas state court.

11. <u>Analysis of Count Eleven: Violations of Texas Business and Commerce Code 27.01 against all of the Defendants on behalf of the Non-CenturyTel Debenture Holders, ClearSky Investors, and the Additional Investors</u>

Count Eleven, in relevant part, alleges that:

463. Defendants violated Texas Business and Commerce Code 27.01(b) by making and causing to be made, numerous false representations of material facts described above to the Non-CenturyTel Debenture Holders for the purpose of inducing them to convert their debentures into shares of SkyComm.

464. Defendants violated Texas Business and Commerce Code 27.01(c) by having actual awareness of the falsity of such statements.

465. The Kubbernus Defendants violated Texas Business and Commerce Code 27.01(b) by making and causing to be made, numerous false representations of material facts described above to the ClearSky Investors and the Additional Investors for the purpose of inducing them to purchase shares in ClearSky and SkyComm, respectively.

466. The Kubbernus Defendants violated Texas Business and Commerce Code 27.01(c) by having actual awareness of the falsity of such statements.

467. The CenturyTel Defendants and Wilson Vukelich violated Texas Business and Commerce Code 27.01(d) in that they had actual awareness of the falsity of the representations made or caused to be made by the Kubbernus Defendants and failed to disclose the falsity of such representations to the shareholders and investors in SkyComm.

468. The CenturyTel Defendants benefited from such false representations in that they were able to divest CenturyTel of its interest in SkyComm and to receive consideration therefore.

469. Wilson Vukelich benefited from such false representations as they were able to derive substantial fees from these transactions and were able to collect other fees that the Kubbernus Defendants owed them for work unrelated to these transactions.

470. Such misrepresentations included numerous materially false and misleading statements to the FCC and Team Telecom agencies described above, which were made in order to induce their approval of the transfer to Balaton, knowing and having reason to expect that such approvals would be relied upon by the shareholders and investors in SkyComm.

88

471. Such representations included numerous false and misleading statements to the shareholders and investors in SkyComm and ClearSky described above, including without limitation that (a) SkyPort was in compliance with all FCC and other governmental requirements for the transfer of control to Balaton and Kubbernus, (b) the FCC and Team Telecom approvals of such transfer of control to Balaton were obtained lawfully and in compliance with FCC and Team Telecom rules and regulations, (c) all of the [Controlling] Debentures would be converted into shares, and (d) all of the [Controlling] Debentures were in fact converted into shares.

472. The Non-CenturyTel Debenture Holders justifiably relied on such statements to their detriment. Had the Non-CenturyTel Debenture Holders known that the approval of the transfer of the SkyPort FCC licenses had been obtained through fraudulent misrepresentations, they never have converted their debentures to shares in SkyComm.

473. The ClearSky Investors and the Additional Investors justifiably relied on such statements to their detriment. Had such investors known that the approval of the transfer of the SkyPort FCC licenses had been obtained through fraudulent misrepresentations, they would never have agreed to purchase shares in ClearSky and SkyComm, respectively.

Count Eleven of the Petition is entirely direct under both the Delaware and Texas standards. These allegations pertain specifically to the sale of securities to the ClearSky Investors, the Additional Investors, and the Non-CenturyTel Debenture Holders and the harms that are alleged to flow from those sales. Texas Business and Commerce Code 27.01, in relevant part, provides that:

a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

(1) false representation of a past or existing material fact, when the false representation is

(A) made to a person for the purpose of inducing that person to enter into a contract; and

(B) relied on by that person in entering into that contract; or
(2) false promise to do an act, when the false promise is

(A) material;

(B) made with the intention of not fulfilling it;

(C) made to a person for the purpose of inducing that person to enter into a contract; and

(D) relied on by that person in entering into that contract.

The language of these provisions only requires that the false promise or false representation be relied upon by a party in entering a contract. They only look at the time up to and including the execution of the contract for the fulfillment of any of their elements. Thus, the point in time when the harm from such a transaction is held to occur must be the time of the effectuation of the offending contract. The harm, as with the Texas Securities Act, is the securities purchaser's change in position pre-contract and post-contract. As a result, the Non-CenturyTel Debenture Holders, ClearSky Investors, and Additional Investors need not prove that SkyPort or SkyComm was harmed in order to demonstrate a violation of Texas Business and Commerce Code 27.01. As a result, these Plaintiffs assert direct claims which will be remanded to the Texas state court.

