## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**03/31/2011**

| | | |
|---|---|---|
| IN RE: | § | |
| SKYPORT GLOBAL | § | **CASE NO: 08-36737-H4-11** |
| COMMUNICATIONS, INC.,| § | |
|     Debtor. | § | |
| | § | |
| JOANNE SCHERMERHORN, JOHN K. | § | |
| WAYMIRE, *et al.*, | § | |
|     Plaintiffs | § | |
| | § | |
| v. | § | **ADVERSARY NO. 10-03150** |
| | § | |
| CENTURYTEL, INC. (a/k/a CENTURY | § | |
| LINK), CLARENCE MARSHALL, *et al.*, | § | |
|     Defendants. | § | |

### MEMORANDUM OPINION REGARDING: (1) NOTICE OF FILING OF REDACTED FEE STATEMENTS OF MCKOOL SMITH P.C.; (2) PLAINTIFFS' CERTIFICATION/AMENDED CERTIFICATION ON REASONABLENESS OF FEES SUBMITTED BY MCKOOL SMITH P.C.; AND (3) DEFENDANTS' MOTION FOR ADDITIONAL SANCTIONS
[Adv. Doc. Nos. 87, 107, 112 & 103]

### I. INTRODUCTION

On August 3, 2010, this Court held a hearing on the following matters: (1) Notice of Filing of Redacted Fee Statements of McKool Smith P.C. [Adv. Doc. No. 87]; (2) Plaintiffs' Certification/Amended Certification on Reasonableness of Fees Submitted by McKool Smith P.C. [Adv. Doc. Nos. 107 & 112]; and (3) Defendants' Motion for Additional Sanctions [Adv. Doc. No. 103]. The Court heard testimony from one witness—Robert M. Manley (a partner at McKool Smith P.C.)—whom the Court finds to be credible. Nineteen exhibits were admitted into evidence—namely, Defendants' Exhibits 2, 3, 17–27, and 31–36—with Exhibits 33–36 being admitted for demonstrative purposes only. The Court took judicial notice of Defendants' Exhibits 6, 14, 15, and 16.

1

Based upon the entire record, the Court now makes findings of fact and conclusions of law pursuant to Federal Bankruptcy Rule 7052.[1]  To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; and to the extent any conclusion of law is construed as a finding of fact, it is also adopted as such.  This Court reserves the right to make additional findings and conclusions as it deems appropriate or as any party may request.

## II. FINDINGS OF FACT

1. Skyport Global Communications, Inc. (Skyport or the Reorganized Debtor) filed its Chapter 11 petition on October 24, 2008. [Main Case Doc. No. 1].

2. This Court confirmed Skyport's Chapter 11 Plan of Reorganization (the Plan) [Main Case Doc. No. 223] orally from the bench at a hearing held on August 7, 2009.  The Court entered an order confirming the Plan (the Confirmation Order) on August 12, 2009. [Main Case Doc. No. 340].

3. On February 12, 2010, the Plaintiffs named in this adversary proceeding (the Plaintiffs) filed an original petition against the Defendants in the District Court of Harris County, Texas, bearing Cause No. 2010-09675 (the Original Petition). [Adv. Doc. No. 1-1].

4. In the Original Petition, the Plaintiffs represented to the Harris County Court that 37 of the plaintiffs are owners of shares of common stock of SkyComm.[2] [Adv. Doc. No. 1-1, p. 9– 14].  This representation was false, as all shares of SkyComm had been cancelled four months prior to the filing of the Original Petition.  Article 6.3 of the Plan expressly provided for the merger of SkyComm into Skyport and for the cancellation of all shares of SkyComm

---

[1] Unless otherwise noted, all section references refer to 11 U.S.C. and all references to the "Code" or the "Bankruptcy Code" refer to the United States Bankruptcy Code.  References to a "Rule" or "Bankruptcy Rule" refer to the Federal Rules of Bankruptcy Procedure.

[2] "SkyComm" is defined in the Plan as SkyComm Technologies Corporation.  SkyComm was the 100% shareholder of Skyport on the date of the filing of Skyport's Chapter 11 petition. [Main Case Doc. No. 223, p. 7, ¶ 2.1.44].

stock. [Main Case Doc. No. 223, Art. 6.3].[3]  On October 13, 2009, the merger of SkyComm with Skyport was effectuated pursuant to the Plan and the Confirmation Order, and all of SkyComm's shareholders lost their equity interests in SkyComm through the cancellation of their shares. All shares of the Reorganized Debtor were then issued to Balaton. [Adv. Doc. No. 272, p. 7, ¶ 6].

5. The Plaintiffs made numerous allegations in the "Factual Background" section of the Original Petition that prior to confirmation of the Plan, and in order to obtain confirmation of the Plan, Robert Kubbernus (Kubbernus) and CenturyTel, Inc. (CenturyTel),[4] among others, defrauded the Plaintiffs and this Court. [Adv. Doc. No. 1-1, p. 20–68].  Such allegations included the following:

> CenturyTel made numerous false representations in the Chapter 11 case, CenturyTel asserting that it held a secured claim of approximately $2,700,000 against SkyPort [sic], alleging that $2,500,000 of SkyComm debentures it had held had never been cancelled and that accumulated interest had brought this debt to $2,700,000.

[Adv. Doc. No. 1-1, ¶ 322].

> As a result of their blatantly false representations and unconscionable breach of their fiduciary duties to the shareholders of SkyComm and ClearSky, Balaton and Kubbernus were able to eliminate all other shareholders in SkyComm and secure 100% of the equity in SkyComm and SkyPort [sic] for themselves in the bankruptcy proceeding and CenturyTel was able to secure the survival of the debt Balaton owed it.

---

[3] Pursuant to the Plan, SkyComm was to be merged into Skyport, which would remain as the sole surviving company after the merger was consummated. [Main Case Doc. No. 223, Art. 6.3]. Once merged, all shares of stock owned by SkyComm's shareholders were to be cancelled and all shares of the Reorganized Debtor were to be re-issued to Balaton Group, Inc. (Balaton). [Main Case Doc. No. 223, Art. 6.3]. The Confirmation Order mandated that this merger occur as part of the effectuation of the Plan. [Main Case Doc. No. 340, p. 9–10, ¶ 34].

[4] Kubbernus is the President and party in control of the defendants Balaton, Bankton Financial Corporation, Bankton Financial Corporation, LLC, ClearSky Investments, LP, ClearSky Management, Lavell-Canada, and Lavell-US. CenturyTel, a/k/a CenturyLink, is a Delaware corporation. From December 2002 through approximately February 2006, CenturyTel, as lender to SkyComm and holder of SkyComm's convertible debentures, exercised complete control over the management and operation of SkyComm and Skyport. On February 15, 2006, CenturyTel transferred operational control of SkyComm to both Balaton and Kubbernus. On November 2, 2006, SkyComm and Skyport transferred formal control to CenturyTel.

[Adv. Doc. No. 1-1, ¶ 333].

> CenturyTel acquiesced and cooperated with Balaton's and Kubbernus' plan, even though it knew that Kubbernus and Balaton were wrongfully and fraudulently using the plan to deprive the SkyComm shareholders of their interests in SkyComm.

[Adv. Doc. No. 1-1, ¶ 334].

6. The above-referenced allegations made by the Plaintiffs directly contradicted findings of fact and conclusions of law which this Court made in confirming the Plan.  Specifically, at the confirmation hearing on August 7, 2009, the Court made an express finding that, in compliance with Section 1129(a)(5), Kubbernus' appointment to continue as an officer of the Reorganized Debtor was consistent with the interest of creditors and the current equity security holders, as well as with public policy. [Main Case Doc. No. 351-1, p. 57–58; August 7, 2009 Tr. 209:10—210:8].  Rather than participate in the hearing and object to the evidence presented—and there is no question that the Plaintiffs had notice of Skyport's bankruptcy filing and of the confirmation hearing—the Plaintiffs waited until the deadline for vacating the Confirmation Order for fraud had passed and then filed the Original Petition in state court alleging that Kubbernus, Balaton, and CenturyTel made misrepresentations to this Court that caused it to erroneously confirm the Plan. [5]

7. Subsequent to its discussion of Count Two in the Original Petition, the Plaintiffs then requested the following relief:

> An Order appointing a provisional director, trustee, managing agent, fiscal agent or other court appointed fiduciary for SkyComm and SkyPort [sic].

