

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**08/07/2013**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SKYPORT GLOBAL | § | CASE NO. 08-36737-H4-11 |
| COMMUNICATIONS, INC., | § | |
| | § | |
| Debtor. | § | |
| | § | |
| JOANNE SCHERMERHORN, ET AL., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | ADVERSARY NO. 10-03150 |
| | § | |
| CENTURYTEL, INC. (A/K/A | § | |
| CENTURYLINK), ET AL., | § | |
| | § | |
| Defendants. | § | |
| | § | |
| SKYPORT GLOBAL | § | |
| COMMUNICATIONS, INC., ET AL., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | ADVERSARY NO. 10-03225 |
| | § | |
| JOANNE SCHERMERHORN, ET AL., | § | (CONSOLIDATED UNDER |
| | § | ADVERSARY NO. 10-03150) |
| Defendants. | § | |

**MEMORANDUM OPINION**
**REGARDING ADVERSARY DOCKET NUMBERS 317; 359; 360; 419; 460 and 461**[*]
[Adv. Doc. Nos. 317, 359, 360, 419, 460, 461]

## I.  INTRODUCTION

The power to impose sanctions for contempt of an order is an inherent and well-settled power of all federal courts—including bankruptcy courts.  *United States. v. Fidanian*, 465 F.2d 755, 757 (5th Cir. 1972) (citations omitted); *Ingalls v. Thompson (In re Bradley)*, 588 F.3d 254, 266 (5th Cir. 2009); *Placid Ref. Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.)*, 108 F.3d 609, 613 (5th Cir. 1997).  While the Court should use this power sparingly, the right to sanction those who flout this Court's authority is both necessary and integral to this Court's performance of its duties.  Without this power, the Court would be a "mere board[] of arbitration, whose judgments and decrees would be only advisory."  *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911).  Indeed, if a party can "make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside,

---

[*] Motion of Schermerhorn Parties to Dissolve Injunction **[Adv. Doc. No. 317]**; Motion by SkyPort Global Communications, Inc. (1) That Joanne Schermerhorn, et al, Sam Goldman, and Franklin Craig Show Cause Why They Should Not be Held in Contempt of the June 10, 2010, Preliminary Injunction, and (2) that Sam Goldman, Franklin Craig, an Officer of Sequoia Aggressive Growth Fund, Ltd., an Officer of Sequoia Diversified Growth Fund, Ltd., an Officer of Rig Fund III, Ltd, an Officer of Aran Asset Management SA, and an Officer of Semper Gestion SA Appear in Person Before this Court on August 5, 2011 at 9:00 A.M. **[Adv. Doc. No. 359]**; Motion for Expedited Consideration—Without a Hearing—of the Initial Relief Sought in the Motion by SkyPort Global Communications, Inc. (1) That Joanne Schermerhorn, et al, Sam Goldman, and Franklin Craig Show Cause Why They Should Not be Held in Contempt of the June 10, 2010, Preliminary Injunction, and (2) that Sam Goldman, Franklin Craig, an Officer of Sequoia Aggressive Growth Fund, Ltd., an Officer of Sequoia Diversified Growth Fund, Ltd., an Officer of Rig Fund III, Ltd, an Officer of Aran Asset Management SA, and an Officer of Semper Gestion SA Appear in Person Before this Court on August 5, 2011 at 9:00 A.M. **[Adv. Doc. No. 360]**; Amended Motion by SkyPort Global Communications, Inc. (1) That Joanne Schermerhorn, et al, Sam Goldman, and Franklin Craig Show Cause Why They Should Not be Held in Contempt of the June 10, 2010, Preliminary Injunction, and (2) That Sam Goldman, Franklin Craig, an Officer of Sequoia Aggressive Growth Fund, Ltd., an Officer of Sequoia Diversified Growth Fund, Ltd., an Officer of Rig Fund III, Ltd, an Officer of Aran Asset Management SA, and an Officer of Semper Gestion SA Appear in Person Before this Court on August 5, 2011 at 9:00 A.M. **[Adv. Doc. No. 419]**; Expedited Motion to Confirm that Contacting Certain Individuals or Agencies Will Not Violate the Court's June 10, 2010 Temporary Injunction **[Adv. Doc. No. 460]**; and Expedited Request/Motion by the Schermerhorn Parties for Permission to Contact Roger Klotz and Dennis Lee Rone **[Adv. Doc. No. 461]**.

then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery." *Id.*; *In re Bradley*, 588 F.3d at 265.

On June 10, 2010, this Court issued a written injunction order under Rule 65 of the Federal Rules of Civil Procedure.[1]   The Court issued this injunction in order to prevent irreparable harm to the reorganized debtor, SkyPort Global Communications, Inc. (SkyPort). Subsequent to its issuance, however, the Court learned that two individuals—Samuel Goldman (Goldman) and Franklin Craig (Craig)—conspired to thwart this order, pursuing certain barred claims and impermissibly contacting Dawn Cole (Cole), a former employee of SkyPort. Accordingly, this Court now issues this opinion to discuss Goldman's and Craig's contumacious conduct, to restore integrity to the judicial process, and most importantly, to affirm that its orders cannot be "flouted, obstructed and violated with impunity."  *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) (quoting *Berry v. Midtown Serv. Corp.*, 104 F.2d 107, 110 (2d Cir. 1939)).

## II.  FINDINGS OF FACT

1. On August 12, 2009, this Court entered the Order Confirming Plan of Reorganization (the Confirmation Order) [Main Case Doc. No. 340], approving the Chapter 11 Plan of Reorganization for SkyPort Global Communications, Inc. (defined previously as SkyPort)[2]  and its modifications (collectively, the Plan). [Main Case Doc. No. 223, 289].

---

[1] Federal Rule of Civil Procedure 65 is made applicable to the bankruptcy court through Federal Rule of Bankruptcy Procedure 7065.

[2] Article 6.3 of the Plan provided for a merger of SkyPort with its sole shareholder, SkyComm. [Main Case Doc. No. 289, Art. 6.3]. After the merger, SkyPort remained as the sole surviving company and all of the shares of this reorganized debtor were then re-issued to an entity known as Balaton Group, Inc. (Balaton) [Main Case Doc. No. 289, Art. 6.3].

Today, the reorganized debtor is known as TrustComm.  However, during the hearings on this proceeding, as well as in many of the e-mail exchanges and other communications which are discussed herein, many of the parties continued to refer to TrustComm as SkyPort.  Thus, for the purposes of this Memorandum Opinion, the Court will refer to the reorganized debtor simply as SkyPort.

2. In the Confirmation Order, and pursuant to the language of the Plan, this Court placed limitations on certain actions between various interested parties to the bankruptcy case, particularly on derivative actions filed on behalf of SkyPort.

3. The plaintiffs/counter-defendants in this proceeding include Joanne Schermerhorn, John K. Waymire, Chet Gutowsky, John Llewellyn, Joseph A. Lopez, Robert Foote, BLF Partners Ltd., ECAL Partners, Ltd., Whizkid Venture, LLC, Bella Krieger, Martin Pollack, George Metcalf, Gloster Holdings, LLC,[3] Melvyn Reiser, Barry Klein, Cheskel Kahan, John A. Rees, Brian W. Harle, Michael Stein, Lawrence Solomon, Tracy Elstein & David Togut, Jason Charles Togut Trust, BMT Grantor Trust, Lynn Joyce Elstein Trust, Charles Stack, Joseph Baker, Movada, Ltd., Puddy, Ltd., Draco Capital, Inc., Edward Pascal, Robert Mendel, Stanley Beraznik, Don Bui, Ben Ariano, 3791068 Canada, Inc., Peter Taylor, John E. Panneton, Wayne C. Fox, David Currie, Byron Messier, Darshan Khurana, Mateo Novelli, Diya Al-Sarraj, Sequoia Aggressive Growth Fund, Ltd., Sequoia Diversified Growth Fund, Rig III Fund, Ltd., Aran Asset Management SA, Semper Gestion SA and Eosphoros Asset Management, Inc. (collectively, the Schermerhorn Parties).

4. At the time these proceedings commenced, Robert Kubbernus (Kubbernus)[4] was the indirect controlling shareholder and CEO of SkyPort and resided in Texas. Since then, Kubbernus has sold his controlling interest in SkyPort [Tr. Nov. 28, 2012 23:12–25:9]

---

[3] Goldman, an attorney-of-record for the Schermerhorn Parties, is a "managing member" of Gloster Holdings, LLC with a 20% ownership interest. [Adv. Doc. No. 686]. Goldman also has various family members with ownership interests in Gloster Holdings, LLC. [Tr. Oct. 14, 2010 51:25–52:9].

[4] In various e-mails listed below, Kubbernus is sometimes referred to as Robert, and sometimes referred to as RK. The Court has left the e-mails in their original form.

and in January or February of 2012, ceased being CEO of SkyPort. [Tr. Nov. 27, 2012 158:9–158:15].

5. Balaton Group, Inc. (defined previously as Balaton) is a Canadian corporation controlled by Kubbernus, which he used to raise money from investors. Pursuant to the Confirmation Order, all shares of the reorganized debtor[5] were issued to Balaton. [Tr. Nov. 27, 2012 115:17–20].

6. SkyPort, Balaton and Kubbernus are all named defendants/counter-plaintiffs in this proceeding. The other plaintiffs include CenturyTel, Inc.[6] (CenturyTel), Clarence Marshall, R. Stewart Ewing, Jr., Michael E. Maslowski, Harvey P. Perry, Bankton Financial Corporation, Bankton Financial Corporation, LLC and ClearSky Management, Inc. (collectively, the SkyPort Parties).

7. Franklin Craig (defined previously as Craig)[7] is an independent investment advisor and securities broker who resides in Paris, France. Craig earns his living by recommending and selling investments to European institutional investors and high net worth individuals. [Tr. Apr. 20, 2012 189:18–190:9]. In this particular suit, Craig recommended that five of the Schermerhorn Parties entities—Sequoia Aggressive Growth Fund, Ltd., Sequoia Diversified Growth Fund, Rig III Fund, Ltd., Aran Asset Management SA, and Semper Gestion SA.—invest in four of the SkyPort Parties—ClearSky Investments, L.P., SkyComm Technologies Corp., Lavell Systems, Inc. and Victoria Grey. [Adv. Doc. No. 681 at p. 15, ¶ 5 n.5].

---

[5] *See* footnote 2.

[6] CenturyTel is also known as CenturyLink.

[7] In various e-mails listed below, Craig is sometimes referred to as Franklin, and sometimes referred to as FCC. The Court has left the e-mails in their original form.

8. Until sometime in 2009, Dawn Cole (previously defined as Cole)[8] was employed by Balaton as an independent contractor. [Tr. May 27, 2012 221:19–225:5]. In that capacity, she reported to Kubbernus and ran the operations of another entity called Victoria Grey, LLC (Victoria Grey). Victoria Grey raised money from investors to purchase residential properties in Detroit, Michigan. [Tr. Apr. 20, 2012 140:2–140:15].

9. In his role as an independent investment advisor, Craig introduced Kubbernus to various investors for both SkyPort and Victoria Grey. For this service, Craig received a finder's fee. Craig also personally invested in Victoria Grey. [*Id.* at 141:15–17].

10. In May 2009, Craig accused Kubbernus of fraud and misappropriation of the Victoria Grey investors' funds. As a result, Kubbernus was ultimately ousted as the manager of Victoria Grey. Kubbernus then became manager of SkyPort and Craig took over as the manager of Victoria Grey.[9] [*Id.* at 146:8–146:20].

11. After Kubbernus began managing SkyPort, Cole joined SkyPort as an employee. She also assisted Craig and Victoria Grey in taking over the management of several properties in Detroit, Michigan. [Tr. Nov. 29, 2012 70:23–71:8].

12. On or about June 22, 2009, Kubbernus sued Craig and the other investors in Victoria Grey for ousting him. [Adv. Doc. No. 681 at p. 18, ¶ 17].

13. Also in June of 2009, Cole sought compensation from Craig and Victoria Grey for the unreimbursed expenses she had incurred while at Balaton for Victoria Grey's benefit. [*Id.* at p. 17, ¶ 16].

---

[8] In various e-mails listed below, Cole is sometimes referred to as Dawn. The Court has left the e-mails in their original form.

[9] To avoid any confusion, SkyPort and Victoria Grey are entirely separate entities.

14. On July 31, 2009, Cole, *inter alia*, sued Balaton in Canada for unpaid compensation and reimbursable expenses, as well as the repayment of loans she had made to Balaton which were to be used to acquire properties for Victoria Grey.  [Tr. May 27, 2012 132:16–134:9].

15. In January of 2010, Craig was introduced to Samuel Goldman (defined previously as Goldman),[10] an attorney licensed by the State of New York whose law offices are in New York City.  Craig then began to send Goldman documents from investors in Kubbernus' various business ventures.  [Tr. Apr. 20, 2012 168:15–25]; [Tr. June 6, 2012 95:17–96:4].  Craig was, in fact, a very important source of information for Goldman as he (i.e., Goldman) prepared to file *Schermerhorn v. CenturyLink,* which is discussed in detail below.  [Adv. Doc. No. 681 at p. 19].  Goldman and Craig became personal friends.  [Tr. June 6, 2012 86:3–86:11].

16. On February 12, 2010, the Schermerhorn Parties filed an original petition to initiate *Schermerhorn v. CenturyLink* (Case No. 2010-09675) in the District Court of Harris County, Texas (the State Court Lawsuit).  In the State Court Lawsuit, Kubbernus, *inter alia*, is named as a defendant, and is accused of fraud, securities fraud and oppression.  The other parties named as defendants are:  Clarence Marshall, R. Stewart Ewing, Jr., Michael E. Maslowski, Harvey P. Perry, Balaton, Bankton Financial Corporation, Bankton Financial Corporation, LLC, Clearsky Management, Inc., Wilson Vukelich, LLP and Clearsky Investment, LP.  [Adv. Doc. No. 1-1 at p. 5].  SkyPort is not a named defendant in the State Court Lawsuit, nor is Craig a named plaintiff or defendant.  *See*

---

[10] In various e-mails listed below, Goldman is sometimes referred to as Sam.  The Court has left the e-mails in their original form.

[*id*].  Goldman was one of the attorneys-of-record for the Schermerhorn Parties.  [*Id*. at p. 115].

17. As an attorney for the Schermerhorn Parties, Goldman arranged to speak to Cole in February or March 2010.  Craig set up the phone call.  [Tr. Aug. 28, 2012 118:22–120:6].

18. On March 26, 2010, the SkyPort Parties[11] responded to the State Court Lawsuit by filing a Notice of Removal of all claims asserted in the State Court Lawsuit [Adv. Doc. No. 1], as well as a Motion to Dismiss the State Court Lawsuit [Adv. Doc. No. 2].  *Schermerhorn v. CenturyLink* was thereafter removed to this Court (the Removed Lawsuit).  [Adv. Doc. No. 1].  The Removed Lawsuit was assigned Adversary No. 10-03150.

19. On April 15, 2010, Cole left SkyPort.  On the same day, Cole notified Craig that she was "free from Kubbernus."[12]  [SkyPort Parties/SkyPort's Ex. No. 37].  Cole, however, remained in contact with Kubbernus. [Adv. Doc. No. 681 at p. 18, ¶ 21].

20. On May 18, 2010, Kubbernus, joined by the two entities that he controlled (i.e., SkyPort and Balaton), filed in this Court an Original Complaint and Application for Preliminary Injunction and Permanent Injunction commencing a separate adversary proceeding (the Preliminary Injunction Application).  [Adv. Case No. 10-03225, Doc. No. 1].  The stated purpose of the Preliminary Injunction Application was to "**preserve the *status quo***

---

[11] Wilson Vukelich LLP is also a named party in this proceeding; however, Wilson Vukelich did not join the other SkyPort Parties in filing the Notice of Removal.

[12] It appears from the evidence that Cole sent this e-mail to herself alone.  However, it is likely that Cole simply blind copied several recipients, as at least one recipient later responded [SkyPort Parties/SkyPort's Ex. No. 37], and in their Proposed Findings of Fact and Conclusions of Law, the Schermerhorn Parties assert that Craig received this e-mail.  [Adv. Doc. No. 681 at p. 18, ¶ 21].

pending determination of the causes of action set forth in this original complaint."[13]

[*Id.* at ¶ 35] (emphasis added).  This suit was assigned Adversary No. 10-03225.

21. On May 20, 2010, Trustcomm, Kubbernus and Balaton moved for an expedited hearing on the Preliminary Injunction Application and on consolidation of various adversary proceedings.  [Adv. Doc. No. 45].  The Court granted this request on May 25, 2010, scheduling the hearing on these issues for May 27, 2010.  [Adv. Doc. No. 61].

22. On May 27, 2010, the Court held this hearing.  The hearing addressed several issues, including the Removed Lawsuit and the Preliminary Injunction Application.  In regards to the Removed Lawsuit, the Court concluded that:  (a) the Schermerhorn Parties had made explicit allegations in the Removed Lawsuit which constituted an attack on the findings of fact and conclusions of law made by this Court in the Confirmation Order; and (b) the relief sought by the Schermerhorn Parties in the Removed Lawsuit—seeking appointment of a receiver to take over SkyPort—was a direct attack on the Plan and the Confirmation Order.  [Tr. May 27, 2010 288:24–289:4].  Under these circumstances, the Court concluded that the dispute between the parties pertained to "the implementation, interpretation and execution of the plan [this Court] confirmed in August of 2009."  [Tr. May 27, 2010 280:16–25].

23. The Court subsequently decided to give the parties an opportunity to reach an agreement; together, they were given until June 22, 2010 to attempt to agree:  (a) which claims alleged in the Removed Lawsuit were direct, and therefore could be prosecuted; and (b)

---

[13] The Preliminary Injunction Application's purpose refers to maintaining the "status quo **pending determination of the causes of action set forth in this original complaint.**" This language refers to the Removed Lawsuit and the process of determining which claims asserted in it are direct and which are derivative.  It was very important at this point for a determination to be made as to which causes of action were derivative because the Plan and the Confirmation Order expressly forbade the prosecution of derivative claims; and neither Kubbernus, SkyPort or Balaton want to spend attorneys' fees and expenses on claims that were already extinguished.

which claims alleged in the Removed Lawsuit were derivative, and therefore could *not* be prosecuted due to certain prohibitive language in the Plan.

24. In regards to the Preliminary Injunction Application, Kubbernus testified at the May 27, 2010 hearing that the Schermerhorn Parties had been calling people associated with SkyPort, including Cole.  [Tr. May. 27, 2010 107:13–108:1].  Based on this testimony, as well as other concerns regarding SkyPort's ability to reorganize,[14] the Court granted the Preliminary Injunction Application, thereby suspending communications between the Schermerhorn Parties and employees, vendors and customers of SkyPort while the Court and the parties determined which causes of action were direct and derivative.  [*Id.* at 300:23–301:11].[15]  The Court found that irreparable harm to SkyPort was likely.  [*Id.* at 291:3–4].  The Court then requested that the SkyPort Parties' counsel, Edward L. Rothberg (Rothberg), draft a proposed order memorializing this ruling and to have counsel for the Schermerhorn Parties sign off as to form.

25. The Court continued the hearing to June 22, 2010, at which time the Court hoped that the parties would have come to an agreement as to which claims in the Removed Lawsuit were direct (and therefore could be prosecuted) and which claims in the Removed Lawsuit were derivative (and therefore could not be prosecuted due to the extinguishing language in the Plan and the Confirmation Order).

26. Cole did not testify on May 27, 2010, but on June 6, 2010, Craig contacted her to let her know that counsel for Kubbernus and SkyPort had listed her as a witness at the upcoming

---

[14] As the Court articulated on the record in open court, "Mr. Kubbernus gave testimony that the reorganized Debtor could be harmed because people are calling, some vendors, and folks who are referring business to the reorganized Debtor. But over and above that, there's also substantial threat that irreparable harm will occur to the system. The integrity process is harmed, if I'm going to let my confirmation orders effectively be ridden roughshod over."  [Tr. May 27, 2010 291:19–25].

[15] At the May 27, 2010 hearing, the Court also granted a motion to consolidate Adv. No. 10-03150 with Adv. No. 10-03225.  [Adv. Doc. No. 84].  The consolidated suit will henceforth be referred to as the SkyPort Litigation.

status conference hearing before this Court.   [SkyPort Parties/SkyPort's Ex. No. 37].

Cole responded that she had not been asked to testify and had nothing more to do with

Kubbernus.   [*Id.*].

27. On June 7, 2010, Rothberg, counsel for the SkyPort Parties, filed a proposed order (the

Proposed Preliminary Injunction), which stated in pertinent part:

> Applicants established that granting of the temporary injunction serves the
> public interest.  Based on the foregoing as well as all of the findings of
> facts and conclusions of law read into the record, the Court is of the
> opinion that the temporary injunction should be granted. Therefore, it is:
>            ORDERED that until further Order of this Court, temporary
> injunction is granted; it is further
>        **ORDERED that [Schermerhorn Parties] are temporarily
> enjoined from: . . . (ii) contacting any customers, vendors, current
> employees or former employees [of SkyPort].**

[Adv. Case No. 10-03225, Doc. No. 2 at p. 2] (emphasis added).

28. As not all of the parties' counsel signed the Proposed Preliminary Injunction, the Court

held a hearing on June 10, 2010.   At the hearing, counsel for the SkyPort Parties

presented an amendment to the Proposed Preliminary Injunction.   Counsel for the

Schermerhorn Parties, however, argued that the amendment to the Proposed Preliminary

Injunction was too broad, and that the provision enjoining the Schermerhorn Parties from

contacting "former employees" should be stricken altogether.  [Tr. June 10, 2010 6:4–7].

According to the Schermerhorn Parties, the SkyPort Parties should instead be required to

delineate by name those employees, customers and vendors covered by the Proposed

Preliminary Injunction. [*Id.* at 6:16–23].

29. On the other hand, counsel for the SkyPort Parties argued at the June 10, 2010 hearing

that the reason the Court had granted the Preliminary Injunction Application was to

prevent harm to SkyPort, and that such harm is likely to result in such a small industry

with very few players.  [*Id.* at 7:1–7].  According to the SkyPort Parties, a mere allegation by a former employee could be very damaging to SkyPort.  [*Id.* at 9:19–24].  Moreover, to the SkyPort Parties, the Proposed Preliminary Injunction was designed to be a temporary injunction, and likely to only be in place until the June 22, 2010 hearing; by that time, the parties hoped to present an agreement defining the direct and derivative claims.  [*Id.* at 7:8–8:1].  Thus, the SkyPort Parties argued that the Schermerhorn Parties should be required to stop pursuing all claims and communications with any and all interested parties simply until that time, *including* "former employees" such as Cole.

30. Steve Smith (Smith), one of the attorneys for the Schermerhorn Parties, conceded at the June 10, 2010 hearing that the SkyPort Parties (and Kubbernus, in particular) had clearly identified at least two former employees—*including Cole*—who had already initiated suits against Kubbernus.  Thus, by no later than June 10, 2010, there is no question that counsel for the Schermerhorn Parties were aware that Cole was a former employee of SkyPort and, more importantly, was covered by the Proposed Preliminary Injunction.[16] [*Id.* at 8:18–25].

31. Having heard both arguments, the Court accepted all the arguments of counsel for the SkyPort Parties, and therefore subsequently signed the Proposed Preliminary Injunction (the Preliminary Injunction Order).  As the Court reasoned, the relationship between the Schermerhorn Parties and the SkyPort Parties was extremely acrimonious; more

---

[16] Smith's comments reflect that he was aware of Cole:  "My feeling is we'll be back over here every time we ask the other side, do you agree and if it's somebody important to the case that we are pursuing, then I'm sure we will get a 'no' and we'll come back before your Honor.  And if we had a list beforehand.  How many employees are there at SkyPort?  There just aren't that many.  And from what, if Mr. Kubbernus couldn't think of anybody *other than* people who had sued him as potential customers, that being Dawn Cole and Mr. Klotz.  If that's all he can think of then, I just, I don't know where he's coming from.  If you start from that base, then he doesn't have any customers or vendors."  [Tr. June 10, 2010 10:19–11:9].

specificity would only be likely to lead to more acrimony.  [*Id.* at 11:4–9].  The Court agreed particularly with the SkyPort Parties that in such a small industry, contacting former employees, including Cole, could hurt SkyPort.  [*Id.* at 11:10–16].  The Court therefore declined to exclude any categories or parties from the Preliminary Injunction Order.  The Court expressed its hope that a broad order would avoid *some* court time (i.e., litigating who and who was not covered under the Preliminary Injunction Order) and give SkyPort the best possible chance at reorganization.  [*Id.* at 11:17–12:6].  But, the Court noted that it would give the parties whatever time necessary for future hearings on the Preliminary Injunction Order.  [*Id.* at 11:4–9].  **The Court therefore finds that the Schermerhorn Parties were aware at the June 10, 2010 hearing that Cole had initiated a suit against Kubbernus, *and* that Cole was specifically covered by the Preliminary Injunction Order.**

32.  In sum, the Preliminary Injunction Order signed by this Court on June 10, 2010 and entered at 2:57 p.m. stated in pertinent part:

> On May 27, 2010, the Court held an evidentiary hearing on this application where all parties appeared, and presented documentary evidence, testimonial evidence and oral arguments.  At the conclusion of the presentation after carefully considering all evidence and oral argument, the Court read its findings and conclusions into the record, and determined that:
>
> 1.  Applicants established a substantial likelihood of success on the merits.
> 2.  **Applicants established that absent granting of the temporary injunction they would incur irreparable harm.**
> 3.  Applicant established that absent granting of the temporary injunction, the injury they would incur far outweighs the harm to the [Schermerhorn Parties].
> 4.  Applicants established that granting of the temporary injunction serves the public interest.  Based on the foregoing as well as all of the findings of fact and conclusions of law read into the record, the Court is of the opinion that the temporary injunction should be granted.  Therefore it is

ORDERED that until further Order of this Court, temporary injunction is granted; it is further

**ORDERED that [the Schermerhorn Parties] are temporarily enjoined from:  pursuing any and all claims or causes of action, derivative or direct, against all of the [SkyPort Parties]**, and; it is further

**ORDERED that [Schermerhorn Parties] may contact former and current vendors, employees, and customers of the Debtor *if and only if* a written request is made by [the] [Schermerhorn Parties'] counsel to counsel for [SkyPort] and counsel for [SkyPort] either a) agrees to the proposed contact or b) does not respond within 1 business day.**  If counsel for [SkyPort] refuses in writing to agree to the proposed contact and the [Schermerhorn Parties] wish to contact that person, [the] [Schermerhorn Parties] may contact this Court's case manager and, without motion, set an expedited hearing within two business days to adduce testimony and evidence that the contact should be permitted.  The party who does not prevail at that hearing will be responsible for paying the opposing party's reasonable attorneys' fees and costs in relation to that hearing  . . .

[Adv. Doc. No. 86 at p. 2] (emphasis added).

33. The Preliminary Injunction Order uses the term "contact" to describe the enjoined conduct.  At the June 10, 2010 hearing, neither the Schermerhorn Parties nor the SkyPort Parties raised an objection to this term.  In fact, there was no discussion *whatsoever* of this word, or its meaning.  The parties' arguments and the Court's ruling instead focused on the procedure to be used if the Schermerhorn Parties wished to contact any of SkyPort's former and current vendors, employees, and customers, as well as the purpose of the Preliminary Injunction Order (i.e., to enjoin any communication while the parties determined the direct and derivative claims [Tr. June 10 2010 12:19–13:22], and thereby prevent harm to SkyPort [*Id.*]).  Indeed, the Court specifically noted that "*contacts* and what is said could hurt" SkyPort as it reorganized under the Plan, and that in such a small industry, statements—including those made to former employees—"carry fast, even if its

[sic] allegations and nothing's been proved up." [Tape Recording, June 10, 2010 Hearing at 11:27:00–11:28:30 p.m.].

34. Goldman authorized Smith, his co-counsel, to sign his name to the Preliminary Injunction Order.

35. The Court has never issued a further order lifting the preliminary injunction as required by the Preliminary Injunction Order.   Thus, since June 10, 2010 at 2:57 p.m., the Preliminary Injunction Order has continuously remained in effect.

36. On June 10, 2010, prior to the entry of the Preliminary Injunction Order (i.e., at 2:57 p.m.), Cole sent Goldman and Craig an e-mail with the subject heading, "Confidential." In her e-mail, Cole complained that information she had provided to Craig was being used by Goldman against Kubbernus and the SkyPort Parties without her express permission.   She asserted that the use of this information hurt her own claims against Kubbernus, and wanted to know why Craig had "broken" her trust.   [SkyPort Parties/SkyPort's Ex. No. 146 at p. 2].

37. After the entry of the Preliminary Injunction Order, at 6:06 p.m.,[17] Craig sent Goldman an e-mail about Cole's e-mail reproach from earlier in the day.   His e-mail stated, in pertinent part, "Sam, [ . . . ] Hmmmmmm……well Dawn is (justifiably) pissed off……..as expected…. [ . . .]  We (I) will need to make her whole if ever successful….. **Do you want to answer or are you not allowed……**" [*Id.*] (emphasis added).  Almost immediately afterwards, Goldman called Craig.  When Craig did not answer, Goldman sent an e-mail response at 6:25 p.m.:  "Left you a voicemail.  You may want to call me before talking to her."  [*Id.*].

---

[17] The Court notes that, unless otherwise indicated, it has made an effort to convert all times to Central Standard Time.

38. Goldman and Craig continued to communicate throughout the evening of June 10, 2010. Goldman indicated that he was in a meeting and, because of the time difference between New York (i.e., where Goldman was located and lives) and Paris (i.e., where Craig was located and lives), Goldman and Craig did not speak directly until June 11, 2010.   They did agree via e-mail, however, that Craig would not call Cole until he had spoken to Goldman.[18]

39. Late on June 10, 2010, in the United States, and early in the morning on June 11, 2010 in France, Craig sent an e-mail to Cole saying, "Dawn, I will call you today . . . [Kubbernus] is a desperate criminal . . . He never had any intention of paying you . . . We need to do the right thing and put this criminal away!!  Talk later, Franklin."  [SkyPort Parties/SkyPort's Ex. No. 150].

40. On June 11, 2010, Goldman and Craig sent two e-mails to each other regarding Kubbernus and his various business ventures.  The two men did not speak by phone.  At 12:46 p.m. and then at 12:51 p.m., Cole called Craig.  They spoke for approximately eighteen minutes, and when they concluded their conversation, Craig immediately sent an e-mail to Goldman, entitled "Just spoke to Dawn…"

> **FYI—she got an email from RK saying noone** [sic] **can contact her…???  I guess I can**…just so you know…I left a message on Dawn's [SkyPort] phone by error.  I only said to call me back…so he knows we are talking…is that a problem…??
>
> I urged Dawn to join the Light Side and talk to you…**I think she will call you in a day or 2**…I also told her you know somel [sic] start-ups who are hiring in Texas and can introduce her…she was quite interested in that…**I also told her if we win a settlement it would "be better for all of us."** FCC

[SkyPort Parties/SkyPort's Ex. No. 151] (emphasis added).

_____
[18] Craig to Goldman, "I'll call Dawn or do you want to talk first??"  Goldman to Craig, "Let's talk first.  I'll call you in am."  [SkyPort Parties/SkyPort's Ex. No. 149, 150].

41. Goldman responded to Craig eighteen minutes later: "You were returning her call; correct?" [*Id.*].  Craig did not respond to this question; instead, he called Cole three times—at 2:50 p.m., 2:50 p.m. again, and then at 2:51 p.m.  She failed to answer. [SkyPort Parties/SkyPort's Ex. No. 217].

42. Goldman and Craig had no further contact with each other on June 11, 2010, and did not communicate again until June 15, 2010, when Craig sent Goldman an e-mail with some financial documentation.  Also on June 15, Matthew Weldon (Weldon), an associate with Goldman's firm, copied both Goldman and Craig on an e-mail attaching a pleading to be filed in this Court on June 16, 2010.

43. On June 18, 2010, Craig e-mailed Cole with the subject line, "Job opportunity."  At the end of the e-mail Craig said, "Also call Sam [Goldman] … he has some leads too.  He may need some info from you too … ???  You will do better on our side!! … I promise you….."  [SkyPort Parties/SkyPort's Ex. No. 153].  Cole responded the same day, "Hi Franklin, Thank you VERY much!"  [SkyPort Parties/SkyPort's Ex. No. 154].  After receiving Cole's e-mail, Craig then forwarded it to Goldman, saying "FYI…don't let her I [sic] know I sent you this…."  [*Id.*].

44. On June 18, 2010, after Goldman received this e-mail, he attempted to call Craig twice— failing to reach him either time.   [SkyPort Parties/SkyPort's Ex. Nos. 168, 176].  Goldman then sent Craig an e-mail, which Craig later forwarded to Cole.  This e-mail read as follows:

> Sorry about the way this went down.  Unfortunately, [Cole] did not want to choose sides between the fraudster and the defrauded.  She knows RK is a crook and she knows she can help us prove it, but she is still trying to hold back on her support.  What excuse does she have for now not coming forward and helping those who lost millions and who like herself were defrauded by Kubbernus.

> She should be making common cause with us rather than trying to hide in the background.
>
> [ . . . ] Does she have any claims against RK for fraud?  Is she owed money ion [sic] Texas by him?  If she does, I can try to help her get a lawyer in Canada or Texas –contingent fee or small retainer to go after these claims.
>
> We will try to get ourselves coordinated.
>
> Regards, Sam

[SkyPort Parties/SkyPort's Ex. No. 157].  On June 19, 2010, Craig forwarded this this e-mail to Cole.

45. Also on June 19, 2010, Craig sent Cole the following e-mail.[19]  Craig also forwarded this e-mail to Goldman, thereby keeping Goldman apprised of Craig and Cole's communications.

> Dawn,
>
> I spoke to Sam yesterday and explained how you feel….and I can understand your bitterness……we got cut off on the phone and this is what Sam sent overnight to summarize the conversation…and he does have a point here.
>
> You have, at times, been duplicitous and played both sides…..which is misleading to people and doesn't help your position [ . . . ]
>
> I understand why you did it [ . . . ] you must have figured "all these idiots are fighting for their money and I'm getting nothing [ . . . ]"
>
> The basic fact is that everyone and his brother (and sister and mistress) wants to see RK ruined and behind bars!!  [ . . . ] You should forget what happened and unabashedly join our ranks NOW [ . . . ]  I think you can be very useful in this case and you will make out better and be doing the right thing and clear your name from being seen in "RK's camp" which is not a pretty place to be seen [ . . . ]

---

[19] Nevertheless, Goldman contends that all "[c]ommunications were in *each* instance . . . commenced by Dawn Cole." [Tr. May 1, 2012 50:1–10].

I don't know what Sam can do for you [ . . . ] but there is an "expense account" put up by the [Schermerhorn Parties] to pay for some expenses….perhaps some of these funds can be used to for your lawyer as it serves the same purpose??  To bring RK to justice!!  [ . . . ]

**I am sure that Sam and I, we can find a deal……but Sam needs your 100% cooperation….**which at this point, makes complete sense.  You will get nothing out of RK in a corner alone by yourself!

Call Sam please……  Franklin

[SkyPort Parties/SkyPort's Ex. No. 154] (emphasis added).

46. Following Craig's e-mail to Cole, he e-mailed Goldman, forwarding both the e-mail above, and adding the following, "This is my best shot at pulling Dawn over on our side… I bet she calls you… [ . . . ] Let's see what she says….? Franklin."  [SkyPort Parties/SkyPort's Ex. No. 154].

47. Later on June 19, 2010, Craig e-mailed Cole again:  "Dawn,   [ . . . ] 5/Don't give up trying to get your funds back… 6/Call Sam… He can help you… If we win a settlement, I'll make sure you see some funds but you need to help us destroy RK. 7/you may not have records but an affadavit [sic] from you would go a long way …. Franklin [P.S.] 6/Call Sam."  [SkyPort Parties/SkyPort's Ex. No. 156].  Cole and Craig then spoke by phone three times—the first time for twenty-five minutes,[20] the second time for two minutes, and the third time for thirty minutes.[21]  [SkyPort Parties/SkyPort's Ex. Nos. 217, 229].  In the midst of these phone calls, Craig sent an e-mail to Goldman, "I'm getting her to help us in Detroit by discrediting RK…she has agreed…What can she do to help out with [SkyPort]???  FCC"  [SkyPort Parties/SkyPort's Ex. Nos. 159, 183, 185].

---

[20] Cole called Craig in the first instance.

[21] Craig called Cole in both the second and third instances.

48. Following this e-mail, Goldman began to become concerned that Craig was in violation of the Preliminary Injunction Order.  On June 20, 2010 at 7:53 a.m., Goldman e-mailed Craig.  Goldman and Craig subsequently sent several e-mails to each other over the course of June 20, 2010 and June 21, 2010.  These e-mails, plus e-mails to and from Craig and Cole sent during the same period, are as follows:

| Date | Time | From: | To: | Text of Email | Notes |
|---|---|---|---|---|---|
| 6/20/2010 | 7:53 a.m. | Goldman | Craig | Franklin, I understand and confirm that Dawn contacted you in the first instance; if this isn't the case, I don't want you talking to her.  You should confirm in your emails that you are talking to her at her in [sic] initiative.  Not sure Balaton still owns SkyPort; he may have transferred it to another entity. She can help in many ways:  1. Is she owed money by SkyPort?  2.  Anyone else Robert hasn't paid?  3. Anything else he's done since the confirmation that is dishonest? 4. Any materials relating to his efforts to sell the company? 5.  Robert hurts people as he goes; who else is out there that can come into bankruptcy court and expose him?<br>I can make some calls for her, try to help her find a job.  But, it must be at her initiative.  I can't believe she doesn't understand that Robert takes peoples [sic] money, manipulates them as long as he can to avoid paying them and then dumps them, while accusing them of disloyalty.<br>She must decide that she is with all the people that Robert has screwed - like her - and full tilt, without holding back.<br>But remember.  We will do just fine without her.<br>Regards, Sam | Responding to 6/19/10 12:47 p.m. e-mail from Craig to Goldman |
| | 8:21 a.m. | Craig | Goldman | She contacted me…several times and I called her back… Franklin<br>I will try to get her to call you…. | |

| Date | Time | From: | To: | Text of Email | Notes |
|------|------|-------|-----|---------------|-------|
| 6/20/2010 | 8:33 a.m. | Craig | Cole | Dawn,  In response to your email re:  your utility in the [SkyPort] fraud…..this how you can help us… 1. Are you owed money by SkyPort? 2.  Anyone else Robert hasn't paid at [SkyPort]?  3.  Anything else he's done since the confirmation that is dishonest? 4. Any materials relating to his efforts to sell the company? 5.  Robert hurts people as he goes; who else is out there that can come into bankruptcy court and expose him? Sam can make some calls for you, try to help her find a job.  But, it must be at your initiative.  Robert takes peoples [sic] money, manipulates them as long as he can to avoid paying them and then dumps them, while accusing them of disloyalty. You are a victim with all the people Robert has screwed - and you should pursue him like Mendel and Brogan at full tilt, without holding back. Craig Fookes was willing to testify too but I think he has some mud on his hands too so he wants to stay low key...but if push came to shove, he would just like the accountant, Walter, who also doesn't want to get involved as he was an instrument in RK's shenanigans... RK has NO FRIENDS...!! Franklin. | |
| | 8:33 a.m. | Craig | Goldman | FYI | Forwarding 6/20/10 8:33 a.m. e-mail from Craig to Cole[22] |
| 6/21/2010 | 6:25 a.m. | Goldman | Smith, Fryar, Obstfeld[23] | Redacted. | |
| | 6:26 a.m. | Goldman | Craig | Pls confirm with Dawn that she is the one who contacted you and is asking you for help.  I do not want to be in a situation where it looks like you are contacting her or we are offering her anything in return for her testimony.  **We do not need her testimony.**  I do not believe that she has given anything useful in court. | |
| | 6:35 a.m. | Goldman | Smith, Fryar, Obstfeld | FYI.  I am concerned about an entrapment scenario by Dawn Cole and Kubbernus, even though Craig says she reached out to him.  I told Craig not to offer her anything.  He said he felt bad that we outed her and wanted to help her.  **I don't believe she's given us anything that could be useful in Court anyway. Do we need to tell the Judge?** | |

---

[22] Goldman has conceded that as of at least June 20, 2010, he knew that Craig was e-mailing Cole about how she could help the Schermerhorn Parties in the dispute at bar.  Goldman has also admitted that Craig was keeping Goldman in the loop by forwarding to him what Craig sent to Cole.  [Tr. May 1, 2012 55:6–12].

[23] W. Steve Smith (previously defined as, Smith), F. Eric Fryar (Fryar) and Harold B. Obstfeld (Obstfeld) are all attorneys for the Schermerhorn Parties.

| Date | Time | From: | To: | Text of Email | Notes |
|------|------|-------|-----|---------------|-------|
| 6/21/2010 | 7:48 a.m. | Craig | Goldman | Ok……..we have been going back and forth so it is difficult to say who has contacted who….but my phone call to her [SkyPort] cell phone was a response to her call about the email….. She contacted me first a few weeks ago abd [sic] is looking for a job... Letks [sic] get some testimonu [sic] from her....!! Franklin | Responding to 6/21/2010 6:26 a.m. e-mail from Goldman to Craig |
| | 8:09 a.m. | Goldman | Craig | Want to call me? | |
| | 8:20 a.m. | Craig | Goldman | In office?? | Responding to 6/21/2010 8:09 a.m. e-mail from Goldman to Craig. Phone records indicate that Craig then called Goldman at 8:25 a.m. and the call lasted approximately seven minutes. [SkyPort Parties/SkyPort's Ex. No. 217] |
| | 11:42 a.m. | Goldman | Craig | Franklin:  This will confirm our conversation this morning.  I understand you have a prior relationship with Dawn Cole regarding another matter and that she contact you, but I do not want you discussing SkyPort with her unless and until we obtain an order from Judge Bohm permitting us to do so. **I realize you are not a [Schermerhorn Party], but I do not want to create an appearance that we are using you to communicate with her.** I understand the conversations with her were at her initiative and that she reached out to you to help her with her issues paying counsel in Canada, and in finding a job, but I do not want this in any way connected to the SkyPort case. To the extent that there is anything you told her that might suggest otherwise, you should let her know that you do not want to discuss the SkyPort case with her until the Judge says it is OK to discuss it with her.  As for any offers to help her find a job or otherwise, as I've mentioned in the past, this could be misinterpreted as trying to gain her favorable testimony in return for this. You should certainly negate any inference that may have been created that we have been an indirect participant in your conversations or that we would seek to help her without first getting an order of the court permitting this. Thank you for your help.  Regards, Sam | Goldman copied Fryar, Obstfeld and Smith |

[Adv. Doc. Nos. 410-1, 410-3, 410-4] (emphasis added).

49. After sending this e-mail of 11:42 a.m., Goldman then called Craig.  Their phone call

lasted seven minutes.  [SkyPort Parties/SkyPort's Ex. No. 176].

50. On June 22, 2010, the Court held its scheduled hearing on the Removed Lawsuit.  As the parties had failed to come to an agreement regarding the derivative and direct causes of action, the Court ordered that by close of business on June 23, 2010 (i.e., the next day), counsel for each party should file a two-page list consisting of derivative causes of action and direct causes of action.  Once the Court reviewed the lists submitted by counsel, the Court would then issue an order setting forth which causes of action were derivative and which causes of action were direct.

51. Goldman and Craig spoke again on June 23, 2010.  Goldman initiated this phone call, which lasted twenty-nine minutes.  [SkyPort Parties/SkyPort's Ex. No. 176].

52. Despite Goldman's statements in the June 21, 2010 e-mail that Craig, Cole and Goldman should not discuss SkyPort and that Craig should "negate any inference that may have been created that [Goldman and the Schermerhorn Parties] have been an indirect participant" in Cole and Craig's conversations, many more emails were sent thereafter among Goldman, Cole and Craig.  [SkyPort Parties/SkyPort's Ex. No. 162].  On June 30, 2010, for example, they sent the following e-mails to each other after Cole learned that SkyPort and Kubbernus were suing her in Texas:

| Date | Time | From: | To: | Text of Email | Notes |
|------|------|-------|-----|---------------|-------|
| 6/30/2010 | 10:41 a.m. | Cole | Craig | Hi Franklin - I received this lawsuit (SkyPort vs. Dawn Cole) thru back channels. Robert has sent this to numerous outside parties indicating that he filed it yesterday in Houston court. I have no funds to fight this ridiculous lawsuit. Had Sam NOT disclosed my confidential email, I am certain that Robert would be focused elsewhere. But now, I will be completely discredited as a business professional and as a witness in any lawsuit against RK. | |
| | 10:51 a.m. | Craig | Goldman | Sam, Not good for poor Dawn…not a very serious suit but she has no money…this is just intimidation of potential witness… [ . . . ] **What can she do??** Franklin | |

23

| Date | Time | From: | To: | Text of Email | Notes |
|------|------|-------|-----|---------------|-------|
| 6/30/2010 | 11:37 a.m. | Craig | Cole | There must be a way to fight it very cheaply by filling a document yourself or a public lawyer who will file a document for $75...?? Just do what RK does…delay…and he'll drop it…**maybe Sam can help??** Franklin | |
| | 11:38 a.m. | Cole | Craig | I haven't done anything to hurt SkyPort's business even after leaving...despite many opportunities to do so. | |
| | 11:44 a.m. | Craig | Cole | I know you haven't...he is obviously doing this for a reason... to piss you off?? (I doubt it...) to discredit you as a witness or to intimidate you so you don't testify...probably... You have to ask yourself why he would do that???...because he is scared and knows you can do him damage...DO THE RIGHT THING and give him some of his own medicine! FCC | |

[SkyPort Parties/SkyPort's Ex. No. 163, 165–66].  Each of these e-mail communications between Cole and Craig were forwarded to Goldman.  He responded to Cole's concerns in an e-mail to Craig at 11:48 p.m., saying "This is a nonsense complaint and easily dismissed.  [ . . . ] How did it get to her?  It wasn't served and I'll bet, not even filed." [SkyPort Parties/SkyPort's Ex. No. 166].

53. Meanwhile, Cole responded to Craig, expressing that if she cooperated with the Schermerhorn Parties, she feared that she would be treated as a "hostile witness," having worked with SkyPort and Kubbernus in the past.  Craig tried to dissuade her fears saying, "I don't believe that Sam will [treat you as a hostile witness]…if you join the right side, there will only be benefits for you…you did nothing wrong so what can Sam complain about????  You should join the rest of us…we are stronger in numbers."  [SkyPort Parties/SkyPort's Ex. No. 167].

54. After receiving the e-mails above, Goldman called Craig.  They eventually spoke for thirty-one minutes, immediately after which Craig called Cole.  He did not reach Cole, but subsequently sent an e-mail to Goldman, saying "Tried to call [Cole] twice…And left a message…" [SkyPort Parties/SkyPort's Ex. Nos. 167, 169–74].  Goldman responded,

"Not sure I understand her [hostile witness] comment. She wasn't treated as a hostile witness and would not be a hostile witness as far as we're concerned. She is another one of the many that were screwed over by Kubbernus and **we should all be banding together**." [SkyPort Parties/SkyPort's Ex. No. 174] (emphasis added).

55. On July 1, 2010, (i.e., after the Preliminary Injunction Order had been signed *and* after Goldman stated that he did "not want [Craig] discussing SkyPort with [Cole] unless and until we obtain an order from Judge Bohm permitting us to do so" [Finding of Fact No. 48], Craig and Goldman spoke by phone. The call began at 10:08 a.m. and lasted thirty minutes. Directly thereafter, Craig e-mailed Cole, "You around for a call?? I have a solution for you...Franklin." Craig and Cole then spoke by phone. [SkyPort Parties/SkyPort's Ex. No. 171, 182].

56. After Craig and Cole concluded their phone call, Craig immediately sent an e-mail to Goldman, entitled "GOOD NEWS on Dawn!!!"

> Sam, I spoke to Dawn. She is willing to join our side and going after RK big time! The lawsuit broke the back of the camel. She agrees to you going to the bankruptcy judge to get permission to speak to her....she is even willing to go see the judge or write her own letter saying she is willing to talk to anyone...should she??
>
> She is very interested in the prospect of our lawyers representing her and helping her....and suing him in Texas for money owed to her!! She liked that idea a lot!!
>
> **How do you want to proceed??** [ . . . ]

[SkyPort Parties/SkyPort's Ex. No. 183] (emphasis added).[24]

---

[24]

| Annie Catmull (Catmull) (counsel for the SkyPort Parties): | So this email is you conveying what Dawn told you to Sam Goldman, right? |
|---|---|
| Craig: | Yes. |

[Tr. Apr. 18, 2010 58:16–18].

57. Goldman and the Schermerhorn Parties made no attempt to contact either counsel for the

SkyPort Parties or this Court on either Thursday, July 1, 2010 or Friday, July 2, 2010 to

request permission to speak to Cole.[25]

58. On July 2, 2010, Cole sent an e-mail to Craig.  The e-mail read as follows:

> Hi Franklin - I had meetings in Austin today and was driving
> through torrential rain from Hurricane Adam.[26] So, I didn't hear your call.
> I'm sorry that I missed you.  Here is the situation:
>
> 1.  The TX Civil Process Code states that the defendant(s) in a civil suit
> must be served immediately as the suit is filed.  Rule 21(b) states that
> plaintiffs who do not serve the defendants timely can be sanctioned. 2. I
> have not been served. My address is on the complaint and I have been at
> that address every day since the suit was filed.
> 3.  Although RK didn't have time to get me served, he DID find time to
> send the complaint to at least a dozen people (all SkyPort employees, a
> couple consultants and at least one of my contacts..probably many more)
> in a blatant attempt to discredit my reputation, harm my startup business
> and intimidate me so that I will not testify against him.  He did this during
> the time that I was NOT aware of any lawsuit and could not address the
> issues.  It worked.  It is causing me problems.
> 4.  **I want to go to the judge on Tuesday (either with or without
> consent)** and request the following sanctions:
> ..a.  RK must provide a copy of every email that he sent regarding
> this issue along with the full name and contact information of the email
> recipient.
> ..b. RK must send a second email to each recipient stating that the
> complaint was never actually filed, informing the recipient that he was
> sanctioned for the act and apologizing to Dawn Cole and the court for this
> misuse of the TX judicial system.  The email should be worded to very
> clearly restore my good reputation.  (I know - this sounds like first grade
> ... but I think that it is justified)
> ..c. RK should pay a fine.  This is truly hurting my business!  One
> group of engineers with whom I was working closely stopped returning
> my calls and emails suddenly the same day that they visited SkyPort.

---

[25] The Court recognized the Independence Day holiday on Monday, July 5, 2010, in accordance with 5 U.S.C. §
6103, which establishes public holidays for federal employees.  But, the Court was open on both Thursday, July 1,
2010 and Friday, July 2, 2010.

[26] The Court assumes that Cole meant Hurricane <u>Alex</u>, which hit Texas in late June and early July of 2010.  Indeed,
as a result of Alex, the city of Houston received more rain fall in the first two days of July 2010 than is typical for
that entire month.  *Hurricane Alex*, http://en.wikipedia.org/wiki/Hurricane_Alex_%282010%29 (last visited July 10,
2013).

..d. If there is a possibility of a few days in jail, RK should serve them.

5.  The next item that I want to cover with the judge (hopefully with counsel but with or without) is the issue of RK committing perjury under oath in the court when he told the judge that I had agreed to testify on his behalf. I understand that perjury carries fines and sometimes jail time and I believe that RK should be sanctioned for this illegal act that mocks our court system.  I'll be around all weekend and Monday.

So, please call me at your convenience.  All the best, Dawn

[SkyPort Parties/CenturyTel's Ex. No. 1 at p. 1] (emphasis added).

Craig replied a few minutes later, sending the following e-mail to Cole at 4:41 p.m.:

I didn't call but I think you're right….you have a lot of recourse but will need some legal advice……**I will talk to Sam and see what his lawyers think**….I don't have enough expererience [sic] in this stuff[.]  Boy.  He is an asshole, RK….. Very vindictive and it is just cheap malingment [sic]!!!  Hang in there..will get thos [sic] bastard !!! Franklin.

[SkyPort Parties/CenturyTel's Ex. No. 1 at p. 6].

Subsequently, from Friday, July 2, 2010 to Monday, July 5, 2010, Cole, Craig and Goldman exchanged <u>fifty-two e-mails</u>, with Cole and Goldman communicating through Craig to provide each other with information and instructions.  All of these e-mails are transcribed below:

| Date | Time | From: | To: | Text of Email | Notes |
|---|---|---|---|---|---|
| 7/2/2010 | 4:49 p.m. | Cole | Craig | Ahhh!  The message must have been from yesterday.  I'll give Ron and his team a day or two to see if the judge will clear us to talk.  **If it will help, will also provide a written request to the judge.  But that might not be a good idea if the judge thinks we are colluding.**  Just let me know if you need a statement.  Thanks! | Responding to 7/2/2010 4:41 p.m. e-mail from Craig to Cole |
| | 5:35 p.m. | Craig | Goldman | Sam, Interesting !!! **What should she do???**  Sounds like Dawn has done some homework…  Franklin | Forwarding 7/2/2010 4:29 p.m. e-mail from Cole to Craig |
| | 6:11 p.m. | Goldman | Craig | We will be going to the bankruptcy court on tuesday [sic] and asking for permission to bring her in so she can tell the judge what kubbernus' [sic] true stripes are. | |

| Date | Time | From: | To: | Text of Email | Notes |
|------|------|-------|-----|---------------|-------|
| 7/2/2010 | 6:28 p.m. | Goldman | Craig | **Will she give us permission to take this email to the judge?**[27] | Responding to 7/2/2010 5:35 p.m. e-mail from Craig to Goldman |
| | 7:46 p.m. | Craig | Goldman | Ok | Responding to 7/2/2010 6:11 p.m. email from Goldman to Craig |
| | 7:46 p.m. | Craig | Goldman | **I will ask** | Responding to 7/2/2010 6:28 p.m. e-mail from Goldman to Craig |
| | 7:47 a.m. | Craig | Goldman | No text. | Forwarding (1) 7/2/2010 4:29 p.m. e-mail from Cole to Craig; (2) 7/2/2010 4:41 p.m. e-mail from Craig to Cole; and (3) 7/2/2010 4:49 p.m. e-mail from Cole to Craig |

---

[27] Goldman argues that he did not intend for Craig to ask Cole this question and that he did not want Craig to find out this information from Cole.  According to Goldman, he was simply asking Craig what he thought.  [Tr. May 1, 2012 60:14–61:16].  The Court rejects Goldman's explanation.  First, Craig explicitly told Goldman the next day that Craig would ask Cole this question.  More importantly, in response, Goldman did not reprimand Craig, ask him not to contact Cole with Goldman's question, or indeed, respond in *any way* to Craig's comment.  The Court finds that Goldman <u>did</u> intend for Craig to reach out to Cole with this question.

| Date | Time | From: | To: | Text of Email | Notes |
|------|------|-------|-----|---------------|-------|
| 7/2/2010 | 8:02 p.m. | Craig | Cole | Yes, Be Careful.  The bankruptcy jusge [sic] is a maniac. He made a bad call on the [SkyPort] bankrutcy [sic] in RK's favor and is ashamed to say he is wrong….apparently he is the laughing stock of the bench in Houston…!!  **I have word from Sam that his Texas lawyer is going to him on Tuesday to discuss some issues and ask if he can talk to you[28].....I discussed your last email with Sam as I don't have the answers to your questions....he has asked your permission to show it to the judge...is that OK[29]....if not maybe a written statement by you is needed??  I don't know....  Let me know??** | |

---

[28]

| | |
|---|---|
| Catmull (counsel for the SkyPort Parties): | And the next paragraph, "I have word from Sam." Do you see that? |
| Craig: | Yes. |
| Catmull: | [ . . . ] Well, "I have word from Sam." That's Sam Goldman, right? |
| Craig: | Yes. |
| Catmull: | Okay. And that's your way of communicating something Sam Goldman told to you to Dawn Cole, right? |
| Craig: | Yeah. |

[Tr. Apr. 18, 2012 40:4–12].

[29]

| | |
|---|---|
| Catmull: | All right. And you write, "Is that okay?" Do you see that? |
| Craig: | Yes, uh-huh. |
| Catmull: | That's you asking Dawn Cole, on behalf of Sam Goldman, whether she will agree to Sam Goldman showing Dawn Cole's emails to this Court, right? |
| Craig: | Yes. |
| Catmull: | And then you finished with, "Let me know." Do you see that? |
| Craig: | Yeah. |
| Catmull: | That's your way of soliciting more information from Dawn Cole to convey to Sam Goldman, right? |
| Craig: | Let me see, yes – yes.  Dawn was looking for help. |

[Tr. Apr. 18, 2012 42:11–23].

| Date | Time | From: | To: | Text of Email | Notes |
|------|------|-------|-----|---------------|-------|
| 7/3/2010 | 3:02 a.m. | Craig | Goldman | FYI | Forwarding 7/2/2010 8:02 p.m. e-mail from Craig to Cole. |
| | 4:03 p.m. | Cole | Craig | Hi Franklin, Thank you.  I am concerned that we don't get reprimanded from communicating.  I don't think that it would be a good thing to show the email to the judge.  RK could use that against us.  I think that the best thing would be for the Texas lawyer to show the lawsuit filing to the judge - making the point that I am NOT a customer or partner of SkyPort - that there should be NO reason that we can't talk directly -- and request that the judge lift the ban on us communicating directly with each other.  I've attached the filing that RK has been sending out to others in a direct effort to harm me.  That can go to the judge.  **But we shouldn't show the judge any emails between any of us.[30]**  I will also provide a statement directly to the judge (since we are banned from talking).  I'll send you a copy over the weekend as soon as it is written.  In fact, I can be "parked" in downtown Houston and be ready to appear in the Judge's chambers if that helps. | Responding to 7/2/2010 8:02 p.m. e-mail from Craig to Cole |
| | 4:16 p.m. | Craig | Cole | OK.  **Let me ask our lawyers what to do....**I am lost in all this stuff….as far as I understand we are allowed to talk…..I'll come back to you.  Franklin | Responding to 7/3/2010 4:03 p.m. e-mail from Cole to Craig |
| | 4:17 p.m. | Cole | Craig | Thanks! Asking them is the best thing.  I'll do what ever they[31] say is best. | Responding to 7/3/2010 4:16 p.m. e-mail from Craig to Cole |
| | 4:18 p.m. | Craig | Goldman | **Sam, What do we do??** | Forwarding 7/3/2010 4:03 p.m. e-mail from Cole to Craig |
| | 5:44 p.m. | Craig | Goldman | No text. | Forwarding (1) 7/3/2010 4:16 p.m. e-mail from Craig to Cole; and (2) 7/3/2010 4:17 p.m. e-mail from Cole to Craig |

---

[30] "Any of us" suggests not only the e-mails between Craig and Cole, but also between Goldman and Craig. [Tr. Apr. 18, 2012 37:1–12]

[31] "They" refers to Goldman, Smith and Fryar, co-counsel for the Schermerhorn Parties.  [Tr. Apr. 18, 2012 30:16–18] (quoting Craig's testimony).

| Date | Time | From: | To: | Text of Email | Notes |
|------|------|-------|-----|---------------|-------|
| 7/4/2010 | 7:34 a.m. | Goldman | Craig | Procedure is we must first ask RK's counsel for permission to talk to Dawn.  If he says no, we go to the Judge.  Steve Smith will be working papers to ask the Court to bring Dawn in to testify.  Should go out on Tuesday.  Decision is the Judge's.  Happy Fourth!  Regards, Sam[32] | |
| | 8:06 a.m. | Craig | Cole | Dawn, I aksed [sic] lawyers.  Procedure is we must first ask RK's counsel for permission to talk to you.  If he says no, we go to the Judge.  Steve Smith will be working on papers to ask the Court to bring you in to testify.  Should go out on Tuesday.  Decision is the Judge's.  Happy Fourth!  Will let you know... Franklin | |
| | 10:37 a.m. | Cole | Craig | Thanks!  I am also going to petition the judge on Tuesday (in person if possible) with a letter that states 1.  my belief that RK committed perjury when he told the court that I had agreed to testify on his behalf 2. my belief that RK has violated civil procedure with the SkyPort vs Cole lawsuit in an effort to intimidate witnesses 3. my belief that RK is tampering/bribing witnesses with the offer to pay that he submitted to me stating a payment plan and that he would owe me nothing if I assisted any outside party in a lawsuit against RK, Balaton or SkyPort 4. asking for sanctions for the above acts 5. asking for permission to work directly with your lawyers since I am not a customer or partner of SkyPort's and since SkyPort has already sued me | Responding to 7/4/2010 8:06 a.m. e-mail from Craig to Cole |

[32] The tone of these e-mails is very different than the tone of the e-mails sent by Goldman *prior to* Cole's stated willingness to cooperate with the Schermerhorn Parties.  Unlike the e-mail sent on June 21, 2010, for example, here Goldman does not express that he "do[es] not want [Craig] discussing SkyPort with [Cole] unless and until we obtain an order from Judge Bohm permitting us to do so" or that Craig should "certainly negate any inference that may have been created that we have been an indirect participant" in any of these conversations.  *See* [Finding of Fact No. 48].

| Date | Time | From: | To: | Text of Email | Notes |
|------|------|-------|-----|---------------|-------|
| 7/4/2010 | 11:09 a.m. | Craig | Cole | Dawn, I think you are right on all these issues but please let the lawyers do it their way….this judge is a whacko apparently and it may screw it up???......let's see whaty [sic] Sam's lawyers say on Tuesday….mkts are closed tomorrow so it is just a weekend wait... Franklin | Responding to 7/4/2010 10:37 a.m. e-mail from Cole to Craig |
| | 11:34 a.m. | Cole | Craig | Well, I think that RK will serve me immediately when Sam's team approaches RK's lawyers.  I don't think that Sam's team is that worried about little Dawn Cole.  (Actually, they have made that point very evident!) And RK's bogus suit against me is really killing my business right now when absolutely every penny and every day counts!  [ . . . ] Honestly, they haven't gotten very far with this judge yet.  Maybe an outsider would be a little more successful?  My letter to the judge, including all associated attachments, is ready to go.  It's 3 pages (plus about 20 pages in attachments) and includes a copy of Robert's payment plan to me that, I believe, will clearly constitute witness tampering.  It also requests that I be able to serve as a witness for your team.  I'll wait but I am very, very concerned that RK will quickly destroy me if I don't have proper legal representation.  RK has absolutely no problem lying under oath.  (I present two instances of proof of that in my letter.)  I will drive to Houston on Tuesday morning and wait to hear from your team.<br>Then, based on the results of their conversations, I will be ready to take my documentation to the courthouse, hand deliver it to the judge's office and request a meeting.  The purpose of my meeting will be to add my voice to the request to work directly with your team and be a witness for your team.<br>**Can you do me favor, please?  Find out from Sam how long a Plaintiff has to serve a defendant once a civil suit is filed?  Rule 21, 21a and 21b in the Texas Civil Code state that the defendant must be served at the same time as the suit is filed. If this is the case, then RK can be found in contempt of court. But there may be some informal guidelines that provides a week or two to serve. I'm not sure.  If you could ask Sam's team that, I would REALLY appreciate it.** | |
| | 12:04 p.m. | Craig | Cole | OK. I'll get you the answer…I think things will go very fast after Tuesday……the lawyers think they may even be able to get RK arrested…… Does he know ALL your contacts for your new business?? Franklin | Responding to 7/4/2010 11:34 a.m. e-mail from Cole to Craig |
| | 12:09 p.m. | Craig | Goldman | Dawn is frothing at the mouth now !!!!  Trying to calm her down…. FCC | Forwarding (1) 7/4/2010 10:37 a.m. e-mail from Cole to Craig; and (2) 7/4/2010 11:34 a.m. e-mail from Craig to Cole |

| Date | Time | From: | To: | Text of Email | Notes |
|---|---|---|---|---|---|
| 7/4/2010 | 12:10 p.m. | Cole | Craig | Thanks!! I believe that I have proof of witness tampering. He gave me a payment agreement that clearly states that he will pay me IF and ONLY IF I don't help your side in the lawsuit. I would LOVE to get him arrested! I have the e-mail chain from his attorneys to him to me with the agreement and release that he had his attorney draft. And, yes, when SkyPort was paying me, I brought all of contacts into the company. I know that it was stupid! But that is what a company buys when they are conned...they buy access to the rolodex. And, as long as I accepted a salary, I felt that I should give the job my all. Most of these contacts know that RK is full if [sic] hot air and will support me. But even though they know that RK is lying, they don't want to be involved with a person or company that is being sued. It's just too risky. Thanks for checking. | Responding to 7/4/2010 12:04 p.m. e-mail from Craig to Cole. |
| | 12:12 p.m. | Craig | Goldman | Sam, you have answer for Dawn?? How quickly can you move against RK?? Fcc | |
| | 12:39 p.m. | Craig | Cole | Well that certainly is very strong info......BUYING your testimony!! I believe that is a felon [sic] ?? Will be back to you... | Responding to 7/4/2010 12:10 p.m. e-mail from Cole to Craig |
| | 12:53 p.m. | Cole | Craig | My plan was to walk all of this evidence into the judge's chambers and let him know that we have all been conned by a very accomplished liar. The judge ruled based on RK's testimony and, like all of us, he had to assume that RK was telling the truth under oath. Now, we have NEW evidence that (1) RK lies under oath and (2) he is bribing witnesses. I want to make the judge feel comfortable that he has enough NEW evidence to change this ruling without it reflecting badly on him. | |
| | 12:54 p.m. | Cole | Craig | **Your lawyers CANNOT take the bribe into court since it is supposed to be confidential and it would clearly indicate that they had contact with me in violation of the judge's ruling. I HAVE to take that to the judge myself.** | Responding to 7/4/2010 12:39 p.m. e-mail from Craig to Cole |
| | 1:01 p.m. | Cole | Craig | **Franklin - one more thing …. You cannot forward these e-mails to your lawyers. If these show up in court, it will be interpreted as a violation of the judge's ruling. PLEASE DO NOT FORWARD THESE!!!** | |
| | 1:21 p.m. | Craig | Cole | **Good point…..let's see what Sam says???** | Responding to 7/4/2010 12:54 p.m. e-mail from Cole to Craig |
| | 1:27 p.m. | Cole | Craig | I actually think a Texas born and bred lady who, as a victim, takes hard evidence of a Canadian's witness tampering, perjury and harassment into a Texas judge will do pretty well. | Responding to 7/4/2010 1:21 p.m. e-mail from Craig to Cole |
| | 1:33 p.m. | Craig | Cole | No just talking……you ARE ALLOWED to talk to me…..we know each other, talk about Detroit and I am not a direct plaintif [sic] in skyport…. | Responding to 7/4/2010 1:27 p.m. e-mail from Cole to Craig. |

| Date | Time | From: | To: | Text of Email | Notes |
|---|---|---|---|---|---|
| 7/4/2010 | 1:34 p.m. | Craig | Cole | Yes…it will go over well…..work on that Southern drawl of yours…!! | Responding to 7/4/2010 1:27 p.m. e-mail from Cole to Craig |
| | 1:39 p.m. | Cole | Craig | LOL!  I'll work on my "Yawl's" and "Sugar's" this weekend. | Responding to 7/4/2010 1:34 p.m. e-mail from Craig to Cole |
| | 1:39 p.m. | Craig | Goldman | No text. | Forwarding (1) 7/4/2010 12:10 p.m. e-mail from Cole to Craig; and (2) 12:39 p.m. e-mail from Craig to Cole |
| | 1:39 p.m. | Craig | Goldman | **Sam, So I just lied to Dawn about sending you the emails so PLEASE don't use them w/o her express permission….besides Dawn is righy [sic] you shouldn't be seeing anything BEFORE the judge gives you permission to talk to her**[33]…….  Are you eating hamburgers and drinking Bud??  Franklin | Forwarding (1) 7/4/2010 1:01 p.m. e-mail from Cole to Craig; and (2) 7/4/2010 1:33 p.m. e-mail from Craig to Cole |
| | 2:21 p.m. | Craig | Goldman | No text. | Forwarding 7/4/2010 12:53 p.m. e-mail from Cole to Craig |
| | 2:23 p.m. | Craig | Goldman | Sam, good point….**what shud [sic] she do??** | Forwarding 7/4/2010 12:54 p.m. e-mail from Cole to Craig |
| | 2:58 p.m. | Goldman | Craig | **Of course.  She is reaching out to us, but I do not want to antagonize the Judge. We want to be careful, but I have some ideas I want to discuss with you.**[34] | Responding to 7/4/2010 2:23 p.m. e-mail from Craig to Goldman |
| | 3:19 p.m. | Goldman | Craig | Can you call my cell [number redacted]? | |
| | 6:42 p.m. | Goldman | Craig | FYI | Forwarding 7/4/2010 4:01 p.m. e-mail from Smith to Goldman, Fryar, Obstfeld, Weldon. *See* [Finding of Fact No. 59]. |
| | 8:04 p.m. | Craig | Goldman | Tyalk [sic] tomorriw [sic] then…. | Responding to 7/4/2010 2:58 p.m. e-mail from Goldman to Craig |

---

[33]

| Catmull: | And the reason Dawn is right is because there's an injunction in place, right? |
|---|---|
| Craig | Yes. |

[Tr. Apr. 18, 2012 49:19–21].

[34] Again, the tone here is very different than the tone of the e-mails sent by Goldman *prior to* Cole's stated willingness to cooperate with the Schermerhorn Parties.  *See* [Finding of Fact No. 48].

| Date | Time | From: | To: | Text of Email | Notes |
|------|------|-------|-----|---------------|-------|
| 7/4/2010 | 10:00 p.m. | Craig | Goldman | Jokes apart…this may come in more useful than you think…..I know a lot about Red States…..!! | Forwarding (1) 7/4/2010 1:21 p.m. e-mail from Craig to Cole; (2) 7/4/2010 1:27 p.m. e-mail from Cole to Craig; (3) 7/4/2010 1:34 p.m. email from Craig to Cole; and (4) 7/4/2010 1:39 p.m. e-mail from Cole to Craig |
| 7/5/2010 | 8:21 a.m. | Goldman | Craig | Want to call now?  How was your foie gras and dom perignon? | |
| | 8:21 a.m. | Craig | Goldman | Bar au sel and Cotes de Beaunes, 2003 | Responding to 7/5/2010 8:21 a.m. e-mail from Goldman to Craig |
| | 9:22 a.m. | Craig | Goldman | Talk today ???? | Responding to 7/5/2010 8:21 a.m. e-mail from Goldman to Craig |
| | 1:13 p.m. | Goldman | Craig | A little reception now. | |
| | 2:15 p.m. | Goldman | Craig | If she thinks she has strong evidence of witness tampering, she should consider going to the US Attorney. | |
| | 2:36 p.m. | Craig | Goldman | This is what she suggested doing…isn't it better if you manage that process for her? | Responding to 7/5/2010 2:15 p.m. e-mail from Goldman to Craig |
| | 2:37 p.m. | Craig | Goldman | I'll call after dinner in 2 hours or so…OK?  I'm in Brittany and reception is so so…. | Responding to 7/5/2010 1:13 p.m. e-mail from Goldman to Craig |
| | 4:48 p.m. | Goldman | Craig | Available next hour. | |
| | 5:33 p.m. | Craig | Goldman | Going to bed…..didn't get enough sleep last night and all day outside today…..not in a mood to talk about low lifes like Kubbernus….talk tomorrow.  **What do I need to tell Dawn?  We need to get to her quickly.  Send me concise instructions overnight and I will get her first thing in the morning which is easy with 8 hour start.** | Responding to 7/5/2010 4:48 p.m. e-mail from Goldman to Craig |
| | 8:17 p.m. | Goldman | Craig | If she wants to act tomorrow, this would make sense.  We need to go to the Judge first and the Judge controls his calendar.  **We can also help her find counsel; we can discuss this.**  We should talk about this first.[35] | |

---

[35] Once again, the tone of this e-mail is very different than that sent previously.  On June 21, 2010 (i.e., before Cole was willing to aid the Schermerhorn Parties), Goldman said "[a]s for any offers to help her find a job or otherwise, as I've mentioned in the past, this could be misinterpreted as trying to gain her favorable testimony in return for this." [Finding of Fact No. 48].  Here, however, Goldman directly offered to provide Cole help in obtaining counsel.

[SkyPort Parties/SkyPort's Ex. Nos. 184–87, 190–95]; [SkyPort Parties/CenturyTel's Ex. Nos. 1, 6–12, 17–18, 21–23].

59. During this same period (i.e., July 2, 2010 to July 5, 2010), Goldman exchanged eleven e-mails with his co-counsel, Smith, Obstfeld, Fryar and Weldon.  These e-mails relate directly to the communications among Goldman, Craig and Cole, and are transcribed in full below.

| Date | Time | From: | To: | Text of Email | Notes |
|---|---|---|---|---|---|
| 7/2/2010 | 5:09 p.m. | Goldman | Fryar, Smith, Obstfeld, Weldon | **Can we go to the judge with this e-mail? We need to help her.** | Forwarding 7/2/2010 5:35 p.m. e-mail from Craig to Goldman |
| | 6:13 p.m. | Goldman | Fryar, Smith, Obstfeld | No text | Forwarding 7/2/2010 6:11 p.m. e-mail from Goldman to Craig |
| | 6:46 p.m. | Smith | Goldman, Fryar, Obstfeld | We really need to work this up before running to the court.  The last thing we need is to go in with accusations that do not live up to our expectations or which do not compel the court to take action in our favor.  To go in on Tuesday trumpeting the wrong done to Dawn does us no good unless it is tied to our matters.  The way to make the necessary connection is to request the court to give us a [sic] hearing, after Rothberg denies our request to contact Roger and Dawn, at which we put Dawn and Roger through the testimony showing that K lied about them being customers, how they are suing him for fraud, how he defrauded the investors, how we could not have known, etc.  We have no credibility and what we have to say will fall on deaf ears.  Roger and Dawn are new voices and may even restore our credibility, if we present them well.  If we do not, he will be more secure in his present beliefs and more angry at us.  I agree helping Dawn is critical but helping her should be done in a manner to benefit us as well. | |
| | 7:11 p.m. | Goldman | Fryar, Smith, Obstfeld | Agreed. | Responding to 7/2/2010 6:46 p.m. e-mail from Smith to Goldman, Fryar, Obstfeld |

| Date | Time | From: | To: | Text of Email | Notes |
|------|------|-------|-----|---------------|-------|
| 7/2/2010 | 7:45 p.m. | Goldman | Fryar, Smith, Obstfeld, Weldon | If the judge lets us bring her in, that would be great.  But what if he wants us to demonstrate a basis first for him to let us do so?  Ray[36] will strongly oppose.  We have 5 or 6 potential witnesses RK has gone after and I have emails on each of these.  We have the complaint against Dawn.  We have her email saying she wants to talk to the judge.  She is threatening to counterclaim against SkyPort.  Does this mean she needs the court's permission?  Let's be careful but we may have no choice but to show the judge why her presence is important.  -- She can testify when she first spoke to Franklin and me about the Kubbernus fraud -- well after confirmation.  I think intimidating witnesses and lying to the court are very important factors on whether Kubbernus should get sanctions from us. | Responding to 7/2/2010 6:46 p.m. e-mail from Smith to Goldman, Fryar, Obsteld |
| 7/4/2010 | 8:16 a.m. | Goldman | Fryar, Smith, Obstfeld, Weldon | No text. | Forwarding 7/4/2010 7:34 a.m. e-mail from Goldman to Craig |
| | 12:21 p.m. | Goldman | Fryar, Smith, Obstfeld, Weldon | Any thoughts on this? | Forwarding 7/4/2010 12:12 p.m. e-mail from Craig to Goldman |
| | 4:01 p.m. | Smith | Goldman, Fryar, Obstfeld, Weldon | The intent should be how quickly will the Judge move on him or unshackle us to move on him. | |
| | 6:33 p.m. | Obstfeld | Goldman | I would like to talk to you about the Dawn issue, but I am on the road now.  You can reach me on my cell [number redacted] or BB [number redacted] or at home late tonight or tomorrow morning.  I leave for Nevada at about Noon tomorrow. | Responding to 7/4/2010 12:21 p.m. e-mail from Goldman to Fryar, Smith, Obstfeld, Weldon |
| | 7:52 p.m. | Goldman | Obstfeld | Tried you; I'm in New Hampshire. Will try again after fireworks. | |
| | 8:13 p.m. | Obstfeld | Goldman | OK; still om [sic] the road. | Responding to 7/4/2010 7:52 p.m. e-mail from Goldman to Obstfeld |

[SkyPort Parties/CenturyTel's Ex. Nos. 1–2, 4–5, 19–20]; [SkyPort Parties/SkyPort's Ex.

No. 189].

---

[36] Goldman is referring to Hugh Massey Ray, III (Mr. Ray), counsel for several of the SkyPort Parties, including CenturyTel, Kubbernus, and Balaton.  Mr. Ray withdrew as counsel, however, on September 16, 2010.  [Adv. Doc. No. 171].

Also, in this Opinion, the Court is referring to him as "Mr." Ray to differentiate him from Samantha Ray, a legal assistant who testified on behalf of the SkyPort Parties.

60. In sum, at no time between July 2, 2010 and July 5, 2010 did Goldman, Craig, or other co-counsel for the Schermerhorn Parties contact either the SkyPort Parties' counsel or this Court for permission to contact Cole (as required by the Preliminary Injunction Order). Rather, **the Court finds that, *without permission*, Goldman and Cole communicated with each other through Craig.** The Court also finds that unlike the June 19, 2010 to June 21, 2010 e-mails, Goldman never: (1) confirmed that the source of the contact between Cole and Craig was at Cole's initiative; (2) mentioned a fear of "entrapment" for communicating with Cole; (3) mentioned that Craig should inform Cole that Craig did **"**not want to discuss the SkyPort case with her until the Judge says it is OK to discuss it with her"; or (4) "negate any inference that may have been created" that Goldman and the Schermerhorn Parties (a) were "indirect participant[s]" in Craig's conversations; (b) would seek to help Cole; or (c) would "be able to help her without first getting an order of the [C]ourt permitting this." In sum, no one requested or recommended that Craig and Cole immediately cease communications with each other. Instead, several times these individuals implied, or indeed, *explicitly stated* that it could be damaging to their positions if this Court were shown these e-mail exchanges (i.e., Goldman: "Can we go to the judge with this e-mail? We need to help her" [Finding of Fact No. 59]; Cole: "You cannot forward these e-mails to your lawyers. If these show up in court, it will be interpreted as a violation of the judge's ruling. PLEASE DO NOT FORWARD THESE!!!" [Finding of Fact No. 58]).

61. On July 5, 2010, Cole e-mailed Craig alerting him that she had prepared a letter and attachments to give to the Court claiming that Kubbernus had repeatedly perjured himself before the Court. Cole also asked Craig to contact a lawyer in Texas to determine

whether the length of time that had elapsed between Kubbernus' filing of the original

petition in state court against Cole and the date of the e-mail violated any Texas rules,

because Cole claimed she had yet to be served with the complaint. [SkyPort

Parties/SkyPort's Ex. No. 197A].

62. Craig forwarded Cole's July 5, 2010 e-mail to Goldman at 6:38 p.m.  Craig also inquired

about the possibility of Cole appealing to either the U.S. Attorney's Office or the

undersigned judge directly.  [SkyPort Parties/SkyPort's Ex. No. 197A].

63. Later in the evening of July 5, 2010, at 8:17 p.m., Goldman replied to Craig with the first

mention of obtaining a lawyer for Cole, "We can also help [Cole] find counsel; we can

discuss this.  We should talk about this first."  [SkyPort Parties/SkyPort's Ex. No. 196].

64. Early the next morning, July 6, 2010 at 6:43 a.m., Goldman once again e-mailed Craig

and expressed strong support for finding Cole legal representation:

> I think we should get Dawn separate counsel.  Can recommend some
> Texas Lawyers.  Not sure judge will entertain her letter without a lawyer
> finding a legal angle to put in front of him.  US attorney may take up the
> case if he thinks it's strong enough.  Available to talk now; can call you
> later this AM.

[SkyPort Parties/SkyPort's Ex. No. 197A].   Later that same day, at 8:36 a.m., Cole e-

mailed Craig and told him that she planned to provide the Court with her documentation

of Kubbernus' wrongdoing, as well as request that the ban on contact with her be lifted.

[SkyPort Parties/SkyPort's Ex. No. 198].  Cole also called Craig and spoke with him for

eleven minutes beginning at 9:01 a.m.   [SkyPort Parties/SkyPort's Ex. No. 228].

Following that phone conversation, Craig forwarded Cole's email to Goldman at 9:35

a.m. and indicated that Cole was awaiting an attorney to represent her before this Court.

[SkyPort Parties/SkyPort's Ex. No. 198].

65. On July 6, 2010, Cole contacted the U.S. Trustee's Office, and then e-mailed Craig the details of her interaction with the U.S. Trustee's Office.  Craig forwarded the email to Goldman at 12:24 p.m. that same day.  [SkyPort Parties/SkyPort's Ex. No. 199].

66. On July 7, 2010, Cole sent her letter and several attachments to this Court's Case Manager.  The Court's Case Manager replied by e-mail, telling Cole that all complaints and documents had to be properly filed with the Clerk of the Court and that any additional attempts to directly put information before the undersigned judge would constitute an "*ex parte* communication."  [SkyPort Parties/SkyPort's Ex. No. 200].

67. On July 12, 2010, Cole filed a letter with this Court.   [Adv. Doc. No. 122].  As Cole wrote, the "purpose of this letter" was to:  (a) "provide a statement to you regarding conduct of SkyPort and Kubbernus that, I believe, includes perjury and witness tampering as it relates to the case over which you preside and to me"; and (b) "submit an official request that the [Schermerhorn Parties] . . . be able to communicate with me freely and that I be allowed to testify in your Court as their witness."  [*Id.* at p. 1].  In her letter, Cole also acknowledged that she was, at one time, an employee for SkyPort [*Id.* at p. 3], as well as that she was subject to the Preliminary Injunction Order.  [*Id.* at pp. 4–5].  Finally, Cole attached several documents to her letter, including an e-mail from Kubbernus. [Adv. Doc. Nos. 122-1–122-9].  In her letter, Cole did not indicate that she had been in contact with Craig or Goldman, and did not attach any of the e-mail communications among Craig, Goldman and herself.

68. Between July 7, 2010 and August 8, 2010, Cole and Craig exchanged numerous e-mails regarding legal representation for Cole, including an agreement by Craig to lend Cole

$10,000.00 to pay a legal retainer.  In all, Cole and Craig exchanged thirty-four e-mails

during this time period.  These emails are reproduced below:

| Date: | Time: | From: | To: | Text of Email: | Notes: |
|---|---|---|---|---|---|
| 7/8/2010 | 2:17 p.m. | Craig | Cole | Dawn, Our lawyers have contacted the best Houston litigation firm to see if they will accept the case. . . Should know soon and they will be able to guide you thru the quagmire of legality... You're right to have gone to the FBI and DA... But don't forget that this case is lot more than just witness tampering and an attempt to buy your testimony... although that is illegal and important you should probably bring them the Big Picture to get them interested as I'm told "they need to be sold" on a felony in order to get their attention... Apparently the Trustee you contacted is very meek and not a meat-eater... Franklin | |
| | 2:43 p.m. | Cole | Craig | In talking with the FBI Duty Agent - I emphasized that I was a witness in a $30Million ++ civil suit that has potential criminal charges embedded. I also emphasized that over 25 investors were defrauded.  Maaaan [sic], I hope that got their attention!<br>(Plus, I'm also hoping that they will check out RK's FBI file and want to take advantage of this chance to get him.  As you know, they got Capone on IRS charges.). | Responding to 7/8/2012 2:17 p.m. e-mail from Craig to Cole |
| 7/9/2010 | 5:59 p.m. | Cole | Craig | Hi Franklin, I hope that you really do have an attorney coming. . . . I will GREATLY appreciate some legal assistance.<br>On Tuesday, I sent a letter to Judge Bohm.  His Case Handler would not accept it and told be that I have to file with the Clerk of Court.  I found out that all I have to do is send it to the Clerk of Court which I did today.  (There are no special legal forms required.)  . . . I wanted to start the filing process before showing it to anyone involved in the case so that we can honestly say tat no one had any input into this letter but me.  It basically accuses RK of perjury, witness tampering via both bribery and intimidation and asked the Honorable Judge if I can serve as a witness for your side. . . . As soon as I know that this package has been delivered, I'll send it electronically to you.  I don't want to put you in a difficult position by sending it earlier.<br>FYI - the US Trustee never even tried to return my call. [par] Also, a friend who reported a crime to the FBI told me that it took them a couple of months to decide to open a case.  So, I'm not expecting anything from the FBI any time soon.<br>Thanks and have a wonderful weekend! Dawn | |
| | 6:18 p.m. | Craig | Cole | Dawn, We will find you an attorney and will advance this case... As I was told, it isn't easy to move these organs of Govt [sic] (like all Govt [sic] bodies, they are slow and motivated by politics and power)... The right law firm can move the process forward!! | Reply to 7/9/2010, 5:59 p.m. e-mail from Cole to Craig |
| | 6:22 p.m. | Cole | Craig | Thank you very much! Have a wonderful weekend! | |

| Date: | Time: | From: | To: | Text of Email: | Notes: |
|---|---|---|---|---|---|
| 7/9/2010 | 7:34 p.m. | Craig | Cole | **We hope to have a lawyer by Monday...if not, our team has a meeting with the bankruptcy judge on Wednesday and then will ask for permission to have access to you**...if the clerk filed your papers properly, then the legal team will have access to thos [sic] papers legally. It was a good thing you didn't send it out directly... We'll get there... **The boys think they can maybe sue for damages for you as well...??** Franklin | |
| 7/10/2010 | 10:42 a.m. | Cole | Craig | Thank you Franklin! I will let you know as soon as the letter is filed.  It should be delivered to the Clerk of Court on Monday afternoon and should be filed by Tuesday. [par] Can you find out if both sides are automatically sent a copy please?  I would like to have an idea about when RK will see it.  . . . I'm also hoping that this letter (along with its hard evidence) will be the straw that broke the camel's back in convincing the Judge that pretty much everything that RK has said on the stand could be a lie.  I'm hoping this gives Judge a way to start to rule against RK without losing face on his original ruling.  He could the Judge administer justice properly when the key witness so radically and skillfully lied on the stand?  RK becomes the fall guy for the Judge to change his rulings.<br><br>. . . [D]amages would be harder to prove since I am basically a start up business with no revenue right now.  I'm game to try! I will REALLY need a good attorney, though.  Especially since I anticipate RK to start getting birtier and dirties [sic] in his retaliation tactics. I truly appreciate your help!! | |
| 7/13/2010 | 1:25 p.m. | Cole | Craig | Hi Franklin,<br>I hope you are doing well. Do you know if the letter that I filed with the court clerk has been made public and/or sent to counsel for both sides yet? Any feedback? . . . And you had mentioned that you're working on a litigator for me.  Where are we on that project please? Thanks very much! Dawn. | |
| | 1:44 p.m. | Craig | Cole | **Sam is in Houston today seeing judge...** He will know if your letter is made public. If so, his lawyers can represent you... he had also been speaking to the top Houston firm who are taking their time deciding what they will do... **we should have counsel very quickly today and will know more today after Sam and his lawyers meet with the judge... I'll let you know...** Franklin | Reply to 7/13/2010, 1:25 p.m. e-mail from Cole to Craig |
| 7/15/2010 | 1:51 p.m. | Cole | Craig | I REALLY need counsel please. Thanks. | |
| 7/17/2010 | 1:55 a.m. | Craig | Cole | Lawyers have requested to judge to have access to you... I think they have found a lawyer for you too to defend you... FCC | |
| | 10:21 a.m. | Cole | Craig | Thank you!  That's a relief  . . . | Reply to 7/17/2010, 1:55 a.m. e-mail from Craig to Cole |

| Date: | Time: | From: | To: | Text of Email: | Notes: |
|---|---|---|---|---|---|
| 7/23/2010 | 9:08 a.m. | Cole | Craig | Awesome!  Will Goldman be calling me?  Also, will he be introducing me to the lawyer who is going to help me with RK's lawsuit?  This is great news.  Thanks. | Reply to 7/23/2010, 3:30 a.m. e-mail from Craig to Cole. |
| 7/23/2010 | 5:40 p.m. | Craig | Cole | Dawn, **Please call Mr. Fridge (who I understand is very good).**[37]  **His number is** [redacted] **and he is expecting your call.** Franklin | Reply to 7/23/2010, 4:32 p.m. e-mail from Cole to Craig |
| 7/26/2010 | 10:44 a.m. | Cole | Craig | Hi Franklin- thank you for the loan.  Do you have a loan agreement that you would like to use?  If not, I can pull one off the Internet. (It won't be great, but it might do.) Here is my wire information.  I'm not sure if you'll be sending the funds form a US or non-US account  . . . | |
| 8/3/2010 | 9:07 p.m. | Cole | Craig | Hi Franklin - I drove to Houston late last night and was ready to go to court this morning.  **But apparently they were concerned about RK's team jumping on you and me because we were talking.**  How did court go today?<br>I met with Charles Fridge (the attorney) today.  He's great!  If you have the chance and the judge doesn't mind, you should meet him in his office.  Tomorrow, I should get some feedback from him about how court went today.  He is ready to attack RK personally on my behalf and to work with your team and the judge as needed.  Apparently he knows pretty much every judge in Houston.  **But he needs a retainer** :-)  . . . | |
| 8/5/2010 | 6:53 p.m. | Cole | Craig | Thanks Franklin.  **I need to get a retainer to Fridge ASAP.  Can you help?** | |
| | 6:57 p.m. | Craig | Cole | What did he say?? How much does he need?? Is this for defense for the breach of contract?? If there isn't a timeline... You may just want to wait because the way this whole case is going... RK won't be CEO of [SkyPort] for much longer and we hill drop the case... do you have a deadline?? Franklin | Reply to 8/5/2010, 6:53 p.m. from Cole to Craig |
| | 7:12 p.m. | Cole | Craig | Hi Franklin - we have to respond by Monday on RK's breach of contract lawsuit and the collections rolled together.  It's the same that we discussed before.  **Its $10,000 retainer** but if the suit is dropped, we would be refunded any unused amount that I would send back to you to send back to the others.  Can they put me in as temporary Pres of SkyPort?  I have a very good idea what to do with the company. | Reply to 8/5/2010, 6:57 p.m. from Craig to Cole. |

[37]

| Catmull (counsel for the SkyPort Parties): | And you'd never heard of Charles Fridge until Sam Goldman told you about him, right? |
|---|---|
| Craig: | Right. |
| Catmull: | And apparently, he's very good. You write back "Because Sam Goldman told you that," right? |
| Craig: | Yes. |
| Catmull: | And you wrote, "He is expecting your call," that's because you understood Sam Goldman to have already spoken with him, right? |
| Craig: | Yes. |

[Tr. Apr. 18, 2012 103:17–104:1].

| Date: | Time: | From: | To: | Text of Email: | Notes: |
|---|---|---|---|---|---|
| 8/5/2010 | 7:21 p.m. | Cole | Craig | Hey Franklin - Hope you are getting some rest after all of the travel.  The last time that we talked, Rod had suggested that you hold off on sending the retainer until after the court. I, in turn, made that agreement with Fridge.  Has something Changed?  Am I being hung out on this one after stepping forward? Thanks! | Reply to 8/5/2010, 5:57 a.m. e-mail from Craig to Cole. |
| | 7:26 p.m. | Craig | Cole | Don't worry... | |
| | 7:39 p.m. | Cole | Craig | Thanks!  Will you be able to wire the funds?  Or would you like for me to send you a copy of the retainer agreement that Fridge gave me for your recorder?  Loan agreements? Maaan [sic], Franklin, I hate to ask you to jump in this when I know that you haven't been in the same city for 2 days in a row.  But I can't afford to lose this lawsuit by default!  Since it is a breach of confidentiality issue, it could prevent me from ever getting a government security clearance again!  Thanks again!! | Reply to 8/5/2010, 7:26 p.m. e-mail from Craig to Cole. |
| | 10:01 p.m. | Craig | Cole | **Why not send me the retainer agreement???... but remember you can only contact me... Franklin** | Reply to 8/5/2010, 7:39 p.m. e-mail from Cole to Craig |
| | 10:43 p.m. | Cole | Craig | Hey Franklin - My bank wire info is below.  Can you please let me know the status?  Thank you, Dawn | Reply to 8/5/2010, 10:01 p.m. e-mail from Craig to Cole |
| | 11:09 p.m. | Craig | Cole | Wire is going out tomorrow morning with loan agreement... Get him to answer by Monday... He should be able to work on it on your word that funds are on their way... | |
| 8/6/2010 | 7:22 a.m. | Cole | Craig | Hi Franklin - **I only contacted you!  . . .  I'm sure Fridge will answer the suit with the knowledge that funds are on the way.** Thank you for helping!  We will nail this guy one way or another. I'm really curious.  Did the judge say anything about RK lying in court? Are you still in the US or headed back across the pond? | |
| | 8:12 a.m. | Craig | Cole | Here for 3 weeks... let's discuss on phone... | |
| | 9:46 a.m. | Craig | Cole | Dawn, This wire is going out this morning.  Please find the $10,000 loan, as discussed, extended for a one year period to help out with your living expenses[38] until you find solid employment or your company takes off. . . . I hope this personal loan assuages the pain some and will help you get back on your feet! . . .  Good luck, Franklin | |
| | 11:31 a.m. | Cole | Craig | Hello Franklin, Thank you.  This will be very helpful.  I am on the road but will find a scanner today and will sign the loan agreement back to you as soon as possible.  Thanks again, Dawn | |

---

[38] The stated purpose for the $10,000.00 seems to suddenly change after the phone call between Craig and Cole on the morning of August 6, 2010.  Up to and including the morning of August 6, 2010, the e-mails between Craig and Cole clearly indicate that the loan is for Fridge's retainer (i.e., Craig to Cole, August 5, 2010:  "Wire is going out tomorrow morning with loan agreement... Get [Fridge] to answer by Monday... He should be able to work on it on your word that funds are on their way." [Finding of Fact No. 68]; Cole to Craig, August 6, 2010:  "**I'm sure Fridge will answer the suit with the knowledge that funds are on the way.** Thank you for helping!" [*Id.*]).  Later on August 6, 2010, however, Craig and Cole abruptly began to call the $10,000.00 a "personal loan" related to Cole's living expenses (i.e., Craig to Cole, August 6, 2010:  "Please find the $10,000 loan, as discussed, extended for a one year period to help out with your living expenses . . . ." [*Id.*]; Cole to Craig, August 6, 2010:  "And I consider these funds for living expenses during a tough time." [*Id.*]).  Nevertheless, the Court finds that the $10,000.00 loan was for Fridge's retainer, *not* for Cole's living expenses.

| Date: | Time: | From: | To: | Text of Email: | Notes: |
|-------|-------|-------|-----|----------------|--------|
| 8/6/2010 | 12:16 p.m. | Craig | Cole | No worries... And no rush... send the original loan agreement to Paris address by regular mail... you can send retainer when you get a chance once back at home... Franklin | Reply to 8/6/2010, 9:46 e-mail from Craig to Cole |
| | 5:41p.m. | Cole | Craig | Hi Franklin- thank you for sending the wire.  I will forward the loan and retainer agreement as we discussed.  And I consider these funds for living expenses during a tough time.  However, just fyi, I took $10,000 from my 401k to send to an attorney who can represent me against RK's bogus lawsuit for breach of NDA.[39]  See the wire below. Again, thank you very much! | |

[SkyPort Parties/SkyPort's Ex. Nos. 15–17, 21, 27, 48, 105–07, 109, 114, 116–17, 119–20, 126, 207].  These e-mails demonstrate that Craig had direct knowledge of Cole's need for legal representation when he wired her money on August 6, 2010.  Moreover, the amount Craig wired Cole—$10,000.00—is the exact amount of the retainer Fridge requested.  The Court therefore finds that Craig provided Cole with the $10,000.00 retainer.

69. During the same timeframe (i.e., July 7, 2010–August 8, 2010), Craig and Goldman exchanged a number of e-mails.  These e-mails discussed the procurement of legal counsel for Cole, as well as the payment options for the necessary retainer.  Those e-mails are reproduced below:

---

[39] The Court finds this comment odd and misplaced when it is considered in relation to the lengthy e-mail chain preceding this e-mail, much of which related to Fridge.  Here, Cole seems to be implying that Craig has never heard of this "attorney who can represent" her against Kubbernus, when, in fact, Craig and Goldman arranged Fridge's representation, *and* provided Cole with the $10,000.00 for his retainer.  Cole and Craig seem to be suddenly exercising more caution.

| Date: | Time: | From: | To: | Text of Email: | Notes: |
|-------|-------|-------|-----|----------------|--------|
| 7/8/2010 | 5:33 a.m. | Goldman | Craig | We've approached one of Houston's top firms about representing Dawn.[40] We sent them the docs yesterday. Will let you know if they're willing to talk to her. | |
| 7/9/2010 | 7:10 p.m. | Goldman | Craig | **We are doing everything we can without violating the Court's order. We hope to get answer from counsel on Monday.** They are reviewing the papers we sent them. **We have a hearing before the judge on Wednesday.** If we can find counsel by then, we will go to Judge and ask him to let us talk to Dawn.[41] If the clerk will know to file the papers under the [SkyPort] bankruptcy case, then we will get them on Monday. I appreciate Dawn no [sic] showing them to us. We can talk to non-customers of [SkyPort]. Will any of these come forward> | |
| 7/16/2010 | 5:29 a.m. | Craig | Goldman | poor Dawn is going to need some help here... If you guys don't get the green light to represent her, **I thing we need to get the litigation firm involved and pay for it... Her testimony is probably the best smoking gun we have so the investment seems necessary.. plus we pulled her into this mess!** Franklin | |

---

[40]

| Catmull: | | | | Now we -- you read this Sam Goldman email, "we," to mean Sam Goldman and Steve Smith in there prior? |
|----------|--|--|--|----------------------------------------------|
| Craig: | | | | Right. |
| Catmull: | | | | And it says: "We have approached one of Houston's top firms." |
| Craig: | | | | Yes. |
| Catmull: | | | | So in other words, rather than just passing on a lawyer name to Dawn Cole, Sam Goldman -- sorry, the Schermerhorn party lawyers approached a Houston lawyer on behalf of Dawn Cole. Is that how you read this email? |
| Craig: | | | | Yes. |

[Tr. Apr. 18, 2010 79:7–80:1].

[41] Despite this statement, Goldman, and counsel for the Schermerhorn Parties, never asked for permission to contact Cole.  Moreover, the Schermerhorn Parties assert in their Proposed Findings of Fact and Conclusions of Law that the Preliminary Injunction Order permitted Goldman and Craig to communicate freely with Cole after she initiated the contact.  [Adv. Doc. No. 681 at 50–51, ¶ 123].  This argument is contradicted, however, by Goldman's statement in this July 9, 2010 e-mail. If Goldman believed that the Preliminary Injunction Order permitted contact with Cole *after* she initiated the communications, then there would be no reason for Goldman to seek permission from the SkyPort Parties or this Court to let the Schermerhorn Parties talk to her.  Indeed, Cole had already reached out to him on June 10, 2010 [Finding of Fact No. 91], as well as through the numerous e-mails with Craig between June 10, 2010 and July 9, 2010.

| Date: | Time: | From: | To: | Text of Email: | Notes: |
|---|---|---|---|---|---|
| 7/24/2010 | 1:47 a.m. | Goldman | Craig | You will be proud of me, the way I looked out for your money.  **Fridge agreed to accept 10k retainer plus contingency.  You need to seal the deal and we have a lot of very important details to cover over the next few days.  Fridge can do a lot to help her and us.**  But, he needs to move very quickly. Happy grogging! Sam | |
| 7/24/2010 | 3:28 a.m. | Craig | Goldman | Good job. Who should pay? Dawn directly or me? **May be better if I make a 'loan' to Dawn. Can we use our expense account for this? Defending Dawn and getting her on our side is ESSENTIAL to our case.**<br>**Is it collusive[42] if you paid her out of -- if you pay out of the kitty?** | |

---

<div style="border-top: 1px solid; width: 30%"></div>

[42]

| Catmull: | And collusive, by "collusive," you mean, like a secret agreement for bad reasons, right? |
|---|---|
| Craig: | No. It's basically, I was asking whether we're allowed to pay out of -- pay Dawn's defense out of the kitty, because we were both being attacked by -- she was being attacked. |
| Catmull: | But you chose to use the word, "collusive," right? |
| Craig: | Yeah. |
| Catmull: | English is your first language, right? |
| Craig: | Correct. |
| Catmull: | "Collusive" implies secret, right? |
| Craig: | No. Collusive is binding. |
| Catmull: | I'm sorry. What was that last word? |
| Craig: | Binding. It's collusive is working in concert. |
| Catmull: | I see. |
| Craig: | It's not secretive necessarily. |
| Catmull: | I see, so it's your testimony to this Court, it's your sworn testimony that when you use the word, "collusive," you don't mean to imply anything secret, right? That's your testimony? |
| Craig: | Yeah, yes. That's correct. Collusive means binding. |

[Tr. Apr. 18, 2012 109:17–110:12].  The Court finds that the term "collusion" means:  Secret agreement or cooperation for an illegal or deceitful purpose. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 226 (10th ed. 1999).  Its synonyms include: complicity, connivance, conspiracy, chicanery, foul play, skullduggery (*or* skullduggery); double-dealing, duplicity; cover-up, frame-up, setup; conspiration, intrigue, plot, scheme. MERRIAM-WEBSTER'S THESAURUS.  The Court therefore finds that the word collusion is <u>not</u> synonymous with the word, "binding," and instead requires secrecy.

| Date: | Time: | From: | To: | Text of Email: | Notes: |
|---|---|---|---|---|---|
| 8/5/2010 | 7:15 p.m. | Craig | Goldman | Sam, Help!!!... What shud [sic] I do????... If I have to lend Dawn these funds I insist that they get the same status as al [sic] the other expenses as this is DIRECTLY linked to the case and to its success and the reason Dawn was sued in the first place is because of your presenting the emails in the case... actually, I think these funds should come out of the [SkyPort] expense acct... | Forwarding 8/5/2010 7:12 p.m. e-mail from Cole to Craig. |
| | 7:29 p.m. | Goldman | Craig | I thought she was paying or had paid the retainer. I thought you were going to lend her some money out of a sense of obligation - because she got sued for trying to help you with Victoria Grey and SkyPort.  I agree that all expenses should come off the top [of the Schermerhorn Parties' SkyPort litigation fund] before anyone gets anything.  I though this was understood.  **I caution that we are still under an injunction not to contact Dawn**.  Regards, Sam | Reply to 8/5/2010 7:15 p.m. e-mail from Craig to Goldman |
| | 7:42 p.m. | Craig | Goldman | Please put in writing that the $10K loan will come off the top of ANY [SkyPort] settlement... [ . . . ] The $10,000 loan is 100 percent, correct? Is to correct her implication to [SkyPort] debacle. **Let's please keep things straight here. I understand you are restricted to giving her funds, but let's be clear on this. I am correcting your error.** [ . . . ] Please confirm in writing.  [ . . . ] What did the Fridge say?? You said to hold off on loan... will he start work before $10K?... she needs to respond by monday!! Franklin | Reply to 8/5/2010, 7:29 p.m. e-mail from Goldman to Craig. |
| | 7:43 p.m. | Craig | Goldman | Fridge??? what does he say??? | |
| | 7:58 p.m. | Goldman | Craig | **I assume that Dawn will pay you back, but if she does not then I agree, it should be reimbursable by SkyPort out of any recovery.** Sam | Response to 8/5/2010, 7:42 p.m. e-mail from Craig to Goldman |
| | 8:17 p.m. | Goldman | Craig | No idea. **I understand that he will represent her and that this should be advantageous to Dawn and to us.** | Response to 8/5/2010, 7:43 p.m. e-mail from Craig to Goldman |

| Date: | Time: | From: | To: | Text of Email: | Notes: |
|---|---|---|---|---|---|
| 8/5/2010 | * | Craig | Goldman | Did you speak to the Fridge or not???  What is the Status????? You introduced him and organized the whole thing.... and now you don't know what the story is???????<br>Sam.... would you level with me please! ... **I've played ball with you and you've drawn Dawn into this unwillingly....** [43] | * The timestamp of this e-mail is not clear from the record. *See* [SkyPort Parties/SkyPort Ex. No. 212]. |
|  | 11:08 p.m. | Goldman | Craig | I recommended him and Dawn was supposed to retain him.  Have no reason to think that he will not do the job he is being hired to do.  Absolutely none.  It may be that he is earning for his retainer from Dawn. Is there a number I can call you on? | Response to 8/5/2010 e-mail from Craig to Goldman |
|  | 11:31 p.m. | Goldman | Craig | Franklin: Sorry if I have not been clear. [par] I don't think there is anything to worry about.  He may be waiting for his retainer, but I would expect him not to miss any deadlines.  **Let's make sure he gets his retainer asap.** I have not heard anything further from Fridge, but understood earlier this week that he was ready to work full-tilt on this. . . . **All expenses incurred by lawyers and clients on this matter will be repaid first out of any recovery.  This is not an issue, and if you like, I can document it more formally.** |  |
| 8/6/2010 | 9:47 a.m. | Craig | Goldman | FW: "PROMISSORY NOTE FOR Dawn Cole, Wire Transfer to Dawn Cole" fyi | Forward of 8/6/2010, 9:46 e-mail from Craig to Cole.  Craig wired the $10,000 from his Morgan Stanley bank account to Cole on August 6, 2010.  [Tr. Apr. 18, 2012 178:24-179:6]. |

---

[43]

| Catmull: | Where you write, "You introduced him and organized the whole thing," by that you mean Sam Goldman introduced Charles Fridge to Dawn Cole, right? |
|---|---|
| Craig: | Yeah, he found Fridge for her, yes. |
| Catmull: | And introduced Charles Fridge to Dawn Cole by way of you, right? |
| Craig: | Yeah, yes. |
|  | [ . . . ] |
| Catmull: | In any event, first there was contact between Charles Fridge and the [Schermerhorn Parties'] lawyers before any contact between Charles Fridge and Dawn Cole, right? |
| Craig: | They referred a lawyer, yes. |
| Catmull: | No, sorry. That's not my question whether they were referred. |
| Craig: | Yes. There was contact – |

[Tr. Apr. 18, 2012 125:16–127:16].

[SkyPort Parties/SkyPort's Ex. Nos. 102, 109–11, 113, 121, 200–01, 204, 209, 212].  The Court finds that based on these e-mails, Goldman was not only aware that Cole needed counsel, but that Goldman conducted extensive research on her behalf and located Charles Fridge (Fridge) of the law firm of Fridge, Resendez LLC, who was willing to represent her.  On behalf of the Schermerhorn Parties' SkyPort Litigation fund, Goldman also guaranteed Fridge's $10,000.00 retainer (Goldman:  "All expenses incurred by lawyers and clients on this matter will be repaid first out of any recovery," as Fridge's representation "should be advantageous to Dawn" and to the Schermerhorn Parties).  Craig, for his part, only wired the money to Cole after he had this assurance of repayment from Goldman, thereby fronting the money on the Schermerhorn Parties' behalf (Craig:  "I understand you are restricted to giving her funds, but let's be clear on this. I am correcting your error.").

70. On July 23, 2010, Goldman sent an e-mail to both Craig and to Cole.  The e-mail simply said "Try my cell – [redacted]."  [SkyPort Parties/SkyPort's Ex. Nos. 207, 232A].  Both Cole and Craig's names and email addresses appeared in the "To" line of the email.  [*Id.*].

71. The next day, on July 24, 2010, Cole responded to Goldman's email, "Hi Sam- I didn't see your message until late yesterday evening.  I will call your cell phone this afternoon.  Thank you, Dawn."  [SkyPort Parties/SkyPort's Ex. No. 209].

72. Later on July 24, 2010, Goldman again emailed Cole, saying: "Sorry, I meant for Franklin to call.  We are still enjoined from contacting you."[44]  [*Id.*].

---

[44] As noted above, the Schermerhorn Parties assert in their Proposed Findings of Fact and Conclusions of Law that the Preliminary Injunction Order permitted Goldman and Craig to communicate freely with Cole *after* she initiated the contact—that the verb, "to contact" only barred the Schermerhorn Parties from *initially* establishing communications with Cole.  [Adv. Doc. No. 681 at pp. 50–51, ¶ 123].

      This argument is contradicted, however, by Goldman's statement in this July 24, 2010 e-mail.  If Goldman believed that the Preliminary Injunction Order permitted contact with Cole *after* she initiated the communications,

73. The Court held a hearing on August 3, 2010.  In preparation for this hearing, Goldman sent Craig and others an e-mail on July 26, 2010 which stated, "Hopefully after August 3rd the Judge will lift this restriction, but in the mean time there should be no communication with her by anyone acting for [Schermerhorn Parties]."  [Craig Ex. No. 36].

74.  On July 27, 2010, Goldman sent Craig an e-mail entitled "Witness Outline."  Craig was listed as a witness for the August 3, 2010 hearing.  Goldman outlined Craig's testimony for this hearing, including that Craig should say that he "did not contact [Cole] after court's injunction [i.e., the Preliminary Injunction Order]" because Craig "didn't want to violate Court's injunction."  [SkyPort Parties/SkyPort's Ex. No. 46].  Craig reviewed these notes, e-mailed Goldman back with no modifications to this proposed testimony; Craig was therefore prepared to come to the August 3, 2010 hearing and testify under oath that he had not contacted Cole when, in fact, he had contacted her.  [Tr. Apr. 20, 2012 20:10–18].

75. Craig and Goldman appeared at the August 3, 2010 hearing.  During his opening statement, Mr. Ray, co-counsel for the SkyPort Parties stated, "Dawn Cole found out somehow about the communications that happened in this courtroom, though she wasn't present. And Ms. Cole was contacted, apparently, we believe, by Franklin Craig who is here today and is probably going to take the stand. And when Mr. Craig testifies, he'll probably tell us how he -- whether he contacted Dawn Cole and whether he violated the injunction."  [Tape Recording, Aug. 3, 2010 Hearing at 11:05:39–11:06:21 p.m.].  Craig,

---

then there would be little reason for Goldman to respond to Cole's e-mail by saying that he was "still enjoined from contacting" her.

therefore, knew as of August 3, 2010 that he was suspected of violating the Preliminary Injunction Order.

76. After Fridge agreed to represent Cole, Goldman called him several times during the month of August 2010.  On August 2, 2010, Goldman called Fridge twice, at 1:58 p.m. and 2:13 p.m. [SkyPort Parties/SkyPort's Ex. Nos. 125, 144].  Goldman also called Fridge twice on August 5, 2010 at 2:02, and at 6:38 p.m.  [*Id.*].  Further, Goldman called Fridge on August 6, 2010 at 9:35 a.m., as well as at 4:35 and 5:22 p.m.  Goldman placed a call to Fridge's cell phone on August 9, 2010 at 3:03 p.m.  [*Id.*].  Goldman also placed a call to Fridge's cell phone on August 11, 2010 at 10:17 a.m.  [*Id.*].

77. On August 6, 2010, three days after appearing in this Court for the August 3, 2010 hearing, Craig wired $10,000.00 to Cole.  While called a "loan," Craig did not conduct the due diligence of a traditional lender, and did not check Cole's credit rating prior to making the loan, and did not lend the $10,000.00 with a "reasonable business expectation of being repaid with interest."  [Tr. Apr. 20, 2012 66:10–25].  Craig later claimed that Cole coerced him into making the loan.  [*Id.* at 69:25–70:11].

78. On August 18, 2010, Weldon, Goldman's associate, sent an e-mail to several parties, copying both Goldman and Craig, and requesting a second installment payment to Goldman and his firm's "SkyPort Expense Retainer Account."  [SkyPort Parties/SkyPort's Ex. No. 51].  Craig objected to this request for payment, and in particular, opposed Goldman's ongoing reimbursements of one non-party's expenditures. Craig reasoned that he should also be reimbursed because, "I'm not a party either . . . !!" [Privilege Log of Sam Goldman at p. INT0005851].

79. On August 21, 2010, Goldman sent drafts of a pleading to Craig and several of the Schermerhorn Parties.   The pleading alleged that Kubbernus and CenturyTel had committed "frauds on the Court" (the Fraud Pleading).   [SkyPort Parties/SkyPort's Ex. Nos. 57, 132].   Goldman requested that the parties review the draft of the Fraud Pleading.

80. On September 4, 2010, Cole requested that Craig forgive the promissory note on the $10,000.00 loan.   [SkyPort Parties/SkyPort's Ex. No. 213].   Later that day, at 5:51 p.m., Craig forwarded this message to Goldman with the additional text as follows:

> Fyi.....I might have mentioned something to this effect...this is all because of the emails you gave to the court that Dawn feels **WE** owe bailing her out and I see her point....however, I am the only one paying for your actions!!!!
> **I would like in writing PLEASE that these $10,000 are considered part of the legal expenses....because that is exactly what they are** unless Dawn gets incredibly lucky and gets a windfall settlement which is very unlikely....otherwise, she will never reimburse me !!

[*Id.*] (emphasis added).

81. On September 5, 2010, Goldman replied to Craig's September 4, 2010 e-mail:   "No worries.  **I agree that this is an expense reimbursable out of the recovery, if Dawn doesn't repay your loan."**   [SkyPort Parties/SkyPort's Ex. No. 214] (emphasis added).

82. On September 6, 2010, Cole and Craig exchanged several emails regarding the promissory note and the repayment of the money Craig gave to Cole.   These emails are reprinted below in their entirety:

| Date: | Time: | From: | To: | Text of Email: | Notes: |
|-------|-------|-------|-----|----------------|--------|
| 9/6/2010 | 7:02 a.m. | Cole | Craig | Hey Franklin - it was my very clear understanding that I am not liable to pay back this money.  I presume that you worked this out with Sam?  I am very hesitant to sign something that you say is meaningless and, yet you are asking for it and it makes me liable for the funds. Did you run into problems with Sam?  Thanks. | |

| Date: | Time: | From: | To: | Text of Email: | Notes: |
|-------|-------|-------|-----|----------------|--------|
| 9/6/2010 | 12:14 p.m. | Craig | Cole | No but what happens if you end up getting a financial settlement and the [SkyPort] investors don't....? .....Do you owe it then?? You said you would sign it and now you're not .... | Response to 9/6/2010, 7:02 a.m. e-mail from Cole to Craig |

[SkyPort Parties/SkyPort's Ex. No. 135].

83. On September 24, 2010, Rothberg, as counsel for SkyPort, Kubbernus and Balaton, filed a motion alleging that the Schermerhorn Parties and their counsel of record had violated the Preliminary Injunction Order, and requested that these parties appear and show cause why they should not be held in contempt (the First Motion for Sanctions). [Adv. Doc. No. 173]. As the Preliminary Injunction Order specifically prohibits contact with former or current SkyPort vendors, according to the First Motion for Sanctions, an associate with Goldman's law firm had violated the Preliminary Injunction Order by calling and leaving a voice mail for one of SkyPort's vendors:  Hein & Associates, an accounting firm. [*Id.* at p. 4, ¶ 12]. Along with the First Motion for Sanctions, SkyPort also filed a Motion for Expedited Consideration. [Adv. Doc. No. 174].

84. On September 27, 2010, the Schermerhorn Parties filed the Fraud Pleading. [Adv. Doc. No. 176]. Because this pleading alleged wrongdoing by Kubbernus and CenturyTel, the Schermerhorn Parties violated the provision in the Preliminary Injunction Order enjoining them from pursuing any claims against the SkyPort Parties.

85. Also on September 27, 2010, the Court issued an order directing the Schermerhorn Parties and their counsel to appear and show cause why they should not be held in contempt for violating the Preliminary Injunction Order. [Adv. Doc. No. 177]. In its order, the Court specifically directed Goldman to appear and show cause [*Id.* at p. 3], and required him, *inter alia*, to produce signed, notarized reports "reflecting each and every

54

contact (since May 27, 2010)" that he had had with "any former or current vendor, employee, and/or customer of [SkyPort]."  [*Id.* at p. 2].  The report was to include the "date and time of each contact, the form of the contact and the substance of the contact," regardless of who initiated the contact.  [*Id.*]; [Tr. May 1, 2012 38:17–39:7] (quoting Goldman's acknowledgment that the order required him to report any and all communications).  Goldman had until October 7, 2010 to submit the report.

86. Also on September 27, 2010, Goldman sent an e-mail to Craig, with a copy to Smith, Weldon, Obstfeld and Fryar, stating the following:

> We filed [the Fraud Pleading] today,[45] but before we did Kubbernus filed a motion for contempt because [Weldon, an associate at Goldman's firm] left a voicemail message for Hein & Co . . . you and I will probably need to disclose that we have been contacted **by** Dawn on several occasions.  I anticipate that we will then be asked for copies of all emails with Dawn. **Emails between you and I will be privileged and should not be disclosable.  I do not beleive [sic] I have any direct emails with Dawn. Emails between you and Dawn should be discoverable.**  As I understand what you have told me all along whatever communications took place between you and Dawn were as a result of her contacting you. Everything was at her initiative.  I would expect them to try to examine you in court . . . on the issue of whether you contacted Dawn.

[Privilege Log of Sam Goldman at p. INT0005972].

87. Craig replied to Goldman, asking him what e-mails Goldman expected the SkyPort Parties would request.  On September 28, 2010, Goldman replied as follows:   "After May 27, 2010."  [*Id.*].  The Court finds that this statement meant that Goldman initially believed that the injunction had been in effect since May 27, 2010 (i.e., when the Court first concluded, on the record in open court, that an injunction was appropriate), and that therefore any and all e-mails after this date were relevant and potentially discoverable.

---

[45] *See* Finding of Fact No. 84.

88. On September 29, 2010, the SkyPort Parties filed a supplement to the First Motion for Sanctions seeking sanctions against the Schermerhorn Parties for filing the Fraud Pleading. [Adv. Doc. No. 184]. The SkyPort Parties argued that this was an additional intentional violation of the Preliminary Injunction Order; specifically, its prohibition against the pursuit of any direct or derivative claims against the SkyPort Parties. [*Id.*].

89. On October 6, 2010, the Schermerhorn Parties, along with Goldman, submitted a motion for summary judgment on the First Motion for Sanctions. [Adv. Doc. No. 193]. While the Schermerhorn Parties agreed that they failed to request permission of the SkyPort Parties prior to contacting Hein & Associates in accordance with the terms of the Preliminary Injunction Order, they argued that Hein & Associates was not a seller or vendor of SkyPort. [*Id.* at p. 6]. Additionally, they argued that the term "vendor," as used in the Preliminary Injunction Order, is too "vague and ambiguous" to find Goldman and the others in contempt. [*Id.*].

90. On October 7, 2010, Goldman, *inter alia*, filed an affidavit in compliance with the Court's September 27, 2010 order. [Adv. Doc. No. 195-1 at pp. 45–46]. In the affidavit, Goldman swore that he, himself, had "not contacted any person known to [him] to be a current or former vendor, employee or customer" of SkyPort. [*Id.*]. "For the avoidance of doubt," Goldman also swore in the affidavit that he had not been contacted by any person whom he knew to be a current or former vendor, employee or customer of SkyPort, except as set forth below. Nevertheless, he understood that *being contacted* was *not* "a violation of the June 10, 2010 order." [*Id.*].

91. To his October 7, 2010 affidavit, Goldman attached a Schedule A, stating that he had received a phone call from Cole, a "former employee" on June 10, 2010 (i.e., the day the

Court signed the Preliminary Injunction Order). [*Id.* at p. 48]. According to Goldman, Cole was upset that e-mails between Kubbernus and she had been entered in this Court without her permission. [*Id.*]. Goldman stated that during this phone call, "I explained [to Cole] that I did not know that she had not given permission to use her emails and apologized." [*Id.*]. Goldman also indicated that later on June 10, 2010, he received an e-mail from Cole, but that he had "not been contacted by Dawn Cole since June 10, 2010." [*Id.*]. Nowhere in his affidavit or attached Schedule A did Goldman mention the June 19, 2011 to June 21, 2011, or the July 2, 2010 to July 5, 2010 e-mail exchanges amongst Goldman, Craig and Cole. Goldman also failed to mention the July 23 and 24, 2010 e-mail exchange that he had with Cole. [Finding of Fact Nos. 70–72]. As a result, the Court finds that Goldman failed to list "each and every contact" with Cole. Indeed, under cross-examination, Goldman himself had to admit that his affidavit was inaccurate. [Tr. May 1, 2012 82:2–7] (The SkyPort Parties' counsel: "Now, this affidavit does not list each and every contact with Dawn Cole, right?" Goldman: "That is correct.").

92. On October 14, 2010, the Court held a hearing on the First Motion for Sanctions. Before this hearing began, Craig e-mailed the Schermerhorn Parties and Goldman with the saying, "Good luck!!... this judge is an autocrat!!... Will he impose sanctions if too much paper is being shuffled...?? Sam, You [sic] better get the judge know that he needs to dismiss the Europeans quickly.... it is 10 pm at night and the calls are expensive...no one will hang on for 2 hours so this judge can play his games…" [SkyPort Parties/SkyPort's Ex. No. 74].

93. At the October 14, 2010 hearing, Goldman testified that he attended the May 27, 2010 hearing, but that despite signing the Preliminary Injunction Order through his co-counsel,

Smith, he did not remember reading the Preliminary Injunction Order before the Court entered it.  Goldman testified that he had read it by the end of June, however.  [Tape Recording, Oct. 14, 2010 Hearing at 4:10:57–4:14:21 p.m.].

94. At the October 14, 2010 hearing, counsel for the SkyPort Parties asked Goldman about his October 7, 2010 affidavit, including his admissions regarding Cole.  Counsel for the SkyPort Parties asked, "Do you see the next paragraph where it says, 'Later on June 10th, 2010, the undersigned received an email from Ms. Cole'?"  Goldman answered, "Yes."  "Did you have *any contact* after that with Ms. Cole?"  Goldman responded "*Absolutely not*."  [Tape Recording, Oct. 14, 2010 Hearing at 4:27:12–4:27:26 p.m.] (emphasis added).  Goldman also testified that any contact that he had with Cole on June 10, 2010 occurred *before* the Court signed the Preliminary Injunction Order; when pressed, however, he testified that, in fact, he did not know if the Preliminary Injunction Order was in place at the time of this conversation with Cole. [*Id.* at 5:26:16–5:29:10 p.m.] ("You don't know what time of day this Court entered the preliminary injunction, do you?  Goldman:  "I was not aware—I was not aware that the Order had been entered . . .").

95. On October 15, 2010 at 11:11 p.m., Weldon e-mailed the Schermerhorn Parties and Craig with an update as to how the October 14, 2010 hearing went.  The e-mail gave a short break down of the Schermerhorn Parties' attorney's impressions of the hearing as well as a projection of how the attorneys thought the dispute might proceed.  It ended by promising further updates as more issues were worked through or resolved.  [SkyPort Parties/SkyPort's Ex. No. 75].

96. On October 15, 2010, the Court issued its findings and conclusions on the record.  The
Court concluded that the First Motion for Sanctions should be granted; that by contacting
Hein & Associates, Goldman and his associates had violated the Preliminary Injunction
Order.   Additionally, the Court noted that it was "unhappy" with what it saw as
"continuing misconduct" on the part of Schermerhorn Parties' counsel, particularly
Goldman.  Goldman had a history of saying that he "really didn't mean to violate" the
Court's orders.   In the Court's view, however, Goldman's actions were not "simple
mistakes," but intentional defiance.[46]   [Tape Recording, Oct. 15, 2010 Hearing at
10:12:00–11:34:00 a.m.].

97. On November 9, 2010, the Court entered an order incorporating the findings and
conclusions made orally on the record on October 15, 2010 and holding Goldman jointly
and severally liable to SkyPort for the attorneys' fees incurred to prosecute the First
Motion for Sanctions.  [Adv. Doc. No. 243].

98. On November 16, 2010, Craig contacted Robert Mendel, one of the Schermerhorn
Parties, and asked him for help in financing the SkyPort Litigation.

> Hi Robert,
>
> Sam Goldman called and is looking for some more money to
> replenish the litigation kitty... **I have personally paid in funds for some
> of my clients who have invested in [SkyPort]** and whom I don't want to
> burden with advancing their funds.   I have also gotten several of the

---

[46] For example, Goldman not only intentionally tried to evade the Preliminary Injunction Order by contacting Cole
through Craig without seeking permission, but also intentionally made an end run around the Confirmation Order
and the Plan by filing the Removed Lawsuit in Harris County District Court.  In the Removed Lawsuit, Goldman
and the Schermerhorn parties included explicit allegations attacking the Confirmation Order's findings of fact and
conclusions of law; and attacking the Plan by seeking appointment of a receiver to take over SkyPort. [Adv. Doc.
No. 1-1].  The Court referred this pleading at the October 15, 2010 hearing, saying, "[t]his is not just simple
mistakes. That pleading that was filed in Harris County was carefully drafted insofar as you don't draft a pleading
for 100 some-odd pages, that specifically, without meaning what you're saying and saying what you're meaning,
and you don't call accountants without intending to pursue a claim in doing your due diligence." [Tr. Oct. 15, 2010
45:1–25].  Goldman, therefore, has a history in this Court of relying on pleas for forgiveness, rather than permission.

European Funds to put up half of the budget. **Sam will need more funds soon** and needs everyone to pitch in here. **He is looking for a total of $20,000 from you and your clients.** I think it is important for you to support the litigation fund personally to demonstrate that you are a victim or RK's fraud and not to be associated with his as you were working with him and responsible for raising funds for the scam. You need to distance yourself from him by actively being on the offense against him. In any case, it is only an advance and will be reimbursed with interest. **Sam is highly confident we will be getting a multi-million dollar settlement.** Thanks & regards....Franklin

[SkyPort Parties/SkyPort's Ex. No. 87] (emphasis added). Based on this e-mail, the Court finds that Craig was actively involved in soliciting money on the Schermerhorn Parties' behalf, speaking for Goldman in order to fund the litigation in this Court against Kubbernus and the SkyPort Parties.

99. On December 12, 2010, Goldman sent an e-mail to Craig with an attached memo listing the investors in the SkyPort Litigation, as well as the outstanding amount of money owed to the Schermerhorn Parties' litigation fund. "Franklin: As requested, attached is a memo breaking out key information regarding your investors and their participation in the SkyPort litigation. Hopefully, with this in hand, we can bring these investors current on their expense fund contributions. **I would appreciate your expeditious follow-up on this.**" [SkyPort Parties/SkyPort's Ex. No. 83] (emphasis added). Craig replied to this e-mail on January 13, 2011, saying: "Sounds great!!! I'll get onto the [Schermerhorn Parties]..." and "Let me send out this rather positive report and try to rustle up solmes$$$ [sic]..." [SkyPort Parties/SkyPort's Ex. No. 90].

100. As the Removed Lawsuit contained fifteen claims, each of which encompassed several sub-parts, in the end, it required almost a year for the Court to analyze this matter and issue a 102-page opinion. The Court issued this Memorandum Opinion on January 13, 2011; in it, the Court detailed which causes of action in the Removed Lawsuit were direct

and which causes of action were derivative.  The Court also issued an accompanying order.  [Adv. Doc. Nos. 272, 273, 274].

101. On December 16, 2010, the Court found the Schermerhorn Parties in contempt of the Preliminary Injunction Order again; this time for filing the Fraud Pleading against Kubbernus and CenturyTel.  The Court also sanctioned the Schermerhorn Parties by striking this pleading from the Court's docket, and expunging it from the record.  [Adv. Doc. No. 267 at p. 2].

102. After several weeks of no e-mail contact, Craig sent Goldman a message on March 22, 2011.  The e-mail was short and asked: "How are you doing Sam??? How is our case doing???"  [SkyPort Parties/SkyPort's Ex. No. 91].

103. On April 14, 2011, the Schermerhorn Parties filed a Notice of Appeal for several judgments, orders and decrees, including the Court's November 9, 2010 order finding the Schermerhorn Parties in contempt of the Preliminary Injunction Order.  [Adv. Doc. No. 310 at p. 2].  The appeal was assigned to U.S. District Judge Sim Lake.  [Adv. Doc. No. 314].

104. On April 19, 2011, the Court entered an order remanding the direct causes of action (as detailed in the Memorandum Opinion) to the Texas state court.[47]  [Adv. Doc. No. 312].

---

[47] The Court remanded the following claims:  **Count 1** Parts (h)–(k), (l) (claims belonging to former shareholders of SkyComm), (n) (claims belonging to former shareholders of SkyComm), (o) (claims belonging to former shareholders of SkyComm), (t); **Count 2** Part (d) (claims belonging to shareholders of SkyComm), (e), (f), (g), and (h) (claims belonging to former shareholders of SkyComm); **Count 3** Parts (a)–(f), (j)–(l); **Count 4** in its entirety; **Count 5** in its entirety; **Count 6** all Parts except Part 397; **Count 7**—claims that a Plaintiff was induced to make an investment; **Count 8** in its entirety; **Count 9**—claims that a Plaintiff was induced to make an investment; **Count 10** in its entirety; **Count 11** in its entirety; **Count 12**—Claims where the predicate act under Counts 1–3 and 5–7 is not barred; *i.e.*: Count 1 Parts (h)–(k), (l) (claims belonging to former shareholders of SkyComm), (n) (claims belonging to former shareholders of SkyComm), (o) (claims belonging to former shareholders of SkyComm), (t); Count 2 Part (d) (claims belonging to former shareholders of SkyComm), (e), (f), (g), and (h) (claims belonging to former shareholders of SkyComm); Count 3 Parts (a)–(f), (j)–(l); Count 5 in its entirety; Count 6 in its entirety; and claims that a Plaintiff was induced to make an investment in Count 7, with the exception of Parts 423(g) and (h); **Count 13**—claims, other than those represented by Part 483(g), where the predicate act under Counts 2 or 3 is not barred; *i.e.*, Count 2 Part (d) (claims belonging to former shareholders of SkyComm), (e), (f), (g), and (h) (claims belonging

105. On April 27, 2011, the SkyPort Parties filed a Notice of Appeal, cross-appealing this Court's November 9, 2010 order.   [Adv. Doc. No. 316].   The cross-appeal was also assigned to District Judge Lake.  [Adv. Doc. No. 351].

106. On April 28, 2011, the Schermerhorn Parties filed a motion to dissolve the Preliminary Injunction Order [Adv. Doc. No. 317] (the Motion to Dissolve).  The Schermerhorn Parties argued that the remand of the direct causes of action to the state court caused the Preliminary Injunction Order—and its restriction on the Schermerhorn Parties to contact any current or former vendors, customer and employees—to become moot.  [*Id.* at p. 2]. The SkyPort Parties filed a Response, both opposing the Motion to Dissolve and requesting that the Court make the Preliminary Injunction Order permanent.  [Adv. Doc. No. 336].

107. Prior to the hearing on the Motion to Dissolve, Goldman prepared a list of the Schermerhorn Parties' potential witnesses.  As part of his preparation, Goldman e-mailed Craig, requesting contact information for some of these witnesses, specifically noting that Goldman "will not be listing Dawn [Cole] as a witness."  [Privilege Log of Sam Goldman at p. INT0006359].   Craig agreed to create this list by June 30, 2011. [SkyPort Parties/SkyPort's Ex. No. 94].

108. On July 7, 2011, the Court held a hearing on the Motion to Dissolve the Preliminary Injunction Order.  Rothberg, as counsel for the SkyPort Parties, objected to the motion on the grounds that the Schermerhorn Parties were continuing to violate the Preliminary Injunction Order.  Moreover, Rothberg argued that in preparing for the July 7, 2011 hearing, he had discovered forty-six additional, alleged violations of the Preliminary

---

to former shareholders of SkyComm); Count 3 Parts (a)–(f), (j)–(l); **Count 14** in its entirety; and **Count 15** in its entirety.  [Adv. Doc. No. 272].

Injunction Order.  [Tape Recording, July 7, 2010 Hearing at 4:08:25–4:10:32 p.m.].  On

that issue, Rothberg introduced e-mails between Craig and Cole.  The Court admitted

these e-mails over the Schermerhorn Parties' objections.[48]  [*Id.* at 5:17:30–5:19:00 p.m.].

109.   At the close of the hearing, the Court found that sufficient evidence had been presented

on potential violations of the Preliminary Injunction Order by Craig to require an

additional hearing.  The Court also noted that it was concerned with Goldman's conduct,

and that he too should be required to attend a future hearing on these allegations. The

Court continued the hearing until August 5, 2011.  [*Id.* at 7:32:09–7:53:40 p.m.].

110.  On July 8, 2011, Craig e-mailed Goldman.  The subject of the e-mail was "Cole Craig

Note Forgive Aug 2012," and attached to this e-mail were several documents.  The first

document was a promissory note executed on August 6, 2011 between Craig and Cole.

According to the terms of the promissory note, Craig agreed to loan Cole $10,000.00 in

exchange for repayment beginning on August 6, 2011 at an annual interest rate of 4%.

The second document was an addendum to the promissory note executed on August 5,

2012.  According to the terms of the addendum, Craig "hereby forgives Promissory Note

Dated on 6 August 2010 . . . ." [Privilege Log of Sam Goldman at p. INT0006365–

INT00063667].

111.  Also on July 8, 2011, Craig sent a second e-mail to Goldman.  The subject of this e-mail,

time stamped 8:27 p.m., was "So I called the judge a 'maniac' and he made a mistake in

his judgement [sic]…is that a capital offense???looks like the truth to me….this mail

isnot [sic] very good for Dawn nor RK ….FCC" [Privilege Log of Sam Goldman at p.

---

[48] In particular, the Court found that the e-mails were relevant, and were non-hearsay admissions of an agent (i.e., Craig) of a party-opponent (i.e., the Schermerhorn Parties) under Federal Rule of Evidence 801(d)(2)(D).  *See United States v. Pena*, 527 F.2d 1356, 1360 (5th Cir. 1976) (quoting Fed. R. Evid. 801(d)(2) for the proposition that a statement by an agent concerning a matter within the scope of his agency or employment, made during the existence of the relationship," is not hearsay).

INT0006384].  Finally, Craig sent a third e-mail to Goldman.  The subject of this e-mail, sent at 8:38 p.m., was "Sam, I don't get it…this is all very negative for RK….OK Dawn was an employee but we are talkking [sic] about FRAUD here !!!!!"  [Privilege Log of Sam Goldman at p. INT0006392].

112. On July 9, 2011, in response to an e-mail from Craig asking Goldman, "Did you call" Goldman wrote:

> No, I didn't..  . . . Looking at the emails, it is clear that [Cole] discovered Kubbernus' fraud and tried to help those like that were defrauded.  . . . I understand that Dawn contacted you, but I think that until the Judge clarifies his order you should not talk to her.  I certainly do not want to hear anything she has said or have anything I've said related to her. Thanks, Sam.

[Privilege Log of Sam Goldman at p. INT0006398].

113. On July 10, 2011, Craig replied to Goldman with the subject line, "Are they going to say that we were planning to kill RK now???  Sorry we like ti [sic] joke around…Franklin." [Privilege Log of Sam Goldman at p. INT0006399].

114. On July 13, 2011, the SkyPort Parties filed a motion requesting that the Schermerhorn Parties, as well as Goldman and Craig specifically, be required to appear and show cause why they should not be sanctioned for violations of the Preliminary Injunction Order (the Second Motion for Sanctions).  [Adv. Doc. No. 359].  The Second Motion for Sanctions alleged numerous separate violations of the Preliminary Injunction Order including:

> (a) Forty-six e-mails between Cole and Craig, "an agent and/or party acting in concert with [the Schermerhorn Parties] and Goldman";
>
> (b) Multiple instances of telephone contact between Cole and Craig, who was "acting on behalf of the [Schermerhorn Parties] and Goldman";
>
> (c) Wiring of a $10,000.00 check to Cole;

(d) Execution of a loan agreement with Cole;

(e) Transmission of a loan forgiveness note addendum; and

(f) Location of, and arrangement for, Charles Fridge (Fridge) to represent Cole.

[*Id.* at p. 4]. The SkyPort Parties also requested that the Schermerhorn Parties, Goldman and Craig produce all documents, including phone records and e-mails, reflecting direct or indirect communication with any current or former vendor, customer or employee of SkyPort, including Cole. [*Id.* at p. 8].

115. On July 13, 2011, the SkyPort Parties also filed a motion for ex parte relief, in which they requested that Goldman and Craig appear and show cause why they should not be held in contempt of the Preliminary Injunction Order (the Motion for Contempt). [Adv. Doc. No. 360].

116. Between July 17, 2011 and September 20, 2011, Craig called Goldman, at either his office or cell number, a total of thirteen times. [SkyPort Parties/SkyPort's Ex. Nos. 225, 224, 222, 223]. Eleven of these calls were made using Skype. The final two, on August 30, 2011 and September 20, 2011, were by conventional telephone. [SkyPort Parties/SkyPort's Ex. No. 222].

117. On August 3, 2011, at the request of the parties, the Court granted an order abating and staying all proceedings pending mediation, including any hearings on the Second Motion for Sanctions and the Motion for Contempt. The Court also set a status conference on the settlement negotiations for September 15, 2011. [Adv. Doc. No. 391].

118. On September 15, 2011, the Court held a status conference, and concluded that no settlement between the parties would occur. Accordingly, on the same day, the Court terminated the abatement order of August 3, 2011 [Adv. Doc. No. 403], and ordered that

the Schermerhorn Parties, Goldman and Craig produce all requested documents and responses in accordance with the Second Motion for Sanctions and the Motion for Contempt by September 26, 2011.  [Adv. Doc. No. 405].

119. On September 26, 2011, Craig filed a response to the Second Motion for Sanctions, arguing that he was not an agent of the Schermerhorn Parties or Goldman, and that as a "layman," he did not know that the Preliminary Injunction Order applied to him.  [Adv. Doc. No. 410].   While Craig admitted that he transferred $10,000.00 to Cole, he maintained that this transaction related to Victoria Grey and his "desire to help a personal friend . . . in dire financial straits, and was completely unrelated" to the SkyPort Litigation.  [*Id.* at pp. 11–37].   Craig also attached several exhibits to his response, including the e-mails exchanged among Goldman, Cole and himself between June 19, 2011 and June 21, 2011.  *See* [Finding of Fact Nos. 45–48].

120. On September 26, 2011, the Schermerhorn Parties filed an objection, arguing that the Second Motion for Sanctions is based on a misstatement of the terms of the Preliminary Injunction Order.  [Adv. Doc. No. 411].  The Schermerhorn Parties also attached several exhibits to the objection relating to the drafting of the Preliminary Injunction Order.

121. On September 30, 2011, Craig filed an objection to the Motion for Contempt, in which he "apologized to the parties, their attorneys and the Court if his actions violated the Preliminary Injunction" and agreed to submit himself to the Preliminary Injunction Order going forward.  [Adv. Doc. No. 415 at p. 4].

122. On October 6, 2011, SkyPort filed an Amended Motion for Sanctions (the Amended Second Motion for Sanctions).  [Adv. Doc. No. 419].  In the Amended Second Motion for Sanctions, SkyPort requests that this Court sanction Goldman for his October 14,

2010 testimony[49] and that he pay SkyPort's attorney fees and costs, as well as punitive damages.  [*Id.* at pp. 10–11].

123. On October 6, 2011, the Court held a hearing on the Amended Second Motion for Sanctions and the Motion for Contempt.  At the October 6, 2011 hearing, counsel for Craig argued that:  (a) there was no clear and convincing evidence that Craig intentionally violated the Preliminary Injunction Order; and (b) the Preliminary Injunction does not satisfy Rule 65 of the Federal Rules of Civil Procedure and is unconstitutionally vague.  [Tape Recording, Oct. 6, 2011 Hearing at 3:52:51–4:01:48 p.m.].  On October 10, 2011, Craig filed a Supplemental Response to the Amended Second Motion for Sanctions and the Motion for Contempt articulating these same arguments.  [Adv. Doc. No. 427].  On October 12, 2011, the Schermerhorn Parties, including Goldman, filed a Supplemental Brief, adopting Craig's arguments in his October 10, 2011 Supplemental Response.  [Adv. Doc. No. 428 at p. 2].

124. On October 20, 2011, Goldman submitted a privilege log to the SkyPort Parties.  *See* [Adv. Doc. No. 483 at p. 6, ¶ 7].

125. On October 26, 2011, the SkyPort Parties filed a reply to Craig's September 26, 2011 response to the Second Motion for Sanctions and the Motion for Contempt.  In their response, they refuted Craig's claim that he was not an agent of the Schermerhorn Parties or acting in concert with them to communicate with Cole.  As the SkyPort Parties asked: **"If [Craig] is not a party acting in concert with the [Schermerhorn Parties], how is it that he is included on client communications in a manner that would not waive privilege?"**  [Adv. Doc. No. 443 at p. 3].  The SkyPort Parties requested that this Court require Craig to appear.  [*Id.*].

---

[49] *See* Finding of Fact No. 94.

126. On October 31, 2011, the Court issued an Order regarding the Motion to Dissolve the Preliminary Injunction Order [Adv. Doc. No. 317], denying the Motion to Dissolve "until further Order of this Court," and setting a hearing for March 8, 2012 in order to address the e-mail communications introduced into evidence at the July 7, 2011 hearing among Goldman, Craig and Cole.  [Adv. Doc. No. 444 at p. 2].

127. On December 22, 2011, the Schermerhorn Parties filed two motions to confirm "out of an excess of caution and concern that they not inadvertently violate the [Preliminary Injunction Order]."  The first motion requests this Court's assurance that contacting certain individuals will not violate the Preliminary Injunction Order [Adv. Doc. No. 460]; the second motion requests this Court's permission to contact certain enjoined individuals [Adv. Doc. No. 461].  Cole was not among the enjoined individuals specified in the second order.   The SkyPort Parties filed a response opposing both motions on the same day.  [Adv. Doc. No. 464].

128. On January 12, 2012, the SkyPort Parties filed a motion to disallow Goldman from withholding the 141 documents which he asserted were privileged, and to compel their production (the Motion to Compel).  [Adv. Doc. No. 483].  As the SkyPort Parties argued, Goldman's claims of privilege as related to Craig relied on a misplaced assertion of the "common interest" privilege.  **If Craig was working in concert with the Schermerhorn Parties (and Goldman, in particular), towards a "common interest," then Craig was *also* a party acting in concert with the Schermerhorn Parties when he contacted Cole—thereby violating the Preliminary Injunction Order.  If Craig was *not* a party acting in concert with the Schermerhorn Parties (and Goldman) when he contacted Cole, then the Schermerhorn Parties and Goldman should not be**

**permitted to assert the "common interest" privilege as related to these documents. In short, the SkyPort Parties argued the Schermerhorn Parties and Goldman should be "estopped from such intentional self-contradiction."** [*Id.*] (emphasis added).

129. The Court held a hearing on the Motion to Compel on February 29, 2012 and March 1, 2012. The Court granted the Motion to Compel, finding that Goldman and the Schermerhorn Parties failed to establish that these documents were privileged. *See* [Adv. Doc. No. 567 at p. 1]. Accordingly, the Court required that Goldman deliver to counsel for SkyPort all of the documents reflected in his privilege log, including the communications between Craig and Goldman. [*Id.* at p. 2].

130. On March 9, 2012, April 18, 2012, April 20, 2012, May 1, 2012, May 2, 2012, June 5, 2012, June 6, 2012, August 23, 2012, August 28, 2012, August 29, 2012, August 30, 2012, November 27, 2012, November 28, 2012, November 29, 2012, November 30, 2012, January 25, 2013, and February 7, 2013, the Court held extensive and lengthy hearings on the Amended Second Motion for Sanctions and the Motion for Contempt, as well as other pending motions (the Hearings).[50] Craig and Goldman testified at the Hearings, arguments were heard, and evidence was presented.

131. Prior to closing arguments, the SkyPort Parties filed Proposed Findings of Fact and Conclusions of Law on January 24, 2013 and February 6, 2013. [Adv. Doc. Nos. 660 & 669]. On March 11, 2013, the Schermerhorn Parties, including Goldman, also filed Proposed Findings of Fact and Conclusions of Law. [Adv. Doc. No. 681]

---

[50] The number of hearings, as well as the extended hiatus between many of them, is due to (1) a serious illness experienced by one of the party's counsel; (2) scheduling conflicts created by Craig's residency in France; (3) death of the immediate family member of one of the party's counsel; and (4) abatement of these proceedings while the parties unsuccessfully mediated this dispute.

132. At the conclusion of closing arguments at the February 7, 2013 hearing, the Court took the following motions under advisement:  (a) the Motion to Dissolve the Preliminary Injunction Order [Adv. Doc. No. 317]; (b) the December 22, 2011 motions to contact certain individuals [Adv. Doc. Nos. 460, 461]; (c) the Second Motion for Sanctions and the Amended Second Motion for Sanctions [Adv. Doc. Nos. 359, 419]; and (d) the Motion for Contempt [Adv. Doc. No. 360].  The Court now issues rulings on these pending motions.

### III. CREDIBILITY OF WITNESSES

Over the course of the seventeen days of hearings, the Court heard testimony from four witnesses:  (1) Craig; (2) Goldman; (3) Kubbernus; and (4) Samantha Ray.[51]  After listening to the testimony, the Court makes the following observations and findings regarding the credibility of these witnesses.

### A.      Franklin Craig

Craig testified over the course of several days.  Craig admitted that he passed information to and from Goldman and Cole, but continued to insist that he had not violated the Preliminary Injunction Order.  Below are four general observations about his testimony.

1.  Often Craig's answers were equivocal and evasive.  Rather than responding directly, Craig often couched his answers in qualifying language, refusing to define the meaning of his own words.  The following testimony is illustrative.

| Catmull (counsel for the SkyPort Parties):[52] | Turn to Trial Exhibit 167, please. And the last line of it reads, "I have every reason to believe that I would be stuck as treated as a hostile witness." [ . . . ] All right. The email next up just above it, that's Franklin Craig to Dawn |
|---|---|

---

[51] Neither party called Dawn Cole as a witness, nor did they ever take her deposition.

[52] Catmull conducted the majority of the cross-examination for the SkyPort Parties.

|  | Cole, right? |
|---|---|
| Craig: | Yes. |
| Catmull: | You emailed this back to her in response to the email we just looked at, right? |
| Craig: | Yes. |
| Catmull: | Read the first line, please. |
| Craig: | "I don't believe Sam will" -- |
| Catmull: | And sorry -- sorry. There Sam will treat her as a hostile witness, right? |
| Craig: | Yes. |
| Catmull: | In the Schermerhorn litigation, right? |
| Craig: | **Well, in any litigation, I think. I'm not quite sure -- yeah.** |
| Catmull: | Well, including the Schermerhorn litigation, right? |
| Craig: | **I assume.** |
| Catmull: | Well, read the rest of the sentence. |
| Craig: | I don't know what she meant by that is what I'm trying to say. "I don't believe Sam will. If you join the right side, there will be benefits for you. You did nothing wrong. So what can Sam complain about?" |
| Catmull: | All right. I need to back up for a second. This is an email that you wrote to Dawn Cole, right? |
| Craig: | Yes. |
| Catmull: | So you know what you meant when you wrote it, right? |
| Craig: | Yes. |

[Tr. Mar. 9, 2012 48:14–49:25] (emphasis added).

| Catmull: | And where you write, "And pay for it," you mean the Schermerhorn parties will pay for it, right? |
|---|---|
| Craig: | **Presumably.** |
| Catmull: | Well, what I wanted your testimony about, what you understood when you wrote this email. |
| Craig: | Yes, I think that -- yes, that's correct. I think that's fair. |

[Tr. Apr. 18, 2012 90:18–24] (emphasis added).

| Catmull: | Okay. Now, where you wrote, "I discussed your last email with Sam." |
|---|---|
| Craig: | Yes. |
| Catmull: | That -- so you discussed [ . . . ] a Dawn Cole |

| | email with Sam Goldman, right? |
|---|---|
| Craig: | **Yes, presumably so, yes.** |
| Catmull: | Well, I don't want a presumption, I want to know what your testimony is. Did you – |
| Craig: | [I] don't remember discussing that email with Sam, but since I wrote it, I suppose it's true, yes. |
| Catmull: | Do you think maybe you were lying to Dawn Cole when you wrote this email? |
| Craig: | No, I just don't remember reading -- you know, reading the emails, discussing with them. |

[Tr. Apr. 18, 2012 40:21–41:10] (emphasis added).

Finally, on July 2, 2010, Craig e-mailed Cole telling her to "hang in there."

| Catmull: | And in the last sentence where you write, "Hang in there. We will get" -- presumably you mean "this bastard" – |
|---|---|
| Craig: | Yes. |
| Catmull: | You -- by "we" you mean the Schermerhorn parties and Dawn Cole, right? |
| Craig: | **Uh, I -- you know, presumably, yes.** |
| Catmull: | Well, actually, I need a "yes" or a "no." This is important testimony. When you write "we" – "We will get this bastard." -- that includes -- that includes the Schermerhorn parties, right? |
| Craig: | Well, it could just be myself and Dawn, but, you know, it's open to interpretation, I'd say. I mean -- |
| Catmull: | Well, you're the one who wrote it, so -- |
| Craig: | Yes. |
| Catmull: | -- what did you mean? |
| Craig: | Well, let me -- okay. Well, I'll tell you. The way I read it, it would be, "Dawn and I will get" – we'll get vengeance. |
| Catmull: | With Sam Goldman's help, right? |
| Craig: | Yes. |

[Tr. Mar. 9, 2012 112:25–114:4] (emphasis added).

2.   Some of Craig's explanations for his behavior were unbelievable.  For example, one

Craig e-mail to Goldman stated:  "Who should pay? Dawn directly or me? May be better if I

make a 'loan' to Dawn. Can we use our expense account for this? Defending Dawn and getting

her on our side is ESSENTIAL to our case.  Is it collusive if you paid her out of -- if you pay out of the kitty?"  [Finding of Fact No. 69].

When asked why he used the word, "collusive," which means "secret agreement or cooperation especially for an illegal or deceitful purpose," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 226 (10th ed. 1999), Craig provided an utterly erroneous definition.

| Catmull: | And collusive, by "collusive," you mean, like a secret agreement for bad reasons, right? |
|---|---|
| Craig: | No. It's basically, I was asking whether we're allowed to pay out of -- pay Dawn's defense out of the kitty, because we were both being attacked by -- she was being attacked. |
| Catmull: | But you chose to use the word, "collusive," right? |
| Craig: | Yeah. |
| Catmull: | English is your first language, right? |
| Craig: | Correct. |
| Catmull: | "Collusive" implies secret, right? |
| Craig: | No. Collusive is binding. |
| Catmull: | I'm sorry. What was that last word? |
| Craig: | Binding. It's collusive is working in concert. |
| Catmull: | I see. |
| Craig: | It's not secretive necessarily. |
| Catmull: | I see, so it's your testimony to this Court, it's your sworn testimony that when you use the word, "collusive," you don't mean to imply anything secret, right? That's your testimony? |
| Craig: | Yeah, yes. That's correct. Collusive means binding. |

[Tr. Apr. 18, 2012 109:17–110:12]; [Finding of Fact No. 69, n.42].

3.    At some points, Craig was unnecessarily flippant, as the following examples demonstrate.  First, on July 4, 2010, Craig forwarded an e-mail from Cole to Goldman saying: "Sam, [Cole made a] good point. What should she do?"  [Finding of Fact No. 58].  At the Hearings, Catmull questioned Craig about this e-mail:

| Catmull: | Right. Now by "good point" you mean Dawn Cole has made a good point that it would clearly indicate that they had contact with |
|---|---|

|  | Dawn Cole in violation of the injunction right? |
|---|---|
| Craig: | At the time I'm not sure what I thought. But today it looks -- yes. Today it looks clear. But at the time I don't know. I don't know what I thought. |
| Catmull: | Mr. Craig this e-mail that says "Sam good point." You didn't write that because you thought something else right? |
| Craig: | Well you know there are a lot of good points that are often wrong, okay?  But, okay, fine. |

[Tr. Mar. 9, 2012 134:19–135:3].

Second, in an effort to determine Craig's background, Mr. Ray, co-counsel for CenturyTel, asked Craig a simple set of questions, to which Craig responded with less-than-veiled sarcasm:

| Mr. Ray: | Where did you go to college? |
|---|---|
| Craig: | The American University of Paris. |
| Mr. Ray: | Okay.  And what other degrees do you hold? |
| Craig: | [ . . . ]  The degree of life. |

[Tr. Apr. 20, 2012 69:13–18].  Craig could have—and should have—just said:  "None."

4.  In an effort to discredit Cole, as well as any evidence in her e-mails that Craig had behaved improperly, Craig characterized Cole as deluded or, at a minimum, woefully misinformed.  In an e-mail sent on September 6, 2010, Cole wrote:  "I will, of course, pay [the $10,000.00 loan] back if I get a financial settlement, but I hope that you have already received that sum from Sam. Is he not cooperating with you?"  [SkyPort Parties/SkyPort's Ex. No. 137]. Catmull, co-counsel for the Schermerhorn Parties, asked Craig about this e-mail at the April 18, 2012 hearing.

| Catmull: | And, "cooperating," you understood to mean that [the Schermerhorn Parties] were going to reimburse you for the [$10,000] expense, right? |
|---|---|
| Craig: | That was Dawn's supposition. I don't know |

| | where she -- this came out of the blue. |
|---|---|
| Catmull: | Okay. So it's your testimony that you don't have any idea why -- how she got in her head that there was some arrangement with Sam, right? That's your testimony? |
| Craig: | That's my testimony. That's the truth. This came out of the blue. This was Dawn Cole. |

[Tr. Apr. 18, 2012 199:20–200:4]. Cole's supposition did not, in fact, come out of the blue. Craig had been in contact with Goldman for weeks prior to the September 6, 2010 e-mail requesting that Goldman provide Craig with assurance *in writing* that "the $10K loan will come off the top of ANY [SkyPort] settlement . . . . " [Finding of Fact No. 69]. Therefore, Craig's testimony to the contrary was, at best, disingenuous, and at worst, a bald-faced lie.

In another example, Cole cautioned Craig that they had violated the Preliminary Injunction Order; accordingly, she warned Craig not show their e-mails to this Court. Under oath, Craig characterized this warning as unnecessarily vigilant, and indeed, almost as ridiculous.

| Catmull: | Do you know why it would not be a good thing to show the email to the Judge? |
|---|---|
| Craig: | No, not really. Dawn says a lot of things. |
| Catmull: | Okay. |
| Craig: | I didn't take her as the gospel. |
| Catmull: | Okay. But to the -- were you concerned that Dawn might be correct and their emails could be used? |
| Craig: | No. |
| Catmull: | You weren't concerned? Did you ask anyone any questions about what should you do? |
| Craig: | No. |
| Catmull: | Didn't you send this very same email to Sam at the same time or -- |
| Craig: | Shortly after. |
| Catmull: | -- 15 minutes later and say, "Sam, what should we do? What should I tell Dawn?" |
| Craig: | It's written there. Yeah. |
| Catmull: | So you, in fact, were going directly to Sam because you didn't know and you were going to report Sam's answer to Dawn, right? |
| Craig: | If there was an answer maybe I would have. I'm |

|  | not sure. |
| Catmull: | Okay. |
| Craig: | Sure. |

[Tr. Apr. 20, 2012 111:13–112:25].

According to Craig's initial testimony, he did not take Cole's words seriously. However, his own e-mail to Goldman fifteen minutes later discredits his testimony. Once again, Craig's testimony was dissembling if not downright misleading.

5. Craig often indicated that he could not remember various facts. Some amount of memory loss is understandable; after all, two years had passed between most of these communications and Craig's testimony before this Court. On the other hand, many of these events and details were of vital significance. As a result, the Court simply does not believe all of Craig's memory lapses.[53] The following exchange demonstrates the sort of crucial detail that Craig claimed to "forget."

| Catmull: | So three days after you came to the [August 3, 2010] hearing here [in this Court] you wired Dawn Cole $10,000, right? |
| Craig: | Yes. |
| Catmull: | And you were here for the whole [August 3, 2010] hearing, right? |
| Craig: | Yes. |
|  | [ . . . ] |

[53] Indeed, Craig was able to remember specific details of events which happened three years before his testimony, as the following exchange with Ruzinsky, counsel for Goldman, demonstrates:

| Ruzinsky: | When did you next have any involvement or encounter with Dawn Cole? |
| Craig: | February, 2009. |
| Ruzinsky: | And what were the circumstance surrounding that? |
| Craig: | Mr. Kubbernus sent her up to Detroit to meet with, to do a due diligence trip, because we were going to buy Mr. Kubbernus out of Victoria Gray. |
| Ruzinsky: | And did you meet with her? |
| Craig: | And so I spent two, two and half days touring around Detroit, looking at all the homes and spent a lot of time talking to Dawn. |

[Tr. Apr. 20, 2012 142:21–143:6].

| | |
|---|---|
| Catmull: | And Mr. Hugh Ray, sitting to my left, he was at that hearing, right? |
| Craig: | I don't recall. |
| Catmull: | Okay. Sir, it's your testimony that you don't recall Hugh Ray saying, and I quote, "And when Mr. Craig testifies he'll probably tell us how whether he contacted Dawn Cole and whether he violated the injunctions." You're telling this Court you don't remember that? |
| Craig: | There were about 12 lawyers in the room. So I forget who is who to tell you the truth. |
| Catmull: | Right, but you remember somebody talking about you violating the injunction while you were at this hearing, right? |
| Craig: | Vaguely. |
| Catmull: | Vaguely, okay. So you do have recollection of you being accused of violating the injunction on August 3rd, 2010? |
| Craig: | I -- to tell you the truth, I really don't remember. |
| Catmull: | It seems like the kind of thing someone would remember but you're telling this Court now, you don't remember? |
| Craig: | Well, to tell you the truth, I was on my BlackBerry a lot because there were 12 lawyers haggling over their fees for 8 hours in a row. So I didn't listen to every word, I can assure you. |
| Catmull: | Okay. So it's your testimony that you don't have any recollection of being accused of violating the injunction at a hearing that you attended? |
| Craig: | No, no recollection. |
| Catmull: | No recollection? |
| Craig: | No recollection. |
| Catmull: | Okay. All right, but in any event three days later you wired $10,000 to Dawn Cole, right? |
| Craig: | Yes. |

[Tr. Apr. 20, 2012 13:7–14:24].

All in all, the Court finds that Craig was only a somewhat credible witness. While he candidly acknowledged that he passed information between Cole and Goldman, he was not fully forthright or believable. The Court therefore gives only some weight to his testimony.

**B.       Samuel Goldman**

Goldman testified over the course of eight days of trial, beginning in May of 2012 and concluding in November of 2012.  During his testimony, he was asked about the numerous e-mails transcribed above.  Goldman also gave testimony regarding his relationship with Craig, as well as with Cole.  The Court has chosen several examples which encapsulate Goldman's testimony, but in short, the Court concludes that during his more than thirty-five hours of testimony, Goldman drifted from occasional forthright responses to non-responsive, rambling, and, at times, argumentative responses.  Additionally, Goldman continually gave longwinded answers to simple questions posed to him.  At other points, his answers became short and harried, responding with a curt "yes" almost before the question was fully asked.   Finally, Goldman gave some testimony that was simply contradictory.  Several examples are detailed below.

1. Goldman gave long-winded and evasive answers to exceedingly simple questions.  For example, when asked whether he had contingent agreements in writing from various clients, Goldman gave a lengthy explanation.  This answer caused the Court to admonish Goldman that he should be not only able to understand English, but as a lawyer, the rules of evidence.  [Tape Recording, May 1, 2012 Hearing at 10:58:17–11:01:44 a.m.].  The Court admonished him to answer the question posed to him.

In another instance, Goldman interrupted the SkyPort Parties' counsel to preemptively answer a potentially damaging line of questioning.

| Catmull: | This July 5th, 2010, [e]mail at 2:15 from Sam Goldman to Franklin Craig, when you wrote, "If she thinks she has strong evidence of witness tampering, she should consider going to the U.S. Attorney," that was your way of telling Franklin Craig to tell Dawn Cole to go to the U.S. |
|---|---|

| | Attorney's Office, right? |
|---|---|
| Goldman: | That was my comment to Franklin Craig. |
| Catmull: | And the point of making that comment to Franklin Craig was to get Franklin Craig to tell Dawn Cole to go to the U.S. Attorney's Office, right? |
| Goldman: | I didn't tell him to do that. |
| Catmull: | That's not my -- |
| Goldman: | My comment in the course of a barrage of Emails where I'm looking at different things and that was a comment that I made to him. |

[Tr. May 1, 2012 65:7–21].  When Catmull asked her question again, Goldman's response was long and rambling.  As Goldman refused to answer the question directly, Catmull was forced to ask the same question—i.e., did Goldman expect Craig to pass this information to Cole?—at least seven times before Goldman finally responded:  "yes."

| Catmull: | And when you wrote this email, Mr. Goldman, you fully expected Franklin Craig to tell Dawn Cole to go to the U.S. Attorney, right? |
|---|---|
| Goldman: | I believe there was a prior email where she said she was going to go to the U.S. Attorney's Office and I was basically saying that seems like the right thing to do. And if you look at the next page, you'll see Franklin's response to me where he says, "That's what she suggested doing." So, you know, if you put it in context, it becomes clear what was going on. |
| Catmull: | My question to you, Mr. Goldman, is: you fully expected Franklin Craig to tell Dawn Cole that you Sam Goldman thinks [sic] Dawn Cole should go to the U.S. Attorney's Office when you wrote this, right? |
| Goldman: | I wrote it as a comment to Franklin; not with the motive -- and as you see the way he responded, he took it as a comment. |
| Catmull: | Well you didn't write anything in here about 'make sure not to tell Dawn Cole this', did you? |
| Goldman: | I did not do that. |
| Catmull: | So it's your testimony today, it's your testimony, your sworn testimony as you sit here today, that you did not mean for Franklin Craig to pass on to |

|  | Dawn Cole your view that she should go to the U.S. Attorney, right? |
| --- | --- |
| Goldman: | I did not tell him to do that. |
| Catmull: | My question, Mr. Goldman, is:  is it your sworn testimony today that when you wrote this email July 5th, 2010, at 2:15 p.m., is it your sworn testimony that you did not mean for Mr. Craig to pass on your advice about the U.S. Attorney to Dawn Cole? |
| Goldman: | I didn't mean for him to pass it on. |
| Catmull: | Well you knew that -- |
| Goldman: | To the best of my recollection, you know, I'm trying to determine what my thinking was when I wrote this Email on July 5th.  It was an Email to Franklin. It was not an Email to him to pass on to Dawn Cole. That, I think, is responsive to your question. |
| Catmull: | Well you sure knew that he might pass it on to Dawn Cole when you wrote it, right? |
| Goldman: | I know that he did pass on some of the things I told him. I know that he didn't pass on other things. And I think he did that the other direction. So the answer is yes. |
| Catmull: | The answer is yes. You knew that she might pass this on to -- that he might – |
| Goldman: | -- that he might pass -- |
| Catmull: | -- that he might pass it on to Dawn Cole, right? |
| Goldman: | Yes. |

[*Id.* at 65:22–67:18].

2. Goldman made numerous sidebar comments to the undersigned judge while on the stand.  These comments, as well as Goldman's continuous non-responsive answers, sufficiently concerned this Court on May 1, 2012, that the Court briefly recessed the hearing to give Goldman's attorney a chance to impress upon him the nature and scope of permissive testimony. Again, as an attorney himself, Goldman should have been fully aware of these rules.  [Tr. May 1, 2012 26:15–18].

3. Similarly, Goldman made inappropriate comments to the undersigned judge, implying that he disagreed with this Court's rulings.

| | |
|---|---|
| Catmull: | Your Honor, so the record is clear, after he said "correct" I'll move to strike as non-responsive. |
| The Court: | Sustained. |
| Goldman: | Your Honor? |
| The Court: | Yes. |
| Goldman: | The answer is "correct," but it's subject to the clarification that I gave. So to just say the answer is "correct" I think is not an accurate statement of what my answer is. |
| The Court: | Mr. Goldman, right now you're a fact witness. You are represented very capably by Mr. Ruzinsky. To the extent that Mr. Ruzinsky wants to make argument, he can do so. But right now your job is solely to answer Ms. Catmull's questions. Any evidentiary rulings I make, Mr. Ruzinsky can make arguments. But I'm not going to allow you to. |
| Goldman: | I'm not making an argument. It was just a matter of inquiry for the Court. |

[Tr. May 1, 2012 10:18–19:10].

| | |
|---|---|
| Catmull: | Mr. Goldman, has Franklin Craig contributed finances to the [SkyPort] litigation fund? |
| Goldman: | No. |
| Catmull: | Sorry? |
| Goldman: | No. |
| Catmull: | No? Never? He's never contributed finances to the [SkyPort] litigation fund? |
| Goldman: | Correct. |
| Catmull: | And other than the $10,000 wire to Dawn Cole, has Franklin Craig contributed any money whatsoever, directly or indirectly, to the [SkyPort] litigation fund? |
| Goldman: | I can't answer the question in the way you phrase it because the $10,000, I believe, was for Franklin's own benefit, and not for the benefit of the Schermerhorn parties.[54] |

---

[54] Goldman later contradicted this testimony:

| | |
|---|---|
| Catmull: | You understand that Mr. Craig thinks he's entitled to reimbursement from the Skyport expense fund [for the $10,000 retainer], right? |
| Goldman: | I understand that Mr. Craig said that it would be submitted as an expense, not that he is entitled to reimbursement as an expense. But it would be submitted as an expense of the litigation, yes. |

| Catmull: | Objection, nonresponsive. |
|---|---|
| Goldman: | Your Honor, I can't answer these questions then. [ . . . ] Can I explain why I can't answer the question? |
| The Court: | No.  Mr. Goldman, if you can't answer the question because you don't understand it, then just say so. |
| Goldman: | Not because I don't understand it, but because the question is loaded -- |

[Tr. May 1, 2012 150:23–152:3].

Continuation of footnote 54:

| Catmull: | Well, is it your testimony to this Court today, Mr. Goldman, that you never agreed for it to be -- for the $10,000 wire to be considered an expense of the Skyport litigation? |
|---|---|
| Goldman: | I agreed later on I would submit it as an expense, that he could submit it as an expense of the Skyport litigation if she didn't pay him back. |
| Catmull: | And the reason you agreed to submit it as an expense is because you thought – [ . . . it was an] expense of the Skyport - - of the Schermerhorn Party litigation, right? |
| Goldman: | I argued with Franklin extensive [sic] about that, but in the end I agreed with him that, but for certain things that happened in this litigation she wouldn't have gotten sued, so the cost of defense was something that he could submit as an expense. |
| Catmull: | But that's not my question, Mr. Goldman. My question is you agreed -- and this is a yes or no question, okay? You agreed to Mr. Craig that he could -- that the $10,000 wire to Dawn Cole was a reimbursable expense from the Schermerhorn Party recovery, if any, right? |
| Goldman: | That it could be submitted as an expense, correct. |
| Catmull: | Well, do you ever agree to submit expenses to your clients that you believe are illegitimate? |
| Goldman: | I thought it was a legitimate -- he convinced me that it was a legitimate expense after I debated the issue with him. |
| Catmull: | All right, so as you sit here today your testimony is that the $10,000 wire from Craig to Cole is a legitimate Skyport -- sorry -- Schermerhorn Party litigation expense, right? |
| Goldman: | My testimony is I said he could submit it as a legitimate expense. That's what I told him. |
| Catmull: | **Because you agreed it is a legitimate expense, right?** |
| Goldman: | **I agreed it could be submitted as a legitimate expense. [ . . . ] Yes, [ . . . ] by September 5th I agreed that it was a legitimate expense.** |

[Tr. May 1, 2012 119:9–121:8].

4. Goldman's testimony was, at times, self-serving and inconsistent. When asked about the provision in the Preliminary Injunction Order prohibiting the pursuit of direct and derivative claims, Goldman testified as follows:

| | |
|---|---|
| Catmull: | [A]s of June 10th, 2010, you understood "Plaintiffs" to mean the Schermerhorn parties, right? |
| Goldman: | Yes. |
| Catmull: | And "pursuing any and all claims or causes of action," you understood that to mean pursuing the Schermerhorn party litigation, right? |
| Goldman: | Yes, I did. |
| Catmull: | And the next clause, "derivative or direct," you understood that meant all the litigation, not just some of the litigation, right? |
| Goldman: | Absolutely, yes. |
| Catmull: | And "against all of the Defendants," you understood the word "Defendants" to include [SkyPort], right? |
| Goldman: | No. But we weren't going to pursue claims against [SkyPort] because we had no claims against [SkyPort]. |

[Tr. May 2, 2012 125:17–126:7]. Goldman's response and definition for "all of the Defendants" are nonsensical and egocentric—he does not have the authority to decide which entities are, and are not, covered by the Preliminary Injunction Order. SkyPort was clearly a named defendant in this dispute, and indeed, the Court issued the Preliminary Injunction Order to protect SkyPort. [Finding of Fact No. 31].

Additionally, at first, Goldman agreed that he authorized his co-counsel, Steve Smith, to sign his name to the Preliminary Injunction Order, and that Goldman would never have done so if he did not understand the order. [Tr. May 2, 2012 130:24–131:1]. Yet, later, Goldman testified as follows:

| | |
|---|---|
| Catmull: | In any event, the preliminary injunction entered by this Court on June 10th, 2010 you've always understood what it meant, |

| | right? |
|---|---|
| Goldman: | I believe it is fraught with a number of ambiguities and as -- and a number of issues. So I can't say I always understood exactly what it meant. |

[Tr. May 2, 2012 133:11–16].   When asked to identify which provisions were ambiguous, Goldman replied that "Former and current vendors, employees and customers of the Debtor" as well as the word "contact" is ambiguous.   According to Goldman, the Preliminary Injunction Order ". . . doesn't say who we're not allowed to talk to; who we have to ask permission to talk to.   They are not identified specifically, so I'd say the whole thing is ambiguous."   This prompted the Court to interrupt Catmull's questioning.

| The Court: | Hold on a minute. Hold on a minute. Mr. Goldman, I think I just heard you testify that the whole document is ambiguous, am I right? |
|---|---|
| Goldman: | This paragraph. |
| The Court: | I want to make sure we get this. Is the entire Order ambiguous to you, or is it just certain language? |
| Goldman: | Just certain language, Judge. |
| | [ . . . ] |
| Catmull: | Is there any other language that you think is ambiguous, and if yes, which? |
| Goldman: | The -- there's a lot of language that is missing from the Order that would be needed to make it unambiguous so I can't read it, but it's missing. [ . . . ] In this particular Order there are a number of items that are missing that would leave one in my position without sufficient knowledge to know exactly what to do in certain circumstances, yes. |

[*Id.* at 136:24–138:7].   Accordingly, Catmull then walked Goldman through each term and phrase within the Preliminary Injunction Order.

| Catmull: | [You] understand that the word "former" means not in the present, but in the past, right? |
|---|---|
| Goldman: | Correct. |
| Catmull: | You understand the word "current" means in |

| | |
|---|---|
| | the present, not in the past, not in the future, right? |
| Goldman: | "Current" means in the present, yes. |
| Catmull: | And you understand the word "employees" means a human who is employed by someone, right? |
| Goldman: | Yes. |
| Catmull: | And the word "Debtor" there, when you saw this – the first time you saw this injunction, you read the word "Debtor" to be reference to [SkyPort], right? |
| Goldman: | That is correct. |
| Catmull: | And I think you've already testified that "if and only if", to you, that means on condition then, right? |
| Goldman: | Yes. |
| Catmull: | All right. And a "written request", now "written", to you, that means either typed or handwritten on a piece of paper or in an Email, right? |
| Goldman: | There may be other ways to do it, but it means in writing. |
| Catmull: | Yeah, in other words, not an oral request? |
| Goldman: | I know what -- yes, "written" is not oral, yes. |
| Catmull: | So and a "request", that's another word for asking for something, right? |
| Goldman: | Yes. |
| | [ . . . ] |
| Catmull: | And the word "and", that's just a word that functions to connect two clauses, right? |
| Goldman: | That is correct. |
| Catmull: | In other words, it means "in addition to" what? The words that preceded the word "and", right? |
| Goldman: | Correct. |

[*Id.* at 139:4–140:23]. This continued for several minutes until Goldman—backing down from his previous statement that "the whole thing is ambiguous"—responded that he understood *every* phrase of the Preliminary Injunction Order, except for a single word: contact. [*Id.* at 139:4–150:7].

| | |
|---|---|
| Catmull: | And then "contact," that means -- that includes a communication by [the Schermerhorn Parties] or their counsel to someone who is a -- including |

| | someone who is a former employee of SkyPort, right? |
|---|---|
| Craig: | I disagree with that. |

[*Id.* at 141:20–24].

In summary, during his testimony, Goldman waffled between three positions:  (1) that he fully understood the Preliminary Injunction Order when it was signed; (2) that the entire Preliminary Injunction Order is ambiguous; and finally (3) that the Preliminary Injunction Order only contains a single confusing word:  contact.  These inconsistencies are wholly irreconcilable, and lead this Court to find that Goldman's testimony is not credible—at least on these important issues.

5.  In some instances, on key points, Goldman's testimony was blatantly false.   On October 7, 2010, Goldman provided an affidavit to this Court, in which he swore that he had never contacted Cole, and that his only communications with her had occurred on June 10, 2010 and was at her behest.  [Finding of Fact Nos. 90–91].  Yet, on July 23 and 24, 2010, Goldman sent an e-mail to both Cole and Craig; Cole then replied. [Finding of Fact Nos. 70–72].

Moreover, at the October 14, 2010 hearing in this Court, Goldman again failed to mention the July 24, 2010 e-mails with Cole.  At this hearing, counsel for the SkyPort Parties asked Goldman "Did you have *any* contact after [June 10, 2010] with Ms. Cole?"  Under oath, Goldman testified "Absolutely not."  [Finding of Fact No. 94].  Both statements—in Goldman's affidavit and under oath in this Court—are absolutely false.  Goldman had, in fact, had contact with Cole after June 10, 2010.  [Finding of Fact No. 91].

6.   In addition to acting as co-counsel for the Schermerhorn Parties, Goldman has a personal financial interest in one of the Schermerhorn Parties.  Goldman is a managing member

of Gloster Holdings, LLC, and holds a 20% ownership interest.  Various members of Goldman's family also hold ownership interests in Gloster Holdings, LLC.  [Finding of Fact No. 3, n.3].

The Court finds that, in and of itself, Goldman's financial interest in one of the Schermerhorn Parties calls his credibility into question, as it creates the unquestioned potential for a conflict of interest.  Whether in settlement discussions or otherwise, Goldman's interests— as well as that of his family—could have easily differed from any of the numerous other Schermerhorn party entities, tainting Goldman's legal advice and professional judgment. Goldman's financial interest also clarifies why he may have so vigorously sought to obtain Cole's aid in the SkyPort Litigation.  As managing member of one of the Schermerhorn Parties, he personally had something to gain—or lose—by her support.

All in all, based on the above-referenced observations and findings, the Court gives little weight to Goldman's testimony on the substantive issues about which he was examined.

**C.    Robert Kubbernus**

Kubbernus is the current Chairman of the Board of Directors of SkyPort and formerly served as the company's president and CEO.  He testified on four consecutive days, from November 27, 2012 to November 30, 2012.  His testimony was occasionally spotty, as the following examples illustrate.

1.  Ruzinsky, counsel for Goldman, asked Kubbernus about SkyPort's damages as a result of Goldman and Craig's behavior.

| Ruzinsky: | Isn't it true that the universe of harm from [the breach of the Preliminary Injunction Order] -- the universe of damages, is your attorneys' fees and some time away from the office? |
|---|---|
| Kubbernus: | [27 second pause]<br><br>I believe -- and that's my belief, that the sale price of [SkyPort] – in [a] recent transaction, was |

| | |
|---|---|
| | impacted by the breach of injunctions. |
| Ruzinsky: | That's all speculation, isn't it? |
| Kubbernus: | It-it's educated speculation. |
| Ruzinsky: | But still speculation. [ . . . ] |
| Ruzinsky: | The question was, it's speculation, right? |
| Kubbernus: | I don't believe so. |
| Ruzinsky: | Well you just told this Court that it was educated speculation, and now you're telling it that it's not speculation? |
| Kubbernus: | I believe the price was diminished . . . in the sale because of the situation. |
| Ruzinsky: | And your belief is based on speculation, right? |
| Kubbernus: | My belief is based on my negotiations with the buyers. |
| Ruzinsky: | And it's speculation what they would have paid in a different circumstance without a lawsuit, right? |
| Kubbernus: | Yes. |
| Ruzinsky | And its speculation what they would have paid without the Dawn Cole, Franklin Craig communication. Right? |
| | [ . . . ] |
| Kubbernus | Um . . . yes, it's speculation. |

[Tape Recording, Nov. 28, 2012 Hearing at 2:56:14–2:58:49 p.m.]. Kubbernus' twenty-seven

second long pause before responding is odd.  While it is certainly reasonable for a witness to

think through a potential answer before speaking, the lengthy pause here seemed excessive and

unnecessary.

2.  During Kubbernus' testimony, there were also a few instances in which he

contradicted his previous testimony.  For example, on June 7, 2011, Kubbernus asserted that

Craig was an agent of the Schermerhorn Parties.  But, on November 29, 2012, Kubbernus

testified that on July 7, 2011, he was aware that Craig was not a fund manager of the

Schermerhorn Parties and that when he used the word "agent" on July 7, 2011, he did not mean

"agent" in a legal sense; what he meant was "agent" as in "broker." [Tr. Nov. 28, 2010 106:24–

107:18].

Overall, however, Kubbernus' somewhat contradictory testimony on one point does not outweigh his otherwise credible testimony on many other points. While, in their e-mails with each other, Goldman, Craig and Cole state that Kubbernus is a liar and should be prosecuted for perjury[55] [Finding of Fact Nos. 66, 67], nothing in Kubbernus' testimony suggests that he was perjuring himself or otherwise trying to deceive the Court; rather, if anything, he was confused, or used overly effusive hyperbole (i.e., his layman's use of the word "agent" to describe Craig). The Court must look to the evidence given *under oath* before it. Accordingly, the Court finds Kubbernus to be overall a credible witness and give substantial weight to his testimony.

### D.      Samantha Ray

Finally, on November 30, 2012, Catmull proffered testimony from Samantha Ray, a legal assistant employed by counsel for the SkyPort Parties, regarding various documents produced during this proceeding. [Tr. Nov. 30, 2012 149:1–152:6]. The Court finds that Ms. Ray was credible and gives substantial weight to her testimony.

## IV. CONCLUSIONS OF LAW

### A.      Jurisdiction and Venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A]

---

[55] Goldman to Craig, June 18, 2010: "[Cole] knows RK is a crook . . ." [Finding of Fact No. 44].
Cole to Craig, July 2, 2010, "If there is a possibility of a few days in jail, RK should serve them. The next item that I want to cover with the judge (hopefully with counsel but with or without) is the issue of RK committing perjury under oath in the court when he told the judge that I had agreed to testify on his behalf. I understand that perjury carries fines and sometimes jail time and I believe that RK should be sanctioned for this illegal act that mocks our court system." [Finding of Fact No. 58].
    Craig to Cole, July 2, 2010:   "Boy.  He is an asshole, RK…. Very vindictive and it is just cheap malingment!!!  Hang in there..will get thos [sic] bastard !!!"  [*Id.*].
    Cole to Craig, July 4, 2010:   "The judge ruled based on RK's testimony and, like all of us, he had to assume that RK was telling the truth under oath.  Now, we have NEW evidence that (1) RK lies under oath and (2) he is bribing witnesses."  [*Id.*].

proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *Kellogg v. Chester*, 71 B.R. 36, 37 (N.D. Tex. 1987) ("Section 157(b)(2) sets forth a list, which it states to be nonexclusive, of matters that are core proceedings. Contempt is not among the matters listed; neither is it expressly excluded.").   This proceeding is also core under 157(b)(2)(L), which states that a proceeding is core if it relates to "confirmations of plans."

The Fifth Circuit has consistently held that a bankruptcy court has post-confirmation jurisdiction over matters "that bear on the interpretation or execution of the debtor's plan." *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001); *In re U.S. Brass Corp.*, 301 F.3d 296, 304 (5th Cir. 2002); *Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 535 F.3d 325, 335 (5th Cir. 2008); *Compton v. Mustang Eng'g Ltd. (In re MPF Holding US LLC)*, No. 08-36084, Adv. No. 10-03477, 2013 Bankr. LEXIS 2475, at *20 (Bankr. S.D. Tex. June 18, 2013); *see also Timely Integrated, Inc. v. Ryder Integrated Logistics, Inc.*, No. EP-09-CV-0285-PRM, 2011 U.S. Dist. LEXIS 98203 (W.D. Tex. Mar. 10 2011) (holding that the bankruptcy court retained jurisdiction over matters arising from and related to the bankruptcy case, including the administration of claims improperly asserted in district court, which implicated orders issued by the bankruptcy court).  As this Court noted in *De Montaigu v. Ginther (In re Ginther Trusts)*, a post-confirmation injunction can bear on a plan's confirmation and implementation—particularly in cases where there are indices of forum shopping.  No. 98-32663-11, Adv. No. 06-3556, 2006 Bankr. LEXIS 3676 (Bankr. S.D. Tex. Dec. 22, 2006) ("[F]orum shopping strongly favors this Court's continuing jurisdiction.").

The acts at issue in the dispute at bar stem from the Confirmation Order and the Plan. The Schermerhorn Parties failed to object to the Plan in this Court, and instead chose to

circumvent the Plan and the Confirmation Order's prohibitions against derivative claims by filing the State Court Lawsuit in the Harris County District Court.   This violation of the Plan and the Confirmation Order led not only to the Removed Lawsuit, but also to the Preliminary Injunction Order—which this Court issued to prevent harm while it interpreted and enforced the terms of the Plan.  Thus, while seemingly attenuated from the Plan and the Confirmation Order, this dispute directly concerns matters pertaining to the implementation or execution of the confirmed plan.  This Court therefore has post-confirmation jurisdiction of this dispute because it concerns violations of the Plan and the Confirmation Order, and also concerns violations of the Preliminary Injunction Order—which this Court issued to ensure the proper enforcement of the Plan.

Additionally, venue is proper pursuant to 28 U.S.C. § 1409(a).

## B.        Constitutional Authority to Enter a Final Order

In the wake of the Supreme Court's ruling in *Stern v. Marshall*, this Court must also evaluate whether it has the constitutional authority to sign a final order regarding the show cause hearing.  *Stern v. Marshall,* 131 S. Ct. 2594 (2011).  In *Stern,* the Supreme Court held that 28 U.S.C. § 157(b)(2)(C)—which authorizes bankruptcy judges to issue final judgments in counterclaims by a debtor's estate against entities filing claims against the estate—is an unconstitutional delegation of Article III authority to bankruptcy judges, at least when the counterclaim being adjudicated is based solely on state common law and does not affect the claims adjudication process.  *Id.* at 2616.

The matter at bar is not a counterclaim based solely on state law.  Rather, in the first instance, this dispute arises over the interpretation and enforcement of the Plan and the Confirmation Order.   Unlike *Stern*, this dispute is not based solely on state law where the

resolution thereof would still not affect the claims. Here, the resolution of the dispute concerns the interpretation and enforcement of the Plan, particularly as it related to whether the claims brought by the Schermerhorn Parties were derivative or direct.

Then, once this Court issued the Preliminary Injunction Order, this Court thereafter has the power to issue an order holding a party, or agent, or aider and abettor in contempt of that order, particularly an officer of this Court, like Goldman. The Court's authority to do so comes from 11 U.S.C. § 105(a)[56] and applicable case law on policing the conduct of those who appear in this Court and imposing sanctions on those who misbehave. *See Chambers v. NASCO*, 501 U.S. 32 (1991); *Knight v. Luedtke (In re Yorkshire, LLC)*, 540 F.3d 328, 332 (5th Cir. 2008); *Kellogg*, 71 B.R. at 39 ("Issuance of a civil contempt order is certainly 'appropriate to enforce or implement' a bankruptcy court order and is therefore clearly within the initial grant of section 105.").

*Stern* does not limit this Court's constitutional authority to enter a final order enforcing the Court's own prior orders—including the Confirmation Order and the Preliminary Injunction Order. *See White v. Kubotek Corp.*, 487 B.R. 1, 10 (D. Mass. 2012) (holding that a bankruptcy court had the constitutional authority to enter a final order on a fraudulent transfer claim because the order was issued to enforce the court's prior sale order); *River Entm't Co. v. Buncher Co.* (*In re River Entm't Co.*), 467 B.R. 808, 812 (Bankr. W.D. Pa. 2012) (holding that the narrow interpretation in *Stern* does not apply to a bankruptcy court's ability to enforce and interpret its own consent order); *CD Liquidation Co., LLC v. Paladini* (*In re CD Liquidation Co., LLC*), 462 B.R. 124, 136 (Bankr. D. Del. 2011) (finding that *Stern* did not prevent a bankruptcy court from

---

[56] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code unless otherwise noted. Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

enforcing its own order confirming a Chapter 11 plan, which barred the plaintiff from filing a derivative suit in district court). As (a) the Motion to Dissolve the Preliminary Injunction Order [Adv. Doc. No. 317]; (b) the December 22, 2011 motions to contact certain individuals [Adv. Doc. Nos. 460, 461]; (c) the Second Motion for Sanctions and the Amended Second Motion for Sanctions [Adv. Doc. Nos. 359, 419]; and (d) the Motion for Contempt [Adv. Doc. No. 360] each arose as direct result of an order issued by this Court—i.e., the Preliminary Injunction Order—the Court is constitutionally permitted to issue a final order on these matters. A final order on these matters is enforcement of a prior order of this Court.

For all of these reasons, the Court concludes that it has the constitutional authority to enter a final order on the pending motions.

### C.    The Court Will Analyze Violations of the Preliminary Injunction Order under Texas Law

The Schermerhorn Parties argue that this Court should apply foreign law to this proceeding, particularly in regards to the issue of agency. Specifically, as Craig is a French resident, and some of the SkyPort Parties are corporate entities headquartered in Switzerland and the United Arab Emirates,[57] the Schermerhorn Parties assert that the Court should apply these countries' rules of law. [Adv. Doc. No. 681 at pp. 71–72].[58] The Court disagrees, and will not apply these laws generally or to the issue of agency.

---

[57] The Schermerhorn Parties actually seek to apply the laws of Abu Dhabi. [Adv. Doc. No. 691 at pp. 71–72]. As Abu Dhabi is a city, and not a country, but is the capital of the United Arab Emirates, the Court finds that the Schermerhorn Parties actually intended to seek to apply the laws of the United Arab Emirates.

[58] In full, the Schermerhorn Parties' argument for the application of foreign law is as follows:

> Finally, Mr. Craig is a resident of France, and the [Schermerhorn Parties] are resident in Switzerland and Abu Dhabi. Therefore, it would appear that the laws of France, Switzerland or Abu Dhabi would govern the agency issue. Trustcomm has made no effort to establish which law governs or what the agency law of the governing jurisdiction would be. If it seeks to prove that Craig is an agent, it must satisfy this burden. Trustcomm has failed to do so.

[Adv. Doc. No. 681 at pp. 59–60].

Determining which substantive law governs a dispute requires a two-step process. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941), *superseded by statute on other grounds*; *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir. 1992); *In re Cyrus II P'ship*, 413 B.R. 609, 612 (Bankr. S.D. Tex. 2008).  The Court must:  (1) determine whether federal or state choice of law rules govern; and (2) apply these rules to the facts of the case to determine the appropriate substantive law.  *In re Cyrus II P'ship*, 413 B.R at 613.

The first step requires this Court to analyze whether the present claim involves important federal bankruptcy policy.  *Id.*  As the Court issued the Preliminary Injunction Order under federal law, there is a compelling federal court interest in this proceeding.  Therefore, federal choice of law rules should govern this Court's choice of law analysis.  *Id.* at 613; *see also Crist v. Crist (In re Crist)*, 632 F.2d 1226, 1229 (5th Cir. 1980) (applying federal choice of law rules and stating that "federal courts are . . . free to apply the law considered relevant to the pending controversy.").

Under the federal choice of law rules, the Court should apply the law of the forum with the "most significant" contacts or relationship to this dispute, thereby exercising an "informed judgment in the balancing of all the interests of the states [or countries] in order to best accommodate the equities among the parties."  *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 162 (1946); *Koreag*, 961 F.2d at 350 ("The goal of this analysis is to evaluate the various contacts each jurisdiction has with the controversy, and determine which [country's] law and policies are implicated to the greatest extent.").  Courts in the Fifth Circuit and elsewhere use the factors articulated in the RESTATEMENT (SECOND) CONFLICT OF LAWS (the Restatement) to determine the forum with the most significant relationship to the dispute.  *See In re Cyrus II P'ship*, 413 B.R at 613 (quoting § 6 of the Restatement); *Danner v. Staggs*, 680 F.2d

427, 431 (5th Cir. 1982) ("As the Texas Supreme Court pointed out, the analysis focuses not on quantitative contacts but on qualitative contacts and the policy factors enumerated in § 6 of the [Restatement].  These choice of law principles point heavily in favor of applying Texas law."); *Clear Entertainment, L.L.C. v. KPMG, L.L.P.,* 2000 U.S. Dist. LEXIS 11279 (N.D. Tex. June 12, 2000) (quoting § 6 of the Restatement).  Section six of the Restatement states, "the factors relevant to the choice of the applicable rule of law include" the following:  (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability, and uniformity of result; and (g) ease in the determination and application of the law to be applied.  Moreover, the party which seeks to have the Court apply the law of another jurisdiction has the burden of pleading that law to a reasonable certainty.  *In re Avantel, S.A.*, 343 F.3d 311, 321 (5th Cir. 2003).  As a result, the Schermerhorn Parties bear the burden of demonstrating that under these factors, French, Swiss or Emirati law should be applied.

The Schermerhorn Parties have not presented any evidence which would support the application of French, Swiss or Emirati law.  Indeed, the extent of their analysis is to assert that: "Mr. Craig is a resident of France, and the [Schermerhorn Parties] are resident in Switzerland and Abu Dhabi. Therefore, it would appear that the laws of France, Switzerland or Abu Dhabi would govern the agency issue."  [Adv. Doc. No. 681 at pp. 59–60].  Thus, the Court sees no need to individually analyze each Restatement factor.  *See In re Cyrus II P'ship*, 413 B.R. at 615 ("[A]ny choice of law rule is not necessarily a precise rule of law.").  The Court simply cannot determine the relevant policies and interests of France, Switzerland, and the United Arab

Emirates, as the Schermerhorn Parties have failed to identify them.  And, simply arguing that Craig is a French resident, and that some of the SkyPort Parties are corporations headquartered in Switzerland and the United Arab Emirates, does not articulate a policy or interest in favor of the application of foreign law.  The Schermerhorn Parties offer no insight into why the laws of France, Switzerland or the United Arab Emirates should take precedence over U.S. law.

Further, having filed for bankruptcy, sought removal of the direct and derivative actions from the District Court of Harris County, Texas and filed the First and Second Motions for Sanctions in this Court, SkyPort has likely presumed that violations of the Preliminary Injunction Order would be analyzed by federal law.  [Finding of Fact Nos. 1, 2, 18, 83, 144, 122].  On the contrary, the laws of France, Switzerland and the United Arab Emirates have never been applied to any proceeding in this case.  In short, the Schermerhorn Parties have failed to meet their burden to prove that under these choice of law factors, foreign law should apply.

Finally, many courts have concluded that even if the Court's choice of law analysis had lead it to apply foreign law, the Court could still refuse to apply foreign law where its application would violate fundamental notions of justice or prevailing concepts of good morals.  *Roberts v. Energy Development Corp.,* 235 F.3d 935 (5th Cir. 2000) (considering whether application of a foreign state's law would offend public policy in the forum state); *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d. Cir. 1998); *Goodwin v. George Fischer Foundry Systems, Inc.*, 769 F.2d 708, 713 (11th Cir. 1985); *Heinrich ex rel. Heinrich v. Sweet*, 49 F. Supp. 2d 27, 38 (D. Mass. 1999); *see also* SCOLES & HAY, CONFLICT OF LAWS § 3.15, at 73 (West 1982) (concluding that the "public policy exception" to the application of foreign law should be exercised only when "fundamental policies of the forum" will be offended).

Here, the Court possesses the inherent authority to enforce its own injunctive decrees. *Waffenschmidt*, 763 F.2d at 715.  Courts are not in the business of making orders without the power to punish violations of those orders and the power of a court to make an order carries with it the equal power to punish for disobedience.  *Id.* ("Enforcement of an injunction through a contempt proceeding must occur in the issuing jurisdiction because contempt is an affront to the court issuing the order.").  The Schermerhorn Parties have simply not articulated <u>any</u> foreign policy with such a fundamental and necessary justification.  Accordingly, and based on all of the reasons cited above, the Court will not apply foreign law, either to the agency issue, or to the proceeding in general.  Instead, the Court will apply federal law to the dispute at bar.

**D.     The Preliminary Injunction Order was Sufficiently Specific Under Rule 65(d)**

Under Federal Civil Procedure Rule 65(d)(1), applied to this matter by virtue of Federal Rule of Bankruptcy Procedure 7065, an injunction must:  (A) set forth the reasons for its issuance; (B) be specific in terms; and (C) describe in reasonable detail the act/acts to be restrained without reference to other documents.  Fed. R. Civ. P. 65(d); *Atiyeh v. Capps*, 449 U.S. 1312, 1317 (1981).

> 1.   <u>The Court Set Forth Its Reasons for the Issuance of the Preliminary Injunction Order, Thus Satisfying Rule 65(d)(1)(A).</u>

The Schermerhorn Parties argue that the Preliminary Injunction Order cannot satisfy Rule 65(d)(1)(A) because this Court failed to set forth the reasons for its issuance in the Preliminary Injunction Order, and that the Court therefore violated the Fifth Circuit's "four corners" requirement.  This requirement compels a court to draft an injunction so that parties be able "to interpret the injunction from the four corners of the order" *Seattle-First Nat'l Bank v. Manges*, 900 F.2d 795, 800 (5th Cir. 1990).  The Court disagrees with the Schermerhorn Parties' argument for two reasons.

First, the Court satisfied the "four corner" rule by including the reasons for issuing the Preliminary Injunction Order within the order itself. As the Preliminary Injunction Order states, this Court held a hearing on May 27, 2010, at the conclusion of which, the Court read its findings and conclusions into the record. [Finding of Fact No. 32]. The Preliminary Injunction Order then makes it explicit that this Court granted it "[b]ased on . . . all of the findings of facts and conclusions of law read into the record" including those read into the record on June 10, 2010. [*Id.*] (emphasis added). Finally, the Preliminary Injunction Order overtly states that it was issued in order to prevent "irreparable harm," which would result "absent granting of the temporary injunction." [Adv. Doc. No. 86].

This order is therefore far more explicit than the injunction order issued in *Seattle-First Nat'l Bank*, in which the district court refused to make its own findings, asserting only that the magistrate court's findings were sufficiently clear. *Seattle-First Nat'l Bank*, 900 F.2d at 798. The *Seattle-First Nat'l Bank* order also did not contain the reasons for granting the injunction, nor did it detail the prohibited conduct. *Id.* Conversely, here, the Court finds that its purpose for issuing the Preliminary Injunction Order was clearly articulated in accordance with the "four corners" rule. In fact, Goldman admitted as much on the record in this Court. When asked if he "understood that the Court entered this injunction in order to save [SkyPort] from injury," he unambiguously and without hesitation answered: "Correct, yes." [Tr. May 2, 2013 124:16–23].

Second, Goldman and Craig cannot ignore this Court's findings and conclusions made on the record in open court—both on May 27, 2010 and on June 10, 2010. *In re Bradley*, 588 F.3d at 266. As the Court clearly stated at the May 27, 2010 hearing, the purpose of the Preliminary Injunction Order was to suspend communications between the Schermerhorn Parties and customers, vendors and employees of SkyPort while the Court and the parties determined which

causes of action were direct and which were derivative. [Finding of Fact No. 24]. At the June 10, 2010 hearing, the Court reiterated this purpose and stated that contacting former employees—such as Cole—could hurt SkyPort as it reorganized under the Plan. [Finding of Fact Nos. 28, 31]. While Goldman himself did not attend this hearing, he appeared through his co-counsel, and without objection, authorized his signature to be included on the Preliminary Injunction Order. [Finding of Fact No. 34]. And, as Goldman testified, he would not have authorized his signature on a document that he did not understand. [Tr. May 2, 2012 130:24–131:1]; [*Id.* at 133:11–16]. Further, Goldman warned Craig not to violate the terms of the order. [Finding of Fact No. 56].

The Court may therefore consider the "circumstances surrounding the issuance of the order." *United States v. Young*, 107 F.3d 903 (D.C. Cir. 1997); *see also EEOC v. Severn Trent Servs., Inc.,* 358 F.3d 438, 442 (7th Cir. 2004) (finding that the explanation of the reasons for an injunction may be verbal and that justification evident from the record may even excuse the absence of an explanation). Indeed, as Rule 65(d)(1)(A)'s intent is to protect the enjoined party from unfair surprise, direct knowledge of the order and the reasons for its issuance—whether oral or written—should satisfy this requirement.[59, 60]

---

[59] The purpose behind Rule 65(d) is to assure adequate notice to parties faced with the possibility of contempt. *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). A court's failure to adhere to every detail of that Rule's requirements does not automatically render an order void under all circumstances and for all purposes. *See Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 632–33 (2d Cir. 1976); *Shannon v. Retail Clerks, Int'l. P. Assoc.*, 128 F.2d 553, 555 (7th Cir. 1942). Rather, "[t]he Court's inherent power to vindicate its authority, necessary to the preservation of the judicial institution, should not be inflexibly bound by procedural niceties where no actual prejudice to the defendants results." *United States v. McAndrew*, 480 F. Supp. 1189, 1192 (E.D. Va. 1979).

[60] The Court notes that Rule 65(d)(1)'s requirements may be waived altogether when it is shown that the enjoined parties had knowledge, or were charged with knowledge, of the terms of the injunction order at issue, and that they consented to the form of the order at the time it was entered. *McAndrew,* 480 F. Supp. at 1192. This is undeniably the case here. Goldman knew the terms of the Preliminary Injunction Order and signed it through co-counsel at the time it was entered. [Finding of Fact No. 34]. Thus, if there is any failure in the Preliminary Injunction Order's form at all, such a failure may be waived. *McAndrew,* 480 F. Supp. at 1192.

For all these reasons, the Court finds that the Preliminary Injunction Order satisfies Rule 65(d)(1)(A).

      2.  <u>The Court Set Forth the Terms of the Preliminary Injunction Order With Sufficient Specificity, Thus Satisfying Rule 65(d)(1)(B).</u>

The language of an injunction should be as specific as is necessary to inform those who are enjoined exactly what conduct is prohibited.  Nevertheless, "the command for specificity is not absolute," *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999), and "[s]ome compromise must be effected in a decree between the need for articulation, and the need for sufficient comprehensiveness to prevent 'easy evasion.'" *Sucrs. De A. Mayol & Co. v. Mitchell*, 280 F.2d 477, 481–82 (1st Cir. 1960) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949)).  Thus, an injunction need only be "framed so that those enjoined will know what conduct the court has prohibited." *Meyer v. Brown & Root Constr. Co.,* 661 F.2d 369, 373 (5th Cir. 1981); *Martin's Herend Imports, Inc.*, 195 F.3d at 771.  A court may even use general terms to define an injunction, particularly where a defendant has been independently advised of the scope of the proscribed activity—such as on the record in open court.  *Sucrs. De A. Mayol & Co.*, 280 F.2d at 481–82.  In evaluating the specificity of the Preliminary Injunction Order, the Court should therefore consider the order as a whole, including what was said on the record as well as its context within the overall litigation. *Reliance Ins. Co. v. Mast Const. Co.*, 159 F.3d 1311, 1316 (10th Cir. 1998).  Finally, in the Fifth Circuit, injunctions that have been found to violate Rule 65(d) have included undeniably vague terms, such as "take all necessary steps to remedy the effects of past discrimination," *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 283–84 (5th Cir. 2008).

The terms here are not so nebulous.  The Preliminary Injunction Order prohibits two actions, stating that (1) "[Schermerhorn Parties] are temporarily enjoined from:  pursuing any all

claims or causes of action, derivative or direct, against all of the [SkyPort Parties]"; and (2) "[Schermerhorn Parties] may contact former and current vendors, employees, and customers of the Debtor" only after complying with specific procedures.  [Finding of Fact No. 32].  At the June 10, 2010 hearing, the Schermerhorn Parties argued that the second prohibition was too broad and that *anyone* could fall within these categories (i.e., former and current vendors, employees, and customers of the Debtor).  [Finding of Fact No. 29].  The Court, however, rejected these arguments.  [Finding of Fact No. 31].  The Court also noted orally on the record that, due to the contentious relationship between the parties and the goals of the Preliminary Injunction Order (i.e., to prevent harm to SkyPort), it was, in fact, best to draft the order broadly.  [*Id.*].  Trying to enumerate specific vendors, employees and customers was only likely to lead to more contention, and as the Preliminary Injunction Order was only meant to be a temporary order—originally intended to last for less than three weeks—the Court found that the procedural safeguards within the Preliminary Injunction Order (i.e., to submit a request to the SkyPort Parties, and if they refused, then to the Court) were a sufficient counter to its breadth.  [*Id.*].  Thus, especially when considered in the overall context of this litigation, the Schermerhorn Parties were aware, or should have been aware, of the following:  (a) who was enjoined; (b) the various claims the Schermerhorn Parties were enjoined from pursuing; and (c) what individuals or entities the Schermerhorn Parties were prohibited from contacting.  The language of the Preliminary Injunction Order is sufficiently specific to put the enjoined parties (here, the Schermerhorn Parties, including Goldman) on notice of what conduct is prohibited.

If the Schermerhorn Parties had any doubts as to the applicability of the Preliminary Injunction Order, they had the ability to seek clarification from either the SkyPort Parties or this

Court.[61]  *See Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 15 (1945); *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1432 (7th Cir. 1985) ("The right to seek clarification or modification of the injunction provides assurance, if any be sought, that proposed conduct is not proscribed").  Indeed, this Court noted on June 10, 2010 that it would make <u>any</u> time necessary to hold <u>any</u> requested hearings on the Preliminary Injunction Order.  [Finding of Fact No. 31]; [Tr. June 10, 2010 11:2–9] ("It is clear to me that this is a really -- I mean this is as -- on a scale of one to 100, 100 being the most acrimony, this is nearing 100. And so I'm going to spend whatever court time I need to.  It's very important to me, since I've confirmed the plan, that the debtor have as best shot as possible at successfully reorganizing.").  This Court, therefore, finds that the terms of the Preliminary Injunction Order are sufficiently specific under Rule 65(d)(1)(B).

3.  <u>The Preliminary Injunction Order Describes in Reasonable Detail the Act/Acts to be Restrained, Thus Satisfying Rule 65(d)(1)(C)</u>

As stated above, the Fifth Circuit strictly construes Rule 65(d)(1) to require that parties be able "to interpret [an] injunction from the four corners of the order."  *Seattle-First Nat. Bank*, 900 F.2d at 800.  In other words, the injunction *itself* must contain sufficient "detail as to put the party enjoined on notice of precisely what he is called upon to do or refrain from doing." *Sheila's Shine Products, Inc*, 486 F.2d at 129.  There is little dispute surrounding the reasonable detail describing the Preliminary Injunction Order's first enjoined activity (i.e., pursuit of any and all causes of action against the SkyPort Parties).[62]  "To pursue" is a verb, and refers to the process of

---

[61] The Schermerhorn Parties, in fact, exercised this right to clarification by filing two motions on December 22, 2011 seeking permission to contact certain individuals.  [Adv. Doc. Nos. 460, 461].

[62] When asked about this provision on the record, Goldman testified as follows:

| Catmull (counsel for the SkyPort Parties): | [A]s of June 10th, 2010, you understood "Plaintiffs" to mean the Schermerhorn parties, right? |
| --- | --- |
| Goldman: | Yes. |

prosecuting a claim in court, or the initiation and continued pursuit of a legal suit.[63]  The Court therefore concludes that the Preliminary Injunction Order describes this first prohibition in reasonable detail under Rule 65(d)(1)(C).  Thus, as all three elements under Rule 65(d) have been met with respect to this first enjoined activity, the Court concludes that **the Preliminary Injunction Order prevented the Schermerhorn Parties from any and all initiation and continued activity to further the prosecution of direct and derivative claims against the SkyPort Parties.**

Conversely, the parties have disputed—vehemently and verbosely—the "reasonable detail" describing the Preliminary Injunction Order's second prohibition.  In context, this section states:

| | |
|---|---|
| Catmull: | And "pursuing any and all claims or causes of action," you understood that to mean pursuing the Schermerhorn party litigation, right? |
| Goldman: | Yes, I did. |
| Catmull: | And the next clause, "derivative or direct," you understood that meant all the litigation, not just some of the litigation, right? |
| Goldman: | Absolutely, yes. |
| Catmull: | And "against all of the Defendants," you understood the word "Defendants" to include [SkyPort], right? |
| Goldman: | No. But we weren't going to pursue claims against [SkyPort] because we had no claims against [SkyPort]. |

[Tr. May 2, 2012 125:17–126:7]

[63] Pursue derives from the Latin word, *prosequi*, from which the verb "prosecute" also derives.   MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 934, 947 (10th ed. 2001).

Pursue:  (1)**:** to find or employ measures to obtain or accomplish **:** seek <*pursue* a goal>; (2): to proceed along <*pursues* a northern course>; (3): to engage in <*pursue* a hobby>; (4):  to follow up or proceed with <*pursue* an argument>; (5): to continue to afflict: haunt <was *pursued* by horrible memories>.  *Id.* at 947.

Prosecute:  (1):  to follow to the end **:** pursue until finished <*prosecute* a war>; (2)**:** to engage in **:** perform; (3): to bring legal action against for redress or punishment of a crime or violation of law; (4)**:** to institute legal proceedings with reference to <*prosecute* a claim>.  *Id.* at 934

BLACK'S LAW DICTIONARY (9th ed. 2009) provides similar definitions for both terms.  While "pursue" is not defined, "pursuer" means:  "A plaintiff."   *Id.* at 1356.  Prosecute:  To commence and carry out a legal action <because the plaintiff failed to prosecute its contractual claims, the court dismissed the suit>. 2. To institute and pursue a criminal action against (a person) <the notorious felon has been prosecuted in seven states>. 3. To engage in; carry on <the company prosecuted its business for 12 years before going bankrupt>.  Id. at 1341.  Case law further defines prosecute.  "As a matter of common usage, to 'prosecute,' in connection with the law, means 'to institute legal proceedings against." *United States v. Streich*, 560 F.3d 926, 930 (9th Cir. 2009) (citing to WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1820 (1986)).

that the [Schermerhorn Parties] may **contact** former and current vendors, employees, and customers of the Debtor *if and only if* a written request is made by [Schermerhorn Parties]'s counsel to counsel for SkyPort and counsel for SkyPort either a) agrees to the proposed **contact** or b) does not respond within one business day.  If counsel for SkyPort refuses in writing to agree to the proposed **contact** and the [Schermerhorn Parties] wish to **contact** that person, [the Schermerhorn Parties] may **contact** this Court's case manager, and without motion, set an expedited hearing within two business days to adduce testimony and evidence that **contact** should be permitted.

[Finding of Fact No. 32].

Initially, Goldman testified at the Hearings that the "whole thing" quoted above is ambiguous.  [Tr. May 2, 2012 133:11–138:7].  Counsel for SkyPort therefore reviewed each word of this provision with him.  [*Id.*].  A word-by-word analysis revealed that it is actually only the single word, "contact," which has caused the contention between these parties.  [*Id.*].  And, although "contact" is used several times in this provision, it is, more specifically, the first use of this word which is at issue (i.e., "the [Schermerhorn Parties] may **contact** former and current vendors, employees, and customers of the Debtor").

The parties have differing interpretations for this word.  The SkyPort Parties construe "contact" as a noun, and the Schermerhorn Parties read "contact" as a verb.  Before analyzing these differing interpretations, the Court notes that the Preliminary Injunction Order is not *per se* invalid simply because two different interpretations are possible.  *United States v. Brown*, 561 F.3d 420, 438 (5th Cir. 2009) ("The mere fact that . . . interpretation is necessary does not render the injunction so vague and ambiguous that a party cannot know what is expected . . . .").  Rather, the Court's overriding consideration is simply whether the enjoined parties understand what conduct, or "contact," is prohibited.

The Court also notes that even within the Preliminary Injunction Order, the word "contact" is used differently.  For example, in four instances, the word is preceded by the article,

104

"the."  Conversely, the phrase "may contact" is used twice:  (1) the "[Schermerhorn Parties] may **contact** former and current vendors, employees, and customers of the Debtor *if and only if* a written request is made"; and (2) the "[Schermerhorn Parties] may **contact** this Court's case manager."

### a. The SkyPort Parties define "contact" in the second clause of the Preliminary Injunction Order as a noun.

The SkyPort Parties interpret this use of the word "contact" as a noun, meaning: (a): association, relationship; (b): connection, communication; or (c): an establishing of communication with someone or an observing or receiving of a significant signal from a person or object <radar *contact* with Mars>.  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 248 (10th ed. 2001).  In short, the Schermerhorn Parties may associate, connect, communicate, or receive information from former and current vendors, employees, and customers of the Debtor *if and only if* a written request is made by the Schermerhorn Parties' counsel.  To the SkyPort Parties, the Preliminary Injunction Order prevents any and all *contact with* these parties.

Under this interpretation of the word "contact", the source of the initial communication is irrelevant, as is whether the communication is direct or indirect.  As a result, even the unintentional receipt of a signal through a third party could violate the Preliminary Injunction Order.  The SkyPort Parties' definition therefore defines "contact" broadly, and is in keeping with the purpose of the Preliminary Injunction Order as stated by this Court both on the record at the May 27 and June 10, 2010 hearings, as well as in the Preliminary Injunction Order itself. [Finding of Fact Nos. 24, 31, 32].  The Court granted the Preliminary Injunction Order to prevent "irreparable harm" to SkyPort's ability to reorganize, which could easily occur without the immediate suspension of communications between the Schermerhorn Parties and former and current vendors, employees, and customers of SkyPort.  [Finding of Fact No. 31].  The SkyPort

Parties' expansive definition of "contact," (or, in essence, "contact with,") is therefore aligned with the Court's purpose and intent when it granted the Preliminary Injunction Order.

>    **b.  The Schermerhorn Parties define "contact" in the second clause of the Preliminary Injunction Order as a verb.**

The Schermerhorn Parties, on the other hand, argue that "contact" is used as a verb [Adv. Doc. No. 681 at p. 47], and indeed, this is the more common usage of this word.  *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 248 (10th ed. 2001) (commenting that the verb "contact" is "accepted as standard by almost all commentators.").  According to the Schermerhorn Parties, the Preliminary Injunction Order therefore prohibits "get[ting] in touch with," former and current vendors, employees, and customers" of SkyPort, or "establishing communications" with former and current vendors, employees, and customers" of SkyPort.  [Adv. Doc. No. 681 at pp. 47–48, ¶ 118].  As a result, and according to the Schermerhorn Parties, after Cole initiated contact with Goldman or Craig, then their further communications were not enjoined.  *See* [*id.* at p. 50, ¶ 123].

The Schermerhorn Parties' definitions therefore focus primarily on the use of the word "contact" in the order, where that word is a *verb*.  Accordingly, the Schermerhorn Parties read the Preliminary Injunction Order as prohibiting *only* "intentional acts."  [*Id.* at p. 48] ("[I]t is clear that the [Preliminary Injunction Order] prevents **intentionally** contacting without permission. . . . Also the language "**wish to contact**" implies doing so with intent.") (emphasis added).

>    **c.   The Court will adopt the verb-form of the word "contact"**

As the Court should construe any ambiguities or uncertainties in an injunction in a light favorable to the entities charged with contempt, the Court will adopt the Schermerhorn Parties' understanding of "contact" as a verb. *Georgia Power Co. v. N.L.R.B.*, 484 F.3d 1288, 1291 (11th

Cir. 2007); *see also New York Tel. Co. v. Commc'ns Workers of Am., AFL-CIO*, 445 F.2d 39 (2d

Cir. 1971) (finding that ambiguity as to the scope of a temporary restraining order enjoining

unions from interference should be resolved in favor of the enjoined party).   Some uses of the

word "contact" in the Preliminary Injunction Order are clearly identified as nouns by a preceding

"the"; yet, the meaning of the word "contact" as a noun is not at issue here.   Rather, the issue is

the meaning of the word "contact" as a verb.   This Court finds that the Schermerhorn Parties'

understanding of "contact" as a verb is reasonable.[64]  *Ala Nuring Home Ass'n v. Harris*, 617 F.2d

385, 388 (5th Cir. 1980) (quoting *Sierra Club v. Callaway*, 499 F.2d 982, 991 (5th Cir. 1974))

("[A]n injunction does not prevent acts which are not within its terms as reasonably construed.").

Therefore, this Court will adopt the Schermerhorn Parties' usage and analyze their compliance

with the Preliminary Injunction Order accordingly.

### d. Exceptions and Qualifications to the adoption of the Schermerhorn Parties' definition

The Court does not, however, accept the Schermerhorn Parties' cherry-picked definition

of this verb.   First, while the Schermerhorn Parties cite the AMERICAN HERITAGE DICTIONARY

(2d ed. 1983), for one interpretation of the term, this dictionary lists much more than just "to get

in touch with."   In full, it states that "contact (verb)" means:   (a) To get in touch with;

communicate with; (b) To come into contact with; (c) To make contact with; touch or strike; and

(d) To be in or come into contact.   *Id.*

---

[64] While the Court, for the purposes of this Opinion, will analyze Goldman and Craig's behavior in accordance with the Schermerhorn Parties' more narrow definition of "contact", the Court does not find that the SkyPort Parties' definition is unreasonable. Rather, this definition—used as a noun—is more aligned with the articulated purpose for the Preliminary Injunction Order:  namely, protecting SkyPort from irreparable harm,  Moreover, the Court notes that to prevent any semblance of impropriety or contempt, the Schermerhorn Parties would likely have been safer using a broader interpretation of the word—even if they suspected that this Court meant to use the word "contact" in its narrower, verb form.

The Schermerhorn Parties also cite WEBSTER'S NEW WORLD DICTIONARY (2d ed. 1982) for the definition:  "establishing communications."  Yet, once again, this explanation is selected from a much broader list.  And, according to a more recent Merriam-Webster's definition, contact (verb) means:  (a):  to make contact; (b):  to bring into contact; (c) to enter or be in contact with: join; or (d):  to get in communication with *<contact your local dealer>*.  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 248 (10th ed. 2001).

Moreover, while "to get in touch with" implies a proactive, intentional action, this action need not have occurred directly between Goldman and Cole to constitute "getting in touch." Rather, courts have found that even indirect contact with an enjoined party can constitute a violation of an order.  *JAK Prods., Inc. v. Wiza*, 986 F.2d 1080, 1088 (7th Cir. 1993) (interpreting the words "he will not contact" as prohibiting the defendant from "directly <u>or indirectly</u> communicating with, soliciting or providing fund-raising events, projects or services for customers or clients" of the plaintiff) (emphasis added); *Id.* (stating that to "contact" can certainly include more than "directly or indirectly communicating with" someone); *Pastos v. State*, 194 P.3d 387, 391–92 (Alaska 2008) (interpreting a domestic violence no-contact order, the court stated that "'[c]ontacting,' as a verb, means in common usage physically touching or communicating" and that "nonphysical contact must involve some element of direct <u>or indirect</u> communication") (emphasis added).  Thus, getting in touch with Cole "indirectly" could fall under the Schermerhorn Parties' definition of the verb, "to contact."

Further, the only way "communications" can be established is through a mutual dialogue. Thus, even the Schermerhorn Parties' own definition does not require that the enjoined party *initiate* the contact.  According to Merriam-Webster's dictionary, "communications" implies a two-way conveyance of information, with a sender and receiver.  It is: (1) an act or instance of

transmitting; (2) information transmitted or conveyed;[65] (3) a verbal or written message; and (4) a process by which information is exchanged between individuals through a common system of symbols, signs, or behavior <the function of pheromones in insect *communication*>; *also*: exchange of information.  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 232 (10th ed. 2001). It is also a system "for transmitting or exchanging information," or refers to entities "engaged in transmitting or exchanging information."   *Id.*   The term "contact" therefore involves a conversation, with the process of *exchanging* information—rather than who initiated the conversation—most relevant to the word and its meaning.

Indeed, as Craig himself stated to Goldman, once communications have begun, and contact has "been going back and forth" it becomes difficult "to say who has contacted who." [Finding of Fact No. 48].  For example, after the Court entered the Preliminary Injunction Order, the first communication from Goldman to Craig was the continuation of an e-mail string with the subject heading "Confidential."  [Finding of Fact No. 36].  This e-mail string was initiated *prior* to the Preliminary Injunction Order, yet continued as a series of e-mails between Goldman and Craig *after* the Preliminary Injunction Order was in place.    [Finding of Fact Nos. 36–39].

After analyzing the various overlapping and simultaneous e-mail and telephone activities among Goldman, Craig and Cole, the Court finds that it is virtually impossible to determine the initial source of individual contacts.  In 2010 alone, Goldman, Craig and Cole initiated dozens of phone calls with each other.  Many of these phone calls were in response to voice mail or e-mail requests to "call me" *see, e.g.*, [Finding of Fact Nos. 37, 48, 58], creating a complex game of "telephone tag."  What is more, during the same period, Goldman, Craig and Cole created many

---

[65] Transmit and convey also involve a sender and receiver.  Transmit:  to send or convey from one person to another; convey:  to cause to pass from one place or person to another.  MERRIAM-WEBSTER'S   COLLEGIATE   DICTIONARY 253, 1251 (10th ed. 2001).  Therefore, these definitions imply that a transmission or conveyance is not complete without a recipient.

new e-mail strings with each other, while concurrently responding to questions and comments made in old e-mail strings.  [Finding of Fact Nos. 36–49, 52–64].  Goldman, Craig and Cole also forwarded numerous e-mail strings created by other parties to each other.  *See, e.g.*, [Finding of Fact Nos. 43–45].  At some point, the maelstrom of individual "contacts" simply begins to look like one long and extended discussion.[66]

In sum, the Court rejects the Schermerhorn Parties' narrow definition for the verb, "to contact."  It is unreasonable to interpret "to get in contact with" or "establish communications" as singularly synonymous with "the intentional initiation of a conversation," and thereby completely ignore the rest of the conversation.  In fact, not even Goldman accepted this argument.  As Goldman wrote to Craig in an e-mail on June 21, 2010:  "I understand you have a prior relationship with Dawn Cole . . . and that she contacted you, but **I do not want you discussing SkyPort with her unless and until we obtain an order from Judge Bohm permitting us to do so**. . . . I do not want to create an appearance that we are using you *to communicate with* her. . . ."  [Finding of Fact No. 48].  Here, Goldman implies that *any* communication between Craig and Cole regarding SkyPort requires this Court's consent.  As a result, the Court concludes that Goldman *knew* that the Schermerhorn Parties need not to have *initiated* the communication with Cole to have violated the Preliminary Injunction Order.  *Sheila's Shine Products, Inc*, 486 F.2d at 129 (an injunction must include enough "detail as to put the party enjoined on notice of precisely what he is called upon to do or refrain from doing.").

---

[66] As only one example, the Court notes the events following the entry of the Preliminary Injunction Order on June 10, 2010.  The Preliminary Injunction Order was entered at 2:57 p.m.  At 6:06 p.m., Craig sent Goldman an e-mail, asking "Do you want to answer [Cole] or are you not allowed . . . ." A few minutes later, at 6:25 p.m., Goldman sent Craig an e-mail saying, "Left you a voicemail.  You may want to call me before talking to [Cole]."  Craig then e-mailed Goldman, "Ok call you in010 [sic] minutes."  Goldman then e-mailed Craig, "In meeting – free at 8 pm nyt."  Craig then e-mailed Goldman, "That is late... it is 1h30 am now here…good to hear that Dawn seems to have calmed down…Did you see RK's response…???"  Goldman then e-mailed Craig with Craig later responding, "I'll call Dawn or do you want to talk first??"  Goldman countered, "Let's talk first.  I'll call you in am."  Finally, Craig e-mailed Cole, saying, "Dawn, I will call you today. . . . Talk later."   [Finding of Fact Nos. 36–39].

The Preliminary Injunction Order contained sufficient detail to put the Schermerhorn Parties on notice of the enjoined conduct. Thus, in conjunction with the discussion of Rule 65(d)(1)(A) and (d)(1)(B) above, the second provision of the Preliminary Injunction Order[67] satisfies each of the requirements under Rule 65(d). And, while the Court will adopt the Schermerhorn Parties' verb-usage of the word "contact", the Court will interpret this verb to mean: **the direct or indirect, exchange or transmission of information**.

### E.    Goldman Violated the Preliminary Injunction Order

In order to hold Goldman in contempt of the Preliminary Injunction Order, this Court must establish by clear and convincing evidence the following elements: (1) that the Preliminary Injunction Order was in place at the time of the alleged violation(s); (2) that the Preliminary Injunction Order required Goldman comply with certain conduct; and (3) that Goldman failed to comply with the Preliminary Injunction Order. *Piggly Wiggly Clarksville, Inc.*, 177 F.3d 380, 382 (5th Cir. 1999). When there is substantial evidence of the enjoined party's innocence, a court cannot establish a violation of an injunction. *Id.* Here, the Court concludes that the SkyPort Parties have shown—clearly and convincingly—that Goldman violated the terms of the Preliminary Injunction Order.

### 1.    The Preliminary Injunction Order was in effect as of June 10, 2010.

Before a party may be found in contempt, the moving party must demonstrate that the court's order was in effect at the time of the alleged conduct. *Id.* Thus, the SkyPort Parties must have demonstrated if—and when—the Preliminary Injunction Order was in place before the Court may analyze Goldman's contempt of that order.

---

[67] "ORDERED that [the Schermerhorn Parties] are temporarily enjoined from: pursuing any and all claims or causes of action, derivative or direct, against all of the [SkyPort Parties] . . . ." [Finding of Fact No. 32].

The Schermerhorn Parties concede that at least as of June 10, 2010, the Preliminary Injunction Order was in effect.  [Adv. Doc. No. 681 at p. 47, ¶ 111].  Thus, the issue is not "*if*," but simply "*when*" the Preliminary Injunction Order took effect.  For their part, the SkyPort Parties allege that the Preliminary Injunction Order took effect on May 27, 2010, because, on that date, the Court concluded that a preliminary injunction was not only necessary, but that the SkyPort Parties had satisfied each required element in order for this Court to grant the Preliminary Injunction Application.  [Finding of Fact No. 24].  Thus, as the SkyPort Parties articulated in the Proposed Preliminary Injunction, the status quo should be preserved.  [Finding of Fact No. 20].

Yet, after announcing its ruling, the Court then permitted the parties to draft this order, giving them two weeks to submit a memorialization of this Court's May 27, 2010 ruling. [Finding of Fact Nos. 24–25].  Much of the arguments and testimony at the various hearings on the Preliminary Injunction Order related to this interim period, including the various draft versions, "agreements" and revisions exchanged between the parties.  *See* [Finding of Fact No. 27].  Nevertheless, by June 6, 2010, it became clear to this Court that the parties were unlikely to agree to a proposed order, and that the issue required another hearing.  [Finding of Fact No. 28].

Thus, on June 10, 2010, the Court held this hearing.  [*Id.*].  At this hearing, the Proposed Preliminary Injunction contained language different than the orders proposed on May 28, 2010 and June 6, 2010, as the June 10, 2010 order incorporated revisions from both parties.  *Compare* [Finding of Fact No. 27], *with* [Finding of Fact No. 32].  Nevertheless, after hearing arguments from counsel, the Court accepted the Proposed Preliminary Injunction (as amended by both parties), concluding that it most fully protected SkyPort from irreparable harm.  [Finding of Fact

No. 31].  At 2:57 p.m. on June 10, 2010, the Court then entered the Preliminary Injunction Order on the docket.  [Finding of Fact No. 32].

Accordingly, the Schermerhorn Parties argue that the Preliminary Injunction Order was not in effect until 2:57 p.m. on June 10, 2010—i.e., the time that it was signed, entered on the docket, and provided notice of the proscribed conduct to all enjoined parties.  [Adv. Doc. No. 681 at p. 47].  The Court agrees.  While Kubbernus testified at the May 27, 2010 hearing that the Schermerhorn Parties had been calling people associated with SkyPort, any prohibition—oral or otherwise—against contacting vendors, employees and customers was not fully articulated until June 10, 2010; the May 27, 2010 hearing focused more on whether the Removed Lawsuit violated the Plan and the Confirmation Order.  Yet, at the June 10, 2010 hearing, the sole focus was the Preliminary Injunction Order and the scope of this particular prohibition.  [Finding of Fact Nos. 28–31].  Consequently, the Court concludes that the Schermerhorn Parties were not provided sufficient notice of the proscribed conduct until June 10, 2010.[68]  Therefore, the Court will only consider conduct occurring *after* June 10, 2010 at 2:57 p.m.[69]

## 2.    The Order remains in place today.

---

[68] As discussed above, the Schermerhorn Parties—including Goldman, who did not attend the June 10, 2010 hearing, but who signed the Preliminary Injunction Order before it was entered on the docket [Finding of Fact No. 32]—did have reasonable notice of what was enjoined by the Preliminary Injunction Order on June 10, 2010 and thereafter.

[69] The Schermerhorn Parties should not, however, assume that merely because the Court did not sign the Preliminary Injunction Order until June 10, 2010 that any reasons and rationales articulated on May 27, 2010 for its issuance are irrelevant or not binding.  First, many—if not all—of these reasons were articulated at the Mary 27, 2010 and then affirmed at the June 10, 2010 hearing.  Second, all of these findings and conclusions were incorporated into the Preliminary Injunction Order through the following language:

> On May 27, 2010, the Court held an evidentiary hearing on this application where all parties appeared, and presented documentary evidence, testimonial evidence and oral argument.  At the conclusion of the presentation after carefully considering all evidence and oral argument, the Court read its finding and conclusions into the record  . . .  **Based on the foregoing as well as all of the findings of fact and conclusions of law read into the record**, the Court is of the opinion that the temporary injunction should be granted.

[Finding of Fact No. 32] (emphasis added).

According to the terms of the Preliminary Injunction Order, the order was to remain in effect until "further Order of this Court."  [Finding of Fact No. 32].  The Court has not yet issued a "further Order."

The Schermerhorn Parties argue that by remanding the direct causes of action to the Harris County District Court on April 19, 2011 [Finding of Fact No. 104], the Court terminated the Preliminary Injunction Order, creating a final judgment that deprived this Court of its jurisdiction to continue to enforce the Preliminary Injunction Order.  [Adv. Doc. No. 681 at pp. 95–99].  The Court disagrees.

First, the Court notes that as it issued the Preliminary Injunction Order on June 10, 2010 under its post-confirmation jurisdictional power to oversee the proper interpretation and implementation of the Plan, the Court was permitted to:  (1) intercede; (2) determine which of the Schermerhorn Parties' causes of action were derivative, and in violation of the Plan; and (3) provide a proverbial "protective wrap" around the newly reorganized debtor (i.e., SkyPort).  *See In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) (quoting *In re Seminole Park & Fairgrounds, Inc.*, 502 F.2d 1011, 1014 (5th Cir. 1974)).  In fact, the Court articulated these purposes when it issued the Preliminary Injunction Order; that by stopping the pursuit of all claims and contacts connected to SkyPort, the Court hoped to prevent irreparable harm to SkyPort as it attempted to fully and effectively reorganize under the Plan.  [Finding of Fact No. 32].  Under this power, the Court undoubtedly had both the authority to issue the Preliminary Injunction Order on June 10, 2010, *and* to keep it in place until the Court determined the direct and derivative causes of action.  Thus, from June 10, 2010 to April 19, 2011, when the Court

remanded the direct causes to the state court, the Court had the post-confirmation jurisdiction to issue and enforce the Preliminary Injunction Order.[70]

Second, the Court's post-confirmation jurisdiction to ensure the proper implementation of the Plan did not become void upon the April 19, 2011 remand of the direct claims. Rather, the Plan and the Preliminary Injunction Order prevented the Schermerhorn Parties from pursuing *derivative* causes of action; remanding the *direct* causes did not remove this threat. And, as the derivative claims were extinguished "as a part of the reorganization plan itself," the Court retained post-confirmation jurisdiction to ensure compliance with this provision of the Plan. *In re Case*, 937 F.2d 1014, 1017 (5th Cir. 1991). "[T]he injunction by its terms" therefore was of continuing importance to SkyPort's successful reorganization and the implementation of the Plan. *See Hollon v. Mathis Indep. School Dist.*, 491 F.2d 92, 93 (5th Cir. 1974). Remand did not render the Preliminary Injunction Order moot, nor should the order have simply "terminated upon its own accord." [Adv. Doc. No. 681 at p. 98].

Moreover, any concern that the Schermerhorn Parties might continue to threaten SkyPort's ability to reorganize was only affirmed at the July 7, 2011 hearing on the Motion to Dissolve the Preliminary Injunction Order. At that hearing, Goldman and Craig's alleged violations of the Preliminary Injunction Order first came to light. [Finding of Fact No. 108]. With the extent of their violations and the effect on SkyPort still unknown, the July 7, 2011 hearing, therefore, confirmed the need to maintain the "status quo" while this Court considered the merits of the SkyPort Parties' allegations and the need for a permanent injunction order. *See Exhibitors Poster Exchange, Inc. v. National Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) ("The purpose of a preliminary injunction is to preserve the status quo and thus prevent

---

[70] Of the claims brought in the State Court Lawsuit, the Court determined that several were derivative and several were direct. The Court remanded the direct claims to the Harris County District Court. [Adv. Doc. No. 272].

irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits."); *W. Ala. Quality of Life Coalition v. U.S. Fed. Hwy. Admin.*, 302 F. Supp. 2d 672, 678 (S.D. Tex. 2004). This determination was within the Court's discretion. *Exhibitors Poster Exchange, Inc.*, 441 F.2d at 561 ("The decision whether or not a preliminary injunction will issue lies within the sound discretion of the trial court."); *Tatum v. Blackstock*, 319 F.2d 397, 401–02 (5th Cir. 1963) ("It is the function of the trial court to exercise its discretion in deciding upon and delicately balancing the equities of the parties involved.").[71] Accordingly, the Court concludes that by keeping the Preliminary Injunction Order in place from June 10, 2010 until today, the Court has not overstepped what was necessary "to preserve the status quo during litigation." *See Hollon*, 491 F.2d at 93.

In sum, the Court concludes that from June 10, 2010 to the issuance of this Opinion and accompanying Order, the Preliminary Injunction Order has been in place, and that to find Goldman in contempt, any conduct in violation of the Preliminary Injunction Order must have occurred during this period.[72]

### 3.   The Preliminary Injunction Order Enjoined Goldman from Certain Conduct.

#### a.   Goldman was enjoined from pursuing direct and derivative claims, and from personally contacting Cole.

According to the Preliminary Injunction Order, the Schermerhorn Parties were enjoined from proceeding in the prosecution of any of the direct or derivative claims, as well as from

---

[71] The Court expressly notes that even while the Preliminary Injunction Order has remained in place, the Court has been mindful of the need to balance the equities of the parties involved. For instance, while the Preliminary Injunction Order remains in place, its prohibition on contacting former and current employees, vendors and customers is not absolute. Rather, the Schermerhorn Parties have been continually free to request permission from either the SkyPort Parties or this Court to contact *any* party they wish.

[72] The Court notes that even though Goldman lives in New York and has his law office there, and this Court is located in Houston, Texas, a "violation of an injunctive order is cognizable in the court which issued the injunction regardless of where the violation occurred." *Waffenschmidt*, 763 F.2d at 716 (quoting *Stiller v. Hardman*, 324 F.2d 626, 628 (2d Cir. 1963)).

contacting former employees, such as Cole.   As discussed above, the Court accepts the Schermerhorn Parties' argument that the verb "contact" as used in the Preliminary Injunction Order prevented the Schermerhorn Parties from intentionally exchanging or transmitting information to any current or former vendors, employees and customers of SkyPort.   This prohibition included Goldman, for he, as counsel for the Schermerhorn Parties, was bound by the Preliminary Injunction Order under Rule 65(d).   Fed. R. Civ. P. 65(d)(2)(B) ("Every order granting an injunction and every restraining order . . . is binding only upon the parties to the action, their officers, agents, servants, employees, and <u>attorneys</u> . . . ."); *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).   Goldman was also personally bound, as he holds a 20% ownership interest in Gloster Holdings, LLC—one of named entities comprised by the Schermerhorn Parties.   [Finding of Fact No. 3, n.3].   Indeed, Goldman concedes that he understood the Preliminary Injunction Order to bind him from personally and directly contacting Cole, and accordingly alleges that "he refused to communicate with [Cole] so long as the [Preliminary Injunction Order] was in effect."   [Adv. Doc. No. 681 at p. 47, ¶ 113].

### b. Goldman was enjoined from pursuing direct and derivative claims, and from getting in contact with Cole through an agent

Under Rule 65(d)(2)(B), "every order granting an injunction" is binding not only on the parties, but also their agents.   Fed. R. Civ. P. 65(d)(2)(B).   While the Preliminary Injunction Order did not contain language binding the Schermerhorn Parties from employing an agent to carry out the prohibited action, this effect is inherent.   Every injunction binds the named parties from using those "identified with [them] in interest, in 'privity' with them, represented by them or subject to their control."   *Regal Knitwear Co.*, 324 U.S. at 14.   Goldman was therefore enjoined from intentionally exchanging or transmitting information to any current or former vendors, employees and customers of SkyPort through an agent—i.e., a party over whom

Goldman exercised control.[73]   Goldman was also enjoined from pursuing the prosecution of direct and derivative claims through either the same, or another, agent.

### c. Goldman was enjoined from pursuing direct and derivative claims, and from getting in contact with Cole through an aider/abettor

Finally, under Rule 65(d)(2)(C), the Preliminary Injunction Order necessarily enjoined Goldman from contacting Cole and from pursuing direct and derivative claims against the SkyPort Parties through anyone "in active concert or participation" with him, "who receive actual notice of the [Preliminary Injunction Order] by personal service or otherwise."  Fed. R. Civ. P. 65(d)(2)(B).  Courts have interpreted "active concert" to include parties not named in the injunction, but who are nevertheless bound as a result of their actions.  *Regal Knitwear Co.*, 324 U.S. at 14.  By aiding and abetting an enjoined party, aider and abettors essentially bind *themselves*; by knowingly helping a named, enjoined party in "a concerted effort to subvert" the injunction's proscriptions, the aider and abettor becomes subject to the enjoining court's authority.  *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 436–37 (1934); *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832–33 (2d Cir. 1930); *Waffenschmidt*, 763 F.2d at 717; *G & C Merriam Co. v. Webster Dictionary Co., Inc.*, 639 F.2d 29, 34–35 (1st Cir. 1980).  Additionally, simply conspiring with an aider and abettor to *evade* an injunction can result in a finding of contempt.  *NLRB v. Laborers' Int'l Union*, 882 F.2d 949, 954 (5th Cir. 1989).

---

[73] The Court reiterates that while it has accepted the Schermerhorn Parties' argument that the word, "contact" is used as a verb in the Preliminary Injunction Order, it does not accept the argument that Goldman *alone* was enjoined from establishing communications with Cole.  Indeed, to make such a finding would directly contravene the wording of Rule 65(d) ("*Persons Bound.* The order binds only the following who receive actual notice of it by personal service or otherwise:  (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)").  To best encapsulate the language and purpose of Rule 65(d), the Court notes again that directly *or indirectly* contacting Cole could constitute a violation of the Preliminary Injunction Order.

By enforcing this Rule, courts seem to be recognizing a practical reality:  that an aider and abettor can cause the same harm as a named party.  Here, for instance, SkyPort could not only be easily harmed by the Schermerhorn Parties; it could just as easily be harmed by a non-party acting in concert with the Schermerhorn Parties.  Indeed, the very aim of an injunction is to prevent harm, and a motion for a preliminary injunction is never granted automatically.  The moving party *must* demonstrate that an irreparable injury would result absent such an extraordinary measure.  *See Siegel v. Lepore*, 234 F.3d 1163, 1177 (11th Cir. 2000) (refusing to grant an injunction where the plaintiff not "shown the kind of serious and immediate injury that demands the extraordinary relief of a preliminary injunction.")  Thus, once a court has determined that such a threat exists, the best way to prevent harm and preserve the status quo is by enjoining both direct *and indirect* violations of the injunction.

Rule 65 is not so broad, however, that courts may punish an enjoined party for the conduct of those who are acting independently.  *Waffenschmidt*, 763 F.2d at 717; *Regal Knitwear Co.*, 324 U.S. at 14.  Thus, a court must consider whether the enjoined party violated the injunction *through* the abettor in accordance with a common plan; not simply whether the aider and abettor violated the injunction.  *Regal Knitwear Co.*, 324 U.S. at 14 ("[D]efendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.").  Thus, Goldman could not "nullify" the Preliminary Injunction Order by carrying out the prohibited act through Craig.  And, if that third party—here, Craig—intentionally exchanged or transmitted information to Cole or pursued the prosecution of prohibited claims at Goldman's direction, then Goldman may be in violation of the Preliminary Injunction Order.

119

In sum, the SkyPort Parties have established that the Preliminary Injunction Order enjoined Goldman from pursuing direct and derivative claims against the SkyPort Parties personally, through an agent, or through an aider and abettor, as well as from personally contacting Cole, contacting Cole through an agent, and contacting Cole though an aider and abettor.  The Court must therefore analyze whether Goldman violated any of these prohibitions.

### 4.   Goldman Failed to Comply With the Preliminary Injunction Order

#### a.   Goldman Violated the Preliminary Injunction Order by Contacting Cole Personally Without Permission

As discussed above, under the terms of the Preliminary Injunction Order, Goldman was enjoined from personally and intentionally exchanging information with or transmitting information to Cole.  Yet, despite this express prohibition against contacting Cole, Goldman did, in fact, send her two emails after the injunction was in place.  First, on July 23, 2010, Goldman sent Cole an e-mail with his cell phone number.  [Finding of Fact No. 70].  The following day, July 24, 2010, Cole replied to Goldman's message, stating that she would call Goldman later that day.  [Finding of Fact No. 71].  Just before midnight, at 11:44 p.m. on July 24, 2010, Goldman again e-mailed Cole, telling her *not* to call him, and indicating that he knew that this contact was improper.  [Finding of Fact No. 72].  Goldman made no attempt to alert the SkyPort Parties or this Court that he had sent these e-mails or that he had received an e-mail from Cole.[74]  *See* [Finding of Fact No. 91]

---

[74] In their Proposed Findings of Fact and Conclusions of Law, the Schermerhorn Parties concede that Goldman contacted Cole on July 24, 2010 by e-mailing her.  They argue that Goldman simply hit "reply all" in response to an e-mail from Craig, thereby mistakenly including Cole.  [Adv. Doc. No. 681 at p. 55].  The case law cited below, including *Middlebrook v. Anderson*, No. 3:04-CV-2294-D, 2005 WL 350578, 2005 U.S. Dist. LEXIS 1976, at *9 (N.D. Tex. Feb. 11, 2005); *Pathman v. Grey Flannel Auctions, Inc.*, 741 F. Supp. 2d 1318, 1325 (S.D. Fla. 2010) and *Version Online Servs., Inc.*, 203 F. Supp. 2d 601, 612 (E.D. Va. 2002), contradicts this argument and instead implies that Goldman's e-mail was intentional.

Goldman also failed to alert this Court or the SkyPort Parties of this contact.  In the affidavit that Goldman provided to this Court on October 7, 2010, which required Goldman to detail *any* communications that he had with Cole, Goldman maintained that he, himself, "had not contacted any person known to him to be a current or former

These two emails represent the only times that Goldman *directly* communicated with Cole after the Preliminary Injunction Order was in place.[75] Nevertheless, sending e-mails *can* constitute contact if sent purposefully. *See Pastos*, 194 P.3d at 390–91; *Einmo v. Aecom Gov't Servs.*, No. 8:06-CV-1371-T-27TBM, 2007 U.S. Dist. LEXIS 63293, at *7–8 (M.D. Fla. Aug. 7, 2007) (discussing the ways an employer contacted the employee plaintiff, including e-mail as a method of contact). E-mail can be an imprecise form of communication; purpose and intentionality can be difficult to discern. Therefore, many courts consider whether the person sending the e-mail entered the recipient's name or e-mail address into the "to" line of the e-mail. This action indicates that the sender intended to send the e-mail to the recipient. *See Middlebrook v. Anderson*, No. 3:04-CV-2294-D, 2005 WL 350578, 2005 U.S. Dist. LEXIS 1976, at *9 (N.D. Tex. Feb. 11, 2005) (finding that a transmission of an e-mail into a forum state constitutes purposeful availment for personal jurisdiction purposes); *Pathman v. Grey Flannel Auctions, Inc.*, 741 F. Supp. 2d 1318, 1325 (S.D. Fla. 2010) (finding that sending direct e-mails to another person's e-mail address in the forum state is purposeful action toward that person and

---

vendor, employee or customer of SkyPort," that the only two communications that he had with Cole were at *her* initiation, and that both occurred on June 10, 2010. [Finding of Fact No. 91]. Indeed, Goldman swore in his affidavit that he had "not been contacted by Dawn Cole since June 10, 2010." [*Id.*].

At the October 14, 2010 hearing in this Court, Goldman again failed to mention the July 24, 2010 e-mails with Cole. At this hearing, counsel for the SkyPort Parties asked Goldman, "[d]id you have *any* contact after [June 10, 2010] with Ms. Cole?" Under oath, Goldman testified "[a]bsolutely not." [Finding of Fact No. 94]. As both statements—in Goldman's affidavit and under oath in this Court—are false, this Court concludes that the July 24, 2010 e-mails were not simply the unintentional result of hitting "reply all," but an *intentional* attempt to contact Cole.

Finally, the Schermerhorn Parties imply in their Proposed Findings of Fact and Conclusions of Law that the Preliminary Injunction Order permitted Goldman and Craig to communicate freely with Cole after she initiated the contact. [Adv. Doc. No. 681 at p. 50, ¶ 122]. This argument is contradicted, however, by Goldman's statements in his affidavit. If he believed that the Preliminary Injunction Order permitted contact with Cole *after* she initiated the communications, then after her phone calls of June 10, 2010 and her e-mail of July 24, 2010 there would be no reason for Goldman to seek permission from the SkyPort or this Court to "have access" to her. Goldman could have communicated with her freely without fear of this Court's contempt power. Clearly, Goldman did not throw caution to the wind after either the June 10, 2010 or July 24, 2010 communication—he continued to communicate with her through Craig, and continued to keep these communications a secret from this Court and the SkyPort Parties.

[75] The Court finds that the two contacts between Cole and Goldman on June 10, 2010 may have occurred before the Preliminary Injunction Order came into effect; the record is unclear on this point. Accordingly, the Court will not consider whether these contacts violated the Preliminary Injunction Order.

state); *Version Online Servs., Inc.*, 203 F. Supp. 2d 601, 612 (E.D. Va. 2002) ("On the other side of the ledger, a spammer is clearly, purposefully and deliberately sending [e-mails]. The spammer *intentionally* enters the e-mail address into the "to" space of the e-mail and is thus fairly aware of . . . .") (emphasis added). Though most of the case law in this area deals with the purposeful availment necessary for personal jurisdiction, the Court concludes that the logic is transferable to this context—it is as if Goldman entered Cole's name into the "to" line. By replying all in his July 23, 2010 e-mail, and by replying to Cole alone in his July 25, 2010 e-mail, Goldman purposefully contacted Cole without seeking prior permission from the SkyPort Parties or this Court to contact her. In sum, by directly, intentionally, and without permission, transmitting information to Cole, Goldman violated the Preliminary Injunction Order twice.

### b. Alternatively, Goldman Violated the Preliminary Injunction Order by Contacting Cole Through Craig, His Agent

#### i. *The SkyPort Parties are not judicially estopped from arguing that Craig is Goldman's agent.*

As Goldman and the Schermerhorn Parties noted in their Proposed Findings and Conclusions of Law, and therefore are clearly well aware, judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The purpose of this rule is to prevent the perception that the court has been previously misled and to "protect the integrity of the courts" by preventing litigants who prevail in court from later adopting inconsistent and contradictory arguments. *Afram Carriers, Inc. v. Moeykens*, 145 F.3d 298, 303 (5th Cir. 1998).

The Schermerhorn Parties, Goldman and Craig together argue that the SkyPort Parties should be estopped from now arguing that Craig is an agent of Goldman and the Schermerhorn

Parties.  According to their argument, the SkyPort Parties made the opposite assertion at the Motion to Compel hearing (i.e. that Craig was not an agent, and therefore not protected from the common interest privilege), and thus, here, are relying on a contradictory argument (i.e., that Craig is an agent).  This Court concludes, however, that the Schermerhorn Parties have misconstrued the SkyPort Parties' arguments.

At the Motion to Compel hearing, the SkyPort Parties argued—and this Court agreed—that Craig was not a *client* of Goldman's whose communications were therefore protected from disclosure by the attorney/client or common interest privilege.  However, the SkyPort Parties argued at the Motion to Compel that it was the *Schermerhorn* Parties who were in contradiction regarding Craig's status as an agent; earlier, the Schermerhorn Parties had argued that Craig was *not* an agent of Goldman.  Yet, at the hearing on the Motion to Compel, the Schermerhorn Parties argued that communications between Craig and Goldman should be protected by privilege.  [Tr. Feb. 29, 2012 20: 3–10] (Catmull:  "Mr. Craig has repeatedly urged to this Court that he's got nothing to do with the Schermerhorn [P]arties. Well, that's not exactly true. He's admitted he's their financial advisor on occasion. So, but other than that, he's repeatedly urged this Court that he -- you know, he's not their agent. He's not acting in concert with them. Well, if that's the case, then I don't see how he can enjoy this joint interest privilege.").

The SkyPort Parties, therefore, have not contradicted their earlier argument; instead, of arguing at the Motion to Compel hearing that Craig was *not* an agent—and here, arguing the opposite—they actually pointed out a potentially irreconcilable inconsistency in the *Schermerhorn* Parties' arguments.  Accordingly, the SkyPort Parties are not judicially estopped from arguing that Craig is Goldman's agent.

ii.    *Craig was Goldman's agent because he had control over Craig and Craig understood his role to be that of an agent.*

Goldman instructed, directed and controlled Craig's contact with Cole, and rather than Craig contacting Cole "independently" out of a "moral obligation," as the Schermerhorn Parties allege [Adv. Doc. No. 681 at p. 53], Craig communicated with Cole as an agent of Goldman. Agency is a fiduciary relationship, which does not occur automatically. Rather, agency results from the manifestation of consent by one person to another that the other shall act on his behalf and be subject to his control; and consent by the other to so act. *See Texas Processed Plastics, Inc. v. Gray Enterprises, Inc.*, 592 S.W.2d 412, 416 (Tex. App. 1979) (citing *Brown v. Cole*, 276 S.W.2d 369, 378 (Tex. Civ. App. 1955)). To create an agency relationship, there must be two elements: a "meeting of the minds" between the principal and the agent, whereby each party agrees—either implicitly or expressly—to create the agency; and a right to control between the principal and the agent, whereby the principal directs the agent's actions.

a)    Goldman and Craig created an agency relationship by establishing a "meeting of the minds."

In an agency relationship, the principal must intend that the agent act for him, and the agent must both intend to accept the authority and act on it. A meeting of the minds must therefore be present, with a court able to infer the parties' intent to create this meeting based on words or conduct between the parties. *Id.*; *First National Bank of Mineola v. Farmers and Merchants State Bank*, 417 S.W.2d 317, 330 (Tex. Civ. App. 1967).

Despite their post-hoc claims to this Court to the contrary, Goldman and Craig had an agency relationship, and their intent to form such a relationship is clear throughout their numerous e-mail exchanges. *See Ames*, 672 S.W.2d at 450 (requiring a pattern of conduct to establish agency). While the Preliminary Injunction Order did not take effect until the Court

entered it on the docket on June 10, 2010 at 2:57 p.m., e-mails sent between Goldman and Craig prior to this period establish the existence of a meeting of the minds to create an agency relationship. For example, on June 6, 2010, Goldman sent an e-mail to Craig requesting that Craig contact Cole: "Need to see whatever [Cole] has from RK. Thanks." [SkyPort Parties/SkyPort Ex. No. 147]. While this e-mail itself is not a violation of the Preliminary Injunction Order, it demonstrates both Goldman's attempts to circumvent any direct contact with Cole, as well as Goldman's intent to use Craig as his agent.

Taking Goldman's instructions, Craig e-mailed Cole the next day, saying that "[Goldman] wants to know if you will give him an affidavit that she is not a prospective customer of SkyPort? …. are you????" [SkyPort Parties/SkyPort Ex. No. 148] (emphasis added); [Tr. Mar. 8, 2012 155:6–15] (quoting Craig's testimony that he sometimes copies and pasted text authored by Goldman because he knew that Goldman was enjoined from contacting Cole).

Goldman and Craig maintained this meeting of minds after the Preliminary Injunction Order took effect. Attempting to convince Cole to aid the Schermerhorn Parties, Craig conveyed to her a message from Goldman: "I am sure that Sam and I, we can find a deal[76]……but Sam needs your 100% cooperation." [Finding of Fact No. 45]. Craig subsequently assured Goldman that Goldman's message had been conveyed, forwarding this e-mail Goldman and adding: "This is my best shot at pulling Dawn over on our side… I bet she calls you… [ . . . ] Let's see what she says….? Franklin." [Finding of Fact No. 46].

The next day, June 20, 2010, Goldman sent Craig a series of questions, requesting that Cole provide him with information. In exchange, Goldman would help Cole find a job. The e-mail reads as follows:

---

[76] Craig suggested that this "deal" could include paying for Cole's lawyer with an "'expense account' put up by the [Schermerhorn Parties] to pay for some expenses." [Finding of Fact No. 45].

> [Cole] can help in many ways:  1.  Is she owed money by SkyPort?  2.  Anyone else Robert hasn't paid?  3.  Anything else he's done since the confirmation [of the Plan] that is dishonest?  4.  Any materials relating to his efforts to sell the company?  5. Robert hurts people as he goes; who else is out there that can come into bankruptcy court and expose him?  I can make some calls for her, try to help her find a job.

[Finding of Fact No. 48].  Later that day, Craig copied and pasted Goldman's questions into an e-mail to Cole:

> [T]his how you can help us…  1.  Are you owed money by SkyPort?  2.  Anyone else Robert hasn't paid at [SkyPort]?  3.  Anything else he's done since the confirmation that is dishonest?  4. Any materials relating to his efforts to sell the company?  5.  Robert hurts people as he goes; who else is out there that can come into bankruptcy court and expose him?  Sam can make some calls for you, try to help her find a job.[77]

[*Id*.].  The copy and paste from one e-mail to another reveals Goldman's direct influence; Goldman intended that Craig would act for him, asking Cole these questions, and Craig agreed to act for Goldman, with the errant "her" in his last sentence indisputably demonstrating that these were *not* Craig's words.  Indeed, absent Craig's—albeit sloppy—attempt to provide some contextual clarity and correct the pronouns, Goldman's words are nearly identical to Craig's.  Craig simply acted as a conduit by which Goldman got into contact with Cole, with Goldman

---

[77] In their Proposed Findings of Fact and Conclusions of Law, the Schermerhorn Parties argue that,

> There is simply no evidence of any instance where . . . Goldman (or Mr. Craig for that matter), sought to contact or get in touch with or did contact or got in touch with Ms. Cole.  Indeed, the record shows that Ms. Cole contacted Mr. Craig on several occasions . . . There is no evidence that if Ms. Cole had not contacted Mr. Craig in response to a threat she perceived from Mr. Kubbernus, there would have been [a] single email between Ms. Cole and Mr. Craig regarding SkyPort or between Mr. Craig and Mr. Goldman regarding Cole.

[Adv. Doc. No. 681 at pp. 50–51].

The Court finds these assertions to be incorrect.  The two examples from June 20, 2010 alone show Goldman seeking to contact and in fact getting in contact with Cole, as well as Craig seeking to contact and getting in contact with Cole.  These communications were not sent simply in response to a communication from Cole, but were sent to obtain useful information.  In other words, Goldman and Craig were <u>not</u> responding; they were starting an entirely new line of questioning in the hope that they (i.e., Craig and Goldman) could then obtain and use any information that Cole provided against Kubbernus and the SkyPort Parties in the SkyPort Litigation.

able to obtain the same information, and communicate the same inflection and tone,[78] while maintaining a semblance of compliance with the Preliminary Injunction Order.[79]

Moreover, while the Schermerhorn Parties argue that Craig was communicating with Cole for his own purposes [Adv. Doc. No. 681 at p. 52], much of the language used in these e-mails reflects a collaborative relationship between Goldman and Craig. For instance, rather than differentiate between their interests, both Goldman and Craig continuously used words such as "we" and "us" to describe their connection.[80] This language demonstrates both that Craig's interests were anything but separate and independent, but also that both Craig and Goldman implicitly agreed that Craig would contact and communicate with Cole on the Schermerhorn Parties' behalf.[81]

In sum, Goldman and Craig had a meeting of the minds; they agreed to create an agency relationship to evade the Preliminary Injunction Order.

> b) <u>As the principal, Goldman controlled his agent's Craig's contact with Cole.</u>

---

[78] Craig to Goldman, July 3, 2010: "Sam, What do we do??" [Finding of Fact No. 58].

    Goldman to Craig, July 4, 2010: "Procedure is we must first ask RK's counsel for permission to talk to Dawn. If he says no, we go to the Judge. Steve Smith will be working papers to ask the Court to bring Dawn in to testify. Should go out on Tuesday. Decision is the Judge's." [*Id.*].

    Craig to Cole, July 4, 2010: "Procedure is we must first ask RK's counsel for permission to talk to Dawn. If he says no, we go to the Judge. Steve Smith will be working papers to ask the Court to bring Dawn in to testify. Should go out on Tuesday. Decision is the Judge's." [*Id.*].

[79] Goldman to Craig, July 9, 2010: "We are doing everything we can without violating the Court's order." [Finding of Fact No. 68].

[80] Craig to Goldman, July 1, 2010: "Sam, I spoke to Dawn. She is willing to join <u>our</u> side and going after RK big time!" [Finding of Fact No. 56].

    Craig to Cole, June 19, 2010: Call Sam… He can help you… If <u>we</u> win a settlement, I'll make sure you see some funds but you need to help us destroy RK." [Finding of Fact No. 47].

    Goldman to Craig, June 21, 2010: "I do not want you discussing SkyPort with her unless and until <u>we</u> obtain an order from Judge Bohm permitting <u>us</u> to do so." [Finding of Fact No. 48].

[81] On July 6, 2010, for example, Goldman e-mailed Craig asking if Cole had contacted the U.S. Attorney's Office. Ten minutes later, Craig e-mailed Goldman saying, "Don't know, we'll ask her." As Craig later testified, Goldman therefore knew that Craig planned to ask Dawn Cole a question for him. [Tr. Apr. 20, 2012 92:11–20].

An agent's designation as an "independent" party with separate interests is not determinative of the agency relationship.  *Northside Realty Associates, Inc. v. United States*, 605 F.2d 1348, 1353 (5th Cir. 1979) ("Despite the [agents'] arguable 'independent contractor' status . . . the [principal] in fact exercises a significant degree of control over the activities of the sales agents.").  In addition to a meeting of the minds, an agency relationship may be inferred through the principal's ability to "control" the agent's actions.  *Id.*

Applying a "right to control" test, courts have considered the principal's right to determine the details of the work, the independent nature of the business, as well as the principal's ability to give advice or direct the activities of the purported agent.[82]  *Smith v. Foodmaker, Inc.*, 928 S.W.2d 683, 687 (Tex. App. 1996); *Northside Realty Associates, Inc.*, 605 F.2d at 1353–54; *Tex. A&M Univ. v. Bishop*, 156 S.W.3d 580, 584–85 (Tex. 2005).  *But see Shell Oil Co. v. Khan*, 138 S.W.3d 288, 294 (Tex. 2004) (finding that merely making recommendations is not evidence of a right of control).  Thus, if the principal fails to take all reasonable steps within his power to ensure the agent's compliance with the injunction order, the principal may be held in contempt based on the agent's actions.  *TMX Funding, Inc. v. Impero Techs., Inc.*, No. C-10-00202-JF, 2010 U.S. Dist. LEXIS 57761, at *31 (D. Cal. May 21, 2010).

In *Regal Knitwear Co.*, for example, the Court held that an injunction could be enforceable against those who served as "instrumentalities" through which the principal sought to evade the injunction order.  *Regal Knitwear Co.*, 324 U.S. at 14.  In fact, principals must ensure that "their agents abide by the law" and cannot "with impunity" simply retain "the fruits of the violation which are committed knowingly by agents . . . ."  *United States v. A & P*

---

[82] The Court must also look for evidence of a pattern of conduct that would lead a reasonable person to believe that the alleged agent had authority to act in favor of the principal.  *Ames v. Great Southern Bank*, 672 S.W.2d 447, 450 (Tex. 1984). Only one event or transaction is generally not sufficient.  *Id.*; *John Chezik Buick Co. v. Friendly Chevrolet Co.*, 749 S.W.2d 591, 594 (Tex. App. 1988).

*Trucking Company*, 358 U.S. 121, 126 (1958); *see also Ex parte Chambers*, 898 S.W.2d 257, 261 (Tex. 1995) (holding the principal in contempt for *failing* to control the agent's actions, stating that "[s]ince [the principal] was the *only* person capable of compelling [the agent] to pay the court ordered fine, it is clear that [agent's] disobedience is due to [the principal's] *personal* refusal to act.").  Accordingly, if Goldman could control, instruct, or direct Craig to contact—or indeed, even *not* to contact—Cole, than Craig was not only Goldman's agent, but Goldman was enjoined from getting in contact with Cole through him.

The Schermerhorn Parties and Goldman argue that Craig was simply acting on his own accord, and that Goldman warned Craig not to imply to Cole that Goldman, Craig, and the Schermerhorn Parties were contacting her regarding SkyPort, or that they were offering her anything in return for her testimony in the SkyPort Litigation.  [Finding of Fact No. 48]. Initially, it appears that Goldman and Craig considered Cole to be an unlikely or unhelpful source of information in the SkyPort Litigation, and therefore, for a period after the imposition of the Preliminary Injunction Order, Goldman took a more proactive role in limiting Craig's communications with Cole.[83]  [*Id.*].  Indeed, as the principal, Goldman had a duty to take reasonable steps within his power to ensure Craig's compliance with the Preliminary Injunction Order.[84]  *TMX Funding, Inc.*, 2010 U.S. Dist. LEXIS 57761, at *31.

---

[83] Goldman to Craig, June 20, 2010:  "[Cole] must decide that she is with all the people that Robert has screwed - like her - and full tilt, without holding back.  But remember.  We will do just fine without her."  [Finding of Fact No. 47].

Goldman to Craig, June 21, 2010:  "Pls confirm with Dawn that she is the one who contacted you and is asking you for help.  I do not want to be in a situation where it looks like you are contacting her or we are offering her anything in return for her testimony.  We do not need her testimony.  I do not believe that she has given anything useful in court." [Finding of Fact No. 48].

Goldman to Craig, June 21, 2010:  "I don't believe [Cole]'s given us anything that could be useful in Court anyway.  Do we need to tell the Judge?" [*Id.*].

[84] Even before Cole switched sides, Goldman was not always cautious.  On June 18, 2010, for example, he e-mailed Craig asking whether Cole had "any claims against RK for fraud?  Is she owed money [in] Texas by him?  If she does, I can try to help her get a lawyer in Canada or Texas –contingent fee or small retainer to go after these claims.  We will try to get ourselves coordinated."  [Finding of Fact No. 44].  Simply by asking these questions, encouraging

These cautionary instructions soon ceased, however, when Cole agreed to aid the SkyPort Litigation.[85]   Goldman then repeatedly used Craig to parlay questions and information to and from Cole.[86]   *See, e.g.*, [Finding of Fact No. 58].   On July 3, 2010, for example, Goldman asked Craig if Cole would be willing to allow Goldman and the Schermerhorn Parties to take her e-mail to the undersigned judge.[87]   [*Id.*].   Goldman's question was not merely a suggestion, but instead a specific and direct request for Craig to ask Cole.   This question had nothing to do with Craig's own litigation against Kubbernus, or, indeed, Craig's interests at all; Goldman's request related entirely to litigation in which Craig was not a party.[88]   [Finding of Fact No. 16]. Nonetheless, Craig quickly passed the question along.[89]   Indeed, Craig often expressed an inability to function without Goldman's direction and instructions, asking him:   "Sam, What do we do??"   [Finding of Fact No. 58].   Thus, despite Craig's arguable "independent" status,

---

Craig's continuing communication with Cole, and indeed, even implying that the Schermerhorn Parties would be willing to provide Cole with an attorney, Goldman violated his duty to take all reasonable steps within his power to ensure compliance with the Preliminary Injunction Order. Thus, whether or not Goldman intended for Craig to convey these questions to Cole, which the Court finds that he did, Goldman's comments violated the Preliminary Injunction Order.

[85] Craig to Goldman, July 1, 2010:  "Sam, I spoke to Dawn.  She is willing to join our side and going after RK big time!  [ . . . ]  How do you want to proceed?? [ . . . ]"  [Finding of Fact No. 56].  Craig to Goldman, July 2, 2010: "Sam, [ . . . ] What should [Cole] do???"  [Finding of Fact No. 58].

[86] Goldman to Craig, July 3, 2010:  "Will she give us permission to take this email to the judge?"  Craig to Goldman, July 3, 2010:  "I will ask".  [Finding of Fact No. 58].
      Cole to Craig, July 4, 2010:  "Can you do me favor, please?  Find out from Sam how long a Plaintiff has to serve a defendant once a civil suit is filed?  [ . . . ]  I'm not sure.  If you could ask Sam's team that, I would REALLY appreciate it."  [*Id.*].

[87] Goldman to Craig, July 3, 2010:  "Will [Cole] give us permission to take this email to the judge?" [Finding of Fact No. 58].

[88] Craig to Cole, July 4, 2010:  "I am not a direct plaintif [sic] in skyport…."  [Finding of Fact No. 58].

[89] Craig to Goldman, July 3, 2010:  "I will ask."  [Finding of Fact No. 58].

130

Goldman exercised a significant degree of control over Craig's communications with Cole, including the topics and questions posed to her.[90]

Even if many of Craig's contacts with Cole were not directly at Goldman's request or behest, as the principal in their agency relationship, Goldman failed to curtail Craig's communications with Cole, and therefore, may be held in contempt for Craig's actions.  For example, Goldman told Craig, "We want to be careful, **but I have some ideas I want to discuss with you.**"  [*Id.*].  "I have some ideas I want to discuss with you" is inapposite of the "reasonable steps" Goldman could have taken to control Craig's contact with Cole.  At the very least, Goldman could have continued to warn Craig not to speak to Cole regarding the SkyPort Litigation; better yet, Goldman could have warned Craig not to speak to Cole at all.  Instead, Goldman encouraged Craig and Cole to continue communicating, repeatedly using Craig to parlay questions and information to and from Cole.[91]

Indeed, it appears that Craig would have listened to Goldman had Goldman told Craig to stop communicating with Cole regarding SkyPort.  Several times, Craig asked Goldman for advice on how to proceed and what to do,[92] with Goldman not only responding with the

---

[90] Craig to Goldman, July 5, 2010:  "What do I need to tell Dawn?  We need to get to her quickly.  Send me concise instructions overnight and I will get her first thing in the morning which is easy with 8 hour start."  [Finding of Fact No. 58].

[91] Example of information passed from Goldman to Cole:  Goldman to Craig, July 3, 2010:  "Will she give us permission to take this email to the judge?"  [Finding of Fact No. 58].  Craig to Goldman, July 3, 2010:  "I will ask".  [*Id.*].

　　　　Example of information passed from Cole to Goldman:  Cole to Craig, July 4, 2010:  "Can you do me favor, please?  Find out from Sam how long a Plaintiff has to serve a defendant once a civil suit is filed?  [ . . . ]  I'm not sure.  If you could ask Sam's team that, I would REALLY appreciate it."  [Finding of Fact No. 58].

[92] Craig to Goldman, July 3, 2010:  "Sam, What do we do??"  [Finding of Fact No. 58].

　　　　Craig to Goldman, July 5, 2010:  "What do I need to tell Dawn?  We need to get to her quickly.  Send me concise instructions overnight and I will get her first thing in the morning which is easy with 8 hour start."  [*Id.*].

　　　　Craig to Goldman, August 5, 2010:  Sam, Help!!!... What shud [sic] I do????..."  [Finding of Fact No. 69].  Craig to Goldman, August 5, 2010:  "Did you speak to the Fridge [i.e., Cole's counsel] or not???  What is the Status????? You introduced [Fridge to Cole] and organized the whole thing.... and now you don't know what the story is???????"  [*Id.*].

requested advice, but failing to warn Craig to stop.[93]  Even if Craig refused to cease his communications with Cole, at the very least, Craig would have had significantly less to report and communicate with Cole regarding the SkyPort Litigation had Goldman flatly cut Craig off. Instead, Goldman copied Craig on e-mails related to the SkyPort Litigation, including drafts of pleadings,[94] and provided answers to Cole's legal questions.[95]  Further, Goldman not only conducted extensive research and found an attorney to represent Cole, Goldman even agreed— on behalf of the Schermerhorn Parties' litigation fund—to provide the $10,000.00 retainer out of SkyPort's recovery.  [Finding of Fact No. 69].  At the very least, Goldman knew about the loan and made no attempt to stop Craig.  As Craig said to Goldman, Cole's testimony in the SkyPort

| [93] Mr. Ray (counsel for the SkyPort Parties): | Now, before you wired the [$10,000] money to Dawn Cole, you informed Mr. Goldman of your intent to make a loan to her, correct? |
| --- | --- |
| Craig: | Yes. |
| Mr. Ray: | Mr. Goldman did not stop you? |
| Craig: | No. |

[Tr. Apr. 20, 2012 105:2–7].

[94] When asked whether he normally copies non-parties on these types of e-mails, Goldman testified before this Court that "I don't normally do that."  [Tr. May 2, 2012 35:16–18]; *see, e.g.*, [Schermerhorn Parties' Ex. No. 57] (e-mailing the draft of a pleading to various parties in this proceeding as well as one non-party: Craig); [Schermerhorn Parties' Ex. No. 62] (same).

[95] Craig to Goldman, July 2, 2010:  "Sam, Interesting !!! What should she do???"  Goldman to Craig, July 2, 2010: "We will be going to the bankruptcy court on tuesday [sic] and asking for permission to bring her in so she can tell the judge what kubbernus' [sic] true stripes are."  Craig to Cole, July 3, 2010:  "I have word from Sam that his Texas lawyer is going to him on Tuesday to discuss some issues and ask if he can talk to you.....I discussed your last email with Sam as I don't have the answers to your questions....he has asked your permission to show it to the judge...is that OK[?]"  [Finding of Fact No. 58].

    Craig to Cole, July 3, 2010:  "I discussed your last email with Sam as I don't have the answers to your questions....he has asked your permission to show it to the judge...is that OK[?]"  [*Id.*].

    Craig to Goldman, July 5, 2010:  "What do I need to tell Dawn?  We need to get to her quickly.  Send me concise instructions overnight and I will get her first thing in the morning which is easy with 8 hour start."  [*Id.*]. Goldman to Craig, July 5, 2010:  "If she wants to act tomorrow, this would make sense.  We need to go to the Judge first and the Judge controls his calendar.  We can also help her find counsel; we can discuss this.  We should talk about this first."  [*Id.*].

    Goldman to Craig, July 6, 2010:  "I think we should get Dawn separate counsel.  Can recommend some Texas Lawyers.  Not sure judge will entertain her letter without a lawyer finding a legal angle to put in front of him. US attorney may take up the case if he thinks it's stong [sic] enough."  [Finding of Fact No. 64].  Craig then spoke to Cole by phone; and shortly thereafter, Cole contacted the U.S. Attorney's Office—as Goldman, coincidentally, had recommended.  [Finding of Fact No. 65].

Litigation "is probably the best smoking gun we[96] have . . . plus we pulled her into this mess." [*Id.*].  Goldman thus sat by, and enjoyed the "fruits" of Cole's involvement as a witness or source of evidence against Kubbernus.[97]  *A & P Trucking Company*, 358 U.S. at 126.  Goldman therefore failed to the reasonable steps within his power to ensure Craig's compliance with the Preliminary Injunction Order.  *TMX Funding, Inc.*, 2010 U.S. Dist. LEXIS 57761, at *31.

Finally, several times in his e-mails to Craig, Goldman indicated that he did not want to create the appearance or illusion that he was in violation of the Preliminary Injunction Order.[98] The Court rejects Goldman's attempt to nullify his violation of the Preliminary Injunction Order. Simply by saying that he was not in contempt, or that Craig was not enjoined, or indeed, that either Goldman and Craig were close to—but not over—the "line," does not nullify their agency relationship or their various violations of the Preliminary Injunction Order.  Merely declaring one's innocence while engaging in the prohibited conduct does not render the conduct itself just, valid or legal.  *See Baer v. Albano*, 50 N.Y.S.2d 284, 286 (N.Y. 1944) (rejecting a similar excuse from a debtor who collected money while the automatic stay was in place, saying "[the court] do[es] not consider this an exculpatory explanation.").  Moreover, even if these declarations were to prove that Goldman's violations of the Preliminary Injunction Order through his agent, Craig, were not willful—which they do not—the Supreme Court has made clear that the absence of

---

[96] Goldman involved Craig in so many aspects of the SkyPort Litigation that Craig implicitly seems to have adopted the Schermerhorn Parties' interests as his own, using "we" and "our" to describe the Schermerhorn Parties' interests.

[97] As Smith cautioned Goldman, "I agree helping Dawn is critical but helping her should be done in a manner to benefit us as well."  [Finding of Fact No. 59].

[98] Goldman to Craig, June 21, 2010:  "I do not want to be in a situation where it looks like you are contacting her or we are offering her anything in return for her testimony."  [Finding of Fact No. 48].  Goldman to Craig, June 21, 2010:  "I am concerned about an entrapment scenario by Dawn Cole and Kubbernus, even though Craig says she reached out to him."  [*Id.*].  Goldman to Craig, June 21, 2010:  "I realize you are not a [Schermerhorn Party], but I do not want to create an appearance that we are using you to communicate with her."  [*Id.*].  Goldman to Craig, July 4, 2010:  "She is reaching out to us, but I do not want to antagonize the Judge. We want to be careful, but I have some ideas I want to discuss with you."  [Finding of Fact No. 58].

willfulness is *not* a defense to contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *F.T.C. v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010).

In sum, Goldman and Craig had an agency relationship whereby Goldman not only controlled Craig's contact with Cole, but also failed to stop Craig's contact with Cole. Accordingly, Goldman violated the Preliminary Injunction Order by indirectly, but intentionally, contacting Cole through an agent.

### c. Alternatively, Goldman Violated the Preliminary Injunction Order by Contacting Cole Through a Party in Active Concert with Him

People who are not parties to an injunction order are bound to observe its restrictions to the extent that they may not knowingly and willing aid and abet its violation. *Laborers' Int'l Union*, 882 F.2d at 954 (holding that non-parties were also in contempt of an order as a result of their indispensable role in aiding the enjoined party in evading that order). And, by conspiring with another to evade the Court's order, the principal may be held in contempt, with the aider/abettor's violation of the order essentially imputed to the principal.[99] *Id.* The pragmatic purpose of this rule, as articulated above, is to prevent enjoined parties from nullifying a decree by simply requesting that an unenjoined party carry out the act that he is prohibited from performing. *Regal Knitwear Co.*, 324 U.S. at 13–14.

In order to determine if the parties—here, Goldman and Craig—are in active concert, they need not be legally affiliated, and the enjoined party need not even be able to control the aider's actions. *See Waffenschmidt*, 763 F.2d at 717; *Blackard v. Memphis Area Med. Ctr. for Women, Inc.*, 262 F.3d 568, 574 (6th Cir. 2001) ("It is not necessary that the enjoined party control the third party in order for the third party to be bound by the injunction."). Rather, courts look at the "actual relationship" between the parties to determine whether they were pursuing a

---

[99] Also, the aider and abettor and the principal may be held jointly and severally liable for any damages resulting from the violation. *Laborers' Int'l Union*, 882 F.2d at 955.

common interest.  *Regal Knitwear Co.*, 324 U.S. at 14; *Blackard*, 262 F.3d at 574 ("To determine whether a person is one who acts in concert or is identified in interest with the enjoined party, the court must look to the actual relationship between the person enjoined and the person thought to be bound by the injunction.").  In *S. Elec. Health Fund v. Kelley*, for instance, the court took into account that the aider/abettor "was much more involved in [the principal's] day-to-day operations and provided more support (both in terms of finance and materials)" than such a party normally would.  308 F. Supp. 2d 847, 857 (M.D. Tenn. 2003).  Accordingly, inquiries into whether a party is an aider/abettor are largely case and fact-specific.  *Power-One, Inc. v. Artesyn Techs., Inc.*, No. 2:05-CV-463, 2008 U.S. Dist. LEXIS 30338, at *9 (E.D. Tex. 2008) ("[A]s both the Supreme Court and Federal Circuit have stated, 'the [ultimate] effect of an injunction on non-parties depends on an appraisal of [their] relations and behavior [with the enjoined party,] and not upon mere construction of the terms of the order.'") (citing *Additive Controls & Measurements Sys., Inc. v. Flowdata, Inc.,* 96 F.3d 1390, 1395–96 (Fed. Cir. 1996)); *see also Vuitton et fils, S.A. v. Carousel Handbags, et al.*, 592 F.2d 126, 130 (2d Cir. 1979); *Crane Boom Life Guard Co. v. Saf-T-Boom Corp.*, 362 F.2d 317, 322 (8th Cir. 1966).

In the Fifth Circuit, courts have found that parties acted "in concert" when the non-party clearly received a signal from the enjoined party to act, *Lance v. Plummer*, 353 F.2d 585, 588 (5th Cir. 1965), as well as when the non-party—with full knowledge of the injunction order's terms—was an active participant in discussions regarding evasion of the order, *Whitcraft v. Brown*, 570 F.3d 268, 272 (5th Cir. 2009).  In each of these cases, the facts clearly demonstrated that the alleged aider/abettor's actions were not performed independently, but in conjunction

with the enjoined party.[100]   And, in these cases, the principal was found in contempt because the

aider's actions were an extension of the principal's actions.[101]   "[W]hat they did as a group they

[were] responsible for as a group."   *Jim Walter Resources, Inc. v. Int'l Union, et al.*, 609 F.2d

165, 169 (5th Cir. 1980) ("There is strict liability for concerted, authorized activity done in

violation of a restraining order.").   Conversely, the Fifth Circuit has found that parties did *not* act

in concert when the facts reflected an arms-length transaction and a legitimate transfer of assets

rather than the conspiracy.   *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 965 (5th Cir. 1995).

> i.   *The Schermerhorn Parties are judicially estopped from arguing that Craig and Goldman were not acting in concert*

First, and as a threshold matter, the Court concludes that the Schermerhorn Parties,

including Goldman, are estopped from now arguing that Craig and Goldman's interests were *not*

aligned and actions were not in concert.   On February 29, and March 1, 2012, this Court held a

hearing on the Motion to Compel, which addressed whether Goldman should be required to

produce various e-mails between Craig and himself.   [Finding of Fact No. 129].   Goldman

refused, citing the "common legal interest privilege," and arguing that Craig's interest and his

interests were so aligned that he had not waived the attorney-client privilege because his

"privileged communication[s] [were] shared with a third person who has a common legal interest

with respect to the subject matter of the communication."   [Adv. Doc. No. 492 at p. 6, ¶ 9]

(citing *In re Santa Fe Int'l Corp.*, 272 F.3d 705 (5th Cir. 2001)); *see also* [Finding of Fact No.

128].

---

[100] Additionally, while good faith is not a defense to a finding of "active concert," good faith is relevant to whether a non-party knowingly aided or abetted another in violating a court order.  *Whitcraft*, 570 F.3d at 272; *Waffenschmidt*, 763 F.2d at 726.

[101] If the principal is not involved in the alleged aider's activities, then the parties are *not* in active concert, and *not* in contempt.  *United Pharmacal Corp. v. United States*, 306 F.2d 515 (Mass. 1962).

Generally, the Fifth Circuit and as well as Texas courts, have permitted the common legal interest doctrine when communications are made as part of a joint defense agreement.  *See, e.g.*, *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 712 (5th Cir. 2001) ("Disclosure of privileged information by an attorney to actual or potential co-defendants, or to their counsel, in the course of a joint defense does not constitute a waiver of the attorney-client privilege. . . . The privilege also protects from disclosure communications between various co-defendants and their attorneys in a civil proceeding."); *In re Seigel*, 198 S.W.3d 21, 27 (Tex. App. 2006) (describing the common interest privilege by its more common name, the "joint defense privilege" and saying that the "the rule is not an independent privilege," but simply "an exception to the general rule that no attorney-client privilege attaches to communications that are made in the presence of or disclosed to a third party.").  This sort of situation clearly does not exist here.  As the Court noted at the March 1, 2012 hearing on the Motion to Compel, Goldman and Craig had no attorney-client relationship at all, much less a joint defense agreement.  Goldman and Craig never signed an engagement letter and Goldman had never submitted a billing invoice to Craig.  [Tape Recording, Mar. 1, 2012 Hearing at 8:59:12–8:59:58 a.m.].  Likewise, Craig was not co-defendant in the SkyPort Litigation; accordingly, his communications with a Schermerhorn Party attorney (i.e., Goldman) were not protected from disclosure.

Rather, Goldman and Craig were engaged in a business relationship, with Craig recommending clients and providing various documents to Goldman.  [*Id.* at 9:55:59–9:56:19 a.m.].  A business relationship may create a common interest, but does not create an expectation of privilege or protection from production.  *Osherow v. Vann (In re Hardwood P-G, Inc.)*, 403 B.R. 445, 460 (Bankr. W.D. Tex. 2009) ("[T]he common interest must relate to a litigation interest, not merely a common business interest.").  Accordingly, while the Court granted the

Motion to Compel, it did not necessarily conclude that Goldman and Craig did not have a common interest sufficient to bind Craig to the Preliminary Injunction Order.   *See* [Tape Recording, Mar. 1, 2012 Hearing at 9:45:31–10:04:46 a.m.].   Ultimately, at the hearing on the Motion to Compel, the Court found both Goldman and Craig's arguments to be incredulous, and in short, an attempt to weasel around the business nature of their relationship. [*Id.*].

Yet, *now,* in order to win a different argument, the Schermerhorn Parties allege that Craig's interests and actions were independent and entirely unconnected to the SkyPort Litigation.  [Adv. Doc. No. 681 at p. 72, ¶ 180].  That, in fact, Goldman and Craig's interests were <u>not</u> aligned, and <u>not</u> in concert; and that, as a result, Craig was <u>not</u> bound by the Preliminary Injunction Order.  The Court not only disagrees, but also concludes that Goldman is estopped from now asserting his independence from Craig.  After all, if Goldman and Craig shared a common interest sufficient to protect their communications under the "common legal interest privilege," then their interests should also be sufficiently common to find that they were in concert.  Indeed, this Court finds that these two arguments are incompatible.  Craig simply cannot be both independent *and* protected by the common legal interest doctrine.  To argue both is unfair and unacceptable.

And, as this Court noted at the Hearings, Goldman and Craig have repeatedly fudged and manipulated the description of their relationship, particularly as it has served their interests in the moment.[102]   Thus, to protect its own integrity, this Court chooses to invoke judicial estoppel. *New Hampshire v. Maine*, 532 U.S. 742 (2001) ("Courts have observed that the circumstances

---

[102] For example, despite being a sophisticated party and a very seasoned attorney, Goldman said under oath that yes, Craig was a client, "in a larger sense."   [Tape Recording, Mar. 1, 2012 Hearing at 9:49:41–10:01:35 a.m.]. Similarly, Craig said that while he knew what hiring a farmhand entails, he could not define "hiring a lawyer," and therefore, could not say with certainty whether he had ever "hired" Goldman.   [*Id.*].   By using such vague descriptions, both men implied that attorney-client relationships and common interests are amorphous and expansive, and that their relationship was sufficiently united to fall within these definitions.

under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle."); *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 206 (5th Cir. 1999) ("The purpose of the doctrine [of judicial estoppel] is to protect the integrity of the judicial process, by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest."); *see also United States v. McCaskey*, 9 F.3d 368, 379 (5th Cir. 1993) (purpose of doctrine is "to protect the integrity of the judicial process and to prevent unfair and manipulative use of the court system by litigants"); *McNemar v. Disney Store, Inc.*, 91 F.3d 610, 616 (3d Cir. 1996) ("The doctrine of judicial estoppel serves a consistently clear and undisputed jurisprudential purpose: to protect the integrity of the courts.").

As a result, the Schermerhorn Parties are estopped from arguing that Craig and Goldman were not acting in concert.

### ii.   Craig had actual notice of the injunction

Alternatively, even without invoking estoppel, the Court finds that Craig aided and abetted Goldman's violation of the Preliminary Injunction Order.  To make this conclusion, the movant—here, the SkyPort Parties—must demonstrate that the alleged aider and abettor had actual notice of the Court's order.  Otherwise, "active concert" between the parties to evade that order is impossible.  *See Vuitton et fils, S.A.,* 592 F.2d at 129.   Actual notice in this context is interpreted broadly.  As long as the aider and abettor had knowledge of the order, the notice requirement is fulfilled.  *See Whitcraft*, 570 F.3d at 270 (restraining those who "receive actual notice of this order by personal service *or otherwise); Rockwell Graphic Systems, Inc. v. DEV Industries*, 91 F.3d 917, 917 (7th Cir. 1996) ("[I]f Tensor had knowledge of the court order . . . then Tensor may be subject to the injunction.") (citing *Regal Knitwear Co.*, 324 U.S. at 13–14); *Stoutler &  Co. v. Able*, 870 F.2d 1158, 1164 (7th Cir. 1989).  Personal service is *not* required.

*See Vuitton et fils, S.A.,* 592 F.2d at 129.  Here, there is substantial evidence to demonstrate Craig's knowledge of the order.

Immediately after the entry of the Preliminary Injunction Order on the docket, Craig e-mailed Goldman asking, "Do you want to answer [Cole] or **are you not allowed**"?  [Finding of Fact No. 37] (emphasis added).  Goldman then called Craig, and when they did not connect, sent Craig an e-mail indicating that Craig and he should speak *before* Craig spoke to Cole.  [*Id.*]. Thus, on the day of the Preliminary Injunction Order entry, Craig was, at the very least, aware that the Schermerhorn Parties *may* have been barred from speaking with Cole.

By the next day, (i.e., June 11, 2010), it is clear that Craig knew about the Preliminary Injunction Order as well as its contents.  As Craig indicated in an e-mail to Goldman, "Just spoke to Dawn…FYI—she got an email from RK saying noone [sic] can contact her…???"  [Finding of Fact No. 40].  Craig then proceeded to ignore this prohibition, e-mailing Cole on June 18, 2010 with the recommendation that she "call Sam [Goldman] … he has some leads too." [Finding of Fact No. 43].

Moreover, while Craig seems to have initially believed that he was immune from the injunction order ("I guess I can [contact Cole]"), on June 20, 2010, Goldman dissuaded this misunderstanding of the Preliminary Injunction Order.  As Goldman stated in an e-mail to Craig, "I understand and confirm that Dawn contacted you in the first instance; if this isn't the case, I don't want you talking to her."  [Finding of Fact No. 48].  On June 21, 2010, Goldman then told Craig, "I understand you have a prior relationship with Dawn Cole regarding another matter and that she contact you, but **I do not want you discussing SkyPort with her unless and until we obtain an order from Judge Bohm permitting us to do so**. . . ."  [*Id.*].  During this same period, Goldman and Craig also spoke by telephone several times.  *See* [*id.*].  While the content

of these conversations is essentially unknown, the surrounding e-mails indicate that these conversations likely related to the Preliminary Injunction Order and its contents. Accordingly, the Court concludes that the "actual notice" requirement has been fulfilled. *See Rockwell Graphic Systems, Inc.*, 91 F.3d at 917. Craig had knowledge of the Preliminary Injunction Order and its contents.

### iii.   Goldman and Craig acted in concert to violate the Preliminary Injunction Order

Goldman may be held in contempt for Craig's actions in breach of the Preliminary Injunction Order because Goldman and Craig were in active concert to circumvent this Court's order. First, the Court concludes that Goldman and Craig's "actual relationship" reveals Craig's role as an aider/abettor. Craig was simply far too involved in the Schermerhorn Parties and Goldman's day-to-day litigation and provided much more support—financial and otherwise—than such a supposed "independent" party normally would.

Craig is <u>not</u> a named Schermerhorn or SkyPort Party in the SkyPort Litigation in this Court.[103]  [Finding of Fact No. 16]. Craig presumably therefore should have had little interest in the SkyPort Litigation. Craig, however, recommended and sold investments in four of the SkyPort Parties—ClearSky Investments, L.P., SkyComm Technologies Corp., Lavell Systems, Inc. and Victoria Grey—to five of the Schermerhorn Parties entities—Sequoia Aggressive Growth Fund, Ltd., Sequoia Diversified Growth Fund, Rig III Fund, Ltd., Aran Asset Management SA, and Semper Gestion SA.  [Adv. Doc. No. 681 at p. 15, ¶ 5 n.5]. Accordingly, Craig was not a wholly independent party, but was likely concerned for his own professional

---

[103] Craig to Cole, July 4, 2010:  "I am not a direct plaintif [sic] in skyport [sic]…."  [Finding of Fact No. 58].

reputation as an investment manager as well as the interests of the Schermerhorn Parties that he

convinced to make investments which entangled them in this dispute.[104]

For his part, Goldman argues that Craig's *only* reason for contacting Cole was because

"Craig believed he had a moral obligation to help [Cole] because the filing of her emails in [this]

Court had contributed to the issues she was now having with Mr. Kubbernus (i.e., the suit that

Kubbernus filed against Cole)" [Adv. Doc. No. 681 at p. 53, ¶ 134].  Goldman therefore argues

that Craig was acting of his own "accord and for his own reasons and not on behalf of Mr.

Goldman."  [*Id.*].  However, Craig's incessant and tangled communications with Goldman and

Cole reveal a more than an impartial "moral obligation."  For example, Goldman used Craig as

the instrumentality through which Goldman contacted and exchanged information with Cole.[105]

---

[104] For example, Craig testified as follows at the April 18, 2012 hearing:

| Catmull (counsel for the SkyPort Parties): | In any event, you and your Schermerhorn party clients wanted CEO – wanted Kubbernus out of SkyPort, right?   . . . |
|---|---|
| Craig: | Well, I wouldn't have cried.  Let's put it that way. |
| Catmull: | Well, actually I just need a yes or no.  Yes or no -- |
| Craig: | That was not my – that was not my goal.  Our goal was to retrieve funds for investors foremost. |
| Catmull: | You saw Kubbernus as an impediment to that goal, right? |
| Craig: | No, a mean. |
| Catmull: | You saw Kubbernus as a means to your goal -- |
| Craig: | Yeah. |
| Catmull: | -- of getting money back for the Schermerhorn parties? |
| Craig: | Right.  Because he's a fraudster. |

[Tr. Apr. 18, 2012 144:9–22].

[105] Goldman to Craig, June 20, 2010:

[Cole] can help in many ways:  1.  Is she owed money by SkyPort?  2.  Anyone else Robert hasn't paid?  3.  Anything else he's done since the confirmation [of the Plan] that is dishonest? 4.  Any materials relating to his efforts to sell the company? 5.  Robert hurts people as he goes; who else is out there that can come into bankruptcy court and expose him? I can make some calls for her, try to help her find a job.

[Finding of Fact No. 48].  Craig to Cole, June 20, 2010:

[T]his how you can help us… 1.  Are you owed money by SkyPort? 2.  Anyone else Robert hasn't paid at [SkyPort]? 3.  Anything else he's done since the confirmation that is dishonest? 4.  Any materials relating to his efforts to sell the company? 5.  Robert hurts people as he goes; who else is

Indeed, Craig's actions were often—if not *always*—merely a disguised extension of Goldman's actions and communications.[106]   Together, Goldman and Craig convinced Cole to join the Schermerhorn Parties' "side",[107] and to file defamatory evidence against Kubbernus in this Court.[108]   As Goldman noted, he could not contact Cole himself, as the very purpose of the Preliminary Injunction Order was to stop all communications with those with information that was potentially hurtful to SkyPort and its ability to reorganize under the Plan.   *See* [Finding of Fact No. 31] (noting that accusations can carry quickly and cruelly).   Thus, Goldman simply used Craig to circumvent the Preliminary Injunction Order and its intent, involving him as an "active participant" in otherwise enjoined communications with Cole.   *Whitcraft*, 570 F.3d at 272; *Regal Knitwear Co.*, 324 U.S. at 13–14.

Craig and Goldman also conspired to find an attorney for Cole.[109]   Goldman began by finding and confirming that Fridge would be willing to represent her,[110] with Craig then relaying

---

out there that can come into bankruptcy court and expose him?  Sam can make some calls for you, try to help her find a job.

[Finding of Fact No. 48].

[106] Goldman to Craig, July 3, 2010:  "Will she give us permission to take this email to the judge?"  Craig to Goldman, July 3, 2010:  "I will ask".  [Finding of Fact No. 58].

[107] Goldman to Craig, June 21, 2010: "I can't believe [Cole] doesn't understand that Robert takes peoples [sic] money, manipulates them as long as he can to avoid paying them and then dumps them, while accusing them of disloyalty. She must decide that she is with all the people that Robert has screwed - like her - and full tilt, without holding back."  [Finding of Fact No. 47].  Craig to Goldman, July 1, 2010:  "Sam, I spoke to Dawn.  She is willing to join our side and going after RK big time!" [Finding of Fact No. 56].

[108] Craig to Goldman, July 5, 2010:  "What do I need to tell Dawn?  We need to get to her quickly.  Send me concise instructions overnight and I will get her first thing in the morning which is easy with 8 hour start."  [Finding of Fact No. 58].

[109] Goldman to Craig, July 5, 2010:  "If she wants to act tomorrow, this would make sense.  We need to go to the Judge first and the Judge controls his calendar. We can also help her find counsel; we can discuss this.  We should talk about this first."  [Finding of Fact No. 58].
Craig to Cole, July 13, 2010:  "Sam is in Houston today seeing judge... He will know if your letter is made public. If so, his lawyers can represent you... he had also been speaking to the top Houston firm who are taking their time deciding what they will do... we should have counsel very quickly today and will know more today after Sam and his lawyers meet with the judge... I'll let you know"  [Finding of Fact No. 68].

this information to Cole.[111]   [Finding of Fact Nos. 68–69].  They agreed that they "need[ed] to get [Fridge] involved and pay for it...," that "Fridge can do a lot to help her and us," and that "[Cole's] testimony is probably the best smoking gun we have so the investment seems necessary.. plus we pulled her into this mess!"  [Finding of Fact No. 69].  Accordingly, when Cole could not come up with the $10,000.00 retainer, Craig and Goldman agreed to advance Cole the necessary funds.[112]  [Finding of Fact Nos. 68–69].

The Schermerhorn Parties argue that advancement of the $10,000.00 was for Craig's independent benefit, and out of some "moral obligation."   [Adv. Doc. No. 681 at pp. 52–53] ("Mr. Craig believed that he had a moral obligation to help [Cole]").  Yet, Craig himself refuted such a nonsensical assertion.  In August of 2010, Craig began to become concerned that he alone would be at risk for the $10,000.00 loan.  Thereafter, Craig confirmed in an e-mail to Goldman that his own interests were <u>not</u> at stake or at issue; that, instead, Craig was simply executing Goldman's actions.  As Craig said to Goldman, "If I have to lend Dawn these funds I insist that they get the same status as al [sic] the other expenses as this is DIRECTLY linked to the case and to its success. . . ."  [Finding of Fact No. 69].  As a result, Craig argued that Goldman and the Schermerhorn Parties should be entirely at risk in case Cole failed to repay the $10,000.00.[113] And, more significantly, Goldman agreed!  As he said, "Let's make sure [Fridge] gets his retainer

---

[110] Goldman to Craig, July 24, 2010:  "You will be proud of me, the way I looked out for your money.  Fridge agreed to accept 10k retainer plus contingency.  You need to seal the deal and we have a lot of very important details to cover over the next few days.  Fridge can do a lot to help her and us."  [Finding of Fact No. 69].

[111] Craig to Cole, July 23, 2010:  "Dawn, Please call Mr. Fridge (who I understand is very good).  His number is [redacted] and he is expecting your call."  [Finding of Fact No. 68].

[112] Goldman to Craig, August 5, 2010:  "I assume that Dawn will pay you back [for the $10,000.00], but if she does not then I agree, it should be reimbursable by SkyPort out of any recovery."  [Finding of Fact No. 69].

[113] Craig to Goldman, August 5, 2010:  "Did you speak to the Fridge or not???  What is the Status?????  You introduced him and organized the whole thing.... and now you don't know what the story is???????  Sam.... would you level with me please! ...  **I've played ball with you and you've drawn Dawn into this unwillingly....**" [Finding of Fact No. 69].

asap. . . . All expenses incurred by lawyers and clients on this matter will be repaid first out of any recovery.  This is not an issue, and if you like, I can document it more formally."  [*Id.*]. Goldman also cautioned Craig that "we are still under an injunction not to contact Dawn," and therefore could not advance the funds to Cole himself.  [*Id.*].  However, Goldman "agree[d] that all expenses should come off the top [of SkyPort's litigation expense fund] before anyone gets anything," and that he "though[t] this was understood."  [*Id.*].  With this assurance,[114] and at Goldman's signal,[115] Craig agreed to loan the $10,000 to Cole.  *See Lance,* 353 F.2d at 588 (finding that a non-party was in concert with the principal after the principal sent a clear "signal" to act).

In sum, Goldman and Craig's conspiracy to thwart the Preliminary Injunction Order was blatant and frequent, occurring over the course of *many* e-mails and phone calls.  The facts unmistakably show that Craig's actions were not independent or gratuitous, but in conjunction and in concerted effort with Goldman.  Goldman may therefore be held in contempt for those actions committed by Craig in contravention of the Preliminary Injunction Order.[116]    Having bound their fates, Craig and Goldman must fall on their swords together.  *See Jim Walter Resources, Inc.*, 609 F.2d at 169 ("[W]hat they did as a group they are responsible for a group."); *Vuitton et fi*ls, *S.A.,* 592 F.2d at 131 (holding that upon proof of (1) actual notice of the injunction; (2) activity in concert; and (3) violation of the terms of the injunction, the only remaining issue is damages).

---

[114] Goldman to Craig, August 5, 2010:  "All expenses incurred by lawyers and clients on this matter will be repaid first out of any recovery [by SkyPort].  This is not an issue, and if you like, I can document it more formally." [Finding of Fact No. 69].

[115] Goldman to Craig, August 6, 2010:  "Let's make sure [Fridge] he gets his retainer asap. . . ."  [Finding of Fact No. 69].  Craig wired the $10,000 to Cole that same day.  [*Id.*].

[116] In brief, Goldman may be held liable for each contact between Craig and Cole which occurred after June 10, 2010.  The Court will discuss Craig's violations as an aider and abettor in more detail below.

### d. Additionally, Goldman Violated the Preliminary Injunction Order by Pursuing Direct and/or Derivative Claims Against the SkyPort Parties[117]

The vast majority of the arguments and evidence adduced in this Court at the Hearings related to Goldman's alleged violation of the second clause in the Preliminary Injunction Order, enjoining "contact."  Nevertheless, according to the first provision of the Preliminary Injunction Order, Goldman was also enjoined from the pursuit of "any and all claims or causes of action, derivative or direct, against all of the [SkyPort Parties]."   [Finding of Fact No. 32].  Despite the Preliminary Injunction Order's prohibition, Goldman continued to pursue claims[118] against the SkyPort Parties—namely, Kubbernus.

As discussed above, pursuit of a claim is defined broadly as the initiation and continued activity to further the prosecution of a cause of action.  Case law has further defined this phrase to encompass actively trying to persuade a person to join a lawsuit, especially when that person is believed to have invaluable knowledge.  *See Hampton Hardware, Inc. v. Cotter & Co., Inc.*, 156 F.D.R. 630, 631 (N.D. Tex. 1994) (finding that letters that contained information about a class action lawsuit, sent to potential plaintiffs by the defendant, constituted contact and was impermissible under the Federal Rules of Civil Procedure as interference in a lawsuit); *Recinos-Recinos v. Express Forestry, Inc.*, No. 05-1355, 2006 WL 197030, at *12 (E.D. La. Jan. 24, 2006) (holding that the contacting of plaintiffs by a defendants' agent was impermissible due to

---

[117] While the Court has addressed Goldman's violation of the "contact" provision in three separate sections (i.e., Goldman contacted Cole personally; Goldman contacted Cole through an agent; and Goldman contacted Cole through an aider/abettor), the Court will now discuss Goldman's improper pursuit of direct and derivative claims against the SkyPort Parties in a single, consolidated section.

[118] There has been lengthy litigation as to which claims were direct and which were derivative within this suit.  This Court spent many hours wading through substantial evidence and testimony, and this Court then issued a lengthy Memorandum Opinion on the matter.  [Adv. Doc. No. 272].  For the purpose of this Opinion, the distinction between direct and derivative claims is unimportant, as the injunction broadly enjoined the pursuit of "**any and all** claims or causes of action, **derivative or direct.**"

the possibility of collusion and the potential effect on the suit).  Accordingly, pursuing evidence and witnesses would be a violation of the Preliminary Injunction Order.

While Goldman may not have personally encouraged Cole to join the suit as a witness and source of evidence, he clearly directed Craig as his agent, and worked in concert with Craig as an aider/abettor, to obtain Cole's aid against the SkyPort Parties.[119]  Even if communications with witnesses and sources of evidence were commenced *before* the Preliminary Injunction Order, continued pursuit of those communications is not excused; rather, communications held after the injunction is issued can still constitute contempt.  *See Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 599 F. Supp. 2d 809, 840 (S.D. Tex. 2008) (finding that continued pursuit of an arbitration claim commenced before the injunction was in place violated the injunction).  Thus, even though Goldman and Craig may have begun communicating with Cole prior to the injunction's issuance, after June 10, 2010, pursuit of her assistance in the SkyPort Litigation is still a violation of the injunction.

Further, the Preliminary Injunction Order not only forbade the pursuit of any existing claims, but also *additional* claims against the SkyPort Parties, for where a party is enjoined from pursuing a lawsuit against a defendant, further suits or litigation represent a violation of the injunction.  *See Anti Lothian Bankruptcy Fraud Committee v. Lothian Oil, Inc.*, No. MO-10-CH-68-H, 2011 WL 4628696, at *4 (W.D. Tex. Sept. 30, 2011).   Applying *Lothian* to the suits at

---

[119] On June 18, 2010, for example, Goldman e-mailed Craig asking whether Cole had "any claims against RK for fraud?  Is she owed money [in] Texas by him?  If she does, I can try to help her get a lawyer in Canada or Texas – contingent fee or small retainer to go after these claims.  We will try to get ourselves coordinated."  [Finding of Fact No. 44].

    Goldman to Craig, June 20, 2010:  "[Cole] must decide that she is with all the people that Robert has screwed - like her - and full tilt, without holding back.  But remember.  We will do just fine without her." [Finding of Fact No. 47].

    Craig to Goldman:  "Sam, I spoke to Dawn.  She is willing to join <u>our</u> side and going after RK big time!" [Finding of Fact No. 56].

    Goldman to Craig, July 2, 2010:  "We will be going to the bankruptcy court on tuesday [sic] and asking for permission to bring [Cole] in so she can tell the judge what kubbernus' [sic] true stripes are." [Finding of Fact No. 58].

bar, encouraging Cole's pursuit of claims in other courts would be a violation of the Preliminary Injunction Order.

In breach of the Preliminary Injunction Order, Goldman personally contacted and arranged counsel for Cole, which Goldman knew could, and likely would, be used to pursue claims against Kubbernus.[120]  [Finding of Fact Nos. 68–69].  Indeed, several e-mails exchanged between Goldman and Craig,[121] as well as more between Goldman and his co-counsel for the Schermerhorn Parties, Smith, Fryer and Obstfeld, indicate Goldman's strong interest in bringing Cole into the lawsuit.[122]  *See, e.g.*, [Finding of Fact Nos. 58–59].  Further, in active concert and agency, Goldman and Craig agreed to provide Cole with the $10,000.00 loan necessary to retain Fridge.[123]  [Findings of Fact No. 68–69].  This last action—i.e., finding Cole legal representation—likely had two motivations:  (1) extend good will to Cole in the hope of

---

[120] Indeed, Goldman knew that Cole contemplated using counsel for much more than responding to the suit that Kubbernus filed against her.  As Goldman stated in an e-mail to his co-counsel, "[Cole] is threatening to counterclaim against SkyPort."  [Finding of Fact No. 59].

Goldman also knew that Cole wished to join the Schermerhorn Parties in their pursuit of any claims against Kubbernus, as well as to seek criminal charges against Kubbernus.  As Goldman said to Craig on July 6, 2010:  "I think we should get Dawn separate counsel.  Can recommend some Texas Lawyers.  Not sure judge will entertain her letter without a lawyer finding a legal angle to put in front of him.  US attorney may take up the case if he thinks it's strong enough."  [Finding of Fact No. 65].

[121] Goldman to Craig, June 18, 2010:  "[Cole] should be making common cause with us rather than trying to hide in the background.  [ . . . ] Does she have any claims against RK for fraud?  Is she owed money ion [sic] Texas by him?  If she does, I can try to help her get a lawyer in Canada or Texas –contingent fee or small retainer to go after these claims.  We will try to get ourselves coordinated."  [Finding of Fact No. 44].

Goldman to Craig, June 20, 2010:  "[Cole] can help in many ways:  1. Is she owed money by SkyPort?  2. Anyone else Robert hasn't paid?  3.  Anything else he's done since the confirmation that is dishonest? 4. Any materials relating to his efforts to sell the company? 5.  Robert hurts people as he goes; who else is out there that can come into bankruptcy court and expose him?"  [Finding of Fact No. 48].

Goldman to Craig, July 6, 2010:  "I think we should get Dawn separate counsel.  Can recommend some Texas Lawyers.  Not sure judge will entertain her letter without a lawyer finding a legal angle to put in front of him.  US attorney may take up the case if he thinks it's strong enough."  [Finding of Fact No. 65].

Goldman to Craig, August 5, 2010:  "I understand that [Fridge] will represent [Cole] and that this should be advantageous to Dawn and to us."  [Finding of Fact No. 69].

[122] Goldman to his co-counsel, Smith, Fryer and Obstfeld, July 2, 2010:  "Can we go to the judge with [Cole's] e-mail?  We need to help her."  [Finding of Fact No. 59].

[123] Goldman to Craig, August 5, 2010:  "I assume that Dawn will pay you back [for the $10,000.00], but if she does not then I agree, it should be reimbursable by SkyPort out of any recovery."  [Finding of Fact No. 69].

persuading her to join (or at least to testify in the prosecution of) the Schermerhorn Parties' suit against the SkyPort Parties; and (2) increase the time and litigation costs to Kubbernus and other SkyPort Parties. As finding counsel for Cole, as well as providing the funds necessary for his retainer, could have resulted in additional litigation against a party in the suit at bar (i.e., Kubbernus), Goldman's personal actions, as well as his actions in conjunction with Craig as an agent and aider and abettor, violated the Preliminary Injunction Order. *See Newby v. Enron Corp.*, 338 F.3d 467, 474 (5th Cir. 2003) (citing *In re Corrugated Container Antitrust Litigation*, 659 F.2d 1332, 1334 (5th Cir. 1981)) (finding that injunctions against pursuing claims prevent enjoined parties from pursuing any suits that may conflict or coincide with the suit from which the injunction was issued).

Finally, Goldman used Craig to pursue financial backing and support for the Schermerhorn Parties' case and continued litigation. At Goldman's request,[124] Craig sent several e-mails to entities and individuals who owed money to the Schermerhorn Parties' litigation expense fund. In these e-mails, Craig not only encouraged their financial support, but also subtlety threatened them from either abandoning the Schermerhorn Parties' cause or supporting the SkyPort Parties' cause.[125] In this way, Goldman used Craig (1) to continue the Schermerhorn Parties' litigation—and therefore the enjoined pursuit of claims—against the SkyPort Parties; and (2) to deflate any support for the SkyPort Parties, thereby hurting their litigation efforts.

In sum, by furthering existing claims, and aiding the creation of additional claims against a party (i.e., Kubbernus), Goldman violated the Preliminary Injunction Order's provision against

---

[124] Goldman to Craig, December 12, 2010: "Franklin: As requested, attached is a memo breaking out key information regarding your investors and their participation in the SkyPort Litigation. Hopefully, with this in hand, we can bring these investors current on their expense fund contributions." [Finding of Fact No. 99].

[125] Craig to Robert Mendel, November 16, 2010: "I think it is important for you to support the litigation fund personally to demonstrate that you are a victim or RK's fraud and not to be associated with his as you were working with him and responsible for raising funds for the scam. You need to distance yourself from him by actively being on the offense against him." [SkyPort Parties/SkyPort Ex. No. 87].

the pursuit of claims; therefore, Goldman may be held in contempt.  *See Symetra*, 599 F. Supp. 2d at 842–43.

F.      **Craig Violated the Preliminary Injunction Order**

As with Goldman, to hold Craig in contempt of the Preliminary Injunction Order, three elements must be proven by clear and convincing evidence:  (1) that the Preliminary Injunction Order was in place at the time of the alleged violation(s); (2) that the Preliminary Injunction Order required Craig to comply with certain conduct; and (3) that Craig subsequently failed to comply with the Preliminary Injunction Order.  *Piggly Wiggly Clarksville, Inc.*, 177 F.3d at 382. The Court has already analyzed the first element; the Preliminary Injunction Order was in effect by June 10, 2010.  The Court also now finds that the SkyPort Parties have shown—by clear and convincing evidence—that Craig repeatedly and continually contacted Cole, and pursued claims against the SkyPort Parties; and that while he is not a named party, Craig may still be held in contempt for these actions.  First, Craig was personally enjoined from these actions, as he was a party in interest, a party in privity and an agent subject to Goldman's control.  Additionally, Craig may be held liable for actions executed on behalf of a named party, particularly as an aider and abettor to Goldman's violation of the Preliminary Injunction Order.

1.   The Preliminary Injunction Order Enjoined Craig from Certain Conduct

a.  **Craig Was Personally Enjoined Under the Preliminary Injunction Order**

Craig argues that the Preliminary Injunction Order, on its face, applies to the Schermerhorn Parties alone; that, as Craig is not a named party in this proceeding, the order does not, and should not, apply to him.  While it is true that Craig is not a named party—either now, or at the time that this Court issued the Preliminary Injunction Order—"*every* order granting an injunction . . . is binding[,]" not only on "the parties defendant but also those identified with

them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co.*, 324 U.S. at 14 (emphasis added). It is therefore beside the point that Craig is not an explicitly named party; he is still personally bound if he is a party in interest, in privity or under the control of a named party, with each situation creating an independent basis for personally enjoining a non-party. *See id.*; *Parker v. Ryan*, 960 F.2d 543, 546 (5th Cir. 1992) (holding that an injunction binds not only the "defendant but also those identified with [him] in interest, in 'privity' with [him], represented by [him] or subject to [his] control." (quoting *Waffenschmidt*, 763 F.2d at 717)). As a result of his behavior, Craig may be personally bound under each of these circumstances.

i. *Because of Their Common Interests, Craig Was Personally Enjoined*

Although the persons most obviously bound by an injunction are those named parties before a court, the Supreme Court has also extended a court's power to enjoin non-parties if they are "identified in interest" with an enjoined party. *Regal Knitwear Co.*, 324 U.S. at 14; *see also Reliance Ins. Co. v. Mast Constr. Co.*, 84 F.3d 372, 377 (10th Cir. 1996) ("[W]e agree that 'alter ego, collusion, or *identity of interest*' would be sufficient to make a restraining order binding upon a nonparty who has actual notice of the order"). In order to bind Craig to the Preliminary Injunction Order, this Court must examine the "commonality of incentives and motivations" between Craig and the Schermerhorn Parties. *Lynch v. Rank*, 639 F. Supp. 69, 72 (N.D. Cal. 1985.); *see also TD Ameritrade, Inc. v. Nev. Agency & Trust Co.*, No. 3:08-CV-00245-LRH-RAM, 2008 WL 4787138, at *6 (D. Nev. Oct. 30, 2008) ("[T]he aim of Rule 65(d) is to extend the reach of injunctions to nonparties who nonetheless share common interests with a party."). While their common interests need not be extensive, the Court must be able to identify a specific and identifiable issue. *Titan Partners, LLC v. USA Tax & Ins. Servs., Inc.*, No. 4:11CV00109

AGF, 2011 WL 940723, at *2 (E.D. Mo. Mar. 16, 2011).  If such an interest exists between Craig and an enjoined party—including Goldman and the other named Schermerhorn Parties— then despite being a non-party to the proceeding at bar, Craig was nevertheless enjoined from the pursuit of direct and derivative claims, as well as from contacting Cole.

Based on Craig's own words, it is clear that the Schermerhorn Parties, Goldman and he shared a common, identified interest:  the pursuit of claims against Kubbernus, including most especially, the claims against him in this Court.  In multiple e-mail communications to Cole, Craig represented Goldman and himself with Goldman as a collective group, using "we" to describe their activities and attitudes.[126]  Craig made further assertions that if "*we* win a settlement" against Kubbernus it would "be better for all of *us*."  [Finding of Fact No. 40].  In addition, Craig repeatedly urged Cole to "join *our* ranks," referring to himself, the Schermerhorn Parties, and Goldman.  [Finding of Fact No. 45].  Craig also told Cole that if "*we* win a settlement," he would ensure that Cole received some funds to aid in her own suit against Kubbernus.  [Finding of Fact No. 47].  When Cole sought advice on a legal matter, Craig replied that he would "ask *our* lawyers what to do."  [Finding of Fact No. 58].  And, despite the fact that

---

[126] Craig to Cole, June 18, 2010:  "You will do better on our side!!!"  [Finding of Fact No. 43] (emphasis added).
    Craig to Cole, June 19, 2010:  "You should forget what happened and unabashedly join our ranks NOW" [Finding of Fact No. 45] (emphasis added).
    Craig to Goldman, June 19, 2010:  "This is my best shot at pulling Dawn over on our side." [Finding of Fact No. 46] (emphasis added).
    Craig to Cole, June 19, 2010:  "If we win a settlement, I'll make sure you see some funds but you need to help us destroy RK." [Finding of Fact No. 47] (emphasis added).
    Craig to Cole, June 20, 2010:  "This is how you can help us . . ." [Id.] (emphasis added).
    Craig to Goldman, July 1, 2010:  "[Cole] is willing to join our side and going after RK big time! . . . She is very interested in the prospect of our lawyers representing her and helping her." [Finding of Fact No. 56] (emphasis added).
    Craig to Cole, July, 3, 2010:  "Let me ask our lawyers what to do."  [Finding of Fact No. 58] (emphasis added).
    Craig to Goldman, July 3, 2010:  "Sam, What do we do??" [Id.] (emphasis added).
    Craig to Goldman, July 16, 2010:  "[Cole's] testimony is probably the best smoking gun we have so the investment seems necessary.. plus we pulled her into this mess!" [Finding of Fact No. 69] (emphasis added).
    Craig to Robert Mendel, November 16, 2010:  "Sam is highly confident we will be getting a multi-million dollar settlement."  [Finding of Fact No. 98] (emphasis added).

he was not represented by Goldman in any legal capacity, Craig sent Goldman a message on March 22, 2011 asking:  "How is *our* case doing???"  [Finding of Fact No. 102] (emphasis added).

In fact, Craig was not a party to the SkyPort Litigation in this Court at all.  [Finding of Fact No. 16].  Yet, as evidenced by his multitude of references to "we," "us" and "our," it is clear that Craig considered himself in common pursuit with Goldman and the Schermerhorn Parties— particularly those Schermerhorn Parties that he encouraged to invest in certain SkyPort Parties. *See* [Finding of Fact No. 98] (writing to Robert Mendel, Craig wrote "I have personally paid in funds for some of my clients who have invested in [SkyPort] and whom I don't want to burden with advancing their funds.").   And, indeed, Goldman reciprocated this common interest with Craig, copying him on dozens of otherwise confidential e-mails between the Schermerhorn Parties and their counsel.[127]   [Finding of Fact Nos. 95, 99]; *see also* [Privilege Log of Sam Goldman].

In sum, despite being a non-party to these proceedings, Craig shared a common interest with the enjoined parties.  As a result, the Court concludes that he was *personally* subject to the Preliminary Injunction Order.  Craig was therefore barred from both the pursuit of derivative and direct claims against the SkyPort Parties, as well as from contacting Cole.

> ii.  *Because He Reasonably Had his Day In Court, Craig Was Personally Enjoined Under a Privity Theory*

In their Proposed Findings of Fact and Conclusions of Law, the Schermerhorn Parties, including Goldman, assert that Craig was not in privity with the Schermerhorn Parties, as Craig

---

[127] Craig testified under oath that he was "routinely" copied on e-mails between the Schermerhorn Parties regarding the SkyPort Litigation.  [Tr. Apr. 18, 2012 254:16–21].  Indeed, these e-mails were the subject of the Motion to Compel.  At the hearing on the Motion to Compel, Goldman sought to keep these communications between Craig and himself private under the common legal interest doctrine.  This motion and this hearing are discussed in more detail below.

has not "had his day in court."  *See* [Adv. Doc. No. 681 at pp. 60–61, ¶¶ 181–82]; *Harris County, Tex. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 314 (5th Cir. 1999) ("The general concept is that an injunction binds only non-parties who are so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated in the original injunction proceeding. In other words, the non-party must have constructively had his day in court.").   Yet, reliance on *CarMax Auto Superstores Inc.* is ultimately unhelpful.  First, the Court notes that "privity" is an expanding term, "now used to describe various relationships between litigants that would not have come within the traditional definition of that term."  *The Nat'l Spiritual Assembly of the Bahá'ís of the U.S. Under the Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of the Bahá'ís of the U.S., Inc.*, 628 F.3d 837, 849 (7th Cir. 2010).  Privity has come to mean more than a rigid and defined legal relationship, but can include those with "sufficiently close identity of interest."  *Id.*

Moreover, the phrase "day in court" does not require that Craig must have actually been a named party.   Indeed, the purpose of this exception is to bind those who are not named. Moreover, the phrase "day in court" is qualified by the word, "*constructively.*"[128]  *Id.*  Thus, the phrase also does not require that Craig appeared in the courtroom or argued his position when this Court issued the Preliminary Injunction Order.  The question is:  were Craig's interests "so identified" with the Schermerhorn Parties "that it would be reasonable to conclude that [Craig's] rights and interests have been represented and adjudicated"?  *Id.* (quoting CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2956, at 340–41 (1995)). If the Court

---

[128] This Court finds it is important to note the meaning of the word "constructive" as used in this context.  Black's Law Dictionary defines "constructive" as "[l]egally imputed; existing by virtue of legal fiction though not existing in fact."  BLACK'S LAW DICTIONARY (9th ed. 2009).  By use of the word "constructive," this Court finds it important to note that the law does not require that Craig have actually been present in the courtroom, or have received a copy of the Preliminary Injunction Order.

concludes that they were, then Craig was in privity with the Schermerhorn Parties, and was enjoined from both the pursuit of derivative and direct claims and from contacting Cole.

The Court concludes that Craig's interests were indeed sufficiently "identified" with the Schermerhorn Parties.  First, despite not being a plaintiff or defendant in the matter at bar, Craig clearly viewed the Schermerhorn Parties' interests as indistinguishable from his own, voluntarily entangling himself with Goldman and the Schermerhorn Parties.  For instance, as Craig said to Cole on June 19, 2010:  "If we [i.e., the Schermerhorn Parties] win a settlement, I'll make sure you see some funds but you need to help us destroy RK."   [Finding of Fact No. 47].  The "we", in short, is very telling; Craig was not a party to the proceeding against SkyPort, and therefore stood to win nothing.  [Finding of Fact No. 16].  Yet, by using "we," Craig thrust himself into this litigation, expressing his alignment with the Schermerhorn Parties—particularly the Schermerhorn Parties that he encouraged to invest in several of the SkyPort Parties.[129]  Indeed, Craig even contributed money to the Schermerhorn Parties' litigation fund!  [Finding of Fact No.

---

[129] Under oath, Craig indicated that his goal in contacting Cole was to obtain sufficient evidence from her to help the Schermerhorn Parties win in the SkyPort Litigation, and "get some money back" for Craig's clients.

| Catmull: | And you cared about [Cole] throwing in with the Schermerhorn Parties because you thought her throwing in would help the Schermerhorn parties' case, right? |
|---|---|
| Craig: | Correct. |
| Catmull: | Because you want the Schermerhorn Parties to win, right? |
| Craig: | Correct. |
| Catmull: | And you helped the Schermerhorn Parties in their litigation right? |
| Craig: | Yes. |

[Tr. Mar. 8, 2012 119:19–120:2].

| Catmull: | Was it your goal for Robert Kubbernus to no longer be CEO of SkyPort? |
|---|---|
| Craig: | No.  It was my goal to get some money back for my clients. |

[Tr. Apr. 18, 2012 141:1–4].

98].  As a result, Craig created the perception that he was part of the collective group—*not* a detached and independent entity with separate interests and rights.

For his part, Goldman not only encouraged this view, but also further enmeshed Craig's rights and interests.  Goldman also used "we" and "us" language to describe Craig, the Schermerhorn Parties, and himself, and established at least some question as to whether Craig was enjoined by the Preliminary Injunction Order.[130]  Further, by including Craig in correspondence with the Schermerhorn Parties, Goldman kept Craig as informed as the named Schermerhorn Parties in any developments in the Schermerhorn Parties' strategies and positions.[131]  As a result, "perception" of Craig as a party created reality, making it eminently reasonable to conclude that Craig's rights and interests were sufficiently aligned with the Schermerhorn Parties to find that he had his "day in court."

Finally, if Craig wanted to communicate with Cole or pursue claims against the SkyPort Parties, he did not need to rely on Goldman and the Schermerhorn Parties to protect him and his interests.  Even as a non-party, he had the right to move to have his interests adjudicated, and to dissolve the Preliminary Injunction Order in relation to his rights.  *See Castillo v. Cameron*, 238 F.3d 339, 349 (5th Cir. 2001) ("Non-parties who are bound by a court's equitable decrees have a right to move to have the order dissolved . . . where a non-party is purportedly bound by an injunction, the non-party may bring an appeal rather than face the possibility of a contempt proceeding." (quoting *United States v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998))).

---

[130] Goldman to Craig, June 21, 2010:  "I do not want you discussing SkyPort with her unless and until <u>we</u> obtain an order from Judge Bohm permitting <u>us</u> to do so."    [Finding of Fact No. 48] (emphasis added).

[131] Indeed, due to their numerous and frequent phone calls and e-mail exchanges, it is arguable that Goldman kept Craig *even more* informed than many of the Schermerhorn Parties.

Simply because Craig failed to pursue this argument and failed to clarify this Court's order does not mean that Craig did not have his day in court.

In conclusion, this Court finds that Craig constructively and fairly had his day in court, and was—and still is—in privity with the named Schermerhorn Parties. As a result, the Preliminary Injunction Order enjoined Craig from personally contacting Cole or from pursuing direct or derivative claims against the SkyPort Parties.

> ### iii. Because He was Under Goldman's Control, Craig was Personally Enjoined

Finally, the Preliminary Injunction Order bound any non-parties subject to the control of the named parties. As discussed above in relation to Goldman, the Schermerhorn Parties argue that Craig was not subject to Goldman's control. Rather, Craig was simply acting independently, and that in fact, Goldman repeatedly warned Craig not to contact Cole regarding SkyPort, or to offer to use her testimony in the SkyPort Litigation.[132] The Schermerhorn Parties argue that Craig subsequently ignored these instructions, proving that Craig simply went rogue.

However, the question of "control" is not so simple. *See Newspapers, Inc. v. Love*, 380 S.W.2d 582, 590–91 (Tex. 1964). The Court must consider Goldman's ability to determine the details of Craig's work, the nature of the actions themselves, as well as Goldman's ability to give instructions.[133] *Smith v. Foodmaker, Inc.*, 928 S.W.2d 683, 687 (Tex. App. 1996); *Northside Realty Associates, Inc.*, 605 F.2d at 1353–54; *Tex. A&M Univ. v. Bishop*, 156 S.W.3d 580, 584–85 (Tex. 2005). The Court has already analyzed both Goldman's ability to control Craig, and

---

[132] Goldman to Craig, June 21, 2010: "I understand you have a prior relationship with Dawn Cole regarding another matter and that she contact you, but I do not want you discussing SkyPort with her unless and until we obtain an order from Judge Bohm permitting us to do so. I realize you are not a [Schermerhorn Party], but I do not want to create an appearance that we are using you to communicate with her." [Finding of Fact No. 48].

[133] The Court must also look for evidence of a pattern of conduct that would lead a reasonable person to believe that the alleged agent had authority to act in favor of the principal. *Ames v. Great Southern Bank*, 672 S.W.2d 447, 450 (Tex. 1984). Only one event or transaction is generally not sufficient. *Id.*; *John Chezik Buick Co. v. Friendly Chevrolet Co.*, 749 S.W.2d 591, 594 (Tex. App. Dallas 1988).

Craig's willingness to act in accordance with Goldman's instructions. *See* [Section E.4.b.ii] (concluding that Craig was Goldman's agent because Goldman had control over Craig and Craig understood his role to be that of an agent of Goldman's instruction).  Goldman provided Craig with more than mere suggestions, but instead made specific and direct requests for Craig to ask Cole questions and seek money from other Schermerhorn Parties to replenish the Schermerhorn Parties' litigation fund.[134]   Accordingly, the Court concludes that Craig was subject to Goldman's control and was therefore personally enjoined from contacting Cole, or from pursuing derivative and direct causes of action against the SkyPort Parties.  *See Lytle v. Galveston, H. & S. A. R. Co.*, 41 Tex. Civ. App. 112 (Tex. App. 1905) ("The court has jurisdiction of agent of party to the suit, though himself not a party, and may punish for violation of its order."); *Ex parte Chambers*, 898 S.W.2d 257, 261 (Tex. 1995) ("[W]hen an agent . . . , having knowledge of an order . . . participates in or encourages the violation of that order, that agent may be individually held in contempt of court.").

### b.  Even if Not Personally Enjoined, Craig May Still Be Held in Contempt as an Aider and Abettor

As discussed in relation to Goldman, Rule 65(d)(2)(C) enjoins anyone "in active concert or participation" with a named party, "who receive[s] actual notice of the [court's order] by personal service or otherwise."  Fed. R. Civ. P. 65(d)(2)(B).  "Active concert" specifically includes parties <u>not</u> named in the injunction, but who are nevertheless bound as a result of their actions.  *Regal Knitwear Co.*, 324 U.S. at 14.  By aiding and abetting an enjoined party, a non-party, such as Craig, essentially binds himself and may therefore be held in contempt for any

---

[134] Goldman to Craig, December 12, 2010:  "[A]ttached is a memo breaking out key information regarding your investors and their participation in the SkyPort Litigation.  Hopefully, with this in hand, we can bring these investors current on their expense fund contributions.  I would appreciate your expeditious follow-up on this."  Craig to Goldman, January 13, 2011: "Sounds great!!!  I'll get onto [the Schermerhorn Parties]... [and] try to rustle up solmes$$$[sic]..."  [Finding of Fact No. 99].

actions taken in "a concerted effort to subvert" the injunction's prohibitions.  *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 436–37 (1934); *Waffenschmidt*, 763 F.2d at 717; *see also Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832–33 (2d Cir. 1930); *G & C Merriam Co.*, 639 F.2d at 34–35.  Simply violating the injunction is not enough—the accused aider and abettor must have acted in concert with an enjoined party, rather than independently or without knowledge of the injunction order.  *Waffenschmidt*, 763 F.2d at 717; *see also Regal Knitwear Co.*, 324 U.S. at 14.[135]

As the Court has already concluded, Craig received actual notice of the Preliminary Injunction Order,[136] and subsequent to that notice, Goldman and he acted in concert under a common scheme to thwart the Preliminary Injunction Order.[137]  Thus, Craig may be held liable

---

[135] Additionally, while good faith is not a defense to a finding of "active concert," good faith is relevant to whether a non-party knowingly aided or abetted another in violating a court order.  *Whitcraft,* 570 F.3d at 272; *Waffenschmidt*, 763 F.2d at 726.

[136] Craig himself admitted as much during his testimony:  "Catmull (counsel for the SkyPort Parties):  When you learned about the -- when did you learn that there was an injunction prohibiting contact with current or former employees?  Craig:  Just after June 10th. I forget the date, but I mean, -- " [Tr. Apr. 20, 2012 55:4–8].
    The e-mail evidence confirms Craig's testimony.  Craig to Goldman, June 11, 2010:  "Just spoke to Dawn…FYI—she got an email from RK saying noone [sic] can contact her…???"  [Finding of Fact No. 40].
    Goldman to Craig, June 21, 2010: "I understand you have a prior relationship with Dawn Cole regarding another matter and that she contact you, but I do not want you discussing SkyPort with her unless and until we obtain an order from Judge Bohm permitting us to do so. "  [Finding of Fact No. 48].

[137] For example, Goldman used Craig to exchange questions and information with Cole.  Goldman to Craig, June 20, 2010:

> [Cole] can help in many ways:  1. Is she owed money by SkyPort?  2.  Anyone else Robert hasn't paid?  3.  Anything else he's done since the confirmation [of the Plan] that is dishonest? 4. Any materials relating to his efforts to sell the company? 5. Robert hurts people as he goes; who else is out there that can come into bankruptcy court and expose him? I can make some calls for her, try to help her find a job.

[Finding of Fact No. 48].  Craig to Cole, June 20, 2010:

> [T]his how you can help us… 1.  Are you owed money by SkyPort? 2.  Anyone else Robert hasn't paid at [SkyPort]?  3.  Anything else he's done since the confirmation that is dishonest? 4. Any materials relating to his efforts to sell the company? 5. Robert hurts people as he goes; who else is out there that can come into bankruptcy court and expose him?  Sam can make some calls for you, try to help her find a job.

for any actions taken under that scheme which violated the Preliminary Injunction Order.  *See*

*Lance*, 353 F.2d at 591 (upholding the trial court's ruling of civil contempt against an aider and

abettor after the court found that he had actual notice of the order, and subsequently violated that

order in concert with a named party); *Jim Walter Resources, Inc.*, 609 F.2d at 169 ("There is

strict liability for concerted, authorized activity done in violation of a restraining order.").

2.  Craig Failed to Comply With the Preliminary Injunction Order

### a. Craig Violated the Preliminary Injunction Order by Contacting Cole Personally Without Permission

Whether in privity, as a party in interest, or indeed, even as Goldman's agent, Craig was

personally bound to abide by the terms of the Preliminary Injunction Order.  By repeatedly

contacting Cole regarding litigation in this Court, Craig intentionally violated the Preliminary

Injunction Order's terms and may therefore be held in contempt for his actions.

First, the Court notes again that it has adopted a broad definition of the verb—"to

contact"—to include the exchange and transmission of information.  Thus, it is irrelevant

whether Craig or Cole initiated each individual e-mail or phone conversation.  Every e-mail

between Craig and Cole is a potential violation of the Preliminary Injunction Order, and despite

Craig and the Schermerhorn Parties' arguments to the contrary, the Court will not exclude those

that Craig made in response to *Cole's* instigation.  Craig, himself, conceded this point, saying

that once communications have begun, and contact has "been going back and forth," it becomes

difficult "to say who has contacted who."  [Finding of Fact No. 48].

---

[*Id.*] (emphasis added).  According to his testimony, Craig was also fully aware that Cole was a former employee of SkyPort:  "Now, you knew because you had talked to Dawn Cole even at her [SkyPort] phone number that Dawn Cole was an employee of [SkyPort] at one time?"  "Yes or a consultant."  [Tr. Apr. 20, 2012 55:20–23].

Further, when the Court issued the Preliminary Injunction Order on June 10, 2010, the Court's goal was to stop all potentially damaging communications while it determined which causes of action were direct and derivative.  *See* [Finding of Fact No. 25].  Even accusations against the SkyPort Parties could be damning, and as a result, *all* contacts—at least temporarily—needed to cease.  [Finding of Fact No. 32].  Nevertheless, after the Preliminary Injunction Order took effect, Craig and Cole exchanged dozens and dozens of e-mails and phone calls with each other, many of which were conducted at either Goldman's direction or with his knowledge and implicit approval.[138]  These communications were not simply related to Victoria Grey and other attenuated matters; most related entirely to SkyPort and litigation in this Court,[139] thereby blatantly and intentionally flouting this Court's order.[140]  Specifically, Craig, Goldman and Cole conspired for Cole to join the Schermerhorn Parties,[141] as well as to send information both to this Court and the U.S. Attorney's office regarding Kubbernus' allegedly contemptuous

---

[138] Goldman to Craig, June 20, 2010:  "[Cole] must decide that she is with all the people that Robert has screwed - like her - and full tilt, without holding back." [Finding of Fact No. 47].

Goldman to Craig, July 3, 2010:  "Will she give us permission to take this email to the judge?"  Craig to Goldman, July 3, 2010:  "I will ask".  [Finding of Fact No. 58].

[139] Craig to Cole, July 3, 2010:  "The bankruptcy jusge [sic] is a maniac. He made a bad call on the [SkyPort] bankrutcy [sic] in RK's favor and is ashamed to say he is wrong….apparently he is the laughing stock of the bench in Houston…!!  I have word from Sam that his Texas lawyer is going to him on Tuesday to discuss some issues and ask if he can talk to you.....I discussed your last email with Sam as I don't have the answers to your questions....he has asked your permission to show it to the judge...is that OK....if not maybe a written statement by you is needed?? I don't know....  Let me know??"  [Finding of Fact No. 58].

[140] Cole to Craig, July 3, 2010:  "I am concerned that we don't get reprimanded from communicating.  I don't think that it would be a good thing to show the email to the judge.  RK could use that against us . . . I've attached the filing that RK has been sending out to others in a direct effort to harm me.  That can go to the judge.  I will also provide a statement directly to the judge (since we [i.e., Craig and Cole] are banned from talking)."  [Finding of Fact No. 58].

Cole to Craig, July 4, 2010:  "You cannot forward these e-mails to your lawyers.  If these show up in court, it will be interpreted as a violation of the judge's ruling.  PLEASE DO NOT FORWARD THESE!!!"  [*Id.*].

[141] Craig to Goldman, July 1, 2010:  "Sam, I spoke to Dawn.  She is willing to join our side and going after RK big time!  . . .  She agrees to you going to the bankruptcy judge to get permission to speak to her….she is even willing to go see the judge or write her own letter saying she is willing to talk to anyone."  [Finding of Fact No. 56].

and criminal behavior.[142]  [Finding of Fact No. 58].  In Craig's words, the aim was to "destroy" Kubbernus and the other SkyPort Parties.[143]  [Finding of Fact No. 47].  Thus, despite his unquestioned knowledge of the Preliminary Injunction Order,[144] Craig participated in and encouraged violations of that order by directly, intentionally, and without permission—from either the SkyPort Parties or this Court—transmitting information to Cole.   As a party in privity, in interest or under Goldman's control, this Court may justifiably hold Craig in contempt for his own illicit actions.

### b.  Alternatively, Craig Violated the Preliminary Injunction Order by Contacting Cole in Active Concert with Goldman

As a non-party, Craig could have remained entirely outside this Court's jurisdiction and contempt power.  The Preliminary Injunction Order did not, on its face, apply to Craig; hence, independently, Craig could have freely contacted Cole.  Nonetheless, Craig's freedom was not unqualified.  He could <u>not</u> contact Cole on Goldman and the Schermerhorn Parties' behalf, acting as their instrument as they plucked the strings.

The Schermerhorn Parties argue that Craig had "a strong independent interest in communicating" with Cole [Adv. Doc. No. 681 at p. 53].  However, unless his e-mails reflected such an unfettered reason for his communications with Cole, then such a "strong independent interest" is not enough to absolve Craig.  Instead, it is apparent that on numerous occasions,

---

[142] Cole to Craig, July 4, 2010:  "I believe that I have proof of witness tampering.  [Kubbernus] gave me a payment agreement that clearly states that he will pay me IF and ONLY IF I don't help your side in the lawsuit [in this Court]. I would LOVE to get [Kubbernus] arrested!" and "My plan was to walk all of this evidence into the [undersigned] judge's chambers and let him know that we have all been conned by a very accomplished liar. The judge ruled based on RK's testimony and, like all of us, he had to assume that RK was telling the truth under oath."  [Finding of Fact No. 58].

[143] Craig to Cole, June 19, 2010:  "If we win a settlement, I'll make sure you see some funds but you need to help us destroy RK." [Finding of Fact No. 47].

[144] As Craig testified under oath, despite knowing of the Preliminary Injunction Order, he urged Cole to call Goldman several times in order to gain her help in the SkyPort Litigation.  [Tr. Mar. 8, 2012 140:20–25].

Craig passed information between Goldman and Cole, allowing them to communicate their questions and information with each other without *expressly* and literally violating the Preliminary Injunction Order.[145]

At the Hearings, Craig admitted his role as an aider/abettor, as the following exchange with the SkyPort Parties' attorney reflects:

| Catmull (counsel for the SkyPort Parties): | So I'm asking -- and your response through your counsel, as I understand it, has been, "No, no, I wasn't, I wasn't helping the Schermerhorn parties." That's – is that your response? |
|---|---|
| Craig: | No, that isn't my response. |
| Catmull: | Okay. So you -- |
| Craig: | My response is:  I'm not a [Schermerhorn Party], therefore it doesn't apply to me. Well, I -- **it's undeniable that I, you know, got documents together and gathered some information I helped them, sure**. But is that a problem? |
| Catmull: | But I'm accusing you of someone acting in -- of being someone acting in concert with the [Schermerhorn Parties], someone not named in the Injunction but someone nonetheless acting in concert with the [Schermerhorn Parties]. That's what I'm accusing you of doing. I'm not asking you whether you think it's okay or not, I'm just asking you are you denying that you've been acting in concert with the Schermerhorn parties since this litigation began? [ . . . ] |
| Catmull: | Were you helping the Schermerhorn parties with their litigation in May of -- |
| Craig: | Yes. |
| Catmull: | -- sorry -- in May of 2010? |
| Craig: | Yes. |
| Catmull: | Were you helping the Schermerhorn parties with their litigation in June of 2010? |
| Craig: | Yes. |

---

[145] Goldman to Craig, July 3, 2010:  "Will she give us permission to take this email to the judge?"  Craig to Goldman, July 3, 2010:  "I will ask."  [Finding of Fact No. 58].

| Catmull: | Were you helping the Schermerhorn parties with their litigation in July of 2010? |
|----------|------------------------------------------------------------------|
| Craig: | Yes. |
| Catmull: | Were you helping the Schermerhorn parties with their litigation in August of 2010? |
| Craig: | Yes. |
| Catmull: | Were you helping the Schermerhorn parties with their litigation in September of 2010? |
| Craig: | Sure. |
| Catmull: | Were you helping the Schermerhorn parties in October of 2010? |
| Craig: | I mean, I suppose I did, I mean, yeah, I did. |
| Catmull: | And from October 2010 to today, you haven't stopped helping the Schermerhorn parties with their litigation, right? |
| Craig: | I suppose I have, yeah, somewhat. |

[Tr. Apr. 18, 2012 265:10–269:9] (emphasis added).  Craig summarized this exchange later in his testimony.  Catmull asked him,  "Now, sir, after all the testimony you've given in this case, it is fair to say is it not that you passed information back and forth between Mr. Goldman and Dawn Cole after June 10th, 2010, correct?"  Craig succinctly confessed:  "I did, yes."  [Tr. Apr. 20, 2012 54:5–9].

Even without Craig's admissions, an injunction order is meant to protect against clear, imminent and irreparable damage, and should not be so easily thwarted by a third party.  Indeed, Rule 65 seems to have been created with this very scenario in mind.[146]  And, while Craig's e-

---

[146] As Rule 65(d)(2) states that, "The [injunction] order binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) **other persons who are in active concert or participation with anyone described**."  Fed. R. Civ. P. 65 (emphasis added).  American Law Reports summarized this section noting that,

> Within the practical meaning of the rule [i.e., Rule 65(d)(2)(c)], the nonparty person and the party simply violate the injunction together as a matter of common interest, purpose or design, or enterprise, to such an extent that the nonparty is in effect an extension, cat's-paw, or alter ego of the party to the suit, this specific kind of relationship between the nonparty and the party defendant, as the principal actor, being a requisite condition of establishing the nonparty as one in active concert or participation. All the cases stated throughout the annotation recognize the general tenor of this proposition.

97 A.L.R.2d 490 at *2.

mails possibly *related* to his own interests—or at least those of his Schermerhorn Party-clients who invested in some of the SkyPort Party-companies—they did not *reflect* them; indeed, some of them did not even reflect Craig's words![147]  Craig would often simply copy and paste material written by Goldman and Cole in e-mails to the other party.[148]  In short, by conspiring with Goldman, and using his supposed freedom from the Preliminary Injunction Order as a ruse to thwart its prohibitions, Craig became subject to its restraints.  The Court may therefore hold Craig in contempt for contacting Cole, and even if not specifically enjoined, he may be held liable for his concerted contacted with Cole.

### c. Craig Violated the Preliminary Injunction Order by Pursuing Direct and/or Derivative Claims Against the SkyPort Parties

In addition to the Preliminary Injunction Order's probation on "contact" is its ban on pursuit of "any and all claims or causes of action, derivative or direct, against all of the [SkyPort

---

[147] Goldman to Craig, June 20, 2010:

> [Cole] can help in many ways:  1. Is she owed money by SkyPort?  2.  Anyone else Robert hasn't paid?  3.  Anything else he's done since the confirmation [of the Plan] that is dishonest? 4.  Any materials relating to his efforts to sell the company? 5. Robert hurts people as he goes; who else is out there that can come into bankruptcy court and expose him? I can make some calls for her, try to help her find a job.

[Finding of Fact No. 48].  Craig to Cole, June 20, 2010:

> [T]his how you can help us… 1.  Are you owed money by SkyPort?  2.  Anyone else Robert hasn't paid at [SkyPort]?  3.  Anything else he's done since the confirmation that is dishonest? 4.  Any materials relating to his efforts to sell the company? 5. Robert hurts people as he goes; who else is out there that can come into bankruptcy court and expose him?  Sam can make some calls for you, try to help <u>her</u> find a job.

[*Id.*] (emphasis added).

[148] Goldman to Craig, July 4, 2010: "Procedure is we must first ask RK's counsel for permission to talk to Dawn. If he says no, we go to the Judge. Steve Smith will be working papers to ask the Court to bring Dawn in to testify. Should go out on Tuesday. Decision is the Judge's."  [Finding of Fact No. 58].
Craig to Cole, July 4, 2010:  "Dawn, I aksed [sic] lawyers.  Procedure is we must first ask RK's counsel for permission to talk to you.  If he says no, we go to the Judge.  Steve Smith will be working on papers to ask the Court to bring you in to testify.  Should go out on Tuesday.  Decision is the Judge's."  [*Id.*].

Parties]."[149]  [Finding of Fact No. 32].  Consequently, Craig's continued pursuit of claims against Kubbernus presents yet another way in which he both personally violated the Preliminary Injunction Order and aided Goldman's violation of the Preliminary Injunction Order.  Craig may be held in contempt for these actions.

As discussed in relation to Goldman, the pursuit of a claim has a broad definition, encompassing the initiation of a new suit and the prosecution of a pending cause of action.  "Pursuit of a claim" also includes actively trying to persuade a person to join a lawsuit when it is believed that the person has valuable knowledge.  *See Hampton Hardware, Inc.*, 156 F.D.R. at 631; *see also Recinos-Recinos*, 2006 WL 197030, at *12.  Applying these definitions to Craig's actions, it is clear that, <u>even if</u> otherwise permitted, Craig's contact with Cole was <u>not</u> innocuous; it furthered the Schermerhorn Parties' litigation efforts against Kubbernus and violated the prohibition against the pursuit of "any and all" claims.  Because Craig was personally enjoined by this Court's order, his attempts to persuade Cole to join the Schermerhorn Parties' "side" and to provide evidence and information to aid the Schermerhorn Parties' prosecution of the SkyPort Litigation constituted a breach of the Preliminary Injunction Order.[150]  Both Craig and Goldman believed Cole to be a valuable source of evidence, and her participation in this dispute seemed—

---

[149] Due to the order's expansive language, the Court does not need to distinguish here between derivative or direct claims.

[150] Craig to Cole, June 18, 2010:  "Also Call Sam [Goldman] … he has some leads too.  He may need some info from you too … ??? You will do better on our side!! … I promise you….."  [Finding of Fact No. 43].

  Craig to Cole, June 19, 2010:  "You should forget what happened and unabashedly join our ranks NOW [ . . . ] I think you can be very useful in this case and you will make out better and be doing the right thing and clear your name from being seen in 'RK's camp' which is not a pretty place to be seen [ . . . ]  Sam needs your 100% cooperation….which at this point makes complete sense."  [Finding of Fact No. 45].

  Craig to Goldman, June 19, 2010:  "I'm getting her [Cole] to help us in Detroit by discrediting RK…she has agreed…  What can she do to help out with [SkyPort]???  FCC"  [Finding of Fact No. 47].

  Craig to Cole, June 20, 2010:  "this how you can help us… 1.  Are you owed money by SkyPort?  2.  Anyone else Robert hasn't paid at [SkyPort]?  3.  Anything else he's done since the confirmation that is dishonest?  4.  Any materials relating to his efforts to sell the company?  5.  Robert hurts people as he goes; who else is out there that can come into bankruptcy court and expose him?  Sam can make some calls for you, try to help her find a job."  [Finding of Fact No. 48].

at least to them—worth any risk.[151]  Nevertheless, by pursuing her participation in the SkyPort Litigation before this Court, Craig personally, and in concert with Goldman, pursued a claim against the SkyPort Parties and therefore violated the Preliminary Injunction Order.

Craig also aided Goldman in the pursuit of the existing suit in this Court by acting as Goldman's unofficial collection agent.  At Goldman's request, Craig harassed those who owed money to the Schermerhorn Parties' litigations expense fund to pay up, and to avoid any perception that they were aligned with Kubbernus and the SkyPort Parties.[152]  By putting muscle behind his request for money, Craig not only enhanced support for the Schermerhorn Parties, but more importantly, deflated support for the SkyPort Parties.  As a result, Craig, personally and in concert with Goldman, inappropriately pursued the suit against the SkyPort Parties in this Court.

---

[151] Cole's value to the Schermerhorn Parties is clear both from e-mails and from testimony:

Goldman to Craig, July 4, 2010:  "[Cole] is reaching out to us, but I do not want to antagonize the Judge. We want to be careful, but I have some ideas I want to discuss with you."  [Finding of Fact No. 58].

Craig to Goldman, July 16, 2010:  "[Cole's] testimony is probably the best smoking gun we have so the investment seems necessary.. plus we pulled her into this mess!"  [Finding of Fact No. 69].

Goldman to Craig, July 24, 2010:  "Fridge agreed to accept 10k retainer plus contingency.  You need to seal the deal and we have a lot of very important details to cover over the next few days.  Fridge can do a lot to help her and us."  [Id.].

| Catmull: | And you cared about [Cole] throwing in with the Schermerhorn Parties because you thought her throwing in would help the Schermerhorn parties' case, right? |
| --- | --- |
| Craig: | Correct. |
| Catmull: | Because you want the Schermerhorn Parties to win, right? |
| Craig: | Correct. |
| Catmull: | And you helped the Schermerhorn Parties in their litigation right? |
| Craig: | Yes. |

[Tr. Mar. 8, 2012 119:19–120:2].

[152] Craig to Robert Mendel, November 16, 2010:  "I think it is important for you to support the litigation fund personally to demonstrate that you are a victim of RK's fraud and not to be associated with his as you were working with him and responsible for raising funds for the scam.  You need to distance yourself from him by actively being on the offense against him." [SkyPort Parties/SkyPort Ex. No. 87].

In addition to the furtherance of existing claims, "pursuit of a claim" also encompasses the pursuit of fresh claims.  As a result, the Preliminary Injunction Order not only prohibits pursuit of the litigation in this Court, but also the pursuit of new or additional claims against the SkyPort Parties.  *See Anti Lothian Bankr. Fraud Comm.*, 2011 WL 4628696, at *4 (holding that when a party is enjoined from pursuing a lawsuit against a defendant, further suits or litigation represent a violation of the injunction).  By encouraging Cole to pursue additional claims against Kubbernus, telling Cole that she was "a victim with all the people Robert has screwed" and that she "should pursue [Kubbernus] . . . at full tilt, without holding back," Craig violated this Court's order.[153]  [Finding of Fact No. 47].  More egregiously, Craig provided Cole, in conjunction with Goldman and the Schermerhorn Parties, with the $10,000.00 retainer necessary to secure the legal counsel that Goldman arranged.  This attorney (i.e., Fridge) acted as Cole's counsel in a breach of contract claim between Cole and Kubbernus.  Fridge also researched other potential suits to bring against Kubbernus.[154]  [Finding of Fact No. 68].  While technically these claims were separate from the litigation in this Court, the Court issued the Preliminary Injunction Order in order to determine the nature of direct versus derivative claims, and to determine which claims the Schermerhorn Parties could legitimately pursue.  By encouraging Cole to pursue claims

---

[153] Further examples of this sort of encouragement include the following:  Craig to Cole, July 8, 2010:  "You're right to have gone to the FBI and DA [with information about Kubbernus]...."  [SkyPort Parties/TrustComm July 7, 2011 Hr'g Ex. 15].

Craig to Cole, July 9, 2010:  "We hope to have a lawyer [for you] by Monday. [ . . . ]  The boys [i.e., Goldman and his co-counsel] think they can maybe sue for damages for you as well….??"  [Finding of Fact No. 68].

[154] Cole to Craig, July 26, 2010:  "I met with Charles Fridge (the attorney) today.  He's great!  If you have the chance and the judge doesn't mind, you should meet him in his office.  Tomorrow, I should get some feedback from him about how court went today.  **He is ready to attack RK personally on my behalf and to work with your team and the judge as needed.**  Apparently he knows pretty much every judge in Houston.  But he needs a retainer :-)"  [Finding of Fact No. 68].

Cole to Craig, August 5, 2010:  "I'm sure Fridge will answer the suit [between Cole and Kubbernus] with the knowledge that [$10,000 is] on the way.  Thank you for helping!  **We will nail this guy one way or another.**"  [*Id.*].

against a named party (i.e., Kubbernus), Craig disregarded this Court's order and defiled the very purpose for its issuance.  In short, Craig personally and in concert thumbed his nose at this Court.

In sum, by furthering existing claims and attempting to create additional claims against Kubbernus, Craig violated the Preliminary Injunction Order's provision against the pursuit of claims, both: (1) personally as a party-in-concert, party-in-interest, and under the control of Goldman; and (2) as an aider and abettor to Goldman's violation.  Under either role, the Court may hold Craig in contempt.

### G.    Goldman and Craig Cannot Assert an Affirmative Defense or Mitigating Factor to Avoid this Court's Finding of Contempt

The Court has found that Goldman and Craig are in contempt, having concluded that, with knowledge, they violated a definite and specific order of this Court requiring that they perform or refrain from performing particular acts.  *Travelhost, Inc. v. Blandford,* 68 F.3d 958, 961 (5th Cir.1995) (quoting *Sec. & Exch. Comm'n v. First Fin. Group of Texas, Inc.,* 659 F.2d 660, 669 (5th Cir.1981)).  Therefore, as the respondents, they now bear the burden of presenting any mitigating circumstances or affirmative defenses which might convince this Court to withhold exercising its contempt power.  *Whitfield v. Pennington,* 832 F.2d 909, 914 (5th Cir. 1987).  In their Proposed Findings of Fact and Conclusions of Law, the Schermerhorn Parties and Goldman assert three affirmative defenses and mitigating circumstances:  (1) the SkyPort Parties filed the Second Motion for Sanctions and the Amended Second Motion for Sanctions to prevent the State Court Lawsuit from proceeding in the Harris County District Court; (2) the SkyPort Parties obtained the Preliminary Injunction Order from this Court on the basis of misrepresentations; and (3) the SkyPort Parties have "unclean hands," having obtained the Preliminary Injunction Order in bad faith.  The Court will address each alleged extenuating circumstance in turn, as well as whether Goldman and Craig substantially complied with the

169

Preliminary Injunction Order, or at a minimum, made every reasonable effort to comply with its terms. *United States Steel Corp. v. United Mine Workers,* 598 F.2d 363, 368 (5th Cir.1979) ("A party may avoid a contempt finding where it can show that it has substantially complied with the order, or has made every reasonable effort to comply.").   Ultimately, Goldman and Craig have failed to successfully assert any affirmative defense or mitigating factors to escape contempt.

1.   The Schermerhorn Parties Have Not Shown that the SkyPort Parties Filed the Second Motion for Sanctions and the Amended Second Motion for Sanctions For an Improper Purpose

First, the Schermerhorn Parties argue that the SkyPort Parties had an unstated and improper purpose for filing the Second Motion for Sanctions and the Amended Second Motion for Sanctions:  to prevent the State Court Lawsuit from proceeding.  While the Court recognizes that the timing of the filing of these motions has resulted in a delay of the prosecution of the remanded claims in the Harris County District Court, it is simply not clear from the record that the SkyPort Parties concealed evidence of Goldman and Craig's contempt to achieve a "tactical advantage" in the state court.  It is not enough for the Schermerhorn Parties to declare that these motions were filed "primarily as a litigation tactic" and that "the tactical advantages of delaying the State Court litigation . . . were obvious."   [Adv. Doc. No. 681 at p. 83, ¶ 213].  Indeed, in light of Goldman and Craig's conduct and this Court's finding of contempt, it is not *at all* obvious that the SkyPort Parties were using the bankruptcy process and motions for contempt simply to hinder the prosecution of the State Court Lawsuit.

Additionally, while the Schermerhorn Parties argue that this dispute is "a perfect illustration of the maxim that justice delayed is justice denied," the Court wholly disagrees. [Adv. Doc. No. 681 at p. 83, ¶ 214] (citing *In re 15375 Memorial Corp.*, 430 B.R. 142, 151 (D. Del. 2010)).  To *excuse* Goldman and Craig's conduct would be the denial of justice; *not* the

other way around.  After all, this Court has a right and duty to police the conduct of those who appear before it, *Chambers*, 501 U.S. at 46 (recognizing the court's inherent power to police itself, thereby "vindicating judicial authority" under 11 U.S.C. § 105); *In re Terreboone Fuel & Lube*, Inc., 108 F.3d 609, 613 (5th Cir. 1997) (concluding that the bankruptcy's court's contempt power derives from 11 U.S.C. § 105), and the Court could not execute this duty until it learned of Goldman and Craig's violations and dealt with them.  Forgiving Goldman and Craig based solely on the Schermerhorn Parties' bare assertions would allow Goldman and Craig to flout this Court's authority "with impunity."[155]  *Waffenschmidt*, 763 F.2d at 716.

### 2. The Schermerhorn Parties Have Not Shown that the SkyPort Parties' Misrepresentations Were Material

Second, the Schermerhorn Parties allege that the SkyPort Parties obtained the Preliminary Injunction Order and the Hearings on the Second Motion for Sanctions and Amended Second Motion for Sanctions by making material misrepresentations to the Schermerhorn Parties and this Court.  [Adv. Doc. No. 681 at p. 84, ¶ 216] (citing *Coastal Corp. v. Texas Eastern Corp.*, 869 F.2d 817, 818 (5th Cir. 1989) (vacating a preliminary injunction granted in the lower court after it was shown that Coastal falsely swore that no other litigation was pending elsewhere between the parties)).  Nevertheless, the Court does not find these misrepresentations to be materially false statements, as the Court did not issue the Preliminary Injunction Order or conduct the Hearings based on any single one of these statements.

---

[155] As discussed in footnote 46, Goldman clearly has a track record of flouting this Court's Orders, having filed the State Court Lawsuit for the purpose of evading the Confirmation Order and Plan.

### a. The Schermerhorn Parties Have Not Shown that the SkyPort Parties' Alleged Misrepresentations Related to the Preliminary Injunction Order Were Material

The Schermerhorn Parties have cited three examples of alleged misrepresentations which relate to the Preliminary Injunction Order.[156]  Yet, these statements were disparate from, or at least superfluous to, the Court's rationale for issuing the Preliminary Injunction Order.[157]  As articulated on June 10, 2010, the Court issued the Preliminary Injunction Order in order to prevent harm to SkyPort, which was likely in such a small industry with very few players.  [Finding of Fact No. 31].  A mere allegation by a former employee could be very damaging to SkyPort.  *See* [*id.*].  These concerns encompassed much more than only whether "the [Schermerhorn Parties] were calling Dawn Cole" or whether "the [Schermerhorn Parties] were intent on taking over SkyPort."  [Adv. Doc. No. 681 at pp. 85–86, ¶¶ 219–23].  Thus, even if Kubbernus' testimony that the Schermerhorn Parties were calling Cole was based *solely* on Kubbernus' intuition, the subsequent e-mail communications among Goldman, Craig and Cole confirms that his intuition was spot on.

---

[156] In full, the three alleged misrepresentations are articulated in the Schermerhorn Parties' Proposed Findings of Fact and Conclusions of Law as follows:

> (1) [O]n November 29, 2012, Mr. Kubbernus admitted that he had been untruthful in obtaining the Injunction. Q I'm talking about your testimony to this Court to secure the injunction to begin with. Your testimony that [the Schermerhorn Parties] were calling Dawn Cole was not based on any facts you knew, but solely upon your intuition, correct? A Correct.  [Tr. Nov. 29, 2012 Tr. 62:21–62:25]
> (2):  At the May 27, 2010 hearing, both counsel for [the SkyPort Parties] repeatedly told this Court that [the Schermerhorn Parties] were intent on taking over [SkyPort], while failing to disclose that [the Schermerhorn Parties]  had offered in writing to remove this prayer for relief from their Petition voluntarily. [Tr. May 27, 2010 37:18–23; 52:6–10; 254:3–6].  Needless to say, had they been candid with the Court, this entire case might have gone off on a different track.
> (3):  The [SkyPort Parties] did not bring to the Court's attention that the proposed form of order they had submitted on June 10, 2010, was different from what the Court had approved on May 27, 2010 and did not comply with what the Court had directed them to do on that date.

[Adv. Doc. No. 681 at pp. 85–86, ¶¶ 219–23].

[157] *See* footnote 13.

Further, it was not necessary for the SkyPort Parties to "bring to the Court's attention" that the June 10, 2010 order differed—to a degree—from what this Court had directed at the May 27, 2010 hearing.  [Adv. Doc. No. 681 at p. 86, ¶ 220].  An oral injunction is not constraining until it is put in writing, *In re Bradley*, 588 F.3d at 262, and after reading the June 10, 2010 order, the Court confirmed that its signed order (i.e., the Preliminary Injunction Order) included prohibitions which were both necessary and in compliance with this Court's May 27, 2010 directions and concerns.[158]  As a result, the Court concludes that the SkyPort Parties' misrepresentations—and it is questionable whether they were, indeed, misrepresentations—were not material to the Court's issuance of the Preliminary Injunction Order, and the Court need not deny the Preliminary Injunction Order's protection to the SkyPort Parties on this basis.

### b.   The Schermerhorn Parties Have Not Shown that the SkyPort Parties' Alleged Misrepresentations Related to the Second Motion for Sanctions, and Amended Section Motion for Sanctions Were Material

The Schermerhorn Parties have cited two examples of alleged misrepresentations which relate to the Second Motion for Contempt and Amended Second Motion for Contempt.[159]  For

---

[158] The Schermerhorn Parties seem to be implying that the Court issues orders blindly and without reflection.  The Court assures the Schermerhorn Parties that it does not.

[159] As stated in the Proposed Findings of Fact and Conclusions of Law, the Schermerhorn Parties allege the following:

> (1):  [O]n July 7, 2011, in which Mr. Kubbernus testified that Mr. Craig was an asset manager and the Fund Manager of [the Schermerhorn Parties]. [Tr. July 7, 2011 83:24–85:5]. [Kubbernus] then untruthfully represented that he had testified that Mr. Craig was an agent of the [Schermerhorn Parties]. [Tr. July 7, 2011 30:23–31:2]. During his testimony on November 29, 2012, [Kubbernus] admitted that this testimony had not been truthful. Mr. Kubbernus stated that he was aware that Mr. Craig was not a fund manager of the [Schermerhorn Parties] and that when he used the word "agent" on July 7, 2011, he did not mean "agent" in a legal sense; what he meant was "agent" as in "broker." [Tr. Nov. 28, 2010 106:24–107:18].

> (2):  Mr. Kubbernus had also not been candid with the Court by not revealing that his relationship with Mr. Craig was multi-faceted and that Mr. Craig had many good reasons to be communicating with Ms. Cole. Specifically, the evidence demonstrated that Mr. Craig was a finder for Mr. Kubbernus in a number of his fund-raising efforts, including Victoria Grey, SkyPort . . .; that Mr. Kubbernus had sued Mr. Craig in Michigan after Mr. Craig had led a group of investors in displacing Mr. Kubbernus as the manager of Victoria Grey; and that Mr. Craig and Ms. Cole, who

example, the Schermerhorn Parties have pointed out some inconsistencies in Kubbernus' testimony—such as failing to disclose Craig's independent and "multi-faceted" relationship with Cole and calling Craig an "agent" of the Schermerhorn Parties when Kubbernus should have used the word, "broker."  [Adv. Doc. No. 681 at pp. 85–86, ¶¶ 219–223].

Yet, the Court permitted the Hearings to proceed on much more than Kubbernus' testimony.  Specifically, and as articulated in the Amended Second Motion for Sanctions, "evidence of at least 47 additional, separate, violations of the preliminary injunction in the form of prohibited contact with former employee Dawn Cole," contradicted Goldman's testimony before this Court in which he declared that he had "absolutely" <u>no</u> communication with Cole after June 10, 2010.  [Finding of Fact No. 94].  Whether Craig had an independent reason for communicating with Cole does not remove the clear contradiction between Goldman's testimony and the e-mail evidence, and knowing this information would not have alleviated the Court's concerns.  And, while Kubbernus' use of the term "agent" may have been inexact, the Court did not rely on this term alone when it scheduled the Hearings on the motions for contempt.  Indeed, as "agency" is a legal concept, it would have been improper for this Court to accept Kubbernus' conclusion without conducting its own analysis.  Accordingly, here too, the Court concludes that the SkyPort Parties' statements were not material to the hearings on the motions for contempt.

In sum, none of these statements made by Kubbernus are sufficient to set aside this Court's finding of contempt.

---

had been Mr. Kubbernus' operations manager at Victoria Grey, were working together on Victoria Grey.

[Adv. Doc. No. 681 at p. 86].

3.  The Schermerhorn Parties Have Not Shown that the SkyPort Parties Have Unclean Hands

Third, the Schermerhorn Parties assert that the SkyPort Parties have "unclean hands," having obtained the Preliminary Injunction Order in bad faith.  The Schermerhorn Parties base this claim primarily on the SkyPort Parties' alleged subterfuge to change and add terms to the Proposed Preliminary Injunction above and beyond what this Court ordered at the May 27, 2010 hearing.  [Adv. Doc. No. 681 at pp. 87–88] (citing *In re Paige*, No. 04-20147-RLJ-7, 2009 WL 540720 (Bankr. N.D. Tex. Mar. 4, 2010) (concluding that the motions incorrectly stated the court's ruling, requiring their modification)).  Specifically, the Schermerhorn Parties allege that the SkyPort Parties added the "contact" provision to the Proposed Preliminary Injunction without providing the Schermerhorn Parties with notice or due process.  [Adv. Doc. No. 681 at p. 88, ¶ 229].

Unlike *Paige*, this Court did not grant the Proposed Preliminary Injunction and issue the Preliminary Injunction Order on the May 27, 2010 testimony and arguments alone.  At the subsequent June 10, 2010 hearing, this Court heard additional arguments from both the SkyPort Parties' and the Schermerhorn Parties' counsel, with each party specifically addressing the provision in the Proposed Preliminary Injunction relating to "contact."  The Court therefore gave each party notice of this provision, as well as an ample opportunity to be heard on the record. *See Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 193 (5th Cir. 2008) ("Baum was given notice and an opportunity to be heard regarding the imposition of the pre-filing injunction, which satisfies the requirements of due process in this case."); *see also Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'") (quoting *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223,

233 (1864)); *Phillips v. Chas. Schreiner Bank*, 894 F.2d 127, 131 (5th Cir. 1990) (internal footnote omitted) ("The courts consistently have treated rule 65(a)(1) as mandatory and have not hesitated to dissolve preliminary injunctions issued without notice or the opportunity for a hearing on disputed questions of fact and law.").   The Schermerhorn Parties' due process argument therefore fails.

Moreover, augmenting the terms of the Preliminary Injunction Order did not constitute "bad faith."  After listening to the Schermerhorn Parties' and the SkyPort Parties' arguments at the June 10, 2010 hearing, the Court agreed with counsel for the SkyPort Parties that the additional "contact" provision supplemented the "pursuit of claims" prohibition, noting on the record that it provided crucial protection to the SkyPort Parties.  [Finding of Fact No. 31].  And while the Schermerhorn Parties now allege that the Preliminary Injunction Order was impermissibly vague, they did not raise this concern at the June 10, 2010 hearing.  [Finding of Fact No. 33].  Adding this provision did not constitute bad faith or unclean hands; and this is not an affirmative defense to Goldman and Craig's contempt.

> ### 4.  The Schermerhorn Parties Have Not Demonstrated that Goldman and Craig Substantially Complied, or Made a Reasonable Effort to Comply, with the Preliminary Injunction Order

Finally, the Court notes that "intent" to violate the Preliminary Injunction Order is <u>not</u> an issue in civil contempt proceedings, and it is irrelevant whether Goldman and Craig *willfully* violated the terms of the Preliminary Injunction Order.  *Jim Walter Resources, Inc.,* 609 F.2d at 168 ("Intent is not an issue in civil contempt proceedings.").  Correspondingly, by merely—and repeatedly—declaring that they were making every effort to comply with the Preliminary Injunction Order,[160] Goldman and Craig did not actually absolve themselves of their violations;

---

[160] Craig to Cole, July 3, 2010:  "Let me ask our lawyers what to do….I am lost in all this stuff….as far as I understand we are allowed to talk." [Finding of Fact No. 58].

subjective good faith in their compliance is *no* defense to a motion for contempt.  *Peters v. Sage Group Assocs.*, 238 A.D.2d 123, 123 (N.Y. App. 1997) ("[I]t is not for the recipient of [the] order to fashion [his] own remedy.").  By announcing, "I'm innocent,"[161] while engaging in the prohibited conduct does not render the conduct itself just, valid or legal.  *Gompers*, 221 U.S. at 450 (1911) (If a party can "make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery."); *see Baer v. Albano*, 50 N.Y.S.2d 284, 286 (N.Y. 1944) (rejecting a similar excuse from a debtor who collected money while the automatic stay was in place, saying "[the court] do[es] not consider this an exculpatory explanation.").  The Court therefore rejects Craig and Goldman's attempts to nullify their violations of the Preliminary Injunction Order simply by saying that they were not in contempt, or that they were close to—but not over—the "line."[162]

Despite these empty assertions, the question remains:  did Goldman and Craig substantially comply with the Preliminary Injunction Order, or even make a reasonable effort to comply?  *U.S. Steel Corp.,* 598 F.2d at 368.  After receiving notice of the Preliminary Injunction

---

Craig to Cole, July 4, 2010:  "[Y]ou ARE ALLOWED to talk to me…..we know each other, talk about Detroit and I am not a direct plaintif [sic] in skyport…."  [*Id.*].

Goldman to Craig, July 9, 2010:  "We are doing everything we can without violating the Court's order."  [Finding of Fact No. 68].

[161] Craig to Goldman, June 11, 2010:  "Just spoke to Dawn…FYI—she got an email from RK saying noone [sic] can contact her…???  I guess I can."  [Finding of Fact No. 40].

[162] Goldman to Craig, June 20, 2010:  "I can make some calls for [Cole], try to help her find a job.  But, it must be at her initiative."  [Finding of Fact No. 48].

Goldman to Craig, June 21, 2010:  "Pls confirm with Dawn that she is the one who contacted you and is asking you for help.  I do not want to be in a situation where it looks like you are contacting her or we are offering her anything in return for her testimony."  [*Id.*].

Goldman to Craig, June 21, 2010: "I realize you are not a [Schermerhorn Party], but I do not want to create an appearance that we are using you to communicate with her.  I understand the conversations with her were at her initiative and that she reached out to you to help her with her issues paying counsel in Canada, and in finding a job, but I do not want this in any way connected to the SkyPort case."  [*Id.*].

Order—which Goldman, in fact, signed through co-counsel—both men appeared to make some preliminary attempts to comply with its terms.  For example, Goldman initially sent a few half-baked warnings to Craig not to communicate with Cole regarding SkyPort and the pending litigation in this Court. [Finding of Fact No. 48].  Craig also reached out to Goldman and his co-counsel to determine the scope of the Preliminary Injunction Order, to which Cole wholeheartedly agreed to comply.[163]   [Finding of Fact No. 58].  Almost immediately, however, particularly after Cole agreed to aid the Schermerhorn Parties' side, Goldman and Craig abandoned their sense of caution, freely transmitting questions, information, counsel, and even thousands of dollars in legal funds to Cole.  *See, e.g.*, [Finding of Fact Nos. 58–59].  These actions were <u>not</u> in "compliance" with the Preliminary Injunction Order, and more importantly, their efforts to comply were <u>not</u> reasonable and substantial.

In fact, recognizing that the Schermerhorn Parties may have had a legitimate and urgent need to speak to people like Cole, the Court incorporated quick and easy procedures within the Preliminary Injunction Order to obtain sufficient permission.  Goldman and Craig ignored them all, choosing instead to carry on communications with Cole for *months* behind the SkyPort Parties' and this Court's backs.  For example, even in October of 2010, Goldman submitted an affidavit to this Court which mentioned two minimal instances of contact with Cole, but conveniently failed to reveal the dozens of e-mails among Craig, Cole and himself.  [Finding of Fact No. 91].  For his part, and despite his right to do so, Craig never reached out to this Court either to assert his independence or affirm his compliance, or indeed, even to reveal his existence.  Miserably and unreasonably in noncompliance with the Preliminary Injunction Order, perhaps Goldman and Craig simply hoped that asking forgiveness would be easier than asking

---

[163] Craig to Cole, July 3, 2010:  "**Let me ask our lawyers what to do….**I am lost in all this stuff"  [Finding of Fact No. 58] (emphasis added).  Cole to Craig, July 3, 2010:  "I'll do what ever [the lawyers] say is best."  [*Id.*].

for permission.  Whatever their reasoning, Goldman and Craig have failed to demonstrate that there are sufficient mitigating circumstances to avoid contempt.

### H.      Sanctions for Civil Contempt

Overall, the Court is given wide discretion to fashion sanctions for civil contempt.[164]  *E. Ingraham Co. v. Germanow*, 4 F.2d 1002, 1003 (2d Cir. 1925); *Danielson v. United Seafood Workers*, 405 F. Supp. 396, 403 (S.D.N.Y. 1975).  However, sanctions imposed after a finding of civil contempt should serve two functions:  to coerce future compliance, and to remedy past non-compliance.  *United States v. United Mine Workers*, 330 U.S. 258, 302–04 (1947).

### 1.      Even Though the SkyPort Parties Have Not Proven Actual Damages, the Court Will Award Attorneys' Fees as Reparation

Many courts have ordered the payment of actual damages, including attorneys' fees, from one party to another as a civil contempt sanction.  *Petroleos Mexicanos v. Crawford Enters.,* 826 F.2d 392, 399 (5th Cir. 1987) ("[S]anctions for civil contempt are meant to be wholly remedial and serve to benefit the party who has suffered injury or loss at the hands of the contemnor.").  This sort of sanction is not vindictive, but simply acts as reparation, restoring the parties to the positions they would have been in had the respondent complied with the court's order in the first place.   *Vuitton et fils, S.A.*, 592 F.2d at 130; *see also Parker v. United States*, 153 F.2d 66, 70 (1st Cir. 1946).

The SkyPort Parties have not demonstrated that they suffered harm as a result of Goldman and Craig's conduct, and are seeking compensatory damages *only* in the amount of their attorneys' fees and expenses incurred to prosecute the Motion for Contempt and the

---

[164] While Goldman and Craig have not been sanctioned by a court before, the Court considers this fact to be relevant *only* the extent of the sanctions—*not* to whether this Court finds their conduct to be sanctionable.

Amended Second Motion for Sanctions.[165]  [Adv. Doc. No. 419 at pp. 10–11].  In response, the Schermerhorn Parties argue that proof of "actual damages"—*beyond* attorneys' fees—are required before this Court may sanction parties for their conduct, citing several cases for this proposition.  *See, e.g., Turner v. First Cmty. Credit Union (In re Turner)*, No. H-11-2825, 2012 U.S. Dist. LEXIS 35195, at \*3–4 (S.D. Tex. Mar. 15, 2012) (finding, in an unpublished opinion, that "[b]ankruptcy courts in this circuit routinely hold that a debtor may not recover attorney's fees if he fails to prove actual damages from a violation of an automatic stay.").

The Court agrees that some bankruptcy courts in the circuit, including this Court, have required proof of actual damages.  Indeed, *Turner* is an appeal of *this Court*'s decision of *Turner v. First Cmty. Credit Union (In re Turner)*, 462 B.R. 214 (Bankr. S.D. Tex. 2011).  *Turner*, however, is an extreme case.  There, debtors' counsel failed to prove "<u>any</u> damages" as a result of the defendant's violation of the automatic stay imposed by 11 U.S.C. § 362; attorneys' fees or otherwise.  *Id.* at 224–25 ("Debtors' counsel was literally drawing a blank as to the amount of actual damages when he submitted his proposed findings and conclusions. . . A 'skeletal argument,' really nothing more than an assertion, does not prove damages" (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))) (emphasis added).  Moreover, the Court does not read the United States District Court's *Turner* opinion as establishing a rule that a debtor may never recover attorneys' fees if he fails to prove actual damages; instead, *Turner* purely points out a general consensus and finds that this conclusion is not "clearly erroneous." *In re Turner*, 2012 U.S. Dist. LEXIS 35195, at \*4.

---

[165]  In addition to their attorneys' fees and expenses for the prosecution of the Amended Second Motion for Sanctions, the SkyPort Parties have requested the award of attorneys' fees and costs related their defense against the Motion to Dissolve as well as their prosecution in favor of a permanent injunction order.  [Adv. Doc. No. 419 at pp. 10–11].  The Court declines to grant such an award; these proceedings were unrelated to Goldman and Craig's contempt, and any fees were not incurred as a *direct result* of Goldman and Craig's misconduct.  Further, and as discussed below in Section I, the Court has concluded that it should grant the Motion to Dissolve and deny the motion for a permanent injunction order.  Accordingly, the SkyPort Parties must bear their own costs related to these matters.

Further, this Court decided *Turner* under a specific provision of the Code—§ 362, which it concluded required proof of actual damages before awarding attorneys' fees. *In re Turner*, 462 B.R. at 225 ("[W]hen a statute requires proof of actual damages," then failure to prove actual damages "will not lead to a successful result for the client.").   The dispute at bar, however, is governed by § 105, which requires that this Court conduct an entirely different analysis than in *Turner*.   Under its § 105 power, the Court may clearly award attorneys' fees, even without proof of other actual damages. *Chambers*, 501 U.S. at 45–46 (internal citations omitted) (concluding that the district court did not abuse its discretion in awarding attorneys' fees as a sanction. Indeed, assessment of attorneys' fees is a "less severe sanction," and "undoubtedly within a court's inherent power," particularly where a party has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons."); *Hutto v. Finney*, 437 U.S. 678, 689–90 n.14 (1978) ("An equity court has the unquestioned power to award attorney's fees against a party who shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order," noting that an attorneys' fee award "makes the prevailing party whole for expenses caused by his opponent's obstinacy").

In *Lance v. Plummer*, for example, the Fifth Circuit failed to even mention the word, "damages," much less make a finding of "actual damages."   353 F.2d 585 (5th Cir. 1965). Nevertheless, it held that "the order requiring the payment of the attorney's fee and the costs of bringing the proceedings" was not punitive, and the award of attorneys' fees is "entirely permissible in a civil contempt proceeding. . . ."   *Id.* at 592.   Attorneys' fees "are clearly compensatory to the injured party." *Id.* (citing *Textag Co. v. Hayslip*, 192 F.2d 435 (5th Cir. 1951)).   In a more recent Southern District of Texas case, the district court upheld a challenge to the bankruptcy court's award of attorneys' fees, finding that "the sanctions imposed by the

Bankruptcy Court are civil in nature and the amount of these sanctions is neither clearly erroneous nor an abuse of discretion." *Musslewhite v. O'Quinn (In re Musslewhite)*, 270 B.R. 72, 81 (S.D. Tex. 2000).   Additionally, in *Mooney v. Green Tree Serv., LLC (In re Mooney)*, 340 B.R. 351, 361 (Bankr. E.D. Tex. 2006), where the debtor asked *solely* for its attorneys' fees expended to prosecute the motion for contempt, a bankruptcy court permitted such an "assessment of actual damages."   Despite the lack of other "actual" damages, the award of attorneys' fees duly compensated the debtor.  *See id.*

Indeed, in a contempt proceeding, a court must often rely on a private litigant to bring the facts of the violation before it.  This is a valuable service, and "[b]y its action, the plaintiff in a contempt proceeding assists the court in enforcing its decrees against those who choose to ignore the orders of the court." *Fox Indus. v. Gurovich*, 2004 U.S. Dist. LEXIS 16797, at *9–12 (E.D.N.Y. July 15, 2004).   After all, it is not the *SkyPort Parties*' fault that revealing these violations resulted in "escalation" of this matter, *In re Newell*, 117 B.R. 323 (S.D. Ohio 1990), and which would otherwise have required "much less lawyering."   *In re Still*, 117 B.R. 251 (E.D. Tex. 1990).  To come to such a conclusion not only punishes the whistleblower, but hurts the integrity of the judicial system.  It discourages other parties from coming forward with evidence of contempt, and turns a court order into "mere mockery." *Gompers*, 221 U.S. at 450.

In sum, "it would be inequitable not to require the contumacious party" to pay the SkyPort Parties' resulting attorneys' fees and costs.  *Fox Indus.*, 2004 U.S. Dist. LEXIS 16797, at *9–12.   An award of the attorneys' fees incurred to prosecute a contempt proceeding is merely compensation.  *In re Mooney*, 340 B.R. at 361.  Thus, as the SkyPort Parties' fees and expenses were incurred as a *direct result* of Goldman and Craig's misconduct, these fees should not be rejected simply because the SkyPort Parties incurred no other damages.  Keeping in mind

182

one of the two main goals of a sanction (i.e., reparation for the past), the Court will award the SkyPort Parties' their reasonable attorneys' fees and costs, and therefore restore the SkyPort Parties to the position they would have been in had Goldman and Craig complied with this Court's order.  The Court is *not* punishing them for their behavior; it is ensuring that the SkyPort Parties are reimbursed for the expenses that they incurred as active, necessary, and justifiable participants in the Hearings.

> ## 2. This Court Will Not Impose Sanctions Against Any of the Schermerhorn Parties Who are Named Plaintiffs.

The SkyPort Parties expressly request that the Schermerhorn Parties, along with Goldman and Craig, reimburse the SkyPort Parties for their attorneys' fees and costs.  The Court disagrees. Certainly, Goldman and Craig can—and should—be held jointly and severally liable for these fees and costs.  *Laborers' International Union*, 882 F.2d at 955.  The Court expressly notes, however, that the Schermerhorn Parties should not be held liable.  This is not a case where imposing sanctions on a client for their attorneys' misdeeds will deter further violations.  *Official Unsecured Creditors' Comm. of Gen. Homes Corp. v. American Sav. & Loan Ass'n (In re General Homes Corp.)*, 181 B.R. 870, 882 (Bankr. S.D. Tex. 1994) ("The purpose of sanctions are to deter attorney and when applicable, client from future violations."). As Goldman and Craig are at fault, Goldman and Craig should jointly bear the cost.

> ## 3. The Court Will Not Award Punitive Damages.

In addition to attorneys' fees and expenses, the SkyPort Parties pray that this Court award punitive damages in the amount of $250,000.00 against Goldman, Craig and the Schermerhorn Parties.  Sanctions for civil contempt are meant to be wholly remedial.  *Petroleos Mexicanos,* 826 F.2d at 399.  They *must* either be compensatory or coercive.  *Int'l Union, UMW v. Bagwell*, 512 U.S. 821, 829 (1994); *see also Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585

(5th Cir. 2000); *Boylan*, 187 F.2d at 378 ("Civil contempt proceedings are . . . <u>not</u> punitive, in their nature") (emphasis added).   This proposed punitive fine, however, is neither.   It is not coercive because it does not provide Goldman and Craig with a "subsequent opportunity to reduce or avoid the fine through compliance" with this Court's orders.   *Bagwell*, 512 U.S. at 829. And, it is not compensatory because it is not based on any evidence of costs, fees or loss.   *Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 398 (5th Cir. 2004).   As a result, the $250,000.00 fee amounts to nothing more than a punitive, *criminal* sanction.   *Id.*   The Court declines to make this award.

<div align="center">4.   <u>The Court Will Not Award a Coercive Bond Against Future Violations.</u></div>

In addition to reparation, sanctions for civil contempt are permissible when they coerce future compliance with court orders.   *Boylan v. Detrio*, 187 F.2d 375, 378 (5th Cir. 1951) ("Civil contempt proceedings are remedial and coercive . . . ").   In accordance with this goal, the SkyPort Parties request that the Court require the Schermerhorn Parties post a bond of "not less than $250,000.00 to secure payment of damages and sanctions in the event of any future violations of this Court's injunctions."   [Adv. Doc. No. 419 at p. 11, ¶ 32].

There is a thin line between permissible civil "coercion" and impermissible criminal "punishment."   Civil contempt sanctions are generally viewed as non-punitive.   *Bagwell*, 512 U.S. at 831.   However, "unlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct."   *Id*.   The contempt power is therefore uniquely "liable to abuse," with so-called "coercive" bonds most likely to result in impermissible punitive fines.   *Id.*

Thus, while this Court has been vested with the power to impose coercive sanctions in order to ensure compliance with its own orders, here, the Court will demur. This power to sanction must be used with caution, and the Court will not grant the request that the Schermerhorn Parties post a bond. This Court has little doubt that the Schermerhorn Parties are acutely aware that this Court will enforce its own orders and that, going forwards, they will not to prosecute any of the derivative claims that this Court set forth in its order of January 13, 2011. [Adv. Doc. No. 273].

### I.        Other Pending Motions

Three other issues are pending before this Court: the Motion to Dissolve [Adv. Doc. No. 317], a motion requesting the Court's assurance that contacting certain individuals will not violate the Preliminary Injunction Order [Adv. Doc. No. 460]; and a motion for permission to contact certain enjoined individuals [Adv. Doc. No. 461]. Having remanded the direct claims to the Harris County District Court [Finding of Fact No. 104], and having now resolved Goldman and Craig's violations of the Preliminary Injunction Order by the issuance of this Opinion and an accompanying Order, the Court concludes that it should now dissolve the Preliminary Injunction Order; the irreparable danger to SkyPort has passed. Accordingly, the Court will grant the Motion to Dissolve [Adv. Doc. No. 317], and also grant the motions requesting this Court's assurance and permission to contact certain individuals [Adv. Doc. Nos. 460 & 461]. After all, the Schermerhorn Parties need to proceed to prosecute the State Court Lawsuit, and such prosecution includes interviewing potential witnesses.

Finally, in their original application for the Preliminary Injunction Order, the SkyPort Parties' request a permanent injunction [Finding of Fact No. 20]. This request should be denied; the Schermerhorn Parties have every right to try the direct causes of action in the Harris County

District Court, and prosecution of these causes of action necessarily involves conducting discovery and communicating with former employees of SkyPort.

## V.  CONCLUSION

When convinced that a clear, imminent and irreparable damage would befall SkyPort without action, this Court issued the Preliminary Injunction Order.  The Court did not enjoin the Schermerhorn Parties, their counsel and their agents as a meaningless exercise, nor did it include provisions which could be lightly thwarted through a third party.   And for their part, Goldman and Craig never objected to, nor sought any clarification of, the Preliminary Injunction Order's supposedly ambiguous language.  Instead, Goldman and Craig individually, and in conspiracy with each other, violated the Preliminary Injunction by intentionally and repeatedly contacting Cole, and by intentionally and repeatedly pursuing claims against the SkyPort Parties.  If the Court were to excuse such chicanery, the bankruptcy powers and judicial system would fail to properly function.   After all, "[c]ourts do not sit for the idle ceremony of making orders" with "no power in the tribunal to punish the offender."  *Berry v. Midtown Service Corp*., 104 F.2d 107, 110–11 (2d Cir. N.Y. 1939).  Rather, they are undeniably "possessed of ample power to protect" themselves from being "hampered or interfered with," both by those who are explicitly enjoined, as well as those third parties who would nullify the order.   *Id*.; *Waffenschmidt*, 763 F.2d at 716.

Accordingly, the Court will impose the above-described sanctions on Goldman and Craig—but not the Schermerhorn Parties—to ensure that the SkyPort Parties are reimbursed for the reasonable attorneys' fees and expenses that they incurred for bringing Goldman and Craig's contempt to this Court's attention, and therefore allowing this Court to vindicate its own orders.

That is the only relief that the Court grants the SkyPort Parties.  All other relief requested by the SkyPort Parties, including punitive damages, a coercive bond of at least $250,000.00, and a permanent injunction, is denied.

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

Signed on this 7th day of August, 2013.

_____
Jeff Bohm
Chief United States Bankruptcy Judge