### 12. Analysis of Count Twelve: Civil Conspiracy against all the Defendants on behalf of all of the Plaintiffs

Count Twelve, in relevant part, alleges that:

477. Defendants conspired among themselves for CenturyTel, the CenturyTel Directors, Balaton and Kubbernus and Wilson Vukelich to defraud the SkyComm shareholders and investors, to breach their respective fiduciary duties to Plaintiffs and to oppress Plaintiffs and to deprive them of their ownership and participation in SkyComm.

478. Defendants conspired among themselves to transfer control of SkyComm without prior notice to or approval of the FCC, to make false and misleading

statements in applications and filings to the FCC and Team Telecom, and to operate the teleport without proper licenses and without required disclosures of transfers of ownership and control.

Under Texas law, the elements of civil conspiracy include: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Tri v. J.T.T.,* 162 S.W.3d 552, 556 (Tex. 2005). Conspiracy is a derivative tort requiring an unlawful means or purpose, which may include an underlying tort. *Chu v. Hong,* 249 S.W.3d 441, 444 (Tex. 2008).

"The elements for civil conspiracy under Delaware law are: (1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage." *AeroGlobal Capitol Mgmt., LLC v. Cirrus Indus., Inc*., 871 A.2d 428, 437 n.8 (Del. 2005). "[I]t is essential that there be an underlying wrongful act, such as a tort or a statutory violation." *Nacco Indus. Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009).

Both Texas and Delaware law require the showing of an unlawful, predicate act in order to prove civil conspiracy. Thus, if this predicate act constitutes a derivative claim, then the claim of civil conspiracy would be derivative. Likewise, if this predicate act constitutes a direct claim, then the claim of civil conspiracy would also be direct.

Here, Paragraph 478 of Count 13 alleges acts that could only result in direct harm to SkyComm or SkyPort, in the form of FCC sanctions. Accordingly, Paragraph 478 of Count 13 is derivative on behalf of SkyComm and SkyPort and will be dismissed with prejudice for the reasons set forth immediately above. Paragraph 477 of Count 13 can be characterized based on the claims that form the predicate for the alleged conspiracy: Count 7 (fraud); Counts 1, 2, and 3 (breach of fiduciary duty); and Counts 5 and 6 (oppression). The aspects of the conspiracy

91

allegedly based on those Counts will be direct or derivative based on which Part of each Count the conspiracy allegations are referring to. For example, an aspect of a conspiracy claim based on Part (f) of Count 1, which asserts that the CenturyTel Defendants breached their fiduciary duties by running SkyComm and SkyPort for CenturyTel's benefit, would be solely derivative because Part (f) is solely derivative. On the other hand, a conspiracy claim predicated on Parts (n) and (o) of Count One, which deals with an issuance of stock for inadequate consideration to a controlling entity, would be both a direct and a derivative claim because Parts (n) and (o) of Count One give rise to both direct and derivative claims. The table of claims in Exhibit A, attached to this Memorandum Opinion, gives a detailed list of which predicate claims of Count 12 are direct, and which predicate claims are derivative.

### 13. Analysis of Count Thirteen: Aiding and Abetting against the CenturyTel Defendants on behalf of all the Plaintiffs

Count Thirteen, in relevant part, alleges that:

481. The CenturyTel Defendants were aware of the fiduciary relationship of the Kubbernus Defendants to the shareholders of SkyComm after their transfer of control of SkyComm to Balaton and Kubbernus.

482. The CenturyTel Defendants knew of the Kubbernus Defendants' breaches of their fiduciary duties to Plaintiff [sic] and knowingly participated in, aided and abetted such breaches by giving substantial assistance to the Kubbernus Defendants.