---

[5] Section 1144 provides that "[o]n request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud." The Court entered the Confirmation Order on August 12, 2009. [Main Case Doc. No. 340]. Thus, the 180 day period for objecting to the Confirmation Order pursuant to Section 1144 expired on February 8, 2010. The Plaintiffs filed the Original Petition in state court four days later, on February 12, 2010. [Adv. Doc. No. 1-1].

[Adv. Doc. No. 1-1, p. 76].

> Awarding all Plaintiffs equitable relief, including disgorgement of compensation, fees and benefits, restitution, forced buyout of interest, or other relief as determined by the Court as necessary to do justice.

[Adv. Doc. No. 1-1, p. 76].

8. The above-referenced relief undermined and attacked the Plan and Confirmation Order because these two documents, taken separately or together, expressly: (a) merged SkyComm into Skyport, thereby making it impossible to appoint a provisional director, trustee, managing agent, fiscal agent or other court-appointed fiduciary over the two separate and distinct entities that existed prior to the merger; and (b) authorized Kubbernus to remain as an officer and director of the Reorganized Debtor, thereby barring his removal from power and replacement with a provisional director, trustee, managing agent, fiscal agent or other court-appointed fiduciary.

9. On March 26, 2010, all Defendants, except the law firm of Wilson Vukelich LLP (the Non-Wilson Vukelich Defendants), filed their Motion to Dismiss, or, Alternatively, for Summary Judgment, and for Sanctions (the Original Motion for Sanctions). [Adv. Doc. No. 2].[6] The Non-Wilson Vukelich Defendants requested that the Court impose sanctions against the Plaintiffs for their bad faith in pursuing causes of action in state court that contradict and/or attack the Plan and Confirmation Order. [Adv. Doc. No. 2, p. 41–43, ¶¶ 121–28].

10. On April 19, 2010, the Plaintiffs filed their Objections to the Original Motion for Sanctions, asserting that sanctions should be imposed, if at all, against the Non-Wilson Vukelich

---

[6] The issues presented in the motion, aside from the Non-Wilson Vukelich Defendants' request for sanctions, were addressed in this Court's memorandum opinion and corresponding order entered on the docket January 13, 2011. [Adv. Doc. Nos. 272 & 274]. Thus, for purposes of this Memorandum Opinion, the Court will refer to Adv. Doc. No. 2 as the Original Motion for Sanctions.

Defendants for removing the entire petition instead of only those counts that could be construed as derivative. [Adv. Doc. No. 15, p. 67–68, ¶¶ 223–26].

11. On May 27, 2010, this Court held a hearing on, among other things, the Original Motion for Sanctions. The Court orally granted the motion, and instructed counsel for the Non-Wilson Vukelich Defendants and counsel for the Reorganized Debtor[7] to submit fee invoices relating to the prosecution of the Original Motion for Sanctions to counsel for the Plaintiffs by June 11, 2010. [May 27, 2010 Tr. 294:2–6; 306:2–1].[8] The Court further instructed counsel for the Plaintiffs to file a certificate as to the reasonableness of the requested fees by June 30, 2010. [May 27, 2010 Tr. 306:19—307:13]. The Court stated that it would permit counsel for the Non-Wilson Vukelich Defendants and counsel for the Reorganized Debtor to file separate motions requesting additional sanctions until June 30, 2010, and that any response to a motion for additional sanctions must be filed by no later than July 23, 2010. [May 27, 2010 Tr. 307:14—308:12].

12. Counsel for the Non-Wilson Vukelich Defendants filed their Notice of Filing of Redacted Fee Statements of McKool Smith on June 11, 2010 (the Fee Statements). [Adv. Doc. No. 87]. The Fee Statements include invoices totaling $571,111.67 for fees and expenses incurred from March 8, 2010 through May 31, 2010 in connection with the Original Petition and this adversary proceeding.

---

[7] For convenience and clarity, the Court refers to McKool Smith P.C. (McKool Smith) as counsel for the Non-Wilson Vukelich Defendants and Hoover Slovacek, LLP as counsel for the Reorganized Debtor throughout the duration of this Opinion—even though the Reorganized Debtor is one of the Non-Wilson Vukelich Defendants. McKool Smith, at least for purposes of prosecuting the Original Motion for Sanctions, represented all of the Non-Wilson Vukelich Defendants aside from the Reorganized Debtor. [Tape Recording, 8/3/2010 Hearing at 9:45:29 a.m.—9:45:52 a.m.]. Likewise, any reference to the Non-Wilson Vukelich Defendants, in connection with the Court's granting of sanctions, does not include the Reorganized Debtor—as sanctions were separately awarded to Hoover Slovacek, LLP as counsel for the Reorganized Debtor.

[8] The Non-Wilson Vukelich Defendants included the relevant portions of the May 27, 2010 transcript in Defendants' Exhibit 1. This transcript is referenced on the docket at Adv. Doc. No. 75, but the docket sheet sets forth that anyone who wants to review the transcript must go to the clerk's office.

13. On June 29, 2010, the Non-Wilson Vukelich Defendants filed a motion requesting that the Court impose the following additional sanctions against the Plaintiffs: (a) $75,000 for an appeal to the District Court; (b) $75,000 for an appeal to the Circuit Court; (c) $250,000 in the event of an appeal to the United States Supreme Court; (d) coercive sanctions of $350 per diem for each day that the sanctions remain unpaid; and (e) that Defendants maintain the ability to seek additional coercive measures (the Motion for Additional Sanctions). [Adv. Doc. No. 103, p. 7].

14. On June 30, 2010, the Reorganized Debtor filed its Motion for Additional Sanctions, requesting that: (a) the Court award additional sanctions in the amount of $354,313, plus the costs of collecting this amount if not paid within ten days; (b) the Court order that the award be joint and several; and (c) the Court order that the Schermerhorn Group may not pursue any direct claims until such time as the sanctions awards are paid in full (the Reorganized Debtor's Motion for Additional Sanctions). [Adv. Doc. No. 104, p. 7–8].

15. Also on June 30, 2010, the Plaintiffs filed their Certification on Reasonableness of Fees. [Adv. Doc. No. 107]. The Plaintiffs "object to the fees and expenses of McKool Smith, P.C. and submit that they are not reasonable in that they are excessive in the extreme, and include entries for work unrelated to the violation determined by the Court to warrant sanctions, as well as unnecessary and duplicative work." [Adv. Doc. No. 107, ¶ 2]. In response to the original fee invoices submitted by Hoover Slovacek, LLP after the May 27 hearing for fees and expenses totaling $17,800.29 (which did not include the fees requested in the Reorganized Debtor's Motion for Additional Sanctions), the Plaintiffs "accept the amount of fees and expenses as reasonable." [Adv. Doc. No. 107, ¶ 3].

16. On July 1, 2010, the Plaintiffs filed their Amended Certification on Reasonableness of Fees,

which is identical to the original certification aside from the addition of a Local Rule 9013

notice (the Certification on Reasonableness of Fees). [Adv. Doc. No. 112].

17. On July 23, 2010, the Plaintiffs filed their Objection to Removing Defendants' Request for

Additional Sanctions and Memorandum on the Unreasonableness of their Fee Request (the

Objection to the Motion for Additional Sanctions). [Adv. Doc. No. 133].   The Plaintiffs

assert that: (a) equitable principles strongly suggest decreasing the sanctions award requested

by the Non-Wilson Vukelich Defendants; (b) the doctrine of unclean hands requires that only

nominal sanctions be awarded; (c) under the *Thomas/Topalian* guidelines, other factors favor

reduced sanctions; (d) the Non-Wilson Vukelich Defendants failed to mitigate their fees and

costs; (e) the fees sought are not wholly related to the violation and are not reasonable; (f) the

sanctions requested are not the least severe to achieve the purpose of the rule under which

they were imposed; (g) there is no legal basis for prospectively sanctioning an appeal; and (h)

a coercive per diem fine is not warranted under these circumstances. [Adv. Doc. No. 133].

18. On July 30, 2010, the Non-Wilson Vukelich Defendants filed their Response to the Objection

to the Motion for Sanctions, asserting that: (a) the Plaintiffs continue to violate this Court's

order; (b) appealing the ruling in this adversary proceeding continues the contempt and

violation of the Confirmation Order; (c) the fees requested by the Non-Wilson Vukelich

Defendants are supported by the *Johnson* factors; and (d) the Plaintiffs' objection should be

struck. [Adv. Doc. No. 136].