483. Specifically, the CenturyTel Defendants participated in, aided and abetted the Kubbernus Defendants in their fraudulent activities, including (a) turning over control of SkyComm to Balaton for what appears to be no cash consideration put up by Balaton; (b) converting portions of the purchase price payable by Balaton for the [Controlling] Debentures into obligations of SkyComm; (c) assisting Balaton in obtaining FCC and Team Telecom approvals through fraudulent applications and statements; (d) depriving the ClearSky Investors of their interests in SkyComm; (e) transferring to SkyComm, Balaton's obligations to CenturyTel; (f) defrauding the ClearSky Investors and Additional Investors by permitting

Kubbernus and Balaton to represent CenturyTel as endorsing their efforts; and (g) permitting Balaton and Kubbernus to deprive all of the shareholders in SkyComm of their share interests in SkyComm in the Chapter 11 case.

Under Delaware law, civil "aiding and abetting" specifically refers to aiding and abetting a breach of a fiduciary duty, and is very similar to a civil conspiracy claim. *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038–39 (Del. Ch. 2006) ("[I]n cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law."). The elements of aiding and abetting are "'(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants,' and (4) damages proximately caused by the breach." *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (quoting *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972)) (alterations in original).

Thus, to prove a civil claim of aiding and abetting a breach of fiduciary duty, a predicate act—*i.e.*, a breach of fiduciary duty—must occur. This predicate act will have its own characterization as derivative or direct, which will then determine the character of the aiding and abetting claim. Thus, if this predicate act constitutes a derivative claim, then the claim of civil conspiracy would be derivative. Likewise, if this predicate act constitutes a direct claim, then the claim of civil conspiracy would also be direct. The table of claims in Exhibit A, attached to this Memorandum Opinion, gives a detailed list of which predicate claims of Count 13 are direct, and which are derivative.

However, Part 483(g) of Count 13 violates the Confirmation Order and Plan because it is based on acts or omissions by the CenturyTel Defendants during the pendency of SkyPort's 2008 bankruptcy. Therefore, this claim must be dismissed with prejudice.

93

14. Analysis of Count Fourteen: Breach of Contract and Recission against the Kubbernus Defendants on behalf of the ClearSky Investors and the Additional Investors

Count Fourteen, in relevant part, alleges that:

485. The Kubbernus Defendants had contractual obligations to the ClearSky Investors pursuant to the ClearSky LPA, ClearSky IM.

486. Kubbernus testified and maintained that these contractual obligations did not require that Balaton assign its interest in SkyComm to the ClearSky partnership in the event that it did not raise $10 Million.

487. In the event that Kubbernus is correct, then the Kubbernus Defendants are contractually obligated to return all of the proceeds of the offering to the ClearSky Investors and the contract between the Kubbernus Defendants and the ClearSky Investors should be rescinded.

488. The Kubbernus Defendants failed to issue share certificates to the Additional Investors despite repeated demands therefore.

489. Thus, the Kubbernus Defendants are obliged under implied contract and under law to return all of the proceeds of the offering to the Additional Investors, and the contract between the Kubbernus Defendants and the Additional Investors should be rescinded.

Count Fourteen of the Petition is entirely direct under both the Delaware and Texas standards. The allegations in Count 14 are related to the sale of equity interests in ClearSky and SkyComm. The Plaintiffs would not have to show harm to SkyPort, SkyComm, or ClearSky in order to prevail on their claims of breach of contract and recission. These claims are therefore direct claims and will be remanded to the Texas state court.

15. Analysis of Count Fifteen: Breach of Fiduciary Duty and Malpractice against Wilson Vukelich and the Kubbernus Defendants brought by the ClearSky Investors, Derivatively on behalf of ClearSky

Count Fifteen, in relevant part, alleges that:

474. The ClearSky Investors owned interests in ClearSky at the time the wrongs

94

complained of below occurred and continue to own interests in ClearSky as of the filing of this Petition. The ClearSky Investors will fairly and adequately represent the interests of ClearSky and its members in enforcing ClearSky's rights in this action.