19. On August 2, 2010, counsel for the Non-Wilson Vukelich Defendants filed their

Supplemental Notice of Filing of Redacted Fee Statements of McKool Smith (the

Supplemental Fee Statements). [Adv. Doc. No. 148].   The Supplemental Fee Statements

include invoices totaling $107,435.02 for fees and expenses incurred from July 1, 2010

through July 31, 2010 in matters pertaining to the Original Petition and this adversary proceeding.

20. On August 3, 2010, the Court held a hearing on, among other things, the Fee Statements, the Certification on the Reasonableness of Fees, and the Motion for Additional Sanctions.  The Court took the matters under advisement.

21. On August 11, 2010, the Court entered an agreed order expressly: (a) providing that the fees and expenses incurred by Hoover Slovacek, LLP (*i.e.*, counsel for the Reorganized Debtor) in the amount of $17,800.29 are reasonable; and (b) continuing the hearing on the Reorganized Debtor's Motion for Additional Sanctions to October 7, 2010 at 9:00 a.m. [Adv. Doc. No. 158, p. 2].  The Plaintiffs filed a notice of compliance on November 1, 2010, stating that "the sum of $17,800.29 has been wired to the account of Hoover Slovacek, LLP." [Adv. Doc. No. 235].

22. On October 15, 2010, this Court held a hearing on the Reorganized Debtor's Motion for Additional Sanctions.  The Court issued an oral ruling at the close of this hearing, and this ruling was reduced to a written order on November 9, 2010.   This order awarded the Reorganized Debtor additional sanctions against the Plaintiffs in the aggregate amount of $8,584.65. [Adv. Doc. No. 242].  Hoover Slovacek, LLP filed a certificate on November 11, 2010 notifying the Court that the firm received a check for $8,584.65 from counsel for the Plaintiffs. [Adv. Doc. No. 247].

23. Thus, the Reorganized Debtor has recovered attorneys' fees totaling $26,384.94.  The Court now issues this Memorandum Opinion on the amount of attorneys' fees to be awarded to McKool Smith, counsel for the remainder of the Non-Wilson Vukelich Defendants.

### III. CONCLUSIONS OF LAW

**A. Jurisdiction and Venue**

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1334(b) and 157(a). *See Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1063 (5th Cir. 1997) (noting that a proceeding in a bankruptcy court to enforce and construe a confirmation order issued by that court constitutes a proceeding arising in or related to a case under title 11). This particular dispute is also a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").

Finally, although the dispute at issue concerns a Chapter 11 case in which a plan of reorganization has been confirmed, this Court has jurisdiction to interpret and enforce its own orders. Indeed, a bankruptcy court's original core jurisdiction continues in order for it to enforce its orders, even after the case has been closed. *In re U.S. Brass Corp.*, 301 F.3d 296, 304 (5th Cir. 2002); *New Nat'l Gypsum Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 219 F.3d 478, 483 (5th Cir. 2000) ("[T]he bankruptcy court [may] interpret and construe the Confirmation Order, Plan, and plan documents regarding matters as to which there is a substantial and immediate controversy."); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*,

511 U.S. 375, 379–80 (1994) (A federal court always has subject matter jurisdiction "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.").

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## B. McKool Smith is entitled to recover a fraction of the fees requested in the Fee Statements as sanctions against the Plaintiffs.

This Court has the inherent authority to impose sanctions in order to regulate the practice of attorneys and litigants appearing before it. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). The Court should limit the amount of the sanction to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. *Id.* at 44–45; *Natural Gas Pipeline Co. of Am. v. Energy Gathering Inc.*, 86 F.3d 464, 467 (5th Cir. 1996) (noting that the inherent authority to impose sanctions may only be exercised if essential to preserve the authority of the court and that the sanction imposed must employ the least possible power adequate to achieve its purpose). A court may assess attorneys' fees as a sanction when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons" in either instituting or conducting litigation. *Chambers*, 501 U.S. at 45–46 (internal quotation marks and citations omitted); *Citizens Bank & Trust Co. v. Case (In re Case)*, 937 F.2d 1014, 1023 (5th Cir. 1991) (holding that "the bankruptcy court has the inherent power to award sanctions for bad-faith conduct in a bankruptcy court proceeding"). Courts generally evaluate the fees requested to determine if they are reasonable and necessary. *See, e.g., Cadle Co. v. Pratt (In re Pratt)*, No. 3:06-CV-257-L, 2007 WL 824117, at *8 (N.D. Tex. March 16, 2007), *aff'd in part and dismissed in part*, 524 F.3d 580, 583–84 (5th Cir. 2008) (holding that the bankruptcy court abused its discretion in awarding opposing counsel's attorney's fees and expenses as sanctions without affording the sanctioned party the right to examine, question, or provide argument against the claimed fees and

11

expenses).[9]

Consistent with this authority, the Court orally granted the Original Motion for Sanctions on May 27, 2010. The Court concluded that the Plaintiffs acted in bad faith by filing the Original Petition in direct contravention of the Plan and Confirmation Order. [Finding of Fact Nos. 6, 8, & 11].[10] Thus, the Court held that counsel for the Non-Wilson Vukelich Defendants and counsel for the Reorganized Debtor were entitled to recover their **reasonable** fees and expenses incurred in prosecuting the motion to dismiss and/or for sanctions (*i.e.*, the Original Motion for Sanctions). [Finding of Fact No. 11]. The Court instructed prevailing counsel to submit invoices to counsel for the Plaintiffs, who would then file a response as to the reasonableness of the fees requested. [Finding of Fact No. 11]. Counsel for the Reorganized Debtor and counsel for the Plaintiffs were able to reach an agreement as to reasonableness of the fees requested by the Reorganized Debtor. [Finding of Fact Nos. 15 & 21]. Also, the Reorganized Debtor's Motion for Additional Sanctions was resolved by a separate hearing and order of this Court dated November 9, 2010. [Finding of Fact Nos. 14 & 22]. However, the Plaintiffs continue to object to both the amount of fees and expenses sought by McKool Smith

---

[9] Specifically, the district court in *Pratt* noted that "[n]o evidence attesting to the necessity of the time expended for services rendered or veracity of attorney's fees and expenses appears in the record. . . . [T]he court is unable to determine whether the amount of attorney's fees and expenses awarded Schiro were necessary and reasonable, or even warranted." *Id.*

[10] Indeed, counsel for the Plaintiffs admitted on the record at the May 27, 2010 hearing that some of the causes of action included in the Original Petition were impermissible derivative claims (*i.e.*, claims brought in direct contravention of the Plan and Confirmation Order):

> [W]e apologize for doing things that we understand are offensive to the Court. We do understand that now. But that was our best understanding at the time, was that what we were doing was asserting direct claims, that that was permitted. And we certainly didn't intend to do anything that was offensive to the Court, or impinge on the Debtor. And we, as soon as this issue arose, we told them we'll remove it. And I—I wish I was more artful in drafting my petition. Of course, then we wouldn't have been here.

[May 27, 2010 Tr. 299:1–11].