475. As alleged above, Wilson Vukelich violated its fiduciary and professional duties to ClearSky by charging excessive fees to ClearSky, charging ClearSky for work not performed for ClearSky, permitting the misapplication and comingling of ClearSky funds, failing to assure that ClearSky obtained title to the interests in SkyComm and representing Balaton in taking title to such interests.

476. As alleged above, the Kubbernus Defendants violated their fiduciary and contractual duties to ClearSky by taking title to the interests in SkyComm to which ClearSky was entitled, and misapplying and misappropriating funds from ClearSky.

477. As a direct and proximate result of the Wilson Vukelich's failure to perform its professional and fiduciary obligations and of the Kubbernus Defendants' violations of their fiduciary and contractual duties, ClearSky has sustained significant damages, for which such Defendants are liable.

478. The ClearSky Investors have not made demand on ClearSky Management, the general partner of ClearSky, to bring this claim against the Kubbernus Defendants and Wilson Vukelich. Such demand would be a futile because ClearSky Management is a wholly-owned subsidiary of Balaton and is managed by Kubbernus as its sole Director; Balaton and Kubbernus would not cause ClearSky to bring suit against themselves or against the law firm which allowed them to deprive ClearSky of its right to title of the shares in SkyComm it was lawfully entitled to receive.

Count 15 is a derivative claim brought on behalf of ClearSky. The ClearSky Investors are not barred from bringing such a derivative claim.[34] Thus, Count 15 will be remanded to the Texas state court.

## IV. CONCLUSION

A table cataloging which of the Plaintiffs' claims will be remanded to the Texas state court and which claims will be dismissed with prejudice is attached to this Memorandum

---

[34] *See supra* note 27.

Opinion as Exhibit A. Because some of the claims must be dismissed with prejudice, while others are being remanded to Texas state court, the Court finds that the Motion to Dismiss should be granted in part and denied in part.

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 13th day of January, 2011.

_____
Jeff Bohm
United States Bankruptcy Judge

96

# Exhibit A

## Table 1—Claims

| COLUMN 1 | COLUMN 2 | COLUMN 3 |
|---|---|---|
| **Claims remanded to the Texas state court** | **Claims dismissed with prejudice because they are derivative claims brought on behalf of SkyComm or SkyPort** | **Claims dismissed with prejudice because they are based on acts or omissions during the pendency of SkyPort's 2008 bankruptcy** |
| **Count 1** Parts (h)-(k), (l) (claims belonging to former shareholders of SkyComm), (n) (claims belonging to former shareholders of SkyComm), (o) (claims belonging to former shareholders of SkyComm), (t) | **Count 1** Parts (a)-(g), (l), (m) (claims originally owned by SkyComm), (n) (claims originally owned by SkyComm), (o) (claims originally owned by SkyComm), (p)-(s), (u)-(w) | |
| **Count 2** Part (d) (claims belonging to shareholders of SkyComm), (e), (f), (g), and (h) (claims belonging to former shareholders of SkyComm) | **Count 2** Parts (a)-(c), (d) (claims originally owned by SkyComm), (h) (claims originally owned by SkyComm); (i)-(k), and (l)-(p) | **Count 2** Parts (q)-(u) |
| **Count 3** Parts (a)-(f), (j)-(l) | | **Count 3** Parts (g)-(i) |
| **Count 4** in its entirety | | |
| **Count 5** in its entirety | | |
| **Count 6** all Parts except Part 397 | | **Count 6** Part 397 |
| **Count 7**—claims that a Plaintiff was induced to make an investment | **Count 7**—claims that a Plaintiff was induced to maintain an investment | **Count 7** Parts 423(g) and (h) |
| **Count 8** in its entirety | | |
| **Count 9**—claims that a Plaintiff was induced to make an investment | **Count 9** –claims that a Plaintiff was induced to maintain an investment | |
| **Count 10** in its entirety | | |
| **Count 11** in its entirety | | |
| **Count 12**—Claims where the predicate act under Counts 1-3 | **Count 12**— Claims where the predicate act under Counts 1-3 | **Count 12**— claims where the predicate act under Counts 1-3 |