(*i.e.*, counsel for the Non-Wilson Vukelich Defendants) pursuant to the Original Motion for Sanctions, as well as the supplemental requests in the Motion for Additional Sanctions. [Finding of Fact Nos. 15–17]. Accordingly, the Court must first determine whether McKool Smith's fees and expenses set forth in the Fee Statements are reasonable.[11]

### 1. Whether the Fee Statements are Reasonable

The Fifth Circuit employs the "lodestar" method to determine what constitutes reasonable attorneys' fees both within and without the bankruptcy context, including determinations of sanctions awards. *Cahill v. Walker & Patterson, P.C. (In re Cahill)*, 428 F.3d 536, 539–40 (5th Cir. 2005) (affirming the bankruptcy court's application of the lodestar method in determining a reasonable fee award for Chapter 13 debtors' attorneys); *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 284 (5th Cir. 2008) (vacating and remanding a fee award in a class action to recover for racial discrimination in the workplace because the district court failed to conduct the proper "lodestar-fee and *Johnson* analyses"); *Skidmore Energy, Inc. v. KPMG*, 455 F.3d 564, 568–59 (5th Cir. 2006) (affirming the district court's application of the lodestar analysis to determine the amount of reasonable attorneys' fees to award as sanctions). Courts compute the lodestar fee by multiplying the number of hours an attorney would reasonably spend for the same type of work by the prevailing hourly rate in the community. *Blum v. Stenson*, 465 U.S. 886, 888 (1984);

---

[11] The Court is evaluating only the $571,111.67 of fees and expenses billed by McKool Smith from March 8, 2010 through May 31, 2010 as set forth in the Fee Statements. [Finding of Fact No. 12]. The Court declines to evaluate the additional $107,435.02 of fees and expenses billed by McKool Smith from July 1, 2010 through July 31, 2010, which are included in the Supplemental Fee Statements. [Finding of Fact No. 19]. When the Court orally granted the Original Motion for Sanctions on May 27, 2010, it requested that McKool Smith, as counsel for the Non-Wilson Vukelich Defendants, submit invoices to the Plaintiffs' counsel for review by no later than June 11, 2010. [Finding of Fact No. 11]. These invoices were to relate solely to the firm's prosecution of the Original Motion for Sanctions. [Finding of Fact No. 11]. The Court did state that counsel for the Non-Wilson Vukelich Defendants could submit requests for additional sanctions prior to June 30, 2010. [Finding of Fact No. 11]. McKool Smith filed the Motion for Additional Sanctions on June 29, 2010, but did not include any supplemental fee requests in the motion. [Finding of Fact No. 13]. Rather, the Supplemental Fee Request was filed on August 2, 2010, and included invoices for fees and expenses incurred during July of 2010—which were clearly unrelated to the prosecution of the Original Motion for Sanctions. [Finding of Fact No. 19].

*Cahill*, 428 F.3d at 540.   Courts may then adjust the lodestar up or down based on its consideration of the *Johnson* factors that are not subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate.[12] *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983); *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 800 (5th Cir. 2006).

The United States Supreme Court recently emphasized the importance of the "lodestar" approach in calculating the reasonableness of attorneys' fees, noting that because the method is readily administrable and objective it "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." *Perdue v. Kenny*, 130 S.Ct. 1662, 1672 (U.S. 2010).   While courts have considerable discretion in determining the amount of a fee award, they must explain the weight given to each factor considered. *Cahill*, 428 F.3d at 540 (citing *In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1298 (5th Cir. 1977)).

i. *Lodestar Fee- Hours Reasonably Expended*

As noted above, the Court must first determine the number of compensable hours in the Fee Statements, including only those hours reasonably expended by McKool Smith's attorneys. *Hensley*, 461 U.S. at 434 ("Cases may be overstaffed, and the skill and experience of lawyers vary widely.   Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary . . . ."); *League of United Latin Am. Citizens # 4552 v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1232 (5th Cir. 1997) (noting that any hours not reasonably expended, excessive, or duplicative should be excluded from consideration).   The burden is on the party seeking payment of his attorneys' fees to show that the hours requested are reasonable. *Hensley*, 461 U.S. at 437; *Firth v. Don McGill of West Houston, Ltd.*, No. H-04-0659, 2006 U.S. Dist. LEXIS 18807, at *13 (S.D. Tex. Mar. 28,

---

[12] *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).

2006), *aff'd* 2007 U.S. App. LEXIS 10479 (5th Cir. 2007). The evidence presented must be sufficient to prove that this burden is met; indeed, an award of fewer hours may be appropriate "if the documentation is *vague* or *incomplete*." *Firth*, 2007 U.S. Dist. LEXIS 18807, at *13–14 (quoting *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995)) (emphasis in original).

In the suit at bar, the Fee Statements indicate that seven attorneys—Robert M. Manley, David Anderson, Hugh M. Ray, III, Ruth Van Meter, Christopher Limpus, Nicholas Zugaro, and Ivan Wang—as well as three individuals whose job positions are not identified on McKool Smith's invoices—Jodie L. Mow, Amy A. Nichols, and Nancy Jones—billed the Non-Wilson Vukelich Defendants for their professional services related to this matter. McKool Smith charged the Non-Wilson Vukelich Defendants a total of $571,111.67 for the three months of services reflected in the invoices. This sum encompasses $569,337.00 for 1,220.1 hours of work by the professionals and $1,774.67 in expenses, including: certified copies, in-house photocopies, postage, filing fees, travel, mileage, and courier fees. [Adv. Doc. Nos. 87-1, 87-2 & 87-3].

Of the 1,220.1 hours of professional services billed, the Court concludes that a number of the entries contain duplicative, redundant, excessive, and unreasonable hours, in addition to services unrelated to the prosecution of the Original Motion for Sanctions. Additionally, many of the billing entries are vague or incomplete, or are otherwise too confusing for this Court to decipher. Accordingly, the Court must reduce the number of hours requested in the Fee Statements as set forth below.

#### a. Duplicative or Redundant Time Entries

Of the 259 billing entries contained in the Fee Statements, at least 83 are duplicative or

redundant—including entries with overlapping tasks, billings by multiple professionals for the same interoffice or client conferences, and excessive time spent bringing various attorneys up to speed on tasks begun by another attorney in the firm. For example, on March 9, 2010, both Robert M. Manley (Manley) and Hugh M. Ray, III (Ray) billed their clients—at the rates of $675 per hour and $515 per hour, respectively—for a teleconference call with each other regarding the strategy for removal of the suit. [Adv. Doc. No. 87-1, p. 1]. On March 11, Manley then conducted a teleconference call with Christopher Limpus (Limpus) and Ivan Wang (Wang) regarding the strategy previously discussed with Ray, and both Limpus and Wang billed their clients for this call. [Adv. Doc. No. 87-1, p. 1]. Ray held a separate status conference with Limpus and Wang the following day, and both the latter attorneys again billed to the clients. [Adv. Doc. No. 87-1, p. 2]. Also on March 12, Ray held a conference with Nicholas Zugaro (Zugaro) to discuss the suit, and both Zugaro and Ray billed for their time. [Adv. Doc. No. 87-1, p. 2]. Limpus and Wang proceeded to bill for research on the same issue from March 18 to 21. On March 22, Ray, Manley, Limpus, and Wang conducted another telephone conference, for which all attorneys but Limpus billed their clients. [Adv. Doc. No. 87-1, p. 3]. Then, both Manley and Ray billed for a teleconference with their clients on March 24. The two billing entries containing these charges total $7,127.00, of which $3,213.00 appears to be directly attributable to the client conference. [Adv. Doc. No. 87-1, p. 4].

On March 23, David Anderson (Anderson) billed for a meeting with Manley "regarding the nature of the bankruptcy action and strategy for the case." [Adv. Doc. No. 87-1, p. 4]. The Court is unsure why Anderson was even brought into this matter, since the sum total of his involvement included three billing entries during March of 2010.[13] Similar to Anderson's brief

---

[13] Specifically, Anderson's billing entries include the following: (1) 3.6 hours on March 23, 2010 for "[m]eeting with R. Manley regarding the nature of the bankruptcy action and strategy for the case; review and evaluation of

involvement in this suit, Ruth Van Meter (Meter) billed a total of 3.2 hours throughout all of the Fee Statements for review of pleadings and conference with various attorneys in the firm.[14] Likewise, Wang billed the clients on April 8 for a "conference with D. Pearson regarding research and potential assistance with case." [Adv. Doc. No. 87-2, p. 3]. However, it does not appear that the attorney referenced in this billing entry had any subsequent involvement with the matters addressed in the Fee Statements.

This pattern of duplicative and redundant billing continued throughout the duration of McKool Smith's prosecution of the Original Motion for Sanctions. The Fee Statements contain: (a) more than 50 additional entries comprising duplicate billings for interoffice or client conferences; (b) more than 25 additional entries encompassing overlapping tasks; and (c) more than 20 additional entries involving excessive time bringing attorneys up to speed on work begun by another. [Adv. Doc. Nos. 87-1, 87-2 & 87-3]. Because the Court concludes that these entries are duplicative and/or redundant, it excludes them from its consideration of the hours reasonably expended by McKool Smith. *Hensley*, 461 U.S. at 434; *Cahill*, 428 F.3d at 542 (affirming the bankruptcy court's factual finding of duplication of effort, and corresponding reduction of hours, where the attorneys had worked on overlapping portions of the case and billed hours for bringing each other up to speed on work begun by the other); *In re Saunders*, 124 B.R. 234, 236–37 (Bankr. W.D. Tex. 1991) (decreasing a fee award for duplicative billing where two attorneys

---

case documentation related to same in preparation for upcoming client conference"; (2) 2.8 hours on March 24, 2010 for "[r]eview and evaluation of case documentation related to the bankruptcy action in preparation for upcoming client conference; conference with H. Ray III regarding same; participate in client conference call regarding case assessment and strategy"; and (3) 0.7 hours on March 25, 2010 for "[r]eview of draft Motion to Dismiss and Motion for Sanctions prepared by H. Ray III." [Adv. Doc. No. 87-1, p. 4–5].