| | | |
|---|---|---|
| and 5-7 is not barred; *i.e.*: Count 1 Parts (h)-(k), (l) (claims belonging to former shareholders of SkyComm), (n) (claims belonging to former shareholders of SkyComm), (o) (claims belonging to former shareholders of SkyComm), (t); Count 2 Part (d) (claims belonging to former shareholders of SkyComm), (e), (f), (g), and (h) (claims belonging to former shareholders of SkyComm); Count 3 Parts (a)-(f), (j)-(l); Count 5 in its entirety; Count 6 in its entirety; and claims that a Plaintiff was induced to make an investment in Count 7, with the exception of Parts 423(g) and (h). | and 5-7 is derivative on behalf of SkyComm or SkyPort; *i.e.*: Count 1 Parts (a)-(g), (l), (m) (claims originally owned by SkyComm), (n) (claims originally owned by SkyComm), (o) (claims originally owned by SkyComm), (p)-(s), (u)-(w); Count 2 Parts (a)-(c), (d) (claims originally owned by SkyComm), (h) (claims originally owned by SkyComm); (i), (j), (l)-(p), (s), and (t); and claims that a Plaintiff was induced to maintain an investment in Count 7. | and 5-7 takes place during the pendency of SkyPort's 2008 bankruptcy; *i.e.*, Count 2 Parts (q)-(u); Count 3 Parts (g)-(i) |
| **Count 13**—claims, other than those represented by Part 483(g), where the predicate act under Counts 2 or 3 is not barred; *i.e.*, Count 2 Part (d) (claims belonging to former shareholders of SkyComm), (e), (f), (g), and (h) (claims belonging to former shareholders of SkyComm); Count 3 Parts (a)-(f), (j)-(l). | **Count 13**—claims where the predicate act under Counts 2 or 3 is derivative on behalf of SkyComm or SkyPort; *i.e.*: Count 2 Parts (a)-(c), (d) (in part), (h) (claims originally owned by SkyComm); (i), (j), (l)-(p), (s), (t). | **Count 13**—Part 483(g) and claims where the predicate act under Count 2 or 3 takes place during the pendency of SkyPort's 2008 bankruptcy; *i.e.*, Count 2 Parts (q)-(u); Count 3 Parts (g)-(i) |
| **Count 14** in its entirety | | |
| **Count 15** in its entirety | | |

# Exhibit B

## Table 2—The Plaintiffs

| Plaintiff Group | Plaintiff's Name | Description | Alleged Shareholder in: | Residence |
|---|---|---|---|---|
| **Original Shareholders** | Joanne Schmermerhorn | Held shares in SkyComm prior to CenturyTel acquiring any interest in SkyComm | SkyComm | Texas |
| | John K. Waymire | | SkyComm | Texas |
| | Chet Gutowsky | | SkyComm | Texas |
| | John Llewellyn | | SkyComm | Texas |
| | Joseph A. Lopez | | SkyComm | New Jersey |
| | Robert Foote | | SkyComm | Florida |
| | BLF Partners Ltd. | | SkyComm | Organized in Texas |
| | ECAL Partners, Ltd. | | SkyComm and ClearSky | Organized in Texas |
| | Whizkid Venture, LLC | | SkyComm | Organized in Nevada |
| | Bella Krieger | | SkyComm | Florida |
| | Martin Pollack | | Sky Comm | New York |
| | Melvyn Reiser | | SkyComm | New York |
| | Barry Klein | | SkyComm | New York |
| | Cheskel Kahan | | SkyComm | New York |
| | John A. Rees | | SkyComm | Arkansas |
| | Brian W. Harle | | SkyComm | Texas |
| | Michael Stein | | SkyComm | New York |
| | Lawrence Solomon | | SkyComm | Florida |
| | Tracy Elstein & David Togut | | SkyComm | Delaware |
| | Jason Charles Togut Trust | | SkyComm | Formed in New York |
| | BMT Grantor Trust | | SkyComm | Formed in New York |
| | Lynn Joyce Elstein Trust | | SkyComm | Formed in Florida |