[14] Meter's billing entries include: (1) .2 hours on April 7, 2010 for "[c]onference with H. Ray III regarding telephone conference and review of pleadings"; (2) 1.8 hours on April 7, 2010 for the following tasks: "[r]eview and analyze motion to dismiss; review and analyze petition"; (3) 1.2 hours on April 12, 2010 for "[c]onference with I. Wang regarding conference call to discuss complaint and motion to dismiss; conference with H. Ray III, C. Limpus and I. Wang to discuss status of case and hearing on Wednesday." [Adv. Doc. No. 87-2, p. 3–4].

involved in a case billed their clients for a substantial number of conferences attended by both attorneys).[15]

b. Vague or Incomplete Time Entries

At least 59 of the billing entries are vague, incomplete, or otherwise do not contain enough detail for this Court to evaluate the nature of the services provided.  For instance, from March 14 to March 18, 2010, Wang billed a total of 19.5 hours for the following tasks: (1) "Review cases relating to research issue."; (2) "Continue to research and review case law."; (3) "Continue to research case law."; (4) "Continue to review cases."; (5) "Continue to search and review cases; review statutes; review pleadings and facts and analyze issues." [Adv. Doc. No. 87-1, p. 2–3].  On April 6, Manley billed 2.8 hours for a "[c]onference with H. Ray III regarding meet and confer; several attempted meeting [sic] with opposing counsel; investigate." [Adv. Doc. No. 87-2, p. 2].  A billing entry on April 12 includes six discrete tasks, none of which are specific enough for this Court to understand the nature of counsel's services:

> Analyze issues related to hearing; conference with C. Limpus regarding tasks and research; conference with C. Limpus and R. Manley regarding updates and research; strategy teleconference with Houston and C. Limpus; analyze facts related to pleadings and notice; conference with C. Limpus and teleconference with C. Limpus and H. Ray regarding findings and action items.

[Adv. Doc. No. 87-2, p. 4].  Ray's billing entry on April 26 consists of yet another vague description: "Discuss case with client; review documents for same; research relating to bankruptcy matters and review of N. Zugaro's research." [Adv. Doc. No. 87-2, p. 8].

---

[15] *See also Johnson*, 488 F.2d at 717 ("The time of two or three lawyers in a courtroom or conference when one would do may obviously be discounted."); *In re Leonard Jed Co.*, 118 B.R. 339, 347 (Bankr. D. Md. 1990) (holding that "excessive use of office conferences and unnecessary duplication of effort will result in reduction of fees when they are unreasonable"); *In re Chicago Lutheran Hosp. Ass'n*, 89 B.R. 719, 736 (Bankr. N.D. Ill. 1988) ("Generally, attorneys should work independently, without the incessant 'conferring' that so often forms a major part of many fee petitions."); *In re Mid-State Fertilizer Co.*, 83 B.R. 555, 556 (Bankr. S.D. Ill. 1988) ("While some intraoffice conferences may be necessary, no more than one attorney may charge for it unless an explanation of each attorney's participation is given.").

18

Such generic language appears throughout the Fee Statements. The following excerpts provide a mere sampling: (1) "research cases" [Adv. Doc. No. 87-1, p. 7]; (2) "[c]onference with H. Ray III regarding telephone conference and review of pleadings" [Adv. Doc. No. 87-2, p. 3]; (3) "consider anticipated tasks; draft and correspond tasks for client" [Adv. Doc. No. 87-2, p. 3]; (4) "teleconference with R. Manley regarding updates" [Adv. Doc. No. 87-2, p. 5]; (5) "work on analysis of pending issues" [Adv. Doc. No. 87-2, p. 6]; (6) "[r]eview seminal case and analyze facts" [Adv. Doc. No. 87-2, p. 7]; (7) "analyze issues regarding pleadings" [Adv. Doc. No. 87-2, p. 9]; (8) "read cases and draft work product; analyze cases and issues relating to same and draft research; teleconferences with C. Limpus regarding mental impressions and strategy" [Adv. Doc. No. 87-2, p. 10]; (9) "edit sub-sections; continue to research and review applicable law and support" [Adv. Doc. No. 87-3, p. 2]; (10) "draft work product for response from research" [Adv. Doc. No. 87-3, p. 2]; (11) "strategy teleconference with R. Manley and C. Limpus; draft issues and cite cases" [Adv. Doc. No. 87-3, p. 4]; (12) "cite petition; search and analyze cases" [Adv. Doc. No. 87-3, p. 5]; (13) "review correspondence and action items" [Adv. Doc. No. 87-3, p. 6]; (14) "correspond regarding additional cases" [Adv. Doc. No. 87-3, p. 9]; and (15) "draft collection of citations in support of argument with respect to pleadings and counts; review correspondence; teleconference with C. Limpus regarding additional case law support; review cases and research." [Adv. Doc. No. 87-3, p. 13].

Such vague, incomplete, or otherwise indecipherable time entries will be excluded from the Court's consideration of the hours reasonably expended by McKool Smith. *See, e.g., Firth*, 2007 U.S. Dist. LEXIS 18807, at *13–14.

c. Excessive or Unreasonable Hours

At least 49 of the billing entries contain excessive or unreasonable hours. For example,

on March 18–21, 2010, Limpus and Wang billed a total for 29 hours for research related to potential affirmative defenses. [Adv. Doc. No. 87-1, p. 3]. On March 26, Ray billed 3.1 hours, or $1,596.50, for finalizing and filing documents on the ECF system [Adv. Doc. No. 87-1, p. 6], and on April 19 Wang billed for correspondence with staff and a teleconference regarding case law binders [Adv. Doc. No. 87-2, p. 6]. Wang also billed his clients 11.8 hours on April 23 for 2 teleconferences and "[c]ontinu[ing] to chronicle petition." [Adv. Doc. No. 87-2, p. 7]. On April 27, Limpus billed 10.5 hours for preparing for an interoffice conference, reviewing case law, and developing arguments. [Adv. Doc. No. 87-2, p. 8]. Throughout the first several weeks of May, four attorneys billed over 100 hours for their simultaneous work in drafting and revising their clients' response to the Plaintiffs' motion to remand—some of which the Court finds to be excessive or unreasonable. [Adv. Doc. No. 87-3, p. 1–7]. Such hours will be excluded from the Court's consideration of the hours reasonably expended by McKool Smith. *Hensley*, 461 U.S. at 434; *In re Osborne*, 375 B.R. 216, 229 (Bankr. M.D. La. 2007) (reducing the number of hours an attorney claimed he invested in the litigation due to the excessive time he spent on certain tasks, including preparing for status conferences, bankruptcy court appearances, and oral arguments in the Fifth Circuit).

           d.  <u>Services Unrelated to the Prosecution of the Original Motion for Sanctions</u>

Finally, at least 7 of the billing entries contain services which do not fall within the category for which this Court stated it would grant attorneys' fees, including—(1) reviewing, revising, and drafting their clients' Rule 7007.1 corporate disclosure statement [Adv. Doc. No. 87-1, p. 7]; (2) reviewing a motion to seek discovery from shareholders prior to the Rule 26(f) conference [Adv. Doc. No. 87-2, p. 1]; (3) drafting a motion for bifurcated trials [Adv. Doc. No. 87-2, p. 2]; and (4) drafting an order on Rule 7007.1 notice [Adv. Doc. No. 87-2, p. 6].

Accordingly, these time entries will also be excluded from the Court's consideration of the hours reasonably expended by McKool Smith. *Hensley*, 461 U.S. at 434.

After discounting the duplicative, redundant, vague, incomplete, excessive, unreasonable, and unrelated hours/time entries from the Fee Statements, the Court concludes that 720.5 hours must be excluded from the 1,220.1 hours of professional services billed by McKool Smith. Thus, a total of 499.6 hours will be considered in computing the lodestar fee.