| | Charles Stack | | SkyComm | Texas |
|---|---|---|---|---|
| | Joseph Baker | | SkyComm | Texas |
| | Movada, Ltd. | | SkyComm | Texas |
| | Puddy, Ltd. | | SkyComm | Texas |
| **Non-CenturyTel Debenture Holders** | Gloster Holdings, LLC | Purchased debentures from SkyComm prior to May 2005 and had their debentures converted into SkyComm shares on November 2, 2006. | SkyComm | Delaware |
| | ECAL Partners, Ltd. | | SkyComm and ClearSky | Organized in Texas |
| **ClearSky Investors** | Draco Capital, Inc. | Purchased membership interests in ClearSky | ClearSky | Organized in Canada |
| | Edward Pascal | | ClearSky | Canada |
| | Robert Mendel | | ClearSky | Canada |
| | Stanley Beraznik | | ClearSky | Canada |
| | Don Bui | | ClearSky | Canada |
| | Ben Ariano | | ClearSky | Canada |
| | Sequoia Diversified Growth Fund | | SkyComm and ClearSky | Managed by Nemo Asset Management in Abu Dhabi, UAE |
| | 3791068 Canada, Inc. | | ClearSky | Organized in Canada |
| | Peter Taylor | | ClearSky | Canada |
| | Semper Gestion SA | | ClearSky | |
| | Sequoia Diversified Growth Fund | | ClearSky | |
| | ECAL Partners, Ltd. | | ClearSky | |
| | Eosophoros Asset Management, Inc. | | ClearSky | |

| **Additional Investors** | John E. Pannton | Purchased shares in SkyComm after November 2, 2006. | SkyComm | |
| | Wayne C. Fox | | SkyComm | Canada |
| | David Currie | | SkyComm | Canada |
| | Byron Meeier | | SkyComm | Canada |
| | Darshon Khurana | | SkyComm | Canada |
| | Mateo Novelli | | SkyComm | France |
| | Diya Al-Sarraj | | SkyComm | United Arab Emirates |
| | Sequoia Aggressive Growth Fund | | SkyComm | Organized in the British Virgin Islands |
| | Sequoia Diversified Growth Fund | | SkyComm and ClearSky | Managed by Nemo Asset Management in Abu Dhabi, UAE |
| | Rig III Fund, Ltd. | | SkyComm | British Virgin Islands |
| | Aran Asset Management SA | | SkyComm | Formed in Switzerland |

# Exhibit C

## Table 3—The Defendants

| Defendant Groups | Defendant's Name | Description | Residence |
|---|---|---|---|
| **CenturyTel Defendants** | CenturyTel, Inc., (a/k/a CenturyLink) | Alleged to have obtained control of SkyComm and SkyPort in its purchase of debenture bonds. | Organized in Delaware; principal place of business in Texas |
| | Clarence Marshall (Marshall) | Vice President – Corporate Technology Assessment and Strategic Planning of CenturyTel, and from December 2002 until sometime in 2006, Chairman of the Board of Directors of SkyComm and SkyPort. | Oklahoma |
| | R. Stewart Ewing, Jr. | Executive Vice President and Chief Financial Officer of CenturyTel, and from December 2002 until sometime in 2006, a Director of SkyComm and SkyPort. | Louisiana |
| | Michael E. Maslowski | Vice President of CenturyTel, and from December 2002 until sometime in 2006, a Director of SkyComm and SkyPort | Louisiana |
| | Harvey P. Perry | Executive Vice President, General Counsel and Chief Administrative Officer of CenturyTel and | Louisiana |

| | | from December 2002 until sometime in 2006, a Director of SkyComm and SkyPort | |
|---|---|---|---|
| **Kubbernus Defendants** | Robert Kubbernus | Person in control of the defendants Balaton, Bankton, Bankton-Texas, and ClearSky Management, as well as Lavell and Lavell-Delaware and the nominal defendant, ClearSky. | Texas and Canada |
| | Balaton Group, Inc., | | Canada |
| | Bankton Financial Corporation | | Canada |
| | Bankton Financial Corporation, LLC (Bankton-Texas) | | Texas |
| | ClearSky Management, Inc | | Delaware |
| **Law Firm** | Wilson Vukelich, LLP | | Canada |
| **Nominal Defendant** | ClearSky Investments, LP (ClearSky) | | Organized in Canada |