### ii. *Lodestar Fee- Reasonable Hourly Rate*

Next, the Court must determine an appropriate hourly billing rate by evaluating the prevailing market rate in the relevant legal community. *Blum*, 465 U.S. at 888; *Cahill*, 428 F.3d at 540. The fee applicant bears the burden of producing evidence that speaks to the "rates actually billed and paid in similar lawsuits." *Firth*, 2006 U.S. Dist. LEXIS 18807, at *18. However, once adequate evidence is presented, parties opposing the fee applicant's rates must offer more than bald assertions that the rates requested are too high. *Arnold v. Babbitt*, No. 3:96-CV-3077, 2000 WL 354395, at *7 (N.D. Tex. April 6, 2000) (citing *Blum*, 465 U.S. at 892) (noting that the fees requested were "perhaps somewhat high" as asserted by the opposing party, but nevertheless holding that they were reasonable based on a review of the attorneys' qualifications and their sworn statements); *see also Mendoza v. Regis Corp.*, No. SA-01-CA-0937, 2008 WL 245176, at *3 (W.D. Tex. 2008) (finding the attorneys' rates reasonable "[i]n absence of objection and considering the supporting materials presented").

Manley testified at the August 3 hearing as to the reasonableness of McKool Smith's rates compared to its prior representations and comparable legal services provided to its clients. [Tape Recording, 8/3/2010 Hearing at 11:57:02 a.m.—11:59:36 a.m.]. At this same hearing, evidence was presented regarding the respective experience of each attorney involved, and

detailed records were introduced charting the total amount billed by each professional. [Defendants' Ex. Nos. 19–26 & 32]. Based on the evidence presented and the absence of any objection by the Plaintiffs, the Court concludes that the rates set forth in the Fee Statements are reasonable hourly rates.

Therefore, the Court computes the lodestar fee by multiplying the hours reasonably expended on the litigation (*i.e.*, 499.6 hours) by the reasonable hourly rate for each respective professional. This computation results in a total lodestar fee of $249,230.00.[16]

---

[16] The Court has computed the total lodestar fee by multiplying the reasonable hours expended by each professional during the respective billing period by their reasonable hourly rate and then totaling the fees for each period as set forth in the charts below.

### March 2010

| Professional | Hours Reasonably Expended | Hourly Rate | Total Fee |
|---|---|---|---|
| Robert M. Manley | 26.2 hours | $675/hour | $17,685.00 |
| Hugh Ray III | 47.5 hours | $515/hour | $24,462.50 |
| David Anderson | 3.5 hours | $515/hour | $1,802.50 |
| Christopher Limpus | 12.5 hours | $495/hour | $6,187.50 |
| Ivan Wang | 32 hours | $350/hour | $11,200.00 |
| Nicholas Zugaro | 9.6 hours | $285/hour | $2,736.00 |
| Jodie L. Mow | .1 hours | $185/hour | $18.50 |
| Amy A. Nichols | 9.7 hours | $155/hour | $1,503.50 |
| Nancy Jones | 2.0 hours | $65/hour | $130.00 |
| | | | **$65,725.50** |

### April 2010

| Professional | Hours Reasonably Expended | Hourly Rate | Total Fee |
|---|---|---|---|
| Robert M. Manley | 10.7 hours | $675/hour | $7,222.50 |
| Hugh Ray III | 21.3 hours | $515/hour | $10,969.50 |
| Christopher Limpus | 72.4 hours | $495/hour | $35,838.00 |
| Ivan Wang | 6 hours | $350/hour | $2,100.00 |
| Nicholas Zugaro | 6.5 hours | $285/hour | $1,852.50 |
| | | | **$57,982.50** |

### May 2010

| Professional | Hours Reasonably Expended | Hourly Rate | Total Fee |
|---|---|---|---|
| Robert M. Manley | 60 hours | $675/hour | $40,500.00 |
| Hugh Ray III | 61.6 hours | $515/hour | $31,724.00 |
| Christopher Limpus | 90.5 hours | $495/hour | $44,797.50 |
| Ivan Wang | 10.2 hours | $350/hour | $3,570.00 |
| Nicholas Zugaro | 17.3 hours | $285/hour | $4,930.50 |
| | | | **$125,522.00** |

### iii. *Adjusting the Lodestar Fee*

#### a. The *Johnson* Factors

The Court must now determine whether an adjustment to the lodestar fee is warranted—beginning with a consideration of the *Johnson* factors.[17]  In applying each of the twelve factors, the Court concludes that several of the factors were already subsumed in its calculation of the lodestar fee.  First, in evaluating the number of hours McKool Smith reasonably expended on the litigation, the Court has considered the novelty and difficulty of the questions presented, the time and labor required to complete necessary tasks, and the skill needed to perform the legal services properly.  The Court acknowledges that the issues presented in this adversary proceeding involve relatively complex questions of law, that prosecution of the Original Motion for Sanctions necessitated a fair amount of time and labor, and that a certain level of skill and expertise in bankruptcy and corporate law was required to successfully navigate the litigation.  Even considering the relative complexity of this adversary proceeding, the Court has found a considerable amount of duplicative and excessive billing in the Fee Statements that—as discussed in detail above—warrants a significant decrease in the number of hours reasonably expended on the litigation.[18]  Additionally, in evaluating the reasonableness of hourly rates billed in the Fee Statements, the Court has considered whether the professionals at McKool Smith charged a customary fee and has examined the relative experience, reputation, and ability of the

---

[17] The *Johnson* factors include the following: (1) time and labor required; (2) novelty and difficulty of the legal questions; (3) skill required to properly perform the legal services; (4) preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the clients or the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717–19.

[18] The Court further notes that the fees and expenses originally requested by counsel for the Reorganized Debtor ($17,800.29) encompassing services rendered in May of 2010 are drastically lower than those requested by McKool Smith ($571,111.67). [Finding of Fact Nos. 12, 15 & 21].  While the Court understands that McKool Smith drafted the Original Motion for Sanctions and had a greater role in its prosecution, the Court finds no basis for such a significant disparity between two fee requests from parties involved in the same litigation.

23

attorneys involved. Thus, the Court will not adjust the lodestar fee either upwards or downwards based on further consideration of these *Johnson* factors. *Saizan*, 448 F.3d at 800 ("The lodestar may not be adjusted due to a *Johnson* factor . . . if the creation of the lodestar amount already took that factor into account; to do so would be impermissible double counting.").

Further, the Court concludes that a number of the *Johnson* factors are not relevant to an evaluation of the reasonableness of attorneys' fees in this adversary proceeding. Indeed, preclusion of other employment due to acceptance of the case, whether the case involves a fixed or contingent fee, the time limitations imposed by the client or other circumstances, the "undesirability" of the case, and the nature or length of the professional relationship with the client are factors which bear more relevance in a fee-shifting case. *In re El Paso Refinery, L.P.*, 257 B.R. 809, 826 (Bankr. W.D. Tex. 2000). Typically, preclusion of employment presumes that an attorney does not generally engage in the sort of representation for which fees are being requested and, therefore, is prevented from undertaking a customary amount of additional work due to the increased time demand of that particular case. *See id.* at 826, n. 30. While the Court notes that counsel spent a significant amount of time prosecuting the Original Motion for Sanctions, nothing in the record indicates that the nature of the litigation involved in this adversary proceeding varies drastically from the average bankruptcy-related representation undertaken by McKool Smith. The professionals involved in this litigation may have been precluded from commencing representation of other clients, but such preclusion is simply due to the natural limitations on billable hours since the fees sought by the firm are fixed per hour, rather than on a contingency fee basis. Consideration of the time limitations imposed by the client or other circumstances likewise does not add to the analysis, as similar limitations are present in all bankruptcy related representations.

While the Court notes that litigating the complicated issues presented in this adversary proceeding could certainly be construed as less than desirable, the relative "undesirability" of a bankruptcy case or related adversary proceeding arguably does not have the same effect as in contingency fee cases. Nevertheless, the Court does not find cause to adjust McKool Smith's fees based on the "undesirability" of this adversary proceeding. Finally, the length of the professional relationship between counsel and their clients rarely affects the nature of the fees requested in a bankruptcy context, especially since a substantial pre-bankruptcy relationship may disqualify attorneys from representation of the debtor. In this adversary proceeding, McKool Smith has represented some of its clients and related parties in prior matters,[19] but the Court concludes that this relationship has no bearing on the nature of the fees requested in the Fee Statements. Similarly, evaluation of awards in similar cases is irrelevant, as the Court is not granting a judgment but rather awarding attorneys' fees as a form of sanctions.