# Exhibit D

## Organizational Charts of Relevant Entities

**Organizational Chart 1: SkyPort before the Controlling Debentures are issued to CenturyTel**: The Original Shareholders own all of the equity in SkyPort.[35]



---

[35] Any reference in the Organizational Charts to the Original Shareholders, SkyPort, SkyComm, CenturyTel, the Non-CenturyTel Debenture Holders, the Additional Investors, ClearSky, or the ClearSky Investors has the defined meaning provided in the body of the Memorandum Opinion to which this Exhibit is attached.

**Organizational Chart 2: SkyPort and SkyComm prior to assignment of Controlling Debentures to Balaton**: SkyComm has been created as a holding company for SkyPort. SkyComm has issued the Controlling Debentures to CenturyTel. The Non-CenturyTel Debenture Holders and Additional Investors have made their investments in SkyComm.



**Organizational Chart 3: SkyPort and ClearSky after the assignment of the Controlling Debentures to Balaton**: The Controlling Debentures have been assigned to Balaton. ClearSky has obtained investments (i.e., cash infusions) from the ClearSky Investors.



# Exhibit E

## Timeline of Allegations



**Late 1990s** — SkyPort* founded

**2002** — CenturyTel agrees to provide funds to SkyPort in the form of debenture bonds.

**2003** — SkyComm is created as a holding company for SkyPort; The first of the Controlling Debentures are issued to Century Tel by SkyComm.

**2005** — The eighth and final round of Controlling Debentures is issued to CenturyTel sometime in 2005; in late 2005, CenturyTel begins looking for a purchaser for the Controlling Debentures.

In November of 2005, SkyPort files its first Chapter 11 Petition; around this time, SkyPort begins filing the 2006 Pro Forma applications with the FCC.

**February 2006** — In February of 2006, CenturyTel enters into a purchase agreement with the Watershed Funds for the Controlling Debentures. The deal also provided for financing to SkyComm and SkyPort. This deal fails and the Controlling Debentures are never assigned to the Watershed Funds; instead, Balaton offers to provide the financing in place of the Watershed Funds; Balaton and Kubbernus obtain operational control of SkyComm and SkyPort.

Also in February of 2006, ClearSky is created as a vehicle for obtaining financing for SkyComm and SkyPort; Investments in ClearSky are solicited; and the NonCenturyTel Debenture Holders are solicited to convert their debenture bonds into equity in SkyComm. These debenture bonds are converted in early 2006.

**March 2006** — On March 15, 2006, SkyPort files a motion to dismiss its first Chapter 11 case. On March 30, 2006, the case is dismissed.

**October 2006** — Around October 27, 2006, closing documents are distributed to SkyComm's directors for approval. These documents indicate that Balaton was to purchase the Controlling Debentures, which would be converted into equity in SkyComm.

* References to SkyPort, and any capitalized references to other entities in this timeline, are given the definitions provided for them in the body of this Memorandum Opinion.

1



On November 2, 2006, the debenture purchase agreement and other financing agreements between SkyComm and Balaton close.

On October 24, 2008, SkyPort files its second Chapter 11 petition, creating the 2008 Bankruptcy Case. At some point between November 2, 2006 and the filing of this Chapter 11 petition, Balaton is issued more stock in SkyComm.

On August 12, 2009, this Court confirms the Plan and signs the Confirmation Order.

On February 12, 2010, the Plaintiffs file the Petition in Texas State Court.

November 2006  |  October 2008  |  March 2009  |  August 2009  |  October 2009  |  February 2010  |  March 2010

After November 2, 2006, Balaton and Kubbernus solicit investors on behalf of SkyComm. These investors become the Additional Investors through purchases of equity in SkyComm.

In March 2009, the FCC issues an Order of Forfeiture against SkyPort.

On October 13, 2009, SkyComm and SkyPort are merged pursuant to the Plan and Confirmation Order. SkyPort is the surviving entity.

On March 26, 2010, the Defendants file the Notice of Removal of all claims in the Petition.

2