The Court does conclude that the lodestar fee should be adjusted based on its consideration of the final *Johnson* factor—namely, the results obtained in the litigation. In prosecuting the Original Motion for Sanctions, the Non-Wilson Vukelich Defendants sought dismissal of all of the causes of action set forth in the Original Petition as derivative claims that belong to the Reorganized Debtor and are barred from being brought under the express terms of the Plan and Confirmation Order. [Finding of Fact No. 9]. In issuing its oral ruling on May 27, however, the Court concluded that not all of the claims and relief sought in the Original Petition are disallowed. The Court gave the parties and their counsel approximately one month to agree as to which claims are derivative with respect to Skyport and which claims are direct, or not otherwise enjoined by the Plan and Confirmation Order. [May 27, 2010 Tr. 302:1—306:1]. At a

---

[19] Manley testified at the August 3 hearing that McKool Smith represented Skyport in an adversary proceeding before this Court in the fall of 2009 and that CenturyTel had been a client of the firm since 1993. [Tape Recording, 8/3/2010 Hearing at 11:57:07 a.m.—11:59:07 a.m.].

hearing held on June 22, 2010, the parties conceded that they were unable to reach such an agreement. [Adv. Doc. No. 272, p. 3].   The Court then issued a memorandum opinion and corresponding order setting forth which causes of action were dismissed with prejudice and which were remanded to state court for further prosecution. [Adv. Doc. Nos. 272 & 274].

The Court ultimately concluded that only 51 out of the 87 causes of action alleged in the Original Petition were derivative claims, either in whole or in part. [Adv. Doc. Nos. 272 & 274]. Because the Non-Wilson Vukelich Defendants achieved dismissal of 59% of the Plaintiffs' causes of action, the Court finds that McKool Smith is only entitled to that same percentage of the fees requested in the Fee Statements.  *See Rousseli v. Brinker Int'l, Inc.*, No. H-05-3733, 2010 WL 1881898, at *3 (S.D. Tex. Jan. 13, 2010) (citing *Hensely*, 461 U.S. at 434) (noting that the most important of the *Johnson* factors to be considered in adjustments to the lodestar fee is "overall degree of success achieved"); *Arnold*, 2000 WL 354395, at *7–8 (citing *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir.), *cert. denied*, 510 U.S. 991 (1993)) (considering the results obtained in making a downward adjustment to the lodestar fee); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1048 (5th Cir. 1998) (holding that even after a ten percent reduction to the lodestar fee, the district court abused its discretion by failing to adequately consider the result obtained relative to the attorney's fees requested).[20]  Accordingly, the Court reduces the lodestar fee from $249,230.00 to $147,045.70 (*i.e.*, $249,230.00 x 0.59).

### b. Lumped Fee Entries

Courts may consider other factors, in addition to those set forth in *Johnson*, in determining whether to adjust the lodestar fee—such as the lumping of fee entries. *Arnold*, 2000

---

[20] Bankruptcy courts, applying the lodestar approach, have both enhanced and reduced fee awards based on the results obtained. *See, e.g., In re East Peoria Hotel Corp.*, 145 B.R. 956, 962 (Bankr. C.D. Ill. 1991); *In re Hutter Construction Co.*, 126 B.R. 1005 (Bankr. E.D. Wis. 1991); *In re WHET, Inc.*, 61 B.R. 709 (Bankr. D. Mass. 1986).

WL 354395, at *7–8 (citing *Shipes*, 987 F.2d at 320) (holding that because counsel's lumping of fees was not considered in calculating the revised lodestar amount, it could serve as a basis for adjusting the fee award) (internal quotations and citations omitted).   Generally, courts will not award fees for time entries that are lumped together. *In re 900 Corp.*, 327 B.R. 585, 598 (Bankr. N.D. Tex. 2005) (noting that "[w]hen time entries are vague or lumped together, such that the Court cannot determine how much time was spent on particular services" then the party seeking payment of its fees has not met its burden to show that its fees are reasonable); *Saunders*, 124 B.R. at 237 ("In order for the court to determine whether time spent on an activity was reasonable, multiple services cannot be 'lumped' together under one time entry.").   Indeed, lumping activities on fee statements violates the U.S. Trustee's Fee Guidelines.[21]

At least 183 of the 250 billing entries in the Fee Statements (*i.e.*, 70.66%) "lumped" activities in such a manner that the Court is unable to discern how much time was allocated to each activity and the respective value rendered by the particular person at McKool Smith performing the service.   For instance, on March 24, 2010, Ray spent 9.3 hours performing six discrete services, all of which appear in a single time entry on the Fee Statements:

> Review massive filing of numerous pleadings, including motion to disqualify, reply to motion to remand, request for emergency consideration; draft and file objection to emergency consideration; inform clients of pleadings and send

---

[21] *Available at* http://www.justice.gov/ust/eo/rules_regulations/guidelines/docs/feeguide.htm (reprinted at 28 C.F.R. Pt. 58, App. A).   Although these guidelines refer to applications filed under 11 U.S.C. § 330, the Court sees no reason why these guidelines should not equally apply to this Court's review of the Fee Statements.   While McKool Smith is not seeking approval of its fees pursuant to Section 330, the firm is nevertheless submitting invoices for services performed in this adversary proceeding to be paid by opposing counsel as a form of sanctions.   Because the parties were unable to reach an agreement as to the reasonableness of these fees and expenses, the Court is now evaluating the Fee Statements under applicable case law, which is incorporated in the Section 330 analysis.   The U.S. Trustee Guidelines expressly state that:

> Time entries should be kept contemporaneously with the services rendered in time periods of tenths of an hour. Services should be noted in detail and not combined or "lumped" together, with each service showing a separate time entry; however, tasks performed in a project which total a <u>de minimis</u> amount of time can be combined or lumped together if they do not exceed .5 hours on a daily aggregate.

pleadings to same; research issues raised in remand reply; conference call with R. Manley about hearing trial strategy; discuss strategy with E. Rothberg.

[Adv. Doc. No. 87-3, p. 12]. Similarly, Limpus billed his clients 11.5 hours on April 26 for providing the following five services, all of which were set forth in a single time entry:

> Review case law cited in plaintiffs' pleadings; develop arguments for response briefs; conference with R. Manley and I. Wang regarding briefs; review outline of facts; review Texas and Delaware law related to determination of derivative actions.

[Adv. Doc. No. 87-2, p. 8]. On May 8, Wang billed 5.1 hours for 22 separate tasks, all presented in the following billing entry:

> Analyze allegations regarding misrepresentations; draft opposition to direct claims; research case law; edit arguments; analyze organization; research cases regarding investments; research issues as to particular plaintiff group; re-organize sections; analyze organization and formatting; draft arguments regarding one plaintiff group; continue to research law; analyze petition regarding claims or lack of claims in support of opposition arguments; analyze another plaintiff group; analyze issues against allegations in petition; review sufficiency; draft arguments and incorporate method of organizing sections; teleconference with R. Manly regarding updates; teleconferences with C. Limpus regarding arguments and tasks; incorporate work product into brief; edit brief; organize parties in connection with fiduciary duty section; correspond updates to R. Manley and C. Limpus.

[Adv. Doc. No. 87-3, p. 6].

This Court has voiced its disapproval of lumping in prior opinions. *See, e.g., In re Energy Partners, Ltd.*, 422 B.R. 68, 89–92 (Bankr. S.D. Tex. 2009) (Citing to the Honorable Barbara J. Houser's 25% reduction due to lumping in *In re 900 Corp.*, 327 B.R. at 598, this Court concluded that a 25% reduction in the fees requested pursuant to Section 503 was appropriate); *In re Jack Kline Co.*, 440 B.R. 712, 751–53 (Bankr. S.D. Tex. 2010) (reducing the fees of the Chapter 7 trustee's law firm by 50% due to lumping).[22]  Courts have wide discretion in

---

[22] This Court increased the percentage reduction in *Jack Kline* from the 25% reduction set forth in *Energy Partners* to a 50% reduction because: (1) as an appointee of the United States Trustee, the Chapter 7 trustee should not have been in direct violation of the U.S. Trustee's guidelines forbidding lumping; and (2) many of the fees were billed

determining the appropriate reduction of the amount of approved fees. *See, e.g., In re 900 Corp.*, 327 B.R. at 598; *In re Brous*, 370 B.R. 563, 576–77 (Bankr. S.D.N.Y. 2007); *Beatrice Cheese, Inc. v. Peter J. Schmidt, Inc. (In re Peter J. Schmidt, Inc.)*, 154 B.R. 632, 637–38 (Bankr. D. Del. 1993). Because such a high percentage of the billing entries in the Fee Statements were lumped (*i.e.*, 70.66%), the Court concludes that a 50% reduction of the lodestar fee is appropriate. Accordingly, the Court further reduces the lodestar fee from $147,045.70 to $73,522.85 (*i.e.*, $147,045.70 x 0.50).

    2. <u>Whether the Expenses Requested are Reasonable</u>

In addition to the 1,220.1 hours billed, the Fee Statements contain $1,774.67 in expenses, including: certified copies, in-house photocopies, postage, filing fees, travel, mileage, and courier fees. [Adv. Doc. Nos. 87-1, 87-2 & 87-3]. Specifically, in March of 2010, McKool Smith billed their clients $143.10 for the following expenses: $17.80 for in-house photocopies, $114.00 for certified copies of documents from the Harris County District Clerk, and $11.30 for a complete copy of the new complaint filed by Schermerhorn from the Harris County Clerk. [Adv. Doc. No. 87-1, p. 8]. The Court concludes that these expenses are reasonable and, thus, incorporates them into the total amount of fees and costs awarded to McKool Smith.

Further, McKool Smith billed its clients for expenses totaling $1,056.18 in April of 2010, including: (1) $250.00 for the filing fee to initiate this adversary proceeding; (2) $48.76 in postage costs; (3) $22.00 for mileage to take mail to the post office; (4) $174.60 in court reporter fees for a hearing transcript; and (5) $560.82 in travel and parking costs. [Adv. Doc. No. 87-2, p. 11–12]. The $560.82 in travel and parking expenses—which incorporates cab fares, airfare, and

---

after this Court issued it's opinion in *Energy Partners* and, thus, the trustee should have known that lumping could result in a reduction of fees requested pursuant to Section 503. *Jack Kline*, 440 B.R. at 753. Other courts have applied a 50% reduction due to lumping without further explanation. *E.g., In re New Towne Dev. Grp.*, No. 09-10029, 2010 WL 1451480, at *4–5 (Bankr. M.D. La. Apr. 9, 2010) ("[T]he court further reduces by one-half the fees for other services where the billing entries for those services were lumped.").

parking associated with Ray's trip to Dallas on April 27 and Manley's travel to Houston for a hearing on April 14—is excessive, given the hourly rate already charged to the client for these attorneys' services, and will be excluded from this Court's consideration of the expenses reasonably expended on the litigation.   The Court concludes that the remaining expenses, in the total amount of $495.36, are reasonable and, accordingly, are included in the sanctions award.

Finally, the Fee Statements covering May of 2010 contain two expense charges: $14.25 in FedEx delivery services and $2.44 in total postage costs. [Adv. Doc. No. 87-3, p. 16].   The Court concludes that both of these expenses—totaling $16.69—are reasonable and, therefore, recoverable as a portion of McKool Smith's sanction award.

In sum, the Court concludes that McKool Smith is entitled to $73,522.85 in fees and $655.15 in expenses, for a total amount of $74,178.00.  This award represents both the amount of fees and expenses this Court determines were reasonably expended by McKool Smith in prosecuting the Original Motion for Sanctions, in addition to the amount this Court believes is appropriate to deter repetition of the Plaintiffs' bad faith conduct. *See Chambers*, 501 U.S. at 44– 45 (holding that the Court should limit the amount of sanctions to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated); *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) (noting that a court's inherent power to sanction "may be exercised only if it's essential to preserve the authority of the court") (internal quotation marks and citation omitted).   Indeed, sanctions imposed in any case must be "tailored to fit the particular wrong." *Topalian v. Ehrman*, 3 F.3d 931, 936 (5th Cir. 1993).   Although the Plaintiffs did file the Original Petition in direct contravention of the Plan and Confirmation Order, thus warranting sanctions, the Court does not believe that an award of $571,111.67 (*i.e.*, the amount of fees and expenses billed by McKool

30

Smith in the Fee Statements) is necessary given the nature and extent of the Plaintiffs' bad faith conduct.

**C. The Motion for Additional Sanctions should be denied.**

The Non-Wilson Vukelich Defendants filed the Motion for Additional Sanctions on June 29, 2010, requesting that the Court impose the following sanctions: (a) $75,000 for an appeal to the District Court; (b) $75,000 for an appeal to the Circuit Court; (c) $250,000 in the event of an appeal to the United States Supreme Court; (d) coercive sanctions of $350 per diem for each day that the sanctions remain unpaid; and (e) that Defendants maintain the ability to seek additional coercive measures. [Finding of Fact No. 13]. The Plaintiffs argue in the Objection to the Motion for Additional Sanctions that there is no legal basis for prospectively sanctioning an appeal and that a coercive per diem fine is not warranted under the circumstances presented in this adversary proceeding. [Finding of Fact No. 17]. The Non-Wilson Vukelich Defendants assert in their response to the Objection to the Motion for Sanctions that appealing the ruling in this adversary proceeding does warrant additional sanctions because it constitutes continued contempt and violation of the Confirmation Order. [Finding of Fact No. 18].

Irrespective of whether the Non-Wilson Vukelich Defendants have a legitimate legal basis for seeking additional sanctions in the event of an appeal, no appeal was in fact taken of either this Court's May 27 oral ruling relating to the Original Motion for Sanctions or this Court's January 13 written order dismissing certain causes of action alleged in the Original Petition with prejudice and remanding the remainder to state court. Thus, the Court concludes that the portion of the Motion for Additional Sanctions requesting sanctions in the event of an appeal is moot.

Further, this Court agrees with the Plaintiffs' assertion that coercive sanctions are not

appropriate in this case. Indeed, coercive measures, such as the $350 per diem fine requested by the Non-Wilson Vukelich Defendants, are typically imposed against parties who have continually failed to comply with a court's judgment. *See, e.g., In re Sanburg Fin. Corp.*, No. C-10-280, 2011 WL 649486, at *9 (S.D. Tex. Feb. 11, 2011) (noting that coercive sanctions may be awarded if a party willfully violates a Section 524(a)(2) discharge injunction); *De La Fuente v. Wells Fargo*, 430 B.R. 764, 791–93 (Bankr. S.D. Tex. 2010) (imposing a coercive per diem fine as a civil contempt sanction against a lender who repeatedly and continuously violated an agreed judgment entered by the court); *In re Young*, No. 06-80534, 2007 WL 128280, at *2 (Bankr. S.D. Tex. Jan. 10, 2007) (noting that the court had imposed daily, coercive sanctions against the debtor for failing to comply with the court's discovery order). Rather than prospectively imposing coercive sanctions, the Court will impose a deadline on the Plaintiffs and then hold a status conference to ensure that the Plaintiffs have timely paid the sanctions amount of $74,178.00. If the Plaintiffs fail to comply with this Court's order requiring them to pay $74,178.00, the Court will then consider allowing McKool Smith to seek additional coercive sanctions against the Plaintiffs. Accordingly, the Court concludes that the Motion for Additional Sanctions should be denied.

## IV. CONCLUSION

For all the reasons set forth above, the Court concludes that McKool Smith is entitled to recover $74,178.00 of its requested fees and expenses as a form of sanctions for the Plaintiffs' bad faith conduct in filing the Original Petition in contravention of the Plan and Confirmation Order. This award represents the amount of fees and expenses reasonably expended by McKool Smith in prosecuting the Original Motion for Sanctions and is appropriate to deter repetition of the Plaintiffs' bad faith conduct. Moreover, the Court concludes that the Motion for Additional

Sanctions should be denied.  The portion requesting sanctions in the event of an appeal is now moot—as no appeal was taken of either this Court's May 27 oral ruling or this Court's January 13 written order—and awarding coercive sanctions is not warranted at this time.

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 31st day of March, 2011.

_____
Jeff Bohm
United States Bankruptcy Judge